XAVIER BECERRA
Attorney General of California
DAVID A. ZONANA, State Bar No. 196029
Supervising Deputy Attorney General
GEORGE TORGUN, State Bar No. 222085
MARY S. THARIN, State Bar No. 293335
CONNIE P. SUNG, State Bar No. 304242
Deputy Attorneys General
 1515 Clay Street, 20th Floor
 P.O. Box 70550
 Oakland, CA  94612-0550
 Telephone:  (510) 879-1974
 Fax:  (510) 622-2270
 E-mail:  Mary.Tharin@doj.ca.gov

*Attorneys for Plaintiffs State of California and the
California Air Resources Board*

HECTOR BALDERAS
Attorney General of New Mexico
ARI BIERNOFF, State Bar No. 231818
BILL GRANTHAM (*pro hac vice pending*)
Assistant Attorneys General
 201 Third St. NW, Suite 300
 Albuquerque, NM 87102
 Telephone:  (505) 717-3520
 E-Mail:  wgrantham@nmag.gov

*Attorneys for Plaintiff State of New
Mexico*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA, by and through XAVIER BECERRA, ATTORNEY GENERAL, and the CALIFORNIA AIR RESOURCES BOARD; and STATE OF NEW MEXICO, by and through HECTOR BALDERAS, ATTORNEY GENERAL,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**RYAN ZINKE,** Secretary of the Interior; **JOSEPH R. BALASH,** Assistant Secretary for Land and Minerals Management, United States Department of the Interior; **UNITED STATES BUREAU OF LAND MANAGEMENT**; and **UNITED STATES DEPARTMENT OF THE INTERIOR,**<br><br>Defendants. | Case No. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>(Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*) |

**INTRODUCTION**

1.      Plaintiffs State of California, by and through Xavier Becerra, Attorney General, and

the California Air Resources Board, and State of New Mexico, by and through Hector Balderas,

Attorney General ("Plaintiffs") bring this action to challenge the latest decision by the U.S.

1

Bureau of Land Management, *et al*. ("BLM" or "Defendants") to roll back the 2016 Waste Prevention Rule—a commonsense measure that would reduce the enormous waste of natural gas on public lands that results from venting, flaring, and equipment leaks.  After twice attempting to illegally suspend the rule, Defendants now seek to erase its key provisions from the books.  In doing so, however, BLM has violated the Administrative Procedure Act ("APA"), the Mineral Leasing Act ("MLA"), and the National Environmental Policy Act ("NEPA").

2.      BLM, a component of the U.S. Department of the Interior ("DOI"), finalized the Waste Prevention, Production Subject to Royalties, and Resource Conservation Rule ("Waste Prevention Rule" or "Rule"), on November 18, 2016, after conducting a multi-year process of stakeholder engagement, analysis, and review of thousands of public comments.  81 Fed. Reg. 83,008, 83,010 (Nov. 18, 2016).  The Waste Prevention Rule provided a much-needed update to 38-year-old regulations governing the waste of natural gas from new and existing oil and gas operations on federal and Indian lands, and clarified when gas lost through venting, flaring, or leaks is subject to royalties.  These prior regulations preceded the development of technologies, such as directional drilling and hydraulic fracturing techniques, that have significantly affected both the manner and volume of gas produced and wasted.  *Id*. at 83,017.  BLM specifically found that its prior regulations were inadequate to prevent the waste of publicly-owned resources and the volume of natural gas lost during production on public and tribal lands was "unacceptably high."  *Id*. at 83,009-10, 83,015.

3.      In 2016, BLM estimated that the Rule would have substantial annual benefits, including capturing and putting to use up to 41 billion cubic feet of otherwise-wasted natural gas, eliminating 175,000–180,000 tons of methane emissions, cutting emissions of volatile organic compounds by 250,000–267,000 tons, reducing toxic air pollutants by 1,860–2,030 tons, and generating up to $14 million in additional royalties.  *Id*. at 83,014.  The Rule became effective on January 17, 2017.

4.      Soon after the change in Presidential administration in January 2017, BLM initiated a series of illegal attempts to prevent implementation of the Rule.  First, the agency purported to postpone certain compliance dates of the Rule even though it had already gone into effect—an

2

1    illegal action that was vacated by this Court.  *State of California v. U.S. Bureau of Land Mgmt.*,

2    277 F. Supp. 3d 1106 (N.D. Cal. 2017).  Then, BLM finalized a rule to suspend certain

3    requirements of the Rule pending its reconsideration.  Again, this Court found the agency's action

4    unlawful, holding that BLM had failed to provide any reasoned basis for its action or adequate

5    notice and comment as required by the APA.  *State of California v. Bureau of Land Mgmt.*, 286

6    F. Supp. 3d 1054 (N.D. Cal. 2018).

7         5.     On September 18, 2018, BLM issued a final rule repealing the key requirements of

8    the Waste Prevention Rule ("Waste Rule Repeal").  In doing so, BLM failed to offer a reasoned

9    explanation for repealing requirements that, just two years ago, the agency determined were

10   necessary to fulfill its statutory mandates.  The rationale that BLM does provide—that the Waste

11   Prevention Rule would "unnecessarily encumber energy production, constrain economic growth,

12   and prevent job creation"—lacks merit and is directly contradicted by the record.  BLM's new

13   assertion that the costs of the Waste Prevention Rule now exceed its benefits is based on an

14   "interim domestic social cost of methane" metric that is arbitrary and not supported by the best

15   available science.  Furthermore, BLM's new definition of "waste of oil or gas" is contrary to the

16   language of the Mineral Leasing Act and is arbitrary and unworkable.  Finally, BLM's

17   perfunctory conclusion that the Waste Rule Repeal would result in no significant environmental

18   impacts violates the requirements of NEPA.

19        6.     Accordingly, Plaintiffs seek a declaration that Defendants' issuance of the Waste

20   Rule Repeal violated the APA, the MLA, and NEPA, and request that the Court vacate and set

21   aside the Waste Rule Repeal, so that the Waste Prevention Rule is reinstated in its entirety.

                              **JURISDICTION AND VENUE**

23        7.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the

24   laws of the United States), 28 U.S.C. § 1361 (action to compel officer or agency to perform duty

25   owed to Plaintiffs), and 5 U.S.C. §§ 701–706 (Administrative Procedure Act).  An actual

26   controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court

27   may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201–

28   2202 and 5 U.S.C. §§ 705–706.

                                    3

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(C) because this is the judicial district in which Plaintiffs State of California and the California Air Resources Board reside, and this action seeks relief against federal agencies and officials acting in their official capacities.

**INTRADISTRICT ASSIGNMENT**

9.     Pursuant to Civil Local Rules 3-5(b) and 3-2(c), there is no basis for assignment of this action to any particular location or division of this Court.  However, this case is related to Case No. 3:17-cv-07186-WHO, which challenged BLM's previous attempt to suspend the Waste Prevention Rule and is currently pending in the San Francisco Division.  Pursuant to Civil Local Rule 3-12(b), Plaintiffs intend to promptly file an Administrative Motion to Consider Whether Cases Should Be Related.

**PARTIES**

10.     Plaintiff STATE OF CALIFORNIA brings this action by and through Attorney General Xavier Becerra.  The Attorney General is the chief law enforcement officer of the State and has the authority to file civil actions in order to protect public rights and interests, including actions to protect the natural resources of the State.  Cal. Const., art. V, § 13; Cal. Gov. Code §§ 12600-12612.  This challenge is brought in part pursuant to the Attorney General's independent constitutional, statutory, and common law authority to represent the public interest.

11.     Plaintiff CALIFORNIA AIR RESOURCES BOARD ("CARB") is a public agency of the State of California within the California Environmental Protection Agency.  The mission of CARB is to promote and protect public health, welfare, and ecological resources of California's citizens through the monitoring and protection of air quality.  CARB's major goals include providing safe, clean air to all Californians, reducing California's emission of greenhouse gases, and providing leadership and innovative approaches for implementing air pollution controls.  In addition to developing statewide rules, CARB works with local California air districts, many of which regulate oil and gas pollution at the regional or county level.

12.     California contains millions of acres of federal and tribal lands that are managed by Defendants for energy production.  These lands contain approximately 600 producing oil and gas

4

leases covering more than 200,000 acres and 7,900 usable oil and gas wells.  California is a leading state in terms of fossil fuel extraction on public lands—producing about 9.3 million barrels of oil and 12.91 billion cubic feet of natural gas in 2017.

13.     Plaintiff STATE OF NEW MEXICO brings this action by and through Attorney General Hector Balderas.  The Attorney General of New Mexico is authorized to prosecute in any court or tribunal all actions and proceedings, civil or criminal, when, in his judgment, the interest of the state requires such action.  N.M. Stat. Ann. § 8-5-2.

14.     More than one-third of New Mexico's land is federally administered, and New Mexico is the second-highest state in the nation in the number of producing oil and natural gas leases on federal land.  In 2017, New Mexico produced approximately 801 billion cubic feet of natural gas and 89 million barrels of crude oil on federal lands.  New Mexico has the third highest volume of flared oil-well gas among all states.

15.     Plaintiffs have a clear monetary stake in Defendants' decision to repeal certain provisions of the Waste Prevention Rule because wasting natural resources deprives states of royalty revenue.  In 2017, California received $57.8 million in royalties from federal mineral extraction within the State.  Royalties from federal oil and gas development in California are deposited into the State School Fund, which supports public education.  New Mexico received $988 million in federal mineral extraction royalties in 2017.  New Mexico, whose per-pupil education spending is below the national average, uses its federal mineral leasing royalty payments for educational purposes.  One study estimates that New Mexico lost between $39 million and $46 million in royalties from venting and flaring between 2010 and 2015.  This figure does not include lost royalties from leaks.  Thus, minimizing waste of natural gas in order to maximize royalty recovery in California and New Mexico serves vital societal interests.

16.     Plaintiffs further have a strong interest in preventing adverse air quality impacts from the production of fossil fuels in their States.  More than 95 percent of federal drilling in California occurs in Kern County, parts of which are in nonattainment with the 2008 federal 8-hour ozone standard and federal fine particulate matter standards, as well as numerous state ambient air quality standards.  Excess pollution in this part of California—including methane, particulate

5

matter, volatile organic compounds ("VOCs"), and toxic air pollution from the oil and gas industry—significantly increases rates of asthma, heart disease, and lung disease, and raises cancer risk. While California has state regulations issued by CARB and local air districts, certain provisions of CARB's oil and gas regulations do not require compliance until 2019. Further, the Waste Prevention Rule provides an additional federal layer of regulation and enforcement that addresses the air pollution issues related to oil and gas production on federal lands within California and provides a regulatory floor for natural resource extraction across multiple states.

17.     In New Mexico, the San Juan Basin in the Four Corners region is the home of the nation's largest methane "cloud" resulting from extensive oil and gas development in that region. VOC emissions from oil and gas development have led to high ozone concentrations, resulting in an "F" grade for San Juan County from the American Lung Association in 2016. Because BLM leases in New Mexico represent a disproportionately large share of federal and tribal natural gas emissions, BLM's repeal of the Rule will result in thousands of additional tons of VOCs being emitted in New Mexico. New Mexico does not have state regulations in place to adequately address venting, flaring, and leaks from oil and gas production, and lacks authority to regulate cross-border emissions from neighboring states that impact the health and safety of its residents.

18.     Plaintiffs also have a strong interest in preventing and mitigating harms that climate change poses to human health and the environment, including increased heat-related deaths, damaged coastal areas, increased wildfire risk, disrupted ecosystems, more severe weather events, and longer and more frequent droughts. *See Massachusetts v. EPA*, 549 U.S. 497, 521 (2007). Methane is an extremely potent greenhouse gas, with climate impacts roughly 86 times those of carbon dioxide when measured over a 20-year period, or 25 times when measured over a 100-year period.

19.     California is already experiencing the adverse effects of climate change, including increased risk of wildfires, a decline in the average annual snowpack that provides approximately 35 percent of the State's water supply, increased erosion of beaches and low-lying coastal properties from rising sea levels, and increased formation of ground-level ozone (or smog), which is linked to asthma, heart attacks, and pulmonary problems, especially in children and the elderly.

6

1   California law establishes targets to reduce the State's greenhouse gas emissions to 1990 levels

2   by 2020 and 40 percent below 1990 levels by 2030, and to achieve 100 percent of electricity sales

3   from renewable energy and zero-carbon resources by 2045.  California has committed to reducing

4   greenhouse gas emissions, including through the development of methane-curbing regulations for

5   oil and gas operations and pipelines.

6          20.    As a state in the arid Southwest, New Mexico is also experiencing the adverse effects

7   of climate change and will suffer additional impacts in the future.  Average temperatures in New

8   Mexico have been increasing 50 percent faster than the global average over the past century,

9   streamflow totals in the Rio Grande and other rivers in the Southwest are declining, and

10  projections of further reduction of late-winter and spring snowpack pose increased risks to water

11  supplies needed to maintain cities, agriculture, and ecosystems.  Further, drought and increased

12  temperatures due to climate change have contributed to extensive tree death across the Southwest.

13         21.    The Waste Rule Repeal will adversely impact Plaintiffs by increasing emissions of

14  hazardous air pollutants and greenhouse gases, reducing royalty collections, and wasting fossil

15  fuel resources that belong to the public.  Consequently, Plaintiffs have suffered a legal wrong as a

16  result of Defendants' action and have standing to bring this suit.

17         22.    Defendant RYAN ZINKE is the Secretary of the United States Department of the

18  Interior, and is sued in his official capacity.  Mr. Zinke has responsibility for implementing and

19  fulfilling the duties of the United States Department of the Interior, including the development of

20  fossil fuel resources on public lands, and bears responsibility, in whole or in part, for the acts

21  complained of in this Complaint.

22         23.    Defendant JOSEPH R. BALASH is the Assistant Secretary for Land and Minerals

23  Management, United States Department of the Interior, and is sued in his official capacity.  Mr.

24  Balash signed the Waste Rule Repeal and bears responsibility, in whole or in part, for the acts

25  complained of in this Complaint.

26         24.    Defendant UNITED STATES BUREAU OF LAND MANAGEMENT is an agency

27  within the United States Department of the Interior that is charged with managing the federal

28

7

1  onshore oil and gas program and bears responsibility, in whole or in part, for the acts complained

2  of in this Complaint.

3       25.    Defendant UNITED STATES DEPARTMENT OF THE INTERIOR is an executive

4  branch department of the U.S. government that is the parent agency of BLM and bears

5  responsibility, in whole or in part, for the acts complained of in this Complaint.

6  **STATUTORY BACKGROUND**

7  **I.    FEDERAL LAND MANAGEMENT STATUTES.**

8       26.    Defendants' duties to minimize waste and to regulate royalties from oil and gas

9  operations on federal and Indian lands are established by several federal statutes.  The Secretary

10  of the Interior has delegated these statutory responsibilities to BLM.  First, the Mineral Leasing

11  Act of 1920 ("MLA"), 30 U.S.C. § 181 *et seq*., instructs BLM to require oil and gas lessees to

12  observe "such rules … for the prevention of undue waste as may be prescribed by [the]

13  Secretary," to protect "the interests of the United States," and to safeguard "the public welfare."

14  *Id*. § 187.  The MLA specifically requires BLM to ensure that "[a]ll leases of lands containing oil

15  or gas … shall be subject to the condition that the lessee will … use all reasonable precautions to

16  prevent waste of oil or gas developed in the land … ."  *Id*. § 225.

17       27.    Pursuant to the Indian Mineral Leasing Act of 1938, 25 U.S.C. §§ 396a–396g, and the

18  Indian Mineral Development Act of 1982, 25 U.S.C. §§ 2101–08, BLM has authority to regulate

19  oil and gas development on 56 million acres of Indian mineral estate held in trust by the federal

20  government.  *See, e.g.*, 25 U.S.C. § 396d (oil and gas operations on Indian lands subject "to the

21  rules and regulations promulgated by the Secretary").  As stated by BLM, the Waste Prevention

22  Rule "helps to meet the Secretary's statutory trust responsibilities with respect to the development

23  of Indian oil and gas interests" because it "will help ensure that the extraction of natural gas from

24  Indian lands results in the payment of royalties to Indian mineral owners, rather than the waste of

25  owners' mineral resources."  81 Fed. Reg. at 83,020.  The Rule also meets these responsibilities

26  because "tribal members and individual Indian mineral owners who live near Indian oil and gas

27  development will realize environmental benefits as a result of this rule's reductions in flaring and

28  air pollution from Indian oil and gas development."  *Id*. at 83,021.

8

Complaint for Declaratory and Injunctive Relief  (Case No. TBD)

28.   BLM has authority to regulate royalty payments pursuant to the Federal Oil and Gas Royalty Management Act of 1982 ("FOGRMA"), 30 U.S.C. § 1701 *et seq*.  In FOGRMA, Congress reiterated its concern about waste of public resources by providing that: "Any lessee is liable for royalty payments on oil or gas lost or wasted from a lease site when such loss or waste is due to negligence on the part of the operator of the lease, or due to the failure to comply with any rule or regulation, order or citation issued under this chapter or any mineral leasing law." *Id*. § 1756.

29.   The Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq*., provides BLM with broad authority to regulate "the use, occupancy, and development of the public lands" under the principles of "multiple use and sustained yield." *Id*. § 1732.  Among other requirements, FLPMA mandates that BLM manage public lands "in a manner that will protect the quality of … ecological, environmental, [and] air and atmospheric … values," *id*. § 1701(a)(8), and provides that BLM "shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." *Id*. § 1732(b).

## II.   ADMINISTRATIVE PROCEDURE ACT.

30.   The Administrative Procedure Act, 5 U.S.C. § 551 *et seq*., governs the procedural requirements for agency decision-making, including the agency rulemaking process.  Under the APA, a "reviewing court shall … hold unlawful and set aside" agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706.  An agency action is arbitrary and capricious under the APA where the agency (i) has relied on factors which Congress has not intended it to consider; (ii) entirely failed to consider an important aspect of the problem; (iii) offered an explanation for its decision that runs counter to the evidence before the agency; or (iv) is so implausible that it could not be ascribed to a difference of view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*").  An agency does not have authority to adopt a regulation that is "manifestly contrary to the statute." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984).

31.     If an agency reverses course by repealing a fully-promulgated regulation, it is "obligated to supply a reasoned analysis for the change." *State Farm*, 463 U.S. at 42.  Further, an agency must show that "there are good reasons" for the reversal and that its new policy is "permissible under the statute." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  An agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate" when "its new policy rests upon factual findings that contradict those which underlay its prior policy." *Id.*  Moreover, an agency cannot suspend a validly promulgated rule without first "pursu[ing] available alternatives that might have corrected the deficiencies in the program which the agency relied upon to justify the suspension." *Public Citizen v. Steed*, 733 F.2d 93, 103 (D.C. Cir. 1984).

III.   **NATIONAL ENVIRONMENTAL POLICY ACT.**

32.     The National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.,* is the "basic national charter for the protection of the environment."  40 C.F.R. § 1500.1.  The fundamental purposes of the statute are to ensure that "environmental information is available to public officials and citizens before decisions are made and before actions are taken," and that "public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment."  *Id.* § 1500.1(b)-(c).

33.     To achieve these purposes, NEPA requires the preparation of a detailed environmental impact statement ("EIS") for any "major federal action significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  A "major federal action" may include "new or revised agency rules [and] regulations."  40 C.F.R. § 1508.18(a).  As a preliminary step, an agency may first prepare an environmental assessment ("EA") to determine whether the effects of an action may be significant.  40 C.F.R. § 1508.9.  If an agency decides not to prepare an EIS, it must supply a "convincing statement of reasons" to explain why a project's impacts are insignificant.  *Nat'l Parks & Conservation Ass'n v. Babbitt,* 241 F.3d 722, 730 (9th Cir. 2001).  However, an EIS must be prepared if "substantial questions are raised as to whether a project ... may cause significant degradation of some human environmental factor."  *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998).

10

1    34.    To determine whether a proposed action may significantly affect the environment,

2    NEPA requires that both the context and the intensity of an action be considered.  40 C.F.R. §

3    1508.27.  In evaluating the context, "[s]ignificance varies with the setting of the proposed action"

4    and includes an examination of "the affected region, the affected interests, and the locality."  *Id*. §

5    1508.27(a).  Intensity "refers to the severity of impact," and NEPA's implementing regulations

6    list ten factors to be considered in evaluating intensity, including "[t]he degree to which the

7    proposed action affects public health or safety," "[t]he degree to which the effects on the quality

8    of the human environment are likely to be highly controversial," "[t]he degree to which the

9    possible effects on the human environment are highly uncertain or involve unique or unknown

10   risks," and "[t]he degree to which the action may establish a precedent for future actions with

11   significant effects or represents a decision in principle about a future consideration."  *Id*. §

12   1508.27(b).  The presence of just "one of these factors may be sufficient to require the

13   preparation of an EIS in appropriate circumstances."  *Ocean Advocates v. U.S. Army Corps of*

14   *Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005).

15                           **FACTUAL AND PROCEDURAL BACKGROUND**

16   35.    BLM oversees more than 245 million acres of land and 700 million subsurface acres

17   of federal mineral estate, on which reside nearly 100,000 producing onshore oil and gas wells.

18   81 Fed. Reg. at 83,014.  In Fiscal Year 2015, the production value of this oil and gas exceeded

19   $20 billion and generated over $2.3 billion in royalties which were shared with tribes and states.

20   *Id*.; *see* 30 U.S.C. § 191(a).

21   36.    Oil and gas production in the United States has increased dramatically over the past

22   decade due to technological advances such as hydraulic fracturing and directional drilling.

23   81 Fed. Reg. at 83,009.  However, the American public has not fully benefitted from this increase

24   in domestic energy production because it "has been accompanied by significant and growing

25   quantities of wasted natural gas."  *Id*. at 83,014.  For example, between 2009 and 2015, nearly

26   100,000 oil and gas wells on federal land vented or flared enough gas to serve about 6.2 million

27   households for a year.  *Id*. at 83,009.  In 2014 alone, operators vented about 30 billion cubic feet

28   ("Bcf") and flared at least 81 Bcf of natural gas, approximately 4.1 percent of the total production

                                                11

1    from BLM-administered leases or enough natural gas to supply 1.5 million households for a year.

2    *Id*. at 83,010.  BLM found that leaks are the second largest source of vented gas from Federal and

3    Indian leases, accounting for about 4 Bcf of the natural gas lost in 2014.  *Id*. at 83,011.

4         37.    Prior to 2016, BLM's regulatory scheme governing the minimization of resource

5    waste had not been updated in over three decades.  *Id*. at 83,008.  Several oversight reviews,

6    including those by the Government Accountability Office ("GAO") and the Department of the

7    Interior's Office of the Inspector General, specifically called on BLM to update its "insufficient

8    and outdated" regulations regarding waste and royalties.  *Id*. at 83,009-10.  The reviews

9    recommended that BLM require operators to augment their waste prevention efforts and clarify

10   policies regarding royalty-free, on-site use of oil and gas.  *Id*.

11        38.    In 2014, BLM responded to these reports by initiating the development of a rule to

12   update its existing regulations on these issues.  *Id*.  After soliciting and reviewing input from

13   stakeholders and the public, BLM released its proposal in February 2016.  81 Fed. Reg. 6,616

14   (Feb. 8, 2016) ("Proposed Rule").  BLM received approximately 330,000 public comments,

15   including approximately 1,000 unique comments, on the Proposed Rule.  81 Fed. Reg. at 83,021.

16   The agency also hosted stakeholder meetings and met with regulators from states with significant

17   federal oil and gas production.  *Id*.

18        39.    BLM issued the final Waste Prevention Rule in November 2016.  *Id*. at 83,008.  In

19   the final Rule, BLM refined many of the provisions of the Proposed Rule based on public

20   comments to ensure both that compliance was feasible for operators, and that the Rule achieved

21   its waste prevention objectives.  *Id*. at 83,022–23.

22        40.    The Rule addressed each major source of natural gas waste from oil and gas

23   production—venting, flaring, and equipment leaks—through different requirements.  *Id*. at

24   83,010–13.  In particular, the Rule prohibited venting except under specified conditions, and

25   required updates to existing equipment.  *Id*. at 83,011–13.  The Rule's flaring regulations reduced

26   waste by requiring gas capture percentages that increased over time, providing exemptions that

27   are scaled down over time, and requiring operators to submit Waste Minimization Plans.  *Id*. at

28

Complaint for Declaratory and Injunctive Relief  (Case No. TBD)

83,011.  Leak detection provisions required semi-annual inspections for well sites and quarterly

inspections for compressor stations.  *Id*.

41.    In promulgating the Rule, BLM stated that it was advancing the mandates placed on

the agency by Congress to oversee federal oil and gas activities, and to ensure that lessees use all

reasonable precautions to prevent waste of public resources.  *Id*. at 83,009-10.  BLM found that

the Rule "is a necessary step in fulfilling its statutory mandate to minimize waste of the public's

and tribes' natural gas resources."  *Id*. at 83,010.

42.    BLM determined that the Rule's benefits outweighed its costs "by a significant

margin."  *Id*. at 83,014.  Using a peer-reviewed model known as the "social cost of methane,"

BLM measured the benefits of the Rule by considering "the cost savings that the industry would

receive from the recovery and sale of natural gas and the environmental benefits of reducing the

amount of methane (a potent GHG) and other air pollutants released into the atmosphere."  *Id*.

BLM estimated that the Rule would result in monetized benefits of $209–$403 million annually,

including the monetized benefits of reducing methane emissions by roughly 35 percent, and

would improve air quality and overall quality of life for residents living near oil and gas wells.  *Id*.

The Rule's costs, on the other hand, would be minimal—between $114 and $275 million per year

industry-wide—which even for small operators would result in an average reduction in profit

margin of just 0.15 percentage points.  *Id*. at 83,013-14.  BLM acknowledged that these cost

estimates could be overstated because they did not take into account operators that were already

in compliance with the requirements of the Rule.  *Id*. at 83,013.

43.    The Rule was immediately challenged by two industry groups and the States of

Wyoming and Montana (later joined by North Dakota and Texas) (collectively, "Petitioners") in

U.S. District Court for the District of Wyoming, on the alleged basis that BLM did not have

statutory authority to regulate air pollution, and that the Rule was arbitrary and capricious.

*Western Energy Alliance v. Jewell*, No. 2:16-cv-00280-SWS (D. Wyo. petition filed Nov. 16,

2016); *State of Wyoming v. Jewell*, No. 2:16-cv-00285-SWS (D. Wyo. petition filed Nov. 18,

2016) (collectively, the "Wyoming Litigation").  The Petitioners then moved for a preliminary

injunction.  The California Attorney General's Office, on behalf of the California Air Resources

13

1   Board, and the State of New Mexico, intervened in December 2016 on the side of BLM to defend

2   the Rule.  Several environmental organizations also intervened on the side of BLM to defend the

3   Rule.  On January 16, 2017, the Wyoming district court denied Petitioners' motions for a

4   preliminary injunction, finding that Petitioners had failed to establish a likelihood of success on

5   the merits or irreparable harm in the absence of an injunction.

6         44.    The Rule became effective on January 17, 2017.

7         45.    On March 28, 2017, President Donald Trump issued Executive Order 13783, entitled

8   "Promoting Energy Independence and Economic Growth."  82 Fed. Reg. 16,093 (Mar. 31, 2017).

9   Section 7 of that Executive Order, entitled "Review of Regulations Related to United States Oil

10  and Gas Development," specifically called on the Secretary of the Interior to review and "as soon

11  as practicable, suspend, revise, or rescind" the Waste Prevention Rule.  *Id*. at 16,096.

12        46.    The following day, Secretary of the Interior Ryan Zinke issued Secretarial Order

13  3349, which provided that within 21 days, BLM would review the Rule and issue an internal

14  report as to "whether the rule is fully consistent with the policy set forth in Section 1 of the March

15  28, 2017 E.O."  BLM published the results of its review on October 24, 2017.  *See* 82 Fed. Reg.

16  50,532 (Nov. 1, 2017).  This review consisted of less then a single page where BLM concluded,

17  without any rationale or justification, that "the 2016 final rule poses a substantial burden on

18  industry, particularly those requirements that are set to become effective on January 17, 2018."

19  *Id*. at 50,535.

20        47.    Concurrently, various states and industry groups lobbied members of Congress to

21  repeal the Waste Prevention Rule using the Congressional Review Act.  On May 10, 2017, the

22  United States Senate voted to reject this effort, leaving the Rule in effect.

23        48.    On June 15, 2017, BLM published a notice in the Federal Register purporting to

24  postpone certain compliance dates of the Rule subject to APA Section 705, 5 U.S.C. § 705.  82

25  Fed. Reg. 27,430 ("Postponement Notice").  Plaintiffs challenged this unlawful action on July 5,

26  2017 in the U.S. District Court for the Northern District of California.  On October 4, 2017, the

27  Court ruled that Section 705 did not apply to an already-effective rule, and that BLM had failed to

28  comply with the APA's notice and comment procedures.  *State of California v. United States*

14

1   *Bureau of Land Mgmt.,* 277 F. Supp. 3d 1106, 1121 (N.D. Cal. 2017).  The Court also found that

2   BLM's failure to consider foregone benefits rendered their action arbitrary and capricious in

3   violation of the APA.  *Id*. at 1123.  Thus, the Court vacated the Postponement Notice, and the

4   Rule went back into effect.  *Id*. at 1127.

5         49.   On December 8, 2017, BLM issued a final rule suspending key requirements of the

6   Waste Prevention Rule.  82 Fed. Reg. 58,050 (Dec. 8, 2017) ("Suspension").  To justify the

7   Suspension, BLM stated it had "concerns regarding the statutory authority, cost, complexity,

8   feasibility, and other implications" of the Rule, and therefore sought to suspend "requirements

9   that may be rescinded or significantly revised in the near future."  *Id.*  The States of California

10  and New Mexico challenged this second unlawful action in the U.S. District Court for the

11  Northern District of California and moved for a preliminary injunction.  This Court ruled in favor

12  of Plaintiffs once again, finding that BLM had failed to provide a reasoned analysis for the

13  Suspension or factual support for the concerns which allegedly justified this action.  *State of*

14  *California v. Bureau of Land Mgmt.*, 286 F. Supp. 3d 1054, 1068 (N.D. Cal. 2018).  The Court

15  also found that Suspension was likely to result in "concrete harms that BLM's own data suggests

16  are significant and imminent," such as significant emissions of methane, VOCs, and other

17  hazardous pollutants.  *Id*. at 1073-75.  Consequently, the Court enjoined the Suspension.  *Id*. at

18  1076.

19        50.   On February 22, 2018, BLM published a proposed "Rescission or Revision of Certain

20  Requirements" of the Waste Prevention Rule, 83 Fed. Reg. 7,924 ("Proposed Repeal"), in which

21  the agency proposed to repeal the majority of the Rule's provisions.  *Id*. at 7,928.  BLM offered

22  three primary justifications for the Proposed Repeal: 1) the agency had reconsidered the balance

23  of the Rule's burdens and benefits, 2) the Rule overlapped with other federal and state

24  requirements, and 3) the Rule would have an undue impact on marginal or low-producing wells.

25  *Id*. at 7,924.  The agency also requested comment on "whether the 2016 Rule is consistent with

26  [BLM's] statutory authority."  *Id*. at 7,927.  Plaintiffs submitted comments on the Proposed

27  Repeal on April 23, 2018, urging BLM to preserve the Waste Prevention Rule's important

28

15

1    requirements to prevent waste, protect public resources, boost royalty receipts for American

2    taxpayers, and ensure the safe and responsible development of oil and gas resources.

3        51.    On April 4, 2018, the Wyoming District Court issued an Order enjoining

4    implementation of all of the Waste Prevention Rule's provisions with January 2018 compliance

5    deadlines.  That Order has been appealed to the Tenth Circuit Court of Appeals.

6        52.    On September 18, 2018, BLM released a final rule entitled "Waste Prevention,

7    Production Subject to Royalties, and Resource Conservation; Rescission or Revision of Certain

8    Requirements."  The Waste Rule Repeal rescinded key provisions of the Waste Prevention Rule,

9    including: 1) waste minimization plans, 2) gas-capture percentages, 3) well drilling requirements,

10   4) well completion and related operations requirements, 5) pneumatic controller requirements, 6)

11   pneumatic diaphragm pump requirements, 7) storage vessel requirements, and 8) leak detection

12   and repair requirements.  The Waste Rule Repeal also modified requirements related to gas

13   capture, downhole well maintenance and liquids unloading, and measuring and reporting volumes

14   of flared and vented gas—effectively reverting to regulatory requirements that preceded the Rule.

15   BLM's justifications for the Waste Rule Repeal largely tracked those offered for the Proposed

16   Repeal: that the Waste Prevention Rule "added regulatory burdens that unnecessarily encumber

17   energy production, constrain economic growth, and prevent job creation"; that the Rule would

18   have "imposed compliance costs well in excess of the value of the resource (natural gas) that

19   would have been conserved," especially with regard to marginal wells; and that the Rule

20   overlapped with EPA and state requirements for oil and gas operations.  Further, BLM argued

21   that the Rule "exceeded the BLM's statutory authority to regulate the prevention of 'waste,'" and

22   it revised the regulatory definition of "waste of oil or gas" so that it would only apply "where

23   compliance costs are not greater than the monetary value of the resources they are expected to

24   conserve."

25       53.    The Waste Rule Repeal relies upon a Regulatory Impact Analysis that, unlike the

26   2016 Rule, concludes that the costs of the Rule's requirements outweigh the benefits by utilizing

27   an "interim domestic social cost of methane" metric that excludes the "global" costs resulting

28   from increased methane emissions.  BLM also prepared a Final Environmental Assessment

16

("EA") and Finding of No Significant Impact ("FONSI"), concluding that the Waste Rule Repeal would have no significant impacts on the environment.

**FIRST CAUSE OF ACTION**

**(Violation of the APA, 5 U.S.C. § 706)**

54.     Paragraphs 1 through 53 are realleged and incorporated herein by reference.

55.     An "agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change." *State Farm*, 463 U.S. at 42.  The Supreme Court has clarified that while an agency need not show that a new rule is better than the rule it replaced, it must demonstrate that "there are good reasons" for the replacement and that the new policy is "permissible under the statute." *Fox*, 556 U.S. at 515; *see Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1052 (9th Cir. 2010) (without providing any reasoned explanation, a court "cannot ascertain whether [the agency] has complied with its statutory mandate").  However, an agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate" when "its new policy rests upon factual findings that contradict those which underlay its prior policy." *Fox*, 556 U.S. at 515.  Any "unexplained inconsistency" between a rule and its repeal is "a reason for holding an interpretation to be an arbitrary and capricious change." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005).

56.     Here, Defendants have failed to provide a reasoned analysis for repealing the Waste Prevention Rule based on a nearly identical factual record that was before the agency during the multi-year rulemaking proceeding that resulted in that Rule's adoption.  Defendants have further failed to adequately explain inconsistencies between their new findings and those which, two years ago, they deemed to necessitate promulgation of the Waste Prevention Rule.

57.     Defendants have failed to provide a reasoned explanation regarding how the Waste Rule Repeal will achieve their statutory mandates to prevent waste, ensure the adequate payment of royalties, protect "the interests of the United States," safeguard "the public welfare" in federal mineral leases, protect air and atmospheric values, prevent unnecessary or undue degradation of the lands, or fulfill their statutory trust responsibilities on tribal lands.  And Defendants have not explained how the regulations and authorities that were in existence at the time that they

17

1    promulgated the Waste Prevention Rule, and to which they are now reverting, are sufficient to

2    address these mandates.

3           58.    Moreover, the justifications that Defendants do provide for the Waste Rule Repeal

4    are contradicted by evidence in the record.  For example, while Defendants cite newfound

5    concerns about compliance costs, Defendants previously found that marginal or low-producing

6    wells would *not* be overburdened by the Rule because, *inter alia*, the Rule contains a provision

7    allowing operators to propose a less costly alternative where compliance with the Rule would be

8    "so costly as to cause the operator to cease production and abandon significant recoverable oil or

9    gas reserves under a lease."  81 Fed. Reg. at 83,030.  In addition, Defendants do not explain why

10   they now consider the Rule to be duplicative of state and federal laws and regulations that were

11   largely already on the books when the Waste Prevention Rule was finalized.

12          59.    In addition, Defendants' reliance on an "interim domestic social cost of methane"

13   model is arbitrary and capricious for multiple reasons, including that it is outcome-seeking; fails

14   to take into account the best available science; undervalues the benefits of the Rule (including

15   benefits to public health and safety), apparently to justify repeal; fails to adequately address risk

16   and uncertainty; and ignores significant climate impacts.  Moreover, Defendants have failed to

17   justify why their newly estimated administrative burdens posed by the Rule are far higher than

18   what the agency calculated in 2016.

19          60.    Finally, Defendants failed to consider alternatives to repealing the Rule's key

20   requirements.  Defendants did not even explore the possibility of addressing any alleged

21   deficiencies with the Rule or allegedly-unreasonable burdens on regulated entities through, for

22   example, narrowly-tailored changes or exemptions.

23          61.    Accordingly, Defendants acted in a manner that was arbitrary, capricious, an abuse of

24   discretion, not in accordance with law, and in excess of their statutory authority.  Such action is in

25   violation of the APA.  5 U.S.C. § 706.  Consequently, the Waste Rule Repeal should be held

26   unlawful and set aside.

27   ///

28   ///

**SECOND CAUSE OF ACTION**

**(Violation of the MLA and the APA;**

**30 U.S.C. §§ 187, 225; 5 U.S.C. § 706)**

62.     Paragraphs 1 through 61 are realleged and incorporated herein by reference.

63.     The MLA requires oil and gas lessees to observe "such rules … for the prevention of undue waste as may be prescribed by [the] Secretary," to protect "the interests of the United States," and to safeguard "the public welfare."  30 U.S.C. § 187.  The MLA also requires BLM to ensure that "[a]ll leases of lands containing oil or gas … shall be subject to the condition that the lessee will … use all reasonable precautions to prevent waste of oil or gas developed in the land … ."  *Id*. § 225.

64.     Defendants' new definition of "waste of oil or gas," which would limit such waste to acts "where compliance costs are not greater than the monetary value of the resources they are expected to conserve," is contrary to law.  Under the Mineral Leasing Act, BLM must enforce leaseholders' use of "all reasonable precautions to prevent waste of oil or gas developed in the land," 30 U.S.C. § 225, and require leaseholders to comply with rules "for the prevention of undue waste," 30 U.S.C. § 187.  The statutory language makes clear that BLM must require leaseholders to prevent waste irrespective of such cost considerations.  Identifying "waste" only when resource value exceeds compliance costs effectively nullifies these statutory provisions and is contrary to law. *See, e.g., King v. Burwell*, 135 S. Ct. 2480, 2498 (2015), Scalia, J., dissenting) ("the rule against treating [a term] as a nullity is as close to absolute as interpretive principles get").

65.     Furthermore, BLM's new definition of "waste of oil or gas" is arbitrary and capricious.  This definition completely ignores BLM's statutory mandates to ensure that the American public receives a fair return on publicly-owned resources, as well as BLM's duty to protect public health and the environment.  This new definition is also contrary to the existing definition of "waste" found elsewhere in BLM's regulations, is incoherent given the variability in the size of operators and oil and gas price fluctuations, and constitutes an unexplained and unsupported change in position.

19

66.     Accordingly, Defendants acted in a manner that was arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of their statutory authority, in violation of the MLA and the APA.  30 U.S.C. §§ 187, 225; 5 U.S.C. § 706.  Consequently, the Waste Rule Repeal should be held unlawful and set aside.

### THIRD CAUSE OF ACTION

### (Violation of NEPA and the APA;

### 42 U.S.C. § 4332(2)(C); 5 U.S.C. § 706)

67.     Paragraphs 1 through 66 are realleged and incorporated herein by reference.

68.     NEPA requires federal agencies to take a "hard look" at the environmental consequences of a proposed activity before taking action.  *See* 42 U.S.C. § 4332.  To achieve this purpose, a federal agency must prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment."  *Id.* § 4332(2)(C); 40 C.F.R. § 1502.3.  To determine whether a federal action will result in significant environmental impacts, the federal agency may first conduct an EA.  40 C.F.R. §§ 1501.4, 1508.9.  An EA must include a discussion of the need for the proposal, alternatives to the proposed action, the environmental impacts of the proposed action and alternatives, and must provide "sufficient evidence and analysis for determining whether to prepare" an EIS or an EA and FONSI.  *Id.* § 1508.9.

69.     NEPA's implementing regulations specify several factors that an agency must consider in determining whether an action may significantly affect the environment, thus warranting the preparation of an EIS.  40 C.F.R. § 1508.27.  The presence of any single significance factor can require the preparation of an EIS.  "The agency must prepare an EIS if substantial questions are raised as to whether a project may cause significant environmental impacts."  *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 946 (9th Cir. 2014).

70.     As the comment letters from Plaintiffs, as well as Defendants' own analysis, demonstrate, there are substantial questions (if not certainties) regarding the Waste Rule Repeal's significant environmental impacts.  In particular, the Waste Rule Repeal will likely result in significant adverse impacts including increased air pollution and related public health impacts, climate change harms, and increased visual and noise impacts from venting, flaring, or leaking

20

billions of cubic feet of natural gas.  As the BLM states in the Waste Rule Repeal, "the final rule will remove almost all of the requirements in the 2016 rule that we previously estimated would … generate benefits of gas savings or reductions in methane emissions."

71.    However, in the EA and FONSI, BLM failed to take a "hard look" at these impacts, and improperly concluded that all impacts of the Waste Rule Repeal are not significant.

72.    Defendants' determination that the Waste Rule Repeal would result in no significant impacts, and its reliance on a FONSI and failure to prepare an EIS, constitutes agency action unlawfully or unreasonably withheld or delayed, in violation of the requirements of the APA and NEPA.  5 U.S.C. § 706(1); 42 U.S.C. § 4332(2)(C).  Defendants' failure to take a "hard look" at the direct, indirect, and cumulative impacts of the Waste Rule Repeal, including impacts related to air pollution, public health, and climate change harms, is also arbitrary and capricious, an abuse of discretion, and contrary to the requirements of the APA and NEPA.  5 U.S.C. § 706(2); 42 U.S.C. § 4332(2)(C).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.    Issue a declaratory judgment that Defendants acted arbitrarily, capriciously, contrary to law, abused their discretion, and failed to follow the procedure required by law in their promulgation of the Waste Rule Repeal, in violation of the MLA, NEPA, and the APA;

2.    Issue an order vacating Defendants' unlawful issuance of the Waste Rule Repeal so that the Waste Prevention Rule is automatically reinstated in its entirety;

3.    Award Plaintiffs their costs, expenses, and reasonable attorneys' fees; and

4.    Award such other relief as the Court deems just and proper.

Complaint for Declaratory and Injunctive Relief  (Case No. TBD)

1  Dated:  September 18, 2018                    Respectfully Submitted,

2                                                XAVIER BECERRA
                                                 Attorney General of California
3                                                DAVID A. ZONANA
                                                 Supervising Deputy Attorney General
4
                                                 /s/ Mary S. Tharin
5                                                MARY S. THARIN
                                                 GEORGE TORGUN
6                                                CONNIE P. SUNG
                                                 Deputy Attorneys General
7
                                                 *Attorneys for Plaintiff*
8                                                *State of California, by and through Xavier*
                                                 *Becerra, Attorney General, and the*
9                                                *California Air Resources Board*

10
                                                 HECTOR BALDERAS
11                                               Attorney General of New Mexico

12                                               /s/ Ari Biernoff
                                                 ARI BIERNOFF
13                                               BILL GRANTHAM
                                                 Assistant Attorneys General
14
                                                 *Attorneys for Plaintiff*
15                                               *State of New Mexico, by and through Hector*
                                                 *Balderas, Attorney General*
16

17

18

19

20

21

22

23

24

25

26

27

28

22

Complaint for Declaratory and Injunctive Relief  (Case No. TBD)