WYOMING ATTORNEY GENERAL'S OFFICE
ERIK E. PETERSEN, WSB No. 7-5608 (*pro hac vice pending*)
MICHAEL M. ROBINSON, WSB No. 6-2658 (*pro hac vice pending*)
Senior Assistant Attorneys General
2320 Capitol Avenue
Cheyenne, WY  82002
Telephone: (307) 777-6946
Facsimile: (307) 777-3542
erik.petersen@wyo.gov
mike.robinson@wyo.gov

DOWNEY BRAND LLP
CHRISTIAN L. MARSH (Bar No. 209442)
455 Market Street, Suite 1500
San Francisco, CA 94105
Telephone: (415) 848-4800
Facsimile: (415) 848-4801
cmarsh@downeybrand.com

Attorneys for THE STATE OF WYOMING

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, by and through XAVIER BECERRA, Attorney General, and the CALIFORNIA AIR RESOURCES BOARD; and STATE OF NEW MEXICO, by and through HECTOR BALDERAS, Attorney General,<br><br>              Plaintiffs,<br><br>      v.<br><br>RYAN ZINKE, Secretary of the Interior, JOSEPH R. BALASH, Assistant Secretary for Land and Minerals Management, United States Department of the Interior; UNITED STATES BUREAU OF LAND MANAGEMENT; and UNITED STATES DEPARTMENT OF THE INTERIOR,<br><br>              Defendants. | Case No. 4:18-Cv-05712-YGR<br><br>**STATE OF WYOMING'S CORRECTED NOTICE OF MOTION, MOTION, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE**<br><br>Date:   December 4, 2018<br>Time:   2:00 p.m.<br>Dept.:  Courtroom 1<br><br>Action Filed:  September 18, 2018 |

1535749.4

Case No. 4:18-cv-05712-YGR

STATE OF WYOMING'S CORRECTED NOTICE OF MOTION, MOTION, AND MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ....................................... 2

INTRODUCTION ................................................................................................ 2

BACKGROUND ................................................................................................. 3

ARGUMENT ....................................................................................................... 5

    I.      Wyoming is entitled to intervene as a matter of right. ........................... 5

           1.     Wyoming's motion is timely. .................................................. 6

           2.     Wyoming has a significant protectable interest. ...................... 7

           3.     Plaintiffs' challenge threatens to impair Wyoming's interests. ................ 10

           4.     The federal Defendants cannot adequately represent Wyoming's interests. .................................................................................. 11

    II.     In the alternative, the Court should grant Wyoming permission to intervene. .................................................................................. 12

CONCLUSION ................................................................................................. 13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page**

**Federal Court Cases**

*California ex rel. Lockyer v. United States,*
  450 F.3d 436 (9th Cir. 2006) ................................................................. 10

*California v. United States Bureau of Land Mgmt.,*
  277 F. Supp. 3d 1106 (N.D. Cal. 2017) ................................................... 4

*California v. United States Bureau of Land Mgmt.,*
  286 F. Supp. 3d 1054 (N.D. Cal. 2018) ................................................... 4

*County of Fresno v. Andrus,*
  622 F.2d 436 (9th Cir. 1980) ................................................................... 7

*Forest Conservation Council v. United States Forest Serv.,*
  66 F.3d 1489 (9th Cir. 1995) ................................................................. 11

*Fund for Animals v. Norton, Inc.,*
  322 F.3d 728 (D.C. Cir. 2003) ............................................................... 10

*Georgia v. United States Army Corps of Eng'rs,*
  302 F.3d 1242 (11th Cir. 2002) ............................................................. 12

*Kootenai Tribe of Idaho v. Veneman,*
  313 F.3d 1094 (9th Cir. 2002) ......................................................... 12, 13

*Nat'l Farm Lines v. Interstate Comm'n,*
  564 F.2d 381 (10th Cir. 1977) ............................................................... 11

*Natural Res. Defense Council v. Costle,*
  561 F.2d 904 (D.C. Cir. 1977) ................................................................. 7

*Sierra Club v. EPA,*
  995 F.2d 1478 (9th Cir. 1993) ............................................................. 6, 7

*Sierra Club v. Espy,*
  18 F.3d 1202 (5th Cir. 1994) ................................................................. 11

*Sw. Ctr. for Biological Diversity v. Berg,*
  268 F.3d 810 (9th Cir. 2001) ............................................................. 6, 11

*United States v. Aerojet Gen. Corp.,*
  606 F.3d 1142 (9th Cir. 2010) ................................................................. 6

*United States v. Alisal Water Corp.,*
  370 F.3d 915 (9th Cir. 2004) ................................................................... 6

*United States v. City of Los Angeles,*
  288 F.3d 391 (9th Cir. 2002) ....................................................... 6, 10, 11

*United States v. Oregon,*
  745 F.2d 550 (9th Cir. 1984) ................................................................... 6

*WildEarth Guardians v. Nat'l Park Serv.,*
  604 F.3d 1192 (10th Cir. 2010) ......................................................... 7, 10

*Wilderness Soc'y v. United States Forest Serv.,*

DOWNEY BRAND LLP

**TABLE OF AUTHORITIES**
(continued)

Page

630 F.3d 1173 (9th Cir. 2011) ........................................................................... Passim

*Wyoming ex rel. Crank v. United States*,
539 F.3d 1236 (10th Cir. 2008) ..................................................................... 8

*Wyoming v. United States Dep't of the Interior*
No. 16-cv-0285 (D. Wyo.) ........................................................................ 3, 4

*Wyoming v. United States Dep't of the Interior*
No. 16-cv-0280 (D. Wyo.) ........................................................................... 4

*Wyoming v. United States Dep't of the Interior*
Nos. 18-8027, 18-8029 (10th Cir.) .............................................................. 4

**Federal Rules and Regulations**

81 Fed. Reg. 83008  (Nov. 18, 2016) ..................................................................... 3

82 Fed. Reg. 16093  (March 31, 2017) ................................................................... 4

82 Fed. Reg. 16096  (March 31, 2017) ................................................................... 4

82 Fed. Reg. 27430  (June 15, 2017) ...................................................................... 4

82 Fed. Reg. 58050  (Dec. 8, 2017) ......................................................................... 4

83 Fed. Reg. 49184  (Sept. 28, 2018) ................................................................. 4, 5

Fed. R. Civ. P. 24 ................................................................. 1, 2, 3, 5, 6, 7, 12

**Additional Authorities**

*3B Moore's Federal Practice*, ¶ 24.07[4] at 24-78 (2d ed. 1995) ................................ 12

*Wyoming Dep't of Envtl. Quality, Comments to Proposed Rule, Waste Prevention,
Production Subject to Royalties, and Resources Conservation* (April 22, 2016) ................... 8-9

DOWNEY BRAND LLP

## NOTICE OF MOTION AND MOTION

Please take notice on December 4, 2018, at 2:00 p.m., or as soon thereafter as this matter may be heard before the Honorable Yvonne Gonzalez Rogers in the above-titled Court, located at the Oakland Courthouse, Courtroom 1, Fourth Floor, 1301 Clay Street, Oakland, California 94612, the State of Wyoming will, and hereby does, move for leave to intervene as a defendant in the above-captioned case under Federal Rule of Civil Procedure 24.

Wyoming hereby moves for leave to intervene as a matter of right under Federal Rule of Civil Procedure 24(a)(2) or, in the alternative, permissively under Federal Rule of Civil Procedure 24(b). In support of its motion, Wyoming submits the enclosed Memorandum of Points and Authorities and supporting affidavits. Also filed concurrently herewith are a proposed Order and Wyoming's proposed Answer to Plaintiffs' Complaint.

Counsel for Wyoming has conferred with counsel for all parties in this matter regarding its motion to intervene and understands that the States of California and New Mexico do not oppose Wyoming's motion. The federal Defendants take no position on the motion.

DATED: October 29, 2018                    DOWNEY BRAND LLP

By:   /s/ Christian L. Marsh
      Christian L. Marsh
      Attorneys for THE STATE OF WYOMING

DOWNEY BRAND LLP

1535749.4

1

Case No. 4:18-cv-05712-YGR

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2        The State of Wyoming has moved for leave to intervene in the above-captioned case as a

3   matter of right under Federal Rule of Civil Procedure 24(a)(2) or, in the alternative, permissively

4   under Federal Rule of Civil Procedure 24(b). Contemporaneously, Wyoming has filed a proposed

5   answer to Plaintiffs' First Amended Complaint pursuant to Federal Rule of Civil Procedure 24(c).

6   Wyoming offers this memorandum in support of its motion.

7

## INTRODUCTION

8        The States of California and New Mexico challenge a decision by the Bureau of Land

9   Management (BLM) to repeal certain provisions and revise others of a rule adopted in 2016 to

10  regulate methane emissions from the production of oil and gas on federal and Indian lands.

11  Plaintiffs ask this Court to vacate the new BLM rule and reinstate the 2016 rule in its entirety.

12  Wyoming seeks to intervene as a matter of right, or in the alternative, permissively, in this case to

13  defend BLM's rule repealing and revising the 2016 rule.

14        There are four factors courts evaluate to determine whether a party is entitled to intervene

15  as a matter of right: (1) the motion is timely; (2) the applicant has a significant protectable interest

16  relating to the property or transaction that is the subject of the action; (3) disposition of the action

17  may, as a practical matter, impair or impede the applicant's ability to protect its interest; and (4)

18  the existing parties may not adequately represent the applicant's interest. Wyoming meets all four

19  factors.

20        First, the motion is timely because the federal Defendants have not yet filed a responsive

21  pleading or the administrative record, and Wyoming's participation will not prejudice any party at

22  this early stage of the litigation. Second, Wyoming has significant, legally protectable interests at

23  stake in this litigation; in particular, the exercise of its sovereign power to enforce its air quality

24  rules and the economic benefits for the development of Wyoming's natural resources, both of

25  which the 2016 rule would negatively impact. Third, reinstatement of the 2016 rule would impede

26  the efficient and effective enforcement of Wyoming's air quality regulations and cost the State a

27  significant amount of revenue. Finally, the federal Defendants cannot adequately represent

28  Wyoming's sovereign interests. Alternatively, Wyoming meets the standard for permissive

DOWNEY BRAND LLP

1  intervention because it contests Plaintiffs' claims regarding the legality of the repeal and revisions

2  to the 2016 rule, satisfying the common question requirement. Accordingly, Wyoming meets the

3  requirements for intervention under Federal Rule of Civil Procedure 24, and its motion to

4  intervene should be granted.

5                                    **BACKGROUND**

6         On November 18, 2016, BLM published a final rule regulating the venting and flaring of

7  natural gas and setting air quality standards on emissions from existing oil and gas production

8  operations on federal and Indian land. 81 Fed. Reg. 83008 (Nov. 18, 2016) (2016 Rule). The 2016

9  Rule requires operators of oil and gas wells to take various actions ostensibly intended to reduce

10 the waste of gas during the production process but in practice are mechanisms to regulate air

11 quality. Specifically, the main provision of the 2016 Rule requires well operators to flare natural

12 gas rather than vent it. *Id.* at 83022-23. The 2016 Rule permits venting only in certain, limited

13 circumstances, such as when flaring is technically infeasible or in an emergency. *Id*. While the

14 2016 Rule replaces venting with flaring, it also requires a reduction in routine flaring over time.

15 *Id*. at 83023. Instead of flaring, operators must capture an increasing percentage of gas, from 85

16 percent in 2018-19 up to 98 percent beginning on January 1, 2026. *Id*. The 2016 Rule also

17 requires operators to adopt waste minimization plans, leak detection and repair programs, and to

18 update or replace equipment to prevent "gas losses from pneumatic controllers and pumps,

19 storage vessels, liquids unloading, and well drilling and completions." *Id*. at 83011-12. The 2016

20 Rule became effective on January 17, 2017, with many requirements, however, being phased-in

21 effective January 17, 2018, or later. *Id*. at 83011.

22         The State of Wyoming, among others, immediately challenged the 2016 Rule in the

23 United States District Court for the District of Wyoming. *Wyoming v. United States Dep't of the*

24 *Interior*, No. 16-cv-0285 (D. Wyo.) (Petition filed November 18, 2016). Among other reasons,

25 Wyoming asked the court to set aside the 2016 Rule because BLM's regulation of air quality

26 standards was outside its statutory authority and the 2016 Rule unlawfully interfered with

27 Wyoming's air quality pollution control regime and state implementation plan. (*Id*. at Dkt. No. 1).

28 In addition, Wyoming challenged the authority of BLM to use ancillary benefits – the impact of

DOWNEY BRAND LLP

1   the rule on global climate – in its cost-benefit analysis. (*Id*. at Dkt. No. 141). Absent the

2   inappropriate ancillary benefits, the annual costs of the 2016 Rule far exceed any savings, and

3   Wyoming thus argued that the 2016 Rule was arbitrary and capricious. (*Id*.).

4        While that case was pending, the President of the United States issued an executive order

5   directing BLM to review the 2016 Rule and propose rules "suspending, revising, or rescinding"

6   the 2016 Rule "if appropriate[.]" 82 Fed. Reg. 16093, 16096 (March 31, 2017). Consistent with

7   that directive, BLM postponed the compliance dates for certain phase-in provisions of the 2016

8   Rule. 82 Fed. Reg. 27430 (June 15, 2017) (Postponement Rule). Also, BLM announced its

9   intention to promulgate a rule suspending the compliance dates for the 2016 Rule's phase-in

10   provisions. *Id*.; 82 Fed. Reg. 58050 (Dec. 8, 2017) (Suspension Rule).

11        The States of California and New Mexico challenged the Postponement and Suspension

12   Rules in the Northern District of California. *See California v. United States Bureau of Land*

13   *Mgmt.*, 277 F. Supp. 3d 1106, 1112 (N.D. Cal. 2017); *California v. United States Bureau of Land*

14   *Mgmt.*, 286 F. Supp. 3d 1054, 1057 (N.D. Cal. 2018). Initially, the court held that BLM failed to

15   present a reasoned analysis for the Postponement Rule and vacated it. 277 F. Supp. 3d at 1122-23.

16   Later, the court granted a preliminary injunction enjoining the Suspension Rule. 286 F. Supp. 3d

17   at 1065-68, 1076.

18        After the California court enjoined the Suspension Rule, the Wyoming district court

19   stayed implementation of the 2016 Rule's phase-in provisions to preserve the status quo. *See*

20   *Wyoming v. United States Dep't of the Interior*, No. 16-cv-0285 (Dkt. No. 215) and No. 16-cv-

21   0280 (Dkt. No. 210) (D. Wyo.) (*Order Staying Implementation of Rule Provisions and Staying*

22   *Action Pending Finalization of Revision Rule* (issued April 4, 2018)) (Attachment 1 at 10).

23   Proponents of the 2016 Rule, including California and New Mexico, appealed the decision. That

24   matter is currently pending before the Tenth Circuit. *Wyoming v. United States Dep't of the*

25   *Interior*, Nos. 18-8027, 18-8029 (10th Cir.).

26        On September 28, 2018, BLM published a rule to rescind or revise provisions of the 2016

27   Rule. 83 Fed. Reg. 49184 (Sept. 28, 2018) (Revision Rule). BLM found that many of the

28   requirements of the 2016 Rule were not cost-effective and, indeed, "imposed compliance costs

DOWNEY BRAND LLP

STATE OF WYOMING'S CORRECTED NOTICE OF MOTION, MOTION, AND MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

1  well in excess of the value of the resource to be conserved." *Id*. at 49190. Accordingly, BLM

2  adopted the Revision Rule to limit waste without unnecessarily burdening production. *Id*. BLM

3  also recognized that numerous provisions of the 2016 Rule exceeded its authority to prevent

4  waste under the Mineral Leasing Act, imposed undue burdens on marginal or low-production

5  wells, and constrained economic growth and prevented job creation. *Id*. at 49185, 49187. The

6  Revision Rule rescinds the following provisions, among others, of the 2016 Rule: waste

7  minimization plans, equipment replacement or upgrade requirements, and leak detection and

8  repair programs. *Id*. at 49190. The Revision Rule amends the provisions relating to venting and

9  flaring. *Id*. While retaining the requirement to flare and not vent outside of limited exceptions, the

10 Revision Rule defers to state and tribal regulations for flaring. *Id*. at 49202-04. Consistent with

11 that deference, the Revision Rule eliminates the gas capture percentage requirement leaving the

12 question of capture up to the states and tribes. *Id*. at 49192-93. The Revision Rule addresses the

13 issues with the 2016 Rule Wyoming identified in its action to set aside that rule.

14       Before the Revision Rule's publication in the Federal Register, the States of California

15 and New Mexico filed this action challenging the new rule. (Dkt. No. 1). Plaintiffs subsequently

16 filed an amended Complaint on October 10, 2018. (Dkt. No. 29). Plaintiffs allege several

17 violations of federal law. Specifically, they allege the Revision Rule: (1) is arbitrary and

18 capricious in violation of § 706 of the APA because BLM failed to provide a reasoned

19 explanation; (2) violates the Mineral Leasing Act because the Revision Rule's definition of

20 "waste of oil and gas" conflicts with the Act's statutory provisions as well as being arbitrary and

21 capricious under the APA as the definition ignores statutory requirements for fair return on public

22 resources and other existing BLM definitions of "waste;" and (3) violates the National

23 Environmental Policy Act because BLM did not produce an environmental impact statement

24 assessing the impacts of the Revision Rule. (*Id*. at 18-23). Plaintiffs ask this Court to vacate the

25 Revision Rule and reinstate the 2016 Rule. (*Id*. at 23).

26                                                  **ARGUMENT**

27 **I.    Wyoming is entitled to intervene as a matter of right.**

28       Federal Rule of Civil Procedure 24(a)(2) governs intervention as a matter of right. An

DOWNEY BRAND LLP

STATE OF WYOMING'S CORRECTED NOTICE OF MOTION, MOTION, AND MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

applicant seeking to intervene as of right must show the following: (1) the motion is timely; (2) the applicant has a significant protectable interest relating to the property or transaction that is the subject of the action; (3) disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; and (4) the existing parties may not adequately represent the applicant's interest. *Wilderness Soc'y v. United States Forest Serv.*, 630 F.3d 1173, 1177 (9th Cir. 2011) (*en banc*) (*quoting Sierra Club v. EPA*, 995 F.2d 1478, 1481 (9th Cir. 1993)). In evaluating these factors, courts are required to take all well-pleaded, non-conclusory allegations in the motion to intervene as true absent "sham, frivolity or other objections." *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 820 (9th Cir. 2001).

The United States Court of Appeals for the Ninth Circuit normally interprets Federal Rule of Civil Procedure 24(a)(2) "'broadly in favor of proposed intervenors'" because "'[a] liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to courts.'" *Wilderness Soc'y*, 630 F.3d at 1179 (alteration in original) (*quoting United States v. City of Los Angeles*, 288 F.3d 391, 397-98 (9th Cir. 2002)). This Court is guided by "practical and equitable" considerations. *United States v. Aerojet Gen. Corp.*, 606 F.3d 1142, 1148 (9th Cir. 2010); *see also Sw. Ctr. for Biological Diversity*, 268 F.3d at 818 (construing "Rule 24(a) liberally in favor of potential intervenors").

Wyoming satisfies all four requirements for intervention as of right: (1) Wyoming's motion is timely because the case is in its early stages and allowing Wyoming to join the action will not cause prejudice or delay; (2) Wyoming has significant protectable interests in this case; (3) disposition of this case in Plaintiffs' favor would impair Wyoming's interests; and (4) the federal Defendants cannot adequately represent Wyoming's unique, sovereign interests.

### 1. Wyoming's motion is timely.

Courts use three factors to assess the timeliness of a motion to intervene: (1) the stage of the proceeding when intervention is sought; (2) the prejudice to the parties if intervention is permitted; and (3) the reasons for and length of any delay. *United States v. Alisal Water Corp.*, 370 F.3d 915, 921 (9th Cir. 2004). Of the three factors, prejudice is the most important for determining timeliness. *United States v. Oregon*, 745 F.2d 550, 552 (9th Cir. 1984).

DOWNEY BRAND LLP

1    In this action, Wyoming satisfies the three timeliness factors for intervention as of right.

2    First, this case is in its earliest stages. The federal Defendants have not yet filed a responsive

3    pleading nor have they filed the administrative record on which this case will be decided, and the

4    Court has not set a briefing schedule. Second, Wyoming's participation will not prejudice any of

5    the other parties, because Wyoming's participation will not delay resolution of the case. Finally,

6    Wyoming did not unreasonably delay filing this motion. Wyoming became aware of the suit

7    shortly after filing and has moved expeditiously to intervene. Accordingly, Wyoming's motion is

8    timely.

9           **2.      Wyoming has a significant protectable interest.**

10    Wyoming has a "significantly protectable interest relating to the property or transaction

11    which is the subject of the action[.]" *Wilderness Soc'y*, 630 F.3d at 1177 (quotation omitted).

12    "Rule 24(a)(2) does not require a specific legal or equitable interest[.]" *Id.* at 1179 (citing *County*

13    *of Fresno v. Andrus*, 622 F.2d 436, 438 (9th Cir. 1980)). Rather, the interest test is "primarily a

14    practical guide to disposing of lawsuits by involving as many apparently concerned persons as is

15    compatible with efficiency and due process." *Id.* (quotation omitted). "[A] prospective

16    intervenor's asserted interest need not be protected by the statute under which the litigation is

17    brought to qualify as 'significantly protectable' under Rule 24(a)(2)." *Id.* (citing *Sierra Club*, 995

18    F.2d at 1481, 1484). "[I]t is generally enough that the interest is protectable under some law, and

19    that there is a relationship between the legally protected interest and the claims at issue." *Id.*

20    (quotation omitted).

21    Indeed, the interest of a proposed intervenor may be impaired simply because "a decision

22    in the plaintiff's favor would return the issue to the administrative decision-making process."

23    *WildEarth Guardians v. Nat'l Park Serv.*, 604 F.3d 1192, 1199 (10th Cir. 2010). And although

24    proposed intervenors could vindicate their rights in that administrative decision-making process,

25    "it is not enough to deny intervention under 24(a)(2) because applicants may vindicate their

26    interests in some later, albeit more burdensome, litigation." *Natural Res. Defense Council v.*

27    *Costle*, 561 F.2d 904, 910 (D.C. Cir. 1977). "[E]specially in administrative law cases, questions

28    of 'convenience' are clearly relevant." *Id.*

DOWNEY BRAND LLP

Wyoming has significant, legally protectable interests at stake in this litigation. The 2016 Rule infringes on Wyoming's sovereign interests because it would intrude on Wyoming's right to regulate mineral production within its borders. *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008) ("States have a legally protected sovereign interest in 'the exercise of sovereign power over individuals and entities within the relevant jurisdiction[, which] involves the power to create and enforce a legal code."). Wyoming has implemented a comprehensive air quality regulatory program governing oil and gas extraction. The 2016 Rule will interfere with Wyoming's ability to enforce its air quality regulations and permitting process.

Venting and flaring emissions from oil and gas well production are subject to regulation under Chapter 6, Section 2 of the Wyoming Air Quality Standards and Regulations. (Vehr aff. at ¶ 13) (Attachment 2). Wyoming regulates emissions through permitting requirements for all new and modified oil and gas facilities. (*Id*.). Oil and gas production facilities are required to install air pollution controls that meet the best available control technology. (*Id*. at ¶¶ 14-18). Wyoming's air quality permits have conditions of operation to ensure compliance with air quality rules, regulations, and performance requirements. (*Id*. at ¶ 23). When reviewing applications and drafting proposed permit conditions, Wyoming considers existing Environmental Protection Agency and Wyoming air quality requirements. (*Id*.).

In some situations, the 2016 Rule's emission control requirements are inconsistent with Wyoming's air quality standards and regulations. (Potter aff. at ¶¶ 13, 17) (Attachment 3). For example, the 2016 Rule requires flaring under most conditions. (*Id*. at ¶ 13). However, not all emission streams contain sufficient flammable gas to be combusted. (*Id*.). In order to flare emission streams that are, for instance, largely composed of carbon dioxide, the operator will have to inject methane or other flammable gas into the stream. (*Id*.). Wyoming analyzes the chemical composition of an emission stream through its source-specific permitting process because this implicates whether a specified control technology is applied for the purpose of improving air quality or minimizing the waste of saleable natural gas, or whether it will increase secondary air pollutants. *Wyoming Dep't of Envtl. Quality, Comments to Proposed Rule, Waste Prevention, Production Subject to Royalties, and Resources Conservation* (April 22, 2016)

1   (attachments omitted) (Comments at 6-7) (Attachment 4). BLM, by assuming all emissions are

2   equal, would require the operator to flare by adding a flammable gas to the emission stream,

3   "which would have the doubly harmful effect of wasting a fuel gas and increasing air pollution."

4   *Id*. In those circumstances, Wyoming's air quality regulations use the appropriate control

5   technology to minimize pollution and waste. (Potter aff. at ¶ 13).  The 2016 Rule would thus

6   impede Wyoming's ability to consistently and fully apply the requirements of the air quality

7   processes set forth in its regulations, with the consequence that BLM's application of the 2016

8   Rule would actually harm Wyoming's air quality.  (Comments at 6-7); (Potter aff. at ¶¶ 13, 17).

9        Further, under the 2016 Rule which Plaintiffs seek to reinstate, Wyoming would have to

10   consider BLM's requirements when reviewing applications and drafting permit conditions. (Vehr

11   aff. at ¶ 24). On a practical level, this means that Wyoming would have to expend time and

12   resources to ensure streamlined record-keeping and reporting requirements to avoid duplicative

13   reporting to Wyoming, EPA, and BLM. (*Id.*).

14        Ultimately, the 2016 Rule would impose significant compliance costs. (*Id.*). Given the

15   additional administrative burdens, the 2016 Rule would adversely affect Wyoming's ability to

16   timely process and issue air quality permits for oil and gas production facilities under federal

17   jurisdiction. (*Id*. at ¶ 27).

18        Furthermore, the 2016 Rule would also cause significant revenue losses to Wyoming.

19   Currently, Wyoming operates an effective and comprehensive air quality inspection and

20   enforcement program. (*Id*. at ¶ 32). In the years 2011-2018, Wyoming issued more than 183

21   notices of violation to oil and gas operators for failure to comply with Wyoming's air quality

22   standards and regulations. (*Id*.). Resolution of 90 of those violations involved facilities with

23   federal mineral production resulting in the payment of $767,000 to Wyoming's public school

24   fund. (*Id*.). Under the 2016 Rule, that money would go to BLM because BLM would enforce the

25   prosecutorial and enforcement functions of Wyoming's regulations. (*Id*. at ¶ 31). In addition, the

26   delay in the production of oil and gas wells subject to the 2016 Rule would cost Wyoming, in

27   severance and ad valorem tax revenue for the 2017 calendar year, an estimated $6.22 million for

28   oil extraction and $2.13 million in natural gas extraction. (Noble aff. at ¶ 5) (Attachment 5).

DOWNEY BRAND LLP

STATE OF WYOMING'S CORRECTED NOTICE OF MOTION, MOTION, AND MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

Wyoming's interest in the efficient functioning of its comprehensive air quality regulatory program, and the tax revenues Wyoming obtains as a result of oil and natural gas development on federal land, constitute significant, legally protectable interests at stake in this litigation. Accordingly, Wyoming meets this requirement for intervention.

### 3.    Plaintiffs' challenge threatens to impair Wyoming's interests.

"[A] prospective intervenor 'has a sufficient interest for intervention purposes if it will suffer a practical impairment of its interests as a result of the pending litigation.'" *Wilderness Soc'y*, 630 F.3d at 1179 (quoting *California ex rel. Lockyer v. United States*, 450 F.3d 436, 441 (9th Cir. 2006)). To satisfy the "practical impairment" requirement, the applicant need only show that the disposition of the action **may** impair its protectable interest. *City of Los Angeles*, 288 F.3d at 401. "[T]he interest of a prospective defendant-intervenor may be impaired where a decision in the plaintiff's favor would return the issue to the administrative decision-making process, notwithstanding the prospective intervenor's ability to participate in formulating any revised rule or plan." *WildEarth Guardians*, 604 F.3d at 1199.

If this Court grants Plaintiffs the relief they seek, federal oil and gas production in Wyoming would be subject to regulation that will impede the efficient and effective operation of Wyoming's air quality regulations. The administrative and enforcement costs imposed on the State would be significant. Reinstating the 2016 Rule would adversely impair Wyoming's investments in its existing regulatory infrastructure.

Furthermore, reinstatement of the 2016 Rule would directly and negatively impact Wyoming's revenues. As a result, programs dependent on taxes from oil and gas development on federal lands would suffer from the loss of funds. The loss of those governmental revenues "constitutes a concrete and imminent injury" that would be "fairly traceable" to Plaintiffs' success in this litigation. *Fund for Animals v. Norton, Inc.*, 322 F.3d 728, 733 (D.C. Cir. 2003).

On the other hand, Wyoming would avoid these risks of injury if this Court upholds the Secretary's decision. Oil and natural gas development would continue on federal lands, as it has for years, and it would continue to generate revenues on which Wyoming relies to provide public services. In turn, Wyoming's investments in its air quality regulatory regime would retain their

DOWNEY BRAND LLP

efficacy. Because Plaintiffs success in this action would concretely harm the State of Wyoming, and because that harm is avoided if the federal action is upheld, Wyoming has met the "impairment" requirement for intervention.

### 4.   The federal Defendants cannot adequately represent Wyoming's interests.

When examining the final criterion for intervention as of right, adequacy of representation, a court considers the following: (1) whether a present party will undoubtedly make all the intervenor's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether the intervenor would offer any necessary elements to the proceedings that other parties would neglect. *City of Los Angeles*, 288 F. 3d at 398. "However, the burden of showing inadequacy is 'minimal,' and the applicant need only show that representation of its interests by existing parties 'may be' inadequate." *Sw. Ctr. for Biological Diversity*, 268 F.3d at 822-23 (citations omitted). Wyoming meets this minimal burden.

The federal Defendants cannot adequately represent Wyoming's sovereign interests. While the federal Defendants have a duty to represent the interests of the general public across the United States, states have a variety of differing interests. The federal government has no duty to represent the personal or economic interests of a single group or state. *See Forest Conservation Council v. United States Forest Serv.*, 66 F.3d 1489, 1499 (9th Cir. 1995) (finding that the federal government is "required to represent a broader view than the more narrow, parochial interests" of a proposed state or county intervenor), *abrogated on other grounds by Wilderness Soc'y*, 630 F.3d at 1173, 1177-78, 1180. Accordingly, the federal Defendants cannot adequately represent Wyoming's interests.

Indeed, courts have found that federal agencies cannot adequately represent other interests in lawsuits challenging federal decision-making. *See, e.g., Nat'l Farm Lines v. Interstate Commerce Comm'n*, 564 F.2d 381, 384 (10th Cir. 1977) (noting that it is impossible for the government to adequately protect both the public interest and the private interests of the petitioners in intervention); *Sierra Club v. Espy*, 18 F.3d 1202, 1207-08 (5th Cir. 1994) (finding that the government did not adequately represent the interests of timber purchasers). Similarly, the federal government cannot adequately represent the narrower interests of non-federal

DOWNEY BRAND LLP

1   governmental entities in environmental litigation challenging federal action. *See*, *e.g., Georgia v.*

2   *United States Army Corps of Eng'rs*, 302 F.3d 1242, 1256 (11th Cir. 2002) (holding that federal

3   defendant did not adequately represent state's interest in interstate waters because federal agency

4   had no independent stake in how much water reached state seeking intervention). Moreover,

5   "[i]nadequate representation is most likely to be found when the applicant asserts a personal

6   interest that does not belong to the general public." 3B Moore's Federal Practice, ¶ 24.07[4] at

7   24-78 (2d ed. 1995).

8          To be certain, Wyoming and the federal government have a basic common interest in

9   seeing that the Revision Rule is upheld. From this common ground, however, differences emerge.

10  In attempting to protect its interests, the BLM will defend the Secretary's decision. But in many

11  respects, the agency can go no further. By contrast, Wyoming is uniquely capable of explaining to

12  the Court how any potential ruling will affect its air quality regulation scheme and its economy,

13  which is heavily dependent on oil and natural gas production. In this regard, Wyoming's

14  sovereign and economic interests are narrower and more specific than the interests of the federal

15  government. Accordingly, Wyoming has met the requirements of this element for intervention.

16  **II.     In the alternative, the Court should grant Wyoming permission to intervene.**

17         In the event this Court does not grant intervention as a matter of right, the Court should

18  permit Wyoming to intervene in this matter pursuant to Federal Rule of Civil Procedure

19  24(b)(1)(B), which provides: "On timely motion, the court may permit anyone to intervene who

20  … has a claim or defense that shares with the main action a common question of law or fact." If

21  the applicant satisfies this requirement, "it is then discretionary with the court whether to allow

22  intervention." *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1111 (9th Cir. 2002),

23  *abrogated on other grounds by Wilderness Soc'y*, 630 F.3d at 1173, 1177-78, 1180.

24         As explained above, Wyoming's motion is timely and will not delay these proceedings.

25  Under the second factor, an applicant for permissive intervention satisfies the "common question"

26  requirement where it will assert defenses that squarely respond to the claims asserted by a

27  plaintiff in the complaint. *Id*. Here, Wyoming contests Plaintiffs' claims that BLM failed to

28  comply with various federal statutes in adopting the Revision Rule. This direct response to

DOWNEY BRAND LLP

STATE OF WYOMING'S CORRECTED NOTICE OF MOTION, MOTION, AND MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

1   Plaintiffs' claims satisfies the "common question" requirement for permissive intervention. *Id*. at

2   1110 (finding intervenor defendants alleged common questions of law and fact by raising

3   defenses "directly responsive" to plaintiff's claims). Accordingly, because Wyoming's timely

4   participation will address the issues of law and fact in this case, it meets the criteria for

5   permissive intervention. Wyoming requests permission to intervene in order to represent its

6   important and unique interests in this action.

<b>CONCLUSION</b>

8   Plaintiffs ask this Court to reinstate the 2016 Rule. Wyoming has a significant interest in

9   preventing reinstatement of that rule, and, if Plaintiffs prevail, Wyoming will be significantly

10  harmed. Accordingly, this Court should permit Wyoming to intervene in this action.

11  DATED: October 29, 2018           DOWNEY BRAND LLP

13                                    By___/s/ Christian L. Marsh_____
14                                        Christian L. Marsh
                                          Attorneys for THE STATE OF WYOMING

DOWNEY BRAND LLP

STATE OF WYOMING'S CORRECTED NOTICE OF MOTION, MOTION, AND MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

# ATTACHMENT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2018 APR -4   AM 10: 28

STEPHAN HARRIS, CLERK
CASPER

| | |
|---|---|
| STATE OF WYOMING and STATE OF MONTANA,    ) | |
| ) | |
|    Petitioners,    ) | |
| ) | |
| STATE OF NORTH DAKOTA and STATE OF    ) | |
| TEXAS,    ) | |
| ) | |
|    Intervenor-Petitioners,    ) | |
| ) | |
| vs.    ) | Case No. 2:16-CV-0285-SWS |
| ) | **(Lead Case)** |
| UNITED STATES DEPARTMENT OF THE    ) | |
| INTERIOR; SALLY JEWELL, in her official    ) | |
| capacity as Secretary of the Interior; UNITED    ) | |
| STATES BUREAU OF LAND MANAGEMENT;    ) | |
| and NEIL KORNZE, in his official capacity as    ) | |
| Director of the Bureau of Land Management,    ) | |
| ) | |
|    Respondents,    ) | |
| ) | |
| WYOMING OUTDOOR COUNCIL, et al.;    ) | |
| EARTHWORKS; STATE OF CALIFORNIA and    ) | |
| STATE OF NEW MEXICO,    ) | |
| ) | |
|    Intervenor-Respondents.    ) | |
| | |
| WESTERN ENERGY ALLIANCE, and the    ) | |
| INDEPENDENT PETROLEUM    ) | |
| ASSOCIATION OF AMERICA,    ) | |
| ) | |
|    Petitioners,    ) | |
| ) | |
| vs.    ) | Case No. 2:16-CV-0280-SWS |
| ) | |
| SALLY JEWELL, in her official capacity as    ) | |
| Secretary of the United States Department of the    ) | |
| Interior; and BUREAU OF LAND    ) | |
| MANAGEMENT,    ) | |
| ) | |
|    Respondents.    ) | |

## ORDER STAYING IMPLEMENTATION OF RULE PROVISIONS AND
## STAYING ACTION PENDING FINALIZATION OF REVISION RULE

Sadly, and frustratingly, this case is symbolic of the dysfunction in the current state of administrative law.  And unfortunately, it is not the first time this dysfunction has frustrated the administrative review process in this Court.[1]

## PROCEDURAL BACKGROUND

On November 18, 2016, the Bureau of Land Management ("BLM") published the final version of its regulations with the stated intent "to reduce waste of natural gas from venting, flaring, and leaks during oil and natural gas production activities on onshore Federal and Indian (other than Osage Tribe) leases."  *See* "Waste Prevention, Production Subject to Royalties, and Resource Conservation:    Final Rule."    81 Fed. Reg. 83,008 ("Waste Prevention Rule"). Petitioners promptly raised various challenges to the Waste Prevention Rule in these consolidated cases.  On January 16, 2017, the day before the Rule became effective, this Court denied Petitioners' request for preliminary injunctive relief, in part because significant portions of the Rule would not become effective until January 17, 2018 ("phase-in provisions"). Thereafter, the Court set an expedited briefing schedule so that the merits of Petitioners' challenges could be addressed prior to the phase-in provisions of the Rule becoming effective. Regrettably, this approach has been derailed.

Uncertainty in the Waste Prevention Rule's fate was first created by Congress.  On February 3, 2017, the U.S. House of Representatives passed a Congressional Review Act resolution to disapprove the Waste Prevention Rule, which would have voided the Rule and barred any other "substantially similar" rule in the future.  H.R.J. Res. 36, 115th Cong. (2017-2018).  The U.S. Senate defeated this Congressional Review Act resolution on May 10, 2017. Then on June 15, 2017, in compliance with a directive from the President to review the Rule for

---

[1] *See State of Wyoming, et al. v. Dep't of Interior*, No. 15-CV-043-S (D. Wyo.).

2

consistency with the policies of the new administration,[2] the BLM announced it was postponing

the January 17, 2018 compliance dates for the phase-in provisions of the Rule,[3] pending judicial

review in this Court, pursuant to its authority under 5 U.S.C. § 705. *See* 82 Fed. Reg. 27,430

(June 15, 2017) ("Postponement Notice"). In doing so, the BLM considered "the substantial cost

that complying with these requirements poses to operators . . ., and the uncertain future these

requirements face in light of the pending litigation and administrative review of the Rule." *Id.* at

27,431. The BLM further stated its intention to conduct notice-and-comment rulemaking to

suspend or extend the compliance dates of those sections affected.[4] *Id.* The Rule's provisions

with compliance dates that had already passed were unaffected by the Postponement Notice.

Five days later, and in light of BLM's plan to propose revision or rescission of the Rule,

the Federal Respondents filed a *Motion to Extend the Briefing Deadlines* (ECF No. 129) which

this Court granted, making the opening merits briefs due October 2, 2017 and response briefs

due November 6, 2017 (ECF No. 133).[5] In granting the extension, this Court determined: "To

move forward on the present schedule would be inefficient and a waste of both the judiciary's

and the parties' resources in light of the shifting sands surrounding the Rule and certain of its

provisions, making it impossible to set a foundation upon which the Court can base its review

under the Administrative Procedures Act." *Id.* at 3. Then on July 5th and 10th, 2017, several of

the Intervenor-Respondents in this case, along with the elected Attorney Generals from the States

of California and New Mexico, challenged the BLM's Postponement Notice in a Federal District

---

[2] *See* Executive Order No. 13783, "Promoting Energy Independence and Economic Growth" (March 28, 2017).
[3] The BLM postponed the future compliance dates for the following sections of the Rule: 43 C.F.R. 3179.7, 3179.9, 3179.201, 3179.202, 3179.203, and 3179.301-3179.305. These provisions obligate operators to comply with the Rule's "capture percentage," flaring measurement, pneumatic equipment, storage tank, and LDAR requirements beginning on January 17, 2018. *See* 82 Fed. Reg. at 27,431.
[4] "Given this legal uncertainty, operators should not be required to expend substantial time and resources to comply with regulatory requirements that may prove short-lived as a result of pending litigation or the administrative review that is already under way." *Id.*
[5] The Court also ordered the BLM to file a status report on September 1, 2017, notifying the Court and parties of its progress in promulgating a suspension of certain requirements of the Rule.

3

Court in the Northern District of California. *See California and New Mexico, et al. v. BLM*, No. 3:17-CV-03804-EDL (N.D. Cal.); *Sierra Club, et al. v. Zinke*, No. 3:17-CV-03885-EDL (N.D. Cal.). On October 4, 2017, the Northern District of California Court held unlawful and vacated the Postponement Notice, thereby reinstating the (by then) three-and-one-half-month away compliance dates for the phase-in provisions.

Meanwhile, back in this Court, Petitioners and Intervenor-Petitioners timely filed their opening briefs. On October 20, 2017, the Federal Respondents filed a second *Motion for an Extension of the Merits Briefing Deadlines* (ECF No. 155), requesting the Court again extend the briefing deadlines then in place by thirty-seven (37) days, allowing time for the BLM to complete a rule ("Suspension Rule") which will suspend or delay the majority of the provisions of the Waste Prevention Rule, including the portions of the Rule that would otherwise become effective on January 17, 2018.[6] At that time, BLM had also begun working on a rule to revise or rescind the Waste Prevention Rule ("Revision Rule"). The Court granted the second extension, again stressing the inefficient use and likely waste of resources by proceeding to address the merits of challenges to a rule when the agency has begun the process for suspending and revising that same rule. (ECF No. 158.)

On December 8, 2017, the BLM published the final "Suspension Rule," temporarily suspending or delaying certain requirements of the Waste Prevention Rule that are at the heart of this litigation.[7] *See* 82 Fed. Reg. 58,050. "The 2017 final delay rule does not substantively change the 2016 final rule, but simply postpones implementation of the compliance requirements for certain provisions of the 2016 final rule for 1 year." *Id.* "The BLM has concerns regarding

---

[6] On October 27, 2017, the Industry Petitioners again sought preliminary injunctive relief in light of the impending January 2018 compliance dates put back into effect after the California court's ruling. (ECF No. 160.)

[7] The Suspension Rule delayed the effective date for the following provisions of the Waste Prevention Rule:  43 C.F.R. 3162.3-1(j), 3179.7, 3179.9, 3179.10, 3179.101, 3179.102, 3179.201, 3179.202, 3179.203, 3179.204, and 3179.301 through 3179.305.

the statutory authority, cost, complexity, feasibility, and other implications of the 2016 final rule, and therefore intends to avoid imposing likely considerable and immediate compliance costs on operators for requirements that may be rescinded or significantly revised in the near future." *Id.* The Suspension Rule's stated effective date was January 8, 2018.

The Federal Respondents, together with the Industry Petitioners and Petitioner States of Wyoming and Montana, then moved the Court to stay these cases on the basis that it would not be a wise use of the parties' or the Court's resources to adjudicate the merits in light of the Suspension Rule and the fact that the BLM is in the process of issuing a proposed Revision Rule. Intervenor-Petitioner States of North Dakota and Texas opposed a stay, arguing that the limited number of provisions that will remain in effect during the suspension period continue to harm those states by infringing upon the States' sovereignty, unlawfully expanding BLM's jurisdiction to state and private interests, and intruding upon the States' congressionally-granted authority to regulate air quality within their borders. Intervenor-Respondents chose to challenge the Suspension Rule by again filing separate actions in the Northern District of California. *See State of California et al. v. BLM et al.*, No. 3:17-CV-07186-WHO (N.D. Cal. Dec. 19, 2017); *Sierra Club et al. v. Zinke et al.*, No. 3:17-CV-07187-MMC (N.D. Cal. Dec. 19, 2017). Requests to transfer the venue of those cases to this Court were denied.

On December 29, 2017, given the on-going rulemaking process that would materially impact the merits of the present challenges to the Waste Prevention Rule and the prudential ripeness concerns relating to the issues before this Court, the requested stay was granted pending finalization of revisions to the Rule, or at least while the Suspension Rule was in effect. (*See* ECF No. 189.) For a third time, this Court emphasized that moving forward to address the merits of the present challenges would be a waste of resources, as such an analysis is dependent

upon which "rules" are in effect. *Id.* at 4 (citing *Wyoming v. Zinke*, 871 F.3d 1133, 1142 (10th Cir. 2017) ("proceeding to address whether the district court erred in invalidating the BLM's Fracking Regulation when the BLM has now commenced rescinding that same regulation appears to be a very wasteful use of limited judicial resources . . . [as] [i]t is clearly evident that the disputed matter that forms the basis for our jurisdiction has thus become a moving target")). This Court further determined prudential ripeness concerns weigh against interfering in the administrative process. *See id.* at 4-5 (citing *Farrell-Cooper Min. Co. v. U.S. Dep't of the Interior*, 728 F.3d 1229, 1234-35 (10th Cir. 2103) ("In order to determine the fitness of issues for review, we may consider whether judicial intervention would inappropriately interfere with further administrative action and whether the courts would benefit from further factual development of the issues presented.")).

On February 22, 2018, the BLM published the proposed Revision Rule, "proposing to revise the 2016 final rule in a manner that reduces unnecessary compliance burdens, is consistent with the BLM's existing statutory authorities, and re-establishes long-standing requirements that the 2016 final rule replaced." 83 Fed. Reg. 7924 (Feb. 22, 2018). Also on February 22, 2018, the District Court for the Northern District of California preliminarily enjoined enforcement of the Suspension Rule, arguably making the phase-in provisions immediately effective.[8] Accordingly, this Court lifted the stay in these cases and set a briefing schedule to resolve the following pending motions now before this Court:   (1) *Joint Motion by the States of North Dakota and Texas to Lift the Stay entered December 29, 2017 and to Establish Expedited Schedule for Further Proceedings* (ECF No. 194); (2) *Motion to Lift Stay and Suspend Implementation Deadlines* filed by Petitioner States of Wyoming and Montana (ECF No. 195);

---

[8] The California court's decision also put back into effect certain provisions that were not part of the Rule's initial phase-in provisions, but had been delayed by the Suspension Rule:  43 C.F.R. 3162.3-1(j); 3179.10, 3179.101, 3179.102, and 3179.204.

and Industry Petitioners' *Motion to Lift Litigation Stay and for Preliminary Injunction or Vacatur of Certain Provisions of the Rule Pending Administrative Review* (ECF No. 196).

The Federal Respondents urge the Court to stay this litigation and the Waste Prevention Rule's implementation deadlines to preserve the status and rights of the regulated parties and avoid entanglement with the administrative process. The Federal Respondents argue the BLM should not be forced to litigate – and implement – the Waste Prevention Rule while the agency is actively reconsidering the Rule and has engaged in rulemaking to suspend and revise the Rule. The Intervenor-Petitioners, North Dakota and Texas, urge the Court to move forward with the merits of these cases on an expedited basis. The Intervenor-Respondents, the States of California and New Mexico and the Environmental Groups, oppose the Industry Petitioners' motion for a preliminary injunction or vacatur, and further oppose any stay of these cases or the existing implementation deadlines.

## DISCUSSION

This Court cannot escape the reality of the difficult, and somewhat unique, procedural circumstances facing it – that going forward on the merits at this point remains a waste of judicial resources and disregards prudential ripeness concerns. The Court's consideration of the various requests for relief must begin by recognizing that the BLM has the inherent authority to reconsider its own rule, in the same manner and pursuant to the same constraints as when initially promulgating the rule. *See Trujillo v. Gen. Elec. Co.*, 621 F.2d 1084, 1086 (10th Cir. 1980) ("Administrative agencies have an inherent authority to reconsider their own decisions, since the power to decide in the first instance carries with it the power to reconsider."); *ConocoPhillips Co. v. U.S. E.P.A.*, 612 F.3d 822, 832 (5th Cir. 2010) (agency has inherent authority to reconsider its decisions unless to do so would be arbitrary, capricious, or an abuse of

7

discretion).  Wish as they might, neither the States, industry members, nor environmental groups are granted authority to dictate oil and gas policy on federal public lands.  In light of the BLM's clearly expressed concerns about certain provisions of the Waste Prevention Rule, and the agency's publication of the proposed Revision Rule, the Court should allow the administrative process to run its course and restrain from prematurely conducting a merits analysis.  *See Wyoming v. Zinke*, 871 F.3d at 1141 ("The Supreme Court has long held the ripeness doctrine is designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.") (internal quotation marks and citations omitted).

Also implicated here is the related doctrine of prudential mootness, which is rooted in the court's equitable powers to fashion remedies and to withhold relief.  *See Fletcher v. U.S.*, 116 F.3d 1315, 1321 (10th Cir. 1997).  "Under the doctrine of prudential mootness, there are circumstances under which a controversy, not constitutionally moot, is so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the power to grant."  *Id.* (internal quotation and citation omitted).  *See also S. Utah Wilderness Alliance v. Smith*, 110 F.3d 724, 727 (10th Cir. 1997) ("Prudential mootness addresses not the power to grant relief but the court's discretion in the exercise of that power.").  The central inquiry is whether "circumstances [have] changed since the beginning of litigation that forestall any occasion for *meaningful* relief."  *Id.* (emphasis added).  Courts typically apply the prudential mootness doctrine where a defendant, "usually the government, has already changed or is in the process of changing its policies or where it appears

that any repeat of the actions in question is otherwise highly unlikely." *Bldg. & Constr. Dep't v. Rockwell Int'l Corp.*, 7 F.3d 1487, 1492 (10th Cir. 1993).

The public comment period for the proposed Revision Rule presently ends April 23, 2018. The proposed revisions substantially change those provisions of the 2016 Waste Prevention Rule that were to be phased in over time and are at the heart of this litigation. If the proposed Revision Rule becomes final, many of the changes and modifications required under the 2016 Rule, including the phase-in provisions, will be eliminated. Yet, the costs and difficulties of immediate compliance with those provisions – particularly considering that the intended period for "ramping up" never came to be because of the BLM's ongoing efforts to suspend and revise those provisions – are undoubtedly substantial and unrecoverable.[9] To force temporary compliance with those provisions makes little sense and provides minimal public benefit, while significant resources may be unnecessarily expended.

"[T]o the extent necessary to prevent irreparable injury," the Administrative Procedures Act gives a reviewing court discretion to "issue *all necessary and appropriate process* . . . to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705 (emphasis added).[10] Petitioners, particularly Industry Petitioners, will be irreparably harmed by full and immediate implementation of the 2016 Waste Prevention Rule, magnified by temporary

---

[9] The Intervenor-Respondents assert that the Petitioners brought any compliance difficulties upon themselves, apparently by not taking steps toward compliance regardless of the BLM's stated intentions and ongoing efforts to suspend, revise and/or rescind portions of the Rule. Such an assertion suggests the invalidation of the Postponement Notice and Suspension Rule were, and the ultimate upending of the Revision Rule is, a foregone conclusion. However, "a presumption of validity attaches to the agency action and the burden of proof rests with the appellants who challenge such action." *WildEarth Guardians v. U.S. Fish and Wildlife Serv.*, 784 F.3d 677, 691 (10th Cir. 2015). Thus, the States, industry, and public may appropriately rely on agency action unless and until it is held unlawful. No reasonable person would rush to comply with a rule that was delayed, suspended, and is soon to be revised, particularly when such compliance requires the expenditure of significant resources.

[10] While the Court acknowledges that some courts have employed the four-factor preliminary injunction test in determining whether to grant relief under § 705, nothing in the language of the statute itself, or its legislative history, suggests it is limited to those situations where preliminary injunctive relief would be available. *See State of California, et al. v. U.S. B.L.M.*, 277 F. Supp. 3d 1106, 1124-25 (N.D. Cal. 2017) ("The plain language of the statute leaves room to dispute whether such an analysis is required, and the legislative history provides limited and not entirely consistent evidence of Congress' intent.").

implementation of significant provisions meant to be phased-in over time that will be eliminated in as few as four months.[11]   The Revision Rule is presently subject to notice-and-comment rulemaking on the very issues before the Court.  The proposed Revision Rule would rescind the provisions of the Waste Prevention Rule addressing waste minimization plans, well drilling, well completion, pneumatic controllers, pneumatic diaphragm pumps, storage vessels, and leak detection and repair, and would also modify many other requirements of the 2016 Rule.  *See* 83 Fed. Reg. at 7928.  Moreover, proceeding to address the merits of these cases will put the BLM in the difficult situation of litigating and defending a rule that it is in the midst of reconsidering and of taking positions on issues that are currently subject to public comment.  There is simply nothing to be gained by litigating the merits of a rule for which a substantive revision has been proposed and is expected to be completed within a period of months.

Petitioners have proposed a range of different mechanisms by which this Court could provide relief from the unusual procedural circumstances which have technically, though not realistically, made the phase-in provisions immediately effective.  Unfortunately, none of the proposed solutions is comprehensively satisfying, and the circumstances presented here do not fall nicely into any particular legal doctrine.  Still, the circumstances that justified this Court's stay of this litigation in the first place have not changed.  Accordingly, in order to preserve the status quo, and in consideration of judicial economy and prudential ripeness and mootness concerns, the Court finds the most appropriate and sensible approach is to exercise its equitable discretion to stay implementation of the Waste Prevention Rule's phase-in provisions and further stay these cases until the BLM finalizes the Revision Rule, so that this Court can meaningfully and finally engage in a merits analysis of the issues raised by the parties.  A stay will provide

---

[11] The BLM anticipates completing and publishing the final Revision Rule in August 2018.  (Tichenor Decl. ¶ 10, ECF No. 207-1.)

certainty and stability for the regulated community and the general public while BLM completes its rulemaking process, will allow the BLM to focus its limited resources on completing the revision rulemaking, and would prevent the unrecoverable expenditure of millions of dollars in compliance costs. The waste, inefficiency, and futility associated with a ping-ponging regulatory regime is self-evident and in no party's interest. THEREFORE, it is hereby

**ORDERED** that the *Joint Motion by the States of North Dakota and Texas to Lift the Stay entered December 29, 2017 and to Establish Expedited Schedule for Further Proceedings* (ECF No. 194) is DENIED; the *Motion to Lift Stay and Suspend Implementation Deadlines* filed by Petitioner States of Wyoming and Montana (ECF No. 195) is GRANTED IN PART and DENIED IN PART; and Industry Petitioners' *Motion to Lift Litigation Stay and for Preliminary Injunction or Vacatur of Certain Provisions of the Rule Pending Administrative Review* (ECF No. 196) is DENIED; it is further

**ORDERED** that implementation of the Waste Prevention Rule's phase-in provisions (43 C.F.R. 3179.7, 3179.9, 3179.201, 3179.202, 3179.203, and 3179.301-3179.305) is **STAYED**; it is further

**ORDERED** that these consolidated matters are **STAYED** pending finalization or withdrawal of the proposed Revision Rule.

DATED this ___4^TH___ day of April, 2018.

SCOTT W. SKAVDAHL
UNITED STATES DISTRICT JUDGE

11

# ATTACHMENT 2

WYOMING ATTORNEY GENERAL'S OFFICE
ERIK E. PETERSEN, WSB No. 7-5608 (*pro hac vice pending*)
MICHAEL M. ROBINSON, WSB No. 6-2658 (*pro hac vice pending*)
Senior Assistant Attorneys General
Wyoming Attorney General's Office
2320 Capitol Avenue
Cheyenne, WY 82002
Telephone: (307) 777-6946
Facsimile: (307) 777-3542
erik.petersen@wyo.gov
mike.robinson@wyo.gov

DOWNEY BRAND LLP
CHRISTIAN L. MARSH (Bar No. 209442)
455 Market Street, Suite 1500
San Francisco, CA 94105
Telephone: (415) 848-4800
Facsimile: (415) 848-4801
cmarsh@downeybrand.com

Attorneys for THE STATE OF WYOMING

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, by and through XAVIER BECERRA, Attorney General, and the CALIFORNIA AIR RESOURCES BOARD; and STATE OF NEW MEXICO, by and through HECTOR BALDERAS, Attorney General, | Case No. 4:18-cv-05712-YGR |
| Plaintiffs, | |
| v. | **NANCY E. VEHR AFFIDAVIT** |
| RYAN ZINKE, Secretary of the Interior, JOSEPH R. BALASH, Assistant Secretary for Land and Minerals Management, United States Department of the Interior; UNITED STATES BUREAU OF LAND MANAGEMENT; | |

and UNITED STATES DEPARTMENT
OF THE INTERIOR,

Defendants.

I, Nancy E. Vehr, being first duly sworn, depose and state of my own knowledge as follows:

1.      I am the Administrator for the Wyoming Department of Environmental Quality, Air Quality Division (WDEQ/AQD).  I have knowledge of the facts set forth herein either from my own personal knowledge, or from records of the WDEQ/AQD, and am competent to testify thereto.

### Background, Education, and Relevant Experience

2.      I graduated with a Bachelor's of Science Degree in Nursing from Creighton University in 1984.  I worked as a nurse until after I graduated from law school.  I continue to maintain my Colorado RN License.

3.      In 1999, I graduated with a Juris Doctorate from the University of Wyoming, College of Law.  I have been licensed to practice law in Colorado and Wyoming since 1999.  I have also been admitted to practice before several federal District and Appellate Courts including the Districts of Colorado, Wyoming, Ninth, Tenth, and D.C. Circuits.

4.      Since 1999, I have been or currently am a member of several legal associations including the Wyoming State Bar; the Laramie County Bar; American Bar Association, Section of Environment, Energy and Resources; Rocky Mountain

2

Mineral Law Foundation; and Ewing T. Kerr Inns of Court.   In addition to membership, I have served in leadership roles for the Wyoming State Bar as the Secretary/Treasurer for the Energy and Natural Resources Section (2015-2016) and the Vice-President of the Ewing T. Kerr Inns of Court (2016-2017).

5.      Also in 1999, I started work at the Wyoming Attorney General's Office as an Assistant Attorney General.   In 2006, I was promoted to Senior Assistant Attorney General and remained in that position until June, 2013.   Over the course of fourteen years, I represented a variety of State agencies including the Office of Medicaid (1999-2001), the Board of Land Commissioners, the State Loan and Investment Board, and the Office of State Lands and Investments (2001-2003), and the WDEQ/AQD (2003-2013).

6.      As an Assistant Attorney General representing the WDEQ/AQD, I provided day-to-day legal advice; reviewed and analyzed agency rules, regulations, and policies; brought administrative and civil judicial enforcement actions on the State's behalf; engaged in settlement negotiations; represented the State's interests in NEPA (National Environmental Policy Act) cases before the Interior Board of Land Appeals (IBLA) and in Federal District Court; and brought or defended agency actions before the Wyoming Environmental Quality Council (EQC) and in State and Federal District Courts.   Some of these actions involved oil and gas air quality rules, regulations, permit appeals, and enforcement matters.   During the period of time that

I represented the WDEQ/AQD, the agency also revised its Oil and Gas Presumptive Best Available Control Technology (P-BACT) guidance on three occasions – 2004, 2007, and 2010.

7.     In June of 2013, I entered private practice, joining the Wyoming law firm of Hickey & Evans as Special Counsel.  While at Hickey & Evans, I represented clients on a variety of issues, including but not limited to environmental and air quality matters, before administrative agencies, state and federal trial and appellate courts.

8.     Additionally, I have been a speaker or presenter on several air quality and environmental topics including:  Air Quality Challenges Facing the Natural Resources Industry in the Western United States, Review of State Minor Source Permitting Programs (Rocky Mountain Mineral Law Foundation (RMMLF) 2007); Clean Air Act Update – Key Enforcement and Regulatory Developments in US EPA Region 8 (American Bar Association Section of Environment, Energy, and Resources 2009); Air Quality Issues Affecting Oil, Gas, and Mining Development in the West, State Air Program Developments (RMMLF 2013); Defending Wyoming's Primacy and Energy Industry in the U.S. Supreme Court and the D.C. Circuit Court of Appeals (Laramie County Bar 2014); Is EPA's Denial of State Developed Plans Backdoor Greenhouse Gas Regulation (University of Wyoming College of Law's Center for Law and Energy Resources in the Rockies 2014); The

Balance of Power – Hot Topics in Environmental Regulation and Cooperative Federalism (Wyoming State Bar Annual Meeting 2014); and What Wyoming Practitioners Need to Know About Recent Energy & Environmental Regulations (Wyoming State Bar Annual Meeting 2016); Air Quality Issues Affecting Oil, Gas, and Mining Development and Operations, Ozone in the West (RMMLF 2018).

9.     In November of 2015, I became the Administrator of the Wyoming Department of Environmental Quality, Air Quality Division.  In this capacity, I oversee and manage Division operations and personnel, including site inspections, compliance and enforcement activities; air quality planning, monitoring, and emission inventories; stationary source construction and operating permit issuance; development and implementation of air quality rules, regulations and state plans; and review of and comment on proposed federal regulations affecting air quality.  I also interact with other state and federal agencies that regulate or impact the energy industry, including the Wyoming Oil and Gas Conservation Commission (WOGCC), the Office of State Lands and Investments (OSLI), the Wyoming Public Service Commission (PSC), the Environmental Protection Agency (EPA), the U.S. Forest Service, and the Bureau of Land Management (BLM).  Specifically, I advise the Director of the WDEQ on air quality issues associated with energy development that may affect the agency, the State, and Wyoming industry.

10.     Since November 2015, I have participated in the review of or comment on over thirty proposed federal regulations or actions affecting air quality, including BLM's Waste Prevention, Production Subject to Royalties, and Resource Conservation; Proposed Rule, Docket No. BLM-2016-0001 (April 22, 2016) (2016 Proposed Rule), and BLM's Waste Prevention, Production Subject to Royalties, and Resource Conservation; Rescission or Revision of Certain Requirements, Docket No. BLM-2018-03144 (Feb. 22, 2018) (2018 Proposed Rule).  I have also reviewed the Comments submitted by the Wyoming Department of Environmental Quality regarding EPA's Five Technical White Papers on Sources of Emissions in the Oil and Gas Sector (June 16, 2014), EPA's Emission Standards for New and Modified Sources, Docket ID No. EPA-HQ-PAR-2010-0505 (Dec. 4, 2015), and EPA's Source Determination for Certain Emission Units in the Oil and Natural Gas Sector, Docket ID No. EPA-HQ-OAR-2013-0685 (Nov. 30, 2015).

**Wyoming has exercised Air Quality Primacy since 1974**

11.     The Clean Air Act mandates that "[a]ir pollution control at its source is the primary responsibility of State and local governments." 42 U.S.C. § 7401(a)(3).

12.     Wyoming has exercised air quality primacy since at least 1974, after the DEQ/AQD's adoption of regulations that established emission control,

6

monitoring, and recordkeeping requirements through state-administered, federally-enforceable New Source Review (NSR) air quality permits. *See* Wyoming's State Implementation Plan codified at 40 C.F.R. Pt. 52, subpt. ZZ (2016), 1973 Wyo. Sess. Laws Ch. 250, § 1; *Rules, Wyo. Dep't of Envtl. Quality, Air Quality*, ch. 6, § 2.

### How Wyoming Air Quality Regulates Venting and Flaring

13.     Venting and flaring emissions associated with producing oil and natural gas wells are subject to regulation under the Wyoming Air Quality Standards and Regulations.  Venting and flaring activities create emissions of Volatile Organic Compounds (VOCs), carbon monoxide, and nitrogen dioxide, which are regulated pollutants under Wyoming's air quality regulations.  Since 1974, the DEQ/AQD has implemented the Wyoming Air Quality Standards and Regulations, which include permitting requirements for non-categorical sources of air pollution emitting more than 250 tons per year of a criteria pollutant or categorical sources emitting 100 tons per year or more of a criteria pollutant.  These permitting requirements are contained in Chapter 6, Section 2 of the Wyoming Air Quality Standards and Regulations.  All new and modified oil and gas production facilities are subject to the permitting requirements of Chapter 6, Section 2.    Certain existing oil and gas production facilities in the Upper Green River Basin 2008 Ozone non-attainment area are also subject to the existing source permit-by-rule requirements of Chapter 6, Section 8.

14.     The permitting requirements in Chapter 6, Section 2(c) of the Wyoming Air Quality Standards and regulations requires the installation of air quality pollution controls that meet best available control technology, or BACT.  The BACT process evaluates and requires permittees to use technology that is cost effective to control emissions.

15.     Wyoming has two BACT process options for oil and gas production facilities.  The outcome of each process requires the installation of air quality pollution controls that meet best available control technology, or BACT, as required by all permitting actions under Wyoming Air Quality Standards and Regulations Chapter 6, Section 2(c).

16.     The first BACT process option is a case-by-case BACT evaluation that requires the owner or operator of the new or modified oil and gas production wells and equipment to apply for an air quality permit in accordance with Chapter 6, Section 2(a) of the Wyoming Air Quality Standards and Regulations.  Under this option, the owner or operator must submit a permit application prior to commencing construction of the new or modified oil and gas production wells and equipment.

17.     The second BACT process option is commonly known as the Presumptive BACT process.  Beginning in approximately 1997, well ahead of the U.S. Environmental Protection Agency's efforts and efforts by other states to develop emission standards specific to oil and gas production facilities, the

8

WDEQ/AQD developed and implemented a Presumptive BACT process for new and modified oil and gas production wells and equipment. This process includes interpretive guidance – *Oil and Gas Production Facilities Chapter 6, Section 2 Permitting Guidance* – that sets out the Division's current understanding of BACT for the purpose of assisting owners and operators who choose to construct or modify oil and gas production facilities prior to initiating the permitting process. Originally issued in 1997, the Division has updated the Guidance eight times – in 1998, 2000, 2001, 2004, 2007, 2010, 2013, and May 2016. The Division is currently reviewing public input regarding its August 2018 Guidance revision draft. *See draft Guidance* (Aug. 2018) at http://deq.wyoming.gov/media/attachments/Air%20Quality/Rule%20Development/Proposed%20Rules%20and%20Regulations/2018_Oil%20and%20Gas%20Guidance.pdf (site last visited Oct. 4, 2018). Both the regularity and public comment process by which the Division has evaluated and updated the Guidance reflects the BACT foundation – a process to evaluate and require the installation of the best available control technology that is cost effective to control emissions.

18.    Under this second BACT process option – Wyoming's Presumptive BACT process - operators must monitor production volumes in the first 30 days of production to determine what air pollution controls are warranted. If production results in emissions above prescribed thresholds then air quality pollution controls must be installed and operational within 60 days of the start of production.

**Wyoming's Control Technology Determinations and Federal Rulemaking**

19.     On July 28, 2011, when the U.S. EPA proposed New Source Performance Standards for oil and gas production equipment and completions, it relied on Wyoming's *Oil and Gas Production Facilities Chapter 6, Section 2 Permitting Guidance. See* Oil and Natural Gas Sector:  New Source Performance Standards and National Emission Standards for Hazardous Air Pollutants Reviews. 76 Fed. Reg. 52738, 52757 (Aug 23, 2011).   The EPA also used examples from Wyoming to determine the final New Source Performance Standards.  *See* Oil and Natural Gas Sector:  New Source Performance Standards and National Emission Standards for Hazardous Air Pollutants Reviews.  77 Fed. Reg. 49490, 49517 and 49526 (Aug. 16, 2012).

20.     In April 2015, when initially developing the proposed venting and flaring regulations, the Bureau of Land Management (BLM) contacted the WDEQ/AQD and requested information on Wyoming's permitting processes and standards for oil and gas production facilities.

21.     In July 2015, the WDEQ/AQD provided additional input to BLM in response to a BLM questionnaire sent to specific states.  In responding to BLM's inquiries, the Division considered and provided information to the BLM on the permitting processes and emissions standards for all oil and gas production facilities throughout the entire State of Wyoming.  The Division also provided information to

the BLM during several BLM phone calls with the Division, the state of Colorado, and the Environmental Defense Fund.  Unfortunately, despite the Division's request to view a draft of the 2016 Proposed Rule either in its entirety or just the recordkeeping part to provide early meaningful input to assist the BLM avoided redundancy, the BLM refused to share.

22.    BLM inaccurately claims that no state regulates all three aspects – venting, flaring and leaking, when in fact, Wyoming does.

## BLM's 2016 Venting and Flaring Rule Negatively Impacts Wyoming's Permitting Process

23.    Wyoming's air quality permit process establishes conditions of operation to ensure compliance with air quality rules, regulations, and performance requirements. After a permit is issued, the operator is held to the federally-enforceable conditions of operation established in the final air quality permit.  The Division's federally approved New Source Review Program has always considered existing EPA and Wyoming air quality requirements when reviewing permit applications and drafting proposed permit conditions.  Prior to the BLM's adoption of the 2016 Venting and Flaring Rule, the Division did not consider BLM air quality regulations because the BLM has no air quality authority.

24.    However, as a result of the BLM's adoption of the 2016 Venting and Flaring Rule, the Division will now need to consider BLM's requirements when

reviewing permit applications and drafting proposed permit conditions. On a practical level, the Division will need to expend time and resources as part of its Best Available Control Technology evaluation to determine whether the proposed oil and gas production facility is regulated, in part or in whole, under BLM's 2016 final rule. In effect, BLM's 2016 Venting and Flaring Rule emission control requirements such as requiring specific engines, green completions, storage tank controls, and low or no-bleed pneumatics, eliminates Wyoming's BACT process from full consideration of other air quality factors.

25.    In addition to eliminating Wyoming's ability to consider key air quality factors in the BACT process, BLM's 2016 Venting and Flaring Rule interferes with the development of other conditions of operation specified by the air quality permit, including record-keeping and reporting requirements. As a result of BLM's 2016 Venting and Flaring Rule, the Division will now be required to evaluate the Rule's record-keeping and reporting requirements when drafting the permit. On a practical level, the Division will need to expend time and resources to attempt to streamline and avoid duplicative reporting to WDEQ/AQD, EPA, and the BLM. This will result in differing air quality record-keeping and reporting requirements based solely on whether the production facility involves federal minerals. Ultimately, these differing requirements will result in additional administrative compliance, enforcement, and cost burdens to the WDEQ/AQD and operators. In previous

permitting discussions, operators have informed the Division that operating and permit cost considerations are evaluated by oil and gas production companies when deciding where and whether to invest their development resources. These additional costs resulting from BLM's record-keeping and reporting requirements may result in operators investing their resources in locations not affected by BLM's rule – those states with private minerals but less federal minerals.

26. BLM's 2016 Venting and Flaring Rule adversely affected the Division's current Presumptive-BACT Guidance revision process. Shortly after the 2016 Guidance was released in May 2016, the Division initiated the process to evaluate further revisions that would address oil and gas production facilities throughout Wyoming, not just those under federal leases or that involve federal minerals. Under the Division's guidance revision schedule, the Division anticipated that it would propose revisions as early as the second quarter of 2017. However, the Division's timeline was extended in part so that the Division could consider the BLM's 2016 Venting and Flaring Rule's technical and cost-considerations to oil and gas production facilities located under federal leases or that involve federal minerals.

27. BLM's 2016 Venting and Flaring Rule will adversely affect the Division's ability to timely issue air quality permits for oil and production facilities located under federal leases or that involve federal minerals. Operators apply for air quality permits may face delays as the Division attempts to reconcile BLM's

additional requirements with Wyoming's air quality requirements. It is conceivable that delays caused by BLM's additional requirements may adversely affect Wyoming's ability to timely issue air quality permits for facilities located under federal leases or that involve federal minerals.

28.    BLM's 2016 Venting and Flaring Rule will increase development and implementation costs for the Division's current electronic data management system. In 2014, the Division implemented a comprehensive online Inventory, Monitoring, Permitting And Compliance Tracking (IMPACT) electronic data management system for facilities that fall under Wyoming's Air Quality jurisdiction. This system allows applicants to submit permit applications electronically. In order to appropriately track production facilities subject to BLM's rule, the Division will need to modify IMPACT. Even with taking steps to mitigate development costs, the Division anticipates that it will cost, at a minimum, an additional $15,000 - $30,000 to modify IMPACT. These additional costs come at a time when the Division is faced with reductions to its existing budget.

29.    Many of the oil and gas companies in Wyoming also operate in states that have fewer federal minerals than Wyoming. The BLM's 2016 Venting and Flaring Rule will not affect the operations of these companies in those other states to the magnitude that it will in Wyoming. *See BLM, Table 1, Number of Leases,* (Wyoming has 13,095 BLM leases and other states have from 0 to 7,855)(2017);

https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/oil-and-gas-statistics (site last visited Oct. 3, 2018).  For example, the BLM positively references upcoming California and Pennsylvania regulations.   81 Fed. Reg. at 83019.  However, the number of federal leases in these states as of 2015 were only 545 and 75.

30.     In Wyoming, the BLM's duplicative or contradictory rule that brings with it the specter of increased costs and permitting time frames may encourage those operators, in order to receive a higher rate of return on their investment, to invest more money in operations in states that have fewer federal leases and minerals than Wyoming.  *See* Wyoming State Geological Survey, *Wyoming's Oil and Gas Resources Summary Report,* at p. 3 (February 2015) https://www.wsgs.wyo.gov/products/wsgs-2015-oilgas-Summary.pdf   (site last visited Oct. 3, 2018). For example, several companies have operations in Wyoming and other states such as Pennsylvania that have fewer federal leases and minerals than Wyoming.   Ultimately, this may result in lower mineral tax revenue and the transfer of jobs out of state or create layoffs in Wyoming.

### BLM's Venting and Flaring Rule Variance Provisions Harms Wyoming's Air Quality Compliance Program and Decreases Revenue to Wyoming's Public School Fund

31.     BLM states that it will "grant variances" from particular requirements if a State demonstrates that it "imposes equally effective requirements."  81 Fed.

Reg. at 83010.  The BLM goes on to explain that "if the variance is granted, the BLM has the authority to enforce" those specific state provisions.  81 Fed. Reg. at 83013.  This "variance" provision will harm Wyoming's air quality compliance and enforcement efforts and will decrease revenue to Wyoming's Public School Fund.

32.    Wyoming has an effective and comprehensive air quality compliance and enforcement program.  Wyoming's air quality compliance efforts are led by twenty district engineers and inspectors operating in five district and field offices located in Cheyenne, Casper, Sheridan, Lander, and Pinedale.  As part of their responsibilities, these engineers and inspectors review emission reports and conduct on-site inspections of oil and gas operations and other facilities throughout Wyoming.  As a result, in the time period covering 2011 – 2018, the Division issued more than 183 Notices of Violation to oil and gas operators in Wyoming for failure to comply with Wyoming's air quality standards and regulations.  At least ninety of these Notices involved facilities with federal mineral production.  The resolution of those ninety Notices involved the payment of $767,000 that was ultimately credited to the public school fund.  *See* Wyo. Const. Art. 7, § 5; Wyo. Stat. Ann. § 35-11-424(c).

33.    Under the BLM's variance procedure, the $767,000 that was ultimately credited to Wyoming's public school fund would have gone to the BLM.

## Conclusion

Based on the information provided in this document, my involvement with air quality matters since 2003, and my education, training, and experience, it is my opinion that BLM's 2016 Venting and Flaring Rule will adversely impact Wyoming's existing Air Quality Program and the Public School Fund.

DATED this _24th_ day of October, 2018.

_____
Nancy E. Vehr

STATE OF WYOMING      )
                            ) ss
COUNTY OF LARAMIE    )

The foregoing NANCY E. VEHR AFFIDAVIT was subscribed and sworn to me by Nancy E. Vehr this 24th day of October, 2018.

Witness my hand and official seal.

_____
Notary Public

My Commission Expires: _June 3, 2022_

CYNTHIA M. HAYDEN - NOTARY PUBLIC
COUNTY OF LARAMIE     STATE OF WYOMING
MY COMMISSION EXPIRES JUNE 3, 2022

# ATTACHMENT 3

WYOMING ATTORNEY GENERAL'S OFFICE
ERIK E. PETERSEN, WSB No. 7-5608 (*pro hac vice pending*)
MICHAEL M. ROBINSON, WSB No. 6-2658 (*pro hac vice pending*)
Senior Assistant Attorneys General
Wyoming Attorney General's Office
2320 Capitol Avenue
Cheyenne, WY 82002
Telephone: (307) 777-6946
Facsimile: (307) 777-3542
erik.petersen@wyo.gov
mike.robinson@wyo.gov


DOWNEY BRAND LLP
CHRISTIAN L. MARSH (Bar No. 209442)
455 Market Street, Suite 1500
San Francisco, CA 94105
Telephone: (415) 848-4800
Facsimile: (415) 848-4801
cmarsh@downeybrand.com

Attorneys for THE STATE OF WYOMING

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, by and through XAVIER BECERRA, Attorney General, and the CALIFORNIA AIR RESOURCES BOARD; and STATE OF NEW MEXICO, by and through HECTOR BALDERAS, Attorney General,<br><br>    Plaintiffs,<br><br>    v.<br><br>RYAN ZINKE, Secretary of the Interior, JOSEPH R. BALASH, Assistant Secretary for Land and Minerals Management, United States Department of the Interior; UNITED STATES | Case No. 4:18-cv-05712-YGR<br><br>**DARLA J. POTTER AFFIDAVIT** |

BUREAU OF LAND MANAGEMENT;
and UNITED STATES DEPARTMENT
OF THE INTERIOR,

                    Defendants.

I, Darla J. Potter, being first duly sworn, depose and state of my own knowledge as follows:

1.      I am the Program Manager for the Wyoming Department of Environmental Quality, Air Quality Division's (WDEQ/AQD) Air Quality Resource Management Program (AQRM).  I have knowledge of the facts set forth herein either from my own personal knowledge, or from records of the WDEQ/AQD, and am competent to testify thereto.

## Background, Education, and Relevant Experience

2.      I have a Bachelor of Science degree in Civil Engineering, which I received from the South Dakota School of Mines and Technology in 1992.  I have a Master of Science degree in Civil Engineering, which I received from the South Dakota School of Mines and Technology in 1993.

3.      Prior to my employment with the WDEQ/AQD, I worked for the South Dakota Department of Transportation in Pierre, South Dakota; Stone & Webster Engineering Corporation in Englewood, Colorado; and United Power Association in Stanton, North Dakota.

4.    In 1996, I began working for the WDEQ/AQD as an Environmental Senior Analyst.  I was promoted to the position of Environmental Program Principal in 1998.  My job responsibilities during that time period included reviewing and assessing visibility and air quality related value monitoring data; preparing reasonably attributable visibility long term strategy reports; coordinating with federal agencies on National Environmental Policy Act (NEPA) planning and project specific actions; and conducting technical analyses for air quality permit applications.  I also reviewed visibility analyses for major (Prevention of Significant Deterioration (PSD)) emitting facilities under the direction of the New Source Review (NSR) Program Manager.

5.    In 2005, I was promoted to the position of Environmental Program Supervisor.  I held that position until 2007.  My job responsibilities during that time period included day-to-day management of the NEPA and Policy Coordination section for the WDEQ/AQD; directing the operational, personnel and planning functions of the section; coordinating and communicating with federal agencies on NEPA resource management and energy development project actions; monitoring and delegating work related to reviewing NEPA documents for technical accuracy resulting in preparing comments; supervising and training staff; and providing day-to-day staff assistance regarding technical issues and regulatory interpretations.  My job responsibilities also included representing the WDEQ/AQD in the Western

3

Regional Air Partnership addressing fire effects on air quality and visibility to respond to the requirements of the Regional Haze Rule.

6.     Throughout my employment with the WDEQ/AQD, I interfaced with the Bureau of Land Management (BLM) as a representative of the State of Wyoming's air quality regulatory authority. As the WDEQ/AQD air quality expert, I provided input to BLM Wyoming to ensure that the following oil and gas development project actions addressed air quality and visibility impacts in a manner that did not conflict with the State of Wyoming's air quality regulatory authority: Moxa Arch Environmental Impact Statement (EIS), Fontenelle EIS, Atlantic Rim EIS, Continental Divide EIS, Desolation Flats EIS, Wyodak Coal Bed Methane EIS, Powder River Basin Oil and Gas EIS, Jonah Field II EIS, Jonah II Modified Environmental Assessment, Jonah Infill EIS, Pinedale Anticline EIS, Pinedale Anticline Supplemental EIS, and Continental – Divide Creston EIS.

7.     In 2007, I was promoted to the position of Natural Resources Program Supervisor. I held that position until June 2010. My job responsibilities during that time period included day-to-day management of the PSD and minor source construction and modification permitting programs, which is also referred to as New Source Review (NSR); assisting the program manager in directing the operational, personnel and planning functions of the NSR program; reviewing permit analyses for technical accuracy and ensuring that all applicable requirements, rules and

4

regulations have been addressed; monitoring and delegating work related processing applications within the regulatory time frame; meeting with applicants to discuss WDEQ/AQD's interpretation of applicable regulations, policy and guidance; supervising and training staff; and providing day-to-day staff assistance regarding technical issues and regulatory interpretations. My job responsibilities also included review of oil and gas permit applications, technical analyses, public comments, decision documents and permit, correspondence and other documents; and making recommendations to or conferring with the NSR Program Manager. A critical aspect of my job responsibilities included ensuring that applicable regulatory requirements were applied appropriately and consistently throughout industry, including application of the WDEQ/AQD Oil and Gas Production Facilities Permitting Guidance. In addition, I oversaw specialized permitting such as applications for drill rig fleets in the Jonah-Pinedale development area in southwest Wyoming to address current and prevent future air quality and visibility impacts.

8.    Throughout my employment with the WDEQ/AQD, I have been involved with development of revisions to the WDEQ/AQD Oil and Gas Production Facilities Permitting Guidance. The guidance document was compiled to assist oil and gas production operators with the Wyoming Air Quality Standards and Regulations (WAQSR) Chapter 6, Section 2 permitting process. Over time the guidance document has been revised eight (8) times, each time addressing emission

sources and the associated air emissions at oil and gas production sites. In addition, the guidance document has been revised over time to incorporate specific consideration for different control requirements for specific areas of the State. For example, a revision to provide specific guidance was developed for the Jonah/Pinedale Anticline Area in July 2004 due to intensified production activity, increased concentration of production equipment, and the associated air quality impact due to proposed infill drilling.

9.      On July 1, 2010, I was promoted to my current position of Natural Resources Program Manager for the AQRM program, which includes ambient and emission monitoring, air resource planning, and emission inventory sections of the WDEQ/AQD. My current job responsibilities include overall management of the AQRM program; directing the operational, personnel and planning functions of the AQRM program; regulation development activities; policy development activities; managing a staff of about 18; air quality assessment activities; emissions inventory and ambient monitoring information tracking activities; and making recommendations to the WDEQ/AQD Administrator. Combined assessment of emissions inventory, ambient monitoring, and energy development activities enables AQRM to protect Wyoming's air resource. My job responsibilities also include actively leading and participating in special projects such as the WDEQ/AQD Ozone Team. The Ozone Team oversees the development and implementation of the

6

WDEQ/AQD ozone reduction plan to bring the Upper Green River Basin (UGRB) back into attainment with the 2008 Ozone National Ambient Air Quality Standard.

**Wyoming's Control Technology Determinations and Federal Rulemaking**

10.    It is unfortunate that when the BLM released its proposal for the 2016 Rule, it focused its review on Wyoming's regulations for existing oil and gas production facilities in the UGRB non-attainment area for the 2008 Ozone National Ambient Air Quality Standard.   See Waste Prevention, Production Subject to Royalties, and Resource Conservation.   81 Fed. Reg. 6618, 6620, 6621, and 6634 (Feb. 8, 2016).   The WDEQ/AQD UGRB Ozone Strategy reflects the ozone reduction plan to bring the UGRB back into attainment with the 2008 8-hour ozone standard.  Specifically the April 22, 2014, Ozone Strategy stated, *"Develop a Phase I control strategy and regulatory option to reduce emissions from existing upstream and midstream oil and gas sources while preserving the current New Source Review permitting processes.   Initiate the statutory rulemaking process for a technology based rule, which is targeted to be complete by the end of January 2015."*  As a member of the WDEQ/AQD Ozone Team, I provided assistance and support during the existing source rulemaking process, which focused solely on the emission standards and control requirements to bring the area back into attainment.  As a result, evaluation of the capital and operational costs are not directly comparable to those that would be considered to maintain compliance for the remainder of the State

of Wyoming, which is in compliance with the Ozone National Ambient Air Quality Standard.

**BLM's 2016 Rule Negatively Impacts Wyoming's Permitting Process**

11.     During the NSR Program review of permit applications, review of applicable regulatory requirements such as new source performance standards (NSPS) and best available control technology (BACT) are critical to appropriate and consistent regulatory application throughout Wyoming.  As a result of the BLM's adoption of the 2016 Rule, the WDEQ/AQD will now need to consider BLM's requirements and will result in an inconsistent regulatory application for a proposed oil and gas production facility producing federal minerals.

12.     BACT is a standard approach used by air quality state and federal regulatory agencies to determine the greatest degree of emissions control that can be achieved at a specific source and accounts for site-specific variables on a case-by-case basis.  ""Best available control technology" means an emission limitation (including a visible emission standard) based on the maximum degree of reduction of each pollutant subject to regulation under these Standards and Regulations or regulation under the Federal Clean Air Act, which would be emitted from or which results for any proposed major stationary source or major modification which the Administrator, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such source or

modification through application or production processes and available methods, systems, and techniques, including fuel cleaning or treatment or innovative fuel combustion techniques for control of such pollutant. If the Administrator determines that technological or economic limitations on the application of measurement methodology to a particular emissions unit would make the imposition of an emission standard infeasible, he may instead prescribe a design, equipment, work practice or operational standard or combination thereof to satisfy the requirement of Best Available Control Technology. Such standard shall, to the degree possible, set forth the emission reduction achievable by implementation of such design, equipment, work practice, or operation and shall provide for compliance by means which achieve equivalent results. Application of BACT shall not result in emissions in excess of those allowed under Chapter 5, Section 2 or Section 3 of these regulations and any other new source performance standard or national emission standards for hazardous air pollutants promulgated by the EPA but not yet adopted by the State of Wyoming."   Wyoming Air Quality Standards and Regulations Chapter 6, Section 4(a).

13.    For example, if a facility, whose business is enhanced oil recovery, produces 6 tons per year of volatile organic compounds (VOC) emissions, BLM's 2016 Rule would require that facility to control those VOC emissions by flaring. However, based on consideration of site-specific factors, the feasibility of

controlling emissions depends on whether the emitted stream of pollutants can be combusted.   Enhanced oil recovery projects, where carbon dioxide is used to stimulate old formations, do not always emit pollutants in sufficient concentration to combust and thereby thermally destroy VOCs.   Additional fuel, at a significant cost to the operator, may have to be added to the emission stream in order to get it to combust.   In such situations, the added fuel cost and associated emissions may outweigh the environmental benefit of reducing VOC emissions by about 5.7 tons per year.   That is not BACT because controls are not technologically feasible or economically reasonable.   Yet, under the BLM 2016 Rule, the company would be required to install such controls.

14.   It is also important to understand the role of NSPS in BACT determinations. A NSPS does not represent the best technology available; it instead represents the best technology available nationwide, regardless of other case-specific factors.   The NSPS is the least common denominator and must be met.   BACT, on the other hand, is the greatest degree of emissions control that can be achieved at a specific source and accounts for site-specific variables on a case-by-case basis.

15.   The EPA has issued new source performance standards for the oil and gas industry, establishing standards that apply nationwide.   EPA has considered Wyoming's experience and statewide approach for addressing air emissions from the oil and gas industry in development of the nationwide standards.   While the

NSPS establish a least common denominator that must be met, Wyoming's specific control requirements for specific areas of the State through BACT will continue to determine the greatest degree of emissions control that can be achieved at a specific source accounting for specific case-by-case variables.

### BLM's 2016 Rule May Harm Wyoming's Air Quality

16.    In June 2014, the WDEQ/AQD initiated the development of existing source permit-by-rule to address VOC emissions from oil and gas production and compressor station facilities located in the UGRB non-attainment area for the 2008 8-hour ozone standard.  The rule was designed to protect air quality while also enabling economic growth and technology in that specific non-attainment area.  The WDEQ/AQD acknowledged that while additional controls will reduce emissions, if the control removal threshold was set too low, there was actually a possibility of unnecessarily creating more emissions:  "We know with adding controls we'll be reducing emissions.  We also have a threshold in there where they can remove controls, because we know there's an exchange where emissions, if you're sending a low flow to a utility, you may be creating more emissions by generating more $NO_x$ than you are producing."  See Transcript of Hearing Proceedings before the Wyoming Environmental Quality Council at 45:4-9, Testimony of Andrew Keyfauver, WDEQ/AQD Principal Engineer (May 19, 2015).

17.     This testimony highlights why it is necessary and important for the agency with regulatory jurisdiction over Wyoming's air resource to evaluate and regulate emissions.   If other entities attempt to regulate emissions, there is the potential that their actions may actually harm Wyoming's air quality.   The agency with regulatory jurisdiction – primacy- over Wyoming's air resources is the State of Wyoming and its WDEQ/AQD.

18.     Under the BLM's 2016 Rule variance process, the BLM decides whether to grant a variance or not, and if a variance is granted the BLM enforces the WDEQ/AQD's regulations.   This does not eliminate this risk of harm to Wyoming's air quality resources.   Rather, it compounds the risk to Wyoming's air quality resources as those with air quality regulatory experience will no longer be able to assess the combination of permitting, emissions inventory, ambient monitoring, energy development, and compliance oversight to protect Wyoming's air resource.

### Conclusion

Based on the information provided in this document, my involvement with air quality matters since 1996, and my education, training, and experience, it is my opinion that BLM's 2016 Rule will adversely impact Wyoming's existing Air Quality Program.

DATED this _24_ day of October, 2018.

_Darla J. Potter_
Darla J. Potter

STATE OF WYOMING )
                 ) ss
COUNTY OF LARAMIE        )

The foregoing DARLA J. POTTER AFFIDAVIT was subscribed and sworn to me by Darla J. Potter this _24th_ day of October, 2018.

My Commission Expires: _June 3, 2022_   Witness my hand and official seal:

_Cynthia M. Hayden_
                        Notary Public

CYNTHIA M. HAYDEN - NOTARY PUBLIC
COUNTY OF LARAMIE    STATE OF WYOMING
MY COMMISSION EXPIRES JUNE 3, 2022

13

# ATTACHMENT 4



# Department of Environmental Quality

*To protect, conserve and enhance the quality of Wyoming's environment for the benefit of current and future generations.*





Matthew H. Mead, Governor

Todd Parfitt, Director

---

April 22, 2016

Director Neil Kornze
U.S. Department of the Interior
Bureau of Land Management
Attention **1004-AE14**
Mail Stop 2134 LM
1849 C St. NW
Washington, DC 20240

Submitted electronically via www.regulations.gov

RE:   **Waste Prevention, Production Subject to Royalties, and Resource Conservation; Proposed Rule; Docket No. BLM-2016-0001**

Dear Director Kornze:

The Bureau of Land Management (BLM) has proposed new regulations to alter royalty rates, clarify when natural gas is subject to royalties, and limit venting, flaring, and leaking, all purportedly to "reduce the waste of natural gas from mineral leases administered by the BLM." Waste Prevention, Production Subject to Royalties, and Resource Conservation; Proposed Rule, 81 Fed. Reg. 6616 (Feb. 8, 2016). The Wyoming Department of Environmental Quality – Air Quality Division (AQD) appreciates the opportunity to provide comments on this proposal. In this letter, the AQD will explain why the BLM should rescind the portions of this proposed rule that do not comport with the BLM's statutory authority. The AQD also provides more specific technical comments, from the perspective of an air pollution control agency, to the extent that such comments are relevant.

## Introduction

The BLM's proposed rule is relatively straight-forward – increase royalties on BLM administered leases, prohibit venting, limit routine flaring, mandate emissions reductions from a variety of typical oil and gas production processes, and require operators to submit gas capture plans to accompany initial applications to drill. 81 Fed. Reg. 6617. The BLM may have authority to regulate royalty rates as proposed, but the AQD does not take a position on that portion of the BLM's proposed rule. However, other portions of the rule, ostensibly promulgated under the BLM's statutory authority to prevent waste, are environmental requirements that the BLM has neither the authority nor the technical expertise to promulgate. *See, e.g.,* 81 Fed. Reg. 6685

---

Wyoming DEQ Air Quality Division Comment
Docket ID No. BLM–2016–0001
April 22, 2016

(proposed emission standards for certain storage vessels), *id.* at 6684 (proposed performance standards for pneumatic controls). This environmental focus is evidenced by the fact that the BLM's regulation is part of the Obama Administration's clarion call to reduce emissions of greenhouse gases. *See* Executive Office of the President, *The President's Climate Action Plan*, June 2013.[1]

But the agency's singular focus on reducing greenhouse gas emissions caused it to create a regulation that will likely have unintended, negative consequences for local and regional air pollution due to the complex nature of air emissions released by oil and gas production. Congress knew that the complicated nature of air emissions would be best understood and managed by the states and the Environmental Protection Agency (EPA), not the BLM. That is why the Clean Air Act mandates that "[a]ir pollution control at its source is the primary responsibility of State and local governments." 42 U.S.C. § 7401(a)(3). Local regulators have the on-the-ground information and experience necessary to develop effective local pollution control regimes. The BLM does not. EPA Administrator Gina McCarthy recently acknowledged the importance of adhering to appropriate governmental jurisdiction in order to effectively implement environmental regulatory policy at the 2016 ECOS Spring Meeting, proclaiming that state and federal agencies need to "stay in their lanes." Gina McCarthy, 2016 ECOS Spring Meeting: *Pathways to Partnerships: Advancing Environmental Protection*, April 10-13, 2016, Nashville, Tennessee. The BLM's proposed rule does the opposite.

Wyoming has repeatedly been recognized as a national leader in regulating air emissions from oil and gas production, which the BLM recognized through initial outreach efforts to our State, yet summarily dismissed in subsequent claims about the inadequacy of state regulations. 81 Fed. Reg. 6618. This proposed rule disregards the successful regulatory framework that the AQD has developed and used over the past twenty years to control local and regional air pollution by limiting venting, leaking, and flaring from Wyoming oil and gas production facilities. In this proposed rule, the BLM makes assumptions about waste stream composition, leading the agency to inappropriately conclude that it has jurisdiction over all air emissions from all sources located at federal and federalized oil and gas production facilities, when it does not and should not.

This proposed rule would create regulations that are redundant with pre-existing state and federal air pollution control requirements, in contravention of the BLM's own regulations. *See* 43 C.F.R. § 3809.1(b) (the BLM's surface regulations "[p]rovide for maximum possible coordination with appropriate State agencies and to avoid duplication"). The proposed rule also goes against an existing Presidential directive to avoid creating redundant and inconsistent regulations. *See* Executive Order 12866 – Regulatory Planning and Review, 58 Fed. Reg. 51735, 51736 (Oct. 4, 1993) ("[E]ach agency shall avoid regulations that are inconsistent, incompatible, or duplicative with its other regulations or those of other Federal agencies."). "Duplicative regulation that frustrates or delays development and incentivizes operators to move development activity off of federal lands negatively impacts states and tribes which rely heavily on these

---

[1]  Available at: https://www.whitehouse.gov/sites/default/files/image/president27sclimateaction plan.pdf (last accessed April 11, 2016).

Wyoming DEQ Air Quality Division Comment
Docket ID No. BLM–2016–0001
April 22, 2016

revenues to fund public projects and services." *Wyoming v. Dep't. of Interior*, -- F. Supp. 3d -- (D. Wyo. 2015). The proposed rule would also subvert pending regulatory action by the EPA. *See* Reducing Methane Emissions from the Oil and Natural Gas Industry (Mar. 10, 2016)[2] ("EPA announced its next step in reducing emissions of methane from the oil and natural gas industry: moving to regulate emissions from existing sources."). The AQD respectfully requests that the BLM rescind the portions of this proposed rule that exceed its statutory authority.

**Wyoming's Experience**

To bolster the need for this proposed rule, the BLM claims that "no State has established a comprehensive set of requirements addressing all three avenues for waste-flaring, venting, and leaks - and only a few States have significant requirements in even one of these areas[.]" 81 Fed. Reg. 6618. In fact, Wyoming regulates all three aspects of oil and gas production. The Wyoming Oil and Gas Conservation Commission (WOGCC) regulates the amount of gas that is vented or flared from a producing well, and the BLM based the routine flaring limitations in this proposed rule on the WOGCC's rules. 81 Fed. Reg. 6619. *See also Comment Letter from WOGCC Director Mark Watson to BLM Director Kornze, Apr. 21, 2016, submitted to the above-referenced docket*. This rulemaking is arbitrary and capricious as applied in Wyoming because the BLM has not "identified a gap in existing regulations the final rule will fill," nor has it analyzed how current Wyoming regulations "are inadequate to protect against the perceived risks." *Wyoming v. Dep't. of Interior*, -- F. Supp. 3d -- (D. Wyo. 2015).

For over 20 years, the AQD has controlled air pollution from oil and gas production sites in Wyoming through permit requirements tailored to the oil and gas sector. *See* February 4, 1997 Memorandum from AQD Administrator, Chuck Collins, to Oil and Gas Producers, regarding Installation of Production Equipment Air Quality Permit Requirements ("Virtually all well production equipment, including fuel fired equipment, separators, storage tanks, engines, and dehydrators has the potential to emit air contaminants."). Because the majority of oil and gas production facilities are minor sources, the AQD establishes requirements through state-administered, federally enforceable New Source Review (NSR) air quality permits. *Rules Wyo. Dep't of Envtl. Quality, Air Quality*, ch. 6, § 2. All NSR permits require owners and operators of minor sources to use the best available control technology (BACT), which is a term of art that refers to the AQD's process of determining the most cost-effective air pollution control method, based on the agency's analysis of the cost of the control against the harm of the pollutant to be avoided. *Rules Wyo. Dep't of Envtl. Quality, Air Quality*, ch. 6, § 2(c)(v). The oil and gas minor source permitting program was a Wyoming initiative, developed by the AQD, and driven by a legislative directive to prevent, reduce, and eliminate pollution and to retain state control over Wyoming's air resource. Wyo. Stat. Ann. § 35-11-102.

The AQD has developed and regularly updates an interpretive policy that describes the presumptive BACT for certain oil and gas production facilities in different regions of the State, first developed in 1997 and subsequently revised in 2001, 2004, 2007, 2010, and 2013, as well as

---

[2] Available at: https://www3.epa.gov/airquality/oilandgas/pdfs/20160310fs.pdf (last accessed April 19, 2016).

Wyoming DEQ Air Quality Division Comment
Docket ID No. BLM–2016–0001
April 22, 2016

a pending Spring 2016 revision. (Wyoming Oil and Gas Facilities Chapter 6, Section 2 Permitting Guidance, (Guidance)[3]. The relative frequency by which the AQD updates the Guidance demonstrates the flexibility of the BACT process to capture advances in effective methods of pollution control. Wyoming's Guidance has requirements related to venting, leaking, and flashing emissions from specified production processes and equipment, as well as general fugitive emission monitoring requirements for portions of the State.[4] The EPA relied on the 2010 version of the Guidance when it first began to regulate emissions of volatile organic compounds produced by oil and gas production facilities.

Most oil and gas production facilities are minor sources not subject to permitting under the Clean Air Act and, until recently, not subject to regulation by the EPA. Although Wyoming had regulated these sources for over 20 years, there was no federal oversight of these facilities until a few years ago when the EPA first promulgated new source performance standards for the oil and natural gas sector. EPA's standards were largely based on pre-existing state programs in Wyoming and Colorado. Oil and Natural Gas Sector: New Source Performance Standards and National Emission Standards for Hazardous Air Pollutants Reviews; Proposed Rule 76 Fed. Reg. 52738, 52757, (Aug. 23, 2011) (EPA acknowledged role of Colorado and Wyoming in its own proposed rule); *Out in Front? State and Federal Regulation of Air Pollution Emissions from Oil and Gas Production Activities in the Western United States.* 55 Nat. Resources J. 1 (Fall 2014) ("The [EPA] did not adopt emission standards for most oil and gas production activities until 2012, when it relied on Colorado and Wyoming as proving grounds for control technology."). These new federal regulations created no significant new requirements for owners and operators of minor oil and gas production facilities in Wyoming because the federal regulations derived from requirements in the pre-existing state program. In Wyoming, compliance with state permitting requirements generally meets or exceeds the EPA standards.

Yet, the BLM's review of existing policy and regulations for controlling emissions from oil and gas production sites ignores Wyoming's established and effective approach to regulating new and modified oil and gas production facilities through the NSR permitting process.[5] The BLM

---

[3] 2013 Guidance available at: http://deq.wyoming.gov/aqd/new-source-review/resources/guidance-documents/ (last accessed Apr. 21, 2016).

[4] In the proposed rule, the BLM uses the term "leak detection and repair," which is a term of art that describes a specific approach towards monitoring specific equipment components for leaks. Fugitive emission monitoring, on the other hand, refers to leak detection practices that are not necessarily focused on specific leak thresholds, and allow for leak identification using alternative methods such as optical gas imaging cameras.

[5] This is in contrast to regional BLM analyses in draft Environmental Impact Statements. *For example, see* 2007 Technical support document for Moxa Arch Area Infill Gas Development Project Draft EIS references the AQD permitting program, available at: http://www.blm.gov/wy/st/en/info/NEPA/documents/kfo/moxa_arch.html (last accessed Apr. 13, 2016). *See also* 2016 Continental Divide-Creston Natural Gas Development Project Final Environmental Impact Statement, Volume I, at 3-61, available at: https://cdxnodengn.epa.gov/cdx-enepa-II/public/action/eis/details?eisId=206386 (last accessed Apr. 18, 2016).

Wyoming DEQ Air Quality Division Comment
Docket ID No. BLM–2016–0001
April 22, 2016

only referenced a recent Wyoming regulation that was developed to control ozone precursors emitted from existing oil and gas production sources in the Upper Green River Basin ozone nonattainment area. 81 Fed. Reg. 6618. The BLM's conflation of the Upper Green River Basin existing source rule with its own foray into the realm of air emission regulations demonstrates its lack of technical expertise. The AQD developed the existing source rule to bring the Upper Green River Basin into attainment of the 2008 National Ambient Air Quality Standard (NAAQS) for ozone. The existing source rule focuses entirely on limiting emissions of volatile organic compounds and nitrogen oxides, both of which contribute to localized air pollution. When drafting the rule, the AQD spent a significant amount of time analyzing whether certain ozone events were driven primarily by nitrogen oxides or volatile organic compounds. This analysis identified whether certain control technologies have the effect of mitigating or exacerbating regional pollution. The existing source rule incidentally reaches other emissions, including methane, but it was not designed to do so, and the AQD did not analyze methane emissions during development of the existing source rule.[6] Therefore, the BLM should not attempt to use it without understanding whether its grafted regulations will cause more harm than good to air quality.

**BLM Legal Authority**

The BLM asserts authority to promulgate this rule through two avenues – minimizing methane emissions as a form of minimizing waste of federal resources and minimizing other air emissions as a form of public land management. This broad exercise of authority is premised on an inaccurate chemical analysis of emission streams and on an over-reading of the BLM's land use management authority.

The BLM claims authority from multiple statutes related to developing federal mineral resources. The Mineral Leasing Act of 1920, 30 U.S.C. §§ 188 through 287, and the Federal Oil and Gas Royalty Management Act, 30 U.S.C. §§ 1701 through 1758, each authorize the BLM to oversee mineral leasing on federal land, which includes assessing royalties and preventing the waste of federal mineral resources. The AQD does not address the BLM's authority with respect to royalty rates or the prevention of federal mineral resource waste. 30 U.S.C. §§ 226(b)(1)(A) and 1756. The AQD notes that such policy decisions extend beyond its expertise as an air pollution control agency and provides no comment on those aspects of this proposed rule. However, the AQD has the technical expertise to respond to BLM's attempt to take authority over all air emission streams, whether from leaking pipes, venting valves, or elsewhere, on an assumption that those streams contain enough, or any, methane. Recently, the BLM was reminded by a court that it may not interpret general rulemaking authority granted by mineral leasing statutes as "authority for comprehensive regulations of hydraulic fracturing." *Wyoming v. Dep't. of Interior*, -- F. Supp. 3d

---

[6] Thus, the BLM should not rely on this regulation to support its own regulation of methane emissions. The AQD developed the existing source rule based on an analysis of existing ambient air quality, the influence of volatile organic compounds and nitrogen oxides on the ambient air quality, and the emission control costs associated with lowering emissions of volatile organic compounds and nitrogen oxides. The AQD believes that our analysis does not translate directly towards support of pollution control requirements developed to control methane emissions.

Wyoming DEQ Air Quality Division Comment
Docket ID No. BLM–2016–0001
April 22, 2016

-- (D. Wyo. 2015). It may not now rely on those same statutes as authority to develop air quality regulations.

The BLM claims additional authority to regulate non-methane emissions as part of its general land use oversight under the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. §§ 1701 through 1787. FLPMA requires the BLM to manage public land and assure that there is no "unnecessary or undue degradation" of federal lands. 43 U.S.C. §§ 1701(a)(5) and 1732. The longstanding BLM interpretation of this Congressional directive is that undue degradation occurs in the air quality context when owners or operators fail to comply with federal and state air quality standards. 43 C.F.R. § 3809.420(b)(4). The BLM's newfound interpretation of its own authority to regulate air quality standards above and beyond the EPA and state air pollution prevention agencies is unlawful because it conflicts with Congress's "unambiguous command" that the EPA, not the BLM, prevent air pollution. 5 U.S.C. § 706(2); 42 U.S.C. § 7401(c); *Public Lands Council v. Babbitt,* 167 F.3d 1287, 1294 (10th Cir. 1999).

The Act of March 3, 1909, 25 U.S.C. § 396, the Indian Mineral Leasing Act of 1938, 25 U.S.C. § 396a–g, and the Indian Mineral Development Act of 1982, 25 U.S.C. §§ 2101 through 2108, relate to the BLM's authority over federal mineral resources located in Indian country, with certain exceptions for the Osage Tribe. A discussion of these statutes is unnecessary for the purpose of this comment, which only challenges the BLM's authority on non-Indian federal land. To the extent that the BLM asserts that these provide the BLM with any Congressional authority to control air emissions on non-Indian land, the AQD disagrees.

**BLM's Waste Prevention Authority Does Not Reach All Emissions**

In this proposal, the BLM wrongly assumes that all emission streams produced by oil and gas production facilities constitute a waste of federal mineral resources, specifically methane. This assumption is inaccurate and by proceeding under this assumption, the BLM seeks to promulgate rules in excess of its statutory authority. Air emissions from oil and gas production facilities contain a varying array of chemicals and chemical compounds such as carbon dioxide, nitrogen, hydrogen sulfide, organic compounds, including methane and ethane, and volatile organic compounds, including benzene, toluene, ethylbenzene, and xylenes. The EPA defines volatile organic compounds in the context of controlling ozone precursors and has specifically excluded methane and ethane, which do not form ozone, from their definition. 40 C.F.R. § 51.100(s); *Rules Wyo. Dep't of Envtl. Quality, Air Quality,* ch. 3, § 6(a) (incorporation of EPA definition of volatile organic compounds).

The only way to determine what is contained in any given air emission stream is to perform a chemical analysis of the emission stream itself. In the absence of stream-specific chemical analyses, which the AQD reviews through its source-specific permitting process, an agency is left to make assumptions about what precisely is venting, flaring, or leaking from a particular source. This has significant implications about whether a specified control technology is applied for the purpose of improving air quality or for minimizing the waste of saleable natural gas, and which secondary air pollutants are created through the ostensible pollution control methodology. The BLM assumes, without requisite analysis, that there are sufficient amounts of methane in all types

of air emission streams at oil and gas production facilities to justify the breadth of this proposed rule. This is not true.

For example, the Wyoming well that vented the greatest quantity of air pollutants in 2014 vented a stream of emissions that was 98.5 percent nitrogen and only 1 – 2 percent methane. (*See Attachment A;* correspondence between WOGCC and Samson Oil and Gas Limited, regarding Bluff 1-11 oil and gas production facility, including gas analyses, indicating that the well vented 1,245 McF of nitrogen gas in 108 days; *Did flaring increase in 2015? It depends on how you count.* Casper Star Tribune, Feb. 3, 2016)[7]. The BLM's proposed rule would have required the operator to flare, rather than vent its emission stream. But the only way to do so would have been to add flammable gas to the stream, which would have the doubly harmful effect of wasting a fuel gas and increasing air pollution.

Control techniques that are appropriate for a specific pollutant in a specific location may be inappropriate for another pollutant in another location. The BLM's proposed rule inexplicably adopts a wholesale preference for flaring over venting. 81 Fed. Reg. 6617. This seems to be at odds with the BLM's claim that this rule prevents waste. There is no difference, from the waste minimization perspective, whether an operator vents it to the atmosphere or combusts it in a flare. There is, however, a difference from the environmental perspective. Flaring does not eliminate air pollution, it is a method of converting flammable air pollutants into dust and inflammable air pollutants, and, eventually, water and land pollution through deposition. Regional environmental assessments help air quality agencies determine when, and how, flaring is an appropriate pollution control technique.

Hydrogen sulfide and sulfur dioxide provide another example of the problems associated with developing control techniques without knowing what is in a particular emission stream. The AQD does not allow oil and gas operators to flare sour gas, or gas containing hydrogen sulfide without demonstrating that the operations meet BACT, because doing so creates sulfur dioxide. *See* Guidance at 1. Sulfur dioxide is a criteria pollutant regulated under the Clean Air Act, 42 U.S.C. § 7408, and it is a very heavy chemical compound. A multi-well PAD drilled into a formation that contains sour gas has the potential to become a "major source," subject to more stringent state and federal regulations, if it creates enough sulfur dioxide through flaring. To illustrate this point, flaring 40,000 thousand cubic feet (Mcf) of sour gas in one year can create 100 tons of sulfur dioxide. Facilities that emit or have the potential to emit over 100 tons of sulfur dioxide are "major sources" under the Clean Air Act and have both permitting obligations and potential penalty liabilities at the state and federal level. *See generally* Title V of the Clean Air Act, 42 U.S.C. §§ 7661 through 7661f, and Wyo. Stat. Ann. §§ 35-11-203 through -212 (establishing permitting programs for sources that emit more than 100 tons of certain air pollutants, including sulfur dioxide); *See also* 42 U.S.C. § 7413, Wyo. Stat. Ann. § 35-11-901 (establishing penalties for violations of air quality regulations, including major source permitting regulations). The BLM's proposed rule establishes flaring limits of 21,600 Mcf per well, with exceptions for

---

[7] Available at: http://trib.com/business/energy/did-flaring-increase-in-it-de
pends-on-how-you-count/article_0e234e7a-27b6-5189-b933-5ce77d56b634.html (last accessed Apr. 11, 2016).

Wyoming DEQ Air Quality Division Comment
Docket ID No. BLM–2016–0001
April 22, 2016

operators who demonstrate to the BLM's satisfaction that such limits cause excessive costs, and with no flaring cap on multi-well PAD facilities. 81 Fed. Reg. 6682 (proposed language for § 3179.6). The BLM's misguided proposed rule encourages oil and gas producers to flare sour gas, thereby creating enough sulfur dioxide to potentially create localized air pollution concerns, as well as trigger more stringent permitting requirements under both federal and state air quality regulations. The BLM does not have a holistic understanding of how to regulate a broad array of air pollutants without inadvertently causing additional air quality concerns, and should leave air quality regulation to the subject matter expert agencies.

The improper assertion of authority could result in the BLM forcing a generalized pollution control regime that exacerbates local and regionalized air pollution[8]. Unlike the BLM, which has crafted this proposed rule for the purpose of minimizing one pollutant, the AQD understands the importance of detecting and controlling air pollutants at all levels – ranging from the district engineer who wears a personal hydrogen sulfide monitor when she performs an inspection at a sour gas facility, to the cross-program team that develops regulations focused on minimizing nitrogen oxides and volatile organic compounds in our Upper Green River Basin ozone nonattainment area, to the permitting team that decides what level of additional controls are appropriate to ensure that Wyoming coal-fired power plants do not unnecessarily contribute to regional haze. The BLM was right to defer on air issues to the EPA and the states through their surface regulations, and should not change that longstanding approach. 43 C.F.R. § 3809.420(b)(4).

## FLPMA Does Not Place the BLM in the EPA's Shoes

The BLM "may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law." *Wyoming v. Dep't. of Interior,* -- F. Supp. 3d -- (D. Wyo. 2015) (internal citations omitted). The BLM may not exercise authority that Congress has unambiguously delegated to another federal agency. Here, Congress established the EPA as the federal agency responsible for managing, among other environmental concerns, air pollution prevention. 42 U.S.C. § 7401. Congress has established the BLM as the federal agency responsible for managing public land. However, that responsibility ends where the EPA's begins. Portions of this proposed rule encroach upon regulatory territory that Congress has clearly established as the EPA's.

Congress gave public land management authority to the BLM through FLPMA and directed the agency to manage public land on the basis of "multiple use and sustained yield." 43 U.S.C. §§ 1731 and 1732(a). Congress further authorized the BLM to ensure that there is no "unnecessary or undue degradation" of federal lands. 43 U.S.C. § 1732(b). Current BLM land use regulations require oil and gas producers to avoid undue degradation of federal lands by

---

[8] Wyoming has primacy for general conformity through its state implementation plan (78 FR 158, Aug. 15, 2013). The BLM would need state approval of its general conformity analysis for the Upper Green River Basin ozone nonattainment area in order to ensure that this proposed rule does not negatively impact state efforts to achieve and maintain ozone attainment.

Wyoming DEQ Air Quality Division Comment
Docket ID No. BLM–2016–0001
April 22, 2016

"comply[ing] with applicable Federal and state air quality standards." 43 C.F.R. § 3809.420(b)(4). Recent permissions to drill issued by the BLM in Wyoming have explicit reference to the AQD.[9] In this proposed rule, the BLM unlawfully seeks to redefine the concept of undue degradation of the air resource to give itself authority to directly regulate air emissions. This is arbitrary and capricious because Congress explicitly delegated authority to the states and the EPA to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and productive capacity of its population" 42 U.S.C. § 7401(b)(1). Under the system of cooperative federalism undergirding the Clean Air Act, states are primarily responsible for air pollution control at its source and the EPA is responsible for providing financial assistance and leadership over a cooperative system to prevent and control air pollution at the national, regional, state, and local levels. 42 U.S.C. § 7401(a). Congressional direction is unambiguous – the EPA, not the BLM, is authorized to regulate air pollution. Previously, through environmental analyses of federal action required under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 through 4370m, the BLM has appropriately deferred to the state on air quality issues.[10]

There is overlap between the BLM's statutory authority and that of the EPA. For example, the EPA has the authority to require oil and gas producers to route methane, an air pollutant, to a centralized gathering facility, and similarly, the BLM has the authority to require that operators route all methane, a commodity, to sales lines, or pay royalties for wasting federal mineral resources. However, the area of overlap is small, and does not encompass the breadth of requirements in this proposed rule. The BLM may be able to regulate air pollutants to the extent that they are federal mineral resources, but may not regulate them both in addition to and in lieu of the EPA. In this proposal, the BLM improperly claims authority to regulate air pollutants, as an effort to enhance local air quality, 81 Fed. Reg. 6617, to minimize nuisances to local populations, 81 Fed. Reg. 6627, to mitigate global climate change, 81 Fed. Reg. 6622, for health benefits, 81 Fed. Reg. 6625, and general "environmental benefits." 81 Fed. Reg. 6670.

---

[9] For example, the following language was included in a 2012 BLM approval of an application to drill an oil well for federal minerals in Wyoming: "Operators are advised that prior to installation of any oil and gas well production equipment which has the potential to emit air contaminants, the owner or operator of the equipment must notify the Wyoming Department of Environmental Quality, Air Quality Division (phone 307-777-7391) to determine permit requirements. Examples of pertinent well production equipment include fuel-fired equipment (e.g., diesel generators), separators, storage tanks, engines and dehydrators."

[10] *See Attachment B*; Letter dated December 1, 2005, from the BLM's Pinedale Field Office to EnCana Oil & Gas (USA) Inc., re: Drill Rig Emission COA, acknowledging that the BLM does not have authority to regulate air quality: "It has been administratively determined that BLM does not have the authority to regulate air quality. That authority rests with the Wyoming Department of Environmental Quality." *See also, Attachment C*; Joint Motion to Dismiss Appeal, *In re BP America Production Co.*, IBLA Docket No. 2006-158 at ¶ 1, "In two prior appeals [IBLA Docket Nos. 97-309 and 97-346] involving other oil and gas projects in southwest Wyoming, BLM agreed that . . . other agencies regulate air emissions."

Wyoming DEQ Air Quality Division Comment
Docket ID No. BLM–2016–0001
April 22, 2016

An overlap in the reach of two federal agencies' collective authority does not entitle one agency to do the work of another. For example, the Occupational Safety and Health Administration (OSHA) and the EPA have concurrent authority over diverse types of industrial activity that have air quality implications for both the general public exposed to ambient air, as well as for the workers at those facilities. It makes sense for the EPA and OSHA to each promulgate regulations that describe appropriate scientific methods to analyze whether a certain material contains asbestos. *Compare* 40 C.F.R. § 763.80, Appendix A, subpart F *with* 29 C.F.R. § 1910.1001, Appendix J. However, this overlap does not entitle the EPA to include worker protection requirements within its asbestos regulations. It most certainly does not entitle the EPA to do so when it knows that OSHA is in the process of collecting information to develop worker protection requirements, which is the exact analogue of what the BLM is doing through this rulemaking.

Portions of this proposed rule would subvert the EPA's authority to regulate existing sources of air pollution through a performance standard development process outlined in the Clean Air Act. 42 U.S.C. § 7411. Under Section 111 of the Clean Air Act, Congress established a logical pathway for the EPA to follow when developing and updating regulations to control air emissions from different categories of sources of air pollution. *Id.* The EPA Administrator must publish and occasionally revise a list of sources that cause or significantly contribute to air pollution that may "reasonably be anticipated to endanger public health or welfare." *Id.* § 7411(b)(1)(A). For each listed source category, the EPA must first develop a standard of performance for all new or modified sources. *Id.* § 7411(b)(1)(B). The standard of performance, also referred to as a new source performance standard, or NSPS, reflects emission limits based on the best available pollution control system, taking into account certain statutory factors such as cost and secondary environmental impacts. *Id.* § 7411(a). The EPA must review all standards every eight years and may revise them, as appropriate. *Id.* Upon promulgation of NSPS, the EPA must, with certain exceptions, subsequently develop regulations to guide states to develop plans to control existing source category analogues or step in the shoes of states that fail to develop or enforce appropriate plans to control emissions from existing sources. *Id.* § 7411(d).

Section 111 is not a blank check to the EPA, but rather a scientific approach that the agency uses to develop achievable emission standards for different source categories likely to harm the public health. The EPA is currently following this approach to regulate emissions of methane and volatile organic compounds from oil and gas production facilities. By initiating this rulemaking, the BLM has stepped in front of the EPA's regulation of existing sources, without the benefit of information that the EPA is in the process of collecting from oil and gas operators. Gina McCarthy, *EPA Taking Steps to Cut Methane Emissions from Existing Oil and Gas Sources*, Mar. 10, 2016,[11] ("This is a routine step to assist in the development process for regulations to reduce air pollution. It helps EPA identify the most significant sources of emissions, the kinds of technologies that work best to reduce them, and how those technologies can be applied effectively.").

The EPA Administrator first listed crude oil and natural gas production as a source category subject to Section 111 rulemaking in 1979. Oil and Natural Gas Sector: New Source Performance

---

[11] Available at: https://blog.epa.gov/blog/2016/03/epa-taking-steps-to-cut-methane-emissions-from-existing-oil-and-gas-sources/ (last accessed April 14, 2016).

Wyoming DEQ Air Quality Division Comment
Docket ID No. BLM–2016–0001
April 22, 2016

Standards and National Emission Standards for Hazardous Air Pollutants Review; Proposed Rule, 76 Fed. Reg. 52738, 52741 (Aug. 23, 2011). The EPA initially promulgated NSPS for this source category in 1985, through two separate actions focused on different air emissions from onshore natural gas processing plants. Standards of Performance for New Stationary Sources; Equipment Leaks of VOC from Onshore Natural Gas Processing Plants, 50 Fed. Reg. 26122 (June 24, 1985); Standards of Performance for New Stationary Sources; Onshore Natural Gas Processing $SO_2$ Emissions, 50 Fed. Reg. 40158 (Oct. 1, 1985). In 2011, the EPA first proposed NSPS to limit emissions of volatile organic compounds from oil and gas production facilities. 76 Fed. Reg. 52738. The EPA is currently revising those regulations to limit emissions of methane as well. Oil and Natural Gas Sector; Emission Standards for New and Modified Sources, 80 Fed. Reg. 56593 (Sept. 18, 2015). After finalizing the updates to the NSPS, the EPA will likely redirect its energy towards developing regulations focused on existing sources in that source category. Andrew Childers. April 8, 2016. Bloomberg BNA. *EPA May Revisit Methane Rule on New Oil, Gas Wells[12]*, (EPA Administrator Gina McCarthy described the proposed NSPS for the oil and gas natural sector as "a very large signal of our commitment to move toward regulating existing sources in the oil and gas sector.").

In this proposal, the BLM acknowledges the EPA's role in developing regulations for new and modified oil and gas production facilities, and even proposes to establish compliance exemptions for certain requirements that are similar to requirements in the EPA's concurrently pending rulemaking. *See, e.g.,* 81 Fed. Reg. 6684 (proposed § 3179.102, related to requirements for green completions). These compliance exemptions are problematic both practically and as a demonstration of the BLM's lack of authority to promulgate this rule. As a practical matter, it does not make sense to draft references in one proposed rule to another proposed rule. Assuming that such compliance exemptions are proper, the BLM would need to revisit them all upon the EPA's final promulgation of its concurrent rulemaking. More importantly, these compliance exemptions demonstrate that the BLM is seeking to reach areas over which it has no authority. Moreover, if a portion of its rule is the equivalent to a federal environmental regulation, then it is redundant, in contravention of the BLM's surface regulations as well as Executive Order 12866. 43 C.F.R. § 3809.1; 58 Fed. Reg. 51735. ("[E]ach agency shall avoid regulations that are inconsistent, incompatible, or duplicative with its other regulations or those of other Federal agencies."). The BLM creates additional interpretational problems in its attempt to control air emissions because the agency uses different terms from those utilized by the EPA. For example, BLM's proposed definitions related to "components" and "storage vessels" are inconsistent with the EPA's current definitions of "equipment," "process unit," and "storage vessels." *Compare* 81 Fed. Reg. 6682 *with* 40 C.F.R. § 60.5430.

The AQD takes the position that it is not necessary to specifically describe which aspects of which provisions the BLM is without statutory authority to promulgate for the purpose of putting the BLM on notice of potential future litigation under the Administrative Procedure Act. 5 U.S.C. § 706. As an example of the illegal nature of this proposed rule, the BLM does not have

---

[12] Available at:
http://news.bna.com/erln/ERLNWB/split_display.adp?fedfid=86562845&vname=ernotallissues&jd=a0j1q9x0c8&split=0 (last accessed April 11, 2016).

Wyoming DEQ Air Quality Division Comment
Docket ID No. BLM–2016–0001
April 22, 2016

authority to impose limits on the emissions of volatile organic compounds from crude oil and condensate storage vessels. 81 Fed. Reg. 6685. Wyoming first began to develop requirements to control emissions of volatile organic compounds from storage tanks in 1997. *See* May 22, 1997 Notice from AQD Administrator Charles A. Collins, to Wyoming Oil and Gas Producers, Rescinding Waiver Thresholds for Production Facilities ("The Division will continue to work with operators and industry associations in the development of BACT control guidelines for specific production equipment, with initial emphasis on emissions of volatile organic compounds from atmospheric storage tanks and glycol dehydrators."). The EPA subsequently utilized the AQD's evolved requirements in its first version of the new source performance standards for the oil and gas sector. 40 C.F.R. § 60.5365(e); 76 Fed. Reg. 52757 (The EPA acknowledged role of Colorado and Wyoming in their own proposed rule). Here, the BLM seeks to impose additional requirements on storage vessels, with the option of proving compliance with the EPA's regulations. 81 Fed. Reg. 6685. This is an environmental control requirement with minimal relation to the BLM's authority over methane.

**Variance Approval Process**

In this proposed rule, the BLM offers up state and tribal variances as a provision for "recognizing highly effective State or tribal requirements that reduce flaring and/or venting as much as, or more than, the proposed rule." *Id.* at 6663. Instead of offering relief, the variance provision is likely to increase regional inconsistency without solving the fundamental legal flaws with the proposed rule. The variance process is wholly discretionary, with no opportunity for administrative appeal, or even for cross-agency dialogue with the EPA, the federal agency best suited to evaluate the stringency of federal environmental requirements. *Id.* at 6686. If in drafting this proposed rule, the BLM did not mention Wyoming's minor source permitting program, indicating that it does not understand Wyoming's regulatory framework, what assurance is there that the BLM would be able to do so in the context of determining whether to grant a variance? The variance approval process is too discretionary to be meaningful and does not eliminate the unlawfulness of this proposed rule.

The AQD does not believe that the BLM has the authority to promulgate this rule. However, if the BLM did have such authority, the BLM should substitute the variance process for a process that grants primacy to states. Primacy would minimize administrative inefficiencies and enable the BLM to rely upon state partners, such as Wyoming, that have robust regulatory frameworks to limit air pollution caused by venting, flaring, and leaking. Cooperative federalism enables federal agencies to act in oversight roles, stepping aside when states demonstrate that they are at least as or more capable than their federal partners, and stepping in when states need assistance. The Preamble to this proposed rule contains many positive references to Wyoming's existing regulatory framework, including acknowledging portions of Wyoming regulations that are more stringent that the BLM's proposed rule. 81 Fed. Reg. 6654. Wyoming appreciates that the BLM has recognized the AQD's hard work in controlling emissions from the oil and gas sector by producing a rule heavily influenced by our pre-existing regulatory framework. The AQD recommends that the BLM revise the variance provision of this proposed rule to allow the BLM to grant primacy to states like Wyoming that have a demonstrated ability to limit air emissions from the oil and gas sector.

Wyoming DEQ Air Quality Division Comment
Docket ID No. BLM–2016–0001
April 22, 2016

**Erroneous Regulatory Impact Analysis**

In the environmental assessment included with this proposed rule, the BLM makes the claim that it "determined that an approach focused on royalty collection would not be as effective in reducing the harmful environmental impacts of vented and flared gas." Environmental Assessment at 9. This is the wrong analytical approach for an agency not granted authority to regulate air quality. However, if the BLM accounts for improvements to air quality from the proposed rule, then it must also account for negative impacts that the rule will have on existing air quality. The BLM did not include an analysis of additional emissions resulting from the expanded use of flares or combustors. Although flares are effective at controlling hydrocarbon emissions, they consequentially create nitrogen oxides and particulate matter emissions. Furthermore, the BLM did not address opacity, a measure of visual obscuration that results from the increased use of flares or combustors.

The BLM improperly accounted for the cost of this rule because it double-counts benefits already accruing to the airshed based on existing state regulations. The BLM also fails to account for the administrative costs of complying with the proposed rule, in addition to pre-existing state requirements. For example, Tables 4a and 4b in the regulatory impact analysis list net benefits of reducing emissions from pneumatic controller of $53-73 million dollars. Without considering state regulations, the BLM is incorrectly calculating the potential volumes of saleable waste gas saved by implementing the proposed rules.

The BLM's rule is based, in part, on emissions data from 2013, which is not representative of current economic conditions or today's field operations. When determining potential volumes of saleable gas saved, the BLM did not adequately address how emissions fluctuate with the age and type of oil or gas development. In 2013, Wyoming oil and gas operators were drilling new wells at a rate higher rate than today. New wells typically result in higher hydrocarbon production rates and more emissions. Additional equipment, such as condensate tanks, dehydration equipment, and pneumatic controllers, are installed at the production site when the well first begins production. As a well ages and production declines, equipment is often replaced or removed as a consequence of lower hydrocarbon production. For this reason, Wyoming anticipates waste gas emissions will be lower than 2013 levels as Wyoming drilling activities remain below 2013 levels. The BLM must revise its regulatory impact analysis to account for reduced waste gas emissions that reflect the decline in drilling activities and the aging of production fields.

The BLM's proposed rule includes ambiguous regulatory language that potentially negates or at least substantively reduces the estimated recoverable waste gas volumes. *See, e.g,* 81 Fed. Reg. 6621 (exemption from replacement requirements for pneumatic pumps when operators can demonstrate that the costs would cause the operator to "cease production and abandon significant recoverable oil reserves under the lease."). Oil and gas operations vary from site to site, and AQD supports the BLM's effort to provide operators with warranted flexibility; however, it is not appropriate to overstate recoverable or reduced waste gas volumes when determining the regulatory impact of this proposed rule. The BLM must revise its regulatory impact analysis to account for the exemptions allowed by the proposed rule.

13

Wyoming DEQ Air Quality Division Comment
Docket ID No. BLM–2016–0001
April 22, 2016

The BLM's regulatory impact analysis lacks site-specific data, which is critical both for determining the effectiveness of emissions controls and for determining reduced waste gas volumes resulting from equipment replacement. During the process of permitting oil and gas production sites, the AQD requires operators to submit analytical component analyses of the produced fluids, including gas, oil, and condensate. AQD uses this information to first determine the overall emissions of hydrocarbons, volatile organic compounds, and hazardous air pollutants, and then to determine appropriate levels of emissions controls. There is no "one size fits all" approach to emissions control.

For example, an older producing well in a production field that is using carbon dioxide for enhanced oil recovery may have emitted 10 tons of volatile organic compounds per year. On face value, this level of emissions may warrant installing a flare. A properly operated flare can achieve a destruction efficiency of 98 percent, which would reduce emissions to the atmosphere by 9.8 tons; in turn, the facility would only emit 0.2 tons of volatile organic compounds per year. However, it is AQD's experience that gas streams from wells where carbon dioxide is used to enhance hydrocarbon recovery can contain a high percentage of carbon dioxide, which can lower the heat content of the gas. Gas with a low heat content often requires the addition of supplemental gas – frequently propane – to ensure that the gas fully combusts in a flare. In such situations, the AQD evaluates the technical feasibility and associated cost of requiring the use of a flare, and may determine that the costs of adding supplemental fuel do not warrant the use of a flare. The BLM's regulatory impact analysis does not adequately account for such site-specific conditions and operational limitations when determining beneficial costs of the proposed rule.

**Technical Concerns**

The AQD provides further comment on the stakeholder input to the BLM encouraging the BLM to use NEPA reviews to prevent methane waste, and encouraging the BLM to consider methane waste from all sources in its NEPA analyses, including when considering alternatives and mitigation measures, and when analyzing cumulative impacts. 81 Fed. Reg. 6662. While using NEPA analyses may be a valid approach in terms of examining (and reducing) potential methane waste (e.g., mitigation measures), in actual practice, mitigation options are typically based on estimated emissions and modeled ambient air impacts from the project only. Mitigation options proposed in a Record of Decision (ROD) would not be based on actual emissions or actual field activities, and mitigation options are typically limited to project-only impacts, and not cumulative impacts.

Specifically, the mitigation options evaluated are based on near-field model predicted impacts from a few different configurations of wells, well pads and ancillary equipment located on a one square mile area. These somewhat generic scenarios do not represent actual waste volumes that may be generated. Further, a typical oil and gas EIS project may involve many different operators, and the modeling scenarios associated with the NEPA near-field analysis may not account for the actual practices of the various operators, nor the specific opportunities these operators would have to implement waste minimization.

Wyoming DEQ Air Quality Division Comment
Docket ID No. BLM–2016–0001
April 22, 2016

The AQD has concerns regarding the proposed amendments requiring that, when submitting an APD for a development oil well, an operator would also have to submit a waste minimization plan, which would not be part of the APD, and the execution of which would not be enforceable. 81 Fed. Reg. 6663. The Preamble to the Proposed Rule states that the waste minimization plan would not be part of the APD, and the execution of which would not be enforceable. The APD process would seem to be one of the most effective mechanisms to engage with and require operators to evaluate waste minimization techniques before getting approval to drill. If the waste minimization plan is not part of the APD, and the execution of the plan is not enforceable, then there does not appear to be a reliable mechanism to engage operators seeking APD's to offer creditable information, or to be held accountable for implementing their waste minimization plan.

**Conclusion**

The AQD appreciates the time and resources committed by the BLM in developing the proposed rule and in considering respective revisions or suggestions that have been offered by state air agencies and other stakeholders. In this rulemaking, the BLM seeks to propel itself well beyond its role as a federal land management agency. The proposed rule crosses the line from a waste minimization rule into an environmental regulation. This is not just a clarification of when emissions are considered waste subject to royalty payments; this is an air quality rule. The AQD recommends that the BLM rescind the portions of this rule that are beyond its statutory authority. As always, the AQD is available to discuss any of the concerns outlined in this letter. Please feel free to contact the AQD Administrator, Nancy Vehr, at 307-777-7391.

Sincerely,

Todd Parfitt
DEQ Director

Cc:    Nancy Vehr, AQD Administrator
       Colin McKee, Wyoming Governor's Office Policy Advisor
       Peter Michael, Wyoming Attorney General
       Mark Watson, Wyoming Oil and Gas Conservation Commission

15

# ATTACHMENT 5

WYOMING ATTORNEY GENERAL'S OFFICE
ERIK E. PETERSEN, WSB No. 7-5608 (*pro hac vice pending*)
MICHAEL M. ROBINSON, WSB No. 6-2658 (*pro hac vice pending*)
Senior Assistant Attorneys General
Wyoming Attorney General's Office
2320 Capitol Avenue
Cheyenne, WY 82002
Telephone: (307) 777-6946
Facsimile: (307) 777-3542
erik.petersen@wyo.gov
mike.robinson@wyo.gov

DOWNEY BRAND LLP
CHRISTIAN L. MARSH (Bar No. 209442)
455 Market Street, Suite 1500
San Francisco, CA 94105
Telephone: (415) 848-4800
Facsimile: (415) 848-4801
cmarsh@downeybrand.com

Attorneys for THE STATE OF WYOMING

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, by and through XAVIER BECERRA, Attorney General, and the CALIFORNIA AIR RESOURCES BOARD; and STATE OF NEW MEXICO, by and through HECTOR BALDERAS, Attorney General, | Case No. 4:18-cv-05712-YGR |
| Plaintiffs, | |
| v. | **DANIEL W. NOBLE AFFIDAVIT** |
| RYAN ZINKE, Secretary of the Interior, JOSEPH R. BALASH, Assistant Secretary for Land and Minerals Management, United States Department of the Interior; UNITED STATES BUREAU OF LAND MANAGEMENT; | |

and UNITED STATES DEPARTMENT
OF THE INTERIOR,

                    Defendants.

I, Daniel W. Noble, being first duly sworn, depose and state of my own knowledge as follows:

1.    I am director of the Wyoming Department of Revenue. I have held this position since July 1, 2013. I am over 18 years of age, and I have knowledge of the facts stated herein either from my own personal knowledge or from the records of the Wyoming Department of Revenue. I am competent to testify to these facts.

2.    I received a Bachelor's Degree in Accounting in 1988 from the University of Wyoming.

3.    In my position with the Department of Revenue, I oversee a staff that administers the State of Wyoming's mineral tax laws, including collection of severance taxes imposed for the privilege of removing minerals and other valuable deposits, including oil and natural gas. *See* Wyo. Stat. Ann. §§ 39-14-101 through 39-14-711.

4.    The Department of Revenue's Mineral Tax Division collects and maintains data relevant to the assessment and collection of mineral

severance and ad valorem taxes. This information is stored electronically on the Mineral Tax Division's computer system.

5.  Based on an assumption that the Bureau of Land Management's - 2016 Waste Prevention Rule would delay production from oil and gas wells by approximately 10%, I estimate that, for the 2017 calendar year, the State would suffer a loss of approximately $6.22 million in severance and ad valorem taxes from oil extraction and approximately $2.13 million in severance and ad valorem taxes from natural gas extraction.

DATED: this 25 day of October, 2018.

_____
Daniel W. Noble

STATE OF WYOMING        )
                        ) ss
COUNTY OF LARAMIE       )

The foregoing DANIEL W. NOBLE AFFIDAVIT was subscribed and sworn to me by Daniel W. Noble this 25 day of October, 2018.

Witness my hand and official seal.

_____
Notary Public

My Commission Expires: _2-14-2020_