1  Stacey Geis, CA Bar No. 181444
2  Earthjustice
   50 California St., Suite 500
3  San Francisco, CA  94111-4608
   Phone: (415) 217-2000
4  Fax: (415) 217-2040
   sgeis@earthjustice.org
5  *Local Counsel for Plaintiffs Sierra Club et al.*
6  *(Additional Counsel Listed on Signature Page)*

7

8

9                    **UNITED STATES DISTRICT COURT**
                **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
10

11  **STATE OF CALIFORNIA,** by and
    through **XAVIER BECERRA,** Attorney
12  General, and the **CALIFORNIA AIR
    RESOURCES BOARD; and STATE OF**
13  **NEW MEXICO,** by and through                Case No. 4:18-cv-05712-YGR
    **HECTOR BALDERAS,** Attorney General,
14  **et al.,**                                   Consolidated with No. 4:18-cv-05984-YGR

15                                Plaintiffs,      Judge: Hon. Yvonne Gonzalez Rogers

16                v.

17  **DAVID BERNHARDT,** Secretary of the         **CITIZEN GROUPS' MOTION FOR
    Interior; **JOSEPH R. BALASH,** Assistant     SUMMARY JUDGMENT**
18  Secretary for Land and Minerals
    Management, United States Department of
19  the Interior; **UNITED STATES BUREAU          Date:      January 14, 2020
    OF LAND MANAGEMENT**; and          Time:      10:00 a.m.
20  **UNITED STATES DEPARTMENT OF                 Location:  Courtroom 1, Fourth Floor
    THE INTERIOR,**                                          1301 Clay Street, Oakland, CA 94612
21

22

23                               Defendants.

24

25

26

27

28

Citizen Groups' Motion for Summary Judgment
Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

# **TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION ........................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ..............................................1

FACTUAL BACKGROUND .......................................................................................3

I.      BLM Promulgates the Waste Prevention Rule in Response to Independent Reports
        Demonstrating Pervasive Waste of Publicly Owned Gas. .....................................3

II.     Industry, Some States, and BLM Attempt to Block the Waste Prevention Rule..............4

III.    BLM Rescinds the Waste Prevention Rule...........................................................5

ARGUMENT .............................................................................................................6

I.      BLM Unlawfully and Arbitrarily Defines Its Statutory Duty to Prevent Waste Out of
        Existence (Issue A). ........................................................................................6

        A.      The Rescission fails to ensure that operators "use all reasonable precautions to
                prevent waste" and "safeguard the public welfare" (Issues A-1, A-2). .................6

        B.      BLM's application of its operator profit policy reads BLM's Mineral Leasing
                Act duty to prevent waste out of the statute, and is arbitrary and capricious
                (Issue A-2). .................................................................................10

        C.      BLM's blanket delegation of flaring controls to the states reads BLM's duty to
                prevent waste out of the statute and is arbitrary (Issue A-3). ...........................11

        D.      BLM arbitrarily fails to address the pervasive problem of waste and record
                supporting the Waste Prevention Rule (Issue A-4)........................................14

II.     BLM's "Excessive Regulatory Burden" Justification Is Arbitrary (Issue B). .................15

        A.      BLM's "excessive regulatory burden" justification runs counter to the
                evidence (Issue B-1). ........................................................................15

        B.      BLM's newly disclosed, non-transparent marginal wells analysis violates the
                notice requirements of the APA and is entirely erroneous (Issue B-2). ...............16

                1.      BLM unlawfully provided no notice of its marginal well analysis
                        (Issue B-2a)..........................................................................17

                2.      BLM's marginal well analysis and conclusions are erroneous
                        (Issue B-2b)..........................................................................18

                3.      BLM's marginal well analysis does not support its blanket Rescission
                        (Issue B-2c)..........................................................................20

III.    BLM Arbitrarily Justifies the Rescission on a Conclusion that the Costs of the Waste Prevention Rule Exceed Its Benefits (Issue C). ....................................................................21

    A.    The record does not support BLM's "interim" social cost of methane (Issue C-1)....................................................................................................21

    B.    BLM completely ignores other health and safety harms (Issue C-2). ...................24

    C.    BLM overstates foregone compliance costs (Issue C-3). ......................................25

IV.    BLM Violates the National Environmental Policy Act by Ignoring Significant Public Health and Climate Impacts (Issue D). ................................................................................26

    A.    BLM fails to take a "hard look" at the Rescission's public health, environmental justice, and climate impacts (Issue D-1). ........................................27

        1.    BLM ignores significant health impacts (Issue D-1a). .............................27

        2.    BLM ignores impacts to tribal communities (Issue D-1b). .......................29

        3.    BLM discounts and ignores important climate impacts (Issue D-1c)........32

    B.    BLM violates NEPA by failing to consider the Rescission's air and climate impacts in combination with other federal actions (Issue D-2). ...........................35

    C.    BLM violates NEPA by failing to prepare an EIS despite the Rescission's significant impacts (Issue D-3). ..........................................................................37

CONCLUSION....................................................................................................................40

1

## <u>ANNOTATED TABLE OF CONTENTS</u>

2

**Issue A:  The Rescission Violates the Mineral Leasing Act's Waste Prevention Mandate**

3

4

Issue A-1: The Waste Prevention Rule lawfully implemented the Mineral Leasing Act's mandate to require operators to "use all reasonable precautions to prevent waste"; the Rescission is contrary to that mandate.

5

6

Issue A-2: BLM's new definition of waste violates the Mineral Leasing Act and is arbitrary and capricious

7

Issue A-3: BLM cannot defer its duty to prevent waste to states and tribes

8

9

Issue A-4: BLM failed to explain its change in position about the need for the Waste Prevention Rule and its definition of waste

10

11

**Issue B:  BLM's Justifications for the Rescission Violate the Administrative Procedure Act (APA)**

12

Issue B-1: BLM's justification that the Waste Prevention Rule created excessive regulatory burdens is arbitrary and capricious.

13

14

Issue B-2: BLM's new analysis of impacts to marginal wells is arbitrary and capricious

15

16

Issue B-2a: BLM violated the APA by failing to provide for notice and comment on its new marginal well analysis

17

Issue B-2b: BLM's new marginal well analysis is contrary to the record

18

Issue B-2c: BLM's new marginal well analysis does not support rescinding the Waste Prevention Rule in its entirety

19

20

**Issue C: BLM's Conclusion that the Waste Prevention Rule's Costs Exceed its Benefits is Arbitrary, Capricious, and Contrary to the Record in Violation of the APA**

21

Issue C-1: The record does not support BLM's "interim domestic" social cost of methane

22

23

Issue C-2: BLM arbitrarily ignored the Waste Prevention Rule's benefits

24

Issue C-3: BLM arbitrarily overstates and fails to explain the Waste Prevention Rule's costs

25

**Issue D: BLM Violated the National Environmental Policy Act (NEPA)**

26

Issue D-1: BLM failed to take a hard look at the Rescission Rule's impacts

27

Issue D-1a:  BLM failed to consider the Rescission Rule's impacts on public health

28

1
2

        Issue D-1b:  BLM failed to consider the Rescission Rule's impacts on tribal communities

3

        Issue D-1c:  BLM failed to consider the Rescission Rule's impacts on the climate

4

Issue D-2: BLM failed to consider the Rescission Rule's cumulative impacts

5
6

Issue D-3: Despite the Rescission Rule's significant impacts, BLM did not prepare an Environmental Impact Statement

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## <u>TABLE OF AUTHORITIES</u>

2
**Page(s)**

3
### Cases

4
*Allentown Mack Sales & Serv., Inc. v. NLRB*,
5
    522 U.S. 359 (1998)..........................................................................................................11

6
*Anderson v. Evans*,
7
    371 F.3d 475 (9th Cir. 2004) ........................................................ 31, 33−34, 38, 39

8
*Assiniboine & Sioux Tribes of the Fort Peck Indian Reservation v. Bd. of Oil & Gas
    Conservation of Mont.*,
9
    792 F.2d 782 (9th Cir. 1986) ......................................................................................12

10
*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*,
    462 U.S. 87 (1983)........................................................................................................34
11

12
*Barnes v. U.S. Dep't of Transp.*,
    655 F.3d 1124 (9th Cir. 2011) ...................................................................................34

13
*Boesche v. Udall*,
14
    373 U.S. 472 (1986)........................................................................................................7

15
*Brewster v. Lanyon Zinc Co.*,
16
    140 F. 801 (8th Cir. 1905) ........................................................................................8, 9

17
*Cal. Cmtys. Against Toxics v. EPA*,
    688 F.3d 989 (9th Cir. 2012) ............................................................................ 17−18

18
*Cal. ex rel. Becerra v. U.S. Dep't of the Interior*,
19
    --F. Supp. 3d--, No. C 17-5948 SBA, 2019 WL 2223804
    (N.D. Cal. Mar. 29, 2019)...........................................................12, 14, 20, 21, 22
20

21
*Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*,
    459 F. Supp. 2d 874 (N.D. Cal. 2006) .................................................................28, 29

22
*Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*,
23
    575 F.3d 999 (9th Cir. 2009) ...................................................................................7, 40

24
*Cal. Pub. Util. Comm'n v. FERC*,
    879 F.3d 966 (9th Cir. 2018) ......................................................................................11
25

26
*California v. BLM*,
    286 F. Supp. 3d 1054 (N.D. Cal. 2018) ............................................................. *passim*

27

28

*Cities Serv. Gas Co. v. Peerless Oil & Gas Co.*,
   340 U.S. 179 (1950)..................................................................................9

*Citizens for Better Forestry v. U.S. Dep't of Agric.*,
   632 F. Supp. 2d 968 (N.D. Cal. 2009) .........................................................27

*Coliseum Square Ass'n, Inc. v. Jackson*,
   465 F.3d 215 (5th Cir. 2006) .......................................................................31

*Comms. Against Runway Expansion, Inc. v. FAA*,
   355 F.3d 678 (D.C. Cir. 2004) ....................................................................31

*Ctr. for Biological Diversity v. BLM*,
   937 F. Supp. 2d  1140 (N.D. Cal. 2013) ......................................................38

*Ctr. for Biological Diversity v. NHTSA*,
   538 F.3d 1172 (9th Cir. 2008) ............................................................... *passim*

*Ctr. for Biological Diversity v. Zinke*,
   900 F.3d 1053 (9th Cir. 2018) .................................................................6, 25

*Ecological Rights Found. v. FEMA*,
   --F. Supp. 3d--, No. 17-cv-02788-JD, 2019 WL 2124337
   (N.D. Cal. May 15, 2019) .............................................................................3

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)........................................................................8, 12, 14

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
   528 U.S. 167 (2000).......................................................................................1

*General Chemical Corp. v. United States*,
   817 F.2d 844 (D.C. Cir. 1987) ....................................................................23

*Greater Yellowstone Coal. v. Servheen*,
   665 F.3d 1015 (9th Cir. 2011) .....................................................................16

*Halliburton, Inc. v. Admin. Review Bd.*,
   771 F.3d 254 (5th Cir. 2014) .........................................................................6

*Henderson Co. v. Thompson*,
   300 U.S. 258 (1937)........................................................................................9

*High Country Conservation Advocates v. U.S. Forest Serv.*,
   52 F. Supp. 3d 1174 (D. Colo. 2014).....................................................24, 33

*Humane Soc'y of U.S. v. Locke*,
   626 F.3d 1040 (9th Cir. 2010) .....................................................................22

*Idaho Farm Bureau Fed'n v. Babbitt*,
    58 F.3d 1392 (9th Cir. 1995) ...................................................................17, 18

*Kern v. BLM*,
    284 F.3d 1062 (9th Cir. 2002) .................................................................29, 35

*Latin Ams. for Social & Econ. Dev. v. Fed. Highway Admin.*,
    756 F.3d 447 (6th Cir. 2014) ...........................................................................31

*Mont. Envtl. Info. Ctr. v. U.S. Office of Surface Mining*,
    274 F. Supp. 3d 1074 (D. Mont. 2017).........................................................33, 34

*Morongo Band of Mission Indians v. FAA*,
    161 F.3d 569 (9th Cir. 1998) ...........................................................................31

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983).............................................................................19, 22, 24

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
    177 F.3d 800 (9th Cir. 1999) ...........................................................................21

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
    668 F.3d 1067 (9th Cir. 2011) .................................................................28, 29, 36

*Nat'l Parks & Conservation Ass'n v. Babbitt*,
    241 F.3d 722 (9th Cir. 2001) ...........................................................................40

*Nat'l Parks Conservation Ass'n v. EPA*,
    788 F.3d 1134 (9th Cir. 2015) ...................................................................11, 14

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
    402 F.3d 846 (9th Cir. 2005) ................................................................ 26−27, 38, 40

*Or. Nat. Desert Ass'n v. Jewell*,
    840 F.3d 562 (9th Cir. 2016) ...........................................................................33

*Or. Nat. Desert Ass'n v. Rose*,
    921 F.3d 1185 (9th Cir. 2019) ............................................................................8

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
    795 F.3d 956 (9th Cir. 2015) (*en banc*) ...........................................14, 15, 16, 23, 40

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*,
    494 F.3d 188 (D.C. Cir. 2007) .........................................................................18

*Paulsen v. Daniels*,
    413 F.3d 999 (9th Cir. 2005) ...........................................................................40

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989).................................................................................................26

*S. Fork Band Council of W. Shoshone v. U.S. Dep't of Interior*,
588 F.3d 718 (9th Cir. 2009) ............................................................................28, 29

*San Juan Citizens All. v. BLM*,
326 F. Supp. 3d. 1227 (D.N.M. 2018) ........................................................................37

*Sierra Club v. Bosworth*,
510 F.3d 1016 (9th Cir. 2007) ........................................................................... *passim*

*Sierra Club v. FERC*,
867 F.3d 1357 (D.C. Cir. 2017)..............................................................29, 35, 37

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
255 F. Supp. 3d 101 (D.D.C. 2017) ..........................................................................30

*Te-Moak Tribe of W. Shoshone v. U.S. Dep't of the Interior*,
608 F.3d 592 (9th Cir. 2010) ..................................................................................35

*TRW, Inc. v. Andrews*,
534 U.S. 19 (2001)................................................................................. 8, 10−11

*Turtle Island Restoration Network v. U.S. Dep't of Commerce*,
878 F.3d 725 (9th Cir. 2017) ..................................................................................23

*Union Oil Co. of Cal. v. Morton*,
512 F.2d 743 (9th Cir. 1975) ....................................................................................7

*White Tanks Concerned Citizens, Inc. v. Strock*,
563 F.3d 1033 (9th Cir. 2009) ..................................................................................32

*WildEarth Guardians v. Zinke*,
368 F. Supp. 3d 41 (D.D.C. 2019) ...........................................................34, 36, 37

**Interior Board of Land Appeals Cases**

*Ladd Petroleum Corp.*,
107 IBLA 5 (1989).......................................................................................................10

*Lomax Expl. Co.*,
105 IBLA 1 (1988)...............................................................................................10, 13

*Maxus Expl. Co.*,
122 IBLA 190 (1992)...............................................................................................10

*Rife Oil Properties, Inc.*,
   131 IBLA 357 (1994)..................................................................................................10

## Statutes

5 U.S.C. § 553 ...............................................................................................................1, 3, 17

5 U.S.C. § 706(2)(A)...........................................................................................................1, 40

30 U.S.C. § 187.........................................................................................................................7

30 U.S.C. § 225 .............................................................................................................. *passim*

42 U.S.C. § 4332.......................................................................................................1, 3, 34, 37

43 U.S.C. § 1701(a)(8).............................................................................................................7

43 U.S.C. § 1732(b) .................................................................................................................7

## Federal Regulations

40 C.F.R. § 1500.1 ......................................................................................................26, 33, 34

40 C.F.R. § 1501.3 ...................................................................................................................38

40 C.F.R. § 1501.4 ...................................................................................................................38

40 C.F.R. § 1502.22 .................................................................................................................34

40 C.F.R. § 1502.24 ...........................................................................................................33, 34

40 C.F.R. § 1508.7 .......................................................................................................27, 32, 35

40 C.F.R. § 1508.8 ...................................................................................................................27

40 C.F.R. § 1508.13 .................................................................................................................38

40 C.F.R. § 1508.18 .................................................................................................................38

40 C.F.R. § 1508.27 .............................................................................................27, 34, 38, 39, 40

43 C.F.R. § 46.30 .....................................................................................................................36

43 C.F.R. § 3160.0-5 ...........................................................................................................9, 10

43 C.F.R. § 3179.3 ...................................................................................................................10

1

**Federal Register**

2   58 Fed. Reg. 51,735 (Oct. 4, 1993)...............................................................................24

3   59 Fed. Reg. 7,629 (Feb. 16, 1994) .............................................................................31

4   82 Fed. Reg. 16,093 (Mar. 31, 2017).............................................................................4

5   83 Fed. Reg. 48,189 (Sept. 28, 2018) ............................................................................1

6   83 Fed. Reg. 52,056 (Oct. 15, 2018)............................................................................36

7

**State Regulations**

8
9   Mont. Admin. R. 36.22.1220 ........................................................................................13

10

**Legislative History**

11  163 Cong. Rec. S2851 (May 10, 2017) ..........................................................................5

12  H.R. Rep. No. 65-206 (1917)..........................................................................................7

13  H.R. Rep. No. 65-1138 (1919)........................................................................................7

14

**Other Authorities**

15  Council on Envtl. Qual., *Environmental Justice, Guidance Under the National*
16      *Environmental Policy Act* (1997).........................................................................31

17  Council on Envtl. Qual., *Considering Cumulative Effects Under the National*
        *Environmental Policy Act* (1997).........................................................................35
18
19  EPA, *Proposed Improvements 2016 New Source Performance Standards* (last
        updated Dec. 19, 2018) .........................................................................................36
20
    Fed. R. Civ. P. 56(a) .......................................................................................................1
21
    Stack & Vandenbergh, *The One Percent Problem*, 111 Colum. L. Rev. 1385 (2011).......................32
22
23  Patrick F. Martin & Bruce M. Kramer, 5 *Williams & Meyers, Oil & Gas Law* § 806.3
        (LexisNexis 2018)...................................................................................................9

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on January 14, 2020, at 10:00 a.m., or as soon thereafter as possible, this motion will be heard before the Honorable Yvonne Gonzalez Rogers. Plaintiffs Sierra Club, et al. (Citizen Groups) move for summary judgment pursuant to Federal Rule of Civil Procedure 56(a). As set forth in the accompanying memorandum of points and authorities, Defendant Bureau of Land Management's (BLM) decision to rescind its Waste Prevention Rule, 83 Fed. Reg. 49,189 (Sept. 28, 2018) (Rescission), violated the Mineral Leasing Act, 30 U.S.C. § 225, the Administrative Procedure Act (APA), 5 U.S.C. §§ 553, 706, and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332. Because there are no genuine issues of material fact and Plaintiffs are entitled to judgment as a matter of law, *see* Fed. R. Civ. P. 56(a), this Court should enter summary judgment for the Citizen Groups, set aside the Rescission, and reinstate the Waste Prevention Rule. 5 U.S.C. § 706(2)(A).[1]

## MEMORANDUM OF POINTS AND AUTHORITIES

The Citizen Groups challenge BLM's unlawful rescission of the Waste Prevention Rule's crucial waste prevention and public health protections that applied nationwide to federal and tribal oil and gas drilling. Despite an extensive record demonstrating a pervasive and preventable problem of waste of public resources by private companies, the Rescission largely reverts to the pre-2016 status quo BLM previously determined led to unacceptable waste and health and environmental harms. In doing so, BLM runs roughshod over its statutory duty to prevent waste, fails to base its changed positions on evidence or rationally explain them, and ignores significant environmental impacts.

The Government Accountability Office and other independent reviewers have repeatedly concluded that the federal public lands oil and gas program is plagued by a pervasive problem: private companies wasting publicly owned natural gas through direct venting or combustion (flaring) of the gas to the atmosphere and leaks in infrastructure. In response, BLM promulgated standards to

---

[1] The Citizen Groups have standing to bring this suit. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81 (2000); Exhibit A (standing declarations).

fulfill the Mineral Leasing Act's mandate that it ensure private operators "use all reasonable precautions to prevent waste." 30 U.S.C. § 225. Those standards would have reduced venting of gas by 35% and flaring by 49%. AR915.[2] BLM also recognized that reducing gas loss would benefit public health and the environment by reducing air pollution and greenhouse gases. AR910, 915, 970.

BLM, purportedly in response to an Executive Order aimed at *increasing* energy production, has now rescinded "almost all of the requirements" in the Waste Prevention Rule that would have resulted in actual "gas savings," i.e., reduced natural gas loss. AR21. BLM admits the Rescission *decreases* energy production by 299 billion cubic feet (thereby increasing waste) and will have *no effect* on jobs or investment. AR 22, 24. This illogical reversal is just the latest in a string of unlawful actions BLM has taken to rid private companies of their obligation to conserve public resources.

BLM's Rescission is premised on a new "policy" that redefines waste as occurring only when a private operator would profit from capturing the public gas. *See* AR7. But Congress adopted the Mineral Leasing Act's waste prevention mandate to protect the *public's* interest in *public* resources, not the profit-motivated interests of private companies. Moreover, contrary to its newly minted policy, BLM rescinds even those provisions that would be profitable because BLM claims operators would do them anyway. If BLM cannot require operators to take any actions that are not profitable and need not require operators to take actions that are, there is nothing left of the agency's obligation to ensure operators take any (let alone *all*) reasonable precautions to prevent waste.

Based upon the flimsiest assessment, BLM further abdicates its responsibility to prevent waste by unlawfully delegating control over gas flaring for approximately 99% of federal oil and gas development to a patchwork of state regulations regardless of how much (or whether) those state regulations prevent waste. AR20. In the face of a massive, documented problem of waste of public resources and explicit Congressional mandate, BLM has abandoned the field.

In an effort to support this abdication, BLM ignores its prior, extensive findings and puts its thumb on the analytical scales. For instance, BLM claims the Rule would have unduly burdened

---

[2] In this brief, "AR" refers to administrative record documents with the Bates label "WPRR_AR", "XR" refers to documents labeled "WPRR_XR," and "VF" refers to documents labeled "VF." *See* ECF No. 106 at 2; ECF No. 106.1 ¶ 10.

1    private companies, but bases this claim solely on an erroneous analysis that BLM did not make

2    available for public comment (or, indeed, until over six months into this litigation) in violation of the

3    APA. *See* 5 U.S.C. § 553(b), (c). Similarly, the agency changes its earlier position that the Waste

4    Prevention Rule's benefits outweigh its costs by a "significant margin" by undercounting and

5    ignoring the Rescission's costs to public health and the environment while inflating compliance

6    costs to industry.

7            Its haste to rescind the Waste Prevention Rule, BLM also shortchanged it analysis of the

8    environmental impacts of the Rescission in violation of our country's environmental Magna Carta,

9    NEPA. *See* 42 U.S.C. § 4332. BLM failed to take the legally required "hard look" at the Rescission's

10   public health, environmental justice, and climate impacts, and ignored cumulative impacts. For

11   example, BLM discounts the significant public health impacts to Native American communities

12   living in the midst of oil and gas development by claiming they are "sparsely populated." Wrongly

13   deeming the Rescission's impacts insignificant, BLM relied on a cursory Environmental Assessment

14   (EA) even though it was obliged to prepare a far more comprehensive Environmental Impact

15   Statement (EIS).

16          This Court should vacate the Rescission and reinstate the Waste Prevention Rule.

17                                  **FACTUAL BACKGROUND**

18   **I.      BLM Promulgates the Waste Prevention Rule in Response to Independent Reports
             Demonstrating Pervasive Waste of Publicly Owned Gas.**
19

20          The Mineral Leasing Act requires BLM to ensure that private companies exploiting publicly

21   owned energy resources "use all reasonable precautions to prevent waste of oil or gas." 30 U.S.C.

22   § 225. In 2008 and 2010, the Government Accountability Office raised concerns that BLM's

23   "insufficient and outdated" waste prevention regulations were leading to the loss of "around 40

24   percent of natural gas" that "could be economically captured with currently available control

25   technologies," criticized BLM's failure to provide operators "clear guidance," and "recommended

26   that the BLM update its regulations to require operators to augment their waste prevention efforts."

27   AR910–11, 918. The Interior Department did its own review and estimated that federal oil and gas

28

1    lessees vented or flared more than 462 billion cubic feet of natural gas on public and tribal lands

2    between 2009 and 2015—enough gas to serve over 6.2 million homes for a year. AR916.

3         BLM then embarked on a multi-year process consisting of extensive outreach and careful

4    consideration of stakeholder feedback. On this basis, BLM determined new regulations were

5    necessary because its 35-year-old existing policy, Notice to Lessees and Operators 4A (NTL-4A),

6    AR3010–15, did "not reflect modern technologies, practices, and understanding of the harms caused

7    by venting, flaring, and leaks of gas," and was not "particularly effective in minimizing waste of

8    public minerals," AR916, 918. The Waste Prevention Rule, promulgated in response under BLM's

9    statutory waste prevention mandate, would have reduced venting of natural gas by 35% and flaring

10   by 49%, all the while costing even small operators only an average of 0.15% of per company profits.

11   AR911–15. BLM modeled the Waste Prevention Rule on cost-effective standards that have been

12   required in some states for years and that some operators do voluntarily, and included reasonable

13   exemptions where compliance would lead operators to abandon resources. *See, e.g.*, AR918–20, 925,

14   929, 952. BLM recognized that in addition to preventing waste, the Rule would reduce greenhouse

15   gas emissions and protect communities from smog and carcinogenic air toxins. AR910–15, 1266.

16   Based on its Regulatory Impact Analysis (2016 RIA), BLM concluded the Waste Prevention Rule's

17   benefits outweighed its costs "by a significant margin." AR914.

18   **II.    Industry, Some States, and BLM Attempt to Block the Waste Prevention Rule.**

19         Shortly after BLM finalized the Waste Prevention Rule, industry groups and states requested

20   that a district court preliminarily enjoin the Rule, a request that the court denied, concluding that the

21   challengers were not likely to succeed on the merits. *See* ECF No. 98 at 3–4. When the Trump

22   Administration came into office, the American Petroleum Institute (API) sent Interior Department

23   officials a memo stating that the Waste Prevention Rule was its number one "[p]riority target for

24   repeal." XR1264. BLM began working in March 2017 to determine what provisions of the Waste

25   Prevention Rule to "drop." XR1. On March 28, 2017, the President issued Executive Order 13,783,

26   directing BLM to consider rescinding the Rule. 82 Fed. Reg. 16,093 (Mar. 31, 2017). Together,

27   industry groups and newly appointed Secretary of the Interior Ryan Zinke lobbied members of

28   Congress to repeal the Rule using the Congressional Review Act, AR16931, XR1165, an effort that

1   was blocked when a majority of Senators voted against the motion to proceed to debate on the

2   resolution on May 10, 2017, 163 Cong. Rec. S2851, S2853 (May 10, 2017). The next week, through

3   a flurry of emails, BLM staff were directed to generate a list of comments that opposed the proposed

4   Waste Prevention Rule because it was "overly burdensome," AR180289–94, and a timetable and

5   options for rescinding or replacing the Rule, *e.g.*, XR162–69, 176–78.

6        Meanwhile, with its internal review not yet finished, Secretary Zinke took two actions to stay

7   or suspend the effectiveness of the Waste Prevention Rule in an effort to ensure operators would

8   never have to comply fully with the Rule. Both efforts faltered when courts concluded that they

9   violated the APA. ECF No. 98 at 3–5.

10   **III.    BLM Rescinds the Waste Prevention Rule.**

11        Despite these court losses and the fact that wasteful flaring of gas from federal and Indian

12   leases continued to increase, XR1204, BLM expedited the Rescission rulemaking, *see, e.g.*,

13   AR166946, 166962. Although it had held eight public hearings and listening sessions in

14   promulgating the Waste Prevention Rule, BLM held none prior to rescinding it. AR911, 84043.

15        The final Rescission "remove[s] almost all of the requirements in the 2016 rule that [BLM]

16   previously estimated would … generate benefits of gas savings or reductions in methane

17   emissions"—i.e., the provisions that prevent waste. AR21. It "in large part, re-establishes the

18   longstanding requirements that the 2016 rule replaced," AR1, even though in 2016 BLM concluded

19   those longstanding requirements were outdated and failed to stem pervasive waste problems,

20   AR910–11. BLM itself estimates that the Rescission will result in an additional 299 billion cubic

21   feet of publicly owned natural gas being released into the atmosphere in the next decade, completely

22   erasing the gains it predicted would result from the Waste Prevention Rule. AR22, 91–92. Based

23   largely on the same factual record, and a revised Regulatory Impact Analysis (2018 RIA), BLM also

24   now concludes that the costs of the Waste Prevention Rule outweigh its benefits. AR1.

25        To support its decision, BLM prepared a 26-page EA that did not consider impacts to public

26   health, tribal communities or climate change, nor cumulative impacts. AR295–331. Based on the

27   EA, BLM concludes that rescinding the Waste Prevention Rule's nationwide protections has no

28   significant environmental impacts, and a more comprehensive EIS is not required. AR332–39.

1

**ARGUMENT**

2       Faced with an extensive record documenting the pervasive waste of federal and tribal

3   minerals, BLM removed virtually all the protections designed to address the problem. Instead, BLM

4   largely reverts to the pre-2016 status quo—a situation it previously concluded led to "unacceptably

5   high" levels of waste. AR916. BLM's flawed rationales for doing so violate the Mineral Leasing Act

6   and APA, and BLM's cursory review of the Rescission's environmental impacts violates NEPA.[3]

7   **I.      BLM Unlawfully and Arbitrarily Defines Its Statutory Duty to Prevent Waste Out of
            Existence (Issue A).**

8

9       **A.      The Rescission fails to ensure that operators "use all reasonable precautions to
                prevent waste" and "safeguard the public welfare" (Issues A-1, A-2).**

10      Rather than preventing waste, the Rescission will lead to the loss of 299 billion cubic feet of

11  publicly owned gas. In an attempt to justify how this loss constitutes "all reasonable precautions to

12  prevent waste," the Rescission relies primarily a new policy, advocated by API, AR104026, under

13  which releasing this gas into the atmosphere is only "waste" if capturing the gas would have been

14  profitable to the private company, AR7 ("The BLM has made the policy determination that it is not

15  appropriate for 'waste prevention' regulations to impose compliance costs greater than the value of

16  the resources they are expected to conserve.").[4] BLM's fixation on operator profits to the exclusion

17  of the public's interest in waste prevention violates the Mineral Leasing Act and is arbitrary.

18      The text, context, and history of the Mineral Leasing Act demonstrate Congress intended

19  BLM to actively prevent waste of publicly owned resources. Congress directed BLM to ensure that

20  private operators exploiting public minerals "use all reasonable precautions to prevent waste." 30

21  U.S.C. § 225. The use of the word "all" is unambiguous; BLM must comprehensively prevent the

22  waste of public resources. *See Halliburton, Inc. v. Admin. Review Bd.*, 771 F.3d 254, 266 (5th Cir.

23  2014) (statutory term "all relief necessary" authorized broad remedies because "we think Congress

24

25   [3] The Citizen Groups defer to State Plaintiffs' motion for the standard of review, and argument
     related to BLM's contentions that the Waste Prevention Rule exceeded its statutory authority (part of
26   Issue A-1), and that the administrative burdens do not justify the Rescission (part of Issue C-3).

27   [4] BLM does not assert that requirements of the Waste Prevention Rule are not "reasonable
     precautions," nor could it. BLM based the Rule upon low cost proven technologies and practices
28   already required in some states and used by many operators. *See supra* p. 4. Instead, BLM relies
     entirely on its new concept of "waste."

1   meant what it said. All means all." (quotation and citations omitted)). BLM's waste prevention

2   mandate fulfills Congress' intent to protect and fairly develop the public's resources.

3          In addition to preventing waste, BLM has a duty to "protect[] … the interests of the United

4   States … and … safeguard[] … the public welfare." 30 U.S.C. § 187. Likewise, under the Federal

5   Land Policy and Management Act (FLPMA) BLM must "protect … air and atmospheric" resources

6   and "prevent unnecessary or undue degradation of the [public] lands." 43 U.S.C. §§ 1701(a)(8),

7   1732(b). Through these provisions, Congress mandated that BLM take into account impacts to the

8   public beyond waste, including environmental impacts.

9          The Mineral Leasing Act's legislative history demonstrates Congress' overriding concern

10  was to "reserve to the *Government* the right to supervise, control, and regulate the … [development

11  of public natural resources]." AR21815 (H.R. Rep. No. 65-1138, at 19 (1919) (Conf. Rep.))

12  (emphasis added). Indeed, it was enacted in response to the "monopoly and waste and other lax

13  methods that ha[d] grown up in the administration of our public-land laws." *Id.*; *see also* AR21728

14  (H.R. Rep. No. 65-206, at 6 (1917)) ("Careful provisions relative to continued development to

15  prevent waste and speculation are inserted in the bill that will … practice conservation of this

16  resource that is so universally used and in which we all feel a keen interest in the prevention of its

17  waste in any form."). Rather than leaving it to private companies to manage the exploitation of

18  public resources, Congress explicitly directed BLM to ensure public oil and gas resources are

19  developed to further the public interest—including the specific duties to prevent waste and protect

20  public welfare. *See, e.g.*, *Boesche v. Udall*, 373 U.S. 472, 481 (1986) ("Conservation through control

21  was the dominant theme of the [Mineral Leasing Act] debates."); *Union Oil Co. of Cal. v. Morton*,

22  512 F.2d 743, 747 (9th Cir. 1975) ("Oil and gas deposits … are precious resources belonging to the

23  entire nation. Congress, although encouraging the extraction of these resources by private

24  companies, provided safeguards to insure that their exploitation should inure to the benefit of all.").

25          By fixating on the operator's bottom line, BLM has abdicated *its* obligation to ensure

26  operators take "all reasonable precautions to prevent waste," protect the "interests of the United

27  States" and the "public welfare," and prevent "undue degradation" of public lands. 30 U.S.C.

28  §§ 225, 187; 43 U.S.C. § 1732(b). Contrary to its mandate to protect the *public's* resources, the

1   Rescission explicitly "allows operators to continue implementing waste reduction strategies and

2   programs that *they* find successful and to tailor or modify their programs in a manner that makes

3   sense for *their* operations." AR1 (emphasis added). Because BLM holds minerals in trust for the

4   public, it must consider the broader *public* perspective, including public health, environmental, and

5   climate damages, and not just the operator's bottom line.

6          Indeed, BLM fails to mention its Mineral Leasing Act obligation to protect public welfare or

7   its FLPMA obligations to protect air resources and prevent undue degradation, despite its previous

8   recognition that the Mineral Leasing Act "rests on the fundamental principle that the public should

9   benefit from mineral production on public lands," and that BLM's legal obligations include

10  "regulating the physical impacts of oil and gas development on public lands." AR920–21; *see also*

11  AR1014 (BLM explaining why "a decision to vent or flare that may make sense to the individual

12  operator may constitute an avoidable loss of gas and unreasonable waste when considered from a

13  broader perspective"). BLM's failure to explain its change in position or how the Rescission is

14  consistent with its statutory duties to protect the public violates the APA. *See Or. Nat. Desert Ass'n*

15  *v. Rose*, 921 F.3d 1185, 1190 (9th Cir. 2019) (finding agency's course reversal arbitrary and

16  capricious where the agency "did not explain … what led it to alter its earlier decision or why the

17  new approach was more consistent with the text of the [relevant statute]"); *FCC v. Fox Television*

18  *Stations, Inc.*, 556 U.S. 502, 515–16 (2009) (*Fox*) (requiring agency to fully explain changes in

19  position and demonstrate the new policy is permissible under governing statutes).

20         BLM claims that looking beyond the operator's economic interests would violate the

21  common law "prudent operator standard," incorporated into the Mineral Leasing Act through its

22  "reasonable diligence" requirement, citing a treatise and *Brewster v. Lanyon Zinc Co.*, 140 F. 801,

23  814 (8th Cir. 1905). AR3. However, the Mineral Leasing Act contains *both* a reasonable diligence

24  *and* a waste prevention requirement, and BLM's reading would render the latter superfluous. *See*

25  *TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (recognizing the "cardinal principle of statutory

26  construction" that "no clause, sentence, or word shall be superfluous, void, or insignificant"

27  (quotations and citations omitted)). Moreover, *Brewster* involved private, not public, resources, and

28  demonstrates that the prudent operator standard has long protected lessors (like the United States)

from the "business judgment" of lessees (like private operators). 140 F. at 813 (rejecting idea that the lessee can be trusted to make decisions "in good faith on business judgment"). The court held "an oil and gas lease cannot be said to make the lessee the arbiter of the extent to which, or diligence with which, the exploration and development shall proceed." *Id.* at 813–14.

Likewise, the treatise BLM cites reinforces *Brewster*'s caution regarding the judgment of lessees, explaining that a "view that measures the performance of the operator by his subjective good faith" is an "extreme" view rejected by most courts. AR15597. Indeed, a more recent version of that treatise specifically states that while commentators (and now BLM) have "seized on" the language in *Brewster* to "support the proposition that there can be no violation of the prudent-operator standard unless the operations demanded by the lessor will be profitable to the lessee … the courts have not read the language so broadly." Patrick F. Martin & Bruce M. Kramer, 5 *Williams & Meyers, Oil & Gas Law* § 806.3 (LexisNexis 2018).[5] Thus, neither *Brewster* nor the treatise support BLM's operator profit policy.

Despite the foregoing, BLM attempts to defend its new operator profit policy by saying it is the "historic approach" or "longstanding concept." AR1, 3. As just explained, that is not the case. Notably, BLM fails to mention its existing (even now) regulatory definition of "waste of oil or gas" as used in the Mineral Leasing Act, which makes no mention of an operator's profits:

> Waste of oil or gas means any act or failure to act by the operator that is not sanctioned by the authorized officer as necessary for proper development and production and which results in: (1) A reduction in the quantity or quality of oil and gas ultimately producible from a reservoir under prudent and proper operations; or (2) avoidable surface loss of oil or gas.

43 C.F.R. § 3160.0-5. BLM's new definition of waste mimics this language exactly but *adds* the language "where compliance costs are not greater than the monetary value of the resources they are

---

[5] The Supreme Court has repeatedly recognized the important role of regulation in protecting resources from operators only concerned with profit. For example, in 1937, it upheld a Texas statute that forbid operators from selling natural gas for use in the manufacture of carbon black (a filler) because the legislature had deemed that use wasteful, even though it was profitable for the operators. *Henderson Co. v. Thompson*, 300 U.S. 258, 264 (1937). In 1950, the Supreme Court declared: "It is now undeniable that a state may adopt reasonable regulations to prevent economic *and physical* waste of natural gas … even though the uses to which property may be profitably put are restricted." *Cities Serv. Gas Co. v. Peerless Oil & Gas Co.*, 340 U.S. 179, 185–86 (1950) (emphasis added).

expected to conserve." *Id.* § 3179.3; AR14 (noting the new definition "incorporated the definition of 'waste of oil or gas' from the BLM's operating regulations at 43 C.F.R. § 3160.0-5, but *added* an economic limitation" (emphasis added)). That BLM's definition did not previously include this limitation undercuts its argument that it is longstanding.[6]

## B. BLM's application of its operator profit policy reads BLM's Mineral Leasing Act duty to prevent waste out of the statute, and is arbitrary and capricious (Issue A-2).

Even if it were not plainly contrary to the language, context, and legislative history of the Mineral Leasing Act, this Court should reject BLM's new operator profit policy because, as applied, it unlawfully reads the waste prevention mandate out of the statute entirely. Indeed, in the same breath that BLM announces the new policy, it declines to follow it if doing so would result in retaining portions of the Waste Prevention Rule.

Specifically, with respect to the requirement that operators use pneumatic controllers that waste less gas (called "low-bleed"), BLM concedes "this requirement … would have imposed costs of about $12 million to $13 million and would have generated cost savings from product recovery of $20 million to $26 million." AR12. Per its new policy, lost gas resulting from failure to use low-bleed pneumatic controllers constitutes waste of oil or gas. Yet BLM rescinds this provision anyway "[b]ecause low-bleed pneumatic controllers are often cost effective" and so "BLM does not believe that it is necessary" to retain the provision "even though it was expected to result in overall cost savings." *Id.* By determining that a requirement only prevents waste when it is profitable, and then saying that if it is profitable no requirement is necessary, BLM's interpretation unlawfully renders the Mineral Leasing Act's mandate to prevent waste entirely superfluous. *See TRW, Inc.*, 534 U.S. at

---

[6] BLM also cites two Interior Board of Land Appeals decisions from the 1980s and 1990s for the proposition that the test for whether loss of gas is avoidable is whether it would have been economic to market. AR3 (citing *Rife Oil Properties, Inc.*, 131 IBLA 357, 376 (1994) and *Ladd Petroleum Corp.*, 107 IBLA 5 (1989)). Notably, there are also Interior Board of Land Appeals decisions that suggest the test is *not* economic. *See Lomax Expl. Co.*, 105 IBLA 1, 7 (1988) (flaring without prior approval constitutes per se waste); *Maxus Expl. Co.*, 122 IBLA 190, 196–97 (1992) (charging royalties for unapproved gas venting under NTL-4A). Thus, BLM's cited cases do not demonstrate a uniform policy or that the *only* factor is economic. Indeed, in *Rife*, BLM itself argued that an economic test was *not* the relevant test for venting from gas wells. 131 IBLA at 367, 373.

1    31; *Cal. Pub. Util. Comm'n v. FERC*, 879 F.3d 966, 974 (9th Cir. 2018) (rejecting interpretation that

2    would render provision "surplusage" and "meaningless").

3            Moreover, it is the "hallmark of arbitrary action" for BLM to apply its operator profit policy

4    only where it leads to BLM's preferred result. *Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d

5    1134, 1145 (9th Cir. 2015) (*NPCA v. EPA*) (finding similarly "internally inconsistent" explanation

6    arbitrary); *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374–76 (1998) ("It is hard to

7    imagine a more violent breach of [the reasoned decisionmaking] requirement than applying a …

8    standard … which is in fact different from the … standard formally announced."). BLM's incoherent

9    application of its new policy demonstrates that it is simply a means of achieving its predetermined

10   deregulatory outcome at the expense of BLM's duty, as lessor of publicly owned oil and gas

11   resources, to protect the public's interest in preventing waste. As BLM concedes, the new definition

12   of "waste of oil or gas" does not affect what operators are required to do under the regulation

13   because the term "waste of oil or gas" is not actually used anywhere else in the regulatory language.

14   *See* AR15, 29–31. BLM admits that "technical application of this definition" would never be

15   required and, if it were, the new definition would not control. AR15. Indeed, if the definition

16   controlled, BLM would be unable to eliminate the profitable pneumatic controller requirement.

17   Moreover, as BLM concedes, if the term were operative, it would be impermissibly vague. AR192

18   (declining to specify a time frame for determining profitability, but at the same time recognizing "it

19   would be absurd to apply the definition without taking into account a time frame" because different

20   equipment may capture enough gas to pay for itself over different periods of time); AR84052. These

21   statements show that BLM's new definition and its inconsistent application are not aimed at

22   preventing the waste of public resources, but instead simply a means to a deregulatory end.

23           C.      **BLM's blanket delegation of flaring controls to the states reads BLM's duty to**
24                   **prevent waste out of the statute and is arbitrary (Issue A-3).**

25           BLM also abdicates its affirmative duty to prevent waste of publicly owned oil and gas

26   resources by rescinding the gas capture requirements at the heart of the Waste Prevention Rule. The

27   Rule identified wasteful flaring of natural gas from oil wells as a significant and growing problem,

28   and found the Rule would reduce flaring by 49%. AR915. The Rescission, rather than squarely

1    address this pervasive problem, instead defers—with respect to 99% of production of federal

2    minerals—to a widely varying patchwork of state regulations (regardless of whether those

3    regulations align with BLM's new concept of "waste"). *See* AR19–20. Based on the slightest of

4    factual records, *see infra*, BLM recognizes the regulations "vary from State to State" and will not

5    "necessarily reduce flaring rates in [a] State," but nonetheless concludes that they constitute all

6    "reasonable precautions to prevent undue waste." *Id.* BLM's abdication of its own mandate leads to

7    the absurd result that "waste" of federal, public minerals will differ state to state, and contravenes the

8    agency's affirmative duty to protect the public interest in the development of public minerals from

9    the profit-motivated decisions of private operators. *See supra* pp. 6–8.

10        In 2016, BLM recognized that it has an "independent legal responsibility" to minimize waste,

11   AR911, and that the Mineral Leasing Act, unlike other statutes, did not authorize delegations to state

12   agencies, AR937. The Rescission takes the opposite position, rescinding gas capture requirements

13   and "defer[ing] to State and tribal regulations for the flaring of associated gas." AR14. BLM cites no

14   authority for this delegation and, "absent clear proof of legislative intent to relieve the Secretary of a

15   portion of his duties," an intent *not* present here, BLM may not abandon its duty to the states.

16   *Assiniboine & Sioux Tribes of the Fort Peck Indian Reservation v. Bd. of Oil & Gas Conservation of*

17   *Mont.,* 792 F.2d 782, 795 (9th Cir. 1986).[7] As with BLM's new waste policy that forbids regulation

18   when it is not profitable and finds it unnecessary when it is, BLM's blanket delegation to states

19   renders meaningless Congress' express mandate for *BLM* to prevent waste of federal minerals. At a

20   minimum, BLM must explain its departure from its prior position, something it has failed to do. *See*

21   *Fox*, 556 U.S. at 515–16; *Cal. ex rel. Becerra v. U.S. Dep't of the Interior*, --F. Supp. 3d--, No. C 17-

22   5948 SBA, 2019 WL 2223804, at *10 (N.D. Cal. Mar. 29, 2019) (*Becerra*) (agency acted arbitrarily

23   in "fail[ing] to satisfy its obligation to explain the inconsistencies between its prior findings in

24   enacting [a] Rule and its decision to repeal such Rule").

25

26   ────────────

26   [7] Indeed, the delegation here is even more stark than the one the Ninth Circuit deemed unlawful in

27   *Assiniboine*. There, BLM tried to delegate its authority over tribal lands to Montana by allowing
     operators to apply for oil and gas permits with a state agency rather than BLM, reducing BLM's role

28   to a mere "rubber stamp." 792 F.2d at 786, 793–95. Here, BLM does not even have to rubber stamp
     a state authorization for an operator developing publicly owned gas to allow flaring of that gas.

1    Moreover, even if BLM could defer to state rules, its analysis is "far too slender a reed on
2    which to base the sweeping conclusion that" those regulations constitute all reasonable precautions
3    to prevent waste. *Ecological Rights Found. v. FEMA*, --F. Supp. 3d--, No. 17-cv-02788-JD, 2019
4    WL 2124337, at *7–8 (N.D. Cal. May 15, 2019) (concluding three-page discussion of "complex
5    issue" insufficient). BLM previously found that only one of nine states with extensive oil and gas
6    operations on federal leases has comprehensive requirements to reduce flaring. AR920. Although
7    BLM offers a new overview of the flaring regulations of these states (plus one other), it is *less than*
8    *five pages* long and merely describes these regulations, rather than analyzing whether they
9    effectively prevent waste or are enforced. AR340–45. BLM provides no analysis of how the
10   regulations compare to the Waste Prevention Rule's requirements or each other in terms of the
11   amount of gas captured. Indeed, while some states have gas capture requirements, three of the ten
12   states that BLM reviewed do not even require approval from a state regulatory agency before
13   operators can begin flaring, AR19, a practice previously found to be per se waste under NTL-4A, *see*
14   *Lomax Expl. Co.*, 105 IBLA at 7. Such an analysis cannot demonstrate that all ten states require "*all*
15   reasonable precautions to prevent waste." 30 U.S.C. § 225. In fact, it proves they do not—regulation
16   that vary significantly in terms of effectiveness cannot all constitute *all* reasonable precautions.

17   The closest BLM comes to answering this obvious fault is to claim that state regulations
18   "account[] for the differing geological and infrastructure realities faced by operators in different
19   regions." AR20. But BLM merely asserts these "realities" without providing any assessment of the
20   geology or infrastructure needs that allegedly support reliance on a patchwork of state standards.
21   Moreover, this explanation is undercut by the fact that for the same exact geologic basin crossing
22   two states, very different standards both constitute all reasonable precautions. *Compare* Mont.
23   Admin. R. 36.22.1220 (allowing operators in the Bakken shale basin to flare up to 100 thousand
24   cubic feet per day, approximately 65% capture, AR1016) *with* AR3333–35 (North Dakota state
25   regulation establishing gas capture goals for the Bakken that require up to 91% capture). BLM
26   provides no reasoned explanation for its blanket delegation.

27

28

1

2

> **D.    BLM arbitrarily fails to address the pervasive problem of waste and record supporting the Waste Prevention Rule (Issue A-4).**

3

4    BLM predicated the Waste Prevention Rule upon independent government reports

5 documenting a pervasive and preventable waste problem, and their conclusions that BLM's existing

6 regulations were inadequate. AR910–11, 918. In order to meet its Mineral Leasing Act obligations,

7 BLM found that additional waste regulation was necessary. *See* AR920. In a 180-degree change in

8 position, the Rescission "in large part, re-establishes the longstanding requirements that the 2016

9 rule replaced." AR1. "Given that [BLM] was not writing on a 'blank slate' in connection with [the

10 Rescission], it was incumbent upon it to provide a reasoned explanation as to why" the findings it

11 relied upon in adopting the Waste Prevention Rule "now justified returning to the [prior] regulatory

12 framework." *Becerra*, 2019 WL 2223804, at *8 (citing *Fox*, 556 U.S. at 515); *see also Organized

13 Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 968 (9th Cir. 2015) (*en banc*) (*Kake*) (requiring

14 "reasoned explanation" for disregarding prior factual findings). BLM failed to do so.

15    While BLM acknowledged in the Rescission that it promulgated the Waste Prevention Rule

16 in response to "oversight reviews," AR2, BLM entirely ignored the content of these reviews, and

17 failed to explain why it disagrees with the reviews' conclusions or recommendations. *See NPCA v.

18 EPA*, 788 F.3d at 1142–44. For example, in the Waste Prevention Rule, BLM expressly agreed with

19 the conclusions of these independent reviews that NTL-4A was "outdated," was subject to

20 "inconsistent application," and was not effective in minimizing waste and lost royalties. AR918,

21 939, 1935–36. In the Rescission, BLM "reinstates the NTL–4A standard for flaring in the absence of

22 applicable State or tribal regulations," AR5, but does not mention any of these findings, much less

23 include "a reasoned explanation … for disregarding facts and circumstances that underlay" the Rule,

24 *Kake*, 705 F.3d at 966 (quotations and citations omitted).

25    Likewise, in the Waste Prevention Rule, BLM found that the patchwork of existing

26 Environmental Protection Agency (EPA) and other state oil and gas regulations did not obviate—

27 and indeed underscored—the need for uniform federal standards. AR919–20 (finding that EPA

28 regulations did not address flaring or already-existing sources and that no state or tribe had

comprehensive standards addressing venting, flaring and leaks). In the Rescission, BLM changes

1    course, claiming the Waste Prevention Rule created "unnecessary regulatory overlap" with EPA and

2    state regulations. AR5. But BLM ignores its previous findings, AR919–20, as well as a recent

3    analysis provided by the Citizen Groups showing that more than 80% of wells subject to the Waste

4    Prevention Rule are not subject to EPA or state leak detection standards, AR84119, 22624–33.

5    Likewise, BLM fails to address its previous findings that state regulations are wholly inadequate.

6    AR919. BLM's wholesale failure to grapple with its previous factual findings violates the APA.

7    *Kake*, 795 F.3d at 966–68.

8                                              ***

9            At bottom, through the Rescission, BLM declines to execute its statutory obligation to

10   require operators to "use all reasonable precautions to prevent waste of oil or gas." 30 U.S.C. § 225.

11   BLM limits its authority to those measures that are profitable for operators, but refuses to adopt any

12   such measures because it believes operators will do them anyway. It then delegates authority to the

13   states regardless of whether those state standards constitute all reasonable precautions to prevent

14   waste under any definition. And it walks away from its previous findings without adequate

15   explanation. The result (and the purpose) is a scheme wherein operators do not have to do anything

16   beyond what they are already doing despite a documented rampant, but unacknowledged, waste

17   problem. The Rescission expressly authorizes the very sorts of problems Congress intended the

18   Mineral Leasing Act to address. While this may be BLM's policy preference, it falls far short of a

19   permissible, non-arbitrary interpretation of agency's statutory obligations.

20   **II.    BLM's "Excessive Regulatory Burden" Justification Is Arbitrary (Issue B).**

21          **A.    BLM's "excessive regulatory burden" justification runs counter to the evidence**
22                  **(Issue B-1).**

23           BLM concluded the Waste Prevention Rule contained "economical, cost-effective, and

24   reasonable" requirements and that compliance costs only represented 0.15% of even small

25   companies' revenues. AR910, 914–15. Upon substantially the same factual record, BLM attempts to

26   justify the Rescission by claiming that "many provisions of the [Waste Prevention Rule] would have

27   added regulatory burdens that unnecessarily encumber energy production, constrain economic

28   growth, and prevent job creation." AR1. BLM came to this conclusion in response to Executive

1    Order 13,783—with no supporting analysis—well before it proposed the Rescission or accepted

2    public comment. XR91–96. It is unexplained and contrary to the evidence. *See Ctr. for Biological*

3    *Diversity v. Zinke*, 900 F.3d 1053, 1069 (9th Cir. 2018) (*Zinke*) (vacating agency decision that came

4    to opposite conclusion "without providing any additional evidence"); *Kake*, 795 F.3d at 967–69

5    (agency must offer a "rationale to explain the disparate findings" (quotation omitted)).

6           Regarding encumbering energy production, BLM concedes that it "do[es] not expect that the

7    [Rescission] will significantly impact the price, supply, or distribution of energy," and that, in fact,

8    the Rescission will cause 299 billion cubic feet *less* natural gas to be produced. AR22. Regarding

9    constraining economic growth, BLM admits that the Rescission will not "substantially alter the

10   investment … decisions of firms" and will only increase average profit margins for small companies

11   by 0.19%, and that "the average reduction in compliance costs associated with [the Rescission] are a

12   small enough percentage of the profit margin for small entities[] so as not to be considered

13   'significant.'" AR23–24. Regarding preventing job creation, BLM acknowledges that the Rescission

14   will not "substantially alter the … employment decisions of firms." AR23. Accordingly, BLM

15   "failed to articulate a rational connection between the [facts] it relied upon and its conclusion" in

16   violation of the APA. *Greater Yellowstone Coal. v. Servheen*, 665 F.3d 1015, 1024 (9th Cir. 2011).

17          Just last year, this Court rejected an identical argument used by BLM in an attempt to defend

18   its decision to suspend the Waste Prevention Rule, concluding that BLM failed to "point to any fact

19   that justifies its assertion that the Waste Prevention Rule encumbers energy production." *California*

20   *v. BLM*, 286 F. Supp. 3d 1054, 1067 (N.D. Cal. 2018) (*California*). So too here. Because both the

21   Waste Prevention Rule and the Rescission "represent a fraction of a percentage point [of changes in

22   small entities' profit margins] … BLM's concern that small operators' ability to maintain or

23   economically operat[e] their wells would be jeopardized is unfounded." *Id*. at 1066.

24          **B.     BLM's newly disclosed, non-transparent marginal wells analysis violates the
25                   notice requirements of the APA and is entirely erroneous (Issue B-2).**

26          The only evidence that allegedly supports BLM's burden conclusion is a supposed analysis

27   of compliance costs compared to revenue at individual marginal wells that it developed long after

28

1    concluding that the Waste Prevention Rule was unduly burdensome.[8] Reliance on this analysis is a

2    violation of the APA, as BLM illegally withheld it from public comment. Even if BLM could rely on

3    it, the belatedly shared data demonstrates that the analysis was entirely erroneous. Moreover, BLM's

4    deeply flawed marginal wells analysis does not support rescinding requirements for *all* wells.

5                    1.      *BLM unlawfully provided no notice of its marginal well analysis (Issue B-2a).*

6            In the Rescission, BLM prominently relies on its new analysis purporting to calculate

7    compliance costs as a percentage of marginal well revenues on a per-well basis. AR 1, 4 (claiming

8    revenue reductions would constitute 24–236% of a single year's revenue for marginal oil well and

9    86–1,037% for a marginal gas well). *Nowhere* in the proposed rule did BLM even hint at such an

10   analysis, much less make any data, analysis, or conclusions pertaining to marginal wells available

11   for public comment. *See* AR417 (discussing marginal wells and concluding with no supporting

12   analysis that the Waste Prevention Rule would impose undue burdens on them), AR431. Indeed,

13   even the final Rescission did not disclose *how* BLM reached its new findings, which conflict with

14   BLM's other conclusion that the compliance costs would not be significant even for small entities.

15   AR23–24. Nor did the initial administrative record shed any light on the matter. Winn Decl. ¶ 6

16   (Exhibit B). Only *after* the Citizen Groups asked BLM to confirm that all material upon which BLM

17   had relied for the new analysis were part of the administrative record did BLM belatedly provide

18   plaintiffs with a spreadsheet of the data BLM claims supports its new conclusions. *Id.* ¶¶ 7–8. The

19   Citizen Groups did not have access to this information until nearly seven months after BLM adopted

20   the final Rescission.

21           BLM's failure to provide the public with notice and a meaningful opportunity to comment on

22   the marginal wells analysis violates the APA. 5 U.S.C. § 553(b), (c); *Idaho Farm Bureau Fed'n v.*

23   *Babbitt*, 58 F.3d 1392, 1404 (9th Cir. 1995) (holding failure to provide the public with "an

24   opportunity to review" a report "central" to the agency's decision violated the APA); *see Cal. Cmtys.*

25

26   ─────────────
     [8] Per BLM, a well is "marginal" if it produces less than 10 barrels of oil or 60 thousand cubic feet of
27   gas per day. AR4. Over 75% of marginal wells on federal and tribal lands are owned by companies
     that operate more than 100 wells on such lands—in other words, large companies. *See* AR96431
28   (companies with over 100 BLM-managed wells own 43,788 of the total 58,120 BLM-managed
     marginal wells).

*Against Toxics v. EPA*, 688 F.3d 989, 993 (9th Cir. 2012) (an agency "must identify and make available technical studies and data that it has employed in reaching the decision to propose particular rules" (quotations and citations omitted)). Here, the new analysis "provided the only scientific information on the" alleged burdens to marginal wells, "unique information that was not duplicated" elsewhere, and was "critical to [BLM]s decision." *Idaho Farm Bureau Fed'n*, 58 F.3d at 1403. Had BLM made this analysis and documentation available for comment, as it was required to do, the Citizen Groups would have offered analyses demonstrating that BLM's conclusions are deeply flawed and misleading, as explained in detail *infra*. BLM's failure to allow comment on its critical analysis substantially prejudiced the Citizen Groups, and the Rescission should be vacated on this ground alone. *Id.*; *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 202–203 (D.C. Cir. 2007) (vacating an agency action for failure to disclose model methodology).

### 2. *BLM's marginal well analysis and conclusions are erroneous (Issue B-2b).*

Even if BLM could overcome this blatant procedural violation, BLM's analyses and conclusions about the Waste Prevention Rule's impact on marginal wells are erroneous and misleading.[9] First, BLM arbitrarily inflates the costs to marginal wells by assuming *all* wells will require *all* controls mandated by the Waste Prevention Rule, when its own analysis elsewhere concedes various control measures will only be required at a *small fraction* of wells. *See* AR36, 88 (explaining that some operators were already complying with some of the Waste Prevention Rule's requirements voluntarily or due to state rules, and different sites will be subject to different parts of the Rule due to site characteristics).[10] Indeed, only a small fraction of wells would experience *all* of the Rule's costs, but BLM's marginal well analysis assumes *all* wells would bear *all* costs.

---

[9] What follows is a subset of critiques the Citizen Groups would have provided if they had been given the required notice and comment opportunity. After the Citizen Groups belatedly obtained the spreadsheet from BLM, they commissioned an assessment of the new data, which revealed a broad range of errors that the Citizen Groups would have presented to BLM but for BLM's failure to include its data, analyses, or conclusions in the proposed Rescission. Winn Decl. ¶¶ 9–10.

[10] BLM concedes that every Waste Prevention Rule requirement would not have required action at every well site. *See* AR88 ("Depending on the existing equipment at the wellsite, under the 2016 rule, the operator *might have been* required to do one or more" actions (emphasis added)).

1    For example, BLM's marginal well analysis assumes that all marginal gas wells will incur

2    the costs associated with installing plunger lift systems (which reduce venting when gas wells are

3    purged during liquids unloading, a process to get rid of liquid build up). AR180479. But BLM

4    elsewhere concedes that only a small fraction of marginal gas wells would be required to install

5    plunger lifts under the Waste Prevention Rule, and possibly none at all. AR70, 89. To calculate how

6    many wells the Waste Prevention Rule would require to install plunger lifts, the 2018 RIA uses two

7    alternative estimates. AR70. One scenario, drawn from the 2016 RIA, estimates 18% of gas wells.

8    AR1130. Another, new to the 2018 Rule, assumes 0% of gas wells. AR70. Both directly controvert

9    the assumptions in BLM's marginal well analysis, which assumes 100% of gas wells would install

10   plunger lifts. AR180479. This is quintessential arbitrary and capricious decision making. *California*,

11   286 F. Supp. 3d at 1070 (finding "flawed and inconsistent assumptions" rendered analysis arbitrary).

12   BLM compounds these serious errors by expressing "the per-well reduction in revenue" in

13   terms of the *total* (ten years worth of) compliance costs per marginal well as a percentage of a *single*

14   *year's* worth of revenue. AR4. This analysis is deeply misleading. First, it assumes that companies

15   incur all capital costs in one year, even though these costs are typically amortized over time. Second,

16   it appears to wrongly assume that future operating costs are also all realized in a single year. BLM's

17   analysis is like a consumer deciding to get a cell phone based on the phone's total cost, which is

18   generally financed over time, *plus* the sum of all future monthly service charges, as a percentage of a

19   single month's paycheck. Indeed, BLM's own data show that when costs are annualized—even

20   using BLM's inflated and inaccurate cost figures—they are an order of magnitude lower: 1–21% of

21   marginal oil well revenues, and 2–39% of marginal gas wells revenues. AR180479. Through its

22   marginal well analysis, BLM fails to provide "a rational connection between the facts found and the

23   choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

24   29, 43 (1983) (*State Farm*) (internal quotations and citations omitted).

25   BLM also arbitrarily fails to provide any evidence relating its new analysis to its alleged

26   concern that marginal wells "could" shut in prematurely, "jeopardiz[ing]" their economic output.

27

28

1    AR4–5.[11] In the Waste Prevention Rule, BLM found that the low cost of controls, additional

2    revenues from the sale of captured gas, and the exemptions available for when requirements would

3    render a well uneconomic made shut-in unlikely even for marginal wells. AR931. BLM's new

4    conclusion regarding marginal well shut-ins is both an unexplained change and counter to the

5    evidence. BLM ignores its own data showing that the Waste Prevention Rule's *total* net compliance

6    costs represent only "a small fraction [approximately 3%] of the economic activity associated with"

7    marginal wells. AR84087. BLM also disregards the Citizen Groups' analysis demonstrating that an

8    operator's decision to shut in a well relies more on absolute production levels than on revenue the

9    well generates, which fluctuates greatly depending on oil or gas prices. AR84086–87. BLM's

10   "conclusory assertions" that the Waste Prevention Rule's requirements *could* cause marginal wells to

11   prematurely shut in and its failure to provide a "reasoned explanation reconciling … inconsistencies"

12   with its prior findings render its analysis arbitrary. *Becerra*, 2019 WL 2223804, at *11–12.

13            3.      *BLM's marginal well analysis does not support its blanket Rescission (Issue*
14                    *B-2c).*

15           Finally, BLM arbitrarily fails to explain why its concern that a subset of the requirements of

16   the Waste Prevention Rule would have placed a "particular burden on marginal wells" justifies

17   rescinding *all* of the Rule's key provisions for *all* wells. AR4. "When considering revoking a rule, an

18   agency must consider alternatives in lieu of a complete repeal, such as by addressing the deficiencies

19   individually." *See Becerra*, 2019 WL 2223804, at *10 (collecting cases). Indeed, this Court recently

20   rejected BLM's identical approach in its attempt to suspend the Rule, concluding that "even if BLM

21   had provided … factual evidence [showing a disproportionate impact on small operators], by itself it

22   would not justify the Suspension Rule, as the rule is not properly tailored and does not merely

23   suspend the Waste Prevention Rule as applied to small operators, but instead is a blanket suspension

24   as to all operators." *California*, 286 F. Supp. 3d at 1066–67. The same is true here. Indeed, BLM's

25   refusal to consider tailoring the Rule demonstrates that its purpose was not to consider ways to

26

27   ───────────────
     [11] Well "shut ins" are a normal part of oil and gas operations. Production at a given well generally
28   declines over time, *see* AR96426, so a high producing well will become marginal over time as
     resources are extracted, and eventually "shut-in" when the operator decides to cease production.

1    reduce regulatory burdens, but rather to implement a predetermined outcome of removing all

2    regulations that limit gas loss.[12]

3    **III.    BLM Arbitrarily Justifies the Rescission on a Conclusion that the Costs of the Waste
4            Prevention Rule Exceed its Benefits (Issue C).**

5           In 2016, BLM concluded "that the benefits of [the Waste Prevention Rule] would outweigh

6    its costs by a significant margin"—between $46 and $204 million per year. AR914. BLM now

7    attempts to justify the Rescission on the opposite finding that the Rule's "compliance costs for

8    industry and implementation costs for the BLM exceed the rule's benefits." AR3. BLM reaches this

9    new conclusion through a gerrymandered analysis that aims to undercount and ignore the

10   Rescission's costs to public health and the environment, while inflating industry's compliance costs.

11          **A.       The record does not support BLM's "interim" social cost of methane (Issue C-1).**

12          In order to slash the Waste Prevention Rule's climate benefits, BLM declined to rely upon

13   the original social cost of methane, the Interagency Working Group (interagency) estimate,

14   developed through a multi-year inter-agency effort that included extensive opportunities for public

15   comment and peer review. *See* AR 7, 84091–92. Instead, BLM relies on an "interim" back-of-the-

16   envelope estimate that the new administration hastily developed in 2017 to justify its numerous

17   deregulatory actions, and that it claims represents a "domestic" damages estimate—something that is

18   impossible to estimate using the current models and methodologies.

19          BLM styles this estimate as "interim," to be used only "until an improved estimate … can be

20   developed." AR7. But BLM cannot use its unsupported "interim" estimate indefinitely when there is

21   a scientifically supported and peer-reviewed estimate available, particularly where it forms such a

22

23   ─────────────
     [12] In fact, in its EA, BLM identified an "alternative" of retaining some of the Rule's provisions for
24   "wells that sell gas to market, wells that would receive positive returns from compliance, or wells
     that are not marginal." AR306. BLM arbitrarily dismissed this alternative without any detailed
25   consideration because "in light of analogous EPA and State regulations, such an approach would not
     meet its goal of eliminating unnecessary regulatory burdens." *Id.* But EPA and state regulations have
26   no impact on whether a more tailored revision would address BLM's (unfounded) burden concerns.
     BLM's failure to consider this alternative that satisfies its stated concerns violates NEPA.
27   *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1999) (holding that
     agency violated NEPA when it "failed to consider an alternative that was more consistent with its
28   basic policy objectives than the alternatives that were the subject of final consideration").

1  critical underpinning of BLM's justification. *See Becerra*, 2019 WL 2223804, at *12 (noting

2  "predicted future actions cannot be used to support a decision already made"). Moreover, BLM has

3  been promising to develop its "improved estimate" for almost two years. AR178220. Yet the Citizen

4  Groups have found no evidence in the record (or elsewhere) that BLM or the federal government

5  generally has done *anything* to move beyond the slapdash "interim" estimate.  It is arbitrary and

6  capricious to rely on this "interim" estimate. *State Farm*, 463 U.S. at 43.

7       Critically, BLM justifies ignoring the interagency estimate in part by claiming that its "final"

8  estimate would "take into consideration the recent recommendations from the National Academies

9  of Sciences, Engineering, and Medicine for a comprehensive update to the current methodology to

10  ensure that the social cost of greenhouse gas estimates reflect the best available science." AR128.

11  But the National Academies' recommendations have been available since early 2017, well before

12  this rulemaking began, as commenters noted. AR22703, 84092. Yet BLM continues to ignore them.

13  BLM cannot "defer[] consideration of substantive comments regarding the regulations at issue."

14  *Becerra*, 2019 WL 2223804, at *16.

15       More importantly, as commenters also pointed out, the National Academies'

16  recommendations completely undermine BLM's "interim" estimate. AR84092–93. The National

17  Academies' report critiques previous efforts to calculate a social cost of carbon based solely on U.S.

18  damages (precisely what BLM's "interim" estimate purports to do) and concludes that an accurate

19  assessment of domestic-only impacts is *not possible* using the existing integrated assessment model

20  methodologies because they are designed to produce global estimates and do not model all relevant

21  interactions among regions. AR22770–72. The National Academies further emphasized that effects

22  that occur internationally can also have significant spill-over effects on the United States, such as

23  impacts on trade and migration, which must be considered in any attempt to estimate domestic only

24  impacts. *Id.* BLM concedes it did not do so. AR7, 206–07; *see also* AR84092 (raising 2017 National

25  Academies recommendation). BLM cannot "avoid its duty to confront these inconsistencies by

26  blinding itself to them." *Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1051 (9th Cir. 2010).

27       In addition, evidence in the record since the development of the interagency estimate

28  suggests that even that estimate was *underestimated*, as methane is even more of a potent greenhouse

1    gas in the short term than previously thought. *See, e.g.*, AR15544–55. Although BLM acknowledges

2    this evidence, it does not take it into account. AR130. BLM's failure to provide a "rational

3    connection between the best available science" and its "interim" estimate renders its decision to rely

4    upon that "interim" estimate arbitrary and capricious. *Turtle Island Restoration Network v. U.S.*

5    *Dep't of Commerce*, 878 F.3d 725, 739 (9th Cir. 2017).

6         BLM's reasoning for relying on this unsupported "interim" estimate is that Executive Order

7    13783 rescinded the technical support documents that formed the basis of the interagency estimate,

8    and that BLM allegedly followed the guidance in OMB Circular A-4. AR1–2, 4, 7. This response is

9    wholly insufficient. While Executive Order 13,783 may have withdrawn the relevant technical

10   support documents for political reasons, it did not and could not erase the scientific and economic

11   facts that formed the foundation for that estimate—facts that BLM now (when convenient) ignores.

12   *See Kake*, 795 F.3d at 969 ("The absence of a reasoned explanation for disregarding previous factual

13   findings violates the APA."). Indeed, despite the "resci[ssion]" of the technical support documents,

14   AR7, BLM continues to rely on the "inputs and modeling" developed for the interagency estimate to

15   provide "discrete alternative scenarios that reflect the best available Federal agency estimates of

16   social costs" for its "interim" estimate. AR130. BLM cannot rely on the interagency

17   recommendations as the "best available Federal agency" estimates for certain aspects of developing

18   its "interim" estimate, including use of the integrated assessment models and methodology

19   recommended by the Group, but disregard findings from the same body of evidence elsewhere. This

20   "internally inconsistent" treatment of the interagency group's findings is arbitrary and capricious.

21   *See General Chemical Corp. v. United States*, 817 F.2d 844, 846, 854 (D.C. Cir. 1987) (agency

22   "cannot have it both ways" by citing evidence as supportive of one conclusion, but disregarding the

23   same evidence when making another finding).

24        BLM also claims that its "interim" estimate, including its purported consideration of

25   domestic impacts, is consistent with OMB Circular A-4. AR74–75. As commenters on the proposed

26   Rescission noted, however, Circular A-4 does not require agencies to exclude consideration of

27   global impacts. AR83419–24. Moreover, the Rescission ignores, and by BLM's own admission

28   underestimates, key *domestic* effects. AR128 (acknowledging BLM's "interim" estimate "may

1  understate the U.S. share" of global damages from methane emissions); *see also* AR83422–31. Even

2  if it were permissible for BLM to consider only domestic impacts from climate change (it is not), its

3  "interim" estimate "fail[s] to consider … important aspect[s] of the problem" and "runs counter to

4  the evidence before the agency." *State Farm*, 463 U.S. at 43.[13]

5  **B.   BLM completely ignores other health and safety harms (Issue C-2).**

6  BLM utterly fails to consider the public health and safety harms that will arise due to the

7  additional smog-forming volatile organic compounds (VOC) and hazardous air pollutants from the

8  Rescission. Given that one of BLM's rationales for the Rescission is that the newly calculated

9  monetized costs of the Waste Prevention Rule outweigh the monetized benefits, BLM has an

10 obligation not to exclude benefits that could be monetized. *High Country Conservation Advocates v.*

11 *U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1191 (D. Colo. 2014) ("In effect the agency prepared half of

12 a cost-benefit analysis, incorrectly claimed that it was impossible to quantify the costs, and then

13 relied on the anticipated benefits to approve the project."); *see also Ctr. for Biological Diversity v.*

14 *NHTSA*, 538 F.3d 1172, 1198–1204 (9th Cir. 2008) (*CBD v. NHTSA*) (failure to consider the social

15 cost of carbon because it was uncertain was arbitrary and capricious, in part because the agency

16 monetized other uncertain benefits). At the very least, BLM was obligated to weigh health impacts

17 before claiming that the costs of the Waste Prevention Rule outweighed its benefits. *See* Exec. Order

18 No. 12,866 § 1(b)(6), 58 Fed. Reg. 51,735, 51,738 (Oct. 4, 1993) (an "agency shall assess both the

19 costs and the benefits of the intended regulation and, recognizing that some costs and benefits are

20 difficult to quantify, propose or adopt a regulation only upon a *reasoned determination* that the

21 benefits of the intended regulation justify its costs" (emphasis added)).

22 BLM only cursorily acknowledges the heath harms associated with the Rescission, stating

23 "VOC and hazardous air pollutants pose negative impacts on climate, health, and human welfare."

24

---

25 [13] BLM also relies upon this Court's decision preliminarily enjoining BLM's earlier attempt to
suspend the Waste Prevention Rule, which concluded that BLM's desire to look only at domestic
26 impacts formed the "factual basis" for its change in position. *California*, 286 F. Supp. 3d at 1070.
Even if as a policy matter BLM could prefer to look at purported domestic impacts, it still cannot use
27 an estimate that that is unsupported by record evidence and fails to consider important aspects of the
problem, like the spillover effect, while failing to respond to specific, material criticisms of that
28 estimate—matters the *California* court did not consider.

1    AR82. BLM acknowledges the Rescission will eliminate the Waste Prevention Rule's health

2    benefits by foregoing emission reductions, but fails to "monetize" the costs to public health and the

3    environment. AR75, 82. BLM fails to provide any explanation for its failure to do so. As the Citizen

4    Groups pointed out, agencies routinely quantify similar health benefits in rulemakings, and there is

5    no reason BLM cannot do the same here. AR84100–01.[14] Even short of monetizing the benefits,

6    BLM makes no attempt to evaluate these "negative impacts," or weigh them against the purported

7    benefits, and ignored requests from commenters to do so. AR220–21, 84100–01.

8        BLM attempts to discount the Rescission's impacts by claiming "emissions … will be

9    dispersed across BLM-managed oil and gas operations nationwide." *See, e.g.*, AR221. But some

10   areas will feel the impacts more acutely. For example, BLM ignores evidence analyzing where

11   pollution that the Waste Prevention Rule would have mitigated will now occur, including comments

12   identifying 6,182 wells in 16 counties that violate federal air quality standards for ozone, and that are

13   not subject to state or EPA leak detection requirements. AR22632–34. These wells will now be free

14   to leak ozone-forming VOCs unchecked. Indeed, this Court previously recognized that suspending

15   the Rule for just one year would "cause irreparable public health and environmental harm to

16   [members of the public] who live and work on or near public and tribal lands with oil and gas

17   development." *California*, 286 F. Supp. 3d at 1073–74. BLM cannot ignore these impacts. *See*

18   *Zinke*, 900 F.3d at 1074 (holding agency action ignoring "available … data" was "arbitrary"); *see*

19   *also infra* pp. 27–28 (discussing BLM's NEPA violations for failure to consider air quality impacts).

20       **C.    BLM overstates foregone compliance costs (Issue C-3).**

21       BLM's analysis of the benefits of the Rescission also relies on flawed and unsupported

22   assumptions. Notably, BLM assumes as the baseline for its cost analysis that *no* operators have taken

23   steps to comply with the Waste Prevention Rule. This assumption is critical because if operators

24

25   ───────────────

     [14] That BLM did not monetize these benefits in the Waste Prevention Rule is irrelevant because in

26   that rulemaking, BLM found that monetized benefits outweighed monetized costs even without
     accounting for health benefits. AR915. Considering those benefits without monetizing them made no

27   difference to the outcome. By contrast, here, ignoring these costs has a significant effect upon
     BLM's conclusion. And because at least some of the lost public health benefits are routinely

28   quantified in other agencies' rulemakings, they should be here as well. *See, e.g.*, AR25660–62.

1    have already made capital investments in equipment upgrades, foregone industry compliance costs

2    associated with the Rescission would be far lower. BLM's entire explanation for its assumption is

3    that "we believe operators will be less likely to [begin compliance] in this case," based on BLM's

4    unlawful prior attempts to suspend the Rule and a single industry trade group claim that unnamed

5    operators were not prepared to comply. *See* AR67. BLM ignores that the Waste Prevention Rule

6    took effect on January 17, 2017, over a year and a half before it finalized the Rescission. AR909.

7    Operators were legally obligated to comply with the Rule for much of 2017 and 2018—with BLM

8    itself stating in March 2018 that it "expects operators to comply with all BLM regulations that are in

9    effect." AR84093–95. BLM also disregards record evidence that undermines its noncompliance

10   assumption, including that major operators were complying with the Rule. *See, e.g.*, AR24151

11   (noting that XTO, the production subsidiary of ExxonMobil, is complying). Even the Interior

12   Department's Chief Economist questioned BLM's choice of baseline. AR177783 ("Is this the most

13   appropriate baseline? The 'delay' reg is not in place. It seems like the baseline should be the reg that

14   is in place now."). In the context of BLM's effort to suspend the Rule, this Court rejected BLM's

15   identical assumption, explaining BLM's "baseless calculation of industry cost savings is not a

16   'judgment call' entitled to deference, but rather an estimated figure that lacks a reasonable basis."

17   *California*, 286 F. Supp. 3d at 1069.

18       Because BLM arbitrarily understates the benefits and overstates the costs, its cost benefit

19   analysis cannot serve as a justification for the Rescission.

20   **IV.    BLM Violates the National Environmental Policy Act by Ignoring Significant Public
21            Health and Climate Impacts (Issue D).**

22       In an attempt to justify its decision to eliminate nationwide regulations that significantly

23   protected public health and reduced greenhouse gas emissions, BLM prepared a cursory EA that

24   violates NEPA by failing to consider the Rescission's serious consequences. *See Robertson v.*

25   *Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (holding NEPA's fundamental purpose is

26   to ensure that "important effects will not be overlooked or underestimated"). NEPA is "our basic

27   national charter for protection of the environment." 40 C.F.R. § 1500.1(a). The statute provides

28   "procedural mechanisms that compel agencies … to take seriously the potential environmental

1   consequences of a proposed action. [Courts] have termed this crucial evaluation a 'hard look.'"

2   *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 864 (9th Cir. 2005) (citation omitted).

3         Agencies must take a "hard look" at environmental impacts before "taking substantive

4   environmental protections off the books." *Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999,

5   1015 (9th Cir. 2009) (*Lockyer II*) (holding that agency violated NEPA by failing to analyze impacts

6   of rescinding nationwide regulation); *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 632 F.

7   Supp. 2d 968, 981 (N.D. Cal. 2009) (rejecting EIS for failure to "actually discuss the environmental

8   consequences of eliminating the specific protections that are provided in the previous …

9   [nationwide] rules"). Here, in its haste to ensure that operators would never have to comply with the

10  Waste Prevention Rule, BLM ignores the significant impacts of rescinding the Waste Prevention

11  Rule. In particular, BLM ignores impacts to the people whose health would have directly benefited

12  from the Rule—including Native Americans living in the midst of expanding oil and gas drilling on

13  public and tribal lands—by dismissing their homes as "sparsely populated." BLM also attempts to

14  downplay the Rescission's climate impacts by ignoring their cumulative significance and arbitrarily

15  ignoring certain domestic and global impacts. In the end, the Rescission's significant impacts—

16  ignored by BLM—require preparation of a more comprehensive EIS, not an EA.

17
18      **A.**    **BLM fails to take a "hard look" at the Rescission's public health, environmental justice, and climate impacts (Issue D-1).**

19          *1.  BLM ignores significant health impacts (Issue D-1a).*

20        Far from taking a hard look, BLM fails to seriously consider the impacts of the Rescission to

21  public health, repeating the error it made in its 2018 RIA, *see supra* pp. 24–25. BLM does so despite

22  this Court's earlier conclusion that suspending the Waste Prevention Rule for just one year would

23  cause health risks in "already at-risk communities … leading to and exacerbating impaired lung

24  functioning, serious cardiovascular and pulmonary problems, and cancer and neurological damage."

25  *California*, 286 F. Supp. 3d at 1073–74.  BLM's failure to examine these impacts violates NEPA.

26        To satisfy its hard look duty, BLM must consider "the direct, indirect, and cumulative"

27  impacts of its proposed action, including "health" impacts. 40 C.F.R. §§ 1508.7, 1508.8,

28  1508.27(b)(7). Here, BLM quantifies the tons of increased ozone precursor and hazardous air

1    pollutant emissions due to the Rescission, but it does not consider what those increased emissions

2    mean for human health and the environment. AR316. Indeed, the Rescission EA's *entire* discussion

3    of air quality impacts is limited to the following:

4         The Proposed Action is expected to affect local air quality. Natural gas contains VOCs,
          which are precursors to ozone and particulate matter, and various toxic air pollutants,
5         such as benzene. These air pollutants affect the health and welfare of humans, as well
          as the health of plant and wildlife species.
6

7    AR315–16. BLM ignores important air quality information, including detailed analysis showing that

8    thousands of wells that would have been required to reduce emissions under the Waste Prevention

9    Rule are located in counties that are already suffering from ozone levels above federal public health

10   standards. *See supra* p. 25. BLM also ignores evidence showing that there are areas in Colorado,

11   Utah, and Wyoming where oil and gas development on public and tribal lands contributes

12   significantly to violations of federal standards. AR84145–46. The Rescission's increased methane

13   emissions will only add to the health threat by leading to warmer temperatures, which increase ozone

14   formation. AR2193. By ignoring the effects of its decision on people living and recreating in these

15   regions, BLM fails to engage in the hard look that NEPA requires. *See S. Fork Band Council of W.*

16   *Shoshone v. U.S. Dep't of Interior*, 588 F.3d 718, 726 (9th Cir. 2009) (holding BLM's failure to

17   consider the air pollution associated with the transport and processing of gold mining ore "shows

18   that it did not take the requisite 'hard look' at the environmental impacts of the proposed project").

19       BLM seeks to avoid its hard look obligations by claiming that it cannot predict precisely

20   where and how fast oil and gas development may progress. AR176–77. But this misses the point.

21   "Because speculation is implicit in NEPA, we must reject any attempt by agencies to shirk their

22   responsibilities under NEPA by labeling any and all discussion of future environmental effects

23   as crystal ball inquiry." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1078–79

24   (9th Cir. 2011) (quotations and alterations omitted); *Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 459

25   F. Supp. 2d 874, 901 (N.D. Cal. 2006) (*Lockyer I*) ("Mere uncertainty about the precise contours of

26   the environmental impact of this major change in [federal regulations] … does not excuse the

27   absence of any overall programmatic NEPA analysis.").

28

1   Nor can BLM avoid its obligations by claiming that it will consider public health *later*.

2   AR237, 321. Agencies cannot "postpone analysis of an environmental consequence to the last

3   possible moment," they must consider impacts "as soon as it can reasonably be done." *Kern v. BLM*,

4   284 F.3d 1062, 1072 (9th Cir. 2002) (rejecting agency's attempt to defer analysis to later site-

5   specific proposals); *Lockyer I*, 459 F. Supp. 2d at 907 (explaining that future site-specific NEPA

6   analysis does not "excuse[] the failure to comply with NEPA where a nationwide Rule has been

7   repealed and replaced with a less environmentally protective scheme").[15] In *Kern*, the Ninth Circuit

8   required BLM to consider impacts in a NEPA document where the problem was "readily apparent"

9   and there was enough information available to "permit productive analysis." 284 F.3d at 1073.

10   Those conditions are satisfied here. BLM knows there are existing air quality problems due to oil

11   and gas development on public and tribal lands, s*ee* AR176–77, and that removing the Waste

12   Prevention Rule's protections will lead to additional ozone precursor emissions, *see* AR316.[16] No

13   crystal ball is necessary to take a hard look at the Rescission's impacts to air quality. *See N. Plains*

14   *Res. Council*, 668 F.3d at 1078–79 (rejecting agency's argument that coal bed methane drilling was

15   "too speculative" to analyze).

16          *2.   BLM ignores impacts to tribal communities (Issue D-1b).*

17   BLM's utter disregard for the Rescission's environmental justice impacts, including

18   significant public health impacts on tribal communities living in the middle of rampant oil and gas

19   drilling, compounds the agency's NEPA violation. Although the public comments on the Rescission

20   were replete with evidence of the impact of drilling emissions on Native American's daily lives and

21

22   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

[15] *See also N. Plains Res. Council*, 668 F.3d at 1078–79 (rejecting agency's attempt to "await the

23   development of site-specific EISs" when sufficient information was available); *Sierra Club v. Bosworth*, 510 F.3d 1016, 1027–30 (9th Cir. 2007) (holding that agency must assess environmental

24   impacts of changing nationally applicable regulation rather than deferring to a project level analysis).

[16] BLM also claims that areas with existing ozone violations are subject to state emissions standards.

25   AR177. BLM, however, may not avoid its NEPA duty to take a hard look at its decision to increase

26   air pollution just because oil and gas operators must also comply with state law. *S. Fork Band Council*, 588 F.3d at 726 (holding that a state air pollution permit "cannot satisfy a federal agency's

27   obligations under NEPA"). Moreover, BLM previously recognized that—despite existing State regulations—the Rule would have "*substantial … air quality benefits*," including reducing ozone

28   precursors. AR1259 (emphasis added).

1    their health, BLM ignored these impacts in its EA. *See, e.g.,* AR83397–98, 83403–04, 96468,

2    104080–82, 159766–67, 163138, 163165–56, 163171–73, 180467–69. Commenters from the Fort

3    Berthold Indian Reservation described the "constant haze" and "seeing the night sky lit up every

4    night – for a decade now." AR83397, 163171. During a formal government-to-government

5    consultation with the Navajo Nation, President Russell Begaye noted that health professionals have

6    noticed an increase in asthma and cancer on the Reservation, and that residents have reported smells

7    and residues on plants and soils around a school in the Nageezi/Counselor area—an area hard hit by

8    oil and gas drilling. AR159757; *see also* AR96468.

9          These types of harms directly impact Citizen Group members living on the Fort Berthold and

10   Navajo Reservations. *See supra* p. 1 n.1 (all standing declarations are included in Ex. A); J. Bird

11   Bear Decl. ¶¶ 13–14, 16 (describing the impacts of flaring and the industrialization of the landscape

12   as a result of oil and gas drilling, including "the orange night sky," the "bluish plume" over her rural

13   reservation, and "noises that sound like a major metropolitan airport is located … just over the hill");

14   T. Bird Bear Decl. ¶¶ 3, 20–24 (describing how she feels like "prisoner in [her] home because of the

15   chemicalized air outside [her] door"); L. DeVille Decl. ¶¶ 14, 16, 21 (describing the constant smell

16   of hydrocarbons and flares that "rumble[] the ground like a train passing by"); Pinto Decl. ¶¶ 11, 14;

17   Begaye Decl. ¶¶ 8, 13–15. Because these impacts disproportionately affect Native Americans living

18   in low-income communities, they raise environmental justice concerns. *See* AR161881–86

19   (concluding that tribal communities experience disproportionate health risks from oil and gas

20   emissions because they are more likely to live within 0.5 miles of an oil and gas well, and that

21   Native Americans living on tribal land in North Dakota, New Mexico, and Utah experience more

22   than double each state's average poverty rates).

23         Yet the EA does not even *mention* the many tribal communities who are suffering the

24   impacts of BLM-approved oil and gas drilling, let alone examine the Rescission's impacts to those

25   communities, as required by NEPA. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,

26   255 F. Supp. 3d 101, 140 (D.D.C. 2017) (holding agency's "bare-bones" environmental justice

27   analysis concluding that Tribe would not be disproportionately harmed violated NEPA's hard look

28   requirement); *see also Sierra Club v. FERC*, 867 F.3d 1357, 1369 (D.C. Cir. 2017) (upholding EIS

that fully discussed disproportionate impacts on environmental-justice communities while recognizing plaintiffs "[p]erhaps … would have a stronger claim if the agency had refused entirely to discuss the demographics of the populations that will feel the pipelines' effects").

Without any analysis, the EA concludes the Rescission "is not expected to have a significant impact on minority and low-income populations living near oil and gas operations." AR318. BLM cannot conclude impacts are not significant absent a comprehensive analysis of the relevant impacts. *Anderson v. Evans*, 371 F.3d 475, 492 (9th Cir. 2004) (holding where a "critical question" was never analyzed the agency could not support its finding that the impacts were not significant). Indeed, BLM's complete disregard for the Rescission's impacts to tribal communities falls well short of Executive Order 12,898 and the Council on Environmental Quality's (CEQ) guidance for considering environmental justice under NEPA, which require every federal agency to "make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies and activities on minority populations and low-income populations," including Native Americans. 59 Fed. Reg. 7,629 (Feb. 16, 1994); CEQ, *Environmental Justice, Guidance Under the National Environmental Policy Act* 9 (1997), https://www.doi.gov/sites/doi.gov/files/uploads/EJ-under-NEPA.pdf (instructing agencies to examine the "interrelated cultural, social, occupational, historical, or economic factors that may amplify the natural and physical environmental effects of the proposed agency action.").[17]

BLM attempts to excuse its failure to consider these impacts by claiming, without support, that hazardous air pollution "would be geographically dispersed and would, for the most part, occur in sparsely populated areas." AR237. NEPA does not allow BLM to discount the localized impacts to people for whom the public health impacts are of clear significance. *See Anderson*, 371 F.3d at

---

[17] Although Executive Order 12,898 does not create an independent right to judicial review, *see Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 575 (9th Cir. 1998), an agency's environmental justice analysis in a NEPA document is reviewable under the APA's arbitrary and capricious standard, *see Latin Ams. for Social & Econ. Dev. v. Fed. Highway Admin.,* 756 F.3d 447, 465 (6th Cir. 2014); *Coliseum Square Ass'n, Inc. v. Jackson,* 465 F.3d 215, 232 (5th Cir. 2006); *Comms. Against Runway Expansion, Inc. v. FAA,* 355 F.3d 678, 689 (D.C. Cir. 2004).

1   490 (holding that even if the proposed action did not significantly impact the overall whale

2   population, the "local effects" to the summer population in the Washington area might be significant

3   and therefore warranted preparation of an EIS); *White Tanks Concerned Citizens, Inc. v. Strock*, 563

4   F.3d 1033, 1039–41 (9th Cir. 2009) (rejecting agency's attempt to ignore water pollution impacts

5   merely because they only impacted a small area). BLM's view that it can ignore rural tribal

6   communities that are suffering significant impacts is a violation of NEPA.

7              *3.      BLM discounts and ignores important climate impacts (Issue D-1c).*

8              The Rescission causes an annual climate impact equivalent to putting nearly 3 million

9   passenger vehicles on the road. AR84146; *see also California*, 286 F. Supp. 3d at 1073. Yet the EA

10  fails to take a "hard look" at these impacts by attempting to minimize the Rescission's significant

11  methane emissions by comparing them to total U.S. emissions, ignoring readily available science-

12  based metrics for assessing the actual effects of the Rescission's emissions, and discounting

13  important domestic and global impacts.

14             The Rescission EA merely incorporates by reference climate-related information from the

15  Waste Prevention Rule, including observed and projected climate impacts in regions where federal

16  and Indian oil and gas leases are located, and quantifies the estimated foregone emissions reductions

17  caused by the Rescission: 175,000 to 180,000 tons of methane per year. AR307–08, 314. BLM then

18  dismisses the Rescission's climate impacts by comparing these foregone emissions reductions to

19  total greenhouse gas emissions for the United States and concluding the Rescission's estimated

20  foregone emissions reductions are less than 1% of total U.S. methane emissions. AR315.

21             BLM's attempt to discount the Rescission's incremental impact ignores that climate change

22  has cumulative impacts attributable to numerous emissions sources that may appear relatively

23  insignificant in isolation, but are collectively harmful. *See* Stack & Vandenbergh, *The One Percent*

24  *Problem*, 111 Colum. L. Rev. 1385, 1393 (2011) (framing sources as less than 1% of global

25  emissions is dishonest and a prescription for climate disaster). NEPA requires BLM to acknowledge

26  this by considering the "incremental impact" of the Rescission's emissions "when added to other

27  past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7; *see infra* p. 35. Indeed,

28  "the impact of greenhouse gas emission on climate change is precisely the kind of cumulative

1   impacts analysis that NEPA requires agencies to conduct." *CBD v. NHTSA*, 538 F.3d at 1217.

2   Moreover, BLM must communicate the "*actual* environmental effects resulting from … emissions"

3   of greenhouse gas emissions, not just quantify them. *Id.* at 1216. BLM has not done so.

4        BLM claims in the EA that "the actual effects of [the Rescission's methane emissions] on

5   global climate change cannot be reliably assessed and thus are sufficiently uncertain as to be not

6   reasonably foreseeable." AR319. This is not true. Scientifically robust methods exist to assess the

7   actual effects of greenhouse gas emissions, including the social cost of methane protocol and carbon

8   budgeting. *See CBD v. NHTSA*, 538 F.3d at 1200 (citing a range of values for carbon emissions

9   reductions, and noting that it "is certainly not zero").

10       Indeed, BLM concedes as much by purporting to estimate the *domestic* social cost of

11  methane in its 2018 RIA, yet fails to use the social cost of methane in the EA to fulfill its duty to

12  take a hard look. Courts have held that agencies must use the social cost of carbon (the rigorous,

13  consensus-based, transparent protocol on which the social cost of methane is built) in their NEPA

14  analyses. *See, e.g.*, *Mont. Envtl. Info. Ctr. v. U.S. Office of Surface Mining*, 274 F. Supp. 3d 1074,

15  1094–95 (D. Mont. 2017); *High Country Conservation Advocates*, 52 F. Supp. 3d at 1192–93. It is

16  arbitrary for an agency to quantify an action's benefits while ignoring its costs, where tools, such as

17  the social cost of carbon, exist to calculate those costs. *High Country Conservation Advocates*, 52 F.

18  Supp. 3d at 1192. Yet that is exactly what BLM did here. *See* AR301–02 (discussing the

19  Rescission's reduction in compliance costs, but nowhere discussing the climate damages).

20       Even if BLM could rely on its "interim" estimate used in the 2018 RIA to somehow satisfy

21  its independent NEPA duty to take a hard look in the Rescission EA, this estimate ignores critical

22  domestic and global damages. *See supra* p. 22. Because BLM's "interim" social cost of methane is

23  inconsistent with peer-reviewed science and expert recommendations, the EA violates NEPA's

24  mandate to use "[a]ccurate scientific analysis," 40 C.F.R. § 1500.1(b), and to ensure the "scientific

25  integrity" of NEPA documents, *id.* § 1502.24. *See Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562,

26  570 (9th Cir. 2016). The omission of important domestic and global costs from the EA also violates

27  NEPA's mandate to consider an action in its appropriate "context," including "*society as a whole

28  (human*, national), the affected region, the affected interests, and *the locality*." *Anderson*, 371 F.3d at

1   487 (citing 40 C.F.R § 1508.27) (some emphasis added); *see also* 42 U.S.C. § 4332(2)(F) (requiring

2   agencies to "recognize the worldwide and long-range character of environmental problems"). The

3   appropriate context for a nationwide rulemaking that contributes to a global problem is the "world as

4   a whole." *See Mont. Envtl. Info. Ctr.*, 274 F. Supp. 3d at 1101–02 (for greenhouse gases, agency may

5   not "limit its context analysis to the local and regional level"); *accord Barnes v. U.S. Dep't of*

6   *Transp.*, 655 F.3d 1124, 1139–40 (9th Cir. 2011) (noting "the effect of greenhouse gases on climate

7   is a *global* problem" (emphasis in original)).

8        Another method BLM could use to address the magnitude and severity (i.e., significance) of

9   total greenhouse gas emissions is a "carbon budget." The Citizen Groups recommend this approach

10  for BLM's use in the EA, but BLM failed to respond. *See* AR84158–61, AR173–74 (BLM

11  disagreeing it must use the social cost of methane it is EA, but not mentioning carbon budgeting). A

12  carbon budget sets a cap on the remaining greenhouse gases that can be emitted while keeping global

13  average temperature rise below certain climate impact thresholds. *See* AR22660–66 (peer-reviewed

14  article discussing carbon budgeting). According to the most recent Intergovernmental Panel on

15  Climate Change report, approximately 1,000 gigatons of $CO_2$ equivalent ($CO_2e$) may be emitted

16  while keeping human-induced warming to less than 2°C. AR22096. BLM can disclose what portion

17  of the remaining budget the Rescission's total, cumulative emissions will consume. Like the social

18  cost of methane protocol, a carbon budget "disclose[s] the actual environmental effects" of the

19  Rescission in a way that "brings those effects to bear on [the agency's] decisions." *Baltimore Gas &*

20  *Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 96 (1983).

21       While NEPA does not mandate any particular methodology, *see, e.g., WildEarth Guardians*

22  *v. Zinke*, 368 F. Supp. 3d 41, 79 (D.D.C. 2019), it does mandate that BLM use state of the art science

23  to make sound scientific decisions, *id.* at n.31; 40 C.F.R. §§ 1500.1(b), 1502.22(b), 1502.24.

24  Accordingly, BLM must analyze the actual effects of climate change using available tools with

25  scientific integrity—such as the peer-reviewed social cost of methane and carbon budgeting. Given

26  the availability of these tools, there is no merit to BLM's claim that there are no methods to assess

27  the Rescission's actual climate impacts.

28

1

2

**B.      BLM violates NEPA by failing to consider the Rescission's air and climate impacts in combination with other federal actions (Issue D-2).**

3

4      BLM was well aware that at the same time it was working to rescind the Waste Prevention

5      Rule's protections, the Administration also was systematically dismantling regulations aimed at oil

6      and gas emissions and ramping up federal fossil fuel development. BLM unlawfully failed to

       consider the cumulative health and climate impacts of these actions.

7      To avoid the "tyranny of small decisions" agencies must consider the cumulative impacts of

8      their actions. *Kern*, 284 F.3d at 1076–78 (quoting CEQ, *Considering Cumulative Effects Under the*

9      *National Environmental Policy Act* 1 (1997)); *Te-Moak Tribe of W. Shoshone v. U.S. Dep't of the*

10     *Interior*, 608 F.3d 592, 602 (9th Cir. 2010) ("[NEPA] require[s] that an EA fully address cumulative

11     environmental effects." (quotation omitted)). "'Cumulative impact' is the impact on the environment

12     which results from the incremental impact of the action when added to other past, present, and

13     reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person

14     undertakes such other actions. Cumulative impacts can result from individually minor but

15     collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

16     Although labeled a "cumulative impacts analysis," the half page BLM devotes to analyzing

17     the Rescission's cumulative impacts does nothing more than reference back to its scant discussion of

18     air quality and climate impacts. AR321. BLM fails to identify *any* other past, present, or reasonably

19     foreseeable future actions or analyze them in combination with the Rescission's impacts. At a

20     minimum, BLM was required to consider the Rescission's cumulative air quality and climate

21     impacts in combination with EPA's proposal to weaken its own oil and gas regulations, and with

22     BLM's fossil fuel program for federal and tribal minerals. *See Bosworth*, 510 F.3d at 1028

23     (recognizing the importance of a cumulative impacts analysis "in a situation … where [the proposed

24     action] is nationwide in scope and has the potential to impact a large number of acres").

25     At the same time that BLM was rescinding its Waste Prevention Rule, EPA was in the

26     process of weakening its own oil and gas air quality regulations—both actions that would result in

27     cumulatively greater air emissions from oil and gas drilling operations nationwide. *See* AR84164–

28     65. Before BLM finalized the Rescission, EPA proposed rescinding provisions in its regulation that

will lead to annual increases in emissions of 380,000 tons of methane, 100,000 tons of VOCs, and 3,800 tons of hazardous air pollutants. 83 Fed. Reg. 52,056, 52,059 (Oct. 15, 2018).[18] Yet, BLM ignored the combined impact of EPA's proposal and the Rescission, in violation of NEPA. 43 C.F.R. § 46.30 (Interior Department NEPA regulations defining "reasonably foreseeable future actions" to include "federal … activities not yet undertaken, but sufficiently likely to occur," including "activities for which there are existing … proposals"); *see also N. Plains Res. Council*, 668 F.3d at 1079 (holding agency failed to consider reasonably foreseeable BLM proposals in its cumulative impacts analysis). In fact, instead of acknowledging EPA's proposal to weaken its regulations, BLM expressly relies on EPA's *existing* regulations in its cumulative impacts analysis to suggest the Rescission's impact would lessen over time. AR321. BLM cannot simply assume EPA regulations will remain in place indefinitely despite contrary evidence.

BLM also ignored the tremendous cumulative climate impacts of its fossil fuel program for federal and tribal lands in combination with the Rescission. *See* AR84149–50, 84153, 84163–64. Between 2003 and 2014, approximately 25% of all U.S. and 3–4% of global fossil fuel greenhouse gas emissions were attributable to federal coal, oil, and gas resources leased and developed by the Interior Department. AR21185. Other studies indicate that in 2012 private extraction of federal fossil fuels contributed approximately 1,344 million metric tons of $CO_2e$ to the atmosphere. AR84160. Because the Interior Department is responsible for federal fossil fuel production—which contributes significantly to climate change—BLM must consider the Rescission in combination with those impacts or, at a minimum, the federal and tribal oil and gas leasing program as a whole. *See WildEarth Guardians*, 368 F. Supp. 3d at 75–77 (requiring cumulative climate assessment for lease sale to include assessment of BLM's oil and gas leasing program nationwide); *see also* AR416

---

[18] Although EPA's proposal was not published in the Federal Register until October 15, 2018, EPA provided it to the public on September 11, 2018, two weeks before BLM promulgated the Rescission. *See* EPA, *Proposed Improvements 2016 New Source Performance Standards* (last updated Dec. 19, 2018), https://www.epa.gov/controlling-air-pollution-oil-and-natural-gas-industry/proposed-improvements-2016-new-source. Furthermore, BLM could have coordinated with EPA earlier in the process, as it did extensively in preparing the Waste Prevention Rule. *See, e.g.*, VF117 (describing coordination with EPA); VF81–82 (proposed Waste Prevention Rule RIA analyzing costs and benefits depending upon whether EPA finalized its regulations).

1   (noting that in Fiscal Year 2015, federal oil and gas wells produced 183.4 million barrels of oil, 2.2

2   trillion cubic feet of natural gas, and 3.3 billion gallons of natural gas liquids). As the *WildEarth*

3   *Guardians* court recognized, given the "cumulative nature of climate change, considering each

4   individual drilling project in a vacuum deprives the agency and the public of the context necessary to

5   evaluate oil and gas drilling on federal land before irretrievably committing to that drilling." 368 F.

6   Supp. 3d. at 83; *CBD v. NHTSA*, 538 F.3d at 1217 ("The impact of greenhouse gas emissions on

7   climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to

8   conduct."); *San Juan Citizens All. v. BLM*, 326 F. Supp. 3d. 1227, 1248 (D.N.M. 2018) (rejecting

9   "facile conclusion" that leasing decision's climate impacts were "minor" and no cumulative impacts

10  analysis was required). Here too, considering the Rescission in a vacuum deprives the public of the

11  broader context:  the significant climate impacts of BLM's fossil fuel program.

12       BLM's only response is the familiar refrain that it will analyze any cumulative impacts *later*.

13  AR337.  But the Rescission has *nationwide* impacts—including cumulative impacts—that are not

14  appropriate for site-specific analysis. *Bosworth*, 510 F.3d at 1027–28 (noting the importance of a

15  cumulative analysis where the action is "nationwide in scope"). Indeed, the Ninth Circuit has held

16  that future impacts analysis at the project level "does not relieve [the agency] of its obligation to

17  ensure that the [project] as a whole has no cumulative impacts." *Id.* at 1027; *see also supra* p. 29.

18
     **C.     BLM violates NEPA by failing to prepare an EIS despite the Rescission's**
19   **significant impacts (Issue D-3).**

20       The foregoing discussion demonstrates that the Rescission will have significant

21  environmental and health impacts. BLM was therefore required to perform a much more detailed

22  analysis in an EIS, rather than an EA. This Court already concluded that a small subset (one year) of

23  these effects would irreparably harm public health. *California*, 286 F. Supp. 3d at 1075. BLM's rush

24  to rescind regulatory protections is no excuse for failing to seriously consider the environmental and

25  health effects of doing so in accordance with NEPA. *See Bosworth*, 510 F.3d at 1026–30 (holding

26  impacts of relaxing nationally applicable environmental standards would be significant).

27       Agencies must prepare an EIS for any "major Federal action[] significantly affecting the

28  quality of the human environment." 42 U.S.C. § 4332(2)(C). "Major federal actions" include "new

or revised agency rules [and] regulations." 40 C.F.R. § 1508.18(a). To determine whether a proposal has significant effects requiring an EIS, an agency may first prepare an EA. *Id.* §§ 1501.3, 1501.4(b)–(c). If the agency determines the proposal will not have significant effects, it must explain its determination in a finding of no significant impact (FONSI). *Id.* §§ 1501.4(e), 1508.13. The FONSI must supply a "convincing statement of reasons" demonstrating the proposed action does not have a significant impact. *CBD v. NHTSA*, 538 F.3d at 1220, 1223 (quotation omitted).

The threshold to prepare an EIS is not high; agencies must prepare an EIS if there are "substantial questions" about whether a project's impacts are significant. *Anderson*, 371 F.3d at 488 (quotation omitted). In deciding whether a proposal's impacts are significant, agencies must consider a number of factors including: "[t]he degree to which the proposed action affects public health or safety"; "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts"; "[t]he degree to which the effects on the … environment are likely to be highly controversial"; and "the degree to which the possible effects … are highly uncertain." 40 C.F.R. § 1508.27(b). The presence of any "one of these factors may be sufficient to require preparation of an EIS in appropriate circumstances." *Ocean Advocates*, 402 F.3d at 865. Here, *all* of these factors are present and raise far more than substantial questions about the Rescission's significant impacts.

First, the Rescission's air and climate pollution poses significant risks to public health. *See CBD v. NHTSA*, 538 F.3d at 1222 (recognizing global warming will have an impact on "public health and safety"); *Ctr. for Biological Diversity v. BLM*, 937 F. Supp. 2d 1140, 1158 (N.D. Cal. 2013) (recognizing that potential public health impacts from fracking satisfied public health significance factor). Rescinding these nationwide protections will harm tribal communities and others living in close proximity to wells and exacerbate ozone pollution in multiple areas already exceeding public health standards, and the Rescission's increased methane emissions will only add to the public health threat. *See supra* pp. 28, 29–30. BLM's FONSI claims these impacts are not significant based on its unsupported, but repeated assertion that emissions will be "geographically dispersed" and occur in "sparsely populated areas." AR336. But this claim ignores that the Rescission's significant public health impacts are localized. *See supra* pp. 31–32.

1    Second, EPA's own proposal to weaken its regulations and BLM's overall federal and tribal

2    oil and gas program compound the significance of these public health and climate impacts. *See supra*

3    pp. 35–37; 40 C.F.R. § 1508.27(b)(7) (requiring consideration of "cumulatively significant

4    impacts"). BLM's FONSI ignores these cumulative impacts, in violation of NEPA. AR337.

5    Third, at the very least, the debate over the extent of the Rescission's climate impacts

6    warrants an EIS. As discussed previously, BLM's reliance on an "interim" social cost of methane

7    arbitrarily ignored peer-reviewed science and the recent recommendations of experts in the field

8    showing impacts far greater than BLM's discloses. *See supra* pp. 21–22. And BLM wrongly claims

9    that the Rescission's "actual effects" are too uncertain to evaluate, when there are scientifically

10   supported tools for doing so. *See supra* p. 32–34. The Court should reject the Rescission on these

11   grounds. In any event, an EIS is required before BLM proceeds because BLM's reliance on an

12   "interim" social cost of methane is "highly controversial" for the purposes of NEPA, and BLM itself

13   claims "uncertainty" in terms of climate impacts. 40 C.F.R. § 1508.27(b).

14   An action "is highly controversial when there is a substantial dispute about [its] size, nature,

15   or effect." *Anderson*, 371 F.3d at 489 (citations and quotations omitted). Here, using the peer-

16   reviewed interagency estimate, BLM found the Waste Prevention Rule would have net climate

17   benefits of up to $204 million per year, AR1073, while BLM's new "interim" approach cuts the

18   Rule's total benefits by up to 96%, AR84090. Numerous commenters, including expert economists,

19   critiqued BLM's use of this "interim metric." AR206; AR83414; AR83419–31; AR83471. BLM's

20   assessment of the climate impacts is precisely the sort of controversial decision under NEPA that

21   compels an EIS. *See Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 736 (9th Cir. 2001)

22   (*NPCA v. Babbitt*) (holding there was a significant controversy where there was a high volume of

23   comments "cast[ing] substantial doubt on the adequacy of the [agency's] methodology and data");

24   *CBD v. NHTSA*, 538 F.3d at 1222 (recognizing volume of comments raising questions about the

25   stringency of the agency's proposal satisfied the controversy factor).

26   Fourth, BLM attempts to avoid in depth climate analysis by claiming (wrongly) that the

27   impacts are too "uncertain" to be reasonably foreseeable. AR319. But NEPA mandates the opposite:

28   uncertainty about environmental impacts "argue[s] in favor of preparing an EIS, not against it."

1  *NPCA v. Babbitt*, 241 F.3d at 731–35, 737 (citing 40 C.F.R. § 1508.27(b)); *Ocean Advocates*, 402

2  F.3d at 870–71. The Rescission EA itself concludes that "there a number of significant uncertainties

3  involved in estimating the climate impacts of methane emissions." AR308. BLM identifies

4  uncertainties pertaining to "aspects of the natural world" as well as "population and economic

5  growth, [greenhouse gas] emissions, the translation of Earth system changes to economic damages,

6  and the role of adaptation." *Id.* Yet—ignoring its own statements—BLM's FONSI asserts "there are

7  no reasonably foreseeable environmental effects that are considered to be highly uncertain." AR337.

8  This arbitrary and unsupported conclusion violates NEPA.[19]

9          In its zeal to make sure that private companies do not have to spend money to protect public

10  resources, BLM runs roughshod over statutory requirements, gives short shrift to the impacts on the

11  very people Congress mandated the agency protect, and adopts an unlawful metric for accounting for

12  the effects of climate change. To comply with NEPA, BLM must step back and take a hard look at

13  the cumulative effects of rescinding nationwide protections through preparation of an EIS.

14                                  **CONCLUSION**

15          Because BLM promulgated the Rescission in violation of law, this Court should vacate the

16  Rescission and reinstate the Waste Prevention Rule. Under the APA, this Court "shall set aside"

17  regulations that violate the APA or NEPA. 5 U.S.C. § 706(2)(A); *Kake*, 795 F.3d at 970. "The effect

18  of invalidating an agency rule is to reinstate the rule previously in force." *Kake,* 795 F.3d at 970

19  (quoting *Paulsen v. Daniels,* 413 F.3d 999, 1008 (9th Cir. 2005)) (striking down rule exempting

20  national forest from the roadless rule and reinstating the roadless rule); *Lockyer II*, 575 F.3d at 1020–

21  21 (upholding remedy order setting aside roadless rule rescission and reinstating roadless rule).

22

23

24

25  ――――――――――――――――
[19] BLM's only justification is that it analyzed the Waste Prevention Rule's impacts in 2016, that EA
26  was not challenged in court, and the Rescission EA "closely followed the 2016 EA." AR336.
However, the fact that the 2016 EA—which analyzed the impacts of *adding* significant public health
27  and climate protections and relied on the longstanding social cost of methane—was not challenged
does not bear on whether the environmental impacts of *rescinding* those protections using a new,
28  "interim," and unsupported social cost of methane is highly controversial. *Id.*

Respectfully submitted this 7th day of June, 2019,

/s/ Stacey Geis
Stacey Geis, CA Bar # 181444
Earthjustice
50 California St., Suite 500,
San Francisco, CA  94111-4608
Phone: (415) 217-2000
Fax: (415) 217-2040
sgeis@earthjustice.org

Robin Cooley, CO Bar # 31168 (*admitted pro hac vice*)
Joel Minor, CO Bar # 47822 (*admitted pro hac vice*)
Earthjustice
633 17th Street, Suite 1600
Denver, CO 80202
Phone: (303) 623-9466
rcooley@earthjustice.org
jminor@earthjustice.org

*Attorneys for Plaintiffs Sierra Club, Fort Berthold Protectors of Water and Earth Rights, The Wilderness Society, and Western Organization of Resource Councils*

Susannah L. Weaver, DC Bar # 1023021 (*admitted pro hac vice*)
Donahue, Goldberg, & Weaver LLP
1800 Pennsylvania Ave., SE
Washington, DC 20003
Phone: (202) 569-3818
susannah@donahuegoldberg.com

Peter Zalzal, CO Bar # 42164 (*admitted pro hac vice*)
Rosalie Winn, CA Bar # 305616
Environmental Defense Fund
2060 Broadway, Suite 300
Boulder, CO  80302
Phone: (303) 447-7214 (Mr. Zalzal)
Phone: (303) 447-7212 (Ms. Winn)
pzalzal@edf.org
rwinn@edf.org

Tomás Carbonell, DC Bar # 989797 (*admitted pro hac vice*)
Environmental Defense Fund
1875 Connecticut Avenue, 6th Floor
Washington, D.C.  20009
Phone: (202) 572-3610
tcarbonell@edf.org
*Attorneys for Plaintiff Environmental Defense Fund*

Laura King, MT Bar # 13574 (*admitted pro hac vice*)
Western Environmental Law Center
103 Reeder's Alley
Helena, MT 59601
Phone: (406) 204-4852
king@westernlaw.org

Erik Schlenker-Goodrich, NM Bar # 17875 (*admitted pro hac vice*)
Western Environmental Law Center
208 Paseo del Pueblo Sur, #602
Taos, NM 87571
Phone: (575) 613-4197
eriksg@westernlaw.org

*Attorneys for Plaintiffs Los Padres ForestWatch, Center for Biological Diversity, Citizens for a Healthy Community, Diné Citizens Against Ruining Our Environment, Earthworks, Montana Environmental Information Center, National Wildlife Federation, San Juan Citizens Alliance, WildEarth Guardians, Wilderness Workshop, and Wyoming Outdoor Council*

Darin Schroeder, KY Bar # 93828 (*admitted pro hac vice*)
Ann Brewster Weeks, MA Bar # 567998 (*admitted pro hac vice*)
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
Phone: (617) 624-0234
dschroeder@catf.us
aweeks@catf.us

*Attorneys for Plaintiff National Wildlife Federation*

Scott Strand, MN Bar # 0147151 (*admitted pro hac vice*)
Environmental Law & Policy Center
60 S. 6th Street, Suite 2800
Minneapolis, MN 55402
Phone: (312) 673-6500
Sstrand@elpc.org

Rachel Granneman, IL Bar # 6312936 (*admitted pro hac vice*)
Environmental Law & Policy Center
35 E. Wacker Drive, Suite 1600
Chicago, IL 60601
Phone: (312) 673-6500
rgranneman@elpc.org

*Attorneys for Plaintiff Environmental Law & Policy Center*

David Doniger, DC Bar # 305383 (*admitted pro hac vice*)
Melissa Lynch, MA Bar # 689235 (*admitted pro hac vice*)
Natural Resources Defense Council
1152 15th St. NW, Suite 300
Washington, DC 20005
Phone: (202) 289-6868
ddoniger@nrdc.org
llynch@nrdc.org

*Attorneys for Plaintiff Natural Resources Defense Council*