Bethany A. Davis Noll, N.Y. State Bar #4541116 (*pro hac vice pending*)
Denise A. Grab, Cal. State Bar #268097
Richard L. Revesz, N.Y. State Bar #2044725 (*pro hac vice pending*)
Jason Schwartz, Va. State Bar #73398 (*pro hac vice pending*)
 Institute for Policy Integrity
 New York University Law School
 139 MacDougal, 3rd floor
 New York, NY 10012
 T: (212) 992-8932
 F: (212) 995-4592
 E-mail: denise.grab@nyu.edu

Counsel for *Amicus Curiae* Institute for Policy Integrity

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STATE OF CALIFORNIA, by and through XAVIER BECERRA, ATTORNEY GENERAL, and the CALIFORNIA AIR RESOURCES BOARD; and STATE OF NEW MEXICO, by and through HECTOR BALDERAS, ATTORNEY GENERAL, | Case No. 4:18-cv-05712-YGR Related: Case No. 4:18-cv-05984-YGR |
| *Plaintiffs*, | BRIEF OF THE INSTITUTE FOR POLICY INTEGRITY AT NEW YORK UNIVERSITY SCHOOL OF LAW AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT |
| v. | Hearing: January 14, 2020, 10:00 AM Judge: Hon. Yvonne Gonzalez Rogers |
| RYAN ZINKE, Secretary of the Interior; JOSEPH R. BALASH, Assistant Secretary for Land and Minerals Management, United States Department of the Interior; UNITED STATES BUREAU OF LAND MANAGEMENT; and UNITED STATES DEPARTMENT OF THE INTERIOR, | Courtroom 1, 4th Floor 1301 Clay Street, Oakland, CA 94612 |
| *Defendants*, | |
| State of Wyoming, Western Energy Alliance, Independent Petroleum Association of America, American Petroleum Institute, | |
| *Intervenor-Defendants*. | |

*Amicus Curiae* Brief of Policy Integrity – Case 4:18-cv-05712-YGR

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ...................................................................................1

SUMMARY OF ARGUMENT .........................................................................................2

ARGUMENT ....................................................................................................................4

I.   BLM'S NARROW DEFINITION OF "WASTE" MISUNDERSTANDS THE ECONOMIC RATIONALE FOR AGENCY REGULATION AND WOULD RENDER THE STATUTE MEANINGLESS .......................................................4

    A.   The Rescission Ignores the Economic Rationale for Agency Regulation ..............4

    B.   Legislative History and State Regulations Support an Interpretation of the Waste Prevention Authority that Adopts the Economic Rationale for Preventing Waste..........................................................................................................6

        1.   The Legislative History Shows Congress Was Motivated by the Classic Justification for Government Regulation and Did Not Intend to Bar BLM From Considering the *Public's* Interest When Preventing "Undue Waste".......................................................................................6

        2.   State Regulations Look at Waste from the Perspective of Society, Not Just the Private Operator ........................................................................8

    C.   BLM's New Definition of Waste Causes Harm in a Way that Contravenes and Irrationally Ignores the Relevant Statutes...............................................9

II.   BLM IGNORED IMPORTANT FACTORS AND RELIED INSTEAD ON ARBITRARY FACTORS TO SEVERELY UNDERVALUE THE RESCISSION'S SIGNIFICANT CLIMATE COSTS ........................................................................10

    A.   BLM's Interim Estimate Ignores Significant Climate Costs That "Accrue to U.S. Citizens" and So Fails to Consider Important Aspects of Public Welfare ....12

    B.   BLM's Interim Estimate Relies on Arbitrary Factors............................................15

    C.   BLM Treats Costs and Benefits Differently, Counting Savings That "Accrue" to Foreign Entities But Ignoring Significant Climate Effects to U.S. Citizens .....16

III.   THE RESCISSION RELIES ON AN ANALYSIS RIDDLED WITH UNEXPLAINED METHODOLOGICAL CHOICES........................................................................17

    A.   BLM's Explanation for Its Changed Position on the Social Cost of Methane Is Inadequate and Inconsistent with Evidence.........................................18

    B.   The Regulatory Impact Analysis Evinces a Pattern of Unexplained Choices.......19

CONCLUSION................................................................................................................21

# TABLE OF AUTHORITIES

**Cases**                                                                 **Pages(s)**

*Air Alliance Houston v. EPA*, 906 F.3d 1049 (D.C. Cir. 2018)................................ 9, 10, 11

*Boesche v. Udall*, 373 U.S. 472 (1963)...................................................................... 8

*Cal. v. U.S. BLM*, 286 F. Supp. 3d 1054 (N.D. Cal. 2018), ECF No. 3 ........................... 14

*California v. Interior*, No. 17-05948, 2019 U.S. Dist. LEXIS 66300 (N.D. Cal. March 29, 2019)..... 2

*California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106 (N.D. Cal. 2017) .................... 1, 11

*Champlin Ref. Co. v. Corp. Com'n of Okla.*, 286 U.S. 210 (1932) ...................................... 9

*Council v. Johnson*, 674 F.2d 791 (9th Cir. 1982)............................................................ 7

*Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172 (9th Cir. 2008) ..................................... 10, 17

*FCC v. Fox Television Stations*, 556 U.S. 502 (2009)......................................................... 18

*Henderson v. Thompson*, 300 U.S. 258 (1937).................................................................. 8

*Kao v. Abbott Labs., Inc.*, 2017 WL 5257041 (N.D. Cal. Nov. 13, 2017) (Tigar, D.J.)

*Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013)..................................... 4

*Love v. Thomas*, 858 F.2d 1347 (9th Cir. 1988) ............................................................... 7

*Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032 (D.C. Cir. 2012)...................................... 17

*R.R. Comm'n of Tex. v. Flour Bluff Oil Corp.*, 219 S.W.2d 506 (Tex. Civ. App. 1949) ................ 5, 8

*S.W. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443 (9th Cir. 1996)...................... 4

*The Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008) ................................................... 15

*Zero Zone Inc. v. Dept. of Energy*, 832 F.3d 654, 677 (7th Cir. 2016)........................................ 12, 15

**Statutes**

30 U.S.C. § 187....................................................................................................... passim

43 U.S.C. § 1701..................................................................................................... 10

43 U.S.C. § 1702..................................................................................................... 20

Alaska Stat. § 31.05.030........................................................................................... 9

Colo. Rev. Stat. §§ 34-60-102 ................................................................................... 9

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF AUTHORITIES (cont.)**

**Statutes (cont.)**                                                                                           **Pages(s)**

Wyo. Stat. Ann. § 30-5-121 ............................................................................................ 9

**Regulations**

Waste Prevention, Production Subject to Royalties, and Resource Conservation, 81 Fed. Reg. 83,008 (Nov. 18, 2016) (AR 90-AR 990) ............................................................................. 1, 6, 10

Waste Prevention, Production Subject to Royalties, and Resource Conservation; Rescission or Revision of Certain Requirements 83 Fed. Reg. 49,184 (Sept. 28, 2018) (AR 1-AR 31) ....... passim

**Other Authorities**

Br. in Support of Wyoming and Montana's Pet. for Review of Final Agency Action at 29, *Wyoming v. U.S. Dep't of Interior*, No. 16-cv-00280 (D. Wy. Oct. 2, 2017), ECF No. 141 ........................... 6

Bruce Huber, *Fair Market Value of Public Resources*, 103 Cal. L. Rev. 1515 (2015) ...................... 8

Citizens Groups' Motion for Summary Judgment .................................................................... 6

Comments from ConocoPhillips, BLM-2018-0001-132464 (Apr. 23, 2018) (AR 103956) .............. 17

Comments from Encana Oil & Gas (USA) Inc., BLM-2018-0001-131954 (Apr. 23, 2018) ............. 17

Encana Corp., Annual Report (SEC Form 40-F) (Dec. 31, 2013), https://perma.cc/HQ6Q-8KAW . 17

Ernest E. Smith & Jacqueline Lang Weaver, 2 Texas Law of Oil and Gas 8.3 (2019) ....................... 8

Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Oct. 4, 1993) ............................................................. 5

H.R. Rep. No. 1138, to accompany S. 2812 (Feb. 25, 1919) (AR 21817-21837) ................................ 8

H.R. Rep. No. 563, Exploration for the Disposition of Coal, Phosphate, Oil, Oil Shales, or Gas (May 14, 1918) (AR 21734-21816) ............................................................................................ 7

H.R. Report No. 206 to accompany H.R. 3232, Exploration for and Disposition of Coal, Oil, Gas, Etc. (Dec. 11, 1917) (AR 21723-21733) ........................................................................... 7

Interagency Working Group, Response to Comments (AR 22039-AR 22082) ................ 13-14, 16, 20

Interagency Working Group, Technical Support Document: Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866 (2010) (AR 21902-AR 21952) .......................... 12

**TABLE OF AUTHORITIES (cont.)**

**Other Authorities (cont.)**                                                                 **Page(s)**

Interagency Working Group, Technical Support Document:
   Technical Update of the Social Cost of Carbon for Regulatory Impact
   Analysis Under Executive Order 12866 (2016) (AR 5607-AR 5641) ........................ 12, 13, 15, 18

John Ise, *The United States Oil Policy* (Yale Univ. Press 1926)...................................... 7, 8

Letter Br. of Intervenor-Defendant American Petroleum Institute in Support of Motion for Summary
   Judgment (Feb. 4, 2019), ECF No. 94 .......................................................... 9

Mot. of the Institute for Policy Integrity to File An Amicus Curiae Brief ...................................... 1, 2

Office of Mgmt. & Budget, *Circular A-4*, *Regulatory Analysis* (2003) (AR 7584-AR 7631).... passim

Paul Krugman & Robin Wells, *Microeconomics* (2d ed. 2009) ......................................... 4

Pls. Not. of Mot. for Prelim. Injunction; Mem. of Points and Auths, *California v. Azar*,
   No. 19-cv-01184-EMC, 2019 WL 1877392 (N.D. Cal. Apr. 26, 2019)......................................... 14

Policy Integrity et al., Joint Comments on the Social Cost of Methane (Apr. 23, 2018)
   (AR 83416-83470)................................................................................... passim

Policy Integrity, Comments on the Proposed Rescission or Revision of Certain Requirements for
   Waste Prevention and Resource Conservation (Apr. 23, 2018) (AR 84215-AR 84222) .......... 2, 21

Public Comments and Responses on the Waste Prevention-Revise or Rescind Rule (2018)
   (AR 192) ................................................................................................ 7

Regulatory Impact Analysis for the Waste Prevention Rule (Nov. 10, 2016)
   (AR 1063-AR 1229) ................................................................................5-6, 10-11

Robert Pindyck, Comments on the Delay and Suspension (Nov. 6, 2017) (AR 83411)................... 19

State Plaintiffs' Notice of Motion and Motion for Summary Judgment ................................. 6, 18, 21

U.S. BLM, Regulatory Impact Analysis for the Final Rule to Rescind or Revise Certain Requirements
   of the 2016 Waste Prevention Rule (2018) (AR 32-AR 141)................................................. passim

The Institute for Policy Integrity at New York University School of Law ("Policy Integrity")[1] submits this brief as *amicus curiae* in support of Plaintiffs' motions for summary judgment seeking vacatur of the Bureau of Land Management's ("BLM") repeal, 83 Fed. Reg. 49,184 (Sept. 28, 2018) ("Rescission") (AR 1-AR 31), of the Waste Prevention Rule, 81 Fed. Reg. 83,008 (Nov. 18, 2016) (AR 90-AR 990).[2]

## INTEREST OF AMICUS CURIAE

Policy Integrity is a nonpartisan think tank dedicated to improving the quality of government decisionmaking through advocacy and scholarship on the topics of administrative law, economics, and environmental policy. In this case, Plaintiffs have challenged the Rescission as arbitrary and capricious for, among other reasons, failure to adequately address the repeal's harms in the agency's new definition of waste and in the agency's calculation of the costs of increasing methane emissions.

Policy Integrity is made up of a team of economists and lawyers who together have significant expertise in these areas, having produced extensive scholarship on the balanced use of economic analysis in regulatory decisionmaking and on the calculation of the costs of increased emissions. *See* Mot. of the Institute for Policy Integrity to File Brief Amicus Curiae ("Policy Integrity Mot.") at 3 nn. 2-4 (citing multiple articles). Policy Integrity has employed its expertise to produce other amicus briefs addressing agency cost-benefit analysis in several repeals and rulemakings that present similar issues to the ones at issue here. *See* Policy Integrity Mot. at 4 (describing briefs). In several cases in which Policy Integrity filed briefs, courts have agreed that the agency's analysis was arbitrary. *E.g.,* *California v. Interior*, No. 17-05948, 2019 U.S. Dist. LEXIS 66300 (N.D. Cal. March 29, 2019) (holding that the repeal of the Valuation Rule was arbitrary); *California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106 (N.D. Cal. 2017) (holding failure to consider forgone benefits arbitrary). In

---

[1] This brief does not purport to represent the views of New York University School of Law, if any. Policy Integrity states that no party's counsel authored this brief in whole or in part, and no person—other than the amicus curiae, its members, or its counsel—contributed money intended to fund the preparation or submission of this brief.

[2] The administrative record is cited as "AR" with the page number, excluding leading zeros.

addition, Policy Integrity has submitted multiple briefs on the rational way to calculate the social cost of greenhouse gases. *See* Policy Integrity Mot. at 4-5.

Moreover, in furtherance of its mission, Policy Integrity has a substantial interest in this case, having participated in the proceedings and litigation surrounding the Waste Prevention Rule and its suspension. *See* Policy Integrity Mot. at 5. In addition, Policy Integrity submitted two sets of comments on the proposed Rescission of the Waste Prevention Rule.[3] Harnessing its extensive expertise and experience with this rule, Policy Integrity's proposed brief addresses the irrationality of the agency's changed definition of waste and the agency's reliance on a new "interim" calculation for the Social Cost of Methane. Policy Integrity's expertise affords it a unique perspective for evaluating those issues and allows it to provide assistance to the Court in conducting that evaluation.

## SUMMARY OF ARGUMENT

In rescinding the Waste Prevention Rule, BLM has caused the public to lose out on hundreds of millions of dollars of net benefits to health, public welfare, and the climate. To justify that decision, BLM takes the economically irrational position that protecting such massive public benefits is outside the agency's authority and BLM relies on gross miscalculations of regulatory costs and benefits. As Plaintiffs have explained, there are several reasons for finding the Rescission arbitrary and capricious. This *amicus* brief focuses on three problematic aspects of BLM's decision.

First, BLM's assertion that the Waste Prevention Rule's consideration of environmental and social benefits exceeded the agency's authority is irrational because it misunderstands the role the agency plays in preventing waste. The plain statutory text and the Mineral Leasing Act's legislative history demonstrate that Congress intended BLM to protect the needs of the public beyond what private operators would do in their own self-interest. In fact, there would be no point to the statute if BLM were required to regulate only when private operators already have an economic incentive to

---

[3] Policy Integrity, Comments on the Proposed Rescission or Revision of Certain Requirements for Waste Prevention and Resource Conservation (Apr. 23, 2018) (AR 84215-AR 84222); Policy Integrity et al., Joint Comments on the Social Cost of Methane (Apr. 23, 2018) (AR 83416-83470) ("Joint SCM Comments").

prevent waste, as private operators would likely undertake those conservation actions without regulation. BLM itself implicitly admits as much in repealing a provision aimed at low-bleed continuous pneumatic controllers. 83 Fed. Reg. at 49,195. Rather, helping internalize costs that are otherwise borne by society is the point of the waste prevention provision. BLM's new and narrower definition of the term "waste" ignores this history and forgoes emissions cuts—thus imposing harm on the American public—in direct contravention of the governing statutes and Congress's goals.

Second, BLM severely undervalues the Rescission's significant climate costs, and does so by ignoring key aspects of the problem while relying instead on arbitrary factors. BLM abandoned the peer-reviewed estimates of the social cost of methane emissions, in favor of untested "interim" values. BLM admits that the entire outcome of its cost-benefit analysis turns primarily on this single change. The "interim" approach decimates the prior estimates, in an effort purportedly to exclude consideration of any climate effect that is not purely "domestic." Yet, in doing so, the interim approach ignores how international climate spillovers, reciprocal foreign actions, and extraterritorial interests will significantly affect U.S. interests, despite BLM's statutory charge to protect "public welfare." 30 U.S.C. § 187. BLM's interim values instead rely on arbitrary factors, for example discounting climate effects to U.S. agriculture and health based in part on the largely irrelevant fact that the United States has a shorter coastline than the European Union. Meanwhile, even as BLM ignores important effects to U.S. interests, BLM fully counts the portion of the Rescission's alleged cost savings that will ultimately accrue to foreign entities, like subsidiaries of foreign oil companies or foreign shareholders of public corporations. This inconsistent approach to counting costs and benefits is patently arbitrary.

Third, BLM's largely unexplained switch to its "interim" methodology runs counter to best evidence before the agency, such as the National Academies of Sciences' rejection of the same methodology. Indeed, the Rescission's regulatory impact analysis is riddled with unexplained methodological choices that run counter to best practices. Because the Rescission relies on a flawed and unexplained regulatory impact analysis, the entire rulemaking must be vacated.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## ARGUMENT

**I.   BLM's Narrow Definition of "Waste" Misunderstands the Economic Rationale for Agency Regulation and Would Render the Statute Meaningless**

BLM claims that the Waste Prevention Rule must be rescinded because it focused on environmental and societal values rather than solely on the benefits to private companies of resource conservation. 83 Fed. Reg. at 49,185-86. In the Rescission, BLM now defines "waste" as only the loss of a resource that would be economical to conserve. *See id.* at 49,190 (stating that compliance costs should be no "greater than the value of the resources they are expected to conserve"). But that view of BLM's statutory responsibility misunderstands the purpose of the regulation and indeed would render waste prevention under the Mineral Leasing Act superfluous, which is not what Congress intended.

### A.   The Rescission Ignores the Economic Rationale for Agency Regulation

Economic theory predicts that private actors in a transaction (such as a transaction to lease oil-rich land) will consider all their own costs and benefits and maximize their own welfare, and thus that they will already consider, in BLM's words, the "value of the resources they are expected to conserve." *See* at 49,190. In contrast, effects of a transaction on those who are not at the negotiating table will likely not be considered. *See* Paul Krugman & Robin Wells, *Microeconomics* 437-38 (2d ed. 2009).[4] For example, if left to their own devices, private oil and gas drillers likely will not consider how their actions may cause negative externalities on public welfare and the environment. In order to ensure that those external costs are internalized, the government must force the private parties to take them into account. *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 605 (2013) (discussing the concept for land-use policy).

Agency regulation is most classically designed to address public effects like externalities that cannot be resolved "through market transactions" alone. Office of Mgmt. & Budget, *Circular A-4*,

---

[4] Citation to this textbook is appropriate to explain technical terms. *See S.W. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996).

*Regulatory Analysis* at 4 (2003) (AR 7584-AR 7631) ("*Circular A-4*").[5] Stated differently, "[i]f the prevention of waste of natural resources such as gas is to await the time when direct and immediate profits can be realized from the operation" there would be "little need" for a regulator because "private enterprise would not need the compulsion of law to conserve these resources if the practice were financially profitable." *R.R. Comm'n of Tex. v. Flour Bluff Oil Corp.*, 219 S.W.2d 506, 508 (Tex. Civ. App. 1949) (affirming Texas regulator's decision to prevent waste even though not economically profitable).

As federal agencies set out to accomplish the task of regulating to promote society's interests rather than just to protect private interests, the White House has instructed regulators to maximize net benefits to society, unless a statute requires otherwise. Exec. Order No. 12,866 § 1(a), 58 Fed. Reg. 51,735 (Oct. 4, 1993).[6] In doing so, agencies must consider effects on "health, safety and the natural environment" when assessing a regulation's costs and benefits. *Id.* § 6(a)(3)(C)(ii). And agencies must conduct this analysis for all costs and benefits of the regulation and its alternatives. *Circular A-4* at 3.

BLM reasonably conducted this analysis in the Waste Prevention Rule. Wasting natural gas and oil affects the public welfare as well as private interests. In the case of the oil and gas operations subject to this rule, the American people own the resources and have significant interests apart from any private interests in reaping profits from extraction: namely, the public interest in balancing near-term development against future uses and the need for conservation. Thus, in cutting waste, the Waste Prevention Rule was designed to achieve both "private cost savings (from the sale of recovered natural gas and natural gas liquids) that would benefit the industry" *and* "public benefits to society from reductions in methane emissions." Regulatory Impact Analysis for the Waste Prevention Rule at 5-6

---

[5] The Office of Management and Budget's *Circular A-4* was issued under President George W. Bush and continues to guide agencies on regulatory cost-benefit analysis. *See* U.S. BLM, Regulatory Impact Analysis for the Final Rule to Rescind or Revise Certain Requirements of the 2016 Waste Prevention Rule at 5 (2018) (AR 32-AR 141) ("2018 RIA") (relying on Circular A-4).

[6] Executive Order 12,866 is the leading White House order governing cost-benefit analysis. *See* 2018 RIA at 5 (relying on Executive Order 12,866). Courts may take judicial notice of such documents. *See Kao v. Abbott Labs., Inc.*, 2017 WL 5257041, at *3 (N.D. Cal. Nov. 13, 2017) (Tigar, D.J.).

(Nov. 10, 2016) (AR 1063-AR 1229) ("2016 RIA"); *see also* 81 Fed. Reg. at 83,014. These were the direct benefits of preventing waste. 81 Fed. Reg. at 83,014.

In contrast, BLM's argument now that it has authority to prevent waste only when it is in the economic interests of private operators to do so is meritless. As petitioners have explained, the plain language of the Federal Land Policy and Management Act and the Mineral Leasing Act provides BLM with authority to consider those environmental and public welfare benefits of cutting waste. *See* State Plaintiffs' Notice of Motion and Motion for Summary Judgment ("States Mot.") at 3-4; Citizens Groups' Motion for Summary Judgment ("Citizens Mot.") at 6-7; *see also* 81 Fed. Reg. at 83,019–20 (summarizing BLM's statutory authority). Indeed, as one of the defendant-intervenors conceded in earlier litigation over the Waste Prevention Rule, BLM "can consider environmental impacts to the public lands when it chooses to regulate." Br. in Support of Wyoming and Montana's Pet. for Review of Final Agency Action at 29, *Wyoming v. U.S. Dep't of Interior*, No. 16-cv-00280 (D. Wy. Oct. 2, 2017), ECF No. 141. BLM's contrary position now is irrational.

## B. Legislative History and State Regulations Support an Interpretation of the Waste Prevention Authority that Adopts the Economic Rationale for Preventing Waste

The legislative history shows that Congress was motivated by the classic rationale for government regulation and sought to ensure that BLM would prevent waste beyond what private operators would do just to protect their own immediate profits.

### 1. The Legislative History Shows Congress Was Motivated by the Classic Justification for Government Regulation and Did Not Intend to Bar BLM From Considering the *Public's* Interest When Preventing "Undue Waste"

Despite the statute's plain language, BLM nonetheless claims that Congress "adopted" the "prudent-operator" standard in the Mineral Leasing Act and thus gave authority to BLM to cut waste only if it was economic to do so for the private oil and gas operators. 83 Fed. Reg. at 49,186; *but see* Citizens Mot. at 8-9. But the legislative history demonstrates the opposite: that Congress sought to have BLM prevent harms to the public interest—the point of regulation.

1    In considering the Mineral Leasing Act, Congress repeatedly emphasized the need to prevent

2   waste and protect the public's interest in the nation's natural resources, not just the private interests

3   involved. *See* H.R. Report No. 206 to accompany H.R. 3232, Exploration for and Disposition of Coal,

4   Oil, Gas, Etc. at 2-8 (Dec. 11, 1917) (AR 21723-21733). For example, while the bill aimed at "proper

5   development and an intelligent utilization of our mineral resources," Congress also emphasized the

6   need to prevent waste, monopoly, and injustice from being "pressed down . . . upon the interests of

7   the public who are entitled to reap the benefits." *Id.* at 8; *see also id.* at 3 (explaining that "safeguards

8   to the public interests are present all through the bill"); *id.* at 5 (explaining that the bill was proposed

9   "in the interest of conservation"); *id.* at 2 (stating that the bill would "safeguard all public interests").

10    In the Rescission, BLM explains that it plans to use the "time frame for recovering the

11   operator's investment" as a measure for determining how much waste an operator should prevent.

12   Public Comments and Responses on the Waste Prevention-Revise or Rescind Rule at 51 (2018) (AR

13   192). But Congress explicitly sought to prevent harms that would be borne by "the generations that

14   are to follow"—making clear that the "time frame for recovering the operator's investment" (AR 192)

15   was not the only consideration for BLM. H.R. Rep. No. 563, Exploration for the Disposition of Coal,

16   Phosphate, Oil, Oil Shales, or Gas at 10 (May 14, 1918) (AR 21734-21816). In order to accomplish

17   this purpose, Interior was directed to act "in the public interests" in implementing the Act, when for

18   example, deciding on drilling applications, *see id*. at 12, and regulating waste occurring "through lack

19   of care of the wells." *Id.* at 24; *see also id.* at 11 ("It is wise conservation which bears the approval of

20   Secretary of the Interior."); John Ise, *The United States Oil Policy* 174-79 (Yale Univ. Press 1926)[7]

21   (explaining in a history of oil policy and the Mineral Leasing Act that wasting a resource such as oil

22   or gas may be "good business" and may "make business profitable," but it is still waste).

23

24

25    [7] The Court may consider these historical materials, which only confirm what can already be
26   found in the House Reports, because they provide useful additional background information for
    determining "the sufficiency of the agency's consideration." *Love v. Thomas*, 858 F.2d 1347, 1356
27   (9th Cir. 1988); *see also Council v. Johnson*, 674 F.2d 791, 794 (9th Cir. 1982).

28

Ultimately, the Mineral Leasing Act was passed in response to calls to protect the public interest and was a victory for conservation. While the bill promised to "open and develop the West," it would do so in the public interest and "along conservation lines." H.R. Rep. No. 1138, to accompany S. 2812 at 20 (Feb. 25, 1919) (AR 21817-21837); *see also Boesche v. Udall*, 373 U.S. 472, 481 (1963) ("Conservation through control was the dominant theme" of Congress's debates over the Act); Bruce Huber, *Fair Market Value of Public Resources*, 103 Cal. L. Rev. 1515, 1537 (2015) (describing purposes of conservation statutes passed in the early 1900s); Ise, *supra*, at 343-45 (explaining that a few Senators argued that conservation should not take priority over the interests of "people who are now on earth," but that many other Senators demanded conservation in the face of those objections, and those demands for conservation won out in the Mineral Leasing Act).

As this history shows, Congress intended BLM to prevent waste even when a private operator's profits would not justify it, in line with the traditional justification for regulation. In contrast, BLM's new and lopsided reading of the term "waste," which looks only at the private economic interest in the nation's natural resources, runs counter to the statute's history.

### 2. State Regulations Look at Waste from the Perspective of Society, Not Just the Private Operator

Several state regulations of waste also follow a definition of waste that looks beyond the individual operator's economic interests and to the public welfare. For example, in the 1940s, a Texas court explained that "natural sweet gas was a valuable and expendable natural resource," that flaring the gas wasted it, and that waste should be prevented even if "direct and immediate profits" could not be "realized from the operation." *R.R. Comm'n of Tex.*, 219 S.W.2d at 507-08; *see also Henderson v. Thompson*, 300 U.S. 258, 262 (1937) (explaining that Texas restricted use of sweet gas for "inferior purposes" as wasteful). Texas also recognized that waste should be regulated to protect "correlative rights"—rights of neighboring well owners to the common pool—which would necessarily mean that the regulator is looking beyond just the economic interests of a individual private operator. *See* Ernest E. Smith & Jacqueline Lang Weaver, 2 Texas Law of Oil and Gas 8.3 (2019) (collecting cases). Other

states recognized these rights as well. *See Champlin Ref. Co. v. Corp. Com'n of Okla.*, 286 U.S. 210, 234 (1932) (describing Oklahoma's rules against "unreasonable and wasteful depletion of a common supply of gas and oil to the injury to others entitled to resort to and take from the same pool").

Other states likewise recognize that waste should be viewed from the perspective of the public, not just private operators. For example, Colorado recognizes distinct "public *and* private interests against waste." Colo. Rev. Stat. §§ 34-60-102(1)(a)(I)-(II), 106(2.5) (emphasis added). Wyoming makes it unlawful to engage in wasteful flaring or venting to "pollute . . . the atmosphere" or to damage "human health, welfare, or safety." Wyo. Stat. Ann. § 30-5-121. And Alaska authorizes its oil and gas regulator to regulate the "drilling, producing, and plugging of wells" for "conservation purposes." Alaska Stat. § 31.05.030(e). As these examples demonstrate, "waste" is not—contrary to intervenor-defendants' claims—"generally understood as the 'preventable loss of [oil and gas] the value of which exceeds the cost of avoidance.'" Letter Br. of Intervenor-Defendant American Petroleum Institute in Support of Motion for Summary Judgment at 3 (Feb. 4, 2019), ECF No. 94. Rather, waste prevention provisions are generally understood to do what is expected of government regulation and protect the public interest and require operators to conserve even in cases where that might not be profitable.

## C. BLM's New Definition of Waste Causes Harm in a Way that Contravenes and Irrationally Ignores the Relevant Statutes

BLM also claims that the Rescission is justified based on a new "policy determination" that waste prevention should seek only to balance the costs of compliance against the economic value "of the resource to be conserved." 83 Fed. Reg. at 49,189. But that "policy determination" is unreasonable because it has led to a rule that causes harm to the public interest without a reasoned explanation.

The way to "measure[] the impact" of the Rescission is to assess it against a baseline that includes the Waste Prevention Rule itself. *Air Alliance Houston v. EPA*, 906 F.3d 1049, 1068 (D.C. Cir. 2018). By including the Waste Prevention Rule in the baseline itself, the agency is able to assess the incremental impact of its new action. *See Circular A-4* at 15 (explaining that the "baseline" is the agency's "best assessment of the way the world would look absent the proposed action").

As the Waste Prevention Rule promised significant net benefits, any decision to repeal those provisions will cause harm, in the form of forgone benefits. Specifically, the Waste Prevention Rule promised benefits that outweighed the compliance costs by up to $204 million per year. 81 Fed. Reg. at 83,013; *see also* 2016 RIA at 5. By rescinding the Waste Prevention Rule, those net benefits are forgone. *See id.* at 41. In forgoing those emissions reductions, the agency has chosen to harm the "public welfare," 30 U.S.C. § 187, and environmental values, 43 U.S.C. § 1701(a)(8), rather than protect them. This "makes a mockery of the statute[s]." *Air Alliance Houston*, 906 F.3d at 1064 (explaining that a rule that contradicts the relevant statute is arbitrary and capricious).

The agency's new regulatory impact analysis does not adequately explain this decision. As explained further below, BLM's calculation of the Rescission's costs and benefits is hopelessly flawed. See *infra* Sections II-III. Moreover, even if BLM had correctly valued environmental costs in its regulatory impact analysis, it would remain true and deeply problematic that BLM adopted a definition of waste that ignores all public interests and environmental externalities. In sum, the statutes provide BLM with ample authority to regulate waste in a way that "provides for long-term productivity and sustainability." 81 Fed. Reg. at 83,010. BLM's claim now that it lacks that authority must fail.

## II. BLM Ignored Important Factors and Relied Instead on Arbitrary Factors to Severely Undervalue the Rescission's Significant Climate Costs

BLM's cost-benefit analysis ignores significant climate effects and so renders the Rescission arbitrary. Regulatory impact analyses can reveal if an agency "relied on factors which Congress has not intended it to consider [or] entirely failed to consider an important aspect of the problem." *See Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1193 (9th Cir. 2008) (quoting *State Farm*'s test for arbitrary agency action). In *Center for Biological Diversity*, for example, the U.S. Court of Appeals for the Ninth Circuit examined the cost-benefit analysis to review whether the agency's "balancing of the statutory factors is arbitrary," *id.* at 1197-98, and ultimately ruled the agency had arbitrarily ignored significant climate effects, *id.* at 1198-1203.

So too here. An important factor that BLM must address is the cost that the Rescission imposes on society. *Air Alliance Houston*, 906 F.3d at 1067 (holding that suspension was arbitrary for failing to adequately address the rule's forgone benefits); *California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106, 1122 (N.D. Cal. 2017) (holding that agency's failure to consider forgone benefits was arbitrary). Rather than fairly address those forgone benefits, BLM's regulatory impact analysis is riddled with unexplained, arbitrary assumptions, which allow BLM to give the false impression that the Rescission's benefits outweigh the costs. But the Rescission's entire cost-benefit justification turns "primarily," as BLM concedes, on a single choice: the decision to abandon the valuation of the Social Cost of Methane developed through a rigorous process by an Interagency Working Group and previously used to assess the Waste Prevention Rule, and instead to devise new "interim" values. 2018 RIA at 7, 78. In an effort purportedly to exclude consideration of any climate effect that is not purely "domestic," BLM's interim valuation *decimates* the Social Cost of Methane, reducing the estimate of methane's damages per ton from $1,300 down to $176. *Compare* 2016 RIA at 36 *with* 2018 RIA at 42 (for year 2020 emissions, 3% discount rate). Consequently, instead of up to $204 million per year in net benefits that BLM calculated for the Waste Prevention Rule, 2016 RIA at 111, BLM now concludes that the original rule was net costly, 2018 RIA at 52.

BLM's reliance on this "interim" value to justify the Rescission is arbitrary, because it shows that BLM ignored important forgone benefits that *will* affect "citizens and residents of the United States," contrary to BLM's reasoning. *See* 2018 RIA at 41. In particular, BLM's interim value completely ignores how international spillovers of climate damages, reciprocal foreign actions on climate policy, and U.S. extraterritorial interests in climate-vulnerable assets will directly affect public welfare. The Mineral Leasing Act instructs BLM to prevent waste to protect "the interests of the United States" and "public welfare," 30 U.S.C. § 187, and thus does not permit BLM to ignore these important factors. Moreover, BLM instead relied on factors that Congress did not intend for the agency to consider and inconsistently treated costs and benefits.

### A.  BLM's Interim Estimate Ignores Significant Climate Costs That "Accrue to U.S. Citizens" and So Fails to Consider Important Aspects of Public Welfare

In its effort to focus on "costs that accrue to the citizens and residents of the United States," 2018 RIA at 41, BLM claims it has attempted to "approximat[e] the climate change impacts that occur within U.S. borders," *id.* at 94. Yet because of our world's interconnected financial, political, health, security, and environmental systems, climate impacts occurring initially beyond the geographic borders of the United States cause significant costs that accrue to U.S. citizens and residents. The Interagency Working Group analyzed climate damages worldwide precisely to account for important aspects of public welfare like international spillover effects, *see* Interagency Working Group, Technical Support Document: Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866 at 17 (2016) (AR 5607-AR 5641) ("2016 TSD"), and the U.S. Court of Appeals for the Seventh Circuit upheld the reasonableness of that approach, *Zero Zone Inc. v. Dept. of Energy*, 832 F.3d 654, 677, 679 (7th Cir. 2016) (ruling that the Department of Energy reasonably relied on the Interagency Working Group's estimates of "global benefits" to assess the Department's statutory charge to promote the "Need of the Nation to Conserve Energy"). BLM's interim estimate, in contrast, ignores how international spillovers, reciprocal foreign actions, and extraterritorial interests will affect "the interests of the United States" and "public welfare," 30 U.S.C. § 187. In other words, BLM's interim estimate arbitrarily failed to consider important aspects of the problem.

*International Spillovers:* As the Interagency Working Group on the Social Cost of Greenhouse Gases explained, attempts to cordon climate effects into strict geographic boundaries will inevitably underestimate damages by ignoring "how damages in other regions could affect the United States" through factors such as "economic and political destabilization" and "global migration." Interagency Working Group, Technical Support Document: Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866 at 11 (2010) (AR 21902-AR 21952) ("2010 TSD"); *see also* Joint SCM Comments at 7, 12 & n.73. For example, climate-induced flooding in Thailand interrupts U.S. supply

chains for electronic components; climate-related financial shocks in China will reverberate through Chinese holdings of U.S. debt; water and food scarcity in Latin American can trigger mass emigration to the United States; infectious diseases exacerbated by climate will spread from abroad through air travel and vectors like mosquitos; a drought in Syria erupts into civil war and pulls the United States into conflict; and global climate effects become, according to the Department of Defense, "threat multipliers" that "increase the frequency, scale, and complexity of future [military] missions." *Id.* at 7-9 (citing supporting documents). BLM's interim estimates ignore all such damaging spillovers and their effect on public welfare. *Compare* 2018 RIA at 96 (admitting that its modeling is "inadequate" on "inter-regional and inter-sectoral linkages") *with* 2016 TSD at 17 (adopting a global perspective to reflect spillovers).

*Foreign Reciprocity:* Methane is a global pollutant that mixes through the planet's atmosphere and affects climate worldwide. Each ton of methane abated in other countries thus directly benefits the United States. Direct U.S. benefits from international climate policies already in effect could reach over $2 trillion in the next decade. Joint SCM Comments at 9. But if foreign countries instead set their climate policies by considering only certain domestic climate effects and ignoring the impact of climate change in other countries, the United States would suffer. The United States is engaged in a repeated strategic dynamic with other countries that have already adopted values for the social cost of their greenhouse gas emissions based on worldwide damages, including the United Kingdom, Germany, Sweden, Canada, and others. *Id.* at 6; 2016 TSD at 17 ("Using a global estimate of damages in U.S. regulatory analyses sends a strong signal to other nations that they too should base their emissions reductions strategies on a global perspective."). Departing from this collaborative dynamic, by reverting to an estimate that ignores the externalities of U.S. emissions, could trigger a tit-for-tat response from other countries. If other countries likewise ignore the effects of their emissions on the United States, they will weaken their climate efforts in ways that cause climate damage to the United States. Economic analysis has shown that, given such strategic international dynamics, the value of reducing greenhouse emissions is strictly higher than so-called "domestic-only" estimates for all

countries, including the United States. Joint SCM Comments at 9 & n.54 (citing the economic literature); *see also* Interagency Working Group, Response to Comments at 32 (AR 22039-AR 22082) ("2015 IWG Response") ("IWG believes that accounting for global benefits can encourage reciprocal action by other nations, leading ultimately to international cooperation that increases both global and U.S. net benefits relative to what could be achieved if each nation considered only its own domestic costs and benefits."). Yet in adopting its interim values, BLM has ignored how reciprocal foreign responses will damage the "interests of the United States" and "public welfare." 30 U.S.C. § 187.

*Extraterritorial Interests:* The climate "costs that accrue to citizens and residents of the United States," *see* 2018 RIA at 41, extend far beyond the geographic borders of the United States. U.S. citizens have investments in climate-vulnerable foreign businesses, foreign properties, and other assets; U.S. citizens have interests in consuming climate-vulnerable foreign goods and services, including tourism; eight million U.S. citizens live abroad; the United States has legal obligations and a willingness to pay to protect global commons like the oceans and Antarctica from climate damages; and U.S. citizens value and are willing to pay to protect foreign natural resources like rainforests, foreign charismatic megafauna like pandas, and the health and welfare of foreign citizens. Joint SCM Comments at 10-11, 13. BLM's interim values ignore all these extraterritorial interests.

\* \* \*

In sum, BLM's interim estimate ignores significant forgone benefits, without a reasoned explanation. BLM cites to dicta from a recent district court decision enjoining the agency's second attempt to suspend the Waste Prevention Rule, to argue that its use of the interim values is "acceptable." 83 Fed. Reg. at 49,190. But that decision established no such thing. In fact, the court in that case was not presented with the argument that the agency had impermissibly ignored spillovers, reciprocity, and extraterritorial interests. *See* Pls. Not. of Mot. for Prelim. Injunction; Mem. of Points and Auths. at 21, *Cal. v. U.S. BLM*, 286 F. Supp. 3d 1054 (N.D. Cal. 2018), ECF No. 3. By ignoring how international climate spillovers, foreign reciprocal actions, and extraterritorial interests will affect the United States, BLM's interim value of the Social Cost of Methane reveals that the agency has

arbitrarily ignored important aspects of how the "undue waste" of natural gas will affect "the interests of the United States" and "public welfare." 30 U.S.C. § 187; *cf. Zero Zone*, 832 F.3d at 677-79 (ruling that climate change "needs to be taken into account" to assess the "Need of the Nation to Conserve Energy" under the Energy Policy and Conservation Act and upholding reliance on the Interagency Working Group's global values to assess national interests).

### B. BLM's Interim Estimate Relies on Arbitrary Factors

BLM asserts that its interim estimate uses an "approximation of the climate change impacts that occur within U.S. borders" that is "calculated directly" in two of the models used by the Interagency Working Group—models known as "FUND" and "PAGE." 2018 RIA at 94. BLM never actually explains how those crucial calculations were made, which itself is arbitrary. *The Lands Council v. McNair*, 537 F.3d 981, 1003 (9th Cir. 2008) (concluding that agencies "must explain the methodology . . . used"). But the Interagency Working Group's description of these models reveals that BLM's interim approach must have relied on arbitrary factors. For example, the only way that the PAGE model possibly "calculate[s] directly" regional impacts is through its "regional scaling factors," which are "based on the length of each region's coastline relative to the EU [European Union]. Because of the long coastline in the EU, other regions are, on average, [deemed to be] less vulnerable than the EU for the same sea level and temperature increase." 2016 TSD at 14; *see also* Joint SCM Comments at 15. In other words, PAGE calculates climate impacts occurring within U.S. borders by first estimating the climate damages that an additional ton of methane will cause in Europe, and then scaling down that value because the United States has a much shorter coastline than Europe.[8]

While relative coastline length may be a relevant factor in calculating damages from coastal flooding, it has no meaningful bearing on key climate damages like agricultural losses, increased cardiovascular mortality, and many other effects that occur inland. Joint SCM Comments at 15. When Congress instructed BLM to protect U.S. interests and safeguard "public welfare," 30 U.S.C. § 187,

---

[8] According to the CIA's *World Factbook*, EU's coastline is over three times longer than the U.S. coastline. *Compare* https://www.cia.gov/library/publications/the-world-factbook/geos/ee.html, *with* https://www.cia.gov/library/publications/the-world-factbook/geos/us.html.

Congress surely did not intend for BLM to limit its assessment of all U.S. interests and public welfare based solely on the relative length of our coastline versus Europe's. Yet, in relying on PAGE's approach to calculating regional impacts, that is precisely what BLM has done.

Ultimately, the Interagency Working Group reviewed PAGE's regional scaling factors as well as the other models' approaches to regional damages and strongly cautioned that "good methodologies for estimating domestic damages *do not currently exist*." 2015 IWG Response at 36 (emphasis added). BLM ignored that advice.

### C. BLM Treats Costs and Benefits Differently, Counting Savings That "Accrue" to Foreign Entities But Ignoring Significant Climate Effects to U.S. Citizens

BLM claims that its interim Social Cost of Methane estimates are justified because the Office of Management and Budget's *Circular A-4* instructs agencies to "focus on the benefits and costs that accrue to citizens and residents of the United States." 2018 RIA at 41. According to BLM, the agency complied with this instruction by comparing "climate change impacts that occur within U.S. borders" against all the Rescission's reduced compliance costs. *Id.* at 52, 94. Yet because all industry compliance costs ultimately fall on the owners, employees, or customers of regulated firms, a significant portion of the Rescission's alleged cost savings will ultimately accrue to any foreign investors or customers of regulated firms. Despite BLM's purportedly "domestic-only" approach to climate effects, BLM's estimates of industry cost savings neither segregate nor ignore savings that accrue to non-U.S. entities.[9] The inconsistent treatment of costs versus benefits is arbitrary.

Oil and gas producers whose rulemaking comments indicate that they directly benefit from the Rescission include, for example, wholly-owned subsidiaries of foreign-based companies (like

---

[9] Policy Integrity does not suggest that BLM should have segregated non-U.S. cost savings, but instead points out the inconsistency. In theory, BLM could perhaps have estimated and excluded some portion of non-U.S. cost savings, based on factors like rates of foreign investment in the relevant industries. But the better, consistent approach would be to count all important costs and benefits regardless of whether they fall inside or outside of strict geographic borders.

Canada's Encana Corporation[10]), and multi-national, publicly-traded corporations (like ConocoPhillips[11]) that have significant foreign investors (like the Government Pension Fund of Norway, which owns several million shares of Conoco). Joint SCM Comments at 11. Foreigners hold around 30% of all U.S. corporate stock and debt, with significant foreign direct investment in the resource-extraction industries. *Id.* Oil and gas produced on federal lands is also increasingly exported to foreign consumers. *Id.* A significant portion of the Rescission's alleged cost savings thus would ultimately pass through and "accrue to" foreign investors or foreign customers. Yet despite counting cost savings in full regardless of whether they ultimately accrue to foreign entities, BLM ignored considerable climate effects—including effects on U.S. interests, *supra* II.A.—simply because the physical damage initially will occur outside U.S. borders. This inconsistent treatment of costs and benefits is patently arbitrary. *See Ctr. for Biological Diversity*, 538 F.3d at 1198 (ruling it is arbitrary to "put a thumb on the scale" by treating costs and benefits differently).

**III. The Rescission Relies on an Analysis Riddled with Unexplained Methodological Choices**

By using its regulatory impact analysis to justify the Rescission, BLM "offer[s] an explanation for its decision that runs counter to the evidence." *Ctr. for Biological Diversity*, 538 F.3d at 1194. "When an agency decides to rely on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule unreasonable." *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1036 (D.C. Cir. 2012). The Rescission's Executive Summary prominently cites the regulatory impact analysis, explains that BLM "determined that [the 2016 rule] would have imposed costs exceeding its benefits," and concludes that "*[f]or these reasons*, the BLM revised the 2016 rule in a manner that reduces unnecessary compliance burdens." 83 Fed. Reg. at 49,184 (emphasis added).

---

[10] Comments from Encana Oil & Gas (USA) Inc., BLM-2018-0001-131954 (Apr. 23, 2018) (praising the Rescission for relieving permitting delays and "excessive[ ] burden[s]"). Encana Oil & Gas (USA) Inc. is a wholly-owned subsidiary of Encana Corp., incorporated in Canada, *see* Encana Corp., Annual Report (SEC Form 40-F) at 3 (Dec. 31, 2013), https://perma.cc/HQ6Q-8KAW.

[11] Comments from ConocoPhillips, BLM-2018-0001-132464 (Apr. 23, 2018) (AR 103956) (commending the Rescission for improving the "benefit-cost value" for "stakeholders").

Because BLM explicitly relied on the regulatory impact analysis to justify the Rescission, BLM's flawed analytical choices infect the rulemaking.

### A.  BLM's Explanation for Its Changed Position on the Social Cost of Methane Is Inadequate and Inconsistent with Evidence

A change in agency policy that "disregard[s] facts and circumstances that underlay . . . the prior policy" requires "a more detailed justification than what would suffice for a new policy created on a blank slate." *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009). Here, BLM has abandoned its use of the Interagency Working Group's approach to the Social Cost of Methane (which was developed with its parent agency, the Department of the Interior's, participation)—an approach that was upheld by the Seventh Circuit in *Zero Zone* and endorsed by the National Academies of Sciences. Joint SCM Comments at 12-13; 2016 TSD at 1, 17. Yet BLM offers only three quotations to support its new "interim" approach; all three are inadequate justifications for the drastic change.

First, BLM says its adjustments are "[i]n accordance with E.O. 13783," a March 2017 Executive Order that instructed agencies to ensure that their "consideration of domestic versus international impacts" is "based on the best available science and economics" and consistent with the Office of Management and Budget's *Circular A-4*. 2018 RIA at 40-41. Yet this request for agencies to reevaluate their "consideration of . . . international impacts" in no way dictates any specific methodological choice, let alone BLM's approach. *See also* States Mot. at 25-26 (explaining that the "Executive Order in and of itself has no impact on [what] constitute[s] the best available science").

BLM next offers two quotations from *Circular A-4*, suggesting that agencies should "focus on benefits and costs that accrue to citizens and residents" and that "effects beyond the borders of the United States . . . should be reported separately." 2018 RIA at 41. To begin, such guidance can never override statutory mandates to more broadly protect public welfare, 30 U.S.C. § 187. And as detailed above, *supra* II.A, BLM's approach in fact ignores several significant categories of climate costs that accrue to U.S. citizens and affect public welfare. Moreover, BLM has ignored other key instructions from *Circular A-4*: specifically, that "[d]ifferent regulations may call for different emphases in the

analysis, depending on the nature and complexity of the regulatory issues and the sensitivity of the benefit and cost estimates to the key assumptions." *Circular A-4* at 3; Joint SCM Comments at 5. In fact, *Circular A-4* requires agencies to conduct sensitivity analyses[12] to determine if methodological choices result in "the value of net benefits chang[ing] from positive to negative" and instructs agencies to then "determine which . . . assumption is more appropriate." *Circular A-4* at 42. BLM admits that its entire net-cost calculation turns "primarily" on its switch to the interim values, and yet BLM never conducts a sensitivity analysis using the Interagency Working Group's Social Cost of Methane and never even "report[s] separately" the effects it claims are only occurring beyond U.S. borders. *See* 2018 RIA at 76, 78 (mentioning an alternate calculation submitted in comments by Resources for the Future, but explicitly stating that "BLM did not incorporate" such estimates into its analysis).

The purportedly "domestic-only" approach that BLM adopted was explicitly rejected not only by the Interagency Working Group but also by the National Academies of Sciences and by economic experts like Nobel laureates Kenneth Arrow and William Nordhaus, with Nordhaus—who developed a key underlying model—cautioning that "regional damage estimates are both incomplete and poorly understood." Joint SCM Comments at 12-14; *see also* Robert Pindyck, Comments on the Delay and Suspension (Nov. 6, 2017) (AR 83411) (calling BLM's "interim" values "clearly . . . wrong from an economic perspective"). BLM has thus ignored the "best available . . . economics." 2018 RIA at 40. BLM's explanation for its radical change in policy is inadequate and runs counter to the evidence before the agency. The "interim" values are arbitrary, and therefore so is the rulemaking.

**B.  The Regulatory Impact Analysis Evinces a Pattern of Unexplained Choices**

BLM's arbitrary approach in relying on a deeply flawed "interim" methodology to calculate the cost of methane emissions is part of a broader pattern of flaws. For example, according to BLM's own numbers, the now-repealed pneumatic pump requirements were net costly only if future effects were discounted at a 7% rate; in contrast, at a 3% rate, BLM concedes that the original requirements

---

[12] In a sensitivity analysis, the analyst changes a key variable or assumption to test how sensitive the analytical results are to any particular methodological choice.

delivered net benefits. 2018 RIA at 56. Discount rates are a key methodological choice, as they determine the weight assigned to future costs and benefits. *Circular A-4* instructs agencies to conduct "further analysis" if a methodological choice results in "the value of net benefits chang[ing] from positive to negative" and instructs agencies to then "determine which . . . assumption is more appropriate." *Circular A-4* at 42. Yet BLM never conducts further analysis or explains why it is justified in rescinding provisions that were net beneficial at a 3% discount rate. *See* 2018 RIA at 54-55 (explaining why it is repealing net-beneficial requirements for liquids unloading and controllers, but giving no explanation for repealing the pumps requirements). BLM's implicit preference for the 7% discount rate is highly problematic for an analysis of climate effects. The Office of Management and Budget—and the rest of the Interagency Working Group—already determined that a 7% discount rate "is not considered appropriate" when valuing climate damages, because it grossly and inappropriately devalues all climate risks that will fall to our children and grandchildren. 2015 IWG Response at 36; Joint SCM Comments at 16. BLM's silent preference for discounting future climate costs at a very high rate is particularly troubling in light of BLM's statutory charge to "take[ ] into account the long-term needs of future generations." 43 U.S.C. § 1702(c).

BLM also fails to explain why its regulatory impact analysis considered only ten years' worth of costs and benefits, 2018 RIA at 43, even though *Circular A-4* requires agencies to "cover a period long enough to encompass all the important benefits and costs likely to result." Joint SCM Comments at 3 (citing *Circular A-4*). Given the original schedule for implementation of the Waste Prevention Rule's provisions, as well as the nature of climate change, annual cost savings from the Rescission should have leveled out or even started dropping beyond the ten-year period considered by BLM, while annual forgone climate benefits would have continued to rise. Though the 2016 RIA also used a ten-year timespan, extending that timespan would have only increased net benefits for the already cost-benefit-justified Waste Prevention Rule. Here, by contrast, a proper timespan could have *flipped* the cost-benefit calculation. *Id.* at 3 & n.7. In short, the incredibly short analytical timespan painted a misleading picture of the Rescission's costs and benefits. *Id.*

Additional examples abound, from the unexplained doubling of estimated administrative burdens, *see* States Mot. 29-30; Policy Integrity Comments at 2-3 (AR 84216-AR 84217), to effectively treating as worthless additional forgone health and welfare benefits simply because those effects were not monetized, *see* States Mot. 28-29. Such under-explained changes and arbitrary choices drive the regulatory impact analysis on which the Rescission relies. Because the regulatory impact analysis is arbitrary, the Rescission must be vacated.

## CONCLUSION

This Court should grant Plaintiffs' motions for summary judgment.[13]

Dated:  New York, NY
        June 21, 2019

Respectfully submitted,
/s/ Richard L. Revesz
Bethany A. Davis Noll, N.Y. State Bar #4541116
(*pro hac vice pending*)
Denise A. Grab, Cal. State Bar #268097
Richard L. Revesz, N.Y. State Bar #2044725
(*pro hac vice pending*)
Jason Schwartz, Va. State Bar #73398
(*pro hac vice pending*)
  Institute for Policy Integrity
  New York University Law School
  139 MacDougal, 3rd floor
  New York, NY 10012
  T: (212) 992-8932
  F: (212) 995-4592
  E-mail: denise.grab@nyu.edu

Counsel for *Amicus Curiae*
Institute for Policy Integrity

---

[13] Policy Integrity gratefully acknowledges the assistance of Alan Masinter and Elizabeth Smith, students in New York University School of Law's Advanced Regulatory Policy Clinic, in the preparation of this brief.