LAWRENCE VANDYKE
Deputy Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice
MARISSA PIROPATO (MA 651630)
P.O. Box 7611
Washington, DC  20044-7611
Tel.: (202) 305-0470/Fax: (202) 305-0506
marissa.piropato@usdoj.gov
CLARE BORONOW, admitted to MD Bar
999 18th Street
South Terrace, Suite 370
Denver, CO 80202
Tel.: (303) 844-1362 / Fax: (303) 844-1350
clare.boronow@usdoj.gov

*Counsel for Defendants*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> DAVID BERNHARDT, *et al.*, <br><br> Defendants. | No. 4:18-cv-05712-YGR <br><br> (Consolidated With Case No. 4:18-cv-05984-YGR) <br><br> **DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT** <br><br> Hearing: January 14, 2020 at 10:00 a.m. |

1

## TABLE OF CONTENTS

2  NOTICE OF CROSS MOTION FOR SUMMARY JUDGMENT ............................................. 1

3  MEMORANDUM OF POINTS AND AUTHORITIES ............................................................ 1

4  BACKGROUND ........................................................................................................................ 2

5       I.      The 2016 Rule.......................................................................................................... 2

6       II.     The Revision Rule..................................................................................................... 5

7  STANDARD OF REVIEW ........................................................................................................ 8

8  ARGUMENT ............................................................................................................................. 9

9       I.      The Revision Rule Is a Lawful Exercise of BLM's Authority Under the
10              Mineral Leasing Act ............................................................................................... 9

11              A.      BLM's Change in Position Regarding the Scope of Its Statutory
12                      Authority under the MLA Is Reasonable and Owed Deference under
13                      *Chevron*............................................................................................................. 9

14              B.      BLM's Interpretation of Its Waste Prevention Authority in the
15                      Revision Rule Complies with the Agency's Obligation under the
                        MLA to Safeguard "Public Welfare" and under FLPMA to Prevent
16                      "Unnecessary and Undue Degradation." .................................................... 19

17              C.      BLM's Interpretation of Waste is Reasonable as Applied to Low-
18                      Bleed Pneumatic Controllers. .................................................................. 21

19      II.     BLM Has Not "Delegated" Its Duty to Prevent Waste to the States. .................. 22

20      III.    BLM Complied with the APA by Explaining Its Reasons for Departing
                from its Previous Findings. ................................................................................... 26

21              A.      BLM's Concerns About the Impact of the 2016 Rule on Marginal
22                      Wells Are Reasonable and Supported by Data. ........................................ 27

23              B.      BLM Acknowledged and Addressed the Concerns Raised in GAO
24                      Oversight Reviews. ................................................................................... 31

25              C.      BLM Explained Why It Reached Different Conclusions Regarding
                        EPA Regulations in the Revision Rule than in the 2016 Rule.................. 32
26
27      IV.     BLM Complied with the APA's Notice Requirements. ....................................... 34

28              A.      BLM Provided Notice of Its Concerns About Its Statutory
                        Authority. ................................................................................................. 35

B.      BLM Provided Notice of Its Concerns Regarding Marginal Wells.......... 37

V.      BLM Reasonably Determined Based on Available Data and Accepted
        Methodologies that the Costs of the 2016 Rule Outweighed Its Benefits. ........... 38

        A.      BLM Reasonably Determined that the 2016 Rule's Costs
                Outweighed its Benefits. ............................................................. 39

        B.      BLM Reasonably Utilized the Domestic Social Cost of Methane. .......... 39

        C.      BLM's Cost-Benefit Analysis Was Well-Supported. ............................... 44

VI.     BLM Complied With NEPA. ................................................................................. 49

        A.      BLM Took a Hard Look at Air and Health Impacts and Impacts to
                Tribes. ................................................................................................. 50

        B.      BLM Took a Hard Look at Climate Impacts. ........................................... 53

        C.      BLM Took a Hard Look at Cumulative Impacts. ..................................... 55

        D.      BLM Reasonably Determined that No EIS Was Required. ...................... 56

VII.    Any Remedy Should Be Narrowly Tailored to the Harms Alleged. ................... 59

CONCLUSION ............................................................................................................. 60

# ANNOTATED TABLE OF CONTENTS[1]

I. The Revision Rule Is a Lawful Exercise of BLM's Authority Under the Mineral Leasing Act (Issues A-1, A-2, & A-4). ...................................................... 9

    A. BLM's Change in Position Regarding the Scope of Its Statutory Authority under the MLA Is Reasonable and Owed Deference under *Chevron.*.................................................................................................... 9

    B. BLM's Interpretation of Its Waste Prevention Authority in the Revision Rule Complies with the Agency's Obligation under the MLA to Safeguard "Public Welfare" and under FLPMA to Prevent "Unnecessary and Undue Degradation." .................................................. 19

    C. BLM's Interpretation of Waste is Reasonable as Applied to Low-Bleed Pneumatic Controllers. ................................................... 21

II. BLM Has Not "Delegated" Its Duty to Prevent Waste to the States (Issues A-3 & A-4)............................................................................................. 22

III. BLM Complied with the APA by Explaining Its Reasons for Departing from its Previous Findings (Issue B). .................................................... 26

    A. BLM's Concerns About the Impact of the 2016 Rule on Marginal Wells Are Reasonable and Supported by Data (Issues B-2b & B-2c)...... 27

    B. BLM Acknowledged and Addressed the Concerns Raised in GAO Oversight Reviews (Issue A-4)............................................................... 31

    C. BLM Explained Why It Reached Different Conclusions Regarding EPA Regulations in the Revision Rule than in the 2016 Rule (Issue A-4)............................................................................................................. 32

IV. BLM Complied with the APA's Notice Requirements. ....................................... 34

    A. BLM Provided Notice of Its Concerns About Its Statutory Authority (Issue A-4). ............................................................................................. 35

    B. BLM Provided Notice of Its Concerns Regarding Marginal Wells (Issue B-2a)............................................................................................. 37

---

[1] As required by ECF No. 95, Defendants cross-reference the issues discussed in Plaintiffs' opening motions in this annotated table of contents.  These issues correspond to the issues listed on Plaintiff Citizen Groups' Annotated Table of Contents.  ECF No. 109 at iii-iv.

V.      BLM Reasonably Determined Based on Available Data and Accepted
        Methodologies that the Costs of the 2016 Rule Outweighed Its Benefits
        (Issue C). ........................................................................................................ 38

        A.      BLM Reasonably Determined that the 2016 Rule's Costs
                Outweighed its Benefits (Issues C-2 & C-3). ........................................... 39

        B.      BLM Reasonably Utilized the Domestic Social Cost of Methane
                (Issue C-1). ................................................................................................ 39

        C.      BLM's Cost-Benefit Analysis Was Well-Supported (Issues B-1, C-
                2, & C-3). ................................................................................................... 44

VI.     BLM Complied With NEPA (Issue D). ................................................................ 49

        A.      BLM Took a Hard Look at Air and Health Impacts and Impacts to
                Tribes (Issues D-1a & D-1b). ................................................................... 50

        B.      BLM Took a Hard Look at Climate Impacts (Issue D-1c). ...................... 53

        C.      BLM Took a Hard Look at Cumulative Impacts (Issue D-2). ................... 55

        D.      BLM Reasonably Determined that No EIS Was Required (Issue D-
                3). ............................................................................................................... 56

VII.    Any Remedy Should Be Narrowly Tailored to the Harms Alleged (New
        issue E). .............................................................................................................. 59

# TABLE OF AUTHORITIES

**Cases**

*Alaska Ctr. For Env't v. U.S. Forest Serv.*,
189 F.3d 851 (9th Cir. 1999) ............................................................................................ 57

*Alaska Ctr. for the Env't v. West*,
157 F.3d 680 (9th Cir. 1998) ....................................................................................... 23, 24

*Anderson v. Evans*,
371 F.3d 475 (9th Cir. 2004) ............................................................................................ 53

*Assiniboine & Sioux Tribes of Fort Peck Indian Reservation v. Board of Oil and Gas
    Conservation of Montana*
792 F.2d 782 (9th Cir. 1986) ............................................................................................ 23

*BASF Wyandotte Corp. v. Costle*,
598 F.2d 637 (1st Cir. 1979) ............................................................................................ 35

*Beverly Hills Unified Sch. Dist. v. Fed. Transit Admin.*,
No. CV 12-9861-GW(SSX), 2016 WL 4650428 (C.D. Cal. Feb. 1, 2016) ...................... 51

*Border Power Plant Working Grp. v. Dep't of Energy*,
260 F. Supp. 2d 997 (S.D. Cal. 2003) ......................................................................... 50, 59

*Brewster v. Lanyon Zinc Co.*,
140 F. 801 (8th Cir. 1905) ................................................................................................ 15

*California Co. v. Udall*,
296 F.2d 384 (D.C. Cir. 1961) .................................................................................... 12, 13

*California ex rel. Lockyer v. USDA*,
459 F. Supp. 2d 874 (N.D. Cal. 2006) .............................................................................. 53

*California v. BLM*,
286 F. Supp. 3d 1054 (N.D. Cal. 2018) ............................................................................ 40

*California v. Block*,
690 F.2d 753 (9th Cir. 1982) ............................................................................................ 51

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*,
467 U.S. 837 (1984) ................................................................................................... 10, 38

*Chrisman v. Miller*,
197 U.S. 313 (1905) .................................................................................................... 15, 16

*Citizens to Pres. Overton Park v. Volpe*,
401 U.S. 402 (1971) .......................................................................................................... 9

*City of Arlington v. FCC*,
569 U.S. 290 (2013) ......................................................................................................... 10

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
538 F.3d 1172 (9th Cir. 2008) ........................................................................... 50

*Ctr. for Food Safety v. Salazar*,
898 F. Supp. 2d 130 (D.D.C. 2012) ................................................................... 52

*Earth Island Inst. v. U.S. Forest Serv.*,
442 F.3d 1147 (9th Cir. 2006) ............................................................................. 9

*Earthlink, Inc. v. FCC*,
462 F.3d 1 (D.C. Cir. 2006) ................................................................................. 9

*EarthReports, Inc. v. FERC*,
828 F.3d 949 (D.C. Cir. 2016) ........................................................................... 54

*Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117 (2016) ................................................................................. 18, 26

*Envtl. Info. Ctr. v. U.S. Office of Surface Mining*,
Civ. No. 15-106, 2017 WL 3480262 (D. Mont. Aug. 14, 2017) ........................... 54

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .............................................................. 10, 32, 33, 34, 38, 39

*Gardner v. U.S. Bureau of Land Mgmt.*,
638 F.3d 1217 (9th Cir. 2011) ........................................................................... 19

*Geo-Energy Partners-1983 Ltd. v. Salazar*,
613 F.3d 946 (9th Cir. 2010) ............................................................................. 60

*Geosearch, Inc. v. Andrus*,
508 F. Supp. 839 (D. Wyo. 1981) ...................................................................... 13

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*,
378 F.3d 1059 ...................................................................................................... 30

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*,
387 F.3d 968 (9th Cir. 2004) ............................................................................. 30

*Greater Yellowstone Coal., Inc. v. Servheen*,
665 F.3d 1015 (9th Cir. 2011) ........................................................................... 43

*High Country Conservation Advocates v. U.S. Forest Serv.*,
52 F. Supp. 3d 1174 (D. Colo. 2014) ...................................................... 48, 49, 54

*High Sierra Hikers Ass'n v. Blackwell*,
390 F.3d 630 (9th Cir. 2004) ............................................................................. 49

*Idaho Farm Bureau Fed'n v. Babbitt*,
58 F.3d 1392 (9th Cir. 1995) ....................................................................... 35, 37

*Idaho Sporting Cong. v. Thomas*,
137 F.3d 1146 (9th Cir. 1998) ..................................................................... 56, 57

Defs.' Cross Mot. for Summ. J. & Resp. to Pls.' Mots. for Summ. J.
*California v. Zinke*, No. 4:18-cv-05712-YGR

*Kern Cty. Farm Bureau v. Allen*,
  450 F.3d 1072 (9th Cir. 2006) ..................................................................... 35, 37

*Kern v. BLM*,
  284 F.3d 1062 (9th Cir. 2002) ..................................................................... 49, 53

*Kleppe v. Sierra Club*,
  427 U.S. 390 (1976) ............................................................................... 9, 31, 49

*L.A. Haven Hospice v. Sebelius*,
  638 F.3d 644 (9th Cir. 2011) ............................................................................. 59

*La. Pub. Serv. Comm'n v. Fed. Energy Regulatory Comm'n*,
  860 F.3d 691 (D.C. Cir. 2017) ........................................................................... 23

*Lands Council v. Martin*,
  529 F.3d 1219 (9th Cir. 2008) ........................................................................... 43

*Lands Council v. McNair*,
  537 F.3d 981 (9th Cir. 2008) ........................................................................ 9, 51

*Louis v. U.S. Dep't of Labor*,
  419 F.3d 970 (9th Cir. 2005) ....................................................................... 34, 36

*Marathon Oil Co. v. Andrus*,
  452 F. Supp. 548 (1978) .................................................................................... 17

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989) ........................................................................... 8, 9, 31, 42

*Metcalf v. Daley*,
  214 F.3d 1135 (9th Cir. 2000) ........................................................................... 49

*Mid-Tex Elec. Co-op., Inc. v. FERC*,
  773 F.2d 327 (D.C. Cir. 1985) ........................................................................... 36

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ............................................................................................. 38

*Nat. Res. Def. Council v. EPA*,
  279 F.3d 1180 (9th Cir. 2002) ........................................................................... 34

*Nat. Res. Def. Council, Inc. v. EPA*,
  863 F.2d 1420 (9th Cir. 1988) ..................................................................... 34, 35

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
  551 U.S. 644 (2007) ........................................................................................... 60

*Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Serv.*,
  545 U.S. 967 (2005) ....................................................................... 10, 27, 29, 30

*Nat'l Ass'n of Home Builders v. EPA*,
  682 F.3d 1032 (D.C. Cir. 2012) ......................................................................... 27

*Neighbors of Cuddy Mountain v. Alexander*,
  303 F.3d 1059 (9th Cir. 2002) ...................................................................... 58

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
  402 F.3d 846 (9th Cir. 2005) ........................................................................ 56

*Pac. Rivers Council v. U.S. Forest Serv.*,
  689 F.3d 1012 (9th Cir. 2012) ...................................................................... 52

*Price v. City of Stockton*,
  390 F.3d 1105 (9th Cir. 2004) ...................................................................... 59

*Pub. Citizen Inc. v. Mineta*,
  343 F.3d 1159 (9th Cir. 2003) ...................................................................... 55

*Pub. Citizen v. Dep't of Transp.*,
  316 F.3d 1002 (9th Cir. 2003) ...................................................................... 58

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ..................................................................................... 49

*Rybachek v. EPA*,
  904 F.2d 1276 (9th Cir. 1990) ............................................................... 35, 38

*Safe Air for Everyone v. EPA*,
  488 F.3d 1088 (9th Cir. 2007) ...................................................................... 60

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) ....................................................... 30, 42, 44

*San Luis & Delta-Mendota Water Auth. v. Locke*,
  776 F.3d 971 (9th Cir. 2014) ................................................................. 42, 43

*Sauder v. Mid-Continent Petroleum, Co.*,
  292 U.S. 272 (1934) ..................................................................................... 15

*Sierra Club v. FERC*,
  867 F.3d 1357 (D.C. Cir. 2017) ................................................................... 53

*Sierra Club v. U.S. Dep't of Transp.*,
  753 F.2d 120 (D.C. Cir. 1985) ..................................................................... 55

*Sierra Club v. U.S. EPA*,
  167 F.3d 658 (D.C. Cir. 1999) ..................................................................... 42

*Solite Corp. v. EPA*,
  952 F.2d 473 (D.C. Cir. 1991) ............................................................... 35, 36

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  255 F. Supp. 3d 101 (D.D.C. 2017) ....................................................... 53, 54

*Sugar Cane Growers Coop. of Fla. v. Veneman*,
  289 F.3d 89 (D.C. Cir. 2002) ....................................................................... 60

*Theodore Roosevelt Conservation P'ship v. Salazar*,
  661 F.3d 66 (D.C. Cir. 2011) ............................................................ 19, 32

*United States v. Afshari*,
  426 F.3d 1150 (9th Cir. 2005) ................................................................. 60

*Utah v. Andrus*,
  486 F. Supp. 995 (D. Utah 1979) .................................................. 19, 20, 22

*W. Org. of Res. Councils v. U.S. Bureau of Land Mgmt.*,
  No. CV 16-21-GF-BMM, 2018 WL 1475470 (D. Mont. Mar. 26, 2018) ............................ 54

*Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*,
  537 U.S. 371  (2003) ................................................................................ 12

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982) ................................................................................. 60

*Wildearth Guardians v. Zinke*,
  368 F. Supp. 3d 41 (D.D.C. 2019) .......................................... 52, 55, 58, 59

*Wildlife v. Hall*,
  807 F. Supp. 2d 972 (D. Mont. 2011) ..................................................... 52

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ...................................................................................... 9

*Wyoming v. U.S. Dep't of Agric.*,
  661 F.3d 1209 (10th Cir. 2011) ............................................................... 51

*Wyoming v. U.S. Dep't of Interior*,
  Nos. 2:16-cv-0280-SWS, 2:16-cv-0285-SWS, 2017 WL 161428 (D. Wyo. Jan. 16, 2017)5, 10, 12, 33

*Zepeda v. Immigration & Naturalization Serv.*,
  753 F.2d 719 (9th Cir. 1983) .................................................................. 59

**Statutes**

5 U.S.C. § 553(b) ........................................................................................ 55

5 U.S.C. § 706(2)(A) ..................................................................................... 8

30 U.S.C. § 187 ...................................................................... 10, 12, 15, 19, 23

30 U.S.C. § 189 .................................................................................... 10, 23

30 U.S.C. § 226 .................................................................................... 11, 13

42 U.S.C. § 4321 ....................................................................................... 49

42 U.S.C. § 4332(C) ............................................................................... 6, 49

43 U.S.C. § 1701(a)(8) ............................................................................... 19

44 U.S.C. § 1507 ................................................................................................... 55

**Regulations**

40 C.F.R. § 1500.1(b) ........................................................................................... 53

40 C.F.R. § 1501.1 ................................................................................................ 49

40 C.F.R. § 1501.4 .......................................................................................... 49, 56

40 C.F.R. § 1502.21 .............................................................................................. 50

40 C.F.R. § 1508.27 .............................................................................................. 57

40 C.F.R. § 1508.27(a) .................................................................................... 51, 57

40 C.F.R. § 1508.27(b) ......................................................................................... 58

40 C.F.R. § 1508.27(b)(2) ..................................................................................... 57

40 C.F.R. § 1508.27(b)(5) ..................................................................................... 59

40 C.F.R. § 1508.27(b)(7) ..................................................................................... 58

40 C.F.R. § 1508.9(a) ........................................................................................... 49

40 C.F.R. part 60 ........................................................................................ 4, 34, 56

43 C.F.R. § 3103.3-1 .................................................................................... 3, 31, 32

43 C.F.R. § 3160.0-5 ............................................................................................. 18

43 C.F.R. § 3179.201(a) ........................................................................................ 22

43 C.F.R. § 3179.301 ............................................................................................ 22

43 C.F.R. § 3179.301(a) ........................................................................................ 31

43 C.F.R. § 3179.4(a) ............................................................................................ 17

43 C.F.R. § 3179.4(b) ........................................................................................... 20

43 C.F.R. § 3179.5 .................................................................................................. 7

43 C.F.R. § 3179.6(b) ........................................................................................... 31

43 C.F.R. §§ 3179.101-104 .............................................................................. 20, 22

43 C.F.R. §§ 3179.4-5 ........................................................................................... 20

43 C.F.R. part 3170 ............................................................................................... 31

**Executive Orders**

Exec. Order 12866, 58 Fed. Reg. 51,735 (Sept. 30, 1993)……………………6, 8, 12, 22, 40, 41

Exec. Order 12898, 59 Fed. Reg. 7629 (February 11, 1994)……………………………...51

1   Exec. Order 13783, 82 Fed. Reg. 16093 (March 28, 2017).......5, 6, 38, 40, 42, 43, 44, 45, 46, 47

2   **Federal Register**

3   83 Fed. Reg. 52,056 (Oct. 15, 2018)..................................................................................... 34, 55

4   **Other Authorities**

5   *Exploration for & Disposition of Coal, Oil, Gas, etc.*, H. Rep. No. 64-17, at 6 (Jan. 4, 1916)....14

6   *Exploration for & Disposition of Coal, Oil, Gas, etc.*, H. Rep. No. 668, at 6 (May 12, 1914)....13

7   *Hrg. Before S. Subcomm. on the Comm. on Public Lands on S. 4898, A Bill To Encourage the
     Mining of Coal, Oil, Gas, Etc. on the Public Domain*, at 26 (May 25, 1914). .................. 13, 14

8
9   *Oil Leasing Lands, Hrg. Before H. Comm. on Public Lands on H.R. 3232 and S. 2812*, at 220-21
     (Feb. 5, 1918)................................................................................................................... 13, 14

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## NOTICE OF CROSS MOTION FOR SUMMARY JUDGMENT

2      Please take notice that on January 14, 2020 at 10:00 a.m. this motion will be heard before

3  the Honorable Judge Gonzalez Rogers.  Defendants Secretary of the Interior David Bernhardt, et

4  al. move for summary judgment pursuant to Federal Rule of Civil Procedure 56.  As set forth in

5  the following memorandum, Defendants are entitled to judgment as a matter of law because the

6  Bureau of Land Management ("BLM") complied with the Mineral Leasing Act ("MLA"),

7  Federal Land Policy and Management Act ("FLPMA"), Administrative Procedure Act ("APA"),

8  and National Environmental Policy Act ("NEPA") in issuing the rulemaking entitled Waste

9  Prevention, Production Subject to Royalties, and Resource Conservation; Rescission or Revision

10  of Certain Requirements ("Revision Rule").

11

## MEMORANDUM OF POINTS AND AUTHORITIES

12      In late 2016, BLM completely revamped its longstanding policies governing the venting

13  and flaring of gas from oil and gas wells on federal and Indian leases such that, for the first time,

14  BLM's authority to prevent "waste" under the MLA included environmental and societal

15  benefits in its sweep.  Waste Prevention, Production Subject to Royalties, and Resource

16  Conservation ("2016 Rule), AR 909.[2]   Within months, a federal court questioned whether the

17  agency had exceeded its statutory authority in promulgating a waste prevention rule whose costly

18  requirements were justified primarily by air pollution benefits.  At the same time, the new

19  administration questioned the wisdom of "waste prevention" regulations that, on the whole, cost

20  significantly more to implement than the value of the gas they were expected to conserve.  After

21  a notice and comment process, BLM decided to rescind and revise many of the most onerous

22  requirements of the 2016 Rule to better align with the agency's statutory authority and avoid

23  imposing unreasonable costs on operators.  In the Revision Rule, the agency returned to

24  regulations similar to those that had been in place for over 30 years prior.

25      Plaintiffs acknowledge (in theory) that agencies are entitled to change their minds and

26  rewrite their regulations in response to new policies and new information, and that such changes

27 

28  [2] This brief uses the prefix "AR" to denote citations to administrative record documents with the Bates stamp prefix "WPRR_AR."

Defs.' Cross Mot. for Summ. J. & Resp. to Pls.' Mots. for Summ. J.
*California v. Zinke*, No. 4:18-cv-05712-YGR                      1

1   are not subject to a heightened standard of review.  But as their briefing demonstrates, *in*
2   *practice*, Plaintiffs are unwilling to apply this standard when an agency's outcome does not
3   accord with their policy preferences.  They ask this Court to flyspeck BLM's every calculation
4   and second-guess its every determination, even though BLM is the expert agency entrusted by
5   Congress when it comes to the management of oil and gas development on federal and Indian
6   lands.

7          BLM met its obligation under the APA and NEPA to examine the facts and explain its
8   reasoning.  The agency's interpretation of its waste prevention authority under the MLA is based
9   on the statutory text, legislative history, and longstanding practice, and is owed deference by this
10  Court.  Its decision to defer to adequate state flaring regulations represents a reasonable decision
11  that it is more effective to make deference the default setting than to impose overlapping
12  requirements.  BLM's use of the domestic social cost of methane comports with federal guidance
13  documents, and its calculation of costs and benefits is based on peer-reviewed research.  And the
14  agency's determination that an environmental impact statement was not required under NEPA is
15  based on the Revision Rule's minimal nationwide impacts.

16         Plaintiffs' dissatisfaction with a new administration's policy choices is simply not a
17  reason to vacate BLM's well-supported and well-reasoned rulemaking.  Because the agency has
18  complied with the law, the Court should uphold the Revision Rule.

19                                    **<u>BACKGROUND</u>**

20         Defendants incorporate by reference the procedural background contained in the Parties'
21  Joint Statement Regarding Procedural History (ECF No. 98) and focus the following discussion
22  on the substantive background underlying the 2016 Rule and the Revision Rule.

23  **I.     <u>The 2016 Rule.</u>**

24         During oil and gas production, "it is not uncommon for gas to reach the surface that
25  cannot be feasibly captured, used, or sold."  AR 2. When this occurs, operators dispose of the gas
26  either by combusting it (flaring) or releasing it into the atmosphere (venting).  *Id.*  Certain types
27  of production equipment and facilities also vent or flare gas both by design and, at times, as a
28  result of leaks.  *Id.*

1    In 1980, BLM established policies to address venting and flaring during the development

2 of federal and Indian minerals in Notice to Lessees and Operators of Onshore Federal and Indian

3 Oil and Gas Leases regarding Royalty or Compensation for Oil and Gas Lost ("NTL-4A").  AR

4 3010.  NTL-4A remained in effect between 1980 and November 2016 when BLM issued the

5 2016 Rule.  NTL-4A discouraged the loss of produced gas by imposing royalties on gas vented

6 or flared in violation of NTL-4A or otherwise "avoidably lost" due to operator negligence,

7 failure to take all reasonable measures to prevent or control the loss, or failure to comply with

8 applicable orders and regulations.  AR 3010-11.  NTL-4A allowed venting and flaring during

9 emergencies and well testing.  AR 3012.  It also provided a process by which an operator could

10 seek prior approval to vent or flare oil-well gas royalty-free by showing that the cost to capture

11 or use the gas was "not economically justified" and "would lead to the premature abandonment

12 of recoverable oil reserves and ultimately to a greater loss of equivalent energy than would be

13 recovered if venting or flaring were permitted."  AR 3013.

14    BLM issued the 2016 Rule on November 18, 2016, with the goal of "reduc[ing] the waste

15 of natural gas from mineral leases administered by the BLM" through venting, flaring, and leaks

16 during oil and gas development.  AR 2, 910.  The 2016 Rule replaced NTL-4A and applied to all

17 oil and gas development of federal and Indian minerals (other than Osage Tribe leases).  AR 910.

18 The 2016 Rule imposed requirements beyond those contained in NTL-4A, including requiring

19 operators to capture a certain percentage of produced gas each month, with the required

20 percentage increasing over a ten-year period.  AR 983-84.  The 2016 Rule also required

21 operators to inspect for and repair equipment leaks and replace certain types of equipment with

22 equipment that vents or flares less gas.  AR 986-87.  Although the 2016 Rule retained NTL-4A's

23 system of imposing royalties on "avoidably lost" gas, it expanded the definition of "avoidably

24 lost" to include any loss not expressly permitted by the other provisions of the rule as well as gas

25 that should have been captured under the Rule's capture requirements.  AR 983.[3]

26

27 [3] The 2016 Rule also set royalty rates for produced oil and gas, 43 C.F.R. § 3103.3-1, and
explained when produced oil and gas could be used royalty-free in operations on the lease, id.
28 part 3178.  The Revision Rule did not affect these provisions, which remain in effect.

1    In response to comments expressing concern at the compliance costs imposed by the

2    2016 Rule, BLM created a process by which an operator could request relief from the Rule's gas

3    capture, equipment, and leak detection and repair requirements if it "demonstrates, and the BLM

4    concurs, that complying with the requirements would impose such costs as to cause the operator

5    to cease production and abandon significant recoverable oil reserves under the lease." AR 913.

6    Likewise, BLM recognized that aspects of the 2016 Rule overlapped with state regulatory

7    regimes and with Environmental Protection Agency ("EPA") New Source Performance Standard

8    ("NSPS") regulations under 40 C.F.R. part 60, subparts OOOO and OOOOa, which govern new

9    and modified sources of emissions in the oil and gas industry. AR 912, 919. To minimize the

10   overlap, for certain requirements BLM exempted operators from compliance with the 2016 Rule

11   if they were already in compliance with applicable EPA regulations, and it allowed states and

12   tribes to seek a "variance" from certain BLM requirements if their regulations were "equally

13   effective." AR 911.

14          BLM determined that it had authority to issue the 2016 Rule under the MLA, FLPMA,

15   Federal Oil and Gas Royalty Management Act, Indian Mineral Leasing Act, and Indian Mineral

16   Development Act. AR 920. BLM found that these statutes gave it authority to promulgate rules

17   for the prevention of "undue waste" and collect royalties on federal and Indian minerals. AR

18   920-21.

19          BLM also determined that the benefits of the 2016 Rule outweighed the costs. BLM

20   calculated the benefits of the 2016 Rule by estimating the sale value of the additional gas that

21   would be captured pursuant to the Rule and monetizing the value of reduced emissions from

22   venting, flaring, and leaks. AR 915. BLM calculated the costs by estimating the cost for

23   operators to comply with the Rule's new requirements and monetizing the social cost of the

24   additional carbon dioxide emissions that would flow from downstream consumption of newly

25   captured gas. AR 914. In monetizing the costs and benefits of changes in emissions, BLM used

26   the global social cost of methane metric. AR 917.

27          The 2016 Rule was immediately challenged by the States of Wyoming and Montana and

28   industry groups in the District of Wyoming. The States of North Dakota and Texas intervened

1   on the side of Petitioners, and the Plaintiffs in this case—the States of California and New

2   Mexico and the coalition of citizen and tribal groups—intervened on the side of BLM.

3   Petitioners in the Wyoming case moved for a preliminary injunction of the 2016 Rule.  Although

4   the Wyoming court declined to enjoin the 2016 Rule, it "question[ed] whether the 'social cost of

5   methane' is an appropriate factor for BLM to consider in promulgating a resource conservation

6   rule pursuant to its MLA authority."  *Wyoming v. U.S. Dep't of Interior*, Nos. 2:16-cv-0280-

7   SWS, 2:16-cv-0285-SWS, 2017 WL 161428, at *10 (D. Wyo. Jan. 16, 2017).  The court also

8   found that the "benefits of the [2016] Rule are predominately based upon the emission[s]

9   reductions, which is outside of BLM's expertise, and not attributable to the purported waste

10   prevention purpose of the Rule."  *Id.*  The court expressed "concerns" with BLM's consideration

11   of the "environmental and related social benefits" of the 2016 Rule under the agency's MLA

12   authority.  *Id.*

13          Before the parties reached the merits in the Wyoming litigation, the court stayed those

14   cases pending BLM's reconsideration of the 2016 Rule.  Most recently, the Wyoming court

15   asked the parties to brief whether the litigation is moot in light of the Revision Rule.  Minute

16   Order, *Wyoming*, No. 2:16-cv-0285-SWS (D. Wyo. June 11, 2019), ECF No. 248.  The parties

17   completed briefing that issue on July 19, 2019.

18   **II.     The Revision Rule.**

19   On March 28, 2017, about two months after the 2016 Rule took effect on January 17, 2017,

20   President Donald J. Trump issued Executive Order 13783, which stated that it is "in the national

21   interest to promote the clean and safe development of our Nation's vast energy resources, while

22   at the same time avoiding regulatory burdens that unnecessarily encumber energy production,

23   constrain economic growth, and prevent job creation."  AR 1871.  Executive Order 13783

24   required the Secretary of the Interior to "review" the 2016 Rule in light of that policy and "if

25   appropriate, . . . as soon as practicable, . . . publish for notice and comment proposed rules

26   suspending, revising, or rescinding" the 2016 Rule.  AR 1874.  As directed, BLM reviewed the

27   2016 Rule and determined that it did not align with the policy set forth in Executive Order

28   13783.  AR 686-87.

1   In light of Executive Order 13783, stakeholder input, and the concerns expressed by the district

2   court in Wyoming, BLM decided to reconsider the 2016 Rule.  *See* AR 416-18.  The agency

3   issued a proposed Revision Rule on February 22, 2018 and provided a 60-day public comment

4   period.  AR 415.  In the proposed rule, BLM explained that after reviewing the 2016 Rule, it

5   "found that some impacts [of the 2016 Rule] were under-estimated and many provisions of the

6   rule would add regulatory burdens that unnecessarily encumber energy production, constrain

7   economic growth, and prevent job creation."  *Id.*  Specifically, BLM found that many

8   requirements of the 2016 Rule "overlap with other Federal and State requirements and

9   regulations" and impose significant compliance costs that could render marginal or low-

10  producing wells uneconomical.  *Id.*  BLM determined that the 2016 Rule also imposed

11  administrative and reporting burdens that were "unnecessary and likely to constrain

12  development."  *Id.*  Along with the proposed rule, BLM issued a draft Regulatory Impact

13  Analysis ("RIA") and draft environmental assessment ("EA").  AR 440, 520.  The RIA is

14  required by Executive Order No. 12866 which "requires agencies to assess the benefits and costs

15  of regulatory actions, and for significant regulatory actions, submit a detailed report of their

16  assessment to OMB [the Office of Management and Budget] for review."  AR 39; *see also*

17  Regulatory Planning and Review, 58 Fed. Reg. 51,735 (Sept. 30, 1993).  BLM developed the EA

18  in compliance with NEPA which requires agencies to consider the environmental impacts of

19  "major Federal actions."  42 U.S.C. § 4332(C).

20          The proposed Revision Rule proposed returning to a modified version of the waste

21  prevention framework established by NTL-4A, which BLM believed would effectively reduce

22  waste without imposing significant and unnecessary costs.  AR 418-19.  In particular, the

23  proposed rule proposed rescinding the requirements of the 2016 Rule that addressed waste

24  minimization plans; well drilling and completions and related operations; pneumatic controllers,

25  pneumatic diaphragm pumps, and storage vessels; and leak detection and repair ("LDAR").  AR

26  419.  It proposed modifying or replacing the requirements of the 2016 Rule related to gas

27  capture, downhole well maintenance and liquids unloading, and the measuring and reporting of

28  vented and flared gas.  *Id.*  In the proposed rule, BLM explained its concerns regarding the

1   agency's statutory authority in light of the District of Wyoming's decision and specifically

2   requested comment "on whether the 2016 final rule was consistent with its statutory authority."

3   AR 418.  Whereas the 2016 Rule did not define "waste," the proposed Revision Rule proposed

4   defining "waste of oil or gas" to include only unapproved losses "where compliance costs are not

5   greater than the monetary value of the resources they are expected to conserve."  AR 424.

6          BLM received over 600,000 comments on the proposed Revision Rule.  AR 2.  The

7   agency compiled and responded to these comments in a separate document released with the

8   final Revision Rule.  AR 142.  In addition, BLM met with numerous interested parties, including

9   some involved in these lawsuits.  *See, e.g.*, AR 162420-22 (noting meetings with Natural

10  Resources Defense Council, Clean Air Task Force, National Wildlife Federation, Earthjustice,

11  and American Petroleum Institute, among others).

12         On September 28, 2018, BLM issued the final Revision Rule.  AR 1.  Though largely

13  similar to the proposed rule, in response to comments received, BLM modified certain aspects of

14  the final rule including clarifying the limitations on royalty-free flaring during downhole well

15  maintenance and liquids unloading, and adding a provision allowing tribes to seek BLM

16  approval to have tribal rules apply in lieu of certain provisions of the Revision Rule.  AR 2.

17  Though the final rule does not use the term "waste of oil or gas" in any of its operative

18  provisions, it includes the definition from the proposed rule which "codifies the BLM's policy

19  determination that it is not appropriate for 'waste prevention' regulations to impose compliance

20  costs greater than the value of the resources they are expected to conserve."  AR 14.

21         Like NTL-4A and the 2016 Rule, the heart of the final Revision Rule is a requirement

22  that operators owe royalties on avoidably lost gas.  43 C.F.R. § 3179.5.  In the final rule,

23  avoidably lost gas includes gas vented or flared without BLM authorization or lost because of

24  operator negligence or failure to comply with applicable rules and regulations.  *Id.* § 3179.4(a).

25  Gas that is lost despite compliance with the Revision Rule's requirements is "unavoidably lost"

26  and thus not royalty-bearing.  *Id.* § 3179.4(b).

27         Although the Revision Rule does away with the gas capture, equipment replacement, and

28  LDAR requirements of the 2016 Rule, it limits allowable, royalty-free venting and flaring during

1   each stage of oil and gas development and production.  For example, an operator may flare for

2   no more than 30 days as part of the initial production testing for a new well, and no more than 24

3   hours as part of any subsequent well testing.  *Id.* §§ 3179.101-102; *see also id.* §§ 3179.103-104.

4        With some limitations, the Revision Rule deems the venting or flaring of gas produced

5   during oil production royalty-free if it is vented or flared pursuant to state or tribal rules or

6   regulations that limit venting and flaring.  *Id.* § 3179.201.  In addition, a tribe can seek approval

7   from BLM to have its own rules and regulations apply in place of all or some of the Revision

8   Rule's provisions.  *Id.* § 3179.401.  Finally, like the 2016 Rule, the Revision Rule requires

9   operators to measure and report all lost oil and gas.  *Id.* § 3179.301.

10       In compliance with Executive Order 12866, BLM produced a final RIA for the Revision

11   Rule that estimated the economic impacts of the rule.  AR 32.  The agency determined that the

12   2016 Rule would have imposed net costs of $736 million to $1.011 billion over a ten year period,

13   the majority of which were due to the cost of compliance with the rule.  AR 41, 88.  In contrast,

14   the Revision Rule will result in a net savings over a ten year period of $734 million to $1.009

15   billion.  AR 36.  In calculating these numbers, BLM used the domestic social cost of methane to

16   monetize the value of emissions.  AR 41.

17       As required by NEPA, BLM also produced a final EA for the Revision Rule.  AR 295.

18   The EA analyzed three alternatives in detail, AR 303, and looked at the direct, indirect, and

19   cumulative impact of each alternative on climate change, air quality, noise and light, wildlife,

20   and socioeconomics.  AR 310-22.  Ultimately, BLM determined that the Revision Rule would

21   not have a significant effect on the quality of the human environment and issued a Finding of No

22   Significant Impact ("FONSI").  AR 332.

23                              **STANDARD OF REVIEW**

24       To succeed, challenges to an agency's decision brought under the APA must show that

25   the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

26   with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory

27   right," or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (C), (D);

28   *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989); *Citizens to Pres. Overton Park v.*

1  *Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S.

2  99 (1977).  "[T]he ultimate standard of review is a narrow one.  The court is not empowered to

3  substitute its judgment for that of the agency."  *Overton Park*, 401 U.S. at 416.  Plaintiffs carry

4  the burden of proof.  *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976).

5  Under the deferential "arbitrary and capricious standard," a court will overturn a decision

6  only "if the agency relied on factors Congress did not intend it to consider," "entirely failed to

7  consider an important aspect of the problem," or offered an explanation "that runs counter to the

8  evidence before the agency or is so implausible that it could not be ascribed to a difference in

9  view or the product of agency expertise."  *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir.

10  2008) (en banc) (quoting *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1156 (9th Cir.

11  2006)), *abrogated on other grounds by Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7

12  (2008).  In other words, there must be "a clear error of judgment."  *Marsh*, 490 U.S. at 378.

13  A reviewing court is at its "most deferential" when assessing the agency's consideration

14  of technical matters.  *Lands Council*, 537 F.3d at 993.  In that role, the reviewing court is not "to

15  act as a panel of scientists" but rather to defer to "an 'agency's predictive judgments about areas

16  that are within the agency's field of discretion and expertise . . . as long as they are reasonable.'"

17  *Id.* at 988, 993 (quoting *Earthlink, Inc. v. FCC*, 462 F.3d 1, 12 (D.C. Cir. 2006)).

18  **ARGUMENT**

19  This Court should uphold the Revision Rule because BLM's interpretation of its statutory

20  authority to regulate waste in the Revision Rule accords with the MLA and is owed deference

21  under *Chevron*, and the agency fully complied with the APA and NEPA.

22  **I.     The Revision Rule Is a Lawful Exercise of BLM's Authority Under the Mineral Leasing Act.**

23

24  **A.     BLM's Change in Position Regarding the Scope of Its Statutory Authority under the MLA Is Reasonable and Owed Deference under *Chevron*.**

25  In the Revision Rule, BLM determined that the 2016 Rule exceeded the agency's

26  statutory authority to prevent waste under the MLA.  AR 2-3.  Plaintiffs attack this change of

27  position on the ground that BLM's interpretation of its statutory authority is legally wrong and,

28  as a result, the Revision Rule fails to satisfy BLM's waste prevention obligations under the

MLA.  In fact, BLM's interpretation is supported by the text and legislative history of the MLA, as well as the longstanding practice of BLM and other regulators of oil and gas development.

An agency's change in position is not subject to a heightened standard of review under the APA.  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009).  The agency

> need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates.

*Id.* at 515.  To determine if an agency's changed position on its statutory authority is permissible under the relevant statute, courts utilize the test developed in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984).  *City of Arlington v. FCC*, 569 U.S. 290, 295-297, 306-307 (2013); *see also Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Serv.*, 545 U.S. 967, 981 (2005) (An agency's change in position "is not a basis for declining to analyze the agency's interpretation under *Chevron*").  At *Chevron* step one, a court applies the traditional tools of statutory interpretation to determine whether Congress has "directly spoken to the precise question at issue."  *City of Arlington*, 569 U.S. at 296 (quoting *Chevron*, 467 U.S. at 842-43).  The "question in every case is, simply, whether the statutory text forecloses the agency's assertion of authority."  *Id.* at 301.  If the statute is "silent or ambiguous with respect to the specific issue," the court proceeds to step two to consider "whether the agency's answer is based on a permissible construction of the statute."  *Id.* at 296 (quoting *Chevron*, 467 U.S. at 843).  The interpretation of an agency delegated authority to administer a statute is entitled to broad deference.  *Id.*

The MLA "creates a program for leasing mineral deposits on federal lands," *Wyoming*, 2017 WL 161428, at *5, and grants BLM broad authority to carry out the purposes of the Act. 30 U.S.C. § 189 (BLM may "prescribe necessary and proper rules and regulations" and "do all things necessary to carry out and accomplish the purposes" of the Act).  Two primary provisions of the MLA directly address "waste."  Section 187 requires mineral leases to contain "a provision that such rules for the safety and welfare of the miners and for the prevention of undue waste . . . shall be observed."  30 U.S.C. § 187.  Section 225 states that "[a]ll leases of lands

containing oil or gas, made or issued under the provisions of this chapter, shall be subject to the condition that the lessee will, in conducting his explorations and mining operations, use all reasonable precautions to prevent waste of oil or gas developed in the land." *Id.* § 225.  Two other provisions use the term "waste" in passing.  Section 226 permits the Secretary of the Interior to authorize the subsurface storage of oil or gas "to avoid waste or to promote conservation of natural resources . . . ." *Id.* § 226(m).  And Section 241 says that "[l]eases may be for indeterminate periods, upon such conditions as may be imposed by the Secretary of the Interior, including covenants relative to methods of mining, prevention of waste, and productive development." *Id.* § 241(a)(3).

In the 2016 Rule, BLM interpreted Sections 187 and 225 to grant the agency authority to require operators to capture a set percentage of produced gas, upgrade equipment, and locate and repair leaks regardless of whether the cost of compliance with these requirements outweighed the value of the gas conserved by them.  *See* AR 3, 920-21, 942.  At the time, BLM recognized that its interpretation of waste was a significant departure from past practice, but found that it was not legally required to take compliance costs into account in its waste prevention requirements.  AR 942.  In the Revision Rule, BLM reconsidered the meaning of these provisions of the MLA, and the meaning of "waste" in particular, and determined that its interpretation in the 2016 Rule was contrary to longstanding practice and to Congress's intent.  AR 3.  Specifically, BLM interpreted "waste" in the MLA to include an economic component—the unauthorized loss of oil or gas is "waste" if "compliance costs are not greater than the monetary value of the resources they are expected to conserve."[4]  AR 3, 29.

BLM's interpretation of the MLA's waste provisions in the Revision Rule is reasonable

---

[4] Plaintiffs misleadingly equate BLM's definition of waste, requiring that the cost of conservation not outweigh the value of the conserved resource, with a requirement that capture of the resource be "profitable."  Citizen Groups' Mot. for Summ. J. ("CG Mot.") 10, ECF No. 109.  Under BLM's definition, lost oil or gas is "waste" if its value is equal to, or only marginally more, than the cost to conserve it.  These conditions do not render capture "profitable"; rather, they ensure that the operator is not losing money on capture.  Avoidance of loss is not the same as profit.

1    under *Chevron*.[5]  The MLA's waste provisions are ambiguous under *Chevron* step one.  The

2    MLA does not define "waste" and there is nothing in the context of the statute that clarifies the

3    meaning of that term.  *See* AR 939; *Wyoming*, 2017 WL 161428, at *5 (proceeding to *Chevron*

4    step two when evaluating BLM's interpretation of MLA's waste provisions).  Under *Chevron*

5    step two, BLM's interpretation of "waste" in the MLA as including an economic component is

6    reasonable in light of the rest of the statute, legislative history, and longstanding practice.

7         First, the text of the MLA makes clear that Congress did not intend BLM to ensure that

8    operators prevent all waste.  Rather, the statute permits the Secretary of the Interior to prescribe

9    rules to prevent "*undue* waste" and requires that leases be subject to a condition that lessees "use

10   all *reasonable* precautions to prevent waste."  30 U.S.C. §§ 187, 225 (emphases added).  The use

11   of these open-ended terms indicates Congress' intent to grant BLM broad discretion to determine

12   what amount of waste is "undue" under what circumstances, and what precautions are

13   "reasonable."  *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537

14   U.S. 371, 390  (2003) (It is a "settled principle of administrative law that an open-ended and

15   potentially vague [statutory] term is highly susceptible to administrative interpretation subject to

16   judicial deference.").

17        Second, the MLA "was intended to promote wise development of these natural resources

18   and to obtain for the public a reasonable financial return on assets that 'belong' to the public."

19   *California Co. v. Udall*, 296 F.2d 384, 388 (D.C. Cir. 1961).  "The public does not benefit from

20

21   ─────────────────────

     [5] The involvement of the Office of Information and Regulatory Affairs ("OIRA") in the

22   rulemaking process does not alter the level of deference owed to BLM's interpretation of its
     statutory authority.  *See* State Pls.' Mot. for Summ. J. ("St. Mot.") 18, ECF No. 108.  As required

23   by Executive Order 12866, OIRA reviews agency rulemakings to ensure that they "are consistent
     with applicable law, the President's priorities, and the principles set forth in this Executive order,

24   and that decisions made by one agency do not conflict with the policies or actions taken or
     planned by another agency."  58 Fed. Reg. 51,735 § 2(b).  The record demonstrates that BLM

25   did not merely defer to OIRA, but instead thoughtfully considered its input as required by
     Executive Order 12866.  AR 173940.  It also demonstrates that BLM was reconsidering its

26   statutory authority under the MLA well in advance of its consultation with OIRA.  *See, e.g.*, AR

27   10026 (noting concerns about statutory authority in June 2017 postponement); 661 (same in
     December 2017 Suspension Rule); 176558, 176563-65 (same in early internal draft of proposed

28   Revision Rule).

1   resources that remain undeveloped, and the Secretary must administer the Act so as to provide

2   some incentive for development." *Id.* To that end, the MLA gives the Secretary of the Interior

3   authority to lease any public lands "known or believed to contain oil or gas deposits" and

4   requires BLM to hold quarterly lease sales in each state that contains eligible lands. 30 U.S.C.

5   §§ 226(a), (b)(1)(A). Thus, the statute itself is intended to promote the development of oil and

6   gas. *Geosearch, Inc. v. Andrus*, 508 F. Supp. 839, 842 (D. Wyo. 1981) ("The purpose of the

7   [MLA] is to promote the orderly development of oil and gas deposits in publicly owned lands of

8   the United States through private enterprise."). BLM's interpretation of the MLA as not

9   requiring an operator to potentially "lose money capturing and marketing uneconomic gas," AR

10  3, comports with the statute's intent to encourage wise development.

11          The legislative history of the MLA confirms this understanding. As enacted by

12  Congress, the MLA was "An Act to promote the mining of coal, phosphate, oil, gas and sodium

13  on the public domain." S. 2775, 66th Cong., 1st session (1919). As to oil and gas, the MLA was

14  intended to replace the existing placer mining laws, which allowed any group of eight people to

15  stake a claim to up to 160 acres of public lands. *Exploration for & Disposition of Coal, Oil, Gas,*

16  *etc.*, H. Rep. No. 668, at 6 (May 12, 1914). There was no limit on these claims, so the same

17  group of eight could keep staking and filing new placer claims in an effort to claim as much

18  acreage as possible as quickly as possible. *Id.* Thus, the placer claim laws incentivized the

19  drilling of numerous wells in the hopes of getting as much oil out of the ground as quickly as

20  possible so as to beat out anyone else who might be drilling in the same oilfield. *See Hrg. Before*

21  *S. Subcomm. of the Comm. on Public Lands on S. 4898, A Bill to Encourage the Mining of Coal,*

22  *Oil, Gas, Etc. on the Public Domain*, at 26 (May 25, 1914); *Oil Leasing Lands, Hrg. Before H.*

23  *Comm. on Public Lands on H.R. 3232 and S. 2812*, at 220-21 (Feb. 5, 1918). This led to

24  rampant fraud and speculation and the monopolizing of public resources by a handful of large

25  companies. *E.g., Oil Leasing Lands, Hrg. Before H. Comm. on Public Lands on H.R. 3232 and*

26  *S. 2812*, at 68 (Feb. 5, 1918) (expressing concern about use of "dummy entrymen" to defraud

27  operators after investment). The MLA was intended to rectify this situation by "secur[ing] bona

28  fide prospecting," "protect[ing] the prospector," and "reward[ing] the prospector who does the

drilling." *Exploration for & Disposition of Coal, Oil, Gas, etc.*, H. Rep. No. 64-17, at 6 (Jan. 4, 1916).  Congress's clear concern for the economic interests of prospectors demonstrates that the MLA sought to promote development by offering prospectors a reasonable rate of return for the risks they assumed in developing public lands.  And under this logic, its stands to reason that Congress did not intend the statute to require prospectors to expend more resources capturing gas than that gas was actually worth.  Indeed, at least one person appearing before Congress at a hearing on one of the precursor bills to the MLA made precisely this point: "[I]f there is more wealth being used in the production of new wealth than the new wealth amounts to, it represents a loss to society and not a gain, and it does not make any difference what is the magnitude of the wealth production in that case; it is an absolute loss if there is not something left above the cost of production, of the labor and capital required to produce that wealth . . . ."  *See Hrg. Before S. Subcomm. Of the Comm. on Public Lands on S. 4898, A Bill to Encourage the Mining of Coal, Oil, Gas, Etc. on the Public Domain*, at 26 (May 25, 1914).

The legislative history also makes clear that Congress saw "waste" as encompassing not only the waste of produced oil and gas that an operator fails to capture, but also the waste of oil and gas that remained in the ground and was not produced and used for the public good, *Oil Leasing Lands, Hrg. Before H. Comm. on Public Lands on H.R. 3232 and S. 2812*, at 220 (Feb. 5, 1918) (noting Bureau of Mines estimated anywhere from 25 to 85% of oil that could be removed using proper methods is left in the ground), and the waste of money and resources on locating and staking claims that might not have any value, *Hrg. Before S. Subcomm. of the Comm. on Public Lands on S. 4898, A Bill to Encourage the Mining of Coal, Oil, Gas, Etc. on the Public Domain*, at 26 (May 25, 1914); *Oil Leasing Lands, Hrg. Before H. Comm. on Public Lands on H.R. 3232 and S. 2812*, at 81, 197-98, 223, 256 (Feb. 5, 1918).  Indeed, the House Committee on Public Lands described the purpose of Section 187's "reasonable precautions to prevent waste" and "reasonable diligence, skill, and care" provisions as having "the ultimate object of securing to the consumer the various products at a reasonable price and the preventing of same from passing into monopolistic control."  *Exploration for & Disposition of Coal, Oil, Gas, etc.*, H. Rep. No. 64-17, at 11 (Jan. 4, 1916).  In short, Congress intended the MLA in large

part to reform oil and gas development in a way that would protect and encourage the investment of operators and thereby provide a steady stream of oil and gas to the public.  BLM's interpretation of "waste" in the MLA as including only oil and gas that is economical to capture is consistent with this goal.

As BLM explained in the Revision Rule, its interpretation of "waste" as incorporating an economic component is also consistent with the longstanding "prudent operator" standard, which requires an operator to exercise "reasonable diligence" but does not expect an operator to expend resources on capture greater than the value of the oil or gas to be conserved.[6]  AR 3.  Well before the MLA was enacted, the Eighth Circuit set forth this rule in *Brewster v. Lanyon Zinc Co.*, where it held that "it is only to the end that the oil and gas shall be extracted with benefit or profit to both [the lessee and lessor] that reasonable diligence is required."  140 F. 801, 814 (8th Cir. 1905); *see also Sauder v. Mid-Continent Petroleum Co.*, 292 U.S. 272, 279-81 (1934) (citing

---

[6] Plaintiffs claim that BLM's interpretation conflates the reasonable diligence and waste prevention requirements and renders the latter superfluous in violation of principles of statutory construction.  CG Mot. 8.  This argument ignores the text of the statute.  The MLA states that

> *Each lease shall contain provisions for the purpose of insuring the exercise of reasonable diligence, skill, and care in the operation of said property*; a provision that such rules for the safety and welfare of the miners and for the prevention of undue waste as may be prescribed by said Secretary shall be observed, including a restriction of the workday to not exceeding eight hours in any one day for underground workers except in cases of emergency; provisions prohibiting the employment of any child under the age of sixteen in any mine below the surface; provisions securing the workmen complete freedom of purchase; provision requiring the payment of wages at least twice a month in lawful money of the United States, and providing proper rules and regulations to insure the fair and just weighing or measurement of the coal mined by each miner, and such other provisions as he may deem necessary to insure the sale of the production of such leased lands to the United States and to the public at reasonable prices, for the protection of the interests of the United States, for the prevention of monopoly, and for the safeguarding of the public welfare.

30 U.S.C. § 187 (emphasis added).  The first clause (in italics) is an umbrella provision. The rest of the sentence after the first semicolon provides examples of the specific types of provisions within the broad umbrella of "reasonable diligence, skill, and care" that the Secretary may prescribe, such as provisions that reach worker safety, waste prevention, child labor, fair pay, and fair prices for produced minerals.

1   *Brewster's* prudent operator standard favorably); *Chrisman v. Miller*, 197 U.S. 313, 323 (1905)

2   ("There was not enough in what he claims to have seen to have justified a prudent person in the

3   expenditure of money and labor in exploitation for petroleum.").

4          Plaintiffs' attempt to distinguish *Brewster* falls flat.  The fact that the lessee alone is not

5   the "arbiter" of what counts as reasonable diligence to develop the lease is inapposite to the

6   holding that a lessor cannot force a lessee to engage in uneconomical operations.  CG Mot. 9.

7   The determination of whether costs outweigh the value of conserved gas is objective; it is not

8   reliant on the lessee's "good faith."  Moreover, the Interior Board of Land Appeals has

9   specifically rejected the contention implied by Plaintiffs in their discussion of *Brewster*—that the

10  prudent operator standard does not apply to federal leases.  *Nola Grace Ptasynski*, 63 IBLA 240,

11  247-48 (1982) (Because a lease is a "business arrangement," "one could not rationally expect

12  that a lessee would drill an offset well to prevent drainage where there was no likelihood that

13  such a well would be profitable. Accordingly, the law implies no such obligation.").

14         Plaintiffs' efforts to distinguish the treatise cited by BLM are also unavailing.  Plaintiffs

15  are correct that the treatise states that courts have not read the language in *Brewster* so broadly as

16  to hold that the prudent operator standard can only be violated where a lessee refuses to engage

17  in activity demanded by the lessor that will be profitable to the lessee.  5 Williams & Meyers, Oil

18  and Gas Law § 806.3 (2018).  But this statement pertained to commentary on a specific sentence

19  in the *Brewster* opinion that was *not* quoted or specifically relied on by BLM in interpreting its

20  waste prevention authority.  Furthermore, Plaintiffs' cherry-picked quote does not refute the fact

21  the treatise explicitly recognizes that the prudent operator standard takes the interests of both the

22  lessee and the lessor into account.  By way of example, the treatise notes that the prudent

23  operator standard would not require a lessee to drill a "protection" or "offset" well where "the

24  evidence does not show that [the lessee] can profitably drill a protection well."  *Id.*  Thus, the

25  treatise does indeed support BLM's assessment of the prudent operator standard.

26         Plaintiffs' claim that cases addressing "avoidably lost" gas are irrelevant to BLM's

27  definition of "waste" misunderstands the Revision Rule and BLM's longstanding regulation of

28  oil and gas operations on public land.  St. Mot. 16.  BLM regulates waste by imposing royalties

on "avoidably lost" gas.  This method of preventing waste was employed in NTL-4A, the 2016 Rule, and the Revision Rule, and Plaintiffs have not questioned the underlying method of disincentivizing "waste" by charging royalties for "avoidably lost" gas.  AR 3010-11 (NTL-4A); AR 983 (2016 Rule); AR 29 (Revision Rule); *see also Marathon Oil Co. v. Andrus*, 452 F. Supp. 548, 551 (1978) ("For more than half a century, both the government, as lessor, and all of its lessees have understood and have been governed by the pertinent statutes to the end that all oil and gas used on the lease for ordinary production purposes or unavoidably lost were not subject to royalty payments to the government.").  Indeed, although BLM defines "waste of oil or gas" in the Revision Rule as a means of setting forth the agency's policy, it does not actually use that term in the operative provisions of the Rule.  *See* AR 14.  Rather, like its predecessor regulations, the Revision Rule regulates waste through the application of royalties to "avoidably lost" gas. Thus, what has materially changed from regulation to regulation is the definition of "avoidably lost" and "unavoidably lost."  In the Revision Rule, BLM is returning to the longstanding concept of "waste" and "avoidable loss" as accounting for the economics of preventing the loss. *See Rife Oil Properties*, 131 IBLA 357, 374 (1994) ("To the extent that BLM read NTL-4A as barring the venting of gas from a producing oil well without regard to whether it was avoidably lost, i.e., whether it was economic to market the gas, we find that BLM misread NTL-4A."); *Ladd Petroleum Corp.*, 107 IBLA 5, 8 (1989) (holding BLM must consider "whether it was uneconomic to capture that gas" in determining if gas was avoidably lost and thus royalty-bearing).[7]

---

[7] Citizen Group Plaintiffs cite two additional IBLA cases to demonstrate that the test for whether a loss is avoidable has never been entirely economic.  CG Mot. 10 n.6 (citing *Lomax Expl. Co.*, 105 IBLA 1, 7 (1988); *Maxus Expl. Co.*, 122 IBLA 190, 196-97 (1992)).  But the Revision Rule itself does not consider only economic factors in determining whether gas is avoidably lost.  43 C.F.R. § 3179.4(a).  In any event, the cited cases confirm BLM's longstanding consideration of economic factors.  *Lomax* was expressly modified by the IBLA's later decision in *Ladd* which allowed an operator an opportunity to avoid royalties by demonstrating after-the-fact that "gas vented or flared without prior authorization was not economically recoverable."  *Ladd*, 107 IBLA at 8-9.  Likewise, *Maxus* confirmed that "engineering, geologic, and economic circumstances" could justify venting gas without prior approval under NTL-4A.  122 IBLA at 196.

1    Plaintiffs point out that BLM's regulations elsewhere define "waste of oil and gas"

2  without reference to the economic component included in the Revision Rule's definition, and

3  suggest that this undermines BLM's claim that the economic aspect has been a longstanding part

4  of BLM's definition.  CG Mot. 9; 43 C.F.R. § 3160.0-5.  This argument is a red herring.  This

5  other definition is in a separate part of the regulations and is unrelated to its regulation of venting

6  and flaring.  As discussed above and as BLM expressly acknowledged in the 2016 Rule, until the

7  2016 Rule, BLM (and other regulators and courts) had consistently considered the economics of

8  conservation in determining whether a loss was avoidable and therefore "waste."  AR 939

9  ("[T]he BLM's practice under NTL–4A has generally been to engage in case-by-case economic

10 assessments before making avoidable/unavoidable loss determinations . . . .").  BLM reasonably

11 based its definition of waste in the Revision Rule on an existing definition elsewhere in its

12 regulations, but modified that definition to fit the waste prevention context.  *See* AR 14.

13   In sum, BLM met the requirements under *FCC v. Fox* for a change in position: it

14 acknowledged its prior position, explained its reasons for believing that "waste" in the MLA

15 contains an economic component, and set forth an interpretation of the MLA and its statutory

16 authority that accords with the text of the statute, its legislative history, and longstanding

17 practice.  BLM's interpretation is reasonable and owed deference under *Chevron*.[8]

18

19

20 [8] Plaintiffs' remaining arguments otherwise are unpersuasive.  *See* St. Mot. 18-20.  First, BLM's

21 change in position is not an "unexplained inconsistency" with the 2016 Rule because BLM
   explicitly explained its reasons for the change.  AR 2-3; *Encino Motorcars, LLC v. Navarro*, 136
   S. Ct. 2117, 2125 (2016) ("Agencies are free to change their existing policies as long as they

22 provide a reasoned explanation for the change.").  While Plaintiffs are correct that the 2016 Rule
   provided limited exemptions for situations where the Rule would "cause the operator to cease

23 production and abandon significant recoverable oil reserves," AR 912, those exemptions are
   unrelated to the scope of BLM's statutory authority under the MLA.  Second, the Revision Rule

24 is not "internally inconsistent" as to whether the 2016 Rule exceeded the agency's statutory

25 authority.  St. Mot. 19.  An "even if" statement does not undermine the validity of the agency's
   position.  As discussed, the proposed rule expressed clear concerns about BLM's statutory

26 authority and included the same definition of waste that is in the final rule, AR 418, 437, and
   BLM's use of the term "policy determination" reflects the fact that the definition of waste has no

27 operative effect in the rule but rather reflects the agency's policy based on the scope of its

28 statutory authority, AR 2-3, 14.  Third, in the Revision Rule, BLM pointed to both its
   reinterpretation of "waste" in the MLA *and* the Wyoming court's concerns about the agency's

1

2

3

**B.**     **BLM's Interpretation of Its Waste Prevention Authority in the Revision Rule Complies with the Agency's Obligation under the MLA to Safeguard "Public Welfare" and under FLPMA to Prevent "Unnecessary and Undue Degradation."**

4       Plaintiffs' contention that the Revision Rule fails to comply with the MLA's requirement

5   to safeguard the "public welfare," 30 U.S.C. § 187, and FLPMA's requirement to prevent

6   "unnecessary and undue degradation," 43 U.S.C. § 1701(a)(8), ignores the MLA's historical

7   context and FLPMA's multiple-use mandate.  Like its references to "undue waste" and

8   "reasonable precautions," the MLA's provision allowing the Secretary to set lease terms to

9   "safeguard[] the public welfare" is vague and thus leaves it to the agency's discretion to define

10   "public welfare" and determine how a given regulation should adequately account for it.  *Supra*

11   Section I.A.  Likewise, FLPMA "leaves [the] BLM a great deal of discretion in deciding how to

12   achieve" its goals of preventing unnecessary or undue degradation "because it does not specify

13   precisely how the BLM is to meet them, other than by permitting the BLM to manage public

14   lands by regulation or otherwise."  *Gardner v. U.S. Bureau of Land Mgmt.*, 638 F.3d 1217, 1222

15   (9th Cir. 2011).  As BLM explained in the Revision Rule, "FLPMA's concern with 'unnecessary

16   or undue degradation' must be understood in light of the statute's overarching mandate that the

17   BLM manage the public lands under 'principles of multiple use and sustained yield.'" AR 6

18   (citing *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 76 (D.C. Cir. 2011)).

19   FLPMA's requirements are necessarily "context-specific": *i.e.*, "unnecessary degradation" in the

20   mining context is "that which is not necessary for mining."  *Theodore Roosevelt*, 661 F.3d at 76.

21   (quoting *Utah v. Andrus*, 486 F. Supp. 995, 1005 n.13 (D. Utah 1979)).

22       BLM's interpretation of "waste" is consistent with FLPMA and the MLA.  As explained

23   above, "public welfare" in the MLA refers not only to the conservation of federal oil and gas, but

24   also to the protection of operators' investments, the promotion of mineral development on

25   federal lands, and generating a fair return for the public.  BLM's interpretation reasonably

26   balances these various obligations.  In suggesting that BLM must require operators to focus on

27

28   authority to regulate air pollution to support its rulemaking.  AR 3.  The existence of the one
does not undermine the validity of the other.

one aspect of oil and gas development (waste prevention) at the expense of others specifically encouraged by the MLA, Plaintiffs ignore FLPMA's multiple use mandate.

On a broader level, Plaintiffs' argument that the Revision Rule fails to comply with FLPMA because it does not adequately prevent waste ignores all of the provisions in the Revision Rule that are, in fact, designed to prevent waste.  BLM's interpretation of "waste" and its statutory authority has not prevented the agency from imposing time and volume limits on royalty-free venting and flaring during initial production testing, well tests, downhole well maintenance, and other non-emergency situations.  43 C.F.R. §§ 3179.101-104.  The Revision Rule prohibits venting in nearly all circumstances, *id.* § 3179.6(b), and requires approval for any venting and flaring not otherwise authorized by the rule or permitted by appropriate state or tribal regulations.  *Id.* § 3179.201(c).  Moreover, contrary to Plaintiffs' assertion, the Revision Rule's standard for when an operator owes royalties on lost gas is not a purely "economic test." CG Mot. 10 n.6.  Under the Revision Rule, operators owe royalties on all "avoidably lost" gas which includes:

> (1) Gas that is vented or flared without the authorization or approval of the BLM; or
> (2) Produced oil or gas that is lost when the BLM determines that such loss occurred as a result of:
> > (i) Negligence on the part of the operator;
> > (ii) The failure of the operator to take all reasonable measures to prevent or control the loss; or
> > (iii) The failure of the operator to comply fully with the applicable lease terms and regulations, appropriate provisions of the approved operating plan, or prior written orders of the BLM.

43 C.F.R. §§ 3179.4-5.

The amici members of Congress' claims that the Revision Rule allows more venting and flaring than NTL-4A, Br. of Members of Cong. in Supp. of Pls.' Mots. for Summ. J. ("Cong. Br.") 19, ECF No. 110, reflect a failure to understand how the Rule works. They claim first that the Revision Rule "does not specify any prerequisites" for a finding that a loss of gas is "unavoidable" and thus not royalty-bearing.  *Id.*  But 43 C.F.R. § 3179.4(b) provides a list of all the specific circumstances in which a loss is unavoidable, such as emergencies and equipment

1    malfunctions.  In fact, the Revision Rule improves upon NTL-4A by providing a more specific

2    and complete list of the instances in which a loss is unavoidable.  AR 15.  The members of

3    Congress also ignore all the other improvements upon NTL-4A included in the Revision Rule,

4    such as a general requirement that gas be flared rather than vented, § 3179.6(b), AR 16;

5    clarifications regarding well testing requirements, AR 17; a narrower definition of "emergency,"

6    AR 18; clarification of liquids unloading requirements, AR 18; a new on-site manual well

7    purging requirement, AR 19; and the ability for BLM to impose royalties where flaring exceeds

8    10 MMcf/month, AR 20.  The members of Congress nevertheless contend that the provisions in

9    the Revision Rule in § 3179.201(c)—under which an operator not subject to State or tribal

10   regulation may seek approval to vent or flare oil-well gas royalty-free—are weaker than those in

11   NTL-4A.  Cong. Br. 19-20.  But in doing so they ignore § 3179.201(d), which sets forth the

12   specific criteria that such an application must include, such as estimates of the volumes of oil and

13   gas that would be produced if the operator is allowed to vent or flare royalty free versus if the

14   operator were required to capture the gas.  Thus, while it uses different phrasing, the Revision

15   Rule requires the same demonstration of economic viability as NTL-4A, but improves upon

16   NTL-4A by requiring specific estimated volumes and allowing BLM to require updated reports

17   as circumstances change.  AR 20.[9]

18        In short, BLM fully complied with FLPMA and the MLA.  Plaintiffs' and Amici's

19   allegations otherwise ignore the Revision Rule's many waste prevention requirements.

20        **C.    BLM's Interpretation of Waste is Reasonable as Applied to Low-Bleed**
            **Pneumatic Controllers.**

21

22        Plaintiffs next argue that even if BLM's interpretation of waste in the MLA is reasonable,

23   BLM has applied it in an unreasonable manner that "reads the waste prevention mandate out of

24   the statute entirely."  CG Mot. 10.  This argument hinges on one specific provision of the 2016

25   _____

26   [9] The amici members of Congress also attack the Revision Rule for failing to take advantage of
     technological advances.  Cong. Br. 15.  But as BLM explained, many of the requirements
27   imposed by the 2016 Rule that were intended to utilize newer technologies, like its equipment
     and LDAR requirements, "were not, in fact, cost-effective and actually imposed compliance
28   costs well in excess of the value of the resource to be conserved."  AR 7.

1    Rule regarding low-bleed pneumatic controllers that BLM rescinded in the Revision Rule.  BLM

2    acknowledged that the value of the gas conserved under this provision would have outweighed

3    compliance costs.  AR 11-12.  But BLM determined the provision was not necessary because the

4    vast majority of operators have already voluntarily adopted low-bleed pneumatic controllers.  *Id.*

5    (low-bleed controllers already represent 89 percent of continuous bleed pneumatic controllers in

6    the oil and gas sector); AR 253-54.  "BLM believes that, given the high prevalence of low-bleed

7    continuous controller use in the industry, it is reasonable to assume that the remaining high-bleed

8    continuous controllers are likely to be on wells that (1) have a functional need for their use or (2)

9    have lower-than-average production or are marginal."  AR 88-89.  For marginal wells, the

10   potential cost-savings from a new low-bleed controller "should be lower than that assumed in"

11   BLM's cost-benefit analysis.  *Id.*

12          BLM's decision not to regulate unnecessarily when the regulated community is

13   effectively achieving the same result is reasonable and complies with the mandate of Executive

14   Order 12866: "Federal agencies should promulgate only such regulations as are required by law,

15   are necessary to interpret the law, or are made necessary by compelling public need, such as

16   material *failures* of private markets to protect or improve the health and safety of the public, the

17   environment, or the well-being of the American people."  58 Fed. Reg. 51,735 § 1(a) (emphasis

18   added).  And it is not "inconsistent" for BLM to rescind certain provisions on the grounds that

19   their costs outweigh their benefits and another provision on the ground that it is unnecessary in

20   light of the behavior of the regulated community.  An agency regulating as complex a space as

21   oil and gas development is permitted to have different reasons for different aspects of its

22   decision.

23   **II.     BLM Has Not "Delegated" Its Duty to Prevent Waste to the States.**

24          Plaintiffs accuse BLM of delegating its responsibility to prevent the waste of oil and gas

25   on federal and Indian lands to the States.  This argument misunderstands how the Revision Rule

26   works.  BLM has not "abdicated" its duty to prevent waste.  The Revision Rule's time and

27   volume limits on venting and flaring (43 C.F.R. §§ 3179.101-104) and its measurement and

28   reporting requirements (43 C.F.R. § 3179.301) apply to all oil and gas development on public

1    lands regardless of whether a State has its own regulations.  43 C.F.R. § 3179.201(a).  For other

2    forms of waste prevention, BLM defers to the "applicable rules, regulations, or orders of the

3    appropriate State regulatory agency or tribe."  *Id.*  Plaintiffs misleadingly call this deferral a

4    "delegation" of BLM's authority.  It is not.  It is a determination that BLM need not regulate in

5    an area that is already effectively regulated by the States.

6         A delegation of authority is the provision of that authority to another entity.  In the

7    Revision Rule, BLM has not given its authority to the States or tribes.  Rather, it has properly

8    recognized that these entities have jurisdiction over oil and gas development within their borders

9    and have promulgated their own regulations that address waste prevention.  AR 5-6, 19, 60-63.

10   For this reason, *Assiniboine & Sioux Tribes of Fort Peck Indian Reservation v. Board of Oil and*

11   *Gas Conservation of Montana* is inapposite.  In that case, BLM had an arrangement with the

12   Montana Board of Oil and Gas Conservation whereby the Board would review drilling

13   applications related to federal and Indian lands over which it had no authority and issue

14   "advisory orders" that were essentially "recommendations" to BLM.  792 F.2d 782, 785 (9th Cir.

15   1986).  In contrast, here, BLM has exercised its own authority in reviewing state regulations and

16   determining that they effectively prevent waste, and it has deferred to existing state and tribal

17   regulations that already apply to all lands within their borders; it has not asked states or tribes to

18   wield any additional federal authority.  *See La. Pub. Serv. Comm'n v. Fed. Energy Regulatory*

19   *Comm'n*, 860 F.3d 691, 696 (D.C. Cir. 2017) (holding FERC did not improperly delegate its

20   authority over electricity rates by deferring to state rates because the agency "used its own

21   judgment" in reviewing and accepting those rates and retains authority to take action if states set

22   unjust or unreasonable rates); *Alaska Ctr. for the Env't v. West*, 157 F.3d 680, 686 (9th Cir.

23   1998) (holding no improper delegation of authority where Army Corps coordinated with

24   municipality regarding wetland permits but "retain[ed] its full legal authority").  BLM's decision

25   to defer to state regulations comports with the MLA which encourages BLM to minimize

26   conflict between federal and state regulations.  30 U.S.C. § 187 (Lease provisions may not "be in

27   conflict with the laws of the State in which the leased property is situated"); 30 U.S.C. § 189

28   ("Nothing" in the MLA "shall be construed or held to affect the rights of the States or other local

1   authority to exercise any rights which they may have.").

2        BLM's determination that state regulations are effective is fact-based and reasonable.  As

3   BLM explained, every one of the ten States that produce 98% of federal gas and 99% of federal

4   oil "have statutory or regulatory restrictions on venting and flaring that are expected to constrain

5   the waste of associated gas from oil wells."  AR 19.  For example, New Mexico, Wyoming,

6   Colorado, Utah, Montana, Texas, and Oklahoma all require approval from the state regulatory

7   authority before flaring.  *Id.* n.41.  North Dakota has implemented gas capture targets for certain

8   wells.  *Id.*; *see also* AR 342-43.  California prohibits the "unreasonable waste of natural gas," AR

9   343-44, and Alaska designates all vented and flared gas as waste subject to limited exceptions,

10  AR 345.  In deciding to rescind the requirement that operators submit waste minimization plans

11  when seeking a drilling permit, BLM noted that North Dakota and New Mexico, where half of

12  all flaring on federal and Indian lands occurs, both have comparable requirements.  AR 9.

13  Likewise, Utah, Wyoming, and Montana all require operators to submit similar information

14  when they seek approval for long-term flaring.  *Id.*  While not every state has leak detection

15  requirements, BLM determined that the costs of leak detection and repair exceeded the value of

16  conserved oil and gas, making them inappropriate for "waste prevention" under BLM's MLA

17  authority.  AR 13.  BLM also found that the 2016 Rule "overstated" the rate of leaks from wells

18  on federal lands.  AR 71-72.

19        Nor is the approach of the Revision Rule as drastic a departure from the 2016 Rule as

20  Plaintiffs suggest.  The 2016 Rule recognized that it overlapped with state regulations and that

21  "applying two sets of requirements is burdensome for operators and would not generate

22  additional benefits."  AR 937.  Its solution to that problem was to put the onus on States to seek a

23  variance from the 2016 Rule allowing their regulations to apply to federal minerals.  *Id.*  BLM

24  specifically explained in the 2016 Rule that its variance process was not a means of "delegating

25  its regulatory or enforcement authority to the State, locality, or tribe.  Rather, the BLM []

26  recogniz[ed] that, in the absence of a variance, an operator would be required to comply with

27  overlapping requirements."  *Id.*; *see also* AR 109.  The Revision Rule takes a different approach

28  of dealing with the same problem.  It essentially provides a blanket variance for all appropriate

1   state regulations and thereby avoids the administrative burdens of requiring states to seek, and

2   BLM to process, variances on a case-by-case basis.  *See* AR 14; AR 47, 120-27.  It shifts the

3   burden to BLM to decline to defer to a state's regulations when they are insufficient, which the

4   agency expects to be a rare occurrence.  AR 20.  In sum, BLM reasonably decided to refrain

5   from regulating in an area where additional regulations are not necessary to achieve the agency's

6   statutory mandate.  58 Fed. Reg. 51,735 § 1(a) (The federal government's "Regulatory

7   Philosophy" is to "promulgate only such regulations as are required by law" or are otherwise

8   "necessary").

9          Plaintiffs contend that BLM's change in its position on the effectiveness of state

10  regulations between the 2016 Rule and Revision Rule is arbitrary.  St. Mot. 31-33.  But the

11  change is based on BLM's changed view of "waste" in the Revision Rule.  In the 2016 Rule,

12  BLM found state regulations inadequate for purposes of preventing "waste" as BLM defined it at

13  that time, i.e., the avoidable loss of gas regardless of the cost of capture.  As explained above,

14  BLM reasonably determined that that definition of waste exceeded its statutory authority.  *See*

15  AR 2-3.  In the Revision Rule, BLM reconsidered state regulations in light of its new definition

16  of waste and asked whether existing state regulations adequately prevent the loss of gas for

17  which the value of the conserved gas outweighs the cost of capture.  AR 19-20.  After reviewing

18  the regulations for the ten states that produce 99% of federal oil and gas, BLM determined that

19  they prevent "waste" as BLM now defines it.  *Id.*; AR 340-45.

20         Plaintiffs' remaining attacks on BLM's consideration of state regulations reflect

21  misunderstandings about how the Revision Rule works.  The Citizen Groups allege that three of

22  the ten states that produce 99% of federal oil and gas "do not even require approval from a state

23  regulatory agency" before flaring.  CG Mot. 13.  Presumably, they inferred this statistic from a

24  footnote in the Revision Rule which notes that seven of the ten states require approval before

25  flaring.  AR 19.  But they clearly did not examine the regulations of the three remaining states

26  (Alaska, California, and North Dakota) because those regulations all include alternative means of

27  substantially restricting flaring other than requiring preapproval.  Alaska designates *all* venting

28  and flaring as "waste" with extremely limited exceptions.  AR 345.  California prohibits the

1  "unreasonable waste of natural gas" and it treats *all* venting and flaring as prima facie evidence

2  of such waste.  AR 343-44.  And North Dakota has a capture requirement that is very similar to

3  that included in the 2016 Rule.  AR 342-43; *see also* AR 924 (2016 Rule capture requirements

4  modeled on North Dakota regulations).

5         The Citizen Groups also try to undermine BLM's point that deferring to state regulations

6  will account "for the differing geological and infrastructure realities faced by operators in

7  different regions," AR 920, by claiming that Montana and North Dakota regulations require

8  different levels of gas capture—65% and 91% respectively—for drilling in the same Bakken

9  shale basin.  CG Mot. 13.  Plaintiffs' 65% capture rate for Montana is inaccurate, as it appears to

10  be an extrapolation from BLM's nationwide estimate in the 2016 proposed rule regarding the

11  reduction in flaring possible with a per well cap on flaring of 3,000 Mcf/month.  AR 1016.  That

12  extrapolation is outdated, it is not Montana-specific, and it conflates a reduction in flaring with

13  capture.  In fact, wells in Montana captured more gas in 2017 than wells in North Dakota.  *See*

14  U.S. Energy Info. Admin.,

15  https://www.eia.gov/dnav/ng/ng_prod_sum_a_EPG0_VGV_mmcf_a.htm, last visited Aug. 9,

16  2019 (showing that Montana had a capture rate of about 94% in 2017 and North Dakota had a

17  capture rate of about 87%).[10]  Equally important, Plaintiffs' argument ignores the differences in

18  infrastructure between states, which is documented in the record.  *See, e.g.,* AR 162, 104414-17

19  (describing infrastructure challenges in North Dakota).

20         In sum, BLM's decision to defer to effective state regulations, rather than impose

21  duplicative regulations and then provide a process for exempting states on a case by case basis, is

22  reasonable, supported by record evidence, and consistent with BLM's statutory obligations.

23  **III.    BLM Complied with the APA by Explaining Its Reasons for Departing from its
    Previous Findings.**

24  

25         Plaintiffs contend that the Revision Rule is arbitrary and capricious because it takes a

26  different approach to certain aspects of waste prevention than the 2016 Rule.  But "[a]gencies are

27  

28  [10] These figures reflect the total amount of gas vented and flared in each state in 2017 divided by the gross withdrawals for each state.  Both sets of data are available on the U.S. Energy Information Administration's website under the "data series" drop-down menu.

Defs.' Cross Mot. for Summ. J. & Resp. to Pls.' Mots. for Summ. J.
*California v. Zinke,* No. 4:18-cv-05712-YGR                                          26

free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars*, 136 S. Ct. at 2125.  A change in position can reflect new facts but it can also reflect the agency's "reevaluation of which policy would be better in light of [existing] facts." *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1038 (D.C. Cir. 2012).  When the subject matter "is technical, complex, and dynamic," the expert agency "is in a far better position to address" difficult regulatory questions than the court.  *Brand X*, 545 U.S. at 1002–03. Because BLM acknowledged and explained its changes in position on marginal wells, GAO oversight reviews, and EPA regulations, the agency complied with the APA.

### A.      BLM's Concerns About the Impact of the 2016 Rule on Marginal Wells Are Reasonable and Supported by Data.

One of BLM's reasons for rescinding and revising the 2016 Rule was the fact that it imposed disproportionate costs on marginal wells, which represent the majority (73%) of wells on BLM-administered lands.  AR 2.  BLM explained that the 2016 Rule's requirements would have cost marginal oil wells over 24%, and marginal gas wells over 86%, of their annual revenue.  AR 2, 4.  These high costs would have threatened the viability of many marginal wells, which together support "an estimated $2.9 billion in economic output in the national economy in FY 2015."  AR 2.  These concerns about marginal wells are not new: the 2016 Rule recognized the threat to marginal wells and tried to address it by allowing an operator to seek an exemption from certain provisions of the 2016 Rule when compliance costs would cause the operator to "cease production and abandon significant recoverable reserves."  AR 4.  But as BLM explained in the Revision Rule, this exemption process was flawed: there was no mechanism for seeking a full exemption from costly LDAR requirements; the 2016 Rule provided no guidance on what constituted "significant recoverable reserves"; and because marginal wells represent the majority of BLM-administered wells, the process of applying for and approving exemptions would have been costly and burdensome for both operators and BLM.  *Id.*

Plaintiffs attack BLM's concerns about marginal wells on numerous grounds, all of which are baseless.  First, Plaintiffs fault BLM for not considering a more narrowly-tailored means of revising the 2016 Rule to address concerns about marginal wells.  CG Mot. 20-21.

1    This argument ignores that marginal wells make up the majority of wells regulated by BLM.  It

2    also ignores that BLM did in fact tailor its revision to address its specific concerns about

3    marginal wells.  As BLM explained, the compliance costs of the 2016 Rule "would have

4    constituted 24 percent of the annual revenues of even the highest producing marginal oil wells

5    and 86 percent of the annual revenues of the highest-producing marginal gas wells."  AR 2.  The

6    agency's decision to revise the 2016 Rule to impose only economical requirements not only

7    complied with its waste prevention authority under the MLA; it also specifically addressed

8    BLM's concern that the 2016 Rule would cause operators to shut-in marginal wells to avoid

9    costly requirements.

10          Second, Plaintiffs claim that BLM improperly assumed that "*all* wells will require *all*

11   controls mandated" by the 2016 Rule.  CG Mot. 18.  This is false.  In calculating the costs

12   imposed by the 2016 Rule on marginal wells, BLM applied the rule's LDAR, pneumatic-

13   controller, and pneumatic-pump requirements to both oil and gas wells.  AR 102, 180479.  It

14   omitted the liquids unloading requirement for oil wells since that requirement "posed a particular

15   burden on declining gas wells."  AR 102-03.  BLM also omitted the gas capture requirements as

16   well as the storage tank requirements, which were not "expected to impact marginal wells due to

17   the low production and relatively high volatile organic compound ("VOC") threshold."  AR 103

18   n.59.  Nor did BLM assume that all marginal wells would bear all costs.  CG Mot. 18.  Rather,

19   the agency calculated the potential per-well reduction in revenue, AR 103, and simply noted that

20   about 69,000 wells producing federal and Indian oil and gas qualified as marginal.  AR 102.  For

21   this reason, Plaintiffs' example of BLM's analysis of the plunger lift requirement (which is part

22   of liquids unloading) is misleading.  BLM did not assume that every marginal gas well would

23   assume these costs; in fact, it disclosed that the 2016 Rule may have overestimated the number

24   of wells that would require a plunger lift.  AR 70.  Instead, BLM properly calculated the

25   potential reduction in revenue for a single gas well that required liquids unloading to provide an

26   upper limit of the 2016 Rule's potential impact on marginal wells.  AR 104.  It then separately

27   compared the impacts of the Revision Rule to those of the 2016 Rule both with and without the

28   plunger lift requirement.  AR 136.  Plaintiffs' dissatisfaction with how BLM expressed these

1    concepts and where it included that information in the RIA does not alter the fact that BLM was

2    transparent in its calculations.

3            Third, Plaintiffs accuse BLM of miscalculating the per-well reduction in revenue for

4    marginal wells by assuming that operators would take on all capital costs in one year.  In fact,

5    BLM calculated the reduction in revenue for marginal wells in two ways: (1) comparing total

6    costs of select requirements of the 2016 Rule as a share of expected annual revenues (*see* AR

7    103-104, Figures 4.5a & 4.5c), *and* (2) comparing annualized costs of those same select

8    requirements as a share of annual revenues (*see* AR 104-05, Figures 4.5b & 4.5d).  Plaintiffs

9    overlook the latter calculations.  Plaintiffs also ignore that the calculation of total costs of the

10   2016 Rule's requirement over the life of a marginal well is important because, unlike a consumer

11   buying a cell phone, CG Mot. 19, operators often secure financing in advance in light of

12   expected total costs and total revenue over the life of the well.  Plaintiffs attempt to dismiss the

13   impacts of the 2016 Rule on marginal wells by relying only on annualized cost calculations, but

14   they admit that these calculations show that the 2016 Rule could reduce revenue by as much as

15   21% for oil wells and 39% for gas wells.  *Id.*  These numbers are significant for an operator

16   deciding how long it can keep a marginal well going.

17           Fourth, Plaintiffs falsely contend that BLM did not provide any support for its conclusion

18   that "full compliance with the 2016 rule could have jeopardized the economic operations of

19   many marginal wells" and resulted in "premature shut-ins."  AR 4-5, 22.  BLM calculated

20   substantial per-well reductions in revenue and explained that the high compliance costs of the

21   2016 Rule and the "uncertainties" in the exemption process "could have led the operators of the

22   lowest-producing marginal wells to shut them in prematurely, stranding otherwise recoverable

23   resources in place."  AR 4-5, 105.  Although the 2016 Rule found shut-ins unlikely, it improperly

24   assumed "that all operators of marginal wells needing exemptions from the various requirements

25   would have applied for the exemptions and that those exemptions would have been granted to

26   them" and "that all operators of marginal wells would have been able to absorb the costs

27   associated with the LDAR program or an alternate program of lesser stringency," since the 2016

28   Rule did not provide a full exemption from LDAR.  AR 105; *see also* AR 4.

1    Fifth, Plaintiffs' claim that total compliance costs for marginal wells represent only 3% of

2    the economic activity associated with those wells is misleading.  CG Mot. 20.  This 3% figure is

3    from Plaintiffs' comment; it is not a BLM data point.  AR 84087.  Plaintiffs calculated the

4    number by dividing the estimated $2.9 billion in economic output generated by marginal wells

5    by estimated compliance costs.  *Id.*  But they ignore that the $2.9 billion in economic output is

6    not equivalent to operator revenue; rather, it includes downstream economic benefits that do not

7    flow to the operator.  AR 106.  This is why BLM's estimated drop in revenue of 24-236% per

8    well is much higher than Plaintiffs' 3% number.  AR 103.  Plaintiffs' calculation also lumps all

9    marginal wells together, thereby ignoring that marginal wells vary significantly in production

10   volumes, and thus how susceptible they are to shut-in due to higher compliance costs.  AR 102

11   (explaining that wells that produce less than 10 barrels of oil equivalent ("BOE")/day are

12   considered marginal, but finding that over half of wells produce less than 4 BOE/day).

13   Sixth, Plaintiffs claim, based on their own analysis, that operators shut in wells based on

14   production rather than revenue and that most wells are shut-in when they drop below 5 BOE/day.

15   CG Mot. 20; AR 84086.  BLM reviewed this analysis and was unable to replicate it because it

16   was not clear which dataset Plaintiffs' contractor used and how it identified relevant wells.  AR

17   114.  In any event, BLM's data shows that roughly 62.7% of oil wells and 54.3% of gas wells

18   produced less than or equal to 4 BOE/day.  AR 102.  Thus, Plaintiffs' own analysis demonstrates

19   that more than half of all wells are on the cusp of shutting-in.  It defies logic that increased

20   operating costs would have no impact on an operator's decision whether to shut-in such a well.

21   In sum, Plaintiffs' efforts to discredit the expert agency's economic analysis of marginal

22   well impacts are themselves flawed and misleading.  "An agency's scientific methodology is

23   owed substantial deference."  *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d

24   1059, 1066 (9th Cir.), *amended*, 387 F.3d 968 (9th Cir. 2004).  Complex, "science-driven"

25   analyses "do[] not easily lend [themselves] to judicial review."  *San Luis & Delta-Mendota*

26   *Water Auth. v. Jewell*, 747 F.3d 581, 621 (9th Cir. 2014).  This Court need not choose between

27   battling experts: "In reviewing [an agency action], we do not sit as a panel of referees on a

28   professional [scientific] journal, but as a panel of generalist judges obliged to defer to a

1   reasonable judgment by an agency acting pursuant to congressionally delegated authority." *Id.*

2   Because BLM set forth rational conclusions regarding marginal wells supported by the data and

3   its own reasonable choice of methodology, it has satisfied the APA. *See Marsh*, 490 U.S. at 377

4   (Where analysis "'requires a high level of technical expertise,' we must defer to 'the informed

5   discretion of the responsible federal agencies.'" (quoting *Kleppe*, 427 U.S. at 412)).

### B.   BLM Acknowledged and Addressed the Concerns Raised in GAO Oversight Reviews.

8   Plaintiffs and Amici point to 2004, 2008, and 2010 oversight reviews by the Government

9   Accountability Office ("GAO") and allege that BLM ignored these reviews in the Revision Rule.

10   CG Mot. 14; Cong. Br. 11; AR 2, 54-55, 910-11.   In fact, BLM explained in the RIA that the

11   GAO's most recent (2010) estimates of venting and flaring on federal land were significantly

12   higher than BLM's 2018 estimates (126 Bcf versus 89 Bcf), largely due to subsequent changes in

13   the regulatory landscape.   AR 58-59.   Thus, the GAO's recommendations are out of date and

14   based on inaccurate data.

15   Even putting the weaknesses of the GAO data aside, the Revision Rule addresses many

16   of the GAO's concerns.   As the members of Congress note, in 2004, GAO recommended that

17   BLM require operators to flare rather than vent and to track how much gas is flared and vented.

18   Cong. Br. 11.   The Revision Rule requires operators to "flare, rather than vent, any gas that is not

19   captured," with limited exceptions.   43 C.F.R. § 3179.6(b).   It also requires operators to

20   "estimate or measure all volumes of lost oil and gas."   *Id.* § 3179.301(a).

21   Later GAO reviews (1) "found that the BLM's existing requirements regarding venting

22   and flaring are insufficient and outdated," (2) "expressed concerns about the 'lack of price

23   flexibility in royalty rates,'" (3) expressed concern "about royalty-free use of gas," and (4) found

24   that about "40 percent of natural gas estimated to be vented and flared on onshore Federal leases

25   could be economically captured with currently available control technologies."   AR 910-11.   The

26   Revision Rule addresses all four of these concerns.   It retains the provisions of the 2016 Rule that

27   addressed royalty rates (43 C.F.R. § 3103.3-1) and the 2016 Rule's clarifications about the

28   royalty-free use of gas (43 C.F.R. part 3170, subpart 3178).   AR 8.   It does not impose capture

1   requirements because it determined that, contrary to the GAO's finding, capture requirements are

2   not economical.  AR 9-10.  And while the Revision Rule takes a similar approach to NTL-4A, it

3   includes significant updates and clarifications to address areas in which NTL-4A was

4   "insufficient and outdated."  *See* AR 6-7 ("Notable improvements on NTL–4A in this final rule

5   include: Codifying a general requirement that operators flare, rather than vent, gas that is not

6   captured (§ 3179.6); requiring persons conducting manual well purging to remain onsite in order

7   to end the venting event as soon as practical (§ 3179.104); and, providing clarity about what does

8   and does not constitute an ''emergency'' for the purposes of royalty assessment (§ 3179.103).").

9   Indeed, in a 2019 report, the GAO found that Interior had "fully implemented 47 of [GAO's] 50

10  recommendations" for the agency's management of oil and gas resources.  ECF No. 110-4 at

11  105.  While GAO stated that the Revision Rule "may not be consistent with our prior work," the

12  agency did not explain how the Revision Rule would be inconsistent and it has not issued a

13  report fully evaluating the Revision Rule.  *Id.* at 106.  Interior cannot be expected to comply with

14  additional recommendations that GAO has not yet issued.[11]

15       ## C.   BLM Explained Why It Reached Different Conclusions Regarding EPA
              Regulations in the Revision Rule than in the 2016 Rule.
16

17          Plaintiffs assail BLM's change in position regarding EPA regulations and note that in the

18  2016 Rule, BLM determined that EPA's existing regulations do not "obviate the need for this

19  rule" because "BLM has an independent legal responsibility" to minimize waste on federal and

20  Indian lands and EPA's regulations do not "fully address the issue of waste."  AR 911.  Upon

21  reconsideration, however, BLM reasonably determined that the 2016 Rule overstepped BLM's

22  authority and generated unnecessary regulatory overlap, AR 1-5, and thus met its burden under

23  *Fox* to explain why the new policy is "permissible under the statute and that there are good

24  ───────────────────

     [11] The GAO reports attached by the members of Congress address Interior's revenue collection
25  procedures in addition to its waste prevention regulations.  *See* ECF Nos. 110-4 at 105; 110-5 at
     14-19; 110-6 at 11-29.  A different Interior agency, the Office of Natural Resources Revenue
26  ("ONRR"), "is responsible for collecting revenues from onshore and offshore leases."  ECF No.
     110-6 at 2.  The reports' criticism of ONRR and royalty collection is not relevant to BLM's
27  regulation of waste.  Moreover, the Revision Rule did not rescind or revise the provisions of the
     2016 Rule related to royalty rates or royalty-free use of produced gas.  *See* 43 C.F.R. § 3103.3-1,
28  part 3170, subpart 3178; AR 8.

1    reasons for it . . . ."  556 U.S. at 515.

2           In the 2016 Rule BLM explained that "EPA regulations are directed at air pollution

3    reduction, not waste prevention; they cover only new, modified and reconstructed sources; and

4    they do not address wasteful routine flaring of associated gas from oil wells, among other

5    things."  AR 911.  Yet, despite these deficiencies, BLM recognized that the 2016 Rule

6    significantly overlapped with EPA regulations.  *Id.*  To address the overlap, BLM included

7    certain exemptions from the 2016 Rule for operators who were already complying with

8    overlapping EPA regulations.  *Id.*

9           In the Revision Rule, BLM reexamined EPA regulations and reached the same

10   conclusion as in 2016: the 2016 Rule overlapped with EPA regulations.  AR 8.  The difference is

11   that this time, BLM determined that the overlap was unjustifiable because it exceeded BLM's

12   authority.  AR 5.  This determination was reasonable.  First, in the case challenging the 2016

13   Rule, the Wyoming court pointedly questioned whether it was appropriate for the BLM to justify

14   the 2016 Rule concerning *waste* by relying on the Rule's *environmental and societal benefit*s.

15   The court raised concerns that BLM was engaged in "overreach," *Wyoming*, 2017 WL 161428,

16   at *6-10, and described the 2016 Rule as "duplicative and potentially unlawful" and reproached

17   BLM for "doubling down" by incorporating certain Clean Air Act ("CAA") requirements into

18   2016 Rule.  *Id.* at *8 n.10, 12.  The court further recognized the "potential conflict and

19   inconsistency with the implementation and enforcement provisions of the CAA," and stated that

20   the "Rule upends the CAA's cooperative federalism framework and usurps the authority

21   Congress expressly delegated under the CAA to the EPA, states, and tribes to manage air

22   quality."  *Id*. at *8.  The Wyoming Court's reservations about duplication standing alone

23   provided grounds to reverse course.  *See* AR 3.

24          Second, as explained above, BLM determined that the provisions of the 2016 rule

25   exceeded BLM's waste prevention authority under the MLA because the rule went beyond

26   economically-sound conservation.  AR 2-3; *supra* Section I.A.  BLM found that many of the

27   emissions-targeting provisions of the 2016 Rule target air pollution—which is in EPA's

28   purview—rather than waste "because their compliance costs far exceed the value of the resource

1   to be conserved."  AR 8; *see Wyoming*, 2017 WL 161428, at *9 ("[T]he BLM cannot use

2   overlap" with EPA regulations "to justify overreach.").  BLM's decision to avoid duplicative

3   regulations that exceed its authority by simply not imposing them in the first instance—instead

4   of allowing for a cumbersome process of exemptions that achieve the same result—is

5   reasonable.[12]  *See* AR 8 (explaining that 2016 Rule also relied on EPA regulations by utilizing

6   exemption process).[13]

7          BLM gave reasoned support for its change in position consistent with *Fox*.  556 U.S. at

8   514-15.  Its decision that it lacks authority to regulate air pollution and therefore should not

9   duplicate EPA's pollution regulations accords with the MLA and the Wyoming court's decision

10  and is owed deference.

11  **IV.    BLM Complied with the APA's Notice Requirements.**

12         Plaintiffs contend that the proposed Revision Rule provided insufficient notice of (1)

13  BLM's position that it lacked authority under the MLA to impose uneconomical waste

14  prevention requirements, St. Mot. 16-17, and (2) its calculations of compliance costs as a

15  percentage of marginal well revenues on a per-well basis, CG Mot. 17.  Both claims are baseless.

16         "The test for sufficiency of the notice" for a proposed rule "is whether the notice 'fairly

17  apprise[s] interested persons of the subjects and issues before the Agency.'" *Louis v. U.S. Dep't

18  of Labor*, 419 F.3d 970, 975 (9th Cir. 2005) (quoting *Nat. Res. Def. Council v. EPA*, 279 F.3d

19  1180, 1186 (9th Cir. 2002)).  "The essential inquiry focuses on whether interested parties

20  ───────────────────

21  [12] After BLM issued the Revision Rule in September 2018, the EPA issued a proposed rule to

22  revise certain aspects of its NSPS regulations under 40 C.F.R. part 60, subpart OOOOa.  The
    proposed rule would not affect NSPS OOOO, which was promulgated in 2012 and "addresses

23  emissions from hydraulically fractured gas well completion operations, storage vessels emitting
    more than 6 tons per year of uncontrolled VOC, continuous-bleed pneumatic controllers, and

24  other sources."  AR 60; 83 Fed. Reg. 52,056 (Oct. 15, 2018).  EPA's proposed amendments to
    OOOOa are narrowly tailored.  *Infra* Section VI.C.

25  [13] BLM also found that, even if it did not exceed BLM's authority, the 2016 Rule provided only

26  incremental benefits on top of EPA's regulations and that those benefits would decrease over
    time.  The EPA's regulations apply to new, reconstructed, and modified sources of emissions.

27  AR 8.  But as old equipment is replaced and new well sites come online, EPA regulations "will
    displace the BLM's regulations, eventually rendering certain emissions-targeting provisions of

28  the 2016 rule entirely duplicative" within a period of less than a decade.  *Id.*

1   reasonably could have anticipated the final rulemaking from the draft" rule.  *Nat. Res. Def.*

2   *Council, Inc. v. EPA*, 863 F.2d 1420, 1429 (9th Cir. 1988).  "Nothing prohibits the Agency from

3   adding supporting documentation for a final rule in response to public comments."  *Rybachek v.*

4   *EPA*, 904 F.2d 1276, 1286 (9th Cir. 1990); *see also Kern Cty. Farm Bureau v. Allen*, 450 F.3d

5   1072, 1076 (9th Cir. 2006) ("It is perfectly predictable that new data will come in during the

6   comment period, either submitted by the public with comments or collected by the agency in a

7   continuing effort to give the regulations a more accurate foundation. The agency should be

8   encouraged to use such information in its final calculations without thereby risking the

9   requirement of a new comment period." (quoting *BASF Wyandotte Corp. v. Costle*, 598 F.2d

10  637, 644–45 (1st Cir. 1979))).  "The agency must have authority to promulgate a final rule that

11  differs in some particulars from its proposed rule.  Otherwise the process might never end."  *Nat.*

12  *Res. Def. Council*, 863 F.2d at 1429 (citation omitted).  For this reason, "an agency may use

13  'supplementary data, unavailable during the notice and comment period, that expand[s] on and

14  confirm[s] information contained in the proposed rulemaking and addresses 'alleged

15  deficiencies' in the pre-existing data, so long as no prejudice is shown."  *Idaho Farm Bureau*

16  *Fed'n v. Babbitt*, 58 F.3d 1392, 1402 (9th Cir. 1995) (*Solite Corp. v. EPA*, 952 F.2d 473, 484

17  (D.C. Cir. 1991)).

18          **A.      BLM Provided Notice of Its Concerns About Its Statutory Authority.**

19          Plaintiffs California and New Mexico claim that BLM's position that it lacked authority

20  to impose uneconomical waste prevention requirements was a "brand new rationale" not

21  included in the proposed Revision Rule.  This is false.  In the proposed Revision Rule, BLM

22  explained:

23          During the development of the 2016 final rule, the BLM received comments from
        the regulated industry and some States arguing that the BLM's proposed rule
24          exceeded the BLM's statutory authority. . . .  Commenters also asserted that the
        proposed rule exceeded the BLM's waste prevention authority by requiring
25          conservation without regard to economic feasibility, a key factor in determining
        whether a loss of oil or gas is prohibited "waste" under the Mineral Leasing Act.
26          Immediately after the 2016 final rule was issued, petitions for judicial review of
        the rule were filed by industry groups and States with significant BLM-managed
27          Federal and Indian minerals.  *Wyoming v. U.S. Dep't of the Interior*, Case No.
        2:16–cv–00285–SWS (D. Wyo.).  Petitioners in this litigation maintain that the

1

2

> BLM's promulgation of the 2016 final rule was arbitrary and capricious (in
> violation of the Administrative Procedure Act), and that the 2016 final rule
> exceeded the BLM's statutory authority by . . . failing to give due consideration to
> economic feasibility.

3

4   AR 418.  The agency concluded by specifically requesting comment "on whether the 2016 final

5   rule was consistent with its statutory authority."  *Id.*

6       BLM disclosed its concerns about its statutory authority to regulate waste without regard

7   for economic feasibility, it cited to locations where the public could find more detail about those

8   concerns (the Wyoming litigation and comments on the 2016 Rule), and it specifically requested

9   comment on those issues.  Moreover, the proposed rule was explicit about BLM's "policy

10  determination that it is not appropriate for 'waste prevention' regulations to impose compliance

11  costs greater than the value of the resources they are expected to conserve," AR 419, and

12  contained the same definition of "waste" that BLM used in the final rule.  AR 437.  Plaintiffs

13  cannot claim that they had no notice of BLM's changed position on its ability to require

14  uneconomic waste prevention methods when the preamble to the proposed rule specifically

15  requested comment on that issue and the text of the proposed rule included an economic

16  limitation on what counts as waste.

17      That BLM achieved its goal of "fairly appris[ing]" the public of its thought-process is

18  demonstrated by the fact that numerous organizations, including the California Air Resources

19  Board and the Attorneys General of California and New Mexico, commented specifically on the

20  question of BLM's statutory authority in their comments on the proposed rule.  *Louis*, 419 F.3d

21  at 975; *see, e.g.*, AR 104453-54, 84758-59.  There is simply no requirement that an agency alert

22  the public in its proposed rule to every legal authority that it may ultimately cite in its final rule.

23  Such a requirement would prevent an agency from expanding its thinking, including in response

24  to comments, between the proposed rule and final rule, thereby undermining the purpose of

25  notice and comment.  *See Mid-Tex Elec. Co-op., Inc. v. FERC*, 773 F.2d 327, 339 (D.C. Cir.

26  1985) ("The Commission's reasoning undoubtedly evolved significantly as a result of the notice

27  and comment rulemaking. . . . But this does not establish that the original notice did not

28  adequately frame the subjects for discussion." (quotation omitted)).  Because the new authorities

1    cited by BLM in the final rule did not "alter" the agency's "justifications or conclusions" but

2    merely provide additional support for the agency's reasoning, BLM did not violate the APA's

3    notice and comment provisions.  *Kern Cty.*, 450 F.3d at 1079.

4        **B.    BLM Provided Notice of Its Concerns Regarding Marginal Wells.**

5        Plaintiff Citizen Groups contend that BLM improperly relied on "new analysis purporting

6    to calculate compliance costs as a percentage of marginal well revenues on a per-well basis" in

7    the Revision Rule and that BLM should have made that analysis available for notice and

8    comment.  CG Mot. 17.  But "the public is not entitled to review and comment on every piece of

9    information utilized during rule making."  *Kern Cty.*, 450 F.3d at 1076.  Here, BLM fully

10   disclosed its concerns about marginal wells in the proposed rule and the RIA for the proposed

11   rule, including its concern that the compliance costs imposed by the 2016 Rule could lead to

12   premature shut-in.  AR 417, 423-24, 431, 497-98.

13       What Plaintiffs are complaining about is one specific set of data that BLM developed

14   after comment: the calculation of compliance costs as a percentage of well revenue.  This single

15   dataset merely confirmed BLM's conclusions in the proposed rule that the compliance costs for

16   marginal wells were substantial and could cause operators to shut in marginal wells.  It also

17   provided the support sought by Plaintiffs in their comments on the proposed rule.  AR 84083-85

18   (commenting that BLM's analysis for the proposed rule was "unsupported by factual evidence").

19   BLM's addition of new data after comment that "enabled [BLM] to respond to concerns and

20   confirm prior calculations" is reasonable under the APA.  *Idaho Farm Bureau*, 58 F.3d at 1402.

21   The additional calculations "do not provide the sole, essential support" for BLM's conclusions

22   regarding marginal wells, let alone the Revision Rule as a whole, but rather "provid[e] additional

23   grounds for the well-supported conclusions in the Proposed Rule."  *Kern Cty.*, 450 F.3d at 1079;

24   *compare* AR 1-2, 4-5, 13, 22-23, 102-06 *with* 417, 423-24, 431, 497-98.  And Plaintiffs'

25   extensive comments on marginal wells make it clear that the lack of this specific data did not

26   prejudice them by preventing meaningful comment.  *See* AR 84083-89; *Kern Cty.*, 450 F.3d at

27   1076 (agency may use supplemental data "so long as no prejudice is shown").  Indeed,

28   "adherence to [Plaintiffs'] view might result in the [BLM's] never being able to issue a final rule

1   capable of standing up to review: every time the Agency responded to public comments, such as

2   those in this rulemaking, it would trigger a new comment period.  Thus, either the comment

3   period would continue in a never-ending circle, or, if the [BLM] chose not to respond to the last

4   set of public comments, any final rule could be struck down for lack of support in the record."

5   *Rybachek*, 904 F.2d at 1286.  BLM's development of additional data that confirms its

6   conclusions in response to Plaintiffs' own comments does not require reopening the comment

7   period.

8   **V.    BLM Reasonably Determined Based on Available Data and Accepted**
        **Methodologies that the Costs of the 2016 Rule Outweighed Its Benefits.**

9

10          Plaintiffs challenge BLM's cost-benefit analysis for the Revision Rule as unreasonable

11   because the agency concluded that the 2016 Rule's costs exceeded its benefits after eschewing

12   the *global* metric used in the 2016 Rule to assess the cost of methane emissions to the United

13   States.  But, consistent with OMB guidance and the direction in Executive Order 13783, in the

14   Revision Rule, BLM relied on a *domestic* metric to assess the cost of methane emissions to the

15   United States.  *State Farm* requires that courts give agencies "ample latitude to adapt their rules

16   and policies to the demands of changing circumstances."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*

17   *v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) (internal quotation marks omitted).

18   Here, as discussed above, BLM determined that its waste prevention authority under the MLA

19   did not sweep broadly to address societal or environmental impacts, including effects on

20   geopolitical security, multinational companies, or U.S. citizens living abroad.  St. Mot. 26; *see*

21   *supra* Section I.A.  Plaintiffs press that the agency should have used a global metric for the social

22   cost of methane ("SCM") precisely because it should have considered *global* impacts.  *Id.*  But

23   Plaintiffs' real dispute is not with the underlying metric but with the underlying policy choice.

24   BLM is entitled substantial deference in its policy choices.  *See* C*hevron,* 467 U.S. at 866 (noting

25   that deference to agency regulations is appropriate because "[t]he responsibilities for assessing

26   the wisdom of such policy choices and resolving the struggle between competing views of the

27   public interest are not judicial ones").  For this reason, and the reasons discussed below, BLM's

28   use of the domestic SCM was reasonable and justifies its new calculation of costs and benefits.

1    *See Fox,* 556 U.S. at 514.

2    **A.      BLM Reasonably Determined that the 2016 Rule's Costs Outweighed its**
3    **Benefits.**

4           In its analysis of the 2016 Rule, BLM determined that the benefits of that rule would

5    outweigh its costs.  To reach this conclusion, BLM monetized the costs and benefits of the rule.

6    BLM determined the rule would cost $1.2 - $1.5 billion over a ten year period and that the costs

7    would consist primarily of the cost of compliance, that is, the cost to companies to replace and

8    install equipment, implement new protocols, complete new paperwork, and conduct other tasks

9    required by the rule.  AR 1172.  BLM estimated that the 2016 Rule would result in $2.2 - $2.7

10   billion in benefits over a ten year period, consisting of approximately $603 - $764 million from

11   the sale of additional captured gas and $1.6 to $1.9 billion from the foregone methane emissions.

12   AR 1174.  BLM monetized the value of foregone emissions using the global SCM.  *Id.*  In total,

13   BLM determined the 2016 Rule would have net benefits of $740 million to $1 billion over a ten

14   year period.  AR 1178.

15          Because the Revision Rule rolls back many of the most costly portions of the 2016 Rule,

16   BLM determined that it would reduce compliance costs by $1.359 - $1.634 billion over ten

17   years.  AR 79.  The costs of the Revision Rule over ten years include a $559 to $734 million

18   worth of gas not captured, $66 to $259 million in methane emissions, and 79,000 to 80,000

19   tons/year of VOC emissions.  AR 81-82.  Thus, BLM determined the Revision Rule would have

20   net benefits of $720 million to $1.083 billion.  AR 86.  As BLM explained, the difference

21   between the two analyses is largely due to BLM's use of the global SCM in its analysis of the

22   2016 Rule versus the domestic SCM in its analysis of the Revision Rule.  AR 41.

23   **B.      BLM Reasonably Utilized the Domestic Social Cost of Methane.**

24          In light of Circular A-4 and the withdrawal of the relevant technical support documents,

25   BLM reasonably chose to monetize the impacts of the Revision Rule on emissions using the

26   interim domestic SCM.  AR 75.  The SCM is a means of monetizing the costs imposed by

27   methane emissions.  AR 74, 1098.  For the 2016 Rule, BLM relied on government estimates of

28   the global SCM contained in technical support documents produced by an Interagency Working

1   Group ("IWG").  AR 475-77 & n.35.  Estimates of the global SCM reflect only global impacts as

2   a whole; they do not indicate the specific impact on the United States.  *See generally* AR 8945-

3   52.

4   In 2017, the technical support documents that formed the basis for BLM's SCM estimates

5   in the 2016 Rule were withdrawn.  AR 7, 74.  In addition, Executive Order 13783 directs

6   agencies to ensure their analyses of the costs and benefits of rulemakings are consistent with

7   OMB Circular A-4, AR 1874, which states that an agency's analysis should "focus on benefits

8   and costs that accrue to citizens and residents of the United States" and should report costs and

9   benefits to the United States separately from those that accrue globally.  AR 7598.  OMB

10   Circular A-4 "does not specifically mandate that agencies consider global impacts."  *California

11   v. BLM*, 286 F. Supp. 3d 1054, 1069 (N.D. Cal. 2018).  Therefore, BLM reasonably focused on

12   domestic impacts.

13   Although Plaintiffs dismiss BLM's use of the domestic SCM as "hastily developed" and

14   "back-of-the-envelope," they ignore the agency's lengthy explanation of its calculations and

15   reasoning, including the sources it relied upon.  AR 128-33.  Indeed, another court in this district

16   has already rejected these same Plaintiffs' complaints about BLM's use of the interim domestic

17   SCM.  *California*, 286 F. Supp. 3d at 1069-70.  Plaintiffs' attempt to attack the SCM here on the

18   same grounds should also be rejected.

19   In trying to undermine BLM's analysis of the SCM, Plaintiffs and the Amicus Institute

20   for Policy Integrity overlook the law that applies to the agency and press for a global metric.  But

21   as the National Academies of Sciences' ("NAS") report and the IWG both acknowledged,

22   "Under current OMB guidance contained in Circular A-4, analysis of economically significant

23   proposed and final regulations from the domestic perspective is required, *while analysis from the

24   international perspective is optional.*"  AR 22770 (emphasis added).  BLM's decision to estimate

25   domestic impacts, as required by Circular A-4, is within its discretion and reasonable in light of

26

27

28

Defs.' Cross Mot. for Summ. J. & Resp. to Pls.' Mots. for Summ. J.
*California v. Zinke*, No. 4:18-cv-05712-YGR                                                      40

the applicable law.[14]  Moreover to the extent that OMB Circular A-4 also directs agencies to report effects "beyond the borders of the United States" separately, AR 7598, BLM complied by including the updated global values from the 2016 Rule and comparing those with the domestic only estimate in the Revision Rule.  AR 137.[15]

Plaintiffs' allegation that BLM has "ignore[d]" the 2017 recommendations of the NAS because it did not use a global metric therefore lacks merit.  CG Mot. 22.  BLM not only references NAS's recommendations in the RIA but also directs the reader to them for a "more detailed discussion of each model and the harmonized input assumptions."  AR 131, 134.  To the extent Plaintiffs contend that the domestic metric is inconsistent with the NAS report because it concluded that a domestic metric is "not possible," that too is incorrect.  CG Mot. 22.  The NAS report noted that that the IWG had provided a provisional domestic metric but that a domestic SCM is complicated "as an empirical matter" because of the lack of country-specific SCM data in the literature.  AR 22771.  The NAS report concluded that "[e]stimation of the net damages per ton of $CO_2$ emissions to the United States alone, beyond the approximations done by the IWG, is feasible in principle" but that the existing modeling methodologies have focused on

---

[14] Citing Executive Order 12866, State Plaintiffs argue that BLM must consider global impacts because the agency must consider "*all* costs and benefits." St. Mot. 24 (citing 58 Fed. Reg. 51,735) (emphasis added)).  But Executive Order 12866 does not specifically require agencies to consider global costs and benefits.  Nor does it purport to override the direction in Circular A-4 for agencies to consider domestic impacts separately.  Rather, Executive Order 12866 directs agencies to assess all costs and benefits of available regulatory alternatives and, when regulation is necessary, to select the approach that maximizes net benefits and to impose the least burden on society, including businesses.  This is exactly what BLM did in the RIA when it estimated the costs and benefits of the Revision Rule to the extent it was reasonably able.  AR 75.

[15] Amicus Institute for Policy Integrity argues that the global effects of climate change are also domestic in character because of the potential for spillover to the United States through economic and political destabilization and the consequent global migration.  But neither the global nor the domestic SCM metric can capture the complex geopolitical interactions that Amicus discusses.  As the Institute notes, the domestic metric cannot fully capture "inter-regional and inter-sectoral linkages," but the global SCM metric could not either.  AR 130.  And, in any event, Amicus' suggestion that BLM consider a climate-change induced flood in Thailand because of its potential effects on supply chains illustrates how many links there are in the chain of causation between the Revision Rule on the one hand and the spillover effects that Plaintiffs want BLM to assess in its analysis on the other.

Defs.' Cross Mot. for Summ. J. & Resp. to Pls.' Mots. for Summ. J.
*California v. Zinke*, No. 4:18-cv-05712-YGR                                                41

global impacts rather than domestic ones.  AR 22772.  And, contrary to Plaintiffs' arguments, BLM did acknowledge multiple sources of uncertainty in its calculations, including uncertainties emanating from utilizing a domestic metric rather than a global one.  AR 128-30.

Moreover, BLM was clear that it will use the interim domestic SCM developed under Executive Order 13783

> until final domestic estimates can be developed, which will take into consideration the recent recommendations from the [NAS] for a comprehensive update to the current methodology to ensure that the social cost of greenhouse gas estimates reflect the best available science while also comporting with the procedures set forth in OMB Circular A-4.

AR 128.  With the final domestic SCM, BLM will harmonize the NAS's recommendations with Circular A-4's procedures, including Circular A-4's direction to assess domestic impacts separately.  BLM's reliance on an interim measure until the final domestic impacts are developed was perfectly reasonable.[16]  *See San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 996 (9th Cir. 2014) (Agency may "use[] the best scientific data available, even if that science was not always perfect."); *Sierra Club v. U.S. EPA*, 167 F.3d 658, 662 (D.C. Cir. 1999) ("We generally defer to an agency's decision to proceed on the basis of imperfect scientific information, rather than to 'invest the resources to conduct the perfect study.'" (citation omitted)).

As the expert agency, BLM's determination of the best available metric to use in monetizing the impacts of methane emissions is owed substantial deference, even if Plaintiffs and Amici disagree with it.[17]  St. Mot. 26; *see San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 621 (9th Cir. 2014) (courts defer to agencies when it comes to modeling and

---

[16] Plaintiffs' allegation that BLM and other government agencies have not moved swiftly enough to update their metric is unpersuasive.  CG Mot. 22.  The IWG process for developing estimates for the social cost of greenhouse gases demonstrates that it can be a years-long process: there were IWG estimates and updates from 2010, 2013, and 2016.  *See* AR 21902-52; AR 21953-22003; AR 21861-81; AR 21882-901.

[17] Indeed, the Institute for Policy Integrity's attacks on the models used by BLM reflect the limitations of existing science, not arbitrary decisionmaking on BLM's part.  Br. in Supp. of Pls.' Mots. for Summ. J. at 19-20, ECF No. 115-1.

1    afford the agency discretion to choose among scientific models; finding that courts "reject an

2    agency's choice of a scientific model only when the model bears no rational relationship to the

3    characteristics of the data to which it is applied" (internal citations omitted)); *Marsh*, 490 U.S. at

4    378 ("When specialists express conflicting views, an agency must have discretion to rely on the

5    reasonable opinions of its own qualified experts even if, as an original matter, a court might find

6    contrary views more persuasive."); *San Luis*, 776 F.3d at 997 ("[T]he agency has substantial

7    discretion to choose between available scientific models, provided that it explains its choice.").

8    And while Plaintiffs complain that the domestic metric is not "peer reviewed" and is inconsistent

9    with "best available science," this relies on several flawed assumptions.  As an initial matter, an

10   agency is not required to only rely on metrics that are "peer reviewed."  *See Lands Council v.*

11   *Martin*, 529 F.3d 1219, 1226 (9th Cir. 2008).  And while the interim domestic SCM was not peer

12   reviewed, BLM calculated it based on the same peer-reviewed Integrated Assessment Models

13   that formed the basis for the IWG's estimates.[18]  *Compare* AR_128-134 *with* AR_7564-7583.

14   Further, to the extent Plaintiffs' criticism is that economists deem the domestic SCM to be

15   unreliable, the same criticism was made about the global metric.  AR 8949 (noting that there is

16   "extremely large uncertainty about the SCC [global social cost of carbon]" in the IWG estimate

17   for the global metric).  The calculation of SCM—whether domestic or global—relies on data and

18   models that contain a significant degree of uncertainty.  AR 130.  This does not mean BLM

19   cannot rely on SCM to inform its policy analysis as it did in 2016 and 2018; rather the agency

20   must, as it has done here, identify any sources of uncertainty.  *Id.*; *Greater Yellowstone Coal.,*

21   *Inc. v. Servheen*, 665 F.3d 1015, 1028 (9th Cir. 2011).  To that end, BLM noted "that even in the

22   presence of uncertainty, scientific and economic analysis can provide valuable information to the

23   ──────────────

24   [18] Plaintiffs argue that BLM tries to have it both ways by relying on the inputs and modeling from
     the IWG while ignoring "the same body of evidence elsewhere."  CG Mot. 23.  But, as the RIA
25   explained, "[a]s an interim approach, until a more comprehensive update can be completed, this
     RIA relies upon the inputs and modeling developed by the now-disbanded Interagency Working
26   Group for the purposes of providing discrete alternative scenarios that reflect the best available
     Federal agency estimates of social costs."  AR 130.  There is no conflict in relying on the IWG
27   estimates to provide "discrete alternative scenarios" while, at the same time, adjusting the
     agency's analysis to comply with Executive Order 13783 and OMB Circular A-4.
28

1    public and decision makers, though the uncertainty should be acknowledged and when possible

2    taken into account in the analysis (National Academies 2013)."  AR130.[19]

3          **C.     BLM's Cost-Benefit Analysis Was Well-Supported.**

4          BLM's conclusion that the 2016 Rule would unduly burden operators, particularly

5    operators of marginal and low-producing wells, meant that it was not consistent with Executive

6    Order 13783's direction to avoid undue regulatory burdens.[20]  AR 4.  Indeed, as directed by

7    Executive Order 13783, BLM reviewed the 2016 Rule and "found that certain impacts were

8    underestimated and many provisions of the rule would have added regulatory burdens that

9    unnecessarily encumber energy production, constrain economic growth, and prevent job

10   creation."  AR 1.  In other words, its costs outweighed its benefits.  Plaintiffs take issue with this

11   conclusion, emphasizing that BLM reached the opposite conclusion in the 2016 Rule.  But BLM

12   explained why its calculation of costs and benefits changed and reached reasonable conclusions

13   based on its new calculations.  Plaintiffs collectively make five arguments attacking BLM's cost-

14   benefit analysis.  None have merit.

15         First, State Plaintiffs argue that BLM's general statements about the Revision Rule's

16   minimal impacts on profit margins show that the Revision Rule does not, in fact, reduce

17   regulatory burdens.  But Plaintiffs conflate an analysis conducted to ensure that an action does

18   not "disproportionally burden small entities" with whether the Rule reduces regulatory burdens

19   and constrains energy production.  AR 115.  BLM's statement that the Revision Rule will only

20

21   _____

22   [19] Nor does the fact that the domestic model may not incorporate alleged recent evidence about
     methane's potency undermine BLM's analysis. CG Mot. 22-23.   BLM is not required to include
23   every scrap of scientific evidence in its modeling.  *See San Luis & Delta-Mendota Water Auth.*,
     747 F.3d at 621.  As discussed above, BLM acknowledged that there were several sources of
24   uncertainty in its domestic SCM analysis, including that "the science incorporated into these
     models understandably lags behind the most recent research." AR 130.  To that end, BLM
25   acknowledged that its domestic SCM "estimates do not account for the direct health and welfare
     impacts associated with tropospheric ozone produced by methane." *Id.*  Plaintiffs' argument that
26   BLM failed to take this evidence into account oversimplifies what BLM actually did.

27   [20] To be clear, BLM's analysis of the 2016 Rule's regulatory burdens and its analysis of the
     scope of its own statutory authority provide two independent grounds for the Revision Rule.  *See*
28   AR 2-5.

1    modestly increase profit margins and will not have a "significant . . . impact . . . on a substantial

2    number of small entities" was made pursuant to the Regulatory Flexibility Act ("RFA"), which

3    requires an agency to prepare a regulatory flexibility analysis if a rule will have a significant

4    economic effect on a substantial number of small entities.  AR 24.  Because the Revision Rule is

5    a deregulatory action that reduces compliances costs, it necessarily would not disproportionately

6    burden small businesses.  AR 116.  That is not to say that the $72,000 in cost savings per

7    operator per year as a result of the Revision Rule is not significant outside of the RFA; BLM

8    notes that the savings "will provide relief to small operators."  AR 24.

9         Second, Plaintiffs argue that BLM's statement that the Revision Rule will not affect

10   "investment and employment decisions" and the "price, supply or distribution of energy" shows

11   that the 2016 Rule did not impose a regulatory burden.  CG Mot. 16.  In fact, BLM concluded

12   that the Revision Rule "is expected to influence the production of natural gas, natural gas liquids,

13   and crude oil from onshore Federal and Indian oil and gas leases."  AR 22, 91.  While these

14   changes may not significantly impact the price, supply, or distribution of energy *nationwide*, they

15   will "have a positive effect on marginal wells," which represent 73% of all wells on federal and

16   Indian lands.  *Id.*  Likewise, while BLM found that the cost savings standing alone will not be

17   large enough to "alter the investment or employment decisions of firms," it noted that "there may

18   be a small positive impact on investment and employment due to the reduction in compliance

19   burdens if the output effects dominate."  AR 99.  Because the Revision Rule reduces operators'

20   compliance costs, BLM concluded that any impacts on employment will be positive and there

21   could be "competitiveness impacts, specifically on marginal wells on Federal lands, encouraging

22   investment."  AR 23.  Notably, BLM found that the 2016 Rule would not alter employment

23   decisions or affect the price, supply, and distribution of energy.  AR 970-71.  If BLM's finding

24   with regard to the Revision Rule indicates that rule will have insignificant effects, it also

25   suggests that Plaintiffs' touted benefits of the 2016 Rule are equally overblown.

26        Third, State Plaintiffs argue that the Revision Rule is inconsistent with Executive Order

27   13783 because it fails to promote "clean air and clean water" or "national security, domestic

28   energy development and economic growth."  St. Mot. 21-22.  But this argument ignores what the

1    Revision Rule does and the problems it was meant to address.  Executive Order 13783 directed

2    BLM to reconsider the 2016 Rule for "consistency with the policy set forth in section 1 of [the]

3    order" and to revise the 2016 Rule as appropriate.  AR 1874; St. Mot. 21-22.  Section 1 of the

4    Order states that it is in the national interest to "promote clean and safe development . . . while at

5    the same time avoiding regulatory burdens" and that the "prudent development" of the Nation's

6    energy resources "is essential to ensuring the Nation's geopolitical security."  AR 1871.  The

7    mandate of Section 1 of the Order is clear: *prudent* development of the nation's resources must

8    balance environmental concerns against regulatory burdens.  *Id.*  The Revision Rule encourages

9    such prudent development whereas BLM found that the 2016 Rule did not.

10         In reaching this conclusion, BLM considered air quality and domestic energy growth as

11   encouraged by Executive Order 13783.  AR 22, 314-16.  However, the agency also determined

12   that it lacks statutory authority under the MLA to impose uneconomical requirements intended to

13   improve air quality.  AR 2-3, 7-8.  Executive Order 13783 does not give BLM permission to

14   exceed its authority under the MLA.  AR 1874 ("Nothing in this order shall be construed to

15   impair or otherwise affect . . . the authority granted by law to an . . . agency.").

16         To the extent Plaintiffs suggest that the Revision Rule is inconsistent with the direction in

17   Executive Order 13783 to adhere to all laws because it conflicts with BLM's statutory mandate

18   under the MLA to reduce waste, that, too, is inaccurate.  St. Mot. 22.  Consistent with historic

19   practice, BLM defined waste under the MLA in the Revision Rule as requiring only economical

20   resource conservation.  AR 3.  In the Revision Rule, BLM properly balanced the reduction of

21   compliance costs against resource conservation and imposed waste prevention requirements

22   consistent with its statutory authority.  *Supra* Section I.A.

23         Fourth, Plaintiffs argue that BLM's cost-benefit analysis is flawed because it overstates

24   the Revision Rule's benefits by incorrectly assuming the operators have not complied with the

25   2016 Rule.  CG Mot. 25-26.  But this ignores the "ping-ponging regulatory regime" that rendered

26   widespread compliance unlikely.  Order Staying Implementation of Rule Provisions at 11,

27   *Wyoming v. Jewell*, 2:16-cv-00280-SWS, ECF No. 210 (D. Wyo. April 4, 2018).  BLM found

28   several factors supported its assumption that operators had not yet complied with the 2016 Rule.

1   First, there were year-long phase-in periods for many of the most capital-intensive provisions of

2   the 2016 Rule.  AR 67, 225.  Second, BLM began its efforts to postpone and suspend certain

3   provisions of the 2016 Rule in early 2017, shortly after the 2016 Rule took effect, thereby

4   creating uncertainty as to the status of the 2016 Rule and discouraging compliance while the

5   Rule was in limbo.  AR 67.  Third, in February 2018, BLM published a proposed rule that would

6   significantly revise the 2016 Rule, making it likely that operators would "wait[] for the outcome

7   of this rulemaking process" before complying with the 2016 Rule.  *Id.*  Fourth, the Wyoming

8   Court stayed implementation of many provisions of the 2016 Rule in 2018 in light of the

9   proposed Revision Rule, noting that operators had not "ramp[ed] up" to comply with the 2016

10  Rule because of the regulatory uncertainty surrounding its fate.  Order at 9, *Jewell*, 2:16-cv-

11  00280-SWS.  To that end, the Wyoming Court explained, "[n]o reasonable person would rush to

12  comply with a rule that was delayed, suspended, and is soon to be revised, particularly when

13  such compliance requires the expenditure of significant resources."  *Id.* at 9 n.9.  But Plaintiffs

14  press that BLM should have assumed that operators acted unreasonably based on little more than

15  a newspaper article about one operator—out of hundreds—that claimed to be complying with the

16  2016 Rule and an email taken out of context from Interior's economist asking what the

17  appropriate baseline was for an economic analysis.[21]  In either case, Plaintiffs provide no

18  "evidence" that there was any large measure of compliance with the 2016 Rule.

19         Plaintiffs complain that if any operators had already undertaken compliance activities,

20  BLM embellishes the benefits on the Revision Rule.  BLM acknowledged, however, that the

21  "baseline estimated for this final rule could be overstated in terms of compliance costs, cost

22  savings, and emissions reductions."  AR 70.  But because BLM could not monetize "other

23  aspects of the rule," the Revision Rule also likely understated certain costs.  *Id.*  In other words,

24

25  [21] Specifically, in an early draft of the 2018 RIA, the baseline incorporated the "2017 proposed delay rule."  AR 177783.  An Interior economist questioned whether this was the correct baseline rather than the 2016 Rule or "what was in place before the 2016" Rule if the 2016 Rule "was not really implemented."  *Id.*  In the final RIA, the 2016 Rule was the baseline.  AR 67.  But that did not mean that BLM's analysis must counterfactually assume that operators were complying with the 2016 Rule.  As discussed, BLM determined that operators had not come into compliance with the 2016 Rule in light of the shifting regulatory landscape.

26

27

28

1    the potential for overstatement of benefits because of limited compliance by operators was

2    counterbalanced by the potential for understatement of costs elsewhere in the Revision Rule.

3         Fifth, Plaintiffs argue that BLM's alleged finding that the "monetized costs of the [2016

4    Rule] outweigh the monetized benefits" was flawed because BLM failed to monetize health

5    impacts.  CG Mot. 24.  As an initial matter, BLM is not legally required by the APA, MLA, or

6    any other statute or regulation to "monetize" benefits, including those that involve public health

7    and safety.  *See* 58 Fed. Reg. 51,735 § 1(a) ("Costs and benefits shall be understood to include

8    both quantifiable measures . . . and qualitative measures of costs and benefits that are difficult to

9    quantify . . . .").  The agency's past practice makes this point plain: BLM did not monetize health

10   effects in the 2016 Rule.  CG Mot. 25.[22]

11        Additionally, foregone public health benefits—including foregone reductions in VOC

12   emissions—are not relevant to BLM's consideration, consistent with its statutory authority, of

13   whether compliance costs outweigh the value of the gas to be conserved.  AR 1.  Nevertheless,

14   while BLM did not monetize public health benefits of foregone VOC emissions reductions,[23]  it

15   did quantify the foregone emissions reductions and explicitly recognized that that "VOC and

16   hazardous air pollutants pose negative impacts on climate, health, and human welfare."  AR 82.

17   BLM further concluded that any health impacts from foregone emissions will be minimized

18   because "the emissions resulting from this rulemaking will be dispersed across BLM-managed

19   oil and gas operations nationwide."  AR 221.  Nor was the Revision Rule the only or last

20   opportunity for BLM to consider health impacts: the agency will examine site-specific public

22   [22] Plaintiffs did not object in 2016 when BLM did not monetize the health benefits of the 2016
23   Rule.  Plaintiffs now argue that such a challenge was unnecessary because it would not have
     affected the outcome.  CG Mot. 25 n.14.  But the scope of the required analysis does not change
24   based on the outcome of that analysis.  And, here, monetizing health and other safety benefits
     would also not affect the outcome because health and safety is not part of the agency's analysis
25   of "waste" under the MLA.

26   [23] As the authority Plaintiffs cite recognizes, NEPA does not even require a cost-benefit analysis,
     much less that it be monetized.  *High Country Conservation Advocates v. U.S. Forest Serv.*, 52
27   F. Supp. 3d 1174, 1191 (D. Colo. 2014) (finding that "NEPA does not require a cost-benefit
28   analysis" but noting "it was nonetheless arbitrary and capricious to quantify the *benefits* of the
     lease modifications and then explain that a similar analysis of the *costs* was impossible . . . .").

1    health impacts in connection with resource management plans and when permitting oil and gas

2    development.  *Id.*

3           In sum, BLM's cost-benefit analysis for the Revision Rule is well-supported and provides

4    a reasonable basis for the agency's conclusions as required by the APA.

5    **VI.    BLM Complied With NEPA.**

6           NEPA serves the dual purpose of informing agency decisionmakers of the environmental

7    effects of proposed major federal actions and ensuring that relevant information is made

8    available to the public.  42 U.S.C. § 4321; 40 C.F.R. § 1501.1; *Robertson v. Methow Valley*

9    *Citizens Council*, 490 U.S. 332, 349 (1989).  The statute achieves its objectives by imposing

10   procedural rather than substantive requirements.  *Kern v. BLM*, 284 F.3d 1062, 1071 (9th Cir.

11   2002) ("NEPA merely prohibits uninformed—rather than unwise—agency action." (quoting

12   *Robertson*, 490 U.S. at 351)).  Thus, NEPA does not require an agency to follow the most

13   environmentally sound course of action, but rather to take a "hard look" at the environmental

14   consequences of proposed actions.  *Robertson*, 490 U.S. at 350; *Kleppe v. Sierra Club*, 427 U.S.

15   390, 410 n.21 (1976).

16          An agency must prepare an environmental impact statement ("EIS") for "major Federal

17   actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  "As

18   a preliminary step, the agency may prepare an Environmental Assessment ("EA") to determine

19   whether the environmental impact of the proposed action is significant enough to warrant an

20   EIS."  *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 639 (9th Cir. 2004); *see also* 40

21   C.F.R. § 1501.4(b)-(c).  If the proposed action's impacts are not significant, the agency issues a

22   Finding of No Significant Impact ("FONSI").  *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir.

23   2000); *see also* 40 C.F.R. § 1501.4(e).  An EA is "a concise public document" that serves to

24   "[b]riefly provide sufficient evidence and analysis for determining whether to prepare" an EIS or

25   a FONSI.  40 C.F.R. § 1508.9(a).  An EA should include "brief discussions of the need for the

26   proposal, of [reasonable] alternatives as required by [NEPA], and of the environmental impacts

27   of the proposed action and alternatives."  *Id.* § 1508.9(b).  A court "examine[s] the EA with two

28   purposes in mind: to determine whether it has adequately considered and elaborated the possible

1    consequences of the proposed agency action when concluding that it will have no significant

2    impact on the environment, and whether its determination that no EIS is required is a reasonable

3    conclusion." *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d

4    1172, 1215 (9th Cir. 2008).

5         **A.      BLM Took a Hard Look at Air and Health Impacts and Impacts to Tribes.**

6            Plaintiffs allege that BLM did not take a "hard look" at impacts on health and on tribal

7    communities.  This argument is belied by the comprehensive discussion of health impacts and

8    impacts to low income and minority communities contained in the 2016 Rule EA and

9    incorporated by reference in the Revision Rule EA, and the Revision Rule EA's own analysis of

10   emissions and air quality impacts.  *See Border Power Plant Working Grp. v. Dep't of Energy*,

11   260 F. Supp. 2d 997, 1020 n.15 (S.D. Cal. 2003) ("[A]n analysis of air quality impacts is . . .

12   simultaneously an analysis of the public health impacts of impaired air quality" since "[a]ir

13   quality is regulated primarily because poor air quality has been linked to health impacts.").

14          Rather than repeat information already contained in prior documents, the Revision Rule

15   EA properly incorporated by reference large portions of the EA for the 2016 Rule, which it

16   attached as an appendix.  AR 306-07; *see* 40 C.F.R. § 1502.21 (encouraging incorporation by

17   reference).  This included extensive discussion on the nature of air quality impacts, including

18   specific types of emissions that result from oil and gas development such as ozone, particulate

19   matter, and hazardous air pollutants.  AR 1262-65, 1282-86.  In that discussion, BLM

20   acknowledged that "[t]hese air pollutants affect the public health and welfare of humans," AR

21   1262, and described particular health impacts such as ozone's potential to "inflame and damage

22   the airways," *id.*, particulate matter's link to "premature mortality for adults and infants," AR

23   1365, and hazardous air pollutants' suspected connection to "cancer" among other health

24   problems," AR 1264.  In the Revision Rule EA, BLM quantified the forgone emissions

25   reductions that would have resulted from the 2016 Rule, and noted that the forgone methane

26   emissions represented only 0.61% of total U.S. methane emissions in 2015.  AR 314-16.  BLM

27   acknowledged that these pollutants "affect the health and welfare of humans," as detailed in the

28   EA for the 2016 Rule, AR 316, but concluded that the effect of these emissions on public health

1   would not be significant because "these emissions would be geographically dispersed and would,

2   for the most part, occur in sparsely populated areas."  AR 336; *see also* AR 1251 (map in EA for

3   2016 Rule EA showing that most federally administered oil and gas development occurs in

4   sparsely populated areas); AR 219-23 (response to comments on air and health).

5          As for impacts to tribes, BLM discussed Executive Order 12898 and its direction to

6   address disproportionate impacts to minority and low-income populations in the 2016 Rule EA

7   incorporated by reference into the Revision Rule EA.  AR 1268, 1293, 1306.  As directed, in the

8   Revision Rule EA, the agency considered the impact of the Revision Rule on minority and low-

9   income populations, including Native Americans, and determined that the rule "is not expected

10  to have a significant impact" on those populations because, while the Revision Rule eliminates

11  certain emissions reductions, it also eliminates the adverse impacts that would have been

12  associated with the 2016 Rule including "increased truck traffic, increased localized flaring, and

13  the buildout of capture infrastructure."  AR 318; *see also* AR 237.  BLM also noted that it could

14  further evaluate impacts to minority and low-income populations "on a project-specific basis by

15  the local BLM field office, which is better positioned to understand local communities."  AR

16  318.

17         Plaintiffs allege that BLM should have considered localized impacts, but that argument

18  ignores the national context of this rulemaking.  NEPA requires an agency to analyze

19  significance within the "setting of the proposed action."  40 C.F.R. § 1508.27(a).  "There is

20  nothing in the statute or CEQ Regulations that requires an agency to include a site-specific

21  analysis for every particular area affected by the proposed action."  *Wyoming v. U.S. Dep't of*

22  *Agric.*, 661 F.3d 1209, 1255 (10th Cir. 2011); *see also Beverly Hills Unified Sch. Dist. v. Fed.*

23  *Transit Admin.*, No. CV 12-9861-GW(SSX), 2016 WL 4650428, at *59-60 (C.D. Cal. Feb. 1,

24  2016) (rejecting argument that agency must consider localized, as opposed to regional, emissions

25  impacts because the court may not impose its "bright-line rules . . . regarding the particular

26  means that it must take in every case to show . . . that it has met [NEPA's] requirements"

27  (quoting *Lands Council*, 537 F.3d at 993-94)).  For a "'broad' nationwide rule," the agency does

28  not need to conduct a site-specific analysis for every location potentially affected by the rule.

1   *Id.*; *see also California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) ("The detail that NEPA

2   requires in an EIS depends upon the nature and scope of the proposed action.").  Because the

3   Revision Rule is a national rulemaking that sets broad national standards, BLM reasonably

4   analyzed its impacts at a national level.  *See* AR 177 ("The EA attempted to address impacts

5   from a nationwide perspective, which is appropriate for the development of a nationwide rule.").

6   As BLM explained, the agency will conduct further NEPA analysis at later stages of oil and gas

7   development, including regional planning, leasing, and permitting of individual wells, and can

8   tailor the requirements at those stages to address specific regional and local concerns, such as

9   local air quality.  AR 298-300, 318, 335.

10          Plaintiffs' assertion that BLM may not defer analysis to a later stage misleadingly

11   suggests that BLM has ignored certain impacts.  But BLM has not postponed its analysis of the

12   foreseeable impacts of the Revision Rule; it has quantified and discussed all of those impacts on

13   a national scale.[24]  What BLM has properly deferred is the discussion of those *same impacts* on

14   regional and local scales, which it will do at later stages when developing regional and local

15   NEPA analyses.  "[B]ecause determining the appropriate level of environmental analysis 'is

16   fairly debatable,' courts have recognized an 'obligation [] to defer to the expertise of the

17   agency.'"  *Ctr. for Food Safety v. Salazar*, 898 F. Supp. 2d 130, 149 (D.D.C. 2012) (quoting *Pac.*

18   *Rivers Council v. U.S. Forest Serv.*, 689 F.3d 1012, 1030 (9th Cir. 2012)); *see also Defs. of*

19   *Wildlife v. Hall*, 807 F. Supp. 2d 972, 987-88 (D. Mont. 2011) (upholding EA's higher level

20   analysis of impacts with understanding that agency would analyze localized impacts at later

21   stage); *Wildearth Guardians v. Zinke*, 368 F. Supp. 3d 41, 66-67 (D.D.C. 2019) (no requirement

22   to analyze site-specific oil and gas impacts at leasing stage of NEPA analysis).  And as BLM

23   explained here, because "it is impossible to predict precisely where and how fast oil and gas

24   development may progress," BLM cannot accurately analyze local impacts at the nationwide

25   rulemaking stage.  AR 176-77.

26   _____

27   [24] Notably, BLM took this same approach in the EA for the 2016 Rule.  *See* AR 1879-87.
     Plaintiffs in this case intervened on the side of Defendants to defend the 2016 Rule, indicating
28   they are satisfied with BLM's approach to NEPA so long as the end result comports with their
     policy preference.

Defs.' Cross Mot. for Summ. J. & Resp. to Pls.' Mots. for Summ. J.
*California v. Zinke*, No. 4:18-cv-05712-YGR                                                52

Plaintiffs' cited cases are inapposite.  In *Kern v. BLM*, the agency failed entirely to analyze the impacts of a particular fungus, arguing that it could defer that analysis to the site-specific stage.  284 F.3d 1062, 1072 (9th Cir. 2002).  And in *California ex rel. Lockyer v. USDA*, 459 F. Supp. 2d 874, 881, 894 (N.D. Cal. 2006), the agency failed to conduct any NEPA analysis whatsoever for a new rulemaking because it claimed the rule was subject to a categorical exclusion.  Here, BLM did not forgo NEPA analysis entirely or fail to even consider certain air or health impacts.  Instead, it analyzed those impacts on a national scale, which is the proper scale for a nationwide rulemaking.  Likewise, Plaintiffs' cited cases regarding tribal impacts involved site-specific actions that affect a single tribe.  *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 140 (D.D.C. 2017); *Sierra Club v. FERC*, 867 F.3d 1357, 1369 (D.C. Cir. 2017).[25]  For a nationwide rulemaking, BLM cannot consider the "distinct cultural practices" of every affected community.  *Standing Rock*, 255 F. Supp. 3d at 140.

### B.    BLM Took a Hard Look at Climate Impacts.

Plaintiffs contend that BLM's reliance on the domestic SCM metric violated NEPA's requirement that BLM use "[a]ccurate scientific information" because it is inconsistent with "peer-reviewed science and expert recommendations" and NEPA mandates that BLM utilize tools such as the global SCM or carbon budgeting.  CG Mot. 33 (citing 40 C.F.R. § 1500.1(b)).  But while Plaintiffs characterize their attack as a scientific one, it is fundamentally a dispute about a policy choice.  There is significant overlap between the science and economics underlying the 2016 and 2018 RIAs, the former of which Plaintiffs did not challenge (and have actively defended in the Wyoming litigation over the 2016 Rule).  Both RIAs rely on the same integrated assessment models and, as Plaintiffs note, upon "the inputs and modeling developed

---

[25] Plaintiffs also cite *Anderson v. Evans*, 371 F.3d 475, 489-92 (9th Cir. 2004), but the cited analysis went to whether the local effects of a whale hunt were "controversial and uncertain" and therefore significant for purposes of NEPA, not to whether the agency took a "hard look" at those impacts.  As discussed below, the impacts of oil and gas development are not controversial or uncertain.  *See infra* Section VI.D; *Wildearth Guardians*, 368 F. Supp. at 82-82 (D.D.C. 2019) (rejecting application of *Anderson* in case challenging oil and gas development on federal lands because "oil and gas leasing is commonplace in the mountain west," and uncertainties "concerning quantity of GHG emissions . . . do not establish uncertainty as to the effect of GHG emissions.").

1    by the now-disbanded Interagency Working Group."  AR 130.  As the 2018 RIA noted, "the

2    limitations and uncertainties associated with the global SC-CH$_4$ estimates, which were discussed

3    in detail in the 2016 RIA, likewise apply to the domestic SC-CH$_4$ estimates presented in this

4    analysis."  *Id.*   Where the analyses diverge is a matter of policy:  whether the SCM should

5    incorporate global effects as well as domestic ones.  AR 41.  Plaintiffs argue that only a global

6    estimate is "peer-reviewed" and considers the full "context."  CG Mot. 33-34.  But BLM made

7    the policy choice to follow the OMB Circular A-4's guidance to assess domestic impacts

8    separately in its SCM calculation.  *See supra* Section V.B.  This decision is entitled to deference.

9    *See EarthReports, Inc. v. FERC*, 828 F.3d 949, 956 (D.C. Cir. 2016) (deferring to the agency's

10   decision to not utilize the social cost of carbon given, among other reasons, the methodology's

11   "significant variation in output").[26]  And consistent with 40 C.F.R. § 1508.27, BLM did analyze

12   "context" in the EA.  AR 306-07 (incorporating by reference the 2016 EA).

13          To the extent Plaintiffs complain about BLM's choice of methodology, neither NEPA,

14   CEQ's regulations, nor CEQ guidance require the use of a global social cost of carbon or carbon

15   budgeting, tools that Plaintiffs would have BLM use.  *See W. Org. of Res. Councils v. U.S.*

16   *Bureau of Land Mgmt.*, No. CV 16-21-GF-BMM, 2018 WL 1475470, at *14 (D. Mont. Mar. 26,

17   2018) ("Plaintiffs identify no case, and the Court has discovered none, that supports the assertion

18   that NEPA requires the agency to use a global carbon budget analysis.").  As the authority that

19   Plaintiffs cite recognizes, "[w]hile an agency must apply a sufficient level of rigor to its NEPA

20

21   ────────────────────

22   [26] The cases Plaintiffs rely upon do not mandate a different result as they involve project-level
     NEPA deficiencies where the agencies did not offer a comprehensive national analysis as BLM
23   did here.  For example, in *Mont. Envtl. Info. Ctr. v. U.S. Office of Surface Mining*, Civ. No. 15-
     106, 2017 WL 3480262, at *9 (D. Mont. Aug. 14, 2017), the Court held that the Office of
24   Surface Mining was required under NEPA to assess the indirect and cumulative impacts of coal
     transportation and combustion when approving a mining plan—a project-specific agency action.
25   Contrary to Plaintiffs' suggestion, the court did not hold that the agency must consider the
     "world as a whole" in its NEPA analysis.  Rather, the court held that "in the case of a site-
26   specific action, significance would usually depend upon the effects in the locale rather than in the
     world as a whole," *id.*, but the agency's error was in concluding that it could not conduct an
27   analysis beyond a certain region.  *See also High Country Conservation Advocates*, 52 F. Supp.
     3d at 1191 (challenging three mining projects and finding that it was arbitrary for BLM to forgo
28   using the social cost of carbon when the agency's EIS touted the regulation's costs savings).

1   analyses, it is within 'the expertise and discretion of the agency' to determine the methodologies

2   underlying those analyses." *WildEarth Guardians*, 368 F. Supp. 3d at 79 (citing *Sierra Club v.*

3   *U.S. Dep't of Transp.*, 753 F.2d 120, 128 (D.C. Cir. 1985)). Thus, BLM did not act arbitrarily

4   and capriciously in not utilizing the global SCM or carbon budgeting.

5       In short, BLM retains ample discretion not to utilize Plaintiffs' proposed methodologies

6   and its articulated policy reasons for adopting the domestic SCM did not run afoul of NEPA's

7   "rule of reason." *Id.*

8       **C.    BLM Took a Hard Look at Cumulative Impacts.**

9       In claiming that the Revision Rule EA fails to consider the cumulative impacts, Plaintiffs

10  once again ignore that the Revision Rule EA properly incorporates by reference the EA for the

11  2016 Rule.  The Revision Rule EA explains that the cumulative impacts of the Revision Rule

12  "are similar" to the impacts of the no-action alternative analyzed in the 2016 EA.  AR 321.  The

13  2016 EA extensively analyzed the cumulative impacts of keeping NTL-4A in place, which is

14  comparable to the Revision Rule.  AR 1268-69, 1306-09.

15      In particular, Plaintiffs argue that BLM should have considered the cumulative impacts of

16  EPA's proposed revision of its regulations and all federal oil and gas development.  As to EPA's

17  proposed revision, the proposal was published over two weeks *after* BLM issued the final

18  Revision Rule.  83 Fed. Reg. 52,056 (Oct. 15, 2018).  Plaintiffs claim the discrepancy in dates

19  does not matter because EPA informally made its proposed rule available two weeks before

20  BLM issued the Revision Rule.  But a proposed agency action is not officially proposed until

21  published in the Federal Register.  44 U.S.C. § 1507; *see also Pub. Citizen Inc. v. Mineta*, 343

22  F.3d 1159, 1161 (9th Cir. 2003) ("We hold that an order has not been 'issued' until it has been

23  filed with the Office of the Federal Register and thus made available for public inspection.").

24  Indeed, any copy of a document made available by an agency in advance of publication in the

25  Federal Register is not yet official and is subject to change.  *See* 5 U.S.C. § 553(b) (APA notice

26  and comment period for proposed rule based off of Federal Register publication).  Plaintiffs'

27  expectation that BLM consider an unofficial version of a proposed EPA regulation made

28  available just weeks before publication of the final Revision Rule is unreasonable.

Defs.' Cross Mot. for Summ. J. & Resp. to Pls.' Mots. for Summ. J.
*California v. Zinke*, No. 4:18-cv-05712-YGR                                           55

1    Moreover, Plaintiffs overstate the impact of EPA's proposed revision.  First, the revision

2    addresses only one of the two EPA regulations addressing emissions from oil and gas sources, 40

3    C.F.R. part 60, subpart OOOOa.  *See* 83 Fed. Reg. at 52,056.  The EPA's new source

4    performance standards for "hydraulically fractured gas well completion operations, storage

5    vessels emitting more than 6 tons per year of uncontrolled VOC, continuous-bleed pneumatic

6    controllers, and other sources" located at 40 C.F.R. part 60, subpart OOOO, AR 60, are

7    unaffected by the proposal.  Second, EPA's proposed rule does not propose rescinding the

8    regulations.  It proposes amendments to address specific technical issues.  83 Fed. Reg. at

9    52,057-59 (proposing changes to monitoring frequency for fugitive emissions, definition of

10   technical infeasibility, certification requirements for professional engineers, location of separator

11   during flowback, among other things).  Because the proposed rule keeps much of the original

12   regulation intact and proposes only narrow technical amendments, there is no reason for BLM to

13   believe that it will, if adopted, lead to significantly different cumulative impacts than those

14   already analyzed.

15   Plaintiffs also argue that BLM should have considered the cumulative impact of the

16   Revision Rule combined with its nationwide oil and gas program.  BLM did just that.  The

17   Revision Rule applies to all oil and gas development on federal land.  Thus, BLM's

18   quantification of emissions and its analysis of climate change impacts—and all other types of

19   impacts—necessarily includes emissions from all oil and gas development on federal and Indian

20   lands.  *See* AR 314-16.

21   **D.    BLM Reasonably Determined that No EIS Was Required.**

22   "Not every project necessitates an EIS."  *Ocean Advocates v. U.S. Army Corps of Eng'rs*,

23   402 F.3d 846, 864 (9th Cir. 2005).  "If an agency . . . opts not to prepare an EIS, it must put forth

24   a 'convincing statement of reasons' that explain why the project will impact the environment no

25   more than insignificantly."  *Id.* (citation omitted); *see also* 40 C.F.R. § 1501.4.  "[A]n EIS must

26   be prepared if 'substantial questions are raised as to whether a project . . . may cause significant

27   degradation of some human environmental factor.'"  *Ocean Advocates*, 402 F.3d at 846 (quoting

28   *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998)).  NEPA's implementing

1   regulations instruct the agency to consider a project's "context" and "intensity" in determining

2   significance, and list ten factors to be considered in evaluating a project's intensity.  *Id.*; 40

3   C.F.R. § 1508.27.  Here, as required by NEPA, BLM explained in the EA and accompanying

4   FONSI why it determined that the Revision Rule would not have a significant impact on the

5   environment.  *See* AR 295-339.

6          Plaintiffs identify four factors from the ten contained in 40 C.F.R. § 1508.27 that they

7   contend support a finding of significance based on the "intensity" prong.  But they ignore the

8   context prong.  As explained above, the context prong supports BLM's nationwide level of

9   analysis for a national rule.  Plaintiffs' attempts to undermine that analysis with references to

10  local impacts is contrary to NEPA's caveat that significance "varies with the setting of the

11  proposed action."  40 C.F.R. § 1508.27(a).

12         Plaintiffs' allegations regarding the intensity factors are also incorrect.  First, they allege

13  the Revision Rule "poses significant risks to public health."  CG Mot. 38; 40 C.F.R.

14  § 1508.27(b)(2).  As discussed above, BLM considered the Revision Rule's impacts to health

15  and found them insignificant.  AR 314-16.  The total methane emissions resulting from the

16  Revision Rule are only 0.61% of total U.S. methane emissions, AR 315, and all emissions would

17  be "geographically dispersed" and occur in "sparsely populated areas."  AR 336.  This is

18  supported by a map showing that the vast majority of BLM-managed oil and gas development is

19  spread among many remote locations in the west.  AR 1251.  In contrast, Plaintiffs' contention

20  that health impacts would be significant because they are "localized" is unsupported.  Plaintiffs

21  are assuming the effects of a small increase in nationwide emissions spread throughout the west

22  will have significant local effects, but they have not cited anything in the record to support that

23  contention.[27]  The conclusion of the expert agency that these minimal increases will not have

24

25  _____

26  [27] Plaintiffs cite a declaration identifying 6,182 wells in NAAQS nonattainment areas spread throughout the country that will add an alleged 2,089 tons of VOCs per year due to the

27  suspension of the 2016 Rule.  CG Mot. 25 (citing AR 22634).  This comes to 0.34 tons per well per year.  To put that number into perspective, EPA regulations (and the 2016 Rule itself) do not

28  require operators to upgrade storage vessels unless those vessels emit at least 6 tons of VOCs per year.  AR 913, 987.

1    significant effects is entitled to deference.  *Alaska Ctr. For Env't v. U.S. Forest Serv.*, 189 F.3d

2    851, 859 (9th Cir. 1999) (An agency's "factual determination on whether the impacts are

3    significant or not . . . implicates substantial agency expertise and is entitled to deference.").

4            Second, Plaintiffs argue that EPA's proposal to revise its own regulations makes the

5    Revision Rule "cumulatively significant."  40 C.F.R. § 1508.27(b)(7).  As already noted, BLM

6    had no duty to consider the EPA proposal since it was issued after the Revision Rule.  *Supra*

7    Section VI.C; *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1071 (9th Cir. 2002)

8    ("[W]e defer to an agency's determination of the scope of its cumulative effects review."). Even

9    putting that aside, Plaintiffs cite no evidence in the record suggesting that EPA's proposal would

10   have a significant impact when combined with the Revision Rule.  It is premature to reach that

11   conclusion as EPA has not yet issued a final rule.  In any event, as explained above, the proposed

12   rule proposes only specific narrow amendments to the EPA regulation that will not lead to

13   cumulatively significant impacts.  *Supra* Section VI.C.

14           Third, Plaintiffs contend that the "debate over the extent" of the Revision Rule's climate

15   impacts and its use of the interim domestic SCM render the rule "highly controversial."  CG

16   Mot. 39 (citing 40 C.F.R. § 1508.27(b)).  "'Controversy' sufficient to require preparation of an

17   EIS occurs 'when substantial questions are raised as to whether a project . . . may cause

18   significant degradation of some human environmental factor, or there is a substantial dispute

19   [about] the size, nature, or effect of the major Federal action." *Pub. Citizen v. Dep't of Transp.*,

20   316 F.3d 1002, 1027 (9th Cir. 2003), *rev'd on other grounds*, 541 U.S. 752 (2004).  Here, there

21   is no controversy or debate regarding emissions quantities or the effect of emissions on the

22   environment; the debate is over how BLM monetized those quantities.  Plaintiffs' disagreement

23   with the expert agency's choice of methodology does not render the Revision Rule "highly

24   controversial."  *Wildearth Guardians*, 368 F. Supp. 3d at 81-82 (rejecting argument that BLM's

25   failure to use "Plaintiffs' suggested climate change protocols rendered lease sales' effects highly

26   controversial); *see also* AR 336-37 (explaining that the Revision Rule EA "closely followed the

27   2016 EA in describing the affected environment and the anticipated environmental effects of

28   reversing the 2016 rule . . . .").

1    Fourth, Plaintiffs argue that "uncertainty" regarding the Revision Rule's effects militates

2  in favor of an EIS. CG Mot. 39-40; 40 C.F.R. § 1508.27(b)(5). But as BLM explained, for

3  decades "[p]rior to the issuance of the 2016 rule, the BLM regulated venting and flaring from oil

4  and gas development on Federal and tribal lands under a regulatory regime similar to the

5  Proposed Action." AR 337. Thus, the environmental effects of the Revision Rule are far from

6  "uncertain." *Id.* Plaintiffs' disagreement with BLM's methodology for monetizing emissions

7  generated by the Revision Rule does not render the effects of the rule "uncertain" for purposes of

8  NEPA. *WildEarth Guardians*, 368 F. Supp. 3d at 83 (rejecting argument that oil and gas lease

9  sales involved "highly uncertain risks" necessitating an EIS because of uncertainties surrounding

10  climate science and "the usefulness and accuracy of tools by which GHG emissions and their

11  precise environmental impacts may be measured"); *see also Border Power Plant Working

12  Group*, 260 F. Supp. 2d at 1021 (holding challenge to methodology used to estimate emissions

13  impacts is not the type of "uncertainty" that justifies preparation of an EIS).

14    In short, BLM reasonably determined that the Revision Rule would not significantly

15  affect the environment and that an EIS was not required under NEPA.

16  **VII.    Any Remedy Should Be Narrowly Tailored to the Harms Alleged.**

17    It is well-settled that, where injunctive relief is warranted, the order must be narrowly

18  tailored to "remedy only the specific harms shown by the plaintiffs, rather than 'to enjoin all

19  possible breaches of the law.'" *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004)

20  (*per curiam*) (citation omitted); *Zepeda v. Immigration & Naturalization Serv.*, 753 F.2d 719,

21  728 n.1 (9th Cir. 1983) (Injunctive relief "should be narrowly tailored to remedy the specific

22  harms shown by plaintiffs, rather than to enjoin all possible breaches of the law." (internal

23  citations and quotations omitted)); *see also L.A. Haven Hospice v. Sebelius*, 638 F.3d 644, 664-

24  65 (9th Cir. 2011) (vacating nationwide injunction against enforcement of regulation after

25  concluding regulation was facially invalid and remanding matter to district court for entry of

26  injunction "that is no broader . . . than necessary to provide complete relief" to plaintiff).

27    Plaintiffs seek an order from this Court vacating the Revision Rule in its entirety and an

28  order reinstating the 2016 Rule. CG Mot. 40; St. Mot. 36. This is improper. Vacatur is an

1    equitable remedy and equity demands a finer balance of the injuries and interests of the parties

2    than the broad brush remedy Plaintiffs demand.  *See Weinberger v. Romero-Barcelo,* 456 U.S.

3    305, 312 (1982) (district court must "balance[] the conveniences of the parties and possible

4    injuries to them according[ly] as they may be affected by the granting or withholding of the

5    injunction").  First, Plaintiffs do not challenge (and may not win on a challenge to) every aspect

6    of the Rule, and each provision of the Rule is severable.  AR 8.  Second, vacatur and

7    reinstatement of the 2016 Rule are unlikely to lead to immediate compliance.  As discussed

8    *supra*, operators are not poised to comply with the 2016 Rule in the near term.  *Supra* Section

9    V.C.  And, given the pending challenge to the 2016 Rule in Wyoming, reinstatement of the 2016

10   Rule will most likely immediately lead to a new or revived challenge to the 2016 Rule in that

11   forum.  In circumstances such as these, the proper course is remand to "allow [BLM] the first

12   opportunity" to address the violation.  *Safe Air for Everyone v. EPA,* 488 F.3d 1088, 1101 (9th

13   Cir. 2007); *see also United States v. Afshari,* 426 F.3d 1150, 1156 (9th Cir. 2005) ("[R]emand

14   without vacatur has long been supported by . . . precedent."); *Sugar Cane Growers Coop. of Fla.*

15   *v. Veneman,* 289 F.3d 89, 98 (D.C. Cir. 2002) ("Appellants insist that we have no discretion in

16   the matter; [an APA violation] must be vacated.  But that is simply not the law."); *Nat'l Ass'n of*

17   *Home Builders v. Defs. of Wildlife,* 551 U.S. 644, 657 (2007) ("[I]f the [agency]'s action was

18   arbitrary and capricious, . . . the proper course would have been to remand to the Agency for

19   clarification of its reasons.").  If the Court is considering vacatur, it should stay any such order to

20   permit BLM to implement an interim remedy under its own authority.  *See Geo-Energy*

21   *Partners-1983 Ltd. v. Salazar,* 613 F.3d 946, 959 (9th Cir. 2010) (protecting an agency's interest

22   in "applying its expertise, correcting its own errors, [and] making a proper record" in the first

23   instance).

24                                          **<u>CONCLUSION</u>**

25          Because BLM complied with the MLA, FLPMA, APA, and NEPA in promulgating the

26   Revision Rule, it is entitled to judgment as a matter of law.

27

28

Respectfully submitted this 12th day of August, 2019.

LAWRENCE VANDYKE
Deputy Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice

*/s/ Clare Boronow*
MARISSA PIROPATO (MA 651630)
P.O. Box 7611
Washington, DC  20044-7611
Tel.: (202) 305-0470/Fax: (202) 305-0506
marissa.piropato@usdoj.gov
CLARE M. BORONOW, admitted to MD Bar
999 18th Street
South Terrace, Suite 370
Denver, CO 80202
Tel.: (303) 844-1362 / Fax: (303) 844-1350
clare.boronow@usdoj.gov

*Counsel for Defendants*