1  DOWNEY BRAND LLP
   CHRISTIAN L. MARSH (Bar No. 209442)
2  DONALD E. SOBELMAN (Bar No. 184028)
   455 Market Street, Suite 1500
3  San Francisco, CA 94105
   Telephone: (415) 848-4800
4  Facsimile: (415) 848-4801
   cmarsh@downeybrand.com
5  dsobelman@downeybrand.com

6  WYOMING ATTORNEY GENERAL'S OFFICE
   ERIK E. PETERSEN (WSB No. 7-5608) (*appearing pro hac vice*)
7  Senior Assistant Attorney General
   2320 Capitol Avenue
8  Cheyenne, WY  82002
   Telephone: (307) 777-7895
9  Facsimile: (307) 777-3542
   erik.petersen@wyo.gov

10
   *Counsel for Intervenor-Defendant State of Wyoming*
11

12          **IN THE UNITED STATES DISTRICT COURT**

13        **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

14

15 | STATE OF CALIFORNIA, by and through       | Case No. 4:18-cv-05712-YGR
   | XAVIER BECERRA, Attorney General, and
16 | the CALIFORNIA AIR RESOURCES             | (Consolidated with No. 4:18-cv-05984-
   | BOARD; and STATE OF NEW MEXICO, by       | YGR)
17 | and through HECTOR BALDERAS, Attorney
   | General,                                 | **INTERVENOR-DEFENDANT STATE**
18 |                                          | **OF WYOMING'S NOTICE OF**
   |                Plaintiffs,               | **MOTION AND CROSS MOTION FOR**
19 |                                          | **SUMMARY JUDGMENT AND**
   |         v.                               | **RESPONSE TO MOTIONS FOR**
20 |                                          | **SUMMARY JUDGMENT;**
   | RYAN ZINKE, Secretary of the Interior,   | **MEMORANDUM OF POINTS AND**
21 | JOSEPH R. BALASH, Assistant Secretary for| **AUTHORITIES; [PROPOSED]**
   | Land and Minerals Management, United States| **ORDER**
22 | Department of the Interior; UNITED STATES
   | BUREAU OF LAND MANAGEMENT; and
23 | UNITED STATES DEPARTMENT OF THE          | Date:      January 14, 2020
   | INTERIOR,                                | Time:      10:00 a.m.
24 |                                          | Judge:     Yvonne Gonzalez Rogers
   |                Defendants.
25 |                                          | Courtroom 1, 4th Floor
   |                                          | 1301 Clay Street, Oakland, CA 94612
26

27

28

DOWNEY BRAND LLP

1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ iii

NOTICE OF CROSS-MOTION FOR SUMMARY JUDGMENT ............................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................. 1

INTRODUCTION ....................................................................................................................... 1

BACKGROUND ......................................................................................................................... 2

I.      The Bureau's statutory authority over mineral leasing and the public lands .......... 2

II.     The states' and the EPA's authority to regulate air emissions from oil and
        gas operations ......................................................................................................... 5

III.    Overview of the 2016 Rule ...................................................................................... 9

IV.     The Legal Challenge to the Venting and Flaring Rule ........................................ 13

V.      The Revision Rule .................................................................................................. 15

ARGUMENT ............................................................................................................................. 16

I.      Standard of Review ................................................................................................ 16

II.     The Bureau provided a reasonable explanation for the Revision Rule ................ 16

        A.      The Bureau exceeded its statutory authority when it promulgated
                the Venting and Flaring Rule (Issue A) ................................................... 16

        B.      No statute required the Bureau to consider the global "Social Cost
                of Methane" in its cost-benefit analysis (Issue C) .................................. 19

                1.      The Bureau could not, and should not, have considered the
                        ancillary, greenhouse gas benefits of the Venting and
                        Flaring Rule when conducting its cost-benefit analysis .............. 20

                2.      The Bureau's consideration of the domestic "Social Cost of
                        Methane" does not undermine the Revision Rule ........................ 24

III.    The Bureau complied with the National Environmental Policy Act prior to
        issuing the Revision Rule (Issue D) ..................................................................... 24

IV.     Remedy (Issue E) .................................................................................................. 25

DOWNEY BRAND LLP

STATE OF WYOMING'S CROSS MOTION FOR SUMMARY JUDGMENT & RESPONSE TO MOTIONS FOR SUMMARY JUDGMENT
Case No. 4:18-cv-05712-YGR (Consolidated With Case No. 4:18-cv-05984-YGR)

i

1

CONCLUSION .................................................................................................................. 25

2

3

4

5

6

7

8

9

10

11

12

DOWNEY BRAND LLP

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2

**Cases**

3

*Ctr. for Auto Safety v. Peck,*
  751 F.2d 1336 (D.C. Cir. 1985)............................................................................................ 20

4

5

*Espinosa v. Roswell Tower, Inc.,*
  32 F.3d 491 (10th Cir. 1994).................................................................................................. 5

6

7

*Fed. Mar. Comm'n. v. Seatrain Lines, Inc.,*
  411 U.S. 726 (1973)............................................................................................................. 17

8

*Geosearch, Inc. v. Andrus,*
  508 F. Supp. 839 (D. Wyo. 1981)....................................................................................... 18

9

*La. Pub. Serv. Comm'n v. FCC,*
  476 U.S. 355 (1986)............................................................................................................. 23

10

11

*Massachusetts v. EPA,*
  549 U.S. 497 (2007)............................................................................................................... 5

12

*Michigan v. EPA,*
  --- U.S. ---, 135 S. Ct. 2699 (2015)........................................................................ 21, 22, 24

13

14

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.,*
  463 U.S. 29 (1983)............................................................................................................... 21

15

*Mountain States Legal Found. v. Andrus,*
  499 F. Supp. 383 (D. Wyo. 1980)....................................................................................... 19

16

17

*Nat. Res. Def. Council, Inc. v. Berklund,*
  609 F.2d 553 (D.C. Cir. 1979)............................................................................................... 2

18

*Norton v. S. Utah Wilderness All.,*
  542 U.S. 55 (2004)................................................................................................................. 4

19

20

*Sierra Club v. Costle,*
  657 F.2d 298 (D.C. Cir. 1981)............................................................................................... 7

21

*Train v. Nat. Res. Def. Council,*
  421 U.S. 60 (1975)................................................................................................................. 5

22

23

*United Steelworkers of Am. v. Or. Steel Mills,*
  322 F.3d 1222 (10th Cir. 2003) ............................................................................................ 6

24

*Utah Physicians for a Healthy Env't v. Kennecott Utah Copper,*
  191 F. Supp. 3d 1287 (D. Utah 2016).................................................................................. 6

25

26

*Util. Air Regulatory Grp. v. EPA,*
  --- U.S. ---, 134 S. Ct. 2427 (2014)...................................................................................... 19

27

28

DOWNEY BRAND LLP

DOWNEY BRAND LLP

*White Stallion Energy Ctr., LLC v. EPA*,
748 F.3d 1222 (D.C. Cir. 2014)..................................................................... 21

*Wyoming v. U.S. Dep't of the Interior*,
No. 2:16-CV-0285-SWS, 2017 U.S. Dist. LEXIS 5736
(D. Wyo. Jan. 16, 2017) ................................................ 3, 9, 10, 12, 14, 15, 16, 17, 18, 20, 23

*Wyoming v. U.S. Dep't of the Interior*,
No. 2:16-CV-0285-SWS (D. Wyo. Aug. 23, 2019) ........................................... 25

**Statutes**

30 U.S.C. §§ 181-287 .................................................................................. 2

30 U.S.C. § 187 ................................................................................... 3, 22

30 U.S.C. § 189 ................................................................................... 3, 17

30 U.S.C. § 223 .......................................................................................... 2

30 U.S.C. § 225 ................................................................................... 3, 22

30 U.S.C. § 226 .......................................................................................... 2

30 U.S.C. § 226-3 ..................................................................................... 2

30 U.S.C. § 1751 ................................................................................. 3, 17

30 U.S.C. §1756 ........................................................................................ 3

42 U.S.C. § 7401 ................................................................................. 5, 18

42 U.S.C. § 7408 ...................................................................................... 5

42 U.S.C. § 7410 ...................................................................................... 5

42 U.S.C. § 7411 ................................................................................... 6, 7

42 U.S.C. § 7412 ................................................................................. , 21

42 U.S.C. § 7413 ...................................................................................... 5

42 U.S.C. § 7479 ...................................................................................... 6

42 U.S.C. § 7602 ...................................................................................... 5

42 U.S.C. § 7604 ................................................................................... 5, 6

43 U.S.C. §§ 1701 to 1784........................................................................ 3

43 U.S.C. § 1701 ...................................................................................... 4

43 U.S.C. § 1702 ................................................................................. 4, 18

43 U.S.C. § 1711 ...................................................................................... 4

43 U.S.C. § 1712 ............................................................................................................ 4, 18

43 U.S.C. § 1732 ................................................................................................................. 4

43 U.S.C. § 1733 ................................................................................................................. 4

43 U.S.C. § 1740 ......................................................................................................... 4, 17

Wyo. Stat. Ann. § 35-11-801 ............................................................................................ 7

**Rules**

*Rules Wyo. Dep't of Envtl. Quality, Air Quality*, ch. 5, § 2 ........................................... 8

*Rules Wyo. Dep't of Envtl. Quality, Air Quality*, ch. 6, § 2 ....................................... 6, 7

**Regulations**

40 C.F.R. § 52.2620 ........................................................................................................... 6

40 C.F.R. § 60 .................................................................................................................... 8

40 C.F.R. §§ 60.5360 to 60.5432 ...................................................................................... 8

40 C.F.R. § 60.5390 .......................................................................................................... 12

40 C.F.R. § 60.5393 .......................................................................................................... 12

40 C.F.R. § 60.5395 .......................................................................................................... 12

43 C.F.R. § 2920.7 ............................................................................................................. 4

43 C.F.R. § 3160.0-5 ......................................................................................................... 3

43 C.F.R. § 3162.3-1 ........................................................................................................ 11

43 C.F.R. §§ 3179.6 to 3179.9 (2016) ............................................................................. 11

43 C.F.R. § 3179.7 (2016) ............................................................................................... 11

43 C.F.R. §§ 3179.101 to 3179.104 (2016) ..................................................................... 11

43 C.F.R. § 3179.105 (2016) ........................................................................................... 11

43 C.F.R. §§ 3179.201 to 3179.203 (2016) ..................................................................... 12

43 C.F.R. § 3179.204 (2016) ............................................................................................. 7

43 C.F.R. §§ 3179.301 to 3179.305 (2016) ..................................................................... 12

43 C.F.R. § 3217.11 .......................................................................................................... 10

DOWNEY BRAND LLP

1

DOWNEY BRAND LLP

**Other Authorities**

Priority List and Additions to the List of Categories of Stationary Sources, 44 Fed. Reg. 49222 (Aug. 21, 1979) .......................................................................................................... 8

New Source Performance Standards and National Emission Standards for Hazardous Air Pollutants Reviews, 77 Fed. Reg. 49490 (Aug. 16, 2012) ........................................................ 8

Emission Standards for New, Reconstructed, and Modified Sources, 81 Fed. Reg. 35824 (June 3, 2016) ........................................................................................................................ 8

Request for Information, Emerging Technologies, 81 Fed. Reg. 46670 (July 18, 2016) .............. 9

Waste Prevention, Production Subject to Royalties, and Resource Conservation, 81 Fed. Reg. 83008 (Nov. 18, 2016) ................................................................................. 7, 9, 10, 11, 12

Notice Regarding Withdrawal of Obligation to Submit Information, 82 Fed. Reg. 12817 (Mar. 7, 2017) ........................................................................................................................ 9

Waste Prevention, Production Subject to Royalties, and Resource Conservation; Rescission or Revision of Certain Requirements, 83 Fed. Reg. 49184 (Sept. 28, 2018) ........................................................................................................................ 1, 15, 16

George Cameron Coggins, *The Developing Law of Land Use Planning on the Federal Lands*, 61 U. Colo. L. Rev. 307 (1990) .................................................................................. 3, 4

Letter from David G. Hawkins, EPA Assistant Administrator for Air, Noise, and Radiation, to Regional Administrators, I-X (January 4, 1979) ........................................................ 6

Letter from EPA Region 8, Air Program Director, to Wyoming Air Quality Division Administrator, *Regarding Automatic Delegation of Clean Air Act (CAA) Section 111 Requirements* (February 27, 2014) .................................................................................... 8

Jana B. Milford, *Out in Front? State and Federal Regulation of Air Pollution Emissions from Oil and Gas Production Activities in the Western United States,* 55 Nat. Resources J. 1 (Fall 2014) ................................................................................................ 8

*Oil and Gas Production Facilities*, Ch. 6, §2 Permitting Guidance (last revised August 2018) ........................................................................................................................ 7

## NOTICE OF CROSS-MOTION FOR SUMMARY JUDGMENT

Please take notice that, on January 14, 2020, at 10:00 a.m. before the Honorable Judge Yvonne Gonzalez Rogers, the State of Wyoming will move this Court to enter summary judgment on behalf of the State. This motion is supported by Rule 56 of the Federal Rules of Civil Procedure and the attached Memorandum of Points and Authorities. As set forth in the Memorandum, Wyoming is entitled to summary judgment because the Bureau of Land Management complied with applicable law when it promulgated the following regulation: Waste Prevention, Production Subject to Royalties, and Resource Conservation; Rescission or Revision of Certain Requirements, 83 Fed. Reg. 49184 (Sept. 28, 2018) (hereinafter, the Revision Rule).

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

In the last year of the prior administration, the EPA issued regulations that govern methane emissions from new (or essentially new) sources. The EPA, however, declined to issue similar regulations to govern existing sources of methane emissions, despite the fact that such regulation fits squarely within its statutory mandate. For reasons that are unclear, the Bureau took it upon itself to promulgate regulations to govern existing sources of methane emissions, despite the fact that Congress empowered the Bureau of Land Management to address land management issues rather than air quality issues. The Bureau's purported goal in promulgating these regulations was to minimize the waste of methane extracted from public lands, but a cursory review of these regulations and the associated cost-benefit analysis shows that the Bureau's true aim was to reduce greenhouse gas emissions that can contribute to climate change. Indeed, the Obama Administration's own cost-benefit analysis showed that the costs of the rule far exceeded its benefits with regard to the waste of methane. It was only when the agency "cooked the books"

DOWNEY BRAND LLP

DOWNEY BRAND LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

by monetizing the alleged benefits related to global greenhouse gas emissions, an area in which the Bureau has **no** expertise, that the rule appeared to make fiscal sense.

The State of Wyoming challenged the Bureau's 2016 rule in the United States District Court for the District of Wyoming, arguing that the Bureau exceeded its statutory authority when it promulgated the 2016 rule. Before the district court could rule on the merits, the Bureau issued the Revision Rule, which revised and rescinded portions of the Bureau's 2016 rule. The agency took these steps because it determined that: (1) the Bureau lacked the statutory authority to promulgate the rule in the first place; and (2) the Bureau's 2016 cost-benefit analysis was flawed. Here, the State of California and various non-governmental organizations (the Advocacy Groups) take the all-too-familiar "kitchen sink" approach and allege that the Bureau violated a host of statutes by promulgating the Revision Rule. But, as discussed by the federal Defendants and below, the fact that the Bureau blatantly exceeded its statutory authority and improperly manipulated its cost-benefit analysis cannot be denied. Accordingly, this Court should grant summary judgment to the Defendants and uphold the Bureau's Revision Rule.

## BACKGROUND

### I.     The Bureau's statutory authority over mineral leasing and the public lands

The Bureau's authority over mineral leasing and the public lands flows from three different statutes. First, the Mineral Leasing Act, 30 U.S.C. §§ 181-287, creates "a program to lease mineral deposits for private mining and marketing while preserving federal ownership of lands." *Nat. Res. Def. Council, Inc. v. Berklund*, 609 F.2d 553, 555 (D.C. Cir. 1979) (per curiam). It establishes terms for leasing oil and gas minerals on public land, 30 U.S.C. § 226(d), (e), and prohibits leasing of wilderness land, *id.* § 226-3. It authorizes the Secretary of Interior to: lease all other public land for oil and gas development, *id.* § 223, 226(a); regulate surface-disturbing activities, *id.* § 226(g); and establish cooperative development plans to conserve oil and gas

resources, *id.* § 226(m). The Mineral Leasing Act requires lessees to "use all reasonable precautions to prevent waste of oil or gas developed in the land."[1] 30 U.S.C. § 225. Moreover, "Each lease shall contain provisions for the purpose of insuring the exercise of reasonable diligence, skill and care in the operation of said property" and "a provision that such rules ... for the prevention of undue waste as may be prescribed by said Secretary shall be observed." 30 U.S.C. § 187. To meet these objectives, Congress granted the Secretary the power to "prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of this [Act]." 30 U.S.C. § 189.

Second, "the Federal Oil and Gas Royalty Management Act of 1982 (FOGRMA), 30 U.S.C. 1751, creates a thorough system for collecting and accounting for federal mineral royalties." *Wyoming v. U.S. Dep't of the Interior*, No. 2:16-CV-0285-SWS, 2017 U.S. Dist. LEXIS 5736, at *23 (D. Wyo. Jan. 16, 2017). In addition to requiring the payment of royalties on minerals that make their way to market, the Act provides that, "[a]ny lessee is liable for royalty payments on oil or gas lost or wasted from a lease site when such loss or waste is due to negligence on the part of the operator of the lease, or due to the failure to comply with any rule or regulation, order or citation issued under this Act or any mineral leasing law." 30 U.S.C. § 1756. Again, Congress authorized the Secretary to "prescribe such rules and regulations as he deems reasonably necessary to carry out this Act**.**" 30 U.S.C. § 1751.

Finally, the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. §§ 1701-84, governs the Bureau's management of the public lands. At its core, "FLPMA is a planning statute." George Cameron Coggins, *The Developing Law of Land Use Planning on the Federal Lands*, 61 U. Colo. L. Rev. 307, 325 (1990). FLPMA charges the Bureau with managing

---

[1] "Waste of oil or gas means any act or failure to act by the operator that is not sanctioned by the authorized officer as necessary for proper development and production and which results in: (1) A reduction in the quantity or quality of oil and gas ultimately producible from a reservoir under prudent and proper operations; or (2) avoidable surface loss of oil or gas." 43 C.F.R. § 3160.0-5.

DOWNEY BRAND LLP

public land for multiple uses and sustained yield of natural resources through routine planning and inventorying of land and uses. 43 U.S.C. §§ 1702(c), (h), 1711-12. The "main thrust" of FLPMA is to ensure that management actions conform to management plans. Coggins, 61 U. Colo. L. Rev. at 324.

Congress declared thirteen policies in FLPMA governing the management of the public lands, which expand upon the "deceptively simple" multiple use mandate. 43 U.S.C. § 1701(a); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 58 (2004). Those policies direct the Bureau to manage "the public lands ... in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber," as well as the protection of "scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values[.]" 43 U.S.C. §§ 1701(a)(8), (12), 1702(c). In pursuit of this general purpose, Congress authorized the Bureau to "prevent unnecessary or undue degradation of the lands" and to promulgate regulations "to carry out the purposes of this Act." 43 U.S.C. §§ 1732(b), 1733(a), 1740.

FLPMA further provides that in the development and revision of land use plans, the Secretary shall "provide for compliance with applicable pollution control laws, including State and Federal air, water, noise, or other pollution standards or implementation plans." 43 U.S.C. § 1712(c)(8). Similarly, the Bureau's regulations provide that land use authorizations shall contain terms and conditions which shall "[r]equire compliance with air and water quality standards established pursuant to applicable Federal or State law[.]" 43 C.F.R. § 2920.7(b)(3).

None of these statutes authorize the Bureau to regulate the emission of greenhouse gases. Nor is the prevention or mitigation of global climate change one of the purposes of any of these acts. The only mention of air quality standards in these Acts comes in FLPMA, where Congress directed the Bureau to comply with applicable pollution control laws enforced by other state and federal agencies, such as the EPA and Wyoming's Department of Environmental Quality.

DOWNEY BRAND LLP

DOWNEY BRAND LLP

1

2

## II.   The states' and the EPA's authority to regulate air emissions from oil and gas operations

When it passed the Clean Air Act, Congress designated the EPA as the agency responsible for regulating air emissions that contribute to climate change. *See Massachusetts v. EPA*, 549 U.S. 497, 528 (2007). In contrast to the Bureau's authority, Congress expressly delegated authority to the states and the EPA to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and productive capacity of its population." 42 U.S.C. § 7401(b)(l). Among other things, the EPA is responsible for setting health-based ambient air quality standards for six criteria pollutants, including ozone and nitrogen oxides. 42 U.S.C. § 7408.

After EPA sets the ambient air quality standards, each state is required to develop a state implementation plan, which is a collection of laws, regulations, and other enforceable mechanisms to control emissions of specific pollutants from in-state sources. 42 U.S.C. § 7410; *Train v. Nat. Res. Def. Council,* 421 U.S. 60, 79 (1975). The EPA must approve each state implementation plan if it contains certain minimum requirements, which effectively converts the contents of the state implementation plan into federal law, enforceable by the state, the EPA, a private citizen, or even by another federal agency. *Espinosa v. Roswell Tower, Inc.,* 32 F.3d 491, 492 (10th Cir. 1994) ("The state implementation plan has the force and effect of federal law[.]"); 42 U.S.C. § 7413(b)(1) (explaining the process by which the EPA may enforce violations of a state implementation plan); 42 U.S.C. § 7604 (explaining the process by which any "person" may enforce violations of a state implementation plan); and 42 U.S.C. § 7602 (defining "person" to include, among other things, states and federal agencies). Wyoming and other states affected by the Revision Rule have federally-approved state implementation plans that include oil and gas

permitting programs. *E.g., Rules Wyo. Dep't of Envtl. Quality, Air Quality*, ch. 6, § 2; 40 C.F.R. § 52.2620, subpart ZZ.[2]

Congress thus established a process by which the EPA sets certain air pollution standards, each state uses localized knowledge to develop appropriate control regimes for industry within its borders, and the EPA strengthens those air pollution control regimes by making them federally enforceable by a large group of diverse state, federal, and private actors. *See, e.g., Utah Physicians for a Healthy Env't v. Kennecott Utah Copper,* 191 F. Supp. 3d 1287, 1292 (D. Utah 2016).

In addition to serving in this cooperative leadership role to safeguard national ambient air quality, the EPA also develops standards of performance for specified categories of air pollution sources that the agency determines should be regulated to protect public health. 42 U.S.C. § 7411(b)(1)(A). Similar to state implementation plans, citizens and other interested parties also may bring citizen suits to enforce repeated or ongoing violations of new source performance standards. 42 U.S.C. § 7604; *United Steelworkers of Am. v. Or. Steel Mills,* 322 F.3d 1222, 1227 (10th Cir. 2003). The Clean Air Act defines "standards of performance" as "standard[s] for emissions of air pollutants which reflect[] the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction and any nonair quality health and environmental impact and energy

---

[2] Under Wyoming's federally enforceable permitting program, owners and operators must use the best available control technology (BACT) at all minor sources. BACT is an individualized approach to permitting that enables air pollution control agencies to make specific control determinations based on a dollar per ton basis, taking "into account energy, environmental, and economic impacts and other costs associated with application of alternative control systems." Letter from David G. Hawkins, EPA Assistant Administrator for Air, Noise, and Radiation, to Regional Administrators, I-X (January 4, 1979), available at https://www.epa.gov/sites/production/files/2015-07/documents/bactupsd.pdf (last visited Aug. 2, 2019); *see also* 42 U.S.C. § 7479(3) and *Rules Wyo. Dep't of Envtl. Quality, Air Quality*, ch. 6, § 2(c)(v).

DOWNEY BRAND LLP

DOWNEY BRAND LLP

1    requirements) the Administrator determines has been adequately demonstrated." 42 U.S.C. §

2    7411(a)(1).

3        To determine whether a system of emission reduction has been adequately demonstrated,

4    the EPA looks to controls required by states to establish a national floor for controls. *Sierra Club*

5    *v. Costle,* 657 F.2d 298, 331 (D.C. Cir. 1981). For example, Wyoming has issued, and frequently

6    updates, an interpretive policy that describes presumptive best available control technology for

7    minor oil and gas production facilities. Wyo. Stat. Ann. § 35-11-801(e); *Oil and Gas Production*

8    *Facilities*, Chapter 6, Section 2 Permitting Guidance (last revised August 2018).[3] The EPA relied

9    on this non-binding interpretive guidance, and the knowledge of the permit writers who created it,

10   when drafting new source performance standards for oil and gas production facilities. Indeed,

11   requirements in the Bureau's 2016 rule also derived from Wyoming's guidance. *Compare, e.g.,*

12   Waste Prevention, Production Subject to Royalties, and Resource Conservation, 81 Fed. Reg.

13   83008, 83086-87 (Nov. 18, 2016) (detailing 43 C.F.R. § 3179.204 (2016)), *with Rules Wyo. Dep't*

14   *of Envtl. Quality, Air Quality*, ch. 6, § 2 (both sections require analogous best management

15   practices and recordkeeping for downhole well maintenance and liquids unloading).

16       The EPA has clear authority to regulate air emissions from oil and gas production. The

17   Clean Air Act establishes a three-step process whereby the EPA first lists a source category, then

18   develops new source performance standards for the listed source category, and finally develops a

19   procedure for states to follow in developing plans to control emissions from existing sources. 42

20   U.S.C. §§ 7411(b)(1)(A), (B), and (d)(1). Even before the EPA begins the third step, states may

21   request concurrent enforcement authority over the new source performance standards.

22   *Id.* at § 7411(c).

---

[3]    Available    at    http://deq.wyoming.gov/media/attachments/Air%20Quality/Rule%20
Development/Proposed%20Rules%20and%20Regulations/2018_Oil%20and%20Gas%20Guidance.pdf

Although Congress gave the EPA the power to do so decades earlier, the EPA did not undertake step one of the process to regulate emissions from oil and gas production facilities until 2012,[4] basing its standards largely on the work of regulators in Wyoming and Colorado. *New Source Performance Standards and National Emission Standards for Hazardous Air Pollutants Reviews*, 77 Fed. Reg. 49490 (Aug. 16, 2012); *see also* Jana B. Milford, *Out in Front? State and Federal Regulation of Air Pollution Emissions from Oil and Gas Production Activities in the Western United States.* 55 Nat. Resources J. 1 (Fall 2014) ("The [EPA] did not adopt emission standards for most oil and gas production activities until 2012, when it relied on Colorado and Wyoming as proving grounds for control technology."). As part of President Obama's "Climate Action Plan: Strategy to Reduce Methane Emissions," the EPA updated those standards to control methane emissions from new (or essentially new) sources, in addition to controlling emissions of volatile organic compounds and sulfur dioxide. *See Emission Standards for New, Reconstructed, and Modified Sources*, 81 Fed. Reg. 35824 (June 3, 2016) (codified at 40 C.F.R. §§ 60.5360a through 60.5432a, referred to as "Quad Oa" for its location in the Code of Federal Regulations). In response, Wyoming adopted Quad Oa into the Wyoming Air Quality Rules, and EPA then delegated to Wyoming concurrent enforcement authority over those standards. *Rules Wyo. Dep't of Envtl. Quality, Air Quality*, ch. 5, § 2; *see also* Letter from EPA Region 8, Air Program Director, to Wyoming Air Quality Division Administrator, *Regarding Automatic Delegation of Clean Air Act (CAA) Section 111 Requirements* (February 27, 2014) (on file with the Division).

EPA began the third step of the statutory process by seeking information about "monitoring, detection of fugitive emissions, and alternative approaches in the oil and natural gas

---

[4] The EPA first listed crude oil and natural gas production in 1979, but the initial new source performance standards, issued in 1985, applied to midstream sources such as gas plants and compressor stations, not to individual well sites. *Priority List and Additions to the List of Categories of Stationary Sources*, 44 Fed. Reg. 49222 (Aug. 21, 1979); 40 C.F.R. § 60, subparts KKK and LLL.

DOWNEY BRAND LLP

sector." *Request for Information, Emerging Technologies*, 81 Fed. Reg. 46670 (July 18, 2016). The EPA intended this request to be a predicate to the issuance of a regulation limiting air pollutants, including methane, from existing sources in the oil and natural gas extraction industry. *Id.* at 46671 ("This additional information may be key in addressing emissions from existing oil and natural gas sources under section 111(d) of the Clean Air Act."). In 2017, however, the EPA withdrew that request to assess the need for the requested information and to avoid undue burden to industry. *Notice Regarding Withdrawal of Obligation to Submit Information*, 82 Fed. Reg. 12817 (Mar. 7, 2017) ("The withdrawal is occurring because EPA would like to assess the need for the information that the agency was collecting through these requests, and reduce burdens on businesses while the Agency assesses such need.").

In sum, there are state and federal regulations in place governing air emissions, including the emission of greenhouse gases, from **new** sources in the oil and natural gas sector, but the EPA has so far chosen not to promulgate regulations governing these emissions from **existing** sources, despite having the statutory authority to do so.

### III.   Overview of the 2016 Rule

The Bureau promulgated its so-called Waste Prevention rule on November 18, 2016. 81 Fed. Reg. 83008 (Nov. 18, 2016). The Bureau claimed that the rule was necessary because several oversight reviews raised concerns about waste gas from federal and Indian oil and gas production, and because there are "economical, cost-effective, and reasonable measures that operators can take to minimize gas waste." *Id.* at 83009.

A variety of chemical compounds are released to the atmosphere during oil and gas production, through both controlled and uncontrolled processes. Leaking or malfunctioning equipment results in uncontrolled emissions. Emissions also occur when operators proactively vent or flare gas that would otherwise remain inside piping, equipment, and tanks. *Wyoming*,

DOWNEY BRAND LLP

DOWNEY BRAND LLP

2017 U.S. Dist. LEXIS 5736, at *7-8. Operators may release emissions to relieve excessive pressure buildup for safety reasons. *Id.* at 8. Operators may also vent or flare otherwise saleable gas in the absence of infrastructure to transport the gas to market. *Id.*

Emissions that occur through leaking and venting are transformed into different emissions when flared. For waste minimization and resource conservation purposes, no difference exists between eliminating excess methane by burning it or leaking it – the same amount is wasted in either event. But there **is** a difference for air quality purposes. For air quality control agencies, the choice between venting or flaring is an opportunity to choose between different general sets of pollutants, based on comparative local and regional air quality concerns. Flaring methane changes it from a potent greenhouse gas with global impacts into nitrogen oxides, which can trigger localized ozone formation. Thus, a regulatory preference for flaring over venting prioritizes global climate change over regional ozone control without changing the amount of natural gas that is wasted.

The Bureau purportedly designed its 2016 rule to: (1) reduce the waste of methane from oil and natural gas production activities on federal and Indian land; and (2) regulate air quality by controlling emissions from existing sources. 81 Fed. Reg. at 83009 ("Flaring, venting, and leaks waste a valuable resource [and] the wasted gas may harm local communities and surrounding areas [] and [contribute to] regional and global air pollution problems of [] climate change."). The rule applied to all existing oil and gas production facilities that either produce federal oil and gas or are combined for accounting purposes with facilities that do. (WPRR_AR_000940). Thus, under the 2016 rule, a well that produces state minerals that is combined with at least one federal well for royalty accounting purposes needed to comply with the entirety of the rule. *See* 43 C.F.R. § 3217.11 (explaining the royalty accounting purposes for communitization agreements).

The 2016 rule modified the Bureau's regulations for the three stages of oil and gas production – pre-drilling, drilling, and production. At the pre-drilling stage, the rule required operators to submit waste minimization plans along with applications for permits to drill. 43 C.F.R. § 3162.3-1. The rule generally banned venting and limits flaring during drilling, well-completion and related operations, and initial production testing. 81 Fed. Reg. at 83084 (detailing 43 C.F.R. § 3179.101 through 3179.104 (2016)). However, the rule authorized royalty-free flaring and venting for a 24-hour period during specified "emergency conditions." *Id.* (detailing 43 C.F.R. § 3179.105 (2016)).

During both drilling and production stages, the 2016 rule banned venting, limited flaring, and established new recordkeeping and reporting requirements. *Id.* at 83082-83 (detailing 43 C.F.R. §§ 3179.6 through 3179.9 (2016)). The proposed rule described the flaring limit as a well-specific numeric limit, but the final rule described the flaring limit as a "capture requirement," which is still a numeric limit calculated on a well-specific basis. *Id.* (detailing 43 C.F.R. § 3179.7 (2016)). Operators could comply with the limit by averaging results across multiple wells. *Id.* This preference for flaring over venting, which has nothing to do with waste prevention and everything to do with greenhouse gas emissions, was the *sine qua non* of the Bureau's 2016 rule and the origin of its well-known nickname – the Venting and Flaring Rule.

In the proposed rule, the Bureau explained that flaring is preferable to venting because leaked methane contributes to global climate change, while burned methane does not. (*See, e.g.*, WPRR_AR_001003). But the Bureau did not explain why the preference for flaring over venting matters for waste prevention. *See, e.g., id.* In the final rule, the Bureau attempted to assert that the addition of an averaging scheme, derived from North Dakota's state regulations, transforms the preference for flaring into a "waste prevention" mechanism. (WPRR_AR_000924)). But the same amount of methane is wasted if it is burned or vented, no matter how rates are averaged.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DOWNEY BRAND LLP

The Venting and Flaring Rule imposed a host of equipment-specific requirements applicable to all oil and gas wells, including existing wells. 81 Fed. Reg. at 83085-86 (detailing 43 C.F.R. §§ 3179.201 through 3179.203 (2016)). These requirements applied to pneumatic controllers, pneumatic diaphragm pumps, and storage tanks. *Id.* Each section required operators to either replace older models of the specified equipment, flare, or otherwise eliminate associated emissions, whether by capture, reinjection, or productive use on-site. *Id.* Notably, the requirements for these types of equipment referenced the EPA's new source performance standards. *See* 40 C.F.R. § 60.5390 (older requirements for pneumatic controllers), 40 C.F.R. § 60.5395 (older requirements for storage vessels), 40 C.F.R. § 60.5390a (newer requirements for pneumatic controllers), 40 C.F.R. § 60.5393a (newer requirements for pneumatic pumps), and 40 C.F.R. § 60.5395a (newer requirements for storage vessels).

The Venting and Flaring Rule also established leak detection and repair requirements for all well-sites. Similar to the equipment-specific requirements, this section referenced the EPA's new source performance standards and clarified that the requirements contained in those regulations are also applicable to well sites that are not subject to the EPA's new source performance standards but would be subject to existing source performance standards, if promulgated. 81 Fed. Reg. at 83087-89 (detailing 43 C.F.R. §§ 3179.301 through 3179.305 (2016)).

Thus, a significant portion of the Venting and Flaring Rule directly regulated the emission of greenhouse gases. The Bureau intentionally cross-referenced both new source performance standards developed by the EPA and EPA's then-nascent existing source regulatory process to avoid redundancy with EPA requirements. (*See, e.g.,* WPRR_AR_001003 and WPRR_AR_001011)). In other words, the Bureau "hijacked the EPA's authority under the guise of waste management." *Wyoming,* 2017 U.S. Dist. LEXIS 5736, at *29.

1   The Bureau admitted that climate change was a significant driver of the Venting and

2   Flaring Rule because methane, in addition to being a saleable federal mineral, is also a potent

3   greenhouse gas. (*See, e.g.,* WPRR_AR_000910). According to the Bureau, greenhouse gas

4   emissions "have negative climate, health, and welfare impacts" that "imposes costs to society that

5   are not reflected in the market price of the gas." (WPRR_AR_001070). It referred to "[t]hese

6   uncompensated costs to society" as "negative externalities." *Id.* The agency then concluded that,

7   "[s]everal market inefficiencies occur when society, rather than the producer, bears the costs of

8   pollution damage." (*Id.*). But the Bureau has no statutory mandate to cure "market inefficiencies."

9   The Bureau also performed a cost-benefit analysis of the Venting and Flaring Rule.

10  (WPRR_AR_001063-001229). It acknowledged that the rule would "require operators to incur

11  costs to reduce flaring, replace outdated equipment, [] and administer these programs."

12  (WPRR_AR_001071). The Bureau estimated that the rule would impose costs of about $114- 279

13  million per year or $110-275 million per year depending on the discount rate. *Id.* It then

14  considered the benefits of the rule which included "the cost savings the industry will receive from

15  the recovery and sale of natural gas, and the environmental benefits of reducing the amount of

16  greenhouse gases [] and other air pollutants released into the atmosphere." (WPRR_AR_001072).

17  The Bureau found that the cost saving to industry from the recovery of additional natural gas

18  would be $20-157 million per year. *Id.* But it valued the environmental benefits of the rule using a

19  global social cost of methane analysis at $189-247 million per year. *Id.*

20  Thus, the 2016 rule only resulted in a net benefit if the ancillary benefits to global climate

21  change were considered a relevant variable in the cost-benefit analysis. Without these ancillary

22  benefits the costs of the rule would likely have more than doubled the benefits every year.

DOWNEY BRAND LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DOWNEY BRAND LLP

## IV.    The Legal Challenge to the Venting and Flaring Rule

Shortly after the Bureau finalized the Venting and Flaring Rule, Wyoming, other states, and several non-governmental organizations challenged the rule in the United States District Court for the District of Wyoming. The district court heard and subsequently denied motions for a preliminary injunction, and the Venting and Flaring Rule went into effect on January 18, 2017. *Wyoming*, 2017 U.S. Dist. LEXIS 5736, at *42-43. But in its opinion denying emergency relief, the district court expressed significant reservations about the Bureau's rationale for the Venting and Flaring Rule, casting doubt on the Bureau's assertion that the Venting and Flaring Rule "is foremost a waste prevention regulation that simply has incidental benefits to air quality[.]" *Id.* at *30. The district court recognized that "[t]he rub here [] is whether the Rule, or at least certain provisions of the Rule, was promulgated *for the prevention of waste* or instead for the *protection of air quality*, which is expressly within the 'substantive field' of the EPA and states pursuant to the Clean Air Act." *Id.* at *24 (emphasis in original). "The Court [did] not agree with BLM's suggestion that FLPMA grants it broad authority to promulgate its own regulations directed at air quality control[, because] [a]t its core, FLMPA is a land use planning statute." *Id.* at *25 n.7.

In particular, the district court expressed concerns about the Bureau's cost-benefit analysis underlying the Venting and Flaring Rule. *Id.* at *31-34. "Taking at face value BLM's assertion that the Rule 'aims to reduce the waste of natural gas,' the cost-benefit analysis should have been considered primarily in terms of waste prevention and not air pollution." *Id.* at *31-32. But the Bureau did not do this. "Instead, the BLM appear[ed] to be propping up the benefits of the Rule in air quality terms." *Id.* at *32.

> The BLM estimates the net benefits of the Rule outweigh its costs by "a significant margin," producing net benefits ranging from $46 million to $204 million per year depending on the discount rate used. Again, depending on the discount rate used, BLM estimates costs (largely for engineering compliance) will range from $110 million to $279 million per year. BLM estimates the Rule will result in monetized benefits of $209-$403 million per year. Of the total benefits, however, $189-$247

1
2
3

million is attributable to the environmental benefit of reducing the amount of methane released into the atmosphere, and the remainder of $20-$157 million to the costs savings that industry will receive from the recovery and sale of natural gas. Thus, the Rule only results in a "net benefit" if the "social cost of methane" is allowed to be factored into the analysis.

4
5
6
7
8

The Court questions whether the "social cost of methane" is an appropriate factor for BLM to consider in promulgating a resource conservation rule pursuant to its [Mineral Leasing Act] authority. Moreover, it appears the asserted cost benefits of the Rule are predominately based upon the emission reductions, which is outside of BLM's expertise, and not attributable to the purported waste prevention purpose of the Rule. The question then becomes whether the Rule is arbitrary and capricious because it imposes significant costs to achieve de minimis benefits.

9

*Id.* at *32-34. Significantly, the district court did not issue a definitive ruling on this issue.

10

Instead, the court noted its concerns and left it to the merits stage for further deliberation. *Id.* at

11
12

*33-34. The district court never reached the merits stage of the litigation, however, because the

13

current administration took steps to delay and eventually revise the Venting and Flaring Rule.

14

**V.    The Revision Rule**

15

On September 28, 2018, the Bureau revised and rescinded selected portions of the Venting

16

and Flaring Rule. 83 Fed. Reg. 49184 (Sept. 28, 2018). The Bureau detailed "several compelling

17

reasons for modifying the requirements" of the Venting and Flaring Rule. *Id.* at 49185. Two are

18

notable for the purposes of this brief.

19
20

First, the Bureau determined that certain aspects of the Venting and Flaring Rule

21

"exceeded the BLM's statutory authority to regulate for the prevention of 'waste' under the

22

Mineral Leasing Act[.]" *Id.* Accordingly, "[i]n its revision of the [Venting and Flaring Rule], the

23

BLM [] sought to ensure that its regulations are justified as waste-prevention measures under the

24

BLM's MLA authority and do not usurp the Clean Air Act authority of the EPA, the States, and

25

tribes." *Id.* at 49186. Second, the Bureau determined that the portions of the Venting and Flaring

26

Rule's requirements imposed compliance costs that exceeded the rule's benefits. *Id.*

27
28

DOWNEY BRAND LLP

1    The Bureau retained and improved other aspects of the Venting and Flaring Rule in order

2  to discourage excessive venting and flaring. 83 Fed. Reg. at 49184. The agency achieved this by

3  "placing volume and/or time limits on royalty-free venting and flaring during production testing,

4  emergencies, and downhole well maintenance and liquids unloading." *Id.* The Bureau also

5

6  retained provisions that "incentivize the beneficial use of gas by making gas used for operations

7  and production purposes royalty free." *Id.*

8                                              **ARGUMENT**

9    **I.    Standard of Review**

10       The State of Wyoming adopts and incorporates by reference the Standard of Review

11  provided by the federal Defendants.[5] (ECF_127 at 8-9).

12
     **II.    The Bureau provided a reasonable explanation for the Revision Rule.**
13
14       As discussed in the federal Defendants' Memorandum in Support, the Bureau complied

15  with applicable law when it promulgated the Revision Rule. *Id.* at 9-60. Below, the State of

16  Wyoming discusses two of the Bureau's most important justifications for issuing the Revision

17  Rule: (A) the Bureau's lack of statutory authority to promulgate many aspects of the Venting and

18  Flaring Rule in the first place; and (B) the flawed 2016 cost-benefit analysis. Wyoming otherwise

19
     limits itself to adopting and incorporating the federal Defendants' arguments by reference.
20
              **A.    The Bureau exceeded its statutory authority when it promulgated the Venting
21                        and Flaring Rule.**

22       The Bureau has clear statutory authority to promulgate rules to minimize the waste of

23  federal minerals, including methane, under the Mineral Leasing Act and FOGRMA. *Wyoming*,

24
     2017 U.S. Dist. LEXIS 5736, at *23. But the Bureau has **no** authority to promulgate air quality
25

26

27  [5] In order to avoid duplication and to respect the page limitations imposed on Wyoming by this
     Court, the State will adopt and incorporate by reference portions of the federal Defendants'
28  Memorandum in Support to the extent practicable.

DOWNEY BRAND LLP

DOWNEY BRAND LLP

1   regulations to minimize the emission of methane or other greenhouse gases under either of these

2   statutory regimes or FLPMA. *Id.* at \*25 n.7. The Bureau's authority to promulgate regulations

3   under each of these statutes is limited to regulations that are necessary to carry out the purposes of

4   those acts. *See* 30 U.S.C. §§ 189 and 1751; 43 U.S.C. § 1740. Minimizing greenhouse gas

5   emissions to combat global climate change is not one of the purposes of **any** of those acts. Thus,

6   although the Bureau has the authority to promulgate a waste minimization rule with venting and

7   flaring components specifically tailored to minimize methane waste, it did not have the authority

8

9   to promulgate the Venting and Flaring Rule, large portions of which were transparently designed

10  in an attempt to address aspects of climate change, not waste minimization. Accordingly, the

11  Bureau was justified in promulgating the Revision Rule.

12

13          Even a cursory review of the Venting and Flaring Rule shows that climate change

14  concerns predominate over the resource conservation components. The Bureau's true purpose in

15  promulgating the rule is evident from the insertion of what are essentially existing source

16  performance standards into the rule, with explicit reference to the EPA's requirements. Indeed,

17  the Bureau candidly admitted that one of the purposes of the rule, and its primary benefit, was the

18  regulation of greenhouse gases by controlling their emission from existing sources.

19  (WPRR_AR_000991). Similarly, the Venting and Flaring Rule's preference for flaring over

20  venting belies the predominant purpose of the rule because the same amount of waste occurs

21  either way. The Bureau tried to distinguish venting and flaring by creating a complex averaging

22

23  scheme, but the root of the preference for flaring over venting lies in air quality, not in waste

24  minimization.

25          "[A]n agency may not bootstrap itself into an area in which it has no jurisdiction." *Fed.*

26  *Mar. Comm'n v. Seatrain Lines, Inc.,* 411 U.S. 726, 745 (1973). But that is precisely what the

27  Bureau did in 2016. Thus, even though the Venting and Flaring Rule contained some waste-

28

specific components, the rule itself was so thoroughly dominated by air quality requirements that the Bureau was fully justified in rescinding the offending portions via the Revision Rule.

The Advocacy Groups disagree and point to prior statements by the Bureau regarding its statutory authority. (ECF_108; ECF_109). For example, in the Venting and Flaring Rule, the Bureau claimed that, as a land management agency, it had "the authority to regulate air quality and [greenhouse gas emissions] on and from public lands pursuant to FLPMA." (WPRR_AR_000956). But nothing in FLPMA empowers the Bureau to regulate air quality. 43 U.S.C. § 1702(c) and (h). That responsibility belongs to state air pollution control agencies and the EPA under the Clean Air Act. 42 U.S.C. § 7401(a)(3). FLPMA merely requires the Bureau to require lessees to **comply** with applicable air pollution control laws. 43 U.S.C. § 1712(c)(8). It does not allow the Bureau to create its own air pollution regulations universally applicable on all federal land. Thus, the Bureau's attempt to justify the air quality components of the Venting and Flaring Rule under its FLPMA authority was misplaced.

Similarly, the Mineral Leasing Act and the FOGRMA "create a program for leasing mineral deposits on federal land" and "a system for collecting and accounting for federal mineral royalties." *Wyoming,* 2017 U.S. Dist. LEXIS 5736, at *21, *23. "The purpose of the [Mineral Leasing Act] is to promote the orderly development of oil and gas deposits in publicly owned lands of the United States through private enterprise." *Geosearch, Inc. v. Andrus,* 508 F. Supp. 839, 842 (D. Wyo. 1981) (internal citations omitted). "The terms of the [Mineral Leasing Act] and FOGRMA make clear that Congress intended the Secretary, through the [Bureau], to exercise its rulemaking authority to prevent the waste of federal and Indian mineral resources and to ensure the proper payment of royalties to federal, state, and tribal governments." *Wyoming,* 2017 U.S. Dist. LEXIS 5736, at *23. Neither of these statutory regimes were enacted to address global

DOWNEY BRAND LLP

1    climate change or purport to authorize the Bureau to promulgate air pollution regulations. The

2    Bureau correctly recognized this when it promulgated the Revision Rule.

3        The Bureau was created to manage federal land, which includes an array of

4    responsibilities. Mineral development is unquestionably one of the more important

5    responsibilities allocated to the Bureau. "[A] review of all legislation dealing with use of public

6    lands shows the serious concern of Congress over mineral development." *Mountain States Legal*

7    *Found. v. Andrus,* 499 F. Supp. 383, 394 (D. Wyo. 1980) (internal citations omitted). "The

8    Mineral Leasing Act was intended to promote wise development of natural resources and to

9    obtain for the public reasonable financial returns on assets belonging to the public." *Id.* at 392.

10   But while the Bureau has great responsibility over federal lands, its authority is not unlimited, and

11   it does not extend to every problem the nation faces. "Even under *Chevron*'s deferential

12   framework, agencies must operate 'within the bounds of reasonable interpretation.'" *Util. Air*

13   *Regulatory Grp. v. EPA*, --- U.S. ---, 134 S. Ct. 2427, 2442 (2014) (citation omitted).

14       Congress chose the EPA and the states to occupy the field of air quality regulation, which

15   includes air emissions that may contribute to climate change. The fact that the EPA chose not to

16   act on this topic did not open the field for the Bureau. No matter how serious a problem may be,

17   the Administrative State cannot decide to act without Congressional authorization. Accordingly,

18   the Bureau acted properly when it rescinded those aspects of the Venting and Flaring Rule that

19   exceeded the Bureau's statutory authority. This Court should grant the Defendants' motions for

20   summary judgment as a result.

21       **B.    No statute required the Bureau to consider the global "Social Cost of Methane" in its cost-benefit analysis.**

22       In addition to the Bureau's lack of statutory authority to promulgate much of the Venting

23   and Flaring Rule, the Bureau also justified the Revision Rule on the grounds that the costs of the

24   Venting and Flaring Rule's provisions outweighed its benefits. (ECF_123 at 38-49). The State of

DOWNEY BRAND LLP

California and the Advocacy Groups disagree, arguing that the Bureau's cost-benefit analysis is flawed because it does not incorporate the **global** "Social Cost of Methane." (ECF_108 at 24-28; ECF_109 at 21-24). The Bureau responds by arguing that it properly limited the scope of its analysis by incorporating the **domestic** "Social Cost of Methane." (ECF_123 at 39-44). Both sides have it wrong. Because the Bureau lacks the statutory authority to regulate air emissions and climate change, the agency should not have relied upon **any** "Social Cost of Methane" tool as part of its cost-benefit analysis. As discussed below, the Bureau cannot rely upon ancillary climate change benefits to justify its waste prevention regulations. And because Congress did not authorize the Bureau to regulate greenhouse gas emissions, any benefits related to those emissions must be ancillary.

Accordingly, the "global" versus "domestic" argument is irrelevant. It is indisputable that the costs of the Venting and Flaring Rule far outweigh its waste prevention benefits when ancillary benefits are removed from the equation. That alone justifies the Revision Rule. But even if one does consider the domestic "Social Cost of Methane," as the Bureau did, the Revision Rule remains justified, as the costs of the Venting and Flaring Rule **still** exceed its benefits.

> 1. **The Bureau could not, and should not, have considered the ancillary, greenhouse gas benefits of the Venting and Flaring Rule when conducting its cost-benefit analysis.**

It is indisputable that, but for the ancillary benefits related to greenhouse gas emissions, the costs of the Venting and Flaring Rule far outweigh its benefits. *E.g., Wyoming*, 2017 U.S. Dist. LEXIS 5736, at *32-34. When a court considers the validity of an agency's cost-benefit analysis, its role is limited to determining "whether the decision was based on a consideration of the **relevant** factors and whether there has been a clear error of judgment." *Ctr. for Auto Safety v. Peck*, 751 F.2d 1336, 1342 (D.C. Cir. 1985) (emphasis added). Any ancillary benefits related to greenhouse gas emissions are **irrelevant** when the Bureau considers the costs and benefits of a

**waste prevention** rule. It necessarily follows that the Venting and Flaring Rule was unjustified, and that the Bureau acted properly when it promulgated the Revision Rule.

In *Michigan v. EPA*, the United States Supreme Court considered a challenge to regulations governing the emission of hazardous air pollutants by power plants under the Clean Air Act. --- U.S. ---, 135 S. Ct. 2699, 2711 (2015). Under the Clean Air Act, the EPA can regulate power plants only if "regulation is appropriate and necessary." 42 U.S.C. § 7412(n)(1)(A). Having estimated some $9.6 billion per year in regulatory costs, EPA nonetheless refused to consider cost in its calculus. *Michigan*, 135 S. Ct. at 2705-06. The Court invalidated EPA's rule because the EPA misinterpreted its duty to consider cost under the statute. *Id.* at 2712. But the Court left open the question of whether an agency can rely on ancillary benefits when deciding whether to adopt a regulation. *Id.* at 2711. The Court's opinion in *Michigan v. EPA* and the Venting and Flaring Rule show why the answer to this question must be **no**.

The Supreme Court first observed that "agency action is lawful only if it rests 'on a consideration of the relevant factors.'" *Id.* at 2706 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted)). The Court then turned to the statutory text, noting that "'appropriate' is 'the classic broad and all-encompassing term that naturally and traditionally includes consideration of all the relevant factors.'" *Id.* at 2707 (citing *White Stallion Energy Ctr., LLC v. EPA*, 748 F.3d 1222, 1266 (D.C. Cir. 2014) (Kavanaugh, J., concurring in part and dissenting in part)). Although the term leaves some discretion, "an agency may not 'entirely fai[l] to consider an important aspect of the problem' when deciding whether regulation is appropriate." *Michigan*, 135 S. Ct. at 2707 (citing *State Farm*, 463 U.S. at 43).

The Court concluded that cost was an important aspect of the problem. *Id.* ("One would not say that it is even rational, never mind 'appropriate,' to impose billions of dollars in economic

DOWNEY BRAND LLP

costs in return for a few dollars in health or environmental benefits."). In fact, cost-benefit analysis is a central part of the administrative process:

> Agencies have long treated cost as a centrally relevant factor when deciding whether to regulate. Consideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions. It also reflects the reality that "too much wasteful expenditure devoted to one problem may well mean considerably fewer resources available to deal effectively with other (perhaps more serious) problems." Against the backdrop of this established administrative practice, it is unreasonable to read an instruction to an administrative agency to determine whether "regulation is appropriate and necessary" as an invitation to ignore cost.

*Id.* at 2707-08 (internal citation omitted). In the end, cost must be balanced against benefit because "[n]o regulation is 'appropriate' if it does significantly more harm than good." *Id.* at 2707.

After concluding that the EPA must consider the costs of its regulation, the Court noted that some parties urged it to uphold the regulation because the rule's ancillary benefits exceeded its costs. *Id.* at 2711. Those benefits included reductions in power plant emissions of particulate matter and sulfur dioxide, substances that are not covered by the hazardous air pollutants program under which the rule was promulgated. *Id.* at 2706. The majority viewed the request with skepticism. *Id.* at 2711. However, because the EPA did not consider cost at all, the Court declined to decide whether the EPA could have considered those ancillary benefits in its cost-benefit analysis. *Id.*

Like the EPA in *Michigan*, the Bureau had to consider the costs and benefits of the Venting and Flaring Rule because it may only require lessees to "use all **reasonable** precautions to prevent waste of oil or gas developed in the land." 30 U.S.C. § 225 (emphasis added). And it may only include lease "provisions for the purpose of insuring the exercise of **reasonable** diligence, skill and care in the operation of said property." 30 U.S.C. § 187 (emphasis added). A regulation that imposes exorbitant costs on lessees in exchange for minimal benefits is

DOWNEY BRAND LLP

unreasonable, and therefore, arbitrary and capricious. *Michigan*, 135 S. Ct. at 2707 ("No regulation is 'appropriate' if it does significantly more harm than good.").

In the Venting and Flaring Rule, the Bureau conducted a cost-benefit analysis. *Wyoming*, 2017 U.S. Dist. LEXIS 5736, at \*32-34. It showed that the rule only resulted in a net benefit if ancillary benefits were considered. *Id.* But they cannot be. While the Supreme Court refrained from directly answering this question in *Michigan v. EPA*, the answer must be that ancillary benefits cannot provide the primary justification for a regulation. Otherwise, agencies could use transparent pretexts, as the Bureau did in the Venting and Flaring Rule, to regulate matters outside the scope of their respective statutory authorities. Congress authorized the Bureau to lease public lands for oil and gas development, to collect appropriate royalties, and to do so using the principles of multiple use and sustained yield. While the Bureau can consider environmental impacts **to the public lands** when it chooses to regulate, there is nothing in any of the statutes empowering the Bureau to consider or work to address **global** climate change in the process. Congress gave the Bureau authority over public lands in the United States, not the Earth.

Moreover, there are sound reasons why the Bureau's regulatory authority is limited to the purposes outlined in the Mineral Leasing Act, FOGRMA, and FLPMA. Practically, the Bureau does not have the expertise to promulgate and enforce appropriate air quality regulations, and Congress has not provided the Bureau the necessary resources to do so. More importantly, if, when, and how to address global climate change is a political question that Congress must answer. If it does so, Congress may then delegate appropriate authority to federal agencies to implement its political determination. Until it does so, however, the Bureau "literally has no power to act," and that limitation must necessarily extend to the consideration of benefits that are not related to the Bureau's specific authority. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374

(1986). Accordingly, the ancillary benefits identified by the Bureau in the Venting and Flaring Rule were irrelevant to a proper cost-benefit analysis.

Absent the ancillary benefits identified by the Bureau, the Venting and Flaring rule was arbitrary and capricious. The rule likely would have cost more than double what it saves annually. In short, the rule failed the statutory test that the Bureau's regulations must be "reasonable" because it did more harm than good. *Michigan*, 135 S. Ct. at 2707 ("No regulation is 'appropriate' if it does significantly more harm than good."). This fact is also self-evident from industry's decision not to implement these methane saving provisions itself. If the actions mandated by the rule actually resulted in more benefits than costs, industry would have a significant profit incentive to implement them. Accordingly, the Bureau acted properly when it issued the Revision Rule.

### 2. The Bureau's consideration of the domestic "Social Cost of Methane" does not undermine the Revision Rule.

The fact that the Bureau did consider ancillary benefits via the domestic "Social Cost of Methane" in the Revision Rule is of no import. The Bureau's ultimate conclusion was that the costs of the Venting and Flaring Rule outweighed the rule's benefits. (ECF_123 at 39). If the Bureau had declined to consider the ancillary benefits of the Revision Rule, the difference between the costs and benefits would only have been starker. Accordingly, this Court should uphold the Revision Rule as a result.

### III. The Bureau complied with the National Environmental Policy Act prior to issuing the Revision Rule.

The State of Wyoming adopts and incorporates by reference the federal Defendants' arguments related to the Bureau's compliance with the National Environmental Policy Act. (ECF_123 at 49-59).

DOWNEY BRAND LLP

## IV.  Remedy

For the reasons discussed above, this Court should uphold the Revision Rule. In the event that this Court rules in favor of the Advocacy Groups, this Court should refrain from vacating the Revision Rule and permit the parties to brief the issue of remedy. Simply vacating the Revision Rule makes no sense. Doing so would bring the Venting and Flaring Rule back into effect. This would force the regulated community to immediately begin to take steps to comply with that rule, even though it is manifestly clear that Wyoming and others will simply return to the District of Wyoming to obtain a merits ruling against this unlawful regulation. Indeed, that litigation is currently stayed pending just such an eventuality. *Wyoming v. U.S. Dep't of the Interior*, Case No. 16-cv-285-SWS (D. Wyo. Aug. 23, 2019) (ECF_285). Such disruption is unnecessary and unwise. For these reasons, if this Court rules in favor of the Advocacy Groups, the Court should provide the parties with the opportunity to brief the issue of remedy.

### CONCLUSION

For the reasons discussed above and in the federal Defendants' Memorandum in Support, the State of Wyoming respectfully requests that this Court uphold the Revision Rule and grant the Defendants' motions for summary judgment.

Respectfully submitted this 26 day of August, 2019.

DOWNEY BRAND LLP

*/s/ Christian L. Marsh*
CHRISTIAN L. MARSH (Bar No. 209442)
DONALD E. SOBELMAN (Bar No. 184028)
455 Market Street, Suite 1500
San Francisco, CA 94105
Telephone: (415) 848-4800
Facsimile: (415) 848-4801
cmarsh@downeybrand.com
dsobelman@downeybrand.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DOWNEY BRAND LLP

*/s/ Erik E. Petersen*
WYOMING ATTORNEY GENERAL'S OFFICE
ERIK E. PETERSEN (WSB No. 7-5608) (*pro hac vice*)
Senior Assistant Attorney General
2320 Capitol Avenue
Cheyenne, WY  82002
Telephone: (307) 777-7895
Facsimile: (307) 777-3542
erik.petersen@wyo.gov

*Counsel for the State of Wyoming*