1  Emil A. Macasinag (State Bar No. 256953)
   emacasinag@wshblaw.com
2  **WOOD, SMITH, HENNING & BERMAN LLP**
   10960 Wilshire Boulevard, 18th Floor
3  Los Angeles, California 90024-3804
   Phone: 310-481-7600 ♦ Fax: 310-481-7650
4
   [ADDITIONAL COUNSEL LISTED ON
5  FOLLOWING PAGE]

6  Attorneys for INTERVENOR-DEFENDANTS
   WESTERN ENERGY ALLIANCE and
7  INDEPENDENT PETROLEUM
   ASSOCIATION OF AMERICA

8                    **UNITED STATES DISTRICT COURT**

9       **NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

10

11  STATE OF CALIFORNIA, by and through       Case No. 4:18-cv-05712-YGR
    XAVIER BECERRA, ATTORNEY               Related: Case No. 4:18-cv-05984-YGR
12  GENERAL; and the CALIFORNIA AIR
    RESOURCES BOARD; and STATE OF          **WESTERN ENERGY ALLIANCE AND**
13  NEW MEXICO, by and through HECTOR       **INDEPENDENT PETROLEUM**
    BALDERAS, ATTORNEY GENERAL,            **ASSOCIATION OF AMERICA'S CROSS**
                                           **MOTION FOR SUMMARY JUDGMENT**
14              Plaintiffs,                **AND OPPOSITION TO PLAINTIFFS'**
                                           **MOTIONS FOR SUMMARY**
15       v.                                **JUDGMENT; MEMORANDUM OF**
                                           **POINTS AND AUTHORITIES IN**
16  DAVID BERNHARDT, Secretary of the      **SUPPORT**
    Interior; JOSEPH R. BALASH, Assistant
17  Secretary for Land and Minerals Management,
    United States Department of the Interior;   Hearing Date: January 14, 2020
18  UNITED STATES BUREAU OF LAND           Hearing Time:    10:00 a.m.
    MANAGEMENT; and UNITED STATES          Courtroom:     2, 4th Floor
19  DEPARTMENT OF THE INTERIOR,            Judge: Hon. Yvonne Gonzales-Rogers

20              Defendants.

21

22  STATE OF WYOMING, WESTERN
    ENERGY ALLIANCE, INDEPENDENT
23  PETROLEUM ASSOCIATION OF
    AMERICA, AMERICAN PETROLEUM
24  INSTITUTE,

25              Intervenor-Defendants.

26

27

28

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

Eric P. Waeckerlin – *Pro Hac Vice*
epwaeckerlin@hollandhart.com
**HOLLAND & HART LLP**
555 17th Street, Suite 3200
Denver, Colorado 80202
Tel: 303.295.8086 ♦ Fax: 303.975.5396

Kathleen Schroder – *Pro Hac Vice*
Katie.Schroder@dgslaw.com
**DAVIS GRAHAM & STUBBS LLP**
1550 17th Street, Suite 500
Denver, Colorado 80202
Tel: 303.892.9400 ♦ Fax: 303.893.1379

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................................2

FACTUAL BACKGROUND .................................................................................................3

STANDARD OF REVIEW ...................................................................................................7

ARGUMENT ....................................................................................................................9

    I.     BLM Has Provided "Good Reasons" to Reduce Impacts on Marginal Wells via the
          Revision Rule (Issue B)…………………………………………………………………9

         A.    The Administrative Record Supports BLM's Decision to Reduce the
              Excessive Regulatory Burdens Associated
              with the 2016 Rule (Issue B-1)……………………………………………10

         B.    Plaintiffs Lack Standing to Challenge BLM's Procedural Compliance with
              the Regulatory Flexibility Act (Issue B-2a)……….………………….....14

         C.    BLM's New Marginal Well Economic Analysis is Accurate and Consistent
              with the Record (Issue B-2b)……………………………………....……17

         D.    BLM's Marginal Well Analysis
              Supports the Revision Rule (Issue B-2c)…………………………………18

    II.    BLM's Cost Benefit Analysis Supports the Revision Rule (Issue C)……………19

CONCLUSION ...................................................................................................................19

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

WESTERN ENERGY ALLIANCE AND INDEPENDENT PETROLEUM ASSOCIATION OF AMERICA'S
CROSS MOTION FOR SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

**Page**

## CASES

*Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue,* 926 F.3d 1061
   (9th Cir. 2019) .......................................................................................... 8

*Desert Survivors v. U.S. Dep't of Interior,* 321 F. Supp. 3d 1011(N.D. Cal. 2018) ...................... 8

*Air Transp. Ass'n of Am. v. Civil Aeronautics Bd.,* 732 F.2d 219 (D.C. Cir. 1984).. ................... 16

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council,* 462 U.S. 87 (1983).. .......................... 18

*Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281 (1974)................8

*California ex rel. Becerra v. U.S. Dep't of the Interior,*
   381 F. Supp.3d 1153 (N.D. Cal. 2019)…………………………………………18

*California v. BLM,* No. 17-7186 (consolidated) (N.D. Cal.)…………………………10,12,15

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)…………………………………….......... …7

*Cement Kiln Recycling Coal. v. E.P.A.,* 255 F.3d 855 (D.C. Cir. 2001)…………………………14

*Cty. of San Diego v. Babbitt,* 847 F. Supp. 768 (S.D. Cal. 1994)……… ............................. ……7

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837 (1984)………………...17

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,* 450 F.3d 930 (9th Cir. 2006)………16

*Encino Motorcars, LLC v. Navarro,* 136 S. Ct. 2117 (2016)………………………..………8

*Envtl. Def. Ctr., Inc. v. U.S. E.P.A.,* 344 F.3d 832 (9th Cir. 2003)………………..…………15

*F.C.C. v. Fox Television Stations, Inc.,* 556 U.S. 502 (2009)………………..…………....8, 9

*Idaho Farm Bureau Fed'n v. Babbitt,* 58 F.3d 1392 (9th Cir. 1995)…………………..…15

*Kobach v. United States Election Assistance Comm'n,* 772 F.3d 1183 (10th Cir. 2014)… ........ …8

*Marathon Oil Co. v. Andrus,* 452 F. Supp. 548 (D. Wyo. 1978). ...................................... 4

*Michigan v. E.P.A.,* 135 S. Ct. 2699  (2015)…………………………………………17

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983)……………………………………………..…….9,17, 18

*Nat'l Ass'n of Home Builders v. Norton,* 340 F.3d 835 (9th Cir. 2003)…………………………..18

*New York v. U.S. E.P.A.,* 413 F.3d 3 (D.C. Cir. 2005)…………………………………...………14

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

*Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766 (9th Cir. 1985)………………………………..……7

*Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956 (9th Cir. 2015)……..………….....8

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am.*
  *v. U.S. Dep't of Agric.*, 415 F.3d 1078  (9th Cir. 2005)…………………………………………15

*San Luis & Delta-Mendota Water Auth. v. Jewell,* 747 F.3d 581 (9th Cir. 2014)………………..16

*U.S. Citrus Sci. Council v. U.S. Dep't of Agric.*, 312 F. Supp. 3d 884
    (E.D. Cal. 2018) ……………………………………………………………………………...14

*W. Energy Alliance v. Jewell*, (D. Wyo. Nov. 23, 2016)…………………………………………15

## STATUTES

5 U.S.C. § 553.. .................................................................................................................... 18

5 U.S.C. § 611(a)(1)............................................................................................................. 14

30 U.S.C. § 187 .................................................................................................................... 3

§ 3179.6…..   ……………………………………………………………………………...7

§ 3179.103……………………………………………………………………………………7

§ 3179.103(c)(2)…………………………………………………………………………..…7

§ 3179.105……………………………………………………………………………………7

## FEDERAL REGISTER

66 Fed. Reg. 28, 355(May 18, 2001)………………………………………………….……13

## OTHER AUTHORITIES

*Manual of Oil & Gas Terms* (16th ed. 2015)……………………………………………………..10

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

1

## <u>ANNOTATED TABLE OF CONTENTS</u>

2

**Page**

3

I.    BLM Has Provided "Good Reasons" to Reduce Impacts on Marginal Wells via the
      Revision Rule (Issue B)                                                                9

4

5

      A.    The Administrative Record Supports BLM's Decision to Reduce the Excessive
            Regulatory Burdens Associated with the 2016 Rule (Issue B-1)                     10

6

      <u>B.</u>    Plaintiffs Lack Standing to Challenge BLM's Procedural Compliance with the
            Regulatory Flexibility Act (Issue B-2a)                                          14

7

8

      C.    BLM's New Marginal Well Economic Analysis is Accurate and Consistent with
            the Record (Issue B-2b)                                                          17

9

      D.    BLM's Marginal Well Analysis Supports the Revision Rule (Issue B-2c)             18

10

II.   BLM's Cost Benefit Analysis Supports the Revision Rule (Issue C)                       19

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

WESTERN ENERGY ALLIANCE AND INDEPENDENT PETROLEUM ASSOCIATION OF AMERICA'S
CROSS MOTION FOR SUMMARY JUDGMENT

1

## NOTICE OF MOTION AND CROSS MOTION FOR SUMMARY JUDGMENT

2

Please take notice that on January 14, 2020 at 10:00 a.m. this Motion and Cross Motion for

3

Summary Judgment will be heard before the Honorable Judge Gonzalez Rogers. Defendant-

4

Intervenors Western Energy Alliance ("the Alliance") and Independent Petroleum Association of

5

America (IPAA) move for summary judgment pursuant to Federal Rule of Civil Procedure 56.

6

For the reasons outlined in the following memorandum, the Alliance and IPAA are entitled

7

to judgment as a matter of law because the Bureau of Land Management (BLM) complied with the

8

Mineral Leasing Act (MLA), Federal Land Policy and Management Act (FLPMA),

9

Administrative Procedure Act (APA), and National Environmental Policy Act (NEPA) in issuing

10

its Rule titled Waste Prevention, Production Subject to Royalties, and Resource Conservation;

11

Rescission or Revision of Certain Requirements ("Revision Rule").

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEGAL:10854-0001/12595657.1

-1-

Case No. 4:18-cv-05712

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

## **MEMORANDUM OF POINTS AND AUTHORITIES**

In 2016, the Bureau of Land Management (BLM) adopted a final rule titled Waste Prevention, Production Subject to Royalties, and Resource Conservation ("2016 Rule"). This rule imposed a host of regulatory requirements aimed at reducing air quality emissions from oil and gas wells. Not only did BLM lack the statutory authority to impose these air quality measures, BLM did not assess the impact of these costly and onerous requirements on low-production wells (known as "marginal" wells), even though nearly three-quarters of the wells affected by the rule are marginal.

BLM initiated a new rulemaking process to revise the 2016 Rule because of concerns it exceeded the agency's statutory authority and unduly and unnecessarily burdened the development of domestic energy resources, particularly marginal wells. In response to comments on the proposed Revision Rule, BLM prepared an analysis that particularly analyzed the costs of compliance of the 2016 Rule on marginal wells. After finding that compliance costs of the 2016 Rule could consume significant portions of an operator's annual revenues from a marginal well (up to 1,037 percent of annual revenue), BLM issued the Revision Rule to provide relief from the most onerous provisions of the 2016 Rule.

BLM's decision to issue the Revision Rule was reasonable and compliant with the APA, and Plaintiffs have not demonstrated otherwise. The new administrative record, including BLM's new analysis of marginal wells, and its concerns with the legality of the 2016 Rule support BLM's decision to revise the 2016 Rule. Further, BLM's analysis of marginal wells was a reasonable and logical outgrowth of public comments on the proposed Revision Rule and accurately identified potential compliance costs from the 2016 Rule. Finally, BLM was not required to consider other revisions to the 2016 Rule tailored only to marginal wells. For these reasons, this Court should uphold the Revision Rule. In the event the Court finds for Plaintiffs, we respectfully request the opportunity to provide separate briefing on the issue of the proper remedy.

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ◆ FAX 310-481-7650

# FACTUAL BACKGROUND[1]

Venting and flaring of natural gas is necessary for oil and natural gas production. As the preamble to the final Revision Rule recognizes, "it is not uncommon for gas to reach the surface that cannot be feasibly captured, used, or sold." AR2.[2] As a result, "[t]he venting or flaring of some natural gas is a practically unavoidable consequence of oil and gas development." *Id*. Some of this gas is combusted (or "flared"), typically when an oil well produces associated gas in a newly developing area or in a field that lacks adequate pipeline infrastructure. *Id*. Other gas is released directly to the atmosphere (or "vented") from various pieces of equipment used in the production process.[3] From an air emissions perspective, flaring is preferred to venting. *See* AR312 ("The reductions in [volatile organic compounds (VOCs)] and [hazardous air pollutants (HAPs)] are expected to be driven almost entirely by the venting prohibition; flaring does not release VOCs or HAPs in substantial quantities . . . ."). Both gas flaring and gas venting have decreased in recent years due to improved state and federal regulations and technological and operational advancements. *See* AR59, Table 2.7d (demonstrating a 25% decrease in total flared and vented gas from federal and Indian production between FY2015 and FY2016 despite production increases).

Since it was enacted in 1920, the MLA has recognized the reality that some natural gas is and must be emitted during oil and gas development. Although the MLA directs BLM to prevent waste of oil and gas, not all lost gas is waste. *See generally* 30 U.S.C. § 187 (requiring oil and gas leases to provide "for the prevention of undue waste"); *id*. at § 225 (requiring lessees to "use all reasonable precautions to prevent waste of oil or gas."). The Revision Rule observes "[t]he Department's implementation of the MLA has long been informed by an understanding that there is a certain amount of unavoidable loss of oil and gas that is inherent in oil and gas production,

---

[1] The parties submitted a Joint Statement Regarding Procedural History on March 1, 2019. *See* ECF No. 98.

[2] Citations to the administrative record are abbreviated "AR" and omit leading zeros.

[3] The primary sources of vented gas are pneumatic controller equipment, fugitive emission leaks from other equipment, liquids unloading, storage tanks, pneumatic pumps, engines, and well completions and workovers. *See* AR55. Some of this equipment is designed to vent gas (e.g., pneumatic controllers) and some venting may occur for safety reasons (e.g., from storage tanks).

1  and therefore, not all losses of gas may be considered 'waste' under the MLA." AR2 (citing

2  *Marathon Oil Co. v. Andrus*, 452 F. Supp. 548, 551 (D. Wyo. 1978)).

3      For 36 years, BLM executed its MLA waste authority to regulate the venting and flaring of

4  natural gas during oil and gas operations under Notice to Lessees-4A (NTL-4A). AR3010-3015.

5  NTL-4A authorized venting and flaring in certain circumstances, including "with [BLM's] prior

6  authorization or approval during drilling, completing, or producing operations" or "pursuant to the

7  rules, regulations, or orders of the appropriate State regulatory agency" if ratified. AR3010. It also

8  authorized venting and flaring for certain short-term events like emergencies, well purging, and

9  initial production tests. AR3012-13. For oil wells, NTL-4A allowed venting and flaring if

10 "expenditures necessary to market or beneficially use such gas are not economically justified."

11 AR3013. The 2016 Rule purported to update and replace NTL-4A but in fact dramatically

12 departed from BLM's historical approach. AR910.

13     The 2016 Rule exceeded BLM's statutory authority in at least two critical respects: (1) it

14 ignored the agency's longstanding recognition that the economics of capturing and marketing gas

15 must be considered when determining what is and is not waste; and (2) it imposed a suite of air

16 quality control requirements, when the Clean Air Act provides exclusive authority to the

17 Environmental Protection Agency (EPA) and the States to regulate air quality. *See* Br. in Supp. of

18 Industry Pet'rs' Pet. for Review of Final Agency Action, No. 16cv00285-SWS, ECF No. 142

19 ("Alliance/IPAA Merits Brief"). In 2017, the U.S. District Court for the District of Wyoming

20 voiced serious concerns with the 2016 Rule's statutory overreach, stating that the rule "upends the

21 [Clean Air Act's] cooperative federalism framework and usurps the authority Congress expressly

22 delegated under the [Clean Air Act] to the EPA, states, and tribes to manage air quality."

23 AR15616. The Revision Rule recognizes these concerns, noting that "[t]he BLM's experience in

24 the litigation of the 2016 rule reinforces the BLM's conclusion that the 2016 rule exceeded its

25 statutory authority." AR3. Specifically, the 2016 Rule "requir[ed] an operator to lose money

26 capturing and marketing uneconomic gas" and "impermissibl[y] conflict[ed] with the regulation of

27 air quality by the EPA or the States under the Clean Air Act." AR3. In addition, the 2016 Rule

28

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

WESTERN ENERGY ALLIANCE INDEPENDENT PETROLEUM ASSOCIATION OF AMERICA'S
CROSS MOTION FOR SUMMARY JUDGMENT

1   imposed compliance costs "well in excess of the value of the resource to be conserved." AR7; *see*

2   *also id*. ("The BLM has made the policy determination that it is not appropriate for 'waste

3   prevention' regulations to impose compliance costs greater than the value of the resources they are

4   expected to conserve.").

5         BLM fixed these fundamental illegalities by revising the 2016 Rule. First, BLM rescinded

6   certain requirements of the 2016 Rule that regulated air quality: waste minimization plans; well

7   drilling; well completion and related operations; pneumatic controller equipment; pneumatic

8   diaphragm pump equipment; storage vessel equipment; and leak detection and repair. AR7. Each

9   of these provisions required operators to replace equipment or otherwise control or reduce

10  emissions to improve air quality. *See e.g.*, AR911 ("The BLM aligned the requirements of [the

11  2016 Rule] with similar [air quality] requirements adopted by the EPA and States. . . ."); AR7

12  ("Many of the rescinded provisions of the 2016 rule focused on controlling emissions from

13  sources and operations, which are regulated by EPA under its Clean Air Act authority, and for

14  which there are analogous EPA regulations . . . ."). As BLM states in the preamble to the Revision

15  Rule, "[b]y removing the duplicative emissions-targeting provisions, the final rule falls squarely

16  within the scope of the BLM's authority to prevent waste and leaves the regulation of air

17  emissions to the EPA, the agency with the experience, expertise, and clear statutory authority to do

18  so." AR8.

19        Second, BLM revised the definition of "waste," and the operative term of "avoidably lost,"

20  to align with the decades-old regulation of waste by avoiding regulatory requirements that impose

21  compliance costs greater than the value of the resources they are expected to conserve. AR7. BLM

22  also modified gas-capture, downhole well maintenance, liquids unloading and measuring and

23  reporting requirements and made other changes to NTL-4A, like the general requirement that

24  operators flare rather than vent uncaptured gas. AR7.

25        Finally, BLM removed and adjusted provisions of the 2016 Rule that "placed a particular

26  compliance burden on operators of marginal or low-producing wells" finding that these provisions

27  posed "a substantial risk that many of these wells would not be economical to operate with the

28

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

WESTERN ENERGY ALLIANCE INDEPENDENT PETROLEUM ASSOCIATION OF AMERICA'S
CROSS MOTION FOR SUMMARY JUDGMENT

1    additional compliance costs." AR4. In response to public comment on the proposed Revision

2    Rule,[4] BLM conducted a new analysis of the per-well reduction in revenue on marginal wells.

3    AR102-106 (BLM's new marginal well analysis as part of the RIA). BLM's marginal well

4    analysis found that the 2016 Rule would impose significant impacts to marginal wells whether

5    based on annualized costs or projected lifetime costs. AR4 (revenue reduction ranging from 24

6    percent to 236 percent for marginal oil wells, and 86 percent to 1,037 percent for marginal gas

7    wells depending on various inputs). BLM also concluded that:

8        [While] [p]roduction from marginal wells represents a smaller fraction of total oil
         and gas production than that of non-marginal wells . . . this means that any
9        associated regulatory burdens would have a disproportionate impact on marginal
         wells, since the compliance costs represent a much higher fraction of oil and gas
10       revenues for marginal wells than they do for non-marginal wells.

11   AR4. And the agency also explained why the exemption process under the 2016 Rule, which

12   purported to reduce burdens on marginal wells, was unclear, impractical, and not a viable solution.

13   AR105 ("Given the prevalence of marginal wells, the economic exemption process contained in

14   the 2016 rule was likely to impose a substantial . . . administrative burden on both the operators of

15   marginal wells and the BLM."). Avoiding these impacts is critical given that 70-80 percent of the

16   wells subject to the 2016 and Revision Rules, or approximately 69,000 wells, are considered

17   "marginal." *See* AR4 at n.9. For each of these reasons, BLM decided to "replace[] the

18   requirements contained in the 2016 Rule with requirements similar to, but with notable

19   improvements on, those contained in NTL-4A." AR6-7.

20       With these changes, however, the Revision Rule does not merely revert to the regulatory

21   landscape that existed before the 2016 Rule. Although the Citizen Groups repeatedly characterize

22   the Revision Rule as a "rescission" or repeal of the 2016 Rule, the Revision Rule actually retains

23   some provisions from the 2016 Rule to which oil and operators objected. *See generally* ECF No.

24   109 (repeatedly characterizing the Revision Rule as a full "[r]escission"); *compare* ECF No. 108

25

26       [4]  *See* AR119228–119494 at app. F (explaining the 2016 Rule's "per-company profit
27   margin" estimate was a meaningless way of assessing the impact of either rule and urging BLM to
     conduct a per-well economic analysis).

28

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

at 2 (characterizing the Revision Rule as a repeal of "key requirements").[5] For example, like the

2016 Rule, the Revision Rule prohibits venting of gas except in limited circumstances. *See* AR16

(explaining that "the final [Revision] rule retains most of the provisions in previous § 3179.6" that

limited venting); AR119287-289 (in comments on 2016 Rule, objecting to venting limitations).

Further, both the Revision Rule and 2016 Rule exclude from treatment as emergencies gas flared

where pipelines lack sufficient transportation capacity to carry the gas from production fields to

markets.  *See* AR30 (excluding gas flared due to lack of pipeline capacity from definition of

emergency in section 3179.103(c)(2)); AR17 ("The provisions in final § 3179.103 [in the Revision

Rule] are nearly identical to those in previous § 3179.105."); AR119340-341 (objecting to the

narrow proposed emergency limitations in 2016 Rule). Thus, the Revision Rule contains

provisions that more strictly regulate venting and flaring than did NTL 4A.

## STANDARD OF REVIEW

"[S]ummary judgment is an appropriate mechanism for deciding the legal question of

whether the agency could reasonably have found the facts as it did." *Occidental Eng'g Co. v.

I.N.S.*, 753 F.2d 766, 769–70 (9th Cir. 1985). "The moving party has the initial burden of

demonstrating that summary judgment is proper." *Cty. of San Diego v. Babbitt*, 847 F. Supp. 768,

771–72 (S.D. Cal. 1994), *aff'd*, 61 F.3d 909 (9th Cir. 1995). If satisfied, the burden shifts to the

nonmoving part to show that summary judgment should not be granted. *Id.* However, the

"ultimate burden of persuasion . . . always remains on the moving party."[6] *Celotex Corp. v.

Catrett*, 477 U.S. 317, 330 (1986).

The APA standard of review is no more stringent when an agency changes its position than

when it issues a new rule. "Agencies are free to change their existing policies as long as they

---

[5] Citations to specific pages of ECF-filed documents reference the page numbers identified
in the original document and not the ECF-stamped page numbers.

[6] State Plaintiffs have argued that the arbitrary and capricious standard is "'very
deferential' to the agency's determination, and a presumption of validity attaches to the agency
action such that the burden of proof rests with the party challenging it." State Resp'ts' Opp'n to
Pets. for Review at 9, No. 16cv00285-SWS, ECF No. 174 (D. Wyo. Dec. 11, 2017) (quoting
*Kobach v. United States Election Assistance Comm'n*, 772 F.3d 1183, 1197 (10th Cir. 2014)).

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (citation omitted). The APA does not distinguish between an "initial agency action and subsequent agency action undoing or revising that action." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Therefore, an agency is not required to provide more substantial justification for a "subsequent agency action undoing or revising" its initial action than it provided for its initial action. *Id.*; *accord Desert Survivors v. U.S. Dep't of Interior*, 321 F. Supp. 3d 1011, 1040 (N.D. Cal. 2018). Rather, an agency's policy change "complies with the APA if the agency (1) displays 'awareness that it is changing position,' (2) shows that 'the new policy is permissible under the statute,' (3) 'believes' the new policy is better, and (4) provides 'good reasons' for the new policy, which, if the 'new policy rests upon factual findings that contradict those which underlay its prior policy,' must include 'a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy.'" *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (quoting *F.C.C.*, 556 U.S. at 515–16) (emphasis omitted)).

Although an agency must demonstrate good reasons for a change in policy, "it need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Fox Television Stations*, 556 U.S. at 515 (emphasis in original). The standard of review is narrow. *Id.* at 513. A court may not "substitute its judgement for that of the agency . . . and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* at 513-514 (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 286 (1974)) (citation omitted); *accord Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*, 926 F.3d 1061, 1080 (9th Cir. 2019) ("[W]e may not set aside agency action simply because the rulemaking process could have been improved; rather, we must determine whether the agency's 'path may reasonably be discerned.'") (citations omitted).

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

WESTERN ENERGY ALLIANCE INDEPENDENT PETROLEUM ASSOCIATION OF AMERICA'S
CROSS MOTION FOR SUMMARY JUDGMENT

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

## **ARGUMENT**

This Court should uphold the Revision Rule for the reasons outlined in the Federal Defendants' Cross Motion for Summary Judgment, ECF No. 123, and American Petroleum Institute's (API) Cross Motion for Summary Judgment, both of which the Alliance and IPAA adopt and incorporate as their own. Additionally, the Court should uphold the Revision Rule because BLM reasonably revised the 2016 Rule to reduce the significant and excessive economic burden on marginal wells based on a revised economic analysis.[7]

### **I.     BLM Has Provided "Good Reasons" to Reduce Impacts on Marginal Wells via the Revision Rule (Issue B)**

BLM reasonably chose to remove provisions of the 2016 Rule that not only violated its statutory authority but would have cost operators of marginal gas wells up to 1,037 percent of annual revenues from those wells' production, imposing a significant risk of well shut-in or premature abandonment. In addition, BLM's 2016 economic analysis was fundamentally flawed because it assessed costs on a per-company rather than a per-well basis, which allowed the agency to ignore substantial impacts to marginal wells. Given that as many as 80 percent of the wells affected by the 2016 and Revision Rules are marginal, BLM's decision to revise its economic analysis and reduce the potentially significant economic burden on those wells based on that analysis is particularly justified. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) ("a change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations."); *see also Fox Television Stations*, 556 U.S. at 514-15.

---

[7] Consistent with the Court's direction, the Alliance and IPAA have coordinated with API to avoid duplication of issues. Accordingly, this brief focuses on BLM's economic analyses regarding marginal well impacts while API's brief focuses on the scope of BLM's authority under the MLA to regulate waste.

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

### A. The Administrative Record Supports BLM's Decision to Reduce the Excessive Regulatory Burdens Associated with the 2016 Rule (Issue B-1)

BLM reasonably concluded that the 2016 Rule would have "added regulatory burdens that unnecessarily encumber energy production, constrain economic growth, and prevent job creation." AR1. Plaintiffs disagree with BLM's decision by clinging to BLM's outdated and flawed 2016 Rule economic analysis while disregarding critical aspects of the new administrative record and analysis which fully support the Revision Rule. Most significant, Plaintiffs continue to cite to BLM's prior conclusion that, on a per-company revenue basis, the 2016 Rule imposed nominal compliance costs. ECF No. 109 at 15-16; ECF No. 108 at 20. Citizen Groups particularly tout these per-company costs without recognizing that the Revision Rule administrative record contains additional information on marginal wells that BLM did not consider during development of the 2016 Rule. *See* ECF No. 109 at 15 (claiming that the Revision Rule has "substantially the same factual record" as the 2016 Rule). This fuller record reinforces that assessing the costs and burdens of the 2016 Rule on a per-company basis is meaningless. AR 119236-39.

Instead, because oil and gas operators make economic decisions about marginal wells on a per-well basis—i.e., whether to let a well continue to produce or either shut it in or abandon it because it is not economic—and not on a company-wide basis, it is necessary to analyze the rule's impacts on a per-well and not a per-company basis.[8] *See, e.g.*, AR119236-39 (explaining how operators evaluate the economics of each marginal well). BLM accomplished this in two important (and new) ways in the administrative record supporting the Revision Rule. First, the RIA assesses the impacts of the 2016 Rule on a "per-well" basis, comparing per-well impacts under the 2016 Rule and the per-well impacts of the Revision Rule to derive an estimated revenue impact to

---

[8] To "shut in" a well is to temporarily close down a producing well; to "abandon" a well is to permanently cease production. Williams & Meyers, *Manual of Oil & Gas Terms* (16th ed. 2015) (definitions of "shut-in well" and "abandoned well"). Shutting in a well, however, does not involve simply flipping a switch; rather, repeatedly choking back or shutting in a well can damage the wellbore and mineral formation, thus yielding a less productive well over time and exacerbating waste in the ground. *See e.g.*, [Proposed] Intervenor-Def. Am. Petroleum Institute Opp'n to Pls.' Mots. for Prelim. Inj., at 13-16, *California v. BLM*, No. 17-7186 (consolidated) (N.D. Cal.) (explaining the consequences of temporary and permanent shut-ins).

marginal wells. AR102. Second, the RIA analyzes the impact of the individual requirements removed from the 2016 Rule, which included assessments of how those provisions would have burdened marginal wells. *See e.g.*, AR88-90.

Based on this analysis, BLM estimates the compliance costs of the 2016 Rule would have been 24 percent of an operator's annual revenues from the highest-producing marginal oil wells and 86 percent of an operator's annual revenues from the highest-producing marginal gas wells. AR1. Compliance costs would make up even a larger share of annual revenues from lower-producing marginal wells. AR103 (finding compliance costs to be as high as 236 percent of annual revenues for oil wells and 1,037 percent of annual revenues for gas wells). BLM summarizes the choice these compliance costs would leave operators: "either shut[-in] a marginal well or assum[e] unwarranted administrative burdens . . . represent[ing] a substantial loss of income for companies operating marginal wells."[9] AR105. Removal of the costliest components of the 2016 Rule also avoids premature marginal well shut-in thereby avoiding the waste and negative economic impact associated with stranded production.[10] AR2.

Employing the new analysis, BLM estimates the Revision Rule will generate a *net benefit* over 10 years ranging from $734 million-$1.009 billion, compared to *net costs* under the 2016 Rule of $814 million to $1.2 billion, much of which are costs that would have been disproportionately borne by operators of marginal wells. AR36-37; *see also* AR112. In the face of this more robust administrative record and economic analyses, Citizen Groups' claim that BLM made its decision on "substantially the same factual record" and "came to [its] conclusion in response to Executive Order 13,783—with no supporting analysis—well before it proposed the

---

[9] The Alliance and IPAA provided comment on why even small increases in well operating costs at marginal wells can render a well unprofitable to operate. *See* AR119398. When a marginal well becomes uneconomic, it must either operate at a loss or be shut in prior to the natural end of its life. *Id*. The Alliance and IPAA estimated the consequence to be a loss of approximately 8.5 million barrels of oil under the 2016 Rule compared with a loss of approximately 768,000 barrels of oil under the Revision Rule. AR119400.

[10] "Oil and gas production from marginal wells on Federal land provide[s] a significant economic contribution to the national economy" estimated to be about $2.9 billion in output. AR106 at tbl. 4.5.6.

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

WESTERN ENERGY ALLIANCE INDEPENDENT PETROLEUM ASSOCIATION OF AMERICA'S
CROSS MOTION FOR SUMMARY JUDGMENT

1    [Revision Rule] or accepted public comment" simply rings hollow and should be rejected.[11] *See*

2    ECF No. 109 at 15-16.

3    Plaintiffs also attempt to read significance into BLM's findings that the Revision Rule will

4    not encumber energy production or alter investment and employment decisions of firms. *See* ECF

5    No. 108 at 21; ECF No. 109 at 16. These findings, however, are irrelevant to BLM's efforts to

6    implement Executive Order 13,783, which announces a national policy of "avoiding regulatory

7    burdens that unnecessarily encumber energy production, constrain economic growth, and prevent

8    job creation" and directs federal agencies to "appropriately suspend, revise, or rescind those

9    [rules] that unduly burden the development of domestic energy resources beyond the degree

10   necessary to protect the public interest or otherwise comply with the law." AR1871.

11   BLM's findings with respect to the Revision Rule's impact on employment and investment

12   decisions satisfy a requirement of President Obama's Executive Order 13,563 (Jan. 18, 2011),

13   which requires different considerations than Executive Order 13,783. Executive Order 13,563

14   directs agencies to specifically consider the regulatory impact of agency actions on employment.

15   *See* Improving Regulation and Regulatory Review, 76 Fed. Reg. 3821, 3821 (Jan. 18, 2011).

16   BLM's finding that the Revision Rule will not "substantially alter the . . . employment decisions of

17   firms" fulfills the directives of Executive Order 13,563.[12] *See* AR23. Similarly, BLM's findings

18   with respect to the Revision Rule's impact on energy distribution, supply, and use satisfy a

19   requirement of President George W. Bush's Executive Order 13,211 (May 18, 2001). *See* AR28.

20

21   [11] Citizen Groups also argue that "this Court rejected an identical argument used by BLM
     in an attempt to defend its decision to suspend the [2016] Rule. . . ." ECF No. 109 at 16 (citing

22   *California v. BLM*, 286 F. Supp.3d 1054, 1067 (N.D. Cal. 2018)). This ruling was on a motion for
     preliminary injunction and neither resolved the merits of the case nor was based on an

23   administrative record (which had not yet been filed by BLM at that early stage of that case). *See
     id.* Further, the Court's findings relate to a regulatory action that predates the new administrative

24   record upon which BLM justifies its decision to promulgate the Revision Rule.

25   [12] Citizen Groups ignore that BLM qualified its finding by recognizing "that there may be
     a small positive impact on investment and employment due to the reduction in compliance

26   burdens if the output effects dominate" and that "[t]he magnitude of the reductions will be
     relatively small but could carry competitiveness impacts, specifically on marginal wells on Federal

27   lands, encouraging investment." AR23.

28

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

WESTERN ENERGY ALLIANCE INDEPENDENT PETROLEUM ASSOCIATION OF AMERICA'S
CROSS MOTION FOR SUMMARY JUDGMENT

1   This Executive Order requires agencies to develop Statements of Energy Effects for certain

2   actions that are "likely to have a significant adverse effect on the supply, distribution, or use of

3   energy" or are designated as a "significant energy action." *See* Actions Concerning Regulations

4   That Significantly Affect Energy Supply, Distribution, or Use, 66 Fed. Reg. 28,355, 28,355–59

5   (May 18, 2001). The findings that the Revision Rule may not substantially alter employment and

6   will not "have an impact on the supply, distribution, or use of energy" does not preclude BLM

7   from concluding that elements of the 2016 Rule unduly burdened energy resources under

8   Executive Order 13,783.[13]

9          Finally, Citizen Groups point to BLM's determination that the Revision Rule would cause

10   299 billion cubic feet (Bcf) of gas to be vented or flared rather than sold to argue that the Revision

11   Rule will not unduly burden energy development under Executive Order 13,783. ECF No. 109 at

12   16; *see* AR22. Yet Citizen Groups ignore that the 2016 Rule would have required oil and gas

13   operators to capture at least some of this gas at an economic loss, or more likely shut in, because

14   the 2016 Rule required gas capture regardless of whether it was economically prudent to do so.

15   *See generally* API's Cross Motion for Summary Judgment and Memorandum in Support. Further,

16   Citizen Groups neglect to mention that this amount is negligible at just 0.109% of total U.S.

17   natural gas production in 2015, *see* AR91, or to reference BLM's finding that "the reduction in

18   compliance burdens [under the Revision Rule] might spur additional production on Federal and

19   Indian lands . . . ." AR93. Regardless, weighing all the other aspects of the 2016 Rule, BLM's

20   decision to promulgate the Revision Rule despite some evidence of potential forgone gas

21
22          [13] The conclusion that the Revision Rule is not likely to have a significant adverse effect
   on the national supply, distribution, or use of energy and is not a "significant energy action" is not
23   unexpected. An example of a "significant energy action" is the Clean Power Plan, which was
   intended to dramatically reduce carbon dioxides from the entire utility power sector. *See* Carbon
24   Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units,
   80 Fed. Reg. 64,662, 64,940 (Oct. 23, 2015) ("This action . . . is likely to have a significant effect
25   on the supply, distribution, or use of energy" including "a 1 to 2 percent change in retail electricity
   prices on average across the contiguous U.S. in 2025, and a 22 to 23 percent reduction in coal-
26   fired electricity generation . . . ."); *compare* to Revision Rule at AR1-2 ("Federal onshore
   production lands accounted for approximately 9 percent of domestic natural gas production, 5
27   percent of U.S. natural gas liquids production, and 5 percent of domestically produced oil.").

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ◆ FAX 310-481-7650

28

1  production does not render its decision based on the entire record arbitrary or capricious. *See New*

2  *York v. U.S. E.P.A.*, 413 F.3d 3, 31 (D.C. Cir. 2005) ("Nor does the fact that 'the evidence in the

3  record may also support other conclusions ... prevent us from concluding that [the agency's]

4  decisions were rational and supported by the record.'").

**B. Plaintiffs Lack Standing to Challenge BLM's Procedural Compliance with the Regulatory Flexibility Act (Issue B-2a)**

Plaintiffs lack standing to challenge the adequacy of notice of BLM's marginal well

analysis under the Regulatory Flexibility Act (RFA). BLM conducted the marginal well analysis

to comply with its RFA obligations to "determine whether there would be a significant economic

impact on a substantial number of small entities." AR40. Because "the vast majority of entities

operating [on federal and Indian leases] are small businesses" BLM concluded "the final rule will

likely affect a substantial number of small entities." AR24; *see also* AR4 (estimating 73.3 percent

of all wells affected by the Revision Rule are marginal wells). BLM also concluded that the 2016

Rule would have had a "disproportionate impact on marginal wells" and would have posed a

greater cost to marginal well producers. AR22.

Plaintiffs lack standing to challenge BLM's procedural compliance with the RFA. *See* ECF

No. 109 at 17-18; ECF No. 108 at 29. The RFA itself provides that only "a small entity that is

adversely affected or aggrieved by final agency action is entitled to judicial review of agency

compliance with the requirements of [certain provisions of the Act]]." 5 U.S.C. § 611(a)(1); *see*

*Cement Kiln Recycling Coal. v. E.P.A.*, 255 F.3d 855, 869 (D.C. Cir. 2001) ("the language of the

statute limits its application to the 'small entities which will be subject to the proposed

regulation'—that is, those 'small entities to which the proposed rule will apply.'" (citation and

emphasis omitted)). None of the Plaintiffs meets this statutory prerequisite. *See U.S. Citrus Sci.*

*Council v. U.S. Dep't of Agric.*, 312 F. Supp. 3d 884, 912 (E.D. Cal. 2018) ("Plaintiffs, who are

not directly regulated by the Final Rule, do not have an injury contemplated within the zone of

interest of the RFA."). Moreover, the RFA is "purely procedural" in nature, imposing upon the

agency only a duty to undertake a good faith effort to fulfill its requirements. *Ranchers Cattlemen*

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

WESTERN ENERGY ALLIANCE INDEPENDENT PETROLEUM ASSOCIATION OF AMERICA'S
CROSS MOTION FOR SUMMARY JUDGMENT

1   *Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1101 (9th

2   Cir. 2005). Even if Plaintiffs had standing, which they do not, the RFA does not provide a right of

3   action under which Plaintiffs could seek to change the substantive outcome of the agency's

4   marginal well analysis and decision. *Envtl. Def. Ctr., Inc. v. U.S. E.P.A.*, 344 F.3d 832, 879 (9th

5   Cir. 2003) ("Like the Notice and Comment process required in administrative rulemaking by the

6   APA, the analyses required by the RFA are essentially procedural hurdles; after considering the

7   relevant impacts and alternatives, an administrative agency remains free to regulate as it sees fit.").

8   Beyond Plaintiffs' lack of standing, BLM's development of the marginal well analysis

9   complied with the APA. *See* ECF No. 109 at 16. Plaintiffs have been "on notice" of the marginal

10  well issue in numerous fora since the 2016 Rule was first proposed over three years ago. This

11  includes in previous litigation in this Court. *See* Alliance/IPAA Merits Brief; Mem. in Supp. of

12  Mot. for Prelim. Inj. at 33, *W. Energy Alliance v. Jewell*, No. 16-00280, ECF No. 13 (D. Wyo.

13  Nov. 23, 2016); Intervenors W. Energy Alliance and IPAA's Resp. in Opp'n to Pls.' Mot. for

14  Prelim. Inj. at 17-18, *Cal. v. Bureau of Land Mgmt.*, Nos. 17-07186, 17-7187, ECF No. 68 (N.D.

15  Cal. Jan. 16, 2018). Moreover, the proposed Revision Rule dedicated significant discussion to the

16  2016 Rule's "particular compliance burden to operators of marginal or low-producing wells." *See*

17  *e.g.*, AR416-417, 423, 430-31. It is disingenuous, at best, to now claim the proposed Revision

18  Rule did not "even hint" at the marginal well issue. ECF No. 109 at 17.

19  Regardless, BLM's RIA in its entirety, and the important consideration of impacts to

20  marginal wells and small businesses, is a logical outgrowth of the proposed Revision Rule and a

21  rational step in BLM's decision-making. "An agency can add material to the administrative record

22  after the close of a public comment period when that material is a response to the comments."

23  *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1402 (9th Cir. 1995). This material can

24  include "supplementary data, unavailable during the notice and comment period, that expand[s] on

25  and confirm[s] information contained in the proposed rulemaking and addresses alleged

26  deficiencies in the pre-existing data, so long as no prejudice is shown." *Id.* (internal quotations

27  omitted). Because BLM's proposed Revision Rule was "sufficiently descriptive" regarding

28

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

regulatory burdens to marginal wells "so that interested parties [could] offer informed criticism and comments" and the final Revision Rule was a "logical outgrowth" of the proposal, the notice requirements of the APA have been satisfied. *See Air Transp. Ass'n of Am. v. Civil Aeronautics Bd.*, 732 F.2d 219, 224 (D.C. Cir. 1984) (finding APA notice requirements were satisfied even though internal staff study was not publicly available prior to the final rule, because "critical elements of the proposal did not change, and the final rule was a 'logical outgrowth' of the proposed rule" (citation omitted)).

Finally, the Citizen Groups' independently commissioned report of BLM's analysis included as Attachment 2 to Exhibit B of their Motion for Summary Judgment, ECF No. 109-2, is extra-record evidence improperly and untimely submitted to supplement the administrative record. "When reviewing an agency decision, 'the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.'" *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 943 (9th Cir. 2006) (citation omitted). A court will "normally refuse to consider evidence that was not before the agency because 'it inevitably leads the reviewing court to substitute its judgment for that of the agency.'" *Id.* (citation omitted). The Citizen Groups' extra-record evidence not only prejudices Industry Intervenors who must now respond to the report in this page-limited brief, but also it gives "the appearance that the administrative record [is] open and that the proceedings [are] a forum for debating the merits." *See San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 603 (9th Cir. 2014) (criticizing the district court's admission of extra-record evidence in "creat[ing] a battle of the experts"). The Court should adhere to the default rule regarding the scope and review of the administrative record and disregard the Citizen Groups' extra-record analysis and arguments based on that analysis. For these reasons, the procedural arguments Plaintiffs raised in Issue B-2a are without merit.

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

**C. BLM's New Marginal Well Economic Analysis is Accurate and Consistent with the Record (Issue B-2b)**

BLM's marginal well analysis supporting the Revision Rule represents the most meaningful method of assessing either rule's impacts and corrects fatal flaws in the economic analysis underlying the 2016 Rule. The aggregate results of this analysis demonstrate that the 2016 Rule would have imposed massive *net costs* over a 10-year period (between $736 million to $1.09 billion depending on discount rates). AR3. By contrast, the Revisions Rule results in 10-year *net benefits* from between $734 million to $1.08 billion. AR21-22. Thus, the Revision Rule reduces compliance costs from the 2016 Rule by up to $2.076 billion (depending on discount rate) and is justified on this basis alone. AR79; *see Michigan v. E.P.A.*, 135 S. Ct. 2699, 2707 (2015) ("Consideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions.").

In reaching this result, BLM made numerous technical corrections and adjustments to the flawed 2016 RIA, only one of which was an additional quantitative marginal well impact analysis. *See* AR67-70. Citizen Groups ignore these corrections, which reflect reasoned agency decision-making and represent precisely the kind of agency behavior the APA encourages. *See Motor Vehicle Mfrs. Ass'n*, *supra*; *see also Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 863–64 (1984) ("An initial agency interpretation is not instantly carved in stone . . . . [T]o engage in informed rulemaking [the agency] must consider varying interpretations and the wisdom of its policy on a continuing basis.").

To argue the entire marginal well analysis is deficient, Citizen Groups provide a single irrelevant example of BLM's analysis—installation of plunger lifts associated with liquids unloading —and argue that plunger lifts may not be installed on all wells under the 2016 Rule. *See* ECF No. 109 at 19. As the Federal Defendants observe, Citizen Groups misunderstand BLM's analysis. *See* ECF No. 123 at 28. Further, Citizen Groups' sole example of alleged error does not undermine BLM's entire marginal well analysis because the costs of installing plunger lifts reflect a minor portion—at most three percent—of the 2016 Rule's compliance costs. *See* AR90, Table

4.4. Citizen Groups further argue that BLM compounds the "serious [plunger lift] errors" by expressing the per-well revenue reduction in total (10 year) versus annual terms. ECF No. 109 at 19. BLM, however, addressed this very issue stating that the total (10 year) per-well revenue reductions "are reduced when using annualized costs, however, the reductions in revenue are *still substantial.*" AR103 (emphasis added). In sum, Plaintiffs have not provided any evidence that BLM's decision to significantly reduce impacts to marginal wells is arbitrary and capricious or not supported by the record.

### D.     BLM's Marginal Well Analysis Supports the Revision Rule (Issue B-2c)

By asserting that BLM should have considered tailoring the Revision Rule to specifically address marginal wells, Plaintiffs essentially argue that BLM should have considered additional alternatives to the Revision Rule. Yet Plaintiffs ignore that the APA does not require an analysis of regulatory alternatives. *See* 5 U.S.C. § 553. An agency need not consider "all policy alternatives in reaching [a] decision" and cannot be faulted for failing to include all conceivable alternatives. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 51. Rather, an agency must simply "consider[ ] the relevant factors and articulate[ ] a rational connection between the facts found and the choice made." *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 841 (9th Cir. 2003) (quoting *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council,* 462 U.S. 87, 105 (1983)). Although the Citizen Groups cite *California ex rel. Becerra v. U.S. Dep't of the Interior*, 381 F. Supp.3d 1153 (N.D. Cal. 2019), to argue that "[w]hen considering revoking a rule, an agency must consider alternatives in lieu of a complete repeal, such as by addressing the deficiencies individually," ECF No. 109 at 20, the logic and holding of *Becerra*, even if correct, are inapplicable because BLM did not revoke the 2016 Rule.[14]

Finally, the Citizen Groups ignore that, when promulgating the Revision Rule, BLM in fact considered alternatives to the 2016 Rule. In the Revision Rule, BLM described the

---

[14] Plaintiffs also rely on *California v. BLM*, 286 F. Supp.3d 1054 (N.D. Cal. 2018), ECF No. 109 at 20; however, this decision ruled on a motion for preliminary injunction and did not resolve the merits of the litigation.

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

1    alternatives that it considered:

2        [W]e examined the impacts of retaining subpart 3179 in its entirety (essentially
         taking no action). We also examined the impacts of retaining the gas-capture
3        requirements of the 2016 rule (previous §§ 3179.7 and 3179.8) and the
         measurement/metering requirements (previous § 3179.9) while rescinding the
4        operational and equipment requirements addressing venting from leaks, pneumatic
         equipment, and storage tanks. The results of these alternative scenarios are
5        presented in the RIA at Section 4.

6    AR22. If BLM did not expressly consider the particular formulation that Plaintiffs now champion

7    (application of the 2016 Rule only to marginal wells), that does not render the Revision Rule

8    invalid. Therefore, BLM properly revised the 2016 Rule in response to its marginal well analysis.

9    **II.      BLM's Cost Benefit Analysis Supports the Revision Rule (Issue C)**

10        BLM appropriately determined the 2016 Rule's cost-benefit analysis incorrectly estimated

11   industry compliance costs (particularly for marginal wells), was inconsistent with the MLA and

12   longstanding Office of Management and Budget (OMB) guidance, and drastically overestimated

13   the 2016 Rule's benefits. AR3-4. Adjusting for these fatal flaws and based on new analyses,

14   including removal of the costliest provisions of the 2016 Rule (which happen to also be the

15   unlawful air quality provisions), BLM determined the Revision Rule will reduce compliance costs

16   by between $1.359 billion and $1.634 billion over ten years resulting in net benefits of between

17   $720 million and $1.083 billion. AR79-86. Intervenor-Defendants generally agree with BLM's

18   new cost-benefit analysis and the Government's defense of this issue in its brief.[15]

19                                    **CONCLUSION**

20        For the foregoing reasons, in addition to those explained in BLM's and API's briefs,

21   Defendants are entitled to summary judgment as a matter of law and the Court should uphold the

22   Revision Rule.

23   _____

24       [15] In comments to the proposed Revision Rule, the Alliance notes the significant flaws with
     the 2016 Rule's cost-benefit analysis and, among other things, provides data regarding the
25   substantial administrative costs that will be borne by industry even under the Revision Rule.
     AR119240-41. In coordination with OMB, BLM determined that it had underestimated the
26   administrative costs of the 2016 Rule, *see* AR199, and that the Revision Rule would alleviate
     many of these costs and this represents "just one of many reasons for [the Revision Rule]." *See*
27   AR148, AR225.

28

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

DATED:  August 26, 2019

HOLLAND & HART LLP

By: _____/s/ Eric P. Waeckerlin_____
ERIC P. WAECKERLIN
Attorneys for INTERVENOR-DEFENDANTS
WESTERN ENERGY ALLIANCE and the
INDEPENDENT PETROLEUM ASSOCIATION OF
AMERICA

DATED:  August 26, 2019

DAVIS GRAHAM & STUBBS LLP

By: _____/s/ Kathleen C. Schroder_____
KATHLEEN C. SCHRODER
Attorneys for INTERVENOR-DEFENDANTS
WESTERN ENERGY ALLIANCE and the
INDEPENDENT PETROLEUM ASSOCIATION OF
AMERICA

DATED:  August 26, 2019

WOOD, SMITH, HENNING & BERMAN LLP

By: _____/s/ Emil A. Macasinag_____
EMIL A. MACASINAG
Attorneys for INTERVENOR-DEFENDANTS
WESTERN ENERGY ALLIANCE and the
INDEPENDENT PETROLEUM ASSOCIATION OF
AMERICA

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and not a party to the within action.  My business address is 10960 Wilshire Boulevard, 18th Floor, Los Angeles, CA 90024-3804.

On August 26, 2019, I served the following document(s) described as  **WESTERN ENERGY ALLIANCE AND INDEPENDENT PETROLEUM ASSOCIATION OF AMERICA'S CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** on the interested parties in this action as follows:

### SEE ATTACHED SERVICE LIST

**BY CM/ECF NOTICE OF ELECTRONIC FILING:**  I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.  Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on August 26, 2019, at Los Angeles, California.


/s/ Adriana C. Moreno
Adriana C. Moreno

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

LEGAL:10854-0001/12595657.1

-1-

Case No. 4:18-cv-05712

WESTERN ENERGY ALLIANCE INDEPENDENT PETROLEUM ASSOCIATION OF AMERICA'S
CROSS MOTION FOR SUMMARY JUDGMENT