Ivan London, Colorado Bar No. 44491 (admitted *pro hac vice* 9/4/19)
ivan.london@bclplaw.com
Zachary W. Fitzgerald, Colorado Bar No. 49226 (admitted *pro hac vice* 9/4/19)
zachary.fitzgerald@bclplaw.com
**BRYAN CAVE LEIGHTON PAISNER LLP**
1700 Lincoln Street, Suite 4100
Denver, CO  80203
Telephone:    (303) 861-7000
Facsimile:     (303) 866-0200

K. Lee Marshall, California Bar No. 277092
klmarshall@bclplaw.com
**BRYAN CAVE LEIGHTON PAISNER LLP**
Three Embarcadero Center, 7th Floor
San Francisco, CA  94111
Telephone:    (415) 675-3400
Facsimile:     (415) 675-3434

Attorneys for *Amici Curiae*

# IN THE UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA, OAKLAND

| | |
|---|---|
| STATE OF CALIFORNIA, by and through XAVIER BECERRA, Attorney General, and the CALIFORNIA AIR RESOURCES BOARD; and STATE OF NEW MEXICO, by and through HECTOR BALDERAS, Attorney General, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DAVID BERNHARDT, Secretary of the Interior; JOSEPH R. BALASH, Assistant Secretary for Land and Minerals Management, United States Department of the Interior; UNITED STATES BUREAU OF LAND MANAGEMENT; and UNITED STATES DEPARTMENT OF THE INTERIOR,<br><br>Defendants. | Case No. 4:18-cv-05712-YGR<br>[Consolidated with Case No. 4:18-cv-05984-YGR]<br><br>**BRIEF OF MEMBERS OF CONGRESS AS *AMICI CURIAE* IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**<br><br>Hon. Yvonne Gonzalez Rogers<br><br>Date:    January 14, 2020<br>Time:    10:00 a.m.<br>Dept.:   Courtroom 1, Fourth Floor<br>            1301 Clay Street, Oakland, CA 94612 |

**Table of Contents**

**Page**

I. INTEREST OF THE *AMICI CURIAE* ............................................................................... 1

II. SUMMARY OF ARGUMENT ........................................................................................ 2

III. BACKGROUND OF THE 2018 RULE ........................................................................... 3

IV. ARGUMENT .................................................................................................................... 5

    A. The Court Should Defer to the BLM's Definition of "Waste." ............................... 5

    B. The 2018 Rule Removes Duplicative Regulatory Burdens of the 2016 Rule. ........................................................................................................................ 7

    C. Development of Oil and Gas Resources on Federal Lands Is Critical. ................... 10

V. CONCLUSION ............................................................................................................... 12

BRYAN CAVE LEIGHTON PAISNER LLP
1700 LINCOLN STREET
SUITE 4100
DENVER, CO 80203

i

Brief of Members of Congress as *Amici Curiae* in Opposition to Plaintiffs' Motions for Summary Judgment
Case No. 4:18-cv-05712-YGR [Consolidated with Case No. 4:18-cv-05984-YGR]

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams Fruit Co., Inc. v. Barrett,*
    494 U.S. 638 (1990) .................................................................................................................. 9

*Bell v. Cheswick Generating Station,*
    734 F.3d 188, 190 (3d Cir. 2013) ............................................................................................. 8

*Chevron, USA, Inc. v. NRDC, Inc.,*
    467 U.S. 837 (1984) .................................................................................................................. 6

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.,*
    937 F. Supp. 2d 1140 (N.D. Cal. 2013) .................................................................................... 6

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) .................................................................................................................. 9

*Michigan v. EPA,*
    135 S.Ct. 2699 (2015) .............................................................................................................. 6

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
    551 U.S. 644 (2007) .................................................................................................................. 6

*Nat'l Cable & Telecom. Ass'n v. Brand X Internet Servs.,*
    545 U.S. 967 (2005) .................................................................................................................. 6

*Smiley v. Citibank (S.D.), N.A.,*
    517 U.S. 735 (1996) .................................................................................................................. 6

*Vt. Yankee Nuclear Power Corp. v. NRDC, Inc.,*
    435 U.S. 519 (1978) .................................................................................................................. 8

*Wyoming v. Dep't of Interior,*
    2017 WL 161428 (D. Wyo. 2017) ..................................................................................... 9, 12

**Statutes**

5 U.S.C. § 801(g) ............................................................................................................................ 3

30 U.S.C. § 21a ............................................................................................................................... 6

30 U.S.C. § 187 ................................................................................................................... 8, 10, 12

30 U.S.C. § 189 ................................................................................................................... 8, 10, 12

30 U.S.C. § 223 ........................................................................................................................... 5, 8

ii

Brief of Members of Congress as *Amici Curiae* in Opposition to Plaintiffs' Motions for Summary Judgment
Case No. 4:18-cv-05712-YGR [Consolidated with Case No. 4:18-cv-05984-YGR]

BRYAN CAVE LEIGHTON PAISNER LLP
1700 LINCOLN STREET
SUITE 4100
DENVER, CO 80203

30 U.S.C. § 225 ............................................................................................................................. 6, 8

30 U.S.C. § 226 ............................................................................................................................. 5, 8

42 U.S.C. § 7401 ........................................................................................................................... 8, 9

42 U.S.C. §§ 7401 *et seq.* ................................................................................................................. 8

**Regulations**

43 C.F.R. § 3160 ............................................................................................................................... 2

43 C.F.R. § 3170 ............................................................................................................................... 2

43 C.F.R. § 3179.6 ............................................................................................................................ 7

81 Fed. Reg. 83,008 .......................................................................................................................... 1

83 Fed. Reg. 49,184 ............................................................................................................. 2, 3, 4, 5, 7

83 Fed. Reg. 49,185 ...................................................................................................................... 3, 4

83 Fed. Reg. 49,186 ............................................................................................................. 4, 5, 7, 10

83 Fed. Reg. 49,188 ..................................................................................................................... 9, 10

83 Fed. Reg. 49,189 ..................................................................................................................... 7, 10

83 Fed. Reg. 49,191 .......................................................................................................................... 9

83 Fed. Reg. 49,204 .......................................................................................................................... 5

83 Fed. Reg. 49,206 .......................................................................................................................... 5

**Other Authorities**

58 Cong. Rec. 4111 (1919) ............................................................................................................. 10

Allan Nevins, *Three Fabulous Decades* ........................................................................................ 10

U.S. Energy Info. Admin., *Total Petroleum and Other Liquids Production - 2018*, *International Dry Natural Gas Production - 2017* ................................................................. 11

David W. Miller, *The Historical Development of the Oil and Gas Laws of the United States*, 51 Calif. L. Rev. 506 (1963) ..................................................................... 10, 11

Info. Mem. from Timothy R. Spisak, Acting Assistant Dir., Energy, Minerals & Realty Mgmt. 1 (Oct. 19, 2017) ......................................................................................... 10

E.O. 13,783 .................................................................................................................................. 3, 8

iii

iv

E.O. 13,783 § 1(a) ............................................................................................................... 3, 8, 9

E.O. 13,783 § 1(c) ...................................................................................................................... 1

Mineral Leasing Act of February 25, 1920,
    Pub. L. No. 66-146, §§ 14, 17, 85 Stat. 437 ......................................................... 5, 8

N.M. Oil & Gas Ass'n, *Fueling New Mexico*
    Available at https://www.nmoga.org/benefits_of_oil_natural_gas .......................... 12

S. Rep. No. 1392 (1946) ............................................................................................ 11

BRYAN CAVE LEIGHTON PAISNER LLP
1700 LINCOLN STREET
SUITE 4100
DENVER, CO 80203

## I. INTEREST OF THE *AMICI CURIAE*

*Amici Curiae* are members of the United States Congress who have a strong interest in ensuring that we achieve the will of the electorate, maintain an effective balance of powers, and continue the critical development of oil and gas resources on our federal lands.

In contrast, this lawsuit is an attempt to seek political action through the courts. Plaintiffs and their supporting *amici* ask the Court to ignore Congress's role in setting national priorities and establishing the measure and limit of administrative-agency authority through legislation. They further ask the Court to ignore the President's authority to direct Executive Branch agencies where Congress has given the authority to do so. Plaintiffs' requested relief is inconsistent with Congress's laws, and it would impede Congress's aims to promote oil and gas development and cooperative federalism. Accordingly, *Amici Curiae* submit this brief in support of the intervenor defendants and in opposition to Plaintiffs' motions for summary judgment.

In the final days of President Obama's term following the 2016 presidential election, the Bureau of Land Management (BLM) promulgated the 2016 Rule,[1] which went beyond the BLM's congressionally authorized authority. The 2016 Rule impermissibly regulated air quality under the guise of the Mineral Leasing Act (MLA), and it would have restrained the development of domestically produced energy resources.

After the election, President Trump ordered the BLM to "immediately review existing regulations that potentially burden the development or use of domestically produced energy resources and appropriately suspend, revise, or rescind those that unduly burden the development of domestic energy resources beyond the degree necessary to protect the public interest or otherwise comply with the law." Exec. Order No. 13,783, § 1(c) (Mar. 28, 2017) ("E.O. 13,783").

In response, the BLM reviewed the 2016 Rule—as it must. The BLM realized that it had overstepped its regulatory authority and underestimated certain impacts of the 2016 Rule— particularly that many provisions "would have added regulatory burdens that unnecessarily encumber energy production, constrain economic growth, and prevent job creation." Waste

---

[1] Waste Prevention, Production Subject to Royalties, and Resource Conservation, 81 Fed. Reg. 83,008 (Nov. 18, 2016) (the "2016 Rule").

1

Prevention, Production Subject to Royalties, and Resource Conservation; Rescission or Revision of Certain Requirements, 83 Fed. Reg. 49,184 (Sept. 28, 2018) (to be codified at 43 C.F.R. pts. 3160 and 3170) (the "2018 Rule"). To correct those errors, the BLM replaced the 2016 Rule with the 2018 Rule. This was a necessary administrative action. It was a course-correction of the 2016 Rule's overreach, and it brought the BLM closer to its statutory authority.

*Amici Curiae*—and the American populace—have a strong interest in this critical matter, and these *amici*[2] ask the Court to uphold the BLM's proper promulgation of the 2018 Rule. The 2018 Rule, as guided by President Trump, lowers compliance costs and encourages domestic production of energy resources while maintaining reasonable restrictions on venting and flaring and allowing the States to regulate oil and gas operations within a cooperative-federalism framework. It avoids the 2016 Rule's air-quality regulations, which were beyond the BLM's granted authority and duplicative of the Environmental Protection Agency's (EPA) regulatory responsibility (as determined by Congress). And it promotes—rather than constrains—economic growth in the United States. *Amici Curiae* support these goals.

## II.     SUMMARY OF ARGUMENT

Congress enacted the MLA *to promote* the prudent development of oil and gas. To make sure the development is effective and prudent, the MLA requires the BLM to ensure lessees use all "reasonable precautions" to prevent "waste" of oil and gas on federal land. Congress has not chosen to define "reasonable precautions" or "waste." So, it is the BLM's job to interpret those terms in line with guidance from the Executive Branch. President Trump provided the guidance shortly after his inauguration, calling into question the 2016 Rule. The BLM responded by promulgating the 2018 Rule. And the 2018 Rule is the appropriate culmination of the BLM's interpretations of those terms.

While the 2018 Rule corrects the errors of the 2016 Rule, that fact is immaterial. The important point is that the BLM used its authority (correctly considered) to interpret the term "waste" in the MLA, and this Court should defer to that interpretation. The BLM corrected its

---

[2] *Amici Curiae* have attached a list identifying themselves individually as Ex. 1 to the Declaration of Zachary W. Fitzgerald in Support of Motion for Leave to File Brief. (Doc. #131-1.)

2

Brief of Members of Congress as *Amici Curiae* in Opposition to Plaintiffs' Motions for Summary Judgment
Case No. 4:18-cv-05712-YGR [Consolidated with Case No. 4:18-cv-05984-YGR]

prior unlawful attempt under a prior President to regulate air quality, a task that Congress entrusted to the EPA.  The 2018 Rule removes this overlap and returns the task of regulating methane emissions to the proper persons.

Finally, the 2018 Rule provides for development of oil and gas resources on federal lands.  Federal oil and gas development is critical for maintaining a strong domestic energy supply, creating jobs, and keeping energy costs low for all Americans.  That Congress, the President, and the Executive Branch wish to focus on economic growth is a policy decision, and this Court should defer to it.

For those reasons, *Amici Curiae* would supplement the efforts of counsel in opposition to Plaintiffs' motions and raise the considerations in this brief to the Court's attention.

### III.   BACKGROUND OF THE 2018 RULE

In the 2018 Rule, the BLM properly revisited the 2016 Rule "in a manner that reduces unnecessary compliance burdens, is consistent with the BLM's existing statutory authorities, and re-establishes longstanding requirements that had been replaced."  83 Fed. Reg. 49,184 (Sept. 28, 2018) (to be codified at 43 C.F.R. pts. 3160 and 3170).  The BLM revisited the 2016 Rule because the President of the United States instructed it to do so.  *See* E.O. 13,783.  President Trump stated, "It is in the national interest to promote clean and safe development of our Nation's vast energy resources, while at the same time avoiding regulatory burdens that unnecessarily encumber energy production, constrain economic growth, and prevent job creation."  E.O. 13,783, § 1(a).  In line with President Trump's directives, the BLM reviewed the 2016 Rule and "determined it to be inconsistent with the policy in section 1 of E.O. 13783."  83 Fed. Reg. 49,185.  After the BLM promulgated the 2018 Rule, Congress took no action to repeal it under the Congressional Review Act.[3]

---

[3] Although *amici* who support Plaintiffs appear to place much weight on the fact that Congress did not repeal the *2016 Rule* under the Congressional Review Act, *see* ECF No. 110-1, at 6, Congress did vote on a resolution of disapproval on the 2016 Rule which passed the U.S. House on a bipartisan vote.  Regardless, the Act itself states that a court should give *no weight* to a decision not to repeal a rule under the Act.  "If the Congress does not enact a joint resolution of disapproval under section 802 respecting a rule, *no court* or agency *may infer any intent of the Congress from any action or inaction* of the Congress with regard to such rule, related statute, or joint resolution of disapproval."  5 U.S.C. § 801(g) (emphasis added).

3

In its review of the 2016 Rule, the BLM found that the 2016 Rule's "approach to reduction of fugitive emissions and flaring departed from the historic approach of considering 'waste' in the context of a reasonable and prudent operator standard," especially given that "the venting or flaring of some natural gas is a practically unavoidable consequence of oil and gas development." 83 Fed. Reg. 49,184–85. Further, the 2016 Rule "exceeded the BLM's statutory authority to regulate for the prevention of 'waste' under the [MLA]." 83 Fed. Reg. 49,185. The 2016 Rule's concept of "waste" constituted "a drastic departure from the concept of 'waste' applied by the Department of the Interior over many decades of implementing the MLA." 83 Fed. Reg. 49,186. The BLM noted that the 2016 Rule misguidedly was "based on the premise that essentially any losses of gas at the production site could be regulated as 'waste,' without regard to the economics of conserving that lost gas." *Id.*

But, contrary to the 2016 Rule's novel interpretation of the term "waste," "the BLM has historically taken the lease-specific circumstances faced by an operator—including the economic viability of capturing and marketing the gas—into account before determining that a particular loss of gas constitutes 'waste.'" *Id.*

In the 2018 Rule, the BLM also noted that the 2016 Rule would have been uneconomical—an issue of critical concern to President Trump. The BLM found that "certain impacts were underestimated [in the 2016 Rule] and many provisions of the rule would have added regulatory burdens that unnecessarily encumber energy production, constrain economic growth, and prevent job creation." 83 Fed. Reg. 49,184. The 2016 Rule "would have imposed costs exceeding its benefits," and many of its requirements would "impose compliance costs well in excess of the value of the gas to be conserved." 83 Fed. Reg. 49,184, 49,186.

For example, the 2016 Rule "would have affected existing wells, including a substantial number that are 'marginal,' or low-producing, and therefore less likely to remain economical to operate if subjected to additional compliance costs." 83 Fed. Reg. 49,184. "[M]arginal oil and gas production on Federal lands supported an estimated $2.9 billion in economic output in the national economy in FY 2015." 83 Fed. Reg. 49,185. "To the extent that the 2016 [Rule] would have adversely impacted production from marginal wells through premature shut-ins, this

4

estimated economic output would have been jeopardized." *Id.* "[A]pproximately 73 percent of wells on BLM-administered leases would be considered marginal wells and . . . annual compliance costs associated with the 2016 rule would have constituted 24 percent of an operator's annual revenues from even the highest-producing marginal oil wells and 86 percent of an operator's annual revenues from the [lowest]-producing marginal gas wells." 83 Fed. Reg. 49,184.

The BLM also determined that the 2016 Rule contained "numerous administrative and reporting requirements that would have imposed unnecessary burdens on operators and the BLM." *Id.* Therefore, the BLM promulgated the 2018 Rule, which "reduces unnecessary compliance burdens and, in large part, re-establishes the longstanding requirements that the 2016 rule replaced." *Id.*

The 2018 Rule will provide greater economic benefit to the United States than the 2016 Rule would have provided, because the 2016 Rule's compliance costs for the industry and implementation costs for the BLM would exceed the 2016 Rule's benefits. 83 Fed. Reg. 49,186. From 2019 to 2028, compliance costs would be $1.63 to $2.08 billion *less* under the 2018 Rule than under the 2016 Rule. 83 Fed. Reg. 49,204. Although royalties and cost savings would also be lower, the 2018 Rule's *net benefit* to the United States will be $720 million to $1.08 billion *more* under the 2018 Rule than it would be under the 2016 Rule. 83 Fed. Reg. 49,204–05. *Amici Curiae* cannot ignore that expected result.

The 2018 Rule will also reduce "the potential economic harm to small businesses" that the 2016 Rule would have imposed." 83 Fed. Reg. 49,206. The BLM promulgated the 2018 Rule in line with President Trump's directives, to provide a benefit—not a burden—to this country's economy.

### IV. ARGUMENT

#### A. The Court Should Defer to the BLM's Definition of "Waste."

Congress has recognized the importance of oil and gas development, and Congress enacted the MLA *to promote* the prudent development of oil and gas. *See* 30 U.S.C. §§ 223, 226; Mineral Leasing Act of February 25, 1920, Pub. L. No. 66-146, §§ 14, 17, 85 Stat. 437, 442, 443. To make sure the development is effective and prudent, the MLA requires that lessees "use all

5

reasonable precautions to prevent waste of oil or gas developed in the land." 30 U.S.C. § 225. But, the MLA does not define "waste" or what the term "reasonable precautions" specifically contemplates. And, "it is for agencies, not courts, to fill statutory gaps." *Nat'l Cable & Telecom. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005). In this situation, Congress impliedly gave the BLM authority to develop a *reasonable* interpretation of the term "waste" and to assess which precautions would be "reasonable." In the 2018 Rule—unlike in the 2016 Rule—the BLM acted within that authority, and the Court should defer to the BLM's decisions in the 2018 Rule.

The fact that the 2018 Rule implements a different interpretation of "waste" than the 2016 Rule is not cause to reverse the BLM's decisions. An agency is "fully entitled" to change its mind. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 659 (2007). "[I]f the agency adequately explains the reasons for a reversal of policy, 'change is not invalidating, since the whole point . . . is to leave the discretion provided by the ambiguities of a statute with the implementing agency.'" *Brand X Internet Servs*, 545 U.S. at 981 (quoting *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996)). Even in *Chevron, USA, Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984), the Supreme Court "deferred to an agency interpretation that was a recent reversal of agency policy." *Id.* at 982.

The BLM correctly changed its mind when it promulgated the 2018 Rule. An agency "'must consider varying interpretations and the wisdom of its policy on a continuing basis' for example, in response to changed factual circumstances, or *a change in administrations*." *Brand X Internet Servs*, 545 U.S. at 981 (quoting *Chevron*, 467 U.S. at 863–64) (emphasis added). Pursuant to President Trump's directive, the BLM properly considered cost in the 2018 Rule as part of its regulation of waste. *Cf. Michigan v. EPA*, 135 S.Ct. 2699, 2707 (2015) ("Agencies have long treated cost as a centrally relevant factor when deciding whether to regulate."). "The Mineral Leasing Act of 1920 allows BLM to grant leases for the 'economically sound and stable' development of federal mineral resources, including gas and oil, on public or private lands where the federal government controls subsurface mineral estates." *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 937 F. Supp. 2d 1140, 1151 (N.D. Cal. 2013) (quoting 30 U.S.C. § 21a). While the MLA's prudent-operator standard requires operators to use "reasonable diligence" and

6

"reasonable precautions" to avoid waste, the MLA does not require operators "to lose money capturing and marketing uneconomic gas." 83 Fed. Reg. 49,186.  Ultimately, the 2018 Rule "allows operators to continue implementing waste reduction strategies and programs that they find successful and to tailor or modify their programs in a manner that makes sense for their operations." 83 Fed. Reg. 49,184.

Despite alarmist language from Plaintiffs and their supporting *amici*, the 2018 Rule discourages "excessive venting and flaring by placing volume and/or time limits on royalty-free venting and flaring during production testing, emergencies, and downhole well maintenance and liquids unloading." 83 Fed. Reg. 49,184; *see, e.g.*, *id.* at 49,199–49,203 (discussion of venting); 43 C.F.R. §§ 3179.6 (2018) (general prohibition on flaring and venting, and requirement to flare rather than vent), 3179.101–04 (2018) (time and volume limits).  The 2018 Rule also does not rescind completely the 2016 Rule.  For example, the 2018 Rule retains the 2016 Rule's "subpart 3178 provisions, which incentivize the beneficial use of gas by making gas used for operations and production purposes royalty free." 83 Fed. Reg. 49,184.

Additionally, the BLM did not create the 2018 Rule in a vacuum.  The BLM considered opposition to the proposed 2018 Rule, but noted that commenters failed to provide any legal authority demonstrating that "the MLA either does not provide the BLM with the discretion to determine what constitutes 'reasonable precautions' and 'undue waste,' or that the BLM's revision of the 2016 rule exceeds the BLM's discretion in this area." 83 Fed. Reg. 49,189.

Finally, Congress could have, but did not, use its Congressional Review Act authority to repeal the 2018 Rule.  Plaintiffs and the *amici* supporting them may have wished for the opposite result, but that should have no bearing on this Court's decision.  This Court should defer to the BLM's lawful exercise of the authority Congress gave to it as guided by the then-newly elected President and deny summary judgment.

**B.**     **The 2018 Rule Removes Duplicative Regulatory Burdens of the 2016 Rule.**

In 2016, rather than adhere to Congress's grant, the BLM used the MLA as a point of departure and acted beyond its legal authority in pursuit of a political end:  regulating air quality under the guise of waste prevention even though the EPA already regulated air quality.  When the

7

1 political winds changed, the Executive Branch took steps to address its error.  *See* E.O. 13,783.
2 President Trump specifically instructed the BLM to find ways to "avoid[] regulatory burdens that
3 unnecessarily encumber energy production[.]"  E.O. 13,783, § 1(a).  In response, the BLM
4 promulgated the 2018 Rule.  Not only does the 2018 Rule hew closer to the authority granted by
5 Congress, but also it addresses the onerous duplication of air-quality regulation in the 2016 Rule.
6 This Court should defer to Congress's and the President's policy decisions and the BLM's
7 implementation of them in this case.  *See Vt. Yankee Nuclear Power Corp. v. NRDC, Inc.*, 435
8 U.S. 519, 558 (1978) ("The fundamental policy questions appropriately resolved in Congress and
9 in the state legislatures are *not* subject to reexamination in the federal courts under the guise of
10 judicial review of agency action."  (emphasis in original)).

11 　　　　To promote oil and gas development, Congress has authorized the leasing, by private
12 permittees, of land containing "valuable deposits of oil or gas[.]"  *See* 30 U.S.C. §§ 223, 226;
13 Mineral Leasing Act of February 25, 1920, Pub. L. No. 66-146, §§ 14, 17, 85 Stat. 437, 442, 443.
14 Congress authorized the BLM to put conditions in those leases and permits requiring the lessees
15 and permittees to "use all reasonable precautions to prevent waste of oil or gas," or face the risk
16 that the federal government would seek forfeiture of the leases and permits through court
17 proceedings.  30 U.S.C. § 225 (emphasis added); Pub. L. No. 66-146, § 16, 85 Stat. at 442.
18 Dating to 1920, Congress prescribed many of the leasing and permitting requirements, such as
19 how to set royalty amounts.  *See, e.g.*, Pub. L. No. 66-146, §§ 14, 17–18, 85 Stat. at 442–44
20 (codified as amended as 30 U.S.C. §§ 223, 226).  And Congress generally authorized the Secretary
21 of the Interior to make "rules and regulations" necessary and proper for carrying out the purpose
22 of the MLA:  "To promote" prudent oil and gas production "on the public domain" subject to
23 Congress's prescribed limits.  *See id.* at §§ 30, 32, 85 Stat. at 437 (quoted material), 449–50
24 (codified as 30 U.S.C. §§ 187, 189).

25 　　　　Congress did *not* authorize the BLM to regulate air quality; instead, Congress gave that
26 authority to the EPA.  *See generally* 42 U.S.C. §§ 7401 *et seq*.; *Bell v. Cheswick Generating*
27 *Station*, 734 F.3d 188, 190 (3d Cir. 2013) ("The Clean Air Act, 42 U.S.C. § 7401 et seq., enacted
28 in 1970, is a comprehensive federal law that regulates air emissions under the auspices of the

8

[EPA]."). In the Clean Air Act, Congress laid out the procedures and substance required for meaningfully regulating air quality. 42 U.S.C. §§ 7401 *et seq*. Congress intended that the EPA—not the BLM—regulate air quality. And when the BLM looked again at the 2016 Rule, which the President directed it to do, the BLM realized that it had overstepped its bounds. *See* 83 Fed. Reg. 49,186 (describing another court's concerns on this issue and finding them valid).

In 2016, not only did the BLM stray beyond its authority, but also it created a *duplicative* regime to regulate air quality. Where agencies' authorities overlap, they should "administer their obligations" to "avoid inconsistency." *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007). And, "an agency may not bootstrap itself into an area in which it has no jurisdiction." *Adams Fruit Co., Inc. v. Barrett*, 494 U.S. 638, 650 (1990) (internal quotation marks and citation omitted). But, the 2016 Rule "upend[ed] the . . . cooperative federalism framework and usurp[ed] the authority Congress expressly delegated . . . to the EPA, states, and tribes to manage air quality." *See Wyoming v. Dep't of Interior*, 2017 WL 161428, at *8 (D. Wyo. 2017). "The asserted benefits of the [2016] Rule are . . . already subject to EPA and state regulations." *Id.* at *12.

In the 2016 Rule, "the BLM . . . hijacked the EPA's authority under the guise of waste management." *Id.* at *8; *see also* 83 Fed. Reg. 49,186, 49,188, 49,191. Upon review of the 2016 Rule, the BLM reached the same conclusion. In the 2018 Rule, the BLM explained, "[T]he BLM believes that the emissions-targeting provisions of the 2016 rule create unnecessary regulatory overlap in light of EPA's Clean Air Act authority and its analogous regulations that similarly reduce losses of gas." 83 Fed. Reg. 49,191. That unnecessary regulation and its associated burdens on "the development of domestic energy resources" are exactly what President Trump charged the BLM with removing. *See* E.O. 13,783, § 1(a).

The 2018 Rule respects Congress's decisions regarding how to regulate air quality. It ensures that the BLM's regulations "are justified as *waste-prevention measures* under the BLM's MLA authority and do not usurp the Clean Air Act authority of the EPA, the states, and tribes." 83 Fed. Reg. 49,186 (emphasis added). That is why the BLM tailored the 2018 Rule to rescind "the provisions of the 2016 rule that imposed costs in excess of their resource conservation benefits or created the potential for impermissible conflict with the regulation of air quality by the

9

EPA or the States under the Clean Air Act." 83 Fed. Reg. 49,186.

Additionally, further regulation of methane should be left to the States. In the MLA, Congress specifically recognized the States' important roles in federal oil and gas development. 30 U.S.C. §§ 187, 189. Congress *mandated* that provisions in federal oil and gas leases could not "be in conflict with the laws of the State in which the leased property is situated." 30 U.S.C. § 187. And Congress *mandated* that its leasing laws could not "be construed or held to affect the rights of the States . . . to exercise any rights which they may have[.]" 30 U.S.C. § 189.

Although *amici* supporting the Plaintiffs claim that most of the States lack comprehensive oil and gas regulations, they neglect to mention that most of the States do not produce significant oil and gas from federal lands. Ten States are responsible for ninety-nine percent of federal oil and gas production, and they all have comprehensive regulatory regimes, including regulations that restrict the venting and flaring of gas from oil and gas wells. *See* 83 Fed. Reg. 49,188; Info. Mem. from Timothy R. Spisak, Acting Assistant Dir., Energy, Minerals & Realty Mgmt. 1 (Oct. 19, 2017) (cited in the record for this case as AR 19).

And, regarding production on Indian lands, the BLM is required to act "in the best interests of the tribes or of the individual Indian mineral owners, considering all factors affecting their interests." 83 Fed. Reg. 49,189. Unlike the 2016 Rule, the 2018 Rule properly acts in the best economic interest of the Indian mineral owners and properly allows the States that produce the most oil and gas from federal lands to regulate the industry appropriately.

### C. <u>Development of Oil and Gas Resources on Federal Lands Is Critical.</u>

World War I forced the United States to reckon with the fact that it possessed "a perilously short supply" of oil. David W. Miller, *The Historical Development of the Oil and Gas Laws of the United States*, 51 Calif. L. Rev. 506, 515, 528 (1963). If the United States wanted to contend at an international level, then it needed petroleum, and Congress accordingly passed the MLA in 1920, recognizing that "the discovery of these minerals [was] necessary for the prosperity of our country." An Act to Promote the Mining of Coal, Phosphate, Oil, Gas, and Sodium on the Public Domain, Senate Debate on § 2775, 58 Cong. Rec. 4111 (1919); Miller, *supra* at 515 (citing and quoting Allan Nevins, *Three Fabulous Decades*, Am. Petrol. Inst. Q. 23 (1959)). However, the

10

MLA as originally enacted had not gone far enough to promote domestic energy development.

Thus, in the wake of World War II, the United States once again found itself "fearful of [its] short supply" of oil, which led to Congress amending the MLA. Miller, *supra* at 528. In 1946, prompted by the "great drain placed on our crude oil reserves by World War II . . . Congress took steps to encourage more exploration and development of public lands." Miller, *supra* at 523–24. As Senator Joseph O'Mahoney of Wyoming explained:

> The bill is the first general revision of the Mineral Leasing Act since the act of August 21, 1935. . . . World War No. II has demonstrated beyond peradventure of doubt that the salvation of this Nation demands that we develop our petroleum reserves to the utmost, to the end that this Nation shall not risk loss of either industrial or political leadership.

S. Rep. No. 1392, at 1 (1946). These policy concerns remain true today.

*Amici Curiae* understand that the United States is, once again, a global energy leader and the largest producer of both oil and natural gas. U.S. Energy Info. Admin., *Total Petroleum and Other Liquids Production - 2018*, *International Dry Natural Gas Production - 2017*.[4] It is imperative that the BLM responsibly regulate federal oil and gas resources to avoid impeding that hard-won status.

Oil and gas development generates jobs and revenue that affect federal, state, and local budgets. There is no disputing that domestic energy production has helped to lower energy prices for American businesses and families, which in turn have helped to stabilize and *grow* our economy.

Additionally, as the States take the lead in regulating oil and gas development, domestic energy production has fueled the States' public-education services. For example, the New Mexico Oil and Gas Association recently reported that oil and natural gas production have been a boon to state education budgets:

> Oil and natural gas production is the single largest source of revenue for [New Mexico's] budget, having provided $2.2 billion in fiscal year 2018 and currently providing [New Mexico] with a billion-dollar budget surplus. Nowhere is that impact more evident than

---

[4] Available at https://www.eia.gov/beta/international/ (last visited Aug. 28, 2019).

11

> [New Mexico's] public schools where oil and natural gas industry contributed more than $822.3 million to help [New Mexico's] school children have the best education possible. An additional $240.5 million supported colleges and universities including the University of New Mexico and New Mexico State University.

N.M. Oil & Gas Ass'n, *Fueling New Mexico*, at 2.[5] The regulatory approach embraced in the 2018 Rule (and preceding the 2016 Rule) reflects a respect for cooperative federalism that Congress wrote into the MLA, and it benefits our nation as a whole and the States individually. *See Wyoming*, 2017 WL 161428, at *8, *12; *cf.* 30 U.S.C. §§ 187, 189 (deference to State laws). The 2016 Rule put all of those benefits in jeopardy.

*Amici Curiae* are glad that the BLM replaced the 2016 Rule with the 2018 Rule, which promotes oil and gas production from federal lands, the United States economy as a whole, and the well-being of the States. It is our hope that the BLM will continue to adhere to its legislative grant of authority and use that grant to work collaboratively, driving more innovative technologies that build upon existing methane-emissions decreases while also continuing to implement common-sense reforms such as the 2018 Rule.

## V.  CONCLUSION

The 2018 Rule returns the BLM to the authority that Congress granted. It returns to the proper definition of "waste"—which includes the compliance costs that would constrain economic growth—and removes the 2016 Rule's duplicative, unauthorized regulation of air quality. The BLM had to correct its course to respect Congress, the President, the States, and American businesses and families. *Amici Curiae* accordingly and respectfully ask the Court to uphold the 2018 Rule and deny Plaintiffs' motions for summary judgment.

Dated: September 6, 2019

Ivan London
Zachary W. Fitzgerald
K. Lee Marshall
**BRYAN CAVE LEIGHTON PAISNER LLP**

By:  */s/K. Lee Marshall*
K. Lee Marshall
Attorneys for *Amici Curiae*

---

[5] Available at https://www.nmoga.org/benefits_of_oil_natural_gas (last visited Aug. 12, 2019) and authenticated as Ex. 3 to the Declaration of Zachary W. Fitzgerald. (Doc. #131-1.)

12

Brief of Members of Congress as *Amici Curiae* in Opposition to Plaintiffs' Motions for Summary Judgment
Case No. 4:18-cv-05712-YGR [Consolidated with Case No. 4:18-cv-05984-YGR]

## **CERTIFICATE OF SERVICE**

I certify that on September 6, 2019, I electronically filed the foregoing BRIEF OF MEMBERS OF CONGRESS AS *AMICI CURIAE* IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT with the Clerk using the CM/ECF system, which I understand to have caused service of the filing to all counsel of record.

*/s/ K. Lee Marshall*
K. Lee Marshall