1   XAVIER BECERRA
    Attorney General of California
2   DAVID A. ZONANA, State Bar No. 196029
    Supervising Deputy Attorney General
3   GEORGE TORGUN, State Bar No. 222085
    SHANNON CLARK, State Bar No. 316409
4   M. ELAINE MECKENSTOCK, State Bar No. 268861
    Deputy Attorneys General
5   1515 Clay Street, 20th Floor
    P.O. Box 70550
6   Oakland, CA  94612-0550
    Telephone:  (510) 879-1974
7   Fax:  (510) 622-2270
    E-mail:  George.Torgun@doj.ca.gov
8
    Attorneys for Plaintiff State of California
9

    HECTOR BALDERAS
    Attorney General of New Mexico
    BILL GRANTHAM (*pro hac vice*)
    Assistant Attorneys General
     201 Third St. NW, Suite 300
    Albuquerque, NM 87102
    Telephone:  (505) 717-3520
    E-Mail:  wgrantham@nmag.gov

    *Attorneys for Plaintiff State of New Mexico*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA,** et al., | Case No. 4:18-cv-05712-YGR |
| Plaintiffs, | (Consolidated with No. 4:18-cv-05984-YGR) |
| **v.** | **STATE PLAINTIFFS' OPPOSITION TO CROSS-MOTIONS FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| **DAVID BERNHARDT,** et al., | |
| Defendants. | Date:  January 14, 2020 |
| | Time: 10:00 a.m. |
| **SIERRA CLUB,** et al., | Courtroom: 1, 4th Floor |
| | Judge: Hon. Yvonne Gonzalez Rogers |
| Plaintiffs, | |
| **v.** | |
| **DAVID BERNHARDT,** et al., | |
| Defendants. | |

**TABLE OF CONTENTS**

**Page**

Introduction .................................................................................................................. 1

Argument ...................................................................................................................... 2

I.  BLM's New Definition of "Waste of Oil or Gas" is Contrary to Law (Issue A-2). .......................................................................................................... 2

    A.  BLM's New Definition is Contrary to the Plain Language and Legislative History of the Mineral Leasing Act. ......................................... 3

    B.  BLM's New Definition Would Improperly Nullify Its Statutory Duties and is Not Entitled to Broad Deference. ........................................ 4

II.  BLM Violated the APA by Failing to Provide a Reasoned Explanation for the Rescission. .................................................................................................. 8

    A.  BLM's Statutory Authority Justification for the Rescission is Arbitrary and Capricious (Issues A-1 and A-4). ...................................... 8

        1.  BLM failed to explain the inconsistencies between the Rescission and the 2016 Rule. ...................................................... 9

        2.  BLM failed to provide a reasoned basis for its new policy determination that the Waste Prevention Rule exceeds its statutory authority. ........................................................................ 11

        3.  BLM failed to allow for meaningful comment on this primary justification for the Rescission. ...................................... 13

        4.  The Wyoming litigation provides no justification for BLM's policy determination ...................................................................... 15

    B.  The New Definition of "Waste of Oil or Gas" is Arbitrary and Capricious (Issue A-2). ............................................................................. 15

    C.  Executive Order 13783 Provides No Basis for the Rescission (Issue B-1). .................................................................................................... 17

    D.  BLM's Regulatory Impact Analysis Arbitrarily Inflates the Burdens of the Waste Prevention Rule and Downplays the Environmental Costs of the Rescission (Issues C and B-2).............................................. 19

        1.  BLM failed to provide any explanation for its change to the administrative burdens of implementing the Waste Prevention Rule (Issue C-3). ............................................................. 19

        2.  BLM's use of a "domestic" social cost of methane metric is arbitrary and capricious and contrary to the best available science (Issue C-1). ...................................................................... 20

i

1

**TABLE OF CONTENTS**
(continued)

2

Page

3.      BLM's use of a "domestic" social cost of methane metric is
        not owed substantial deference (Issue C-1). ................................ 23

4.      BLM's provided no reasoned explanation for its failure to
        consider other substantial benefits of the Waste Prevention
        Rule (Issue C-2). .......................................................................... 25

5.      BLM's new analysis of impacts to marginal wells is
        arbitrary and capricious (Issue B-2). ............................................ 26

E.      There is No Basis in the Record to Support BLM's Claim that the
        Waste Prevention Rule is Duplicative of Federal and State
        Regulations (Issue A-4) ................................................................. 26

III.    BLM Failed to Take a "Hard Look" at the Environmental Impacts of the
        Rescission as Required by NEPA (Issue D). ......................................... 28

IV.     This Court Should Apply the Standard Remedy of Vacatur (Issue E). ............... 28

Conclusion ...................................................................................................... 31

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

CASES

*A.Y. Chrisman v. Miller*
    25 S. Ct. 468 (1905) ................................................................................................5

*All. for the Wild Rockies v. U.S. Forest Serv.*
    907 F.3d 1105 (9th Cir. 2018) ..............................................................3, 20, 28

*Alsea Valley All. v. Dep't of Commerce*
    358 F.3d 1181 (9th Cir. 2004) ...........................................................28, 31

*Altera Corporation & Subsidiaries v. Commissioner of Internal Revenue*
    926 F.3d 1061 (9th Cir. 2019) ..............................................................2

*Boesche v. Udall*
    373 U.S. 472 (1963) ..............................................................................4

*Brewster v. Lanyon Zinc. Co.*
    140 F. 801 (8th Cir. 1905) ....................................................................5

*Cal. Cmties. Against Toxics v. U.S. E.P.A.*
    688 F.3d 989 (9th Cir. 2012) ...............................................................29

*Cal. Wilderness Coal. v. U.S. Dep't of Energy*
    631 F.3d 1072 (9th Cir. 2011) ...........................................................28

*California Pub. Utilities Comm'n v. Fed. Energy Regulatory Comm'n*
    879 F.3d 966 (9th Cir. 2018) ................................................................7

*Camp v. Pitts*
    411 U.S. 138 (1973) ..............................................................................8

*Center for Biological Diversity v. Lubchenco*
    758 F. Supp. 2d 945 (N.D. Cal. 2010) ...............................................24

*Center for Biological Diversity v. NHTSA*
    538 F.3d 1172 (9th Cir. 2008) ............................................................23

*Center for Biological Diversity v. U.S. Bureau of Land Mgmt.*
    2019 WL 2635587 (C.D. Cal. June 20, 2019) ...............................9, 20

*Center for Biological Diversity v. Zinke*
    900 F.3d 1053 (9th Cir. 2018) ............................................................24

*Chevron, USA, Inc. v. Natural Resources Defense Council, Inc.*
    467 U.S. 837 (1984) ....................................................................1, 2, 3, 4

State Plaintiffs' MSJ Opposition and Reply - Case No. 4:18-cv-05712-YGR

## TABLE OF AUTHORITIES
### (continued)

Page

*Chubb Custom Ins. Co. v. Space Systems/Loral, Inc.*
710 F.3d 946 (9th Cir. 2013)..............................................................................5

*Citizens to Preserve Overton Park, Inc. v. Volpe*
401 U.S. 402 (1971) .........................................................................................8

*Clifton v. Koontz*
160 Tex. 82 (Tex. 1959).....................................................................................6

*Connecticut Light & Power Co. v. Nuclear Regulatory Comm'n*
673 F.2d 525 (D.C. Cir. 1982) ........................................................................14

*Ctr. for Food Safety v. Vilsack*
734 F. Supp. 2d 948 (N.D. Cal. 2010) .............................................................29

*Defenders of Wildlife v. U.S. Fish & Wildlife Serv*.
2016 WL 4382604 (N.D. Cal. Aug. 17, 2016)...................................................24

*Dep't of Treasury-I.R.S. v. Federal Labor Relations Authority*
521 F.3d 1148 (9th Cir. 2008)............................................................................7

*Eagle Oil & Gas Co. v. Travelers Property Cas. Co. of America*
2014 WL 3406686 (N.D. Tex. Jul. 14, 2014) .....................................................5

*Encino Motorcars, LLC v. Navarro*
136 S. Ct. 2117 (2016).............................................................................11, 28

*ETSI Pipeline Project v. Missouri*
484 U.S. 495 (1988) .........................................................................................3

*F.C.C. v. Fox Television Stations, Inc.*
556 U.S. 502 (2009)........................................................................................11

*FDA v. Brown & Williamson Tobacco Corp.*
529 U.S. 120 (2000) .........................................................................................3

*Flores v. Meese*
942 F.2d 1352 (9th Cir. 1991)..........................................................................25

*Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*
381 F. Supp. 3d 1127 (D. Alaska 2019).................................................19, 25, 30

*High Country Conservation Advocates v. U.S. Forest Serv.*
52 F. Supp. 3d 1174 (D. Colo. 2014)................................................................23

iv

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

*Humane Soc'y of U.S. v. Locke*
   626 F.3d 1040 (9th Cir. 2010)...................................................................... *passim*

4

5

*Idaho Farm Bureau Fed'n v. Babbitt*
   58 F.3d 1392 (9th Cir. 1995)......................................................................15, 29

6

7

*Kern County Farm Bureau v. Allen*
   450 F.3d 1072 (9th Cir. 2006).............................................................14, 15, 23

8

*King v. Burwell*
   135 S. Ct. 2480 (2015) ....................................................................................4

9

10

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine Fisheries Serv.*
   109 F. Supp. 3d 1238 (N.D. Cal. 2015) .................................................30

11

12

*Lands Council v. McNair*
   537 F.3d 981 (9th Cir. 2008)...........................................................................23

13

14

*Lyco Energy Corp.*
   92 IBLA 81 (1986) ............................................................................................6

15

*Michigan v. EPA*
   135 S. Ct. 2699 (2015) .............................................................................20, 21

16

17

*Mid-Tex Electric Cooperative v. FERC*
   773 F.2d 327 (D.C. Cir. 1995) .......................................................................14

18

19

*Monsanto Co. v. Geertson Seed Farms*
   561 U.S. 139 (2010) .......................................................................................31

20

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Automobile Ins. Co.*
   463 U.S. 29 (1983) .............................................................................12, 13, 25

21

22

*National Parks Conservation Ass'n v. EPA*
   788 F.3d 1134 (9th Cir. 2015)........................................................................16

23

24

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*
   565 F.3d 683 (10th Cir. 2009).........................................................................9

25

*Nola Grace Ptasynski*
   63 IBLA 240 (1982).........................................................................................6

26

27

*Organized Vill. of Kake v. U.S. Dep't of Agric.*
   795 F.3d 956 (9th Cir. 2015)....................................................................19, 26

28

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Pollinator Stewardship Council v. U.S. E.P.A.*
806 F.3d 520 (9th Cir. 2015)........................................................................28, 29

*Pub. Employees for Envtl. Responsibility v. U.S. Fish & Wildlife Serv.*
189 F. Supp. 3d 1 (D.D.C. 2016) ...................................................................30

*Reed v. Salazar*
744 F. Supp. 2d 98 (D.D.C. 2010) .................................................................31

*Rodman v. Safeway Inc.*
125 F. Supp. 3d 922 (N.D. Cal. 2015) ......................................................17, 19

*Safe Air for Everyone v. U.S. E.P.A.*
488 F.3d 1088 (9th Cir. 2007)........................................................................31

*San Luis & Delta-Mendota Water Auth. v. Jewell*
747 F.3d 581 (9th Cir. 2014).....................................................................23, 24

*San Luis & Delta-Mendota Water Auth. v. Locke*
776 F.3d 971 (9th Cir. 2014).....................................................................23, 24

*Scheduled Airlines Traffic Offices, Inc. v. Dep't of Defense*
87 F.3d 1356 (D.C. Cir. 1996) .......................................................................25

*State of California v. U.S. Bureau of Land Mgmt.*
277 F. Supp. 3d 1106 (N.D. Cal. 2017) ...............................................7, 25, 29, 30

*State of California v. Bureau of Land Mgmt.*
286 F. Supp. 3d 1054 (N.D. Cal. 2018) ...............................................7, 17, 18, 19

*State of California v. U.S. Dep't of the Interior*
381 F. Supp. 3d 1153 (N.D. Cal. 2019) ......................................................*passim*

*Tovar v. Sessions*
882 F.3d 895 (9th Cir. 2018)...........................................................................4

*U.S. v. Mead*
533 U.S. 218 (2001) ........................................................................................6

*Univ. of Tex. v. Camenisch*
451 U.S. 390 (1981) ......................................................................................23

*W. Radio Servs. Co. v. Qwest Corp.*
678 F.3d 970 (9th Cir. 2012)............................................................................7

1

### TABLE OF AUTHORITIES
**(continued)**

2

**Page**

3

*Walters v. Metro. Educ. Enters.*
   519 U.S. 202 (1997) .................................................................................5

4

5

*Western Watersheds Project v. Salazar*
   2011 WL 882641 (D. Mont. Mar. 10, 2011).........................................24

6

*Wyoming v. U.S. Dep't of the Interior*
   2017 WL 161428 (D. Wyo. Jan. 16, 2017)...........................13, 15, 31

7

8

*Wyoming v. U.S. Dep't of Interior*
   768 Fed. Appx. 790 (10th Cir. Apr. 9, 2019).........................................31

9

*Zamani v. Carnes*
   491 F.3d 990 (9th Cir. 2007)............................................................17, 19

10

11

*Zero Zone Inc. v. Dept. of Energy*
   832 F.3d 654 (7th Cir. 2016)..................................................................23

12

13

14

**STATUTES**

15

5 U.S.C. § 706(2)(A)..................................................................................8, 28

16

5 U.S.C. § 706(2)(C)........................................................................................8

17

16 U.S.C. § 1536............................................................................................24

18

30 U.S.C. § 1701(a)(4)...................................................................................10

19

30 U.S.C. § 187....................................................................................3, 5, 12

20

30 U.S.C. § 189.......................................................................................12, 16

21

30 U.S.C. § 225................................................................................................3

22

30 U.S.C. § 1756.......................................................................................10, 12

23

42 U.S.C. § 7412(n)(1)(A).............................................................................21

24

43 U.S.C. § 1701(a)(8)...................................................................................10

25

43 U.S.C. § 1732(b).......................................................................................10

26

27

28

1

## **TABLE OF AUTHORITIES**
### (continued)

2

Page

3

**LEGISLATIVE HISTORY**

4

H.R. Rep. No. 65-206, 65th Cong. (1917) ..................................................................4

5

H.R. Rep. No. 65-563, 65th Cong. (1918) ...............................................................4, 5

6

7

**FEDERAL REGULATIONS**

8

9

43 C.F.R. § 3160.0-1 ...........................................................................................16

10

43 C.F.R. § 3160.0-5 ...........................................................................................16

11

43 C.F.R. § 3179.3 ..............................................................................................16

12

43 C.F.R. § 3179.4 ..............................................................................................17

13

43 C.F.R. § 3179.4-5 .......................................................................................6, 12

14

15

**FEDERAL REGISTER NOTICES**

16

47 Fed. Reg. 47,758 ............................................................................................16

17

58 Fed. Reg. 51,735 ............................................................................................25

18

81 Fed. Reg. 83,009 ......................................................................................10, 12

19

81 Fed. Reg. 83,009-10 .......................................................................................13

20

81 Fed. Reg. 83,014 .............................................................................................8

21

81 Fed. Reg. 83,019 .........................................................................................4, 9

22

81 Fed. Reg. 83,020 ............................................................................................10

23

81 Fed. Reg. 83,019-21 .......................................................................................10

24

81 Fed. Reg. 83,020-21 .......................................................................................28

25

81 Fed. Reg. 83,038 .........................................................................................9, 10

26

81 Fed. Reg. 83,038-39 .........................................................................................4

27

81 Fed. Reg. 83,082 ............................................................................................12

28

State Plaintiffs' MSJ Opposition and Reply - Case No. 4:18-cv-05712-YGR

## TABLE OF AUTHORITIES
### (continued)

**Page**

82 Fed. Reg. 16,093 ...................................................................................................18

82 Fed. Reg. 16,096 ...................................................................................................17

83 Fed. Reg. 7,927 .....................................................................................................13

83 Fed. Reg. 49,184 .....................................................................................................1

83 Fed. Reg. 49,191 ...................................................................................................27

83 Fed. Reg. 49,204 ...................................................................................................29

83 Fed. Reg. 49,205 .....................................................................................................8

84 Fed. Reg. 50,244 ...................................................................................................27


**OTHER AUTHORITIES**

Executive Order 12866 .............................................................................16, 20, 21, 25

Executive Order 13783 .........................................................................17, 18, 19, 21, 22

ix

# INTRODUCTION

In this action, Plaintiffs State of California, by and through Xavier Becerra, Attorney General, and the California Air Resources Board, and State of New Mexico, by and through Hector Balderas, Attorney General (collectively, "State Plaintiffs") challenge the decision by Defendants U.S. Bureau of Land Management, *et al*. ("BLM") to repeal key requirements of the 2016 Waste Prevention Rule.  83 Fed. Reg. 49,184 (Sept. 28, 2018) (the "Rescission") (AR 1).[1] The attempts by BLM and the Intervenor-Defendants (collectively, "Defendants") to defend the Rescission in their cross-motions for summary judgment fail at every turn.  First, Defendants are not saved by their reliance on *Chevron* with regard to the new definition of "waste of oil or gas." The plain language and legislative history of the Mineral Leasing Act demonstrate that the statute has countervailing public purposes which do not allow for a definition that considers only the profit motives of private operators.  More fundamentally, Defendants ignore the fundamental principle that *Chevron* must be applied in light of traditional tools of statutory construction, including the cardinal rule that a statute must not be interpreted so as to render any provision meaningless or insignificant.

With regard to State Plaintiffs' claims under the Administrative Procedure Act ("APA"), Defendants contend that the Rescission merely reinstated BLM's historical understanding of the scope of its statutory authority to regulate waste.  Yet Defendants fail to cite a single authority that supports this interpretation, and their claim that the 2016 Rule recognized that it was a significant departure from past practice is simply false.  In addition, Defendants' assertion that they adequately noticed this interpretation and afforded State Plaintiffs and others an opportunity to point out its many infirmities is equally baseless.  Moreover, rather than address the evidence in the administrative record, Defendants improperly rely on *post-hoc* assertions and new authorities that were never mentioned as a basis for the Rescission.

Defendants also fail to offer any persuasive defense of the Rescission's regulatory impact analysis.  Notably absent from Defendants' briefs is any attempt to dispute that the Rescission

---

[1] The administrative record in this matter is cited as "AR [page number]," excluding leading zeros.

1   inflated the administrative burden supposedly avoided by arbitrarily doubling the estimated hours

2   needed to comply with the Waste Prevention Rule.  And while Defendants attempt to defend the

3   Rescission's calculation of environmental costs, they are unable to reconcile that calculation with

4   the best available science or to justify the arbitrary, outcome-driven approach utilized by BLM in

5   considering only the "domestic" costs.

6   Implicitly recognizing the Rescission's many infirmities, Defendants assert that vacatur

7   would be improper.  It is well-settled, however, that vacatur is the standard remedy for a rule

8   issued in violation of the law, and courts should forgo that remedy only in limited circumstances.

9   Defendants have not even begun to show that such circumstances are present here.

10  Accordingly, this Court should grant State Plaintiffs' motion for summary judgment, deny

11  Defendants' cross-motions for summary judgment, and vacate and set aside the Rescission until

12  BLM complies with applicable law.

13  **ARGUMENT**

14  **I.    BLM'S NEW DEFINITION OF "WASTE OF OIL OR GAS" IS CONTRARY TO LAW**
        **(Issue A-2).**

15  While BLM relies heavily on *Chevron, USA, Inc. v. Natural Resources Defense Council,*

16  *Inc*., 467 U.S. 837 (1984) to justify its new interpretation of "waste" under the Mineral Leasing

17  Act, *see* Defendants' Cross Motion for Summary Judgment and Response to Plaintiffs' Motions

18  for Summary Judgment, ECF No. 123 ("BLM Br.") at 9-18, *Chevron* does not save BLM here.

19  Under the familiar two-step framework of *Chevron,* the Court must first determine "whether

20  Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear,

21  that is the end of the matter; for the court, as well as the agency, must give effect to the

22  unambiguously expressed intent of Congress."  *Chevron,* 467 U.S. at 842-43.  In conducting this

23  analysis, the court examines "the legislative history, the statutory structure, and other traditional

24  aids of statutory interpretation in order to ascertain congressional intent."  *Altera Corporation &*

25  *Subsidiaries v. Commissioner of Internal Revenue*, 926 F.3d 1061, 1075 (9th Cir. 2019) (internal

26  quotations and citation omitted).  Second, "if the statute is silent or ambiguous with respect to the

27  specific issue, the question for the court is whether the agency's answer is based on a permissible

28

2

construction of the statute." *Chevron,* 467 U.S. at 843.  "Regardless of how serious the problem

an administrative agency seeks to address, ... it may not exercise its authority 'in a manner that is

inconsistent with the administrative structure that Congress enacted into law.'"  *FDA v. Brown &*

*Williamson Tobacco Corp*., 529 U.S. 120, 125 (2000) (quoting *ETSI Pipeline Project v. Missouri*,

484 U.S. 495, 517 (1988)).

Here, BLM cannot identify any legal basis for its new definition of "waste of oil or gas."

The plain language of the Mineral Leasing Act and its legislative history do not allow for such an

"economic limitation" on the definition of waste.  And even if the Court were to consider the

mandate to regulate waste to be ambiguous and reach *Chevron* step 2, BLM's definition, which

would effectively nullify this statutory mandate, is not based on a permissible construction of the

statute and is not owed deference.  Furthermore, as discussed *infra* in Section II.B., BLM has

failed to provide a reasoned explanation for this new definition or how it will work in practice,

rendering it arbitrary and capricious under the APA.

> **A.  BLM's New Definition is Contrary to the Plain Language and Legislative History of the Mineral Leasing Act.**

First, the plain language of the Mineral Leasing Act does not support an economic

limitation that narrows the definition of waste to acts "where compliance costs are not greater

than the monetary value of the resources they are expected to conserve."  As Congress provided

in the statute, BLM must require oil and gas lessees to observe "such rules ... for the prevention of

undue waste as may be prescribed by [the] Secretary," and assure that lessees "use *all* reasonable

precautions to prevent waste of oil or gas."  30 U.S.C. §§ 187, 225 (emphasis added).  Not only is

this plain language inconsistent with a definition that only considers operators' private profit

motives, but Congress also required BLM to ensure that federal oil and gas leases provide, among

other public purposes, "for the protection of the interests of the United States" and "for the

safeguarding of the public welfare."  *Id.* § 187.  As the Ninth Circuit recently stated:

> When interpreting the language of a statute we do not look at individual subsections
> in isolation.  Instead, 'when deciding whether the language is plain, we must read the
> words in their context and with a view to their place in the overall statutory scheme.
> Our duty, after all, is to construe statutes, not isolated provisions.'

1   *Tovar v. Sessions*, 882 F.3d 895, 901 (9th Cir. 2018) (quoting *King v. Burwell*, 135 S. Ct. 2480,

2   2489 (2015)).  As BLM itself noted in 2016, "[t]he [Mineral Leasing Act] rests on the

3   fundamental principle that the public should benefit from mineral production on public lands."

4   81 Fed. Reg. at 83,019 (AR 920).  Yet BLM's new definition completely ignores and is contrary

5   to these plain language requirements to protect the public interest and safeguard the public

6   welfare.

7          The legislative history cited by BLM similarly provides no support for an economic

8   limitation on the definition of waste.  *See* BLM Br. at 12-16.  To the contrary, the legislative

9   history of the Mineral Leasing Act clearly reflects a concern for conservation and assuring that

10  leases on federal lands are conducted in the public interest.  *See* H.R. Rep. No. 65-206, 65th

11  Cong. (1917), at 2 (AR 21724) (finding that under existing laws, "little effort was made to protect

12  the public interest or the rights of the public"); H.R. Rep. No. 65-563, 65th Cong. (1918), at 23

13  (AR 21756) ("The purpose of this bill is to open up all of these deposits for use, on such terms

14  and conditions as will prevent their waste, secure proper methods of operation, encourage

15  exploration and development, and protect the public"); *see also Boesche v. Udall*, 373 U.S. 472,

16  481 (1963) ("Conservation through control was the dominant theme of the debates" in legislative

17  history of Mineral Leasing Act).  Consistent with this authority, in 2016, BLM found "no

18  statutory or jurisprudential basis" requiring the agency to "conduct an inquiry into a lessee's

19  economic circumstances before determining a loss of oil or gas to be 'avoidable'" or to regulate

20  waste.  81 Fed. Reg. at 83,038-39 (AR 939-40).

21         Simply put, the plain language and legislative history of the Mineral Leasing Act do not

22  allow BLM to import its "economic test" into the regulation of waste.

23         **B.     BLM's New Definition Would Improperly Nullify Its Statutory Duties and
               is Not Entitled to Broad Deference.**

24

25         Even if the Court were to consider BLM's construction of the Mineral Leasing Act under

26  *Chevron* step 2, the agency's interpretation is not based on a permissible construction of the

27  statute and is not entitled to deference.  In particular, BLM's attempt to conflate its authority to

28  prevent waste into the "prudent operator" standard, *see* BLM Br. at 15 n.6, violates fundamental

principles of statutory construction by rendering this distinct statutory mandate to prevent "waste" meaningless.  As the Supreme Court has stated, a statute "must be interpreted, if possible, to give each word some operative effect."  *Walters v. Metro. Educ. Enters*., 519 U.S. 202, 209 (1997); *see also Chubb Custom Ins. Co. v. Space Systems/Loral, Inc.*, 710 F.3d 946, 965 (9th Cir. 2013) ("In interpreting statutes, we observe the cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant") (internal quotations and citations omitted).  Yet BLM's interpretation contravenes this fundamental principle by claiming that the mandate to prevent "undue waste" is simply an "example" of how BLM should apply the alleged "umbrella provision" regarding reasonable diligence, skill, and care.  *See* BLM Br. at 15 n.6.  It makes no sense to read the Mineral Leasing Act this way.  Nothing in the structure of the statute suggests that the extensive list of mandated lease provisions are merely "examples" of how BLM might effectuate its mandate regarding reasonable diligence, skill, and care.  *See* 30 U.S.C. § 187.  The legislative history of the Mineral Leasing Act also does not support BLM's attempt to conflate these two separate statutory requirements.  *Se*e H.R. Rep. No. 65-563, 65th Cong. (1918), at 26 (AR 21759) ("This section also contains provisions to prevent waste *and* to insure the exercise of reasonable diligence, skill, and care in operating the property.  These and similar provisions have the ultimate object of securing to the consumer the various products at a reasonable price and the preventing of same from passing into monopolistic control") (emphasis added).

The case law cited by BLM regarding the "prudent operator" standard also provides no basis for the agency's new definition of "waste of oil or gas."  *See* BLM Br. at 15-16.  These cases involve disputes between private parties and do not discuss the concept of "waste" or the requirements of the Mineral Leasing Act; in fact, two of the decisions predate the Mineral Leasing Act by 15 years.  *See Brewster v. Lanyon Zinc Co*., 140 F. 801 (8th Cir. 1905); *A.Y. Chrisman v. Miller*, 25 S. Ct. 468 (1905).  Moreover, given that a "prudent operator" is expected to conduct its activities "in compliance with applicable law and regulation," this standard does not support an economic limitation on the definition of waste.  *See, e.g., Eagle Oil & Gas Co. v.*

1  *Travelers Property Cas. Co. of America*, 2014 WL 3406686, *11 (N.D. Tex. Jul. 14, 2014); *Lyco*

2  *Energy Corp.*, 92 IBLA 81, 83 (1986) ("As a responsible and prudent operator, Lyco has

3  endeavored to comply with applicable federal regulations").[2]

4        The other new authorities cited by API on this issue similarly say nothing about BLM's

5  authority to regulate waste. *See* American Petroleum Institute Cross-Motion for Summary

6  Judgment and Opposition to Plaintiffs' Motions for Summary Judgment; Memorandum of Points

7  and Authorities in Support, ECF No. 126 ("API Br."), at 7-8 & Exh. 1.  For example, the book

8  "Petroleum Conservation in the United States:  An Economic Analysis," and Wyoming law do

9  not provide authority for interpreting the Mineral Leasing Act or BLM's other governing statutes.

10  *See also Clifton v. Koontz*, 160 Tex. 82, 96 (Tex. 1959) (discussing prudent operator standard

11  under Texas law); *Nola Grace Ptasynski*, 63 IBLA 240, 247-48 (1982) (finding prudent operator

12  standard applicable to compensatory royalty for drainage from federal lands, but providing no

13  mention of waste); North Dakota Petroleum Council, SDR No. 922-15-07 (Feb. 11, 2016)

14  (requiring decision to make avoidable loss determination on flaring requests to comply with NTL-

15  4A, but not discussing waste).  And BLM Lease Form 3100-11 affirms that lessees "must be

16  liable for royalty payments on oil or gas lost or wasted from a lease site when such loss or waste

17  is … due to the failure to comply with any rule, regulation, order, or citation issued under

18  FOGRMA or the leasing authority."  BLM Lease Form 3100-11 (Oct. 2008), Sec. 2.[3]

19        While BLM argues for "broad deference" in its interpretation of the Mineral Leasing Act,

20  BLM Br. at 10, there are several reasons why such expansive deference is not owed here.  First,

21  as discussed above, BLM's interpretation that the Mineral Leasing Act requires an economic

22  limitation on the regulation of waste is entirely contrary to the position it took less than two years

23  earlier and lacks persuasiveness.  *See U.S. v. Mead*, 533 U.S. 218, 228 (2001) ("[t]he fair measure

24  of deference to an agency administering its own statute has been understood to vary with

---

25  [2] Similarly, as discussed *infra* in Section II.A., the IBLA decisions cited by BLM (*see* BLM Br. at
26  17) do not address the concept of waste, and the determination of whether oil or gas is "avoidably
   lost" goes beyond such economic conditions to include a failure "to comply fully with the
   applicable lease terms and regulations."  *See* BLM Br. at 20; 43 C.F.R. § 3179.4-5.
27  [3] BLM Lease Form 3100-11 is *available at*:
   https://www.blm.gov/sites/blm.gov/files/uploads/Services_National-Operations-
28  Center_Eforms_Fluid-and-Solid-Minerals_3100-011.pdf.

6

circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position.") (citations omitted); *California Pub. Utilities Comm'n v. Fed. Energy Regulatory Comm'n*, 879 F.3d 966, 975 (9th Cir. 2018) (finding that "an agency's interpretation is not owed deference if 'there is reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question.'") (quoting *W. Radio Servs. Co. v. Qwest Corp.*, 678 F.3d 970, 985 (9th Cir. 2012)).

Second, as discussed in State Plaintiffs' brief, this new definition was not advocated by BLM, but by the Office of Information and Regulatory Affairs ("OIRA"). *See* State Plaintiffs' Notice of Motion and Motion for Summary Judgment; Memorandum in Support, ECF No. 108 ("States' Br.") at 35. BLM now claims that it did not merely defer to OIRA, but "thoughtfully considered" its input and had been reconsidering its statutory authority in advance of consultation with OIRA. BLM Br. at 12 n.5. However, the record pages cited by BLM do not support this claim. For example, the first record page is an internal memorandum stating that "OIRA has requested two significant changes that require policy direction from leadership." AR 173940. Moreover, BLM's two prior attempts to undo the 2016 Rule—the Postponement Notice and Suspension—did not include or discuss this new definition or provide for an economic limitation on the concept of waste, *see* AR 10026, AR 661, and, regardless, both of these rulemakings were found to be arbitrary and capricious. *See State of California v. U.S. Bureau of Land Mgmt.,* 277 F. Supp. 3d 1106, 1121-23 (N.D. Cal. 2017) ("*California I*"); *State of California v. Bureau of Land Mgmt.*, 286 F. Supp. 3d 1054, 1068-75 (N.D. Cal. 2018) ("*California II*"). Finally, the "early internal draft" of the Rescission says nothing about the definition of "waste of oil or gas," but reflects BLM's unfounded concerns about the Wyoming litigation and the social cost of methane. *See* AR 176558, 176563-176565. OIRA's interpretation of the Mineral Leasing Act to include this new definition is not entitled to deference. *See Dep't of Treasury-I.R.S. v. Federal Labor Relations Authority*, 521 F.3d 1148, 1152 (9th Cir. 2008) ("We review de novo [an agency's] interpretation of a statute that it does not administer").

7

State Plaintiffs agree that the Mineral Leasing Act does not require BLM to prevent "all waste," and that the statute is intended to "promote the wise development" of public resources. *See* BLM Br. at 12-13.  However, neither the Mineral Leasing Act nor the authorities cited by Defendants support an economic limitation that limits waste to acts "where compliance costs are not greater than the monetary value of the resources they are expected to conserve."  Such a definition puts the self-interest of operators above those of the public[4] and is inconsistent with BLM's statutory mandates.  Consequently, BLM's new definition of "waste of oil or gas" is contrary to law, in violation of 5 U.S.C. § 706(2)(A) and (C).

## II.   BLM VIOLATED THE APA BY FAILING TO PROVIDE A REASONED EXPLANATION FOR THE RESCISSION.

### A.   BLM's Statutory Authority Justification for the Rescission is Arbitrary and Capricious (Issues A-1 and A-4).

BLM's attempt to explain its new "policy determination" that the Waste Prevention Rule exceeded the scope of its statutory authority fails for several reasons.  *See* BLM Br. at 9-18, 35-37.  First, BLM's current characterization of its own 2016 findings on this issue when it promulgated the Rule are contradicted by the administrative record, and it has failed to justify the glaring inconsistencies in the agency's positions.  Moreover, BLM cannot show where in the administrative record it provided the reasoned explanation for this new policy determination, as the authorities it relied upon do not support this justification, and its *post-hoc* arguments cannot satisfy the requirements for agency decision making under the APA and should not be considered by the Court.  *See Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419-20 (1971) (rejecting reliance on "'*post-hoc* rationalizations" contained in litigation affidavits);

---

[4] As the record shows, the Waste Prevention Rule would have generated up to $14 million annually in additional royalties for the federal and state governments.  81 Fed. Reg. at 83,014 (AR 915).  BLM admits that the Rescission "is expected to reverse the estimated royalty impacts of the 2016 rule."  83 Fed. Reg. at 49,205 (AR 22).  Consequently, there is no basis for the contention made by Amici Members of Congress that the Waste Prevention Rule places the benefits of these royalty payments to states "in jeopardy."  ECF No. 135 at 11-12.  To the contrary, State Plaintiffs and other governments stand to lose millions of dollars annually in royalty payments as a result of the Rescission.

8

*Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1050 (9th Cir. 2010) ("Defendants' *post-hoc* explanations serve only to underscore the absence of an adequate explanation in the administrative record itself."); *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009) ("we consider only the agency's reasoning at the time of decisionmaking, excluding *post-hoc* rationalization concocted by counsel in briefs or argument.").

### 1. BLM Failed to Explain the Inconsistencies Between the Rescission and the 2016 Rule.

BLM asserts that the 2016 Waste Prevention Rule "recognized that its interpretation of waste was a significant departure from past practice." BLM Br. at 11 (citing AR 942). However, there is no basis in the record to support this assertion. The record page cited by BLM (AR 942) does not even discuss this issue. To the contrary, BLM in 2016 found ample authority for its promulgation of the Waste Prevention Rule. As BLM noted at that time, "[t]he [Mineral Leasing Act] rests on the fundamental principle that the public should benefit from mineral production on public lands." 81 Fed. Reg. at 83,019 (AR 920). To achieve such public benefits, "BLM has the authority to manage public and tribal oil and gas resources to reduce waste and ensure environmentally responsible development." *Id.* at 83,020-21 (AR 921-22).

BLM fails to acknowledge that in promulgating the Waste Prevention Rule, it explicitly considered and rejected the "policy determination" that it now adopts. As BLM stated in November 2016, "there is *no statutory or jurisprudential basis* for the commenters' position that the BLM must conduct an inquiry into a lessee's economic circumstances before determining a loss of oil or gas to be 'avoidable'" and thus potentially subject to royalties as waste. 81 Fed. Reg. at 83,038 (AR 939) (emphasis added); *see id.* at 83,021 (AR 922) ("BLM received many comments asserting a range of different arguments regarding the BLM's exercise of its legal authority in promulgating this rule. … BLM did not make any changes to this rule based on comments about the BLM's authority"). BLM's failure to provide a reasoned explanation for this reversal in position is a clear violation of the APA. *See, e.g., Center for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 2019 WL 2635587, *28-31 (C.D. Cal. June 20, 2019) (holding that

1  BLM's failure to provide an explanation for its reversal in legal position regarding right-of-way

2  for water pipeline project was arbitrary and capricious).

3  　　　In addition to its explicit authority to regulate "waste" under the Mineral Leasing Act, BLM

4  found support for the Rule under the mandates of the Mineral Leasing Act for Acquired Lands,

5  the Federal Oil and Gas Royalty Management Act ("FOGRMA"), the Federal Land Policy and

6  Management Act ("FLPMA"), and pursuant to its statutory trust responsibilities under the Indian

7  Mineral Leasing Act and the Indian Mineral Development Act.  81 Fed. Reg. at 83,019-21 (AR

8  920-922).  FLPMA, for example, "mandates that the Secretary, '[i]n managing the public lands ...

9  shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue

10  degradation of the lands,'" and declares that "BLM should balance the need for domestic sources

11  of minerals against the need to 'protect the quality of scientific, scenic, historical, ecological,

12  environmental, air and atmospheric, water resources, and archeological values; ... [and] provide

13  for outdoor recreation and human occupancy and use.'"  *Id*. at 83,020 (AR 921) (quoting 43

14  U.S.C. §§ 1701(a)(8), 1732(b)).  BLM further recognized that "Congress has directed the

15  Secretary to 'aggressively carry out [her] trust responsibility in the administration of Indian oil

16  and gas.'"  *Id.* (quoting 30 U.S.C. § 1701(a)(4)).  And BLM found that "FOGRMA provides

17  BLM with an independent statutory authorization to impose royalties on oil or gas lost as a result

18  of an operator's negligence or failure to comply with any rule or regulation issued under the

19  mineral leasing laws, without further economic analysis."  *Id.* at 83,038 (AR 939) (citing 30

20  U.S.C. § 1756).  BLM's *post-hoc* statements that these other authorities simply provide it with

21  "discretion" with how to meet these statutory goals, BLM Br. at 19, find no basis in the record

22  and should be rejected.  *See Humane Soc'y*, 626 F.3d at 1049 (agency's *post-hoc* explanations

23  cannot substitute for an adequate explanation in the administrative record itself).

24  　　　Furthermore, the Rescission offers no basis for contradicting BLM's 2016 findings that the

25  Waste Prevention Rule represented "economical, cost-effective, and reasonable measures that

26  operators can take to minimize waste," 81 Fed. Reg. at 83,009 (AR 910), and ignores the many

27  exemptions that were provided to ensure that the Rule's requirements would not cause operators

28

1    to cease production and abandon significant recoverable oil or gas reserves, *id.* at 83,011 (AR

2    912), 83,012 (AR 913), 83,028 (AR 929), 83,030 (AR 931).  Consequently, BLM's bare assertion

3    that it reconsidered its position, based on an unsupported rationale that it had previously rejected,

4    represents an "unexplained inconsistency" that is "a reason for holding an interpretation to be an

5    arbitrary and capricious change."  *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126

6    (2016).

### 2.   BLM Failed to Provide a Reasoned Basis for its New Policy Determination that the Waste Prevention Rule Exceeds its Statutory Authority.

9        In addition to the unexplained inconsistencies with the 2016 Rule, BLM failed to provide a

10   reasoned analysis or "good reasons for the new policy" in the Rescission itself.  *See F.C.C. v. Fox*

11   *Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  In its brief, BLM claims that the Rescission

12   "reconsidered the meaning" of waste under the Mineral Leasing Act and determined that its 2016

13   interpretation was "contrary to longstanding practice and Congress's intent."  BLM Br. at 11

14   (citing AR 3).  However, BLM cannot show where *in the administrative record* it provided the

15   reasoned explanation for this policy change that satisfies the requirements for agency rulemaking

16   under the APA.

17       As discussed in the State Plaintiffs' brief, the legal authorities cited in the Rescission to

18   support this new policy say nothing about the meaning of "waste," and Defendants' continued

19   reliance on these decisions is unreasonable.  States' Br. at 16; *see* BLM Br. at 17; API Br. at 9.

20   BLM now acknowledges that these authorities are relevant to the separate definition of when oil

21   and gas is "avoidably lost," and thus subject to royalties, but claims that the agency "is returning

22   to the longstanding concept of 'waste' and 'avoidable loss' as accounting for the economics of

23   preventing the loss."  BLM Br. at 17.  API takes this a step further and contends that these cases

24   "equate avoidable loss with waste," and that a determination of waste "relies on a determination

25   of 'avoidable loss.'"  API Br. at 9, 11.

26       However, as with the concept of waste, the determination of whether oil or gas is

27   "avoidably lost" and thus subject to royalties is not, and never has been, exclusively limited by an

28

11

1   economic accounting.  In fact, as BLM admits, the Rescission's "standard for when an operator

2   owes royalties on lost oil or gas is not a purely 'economic test.'"  BLM Br. at 20.  Rather,

3   "avoidably lost" includes gas "that is vented or flared without the authorization or approval of the

4   BLM" or when oil or gas is lost due to "[t]he failure of the operator to comply fully with the

5   applicable lease terms and regulations."  BLM Br. at 20 (quoting 43 C.F.R. §§ 3179.4-5); *see* 81

6   Fed. Reg. at 83,082 (AR 983) ("[u]navoidably lost oil or gas means lost oil or gas provided that

7   … the operator has complied fully with applicable laws, lease terms, regulations").  This is

8   consistent with BLM's duty under the Mineral Leasing Act to enact "regulations … to carry out

9   and accomplish the purposes of this chapter," including "for the prevention of undue waste," *see*

10  30 U.S.C. §§ 187, 189, and with the language of FOGRMA, which provides that:

11      Any lessee is liable for royalty payments on oil or gas lost or wasted from a lease site
        when such *loss or waste is* due to negligence on the part of the operator of the lease,
12      or *due to the failure to comply with any rule or regulation*, order or citation issued
        under this chapter or any mineral leasing law.
13

14  30 U.S.C. § 1756 (emphasis added).  Thus, when BLM utilizes its statutory authorities to

15  promulgate regulations to prevent waste, as it did in 2016, *see* 81 Fed. Reg. at 83,009 (AR 910), a

16  failure to fully comply with such regulations constitutes avoidably lost production, independent of

17  any economic test.

18      API further claims that until the Waste Prevention Rule, BLM "consistently made

19  'avoidable' loss determinations based on lease-specific economic considerations."  API Br. at 8-9

20  (citing AR 3011-12, 3013, 3036-48).  As an initial matter, the evaluation of "lease-specific

21  economic considerations" is not the same thing as trying to determine whether an operator will

22  profit from implementing a compliance measure at a particular well, as BLM's new definition of

23  waste would require.  Moreover, the record pages cited by API, which are from the prior

24  regulatory regime — "Notice to Lessees and Operators of Onshore Federal and Indian Oil and

25  Gas Leases 4A ("NTL-4A") — were not relied upon by BLM and cannot substitute for the

26  reasoned basis that the agency must provide during the administrative process.  *See Motor Vehicle*

27  *Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 42 (1983).[5]

28  _____
    [5] In any case, NTL-4A provides no support for this argument.  To the contrary, even under this

Furthermore, it was the need to update this "insufficient and outdated" regulatory regime that led to the development of the Waste Prevention Rule in the first place.  *See* 81 Fed. Reg. at 83,009-10 (AR 910-11); *id.* at 83,017 (AR 918) (finding that NTL-4A "neither reflects today's best practices and advanced technologies, nor is particularly effective in minimizing waste of public minerals").

Consequently, the standard for when oil and gas is "avoidably lost" does not support BLM's statutory authority justification.[6]

### 3.    BLM Failed to Allow for Meaningful Comment on this Primary Justification for the Rescission.

BLM further acknowledges that the legal reasoning cited for its new policy determination appeared for the first time in the final Rescission, but claims that State Plaintiffs should have anticipated this reasoning from the "concerns" expressed in the proposed Rescission.  BLM Br. at 35-37 (citing AR 418).  However, the proposed Rescission simply restated arguments that BLM itself considered and rejected when it promulgated the Waste Prevention Rule, and the only authority cited was the Wyoming district court decision.  *See* 83 Fed. Reg. at 7,927 (AR 419). The Wyoming court only addressed an argument that the Rule was an illegal attempt by BLM to regulate air pollution under the Clean Air Act (which BLM also contested), a claim for which the court determined petitioners failed to demonstrate a likelihood of success.  *Wyoming v. U.S. Dep't of the Interior*, 2017 WL 161428, *9 (D. Wyo. Jan. 16, 2017).

While BLM argues that it was not required to "alert the public in its proposed rule to every legal authority that it may ultimately rely on in its final rule," BLM Br. at 36, the proposed Rescission identified *none* of the authorities that were eventually cited to justify this new "policy determination" in the Rescission.  "[B]y failing to provide the requisite information to adequately

---

prior regulatory regime, "avoidably lost" was defined to include "the failure of the lessee or operator to comply fully with the applicable lease terms and regulations."  AR 3011.  The fact that an area oil and gas supervisor had the discretion to approve an application for the venting or flaring of oil well gas under specific "engineering, geologic, and economic" conditions does nothing to diminish BLM's statutory authority to regulate waste.  AR 3013.

[6] BLM and API also cite several new legal authorities, pages of legislative history, and other documents to support BLM's policy determination regarding the extent of its statutory authority to regulate waste.  BLM Br. at 12-16; API Br. at 6-10.  To the extent that Defendants are relying upon these authorities to provide the reasoned explanation that is lacking from the record, such *post-hoc* justifications fail.  *See Humane Soc'y*, 626 F.3d at 1050.  Moreover, as discussed *supra* in Part I, these authorities do not support its new definition of "waste of oil or gas."

13

1   apprise the public regarding the reasons the [agency] was seeking to repeal" the Waste Prevention

2   Rule, BLM "effectively precluded interested parties from meaningfully commenting on the

3   proposed repeal," in violation of the APA.  *See State of California v. U.S. Dep't of the Interior*,

4   381 F. Supp. 3d 1153, 1174 (N.D. Cal. 2019) ("*California III*").

5          The cases cited by BLM do not warrant a different result.  *See* BLM Br. at 36-37.  In *Mid-*

6   *Tex Electric Cooperative v. FERC*, 773 F.2d 327 (D.C. Cir. 1995), wholesale customers of

7   electric utilities challenged a final rule allowing the utilities to include in their rate bases amounts

8   equal to 50% of their investments in construction work in progress.  *Id*. at 330.  The court found

9   "no merit" to the plaintiffs' claim that FERC's proposed rule had failed to give adequate notice

10  regarding the rationale for the rule, given that the proposal discussed this rationale and plaintiffs

11  had "actual notice that FERC might adopt the alternative it ultimately chose."  *Id*. at 339.

12  Nowhere did the plaintiffs claim, as here, that the agency failed to disclose the primary legal

13  rationale that formed the basis for the rule.  *See Connecticut Light & Power Co. v. Nuclear*

14  *Regulatory Comm'n*, 673 F.2d 525, 530 (D.C. Cir. 1982) ("If the notice of proposed rule-making

15  fails to provide an accurate picture of the reasoning that has led the agency to the proposed rule,

16  interested parties will not be able to comment meaningfully upon the agency's proposals.").

17         In *Kern County Farm Bureau v. Allen*, 450 F.3d 1072 (9th Cir. 2006), the plaintiffs

18  challenged a decision by the U.S. Fish & Wildlife Service ("FWS") to list the Buena Vista Lake

19  shrew as an endangered species under the federal Endangered Species Act.  *Id*. at 1074.  In

20  particular, plaintiffs claimed that FWS violated the APA by failing to provide the public an

21  opportunity to review and comment on three scientific studies that became available after the

22  close of the public comment period and which were cited in the final rule.  *Id*. at 1074-75.  That

23  alone distinguishes the situation here, where BLM relied on decades-old authorities that were

24  certainly available at the time of the proposed Rescission.  In addition, the court in *Kern County*

25  found that these new studies "were not vital to FWS's decision" but were used "merely to refine

26  and expand on its pre-existing data," *id*. at 1076-80, whereas, here, BLM relied upon the

27  previously undisclosed authorities as the primary basis for the Rescission.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Notably, the Ninth Circuit distinguished *Kern County* from the situation in *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392 (9th Cir. 1995) on precisely these grounds.  In *Idaho Farm Bureau Fed'n*, the newly introduced materials "provided the only scientific information on the cause of the decline" of the species habitat.  *Id*. at 1402-03.  This primary reliance "greatly heightened" the need to provide for public notice and comment.  *Id*. at 1403.  Similarly, here, the central legal authorities that BLM relied upon to support its new "policy determination" in the Rescission were not mentioned in proposed Rescission and deprived the public of a meaningful opportunity to comment, in violation of the APA.

> **4.    The Wyoming Litigation Provides No Justification for BLM's Policy Determination.**

Finally, BLM provides no explanation for its unreasonable reliance on the Wyoming district court litigation to justify its new policy determination.  To the contrary, BLM simply claims that the Rescission "pointed to both its reinterpretation of 'waste' in the Mineral Leasing Act and the Wyoming court's concerns about the agency's authority to regulate air pollution to support its rulemaking."  BLM Br. at 18 n.8 (citing AR 3).  As discussed above, the Wyoming court did not address BLM's new statutory authority justification or its definition of "waste of oil or gas," and BLM fully defended its authority to promulgate the Rule under the Mineral Leasing Act in that case.  *See Wyoming*, 2017 WL 161428 at *6.  In effect, BLM now admits that one of the stated rationales for its new policy determination in fact provides no basis for repealing the key requirements of the Waste Prevention Rule.

> **B.    The New Definition of "Waste of Oil or Gas" is Arbitrary and Capricious (Issue A-2).**

In addition to violating the Mineral Leasing Act, BLM has failed to provide a reasoned basis for its new definition of "waste of oil or gas" or explain how it will work in practice, given the varying size of oil and gas operators and the fluctuating price of oil and gas.  *See States' Br.* at 35-36.  Defendants fail to show where in the administrative record these issues are addressed.  And BLM's position on the pneumatic controller requirement demonstrates the arbitrariness of its position.  *See* BLM Br. at 21-22.  In its brief, BLM effectively acknowledges that the failure to

15

use such equipment would qualify as a "waste of oil or gas" because "the value of the gas conserved under this provision would have outweighed the compliance costs."  BLM Br. at 22 (citing AR 11-12).  Yet BLM still repeals this requirement, claiming that such equipment is "cost-effective and are already very common" among industry, AR 11, 254, undermining its central rationale for the Rescission.  BLM also "assumes" that the remaining high bleed controllers "are likely" on wells that "have a functional need for their use" or are marginal, BLM Br. at 22 (citing AR 88-89), but it provides no data or evidence to support this rationale.  *See National Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1143 (9th Cir. 2015) (finding agency's "unexplained assertions" regarding cost-effectiveness of rule to be arbitrary and capricious).  BLM's additional claim that removing this requirement "complies with the mandate of Executive Order 12866" is an impermissible *post-hoc* rationalization.  *See* BLM Br. at 22.

Nor does BLM explain the inconsistency it has created with its existing regulations, which have defined "waste of oil or gas" without an economic limitation since 1982.  43 C.F.R. § 3160.0-5; *see* 47 Fed. Reg. 47,758 (Oct. 27, 1982) (Oil and Gas Operating Regulations; Final rulemaking).  BLM now claims that this "other definition is in a separate part of the regulations and is unrelated to its regulation of venting and flaring."  BLM Br. at 18.  This argument fails for two reasons.  First, the definitions in section 3160.0-5 clearly pertain to BLM's regulation of onshore oil and gas operations and were promulgated pursuant to its authority under the Mineral Leasing Act, FLPMA, and other statutes.  *See* 43 C.F.R. § 3160.0-1 ("The regulations in this part govern operations associated with the exploration, development and production of oil and gas deposits from—(a) Leases issued or approved by the United States") (citing 30 U.S.C. § 189, among other authorities).  Second, the definition of "waste of oil or gas" in section 3160.0-5 is the same as BLM's new definition in 43 C.F.R. § 3179.3, with the exception of BLM's addition of the phrase "where compliance costs are not greater than the monetary value of the resources they are expected to conserve" in the latter version.

API contends that this allegation of inconsistency "is 'meritless' because the 'waste' definition in 43 C.F.R. § 3160.0-5 relies on a determination of 'avoidable loss,' which in turn is

1    defined exclusively in the" Rescission in 43 C.F.R. § 3179.4.  API Br. at 11.  In effect, contrary to

2    BLM's claim that these subparts of the regulations are "unrelated," API argues that 43 C.F.R.

3    subparts 3160 and 3179 are inextricably linked together.  Even so, this rationale does nothing to

4    explain the inconsistency between the two different definitions of "waste of oil or gas" that now

5    exist in BLM's regulations.  Moreover, as discussed above, since the concept of "avoidable loss"

6    is not limited by an economic test, then neither is the definition of waste.  *See supra* Part II.A.

7        **C.    Executive Order 13783 Provides No Basis for the Rescission (Issue B-1).**

8        BLM's continued reliance on Executive Order 13783's mandate to "avoid regulatory

9    burdens that unnecessarily encumber energy production" to justify the Rescission lacks merit and

10   is contradicted to the record.  As an initial matter, BLM failed to contest State Plaintiffs'

11   demonstration that Executive Order 13783 cannot be used to "impair or otherwise affect" the

12   statutory mandates imposed upon BLM by Congress.  States' Br. at 22; *see* 82 Fed. Reg. at

13   16,096 (AR 1874).  To the extent that BLM attempts to address this issue in its reply brief, this

14   Court should decline to consider such arguments.  *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th

15   Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply

16   brief"); *Rodman v. Safeway Inc.*, 125 F. Supp. 3d 922, 930 n.6 (N.D. Cal. 2015) ("Generally, the

17   Court does not consider new arguments made for the first time in a reply brief").

18       Second, BLM claims that its own findings regarding the Rule's minimal impact on the

19   profit margins of small entities are irrelevant because they were made pursuant to the Regulatory

20   Flexibility Act, and because these savings "will provide relief to small operators."  BLM Br. at

21   44-45 (citing AR 24).  However, BLM's analysis under the Regulatory Flexibility Act ultimately

22   concludes that any impacts on profit are not significant, "whether detrimental or beneficial, on a

23   substantial number of small entities."  AR 24.  Nowhere in the record does BLM explain how

24   these findings support its reliance on Executive Order 13783 as a basis for the Rescission.

25   *California II*, 286 F. Supp. 3d at 1066 ("BLM does not explain how or why it could conclude that

26   the calculated costs could be so insignificant as not to unnecessarily or disproportionately burden

27

28

1    small entities within the meaning of the [Regulatory Flexibility Act], and simultaneously

2    conclude that there would be a disproportionate effect for other purposes.").

3    BLM's statements regarding the Rescission's impacts on energy production and job

4    creation similarly provide no basis for its reliance on Executive Order 13783.  BLM Br. at 45

5    (citing AR 22, 23, 91, 99).  While BLM is correct that it found the Rescission "is expected to

6    influence the production of natural gas," *id.* (quoting AR 22), it concludes that this influence is to

7    *reduce* such production.  AR 22 (estimating "that there will be 299 billion cubic feet of forgone

8    natural gas production that would have been produced and sold under the 2016 rule, rather than

9    vented or flared").  And while BLM states that "there may be a small positive impact on

10   investment and employment due to the reduction in compliance burdens if the [economic] output

11   effects dominate," BLM Br. at 45 (quoting AR 99), it ultimately finds that "the effect on

12   investment and employment of this rule remains unknown."  AR 99.  Furthermore, the fact that

13   these statements regarding energy production and employment were made to satisfy the

14   requirements of other Executive Orders does not make them "irrelevant" for purposes of

15   considering BLM's reliance on Executive Order 13783 to justify the Rescission.  *See* Western

16   Energy Alliance and Independent Petroleum Association of America's Cross Motion for

17   Summary Judgment and Opposition to Plaintiffs' Motions for Summary Judgment; Memorandum

18   of Points and Authorities in Support, ECF No. 127 ("WEA Br.") at 12-13; *California II*, 286 F.

19   Supp. 3d at 1066.

20   Third, BLM's *post-hoc* explanation for its failure to consider the other provisions of

21   Executive Order 13783 misses the mark.  BLM Br. at 45-46.  Executive Order 13783 makes clear

22   that the "prudent development" of energy production includes ensuring that such development is

23   "clean and safe" and "promote[s] clean air and clean water for the American people."  82 Fed.

24   Reg. at 16,093 (AR 1871).  BLM's claim that it "considered air quality" (BLM Br. at 46) is not

25   only undermined by its deficient analysis of this issue, but is contradicted by its own incorrect,

26   tortured position that it has no statutory authority to even address air quality or other

27   "environmental impacts."  *See* BLM Br. at 38, 46; *see also* Citizen Groups' Opposition to Cross-

28

18

1   Motions for Summary Judgment and Reply in Support of Motion for Summary Judgment,

2   Argument, Section III.  Nowhere does BLM show where in the record that it considered the

3   promotion of "clean air and clean water" pursuant to Executive Order 13783 in deciding to

4   promulgate the Rescission.

5        In sum, BLM cannot justify its reliance on Executive Order 13783 as a rationale for

6   rescinding the requirements of the Waste Prevention Rule.  *See State of California II*, 286 F.

7   Supp. 3d at 1067 (BLM failed to "point to any fact that justifies its assertion that the Waste

8   Prevention Rule encumbers energy production"); *California III*, 381 F. Supp. 3d at 1170

9   (Department of the Interior failed to provide a "reasoned explanation" for its reliance on

10   Executive Order 13783 to justify rule repeal).

11       **D.      BLM's Regulatory Impact Analysis Arbitrarily Inflates the Burdens of the
              Waste Prevention Rule and Downplays the Environmental Costs of the**
12            **Rescission (Issues C and B-2).**

13            **1.      BLM Failed to Provide Any Explanation for its Change to the
                  Administrative Burdens of Implementing the Waste Prevention Rule**
14                **(Issue C-3).**

15       BLM failed to respond to State Plaintiffs' claim that it provided no reasoned explanation for

16   its change to the administrative burdens of implementing the Waste Prevention Rule.  States' Br.

17   at 29-30.  As State Plaintiffs demonstrated, BLM more than doubled it calculation of the cost for

18   industry and the agency to implement the Rule, without any explanation in the record.  *Id*.  This

19   failure to provide "a reasoned explanation for disregarding [its] previous factual findings"

20   violated the APA.  *See Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 381 F. Supp. 3d

21   1127, 1139-40 (D. Alaska 2019) (finding that Secretary of the Interior violated APA by

22   impermissibly disregarding "prior factual findings without a reasoned explanation" in approving

23   land exchange to construct road through national wildlife refuge) (citing *Organized Vill. of Kake*

24   *v. U.S. Dep't of Agric.*, 795 F.3d 956, 968 (9th Cir. 2015)).  To the extent that BLM attempts to

25   address this issue in its reply brief, this Court should not consider such arguments.  *See Zamani*,

26   491 F.3d at 997; *Rodman*, 125 F. Supp. 3d at 930 n.6.

27

28

### 2. BLM's Use of a "Domestic" Social Cost of Methane Metric is Arbitrary and Capricious and Contrary to the Best Available Science (Issue C-1).

Nothing in Defendants' briefs can justify the arbitrary, outcome-driven approach utilized by BLM in the Rescission to reverse its 2016 conclusions regarding the costs and benefits of the Waste Prevention Rule. To start, BLM's initial justification for using a "domestic" social cost of methane metric – because "its waste prevention authority under the [Mineral Leasing Act] did not sweep broadly to address society or environmental impacts" – highlights why such an approach is arbitrary and capricious. *See* BLM Br. at 38; *see also* Intervenor-Defendant State of Wyoming's Notice of Motion and Cross Motion for Summary Judgment and Response to Motions for Summary Judgment; Memorandum of Points and Authorities; [Proposed] Order, ECF No. 125 ("Wyoming Br.") at 19-24 (claiming that BLM acted impermissibly by considering *any* social cost of methane).[7] The regulatory impact analysis process for federal agency rulemaking, as directed by Executive Order 12866 and subsequent orders and guidance, requires federal agencies to consider "all costs and benefits" of regulatory actions and to use the best available science in doing so. *See* E.O. 12866, §§ 1(a), 1(b)(7), 58 Fed. Reg. 51,735, 51,736 (Oct. 4, 1993), *id*. § 6(a)(3)(C)(ii) (agency must consider effects of regulation on "health, safety and the natural environment"); OMB Circular A-4 (agency's economic analysis should encompass "all the important benefits and costs likely to result from the rule") (AR 7598, 7609-7610). Nothing in these orders permits this analysis to ignore benefits merely because they are not, in the agency's opinion, the primary objective of the authorizing statute. Rather, *all* costs and benefits must be considered "unless a statute *requires* another regulatory approach." E.O. 12866, Section 1(a), 58 Fed. Reg. at 51,735 (emphasis added). Defendants identify no such statutory requirement. To the contrary, BLM admits that its use of a domestic-only approach was not required by statute, but was a "policy choice." BLM Br. at 38.

The Supreme Court decision discussed by Intervenor-Defendant State of Wyoming, *Michigan v. EPA*, 135 S. Ct. 2699 (2015), does not support BLM's position here. In that case,

---

[7] To the extent that Defendants are attempting to relitigate their challenges to the 2016 Waste Prevention Rule as part of this matter, such claims are "not before this Court." *See Center for Biological Diversity*, 2019 WL 26365587 at \*31.

20

1   EPA was attempting to comply with a "unique procedure" of the federal Clean Air Act in which

2   Congress directed the agency to "perform a study of the hazards to public health reasonably

3   anticipated to occur as a result of emissions by [power plants] of [hazardous air pollutants] after

4   imposition of the requirements of this chapter," and to issue regulations if it determined that such

5   "regulation is appropriate and necessary after considering the results of the study." *Id.* at 2705-07

6   (quoting 42 U.S.C. § 7412(n)(1)(A)). That case did not discuss the general requirements for

7   conducting regulatory impact analyses under Executive Order 12866, and the Supreme Court did

8   not consider, let alone decide, whether agencies can ignore certain categories of costs when

9   conducting such analyses, as BLM did here.

10      BLM next defends the use of a domestic-only measure by citing OMB Circular A-4 and

11   Executive Order 13783's withdrawal of the Interagency Working Group's ("IWG") technical

12   support documents. BLM Br. at 39-41. There are several problems with this reasoning. First,

13   OMB Circular A-4 does not support a domestic-only approach. To the contrary, OMB Circular

14   A-4 provides that an agency's economic analysis should encompass "all the important benefits

15   and costs likely to result from the rule," including "any important ancillary benefits," and

16   specifically contemplates the consideration and reporting of "effects beyond the borders of the

17   United States." AR 7598, 7609-7610. BLM now claims that it complied with this requirement

18   "by including the updated global values from the 2016 Rule and comparing those with the

19   domestic only estimate" in the 2018 regulatory impact analysis. BLM Br. at 41 (citing AR 137).

20   However, simply restating the numbers that it calculated in 2016 for the Waste Prevention Rule

21   does not cure BLM's failure to consider the "effects beyond the borders of the United States"

22   when conducting its regulatory impact analysis for the Rescission. The plain language of OMB

23   Circular A-4 also directly contradicts Wyoming's assertion that "[a]ny ancillary benefits related

24   to greenhouse gas emissions are irrelevant when [BLM] considers the costs and benefits" of the

25   Waste Prevention Rule. *See* Wyoming Br. at 20-21.

26      Furthermore, both OMB Circular A-4 and Executive Order 13783 require agencies to use

27   the best available scientific and economic information in conducting a regulatory impact analysis.

28

1   AR 1874, 7600.  BLM does not, and cannot, justify its reliance on an "interim," domestic-only

2   approach that lacks peer review and relies on assumptions that are at odds with current scientific

3   understanding to fulfill this requirement.  *See* BLM Br. at 42 (defending its decision to "rel[y] on

4   an interim measure until the final domestic impacts are developed"), 43 (admitting that "the

5   interim domestic [social cost of methane] was not peer reviewed").  BLM appears to contend,

6   *post-hoc*, that the IWG's approach is equally "unreliable."  BLM Br. at 43 (citing AR 8949);

7   *Humane Soc'y*, 626 F.3d at 1049 (agency's *post-hoc* explanations cannot substitute for an

8   adequate explanation in the administrative record itself).  However, the Nordhaus study cited by

9   BLM makes no such assertion.  While Nordhaus notes the uncertainty present in the IWG's

10  approach, the author identifies the social cost of carbon as "[t]he most important single economic

11  concept in the economics of climate change," and finds that regional or country-specific estimates

12  "are both incomplete and poorly understood."  AR 8945, 8949.

13      BLM then attempts to have it both ways by claiming that its interim measure was "based on

14  the same peer-reviewed Integrated Assessment Models that formed the basis for the IWG's

15  estimates," but that it simply "adjust[ed]" the analysis to comply with Executive Order 13783 and

16  OMB Circular A-4.  *See* BLM Br. at 43 and n.18.  Yet, as BLM acknowledges, the IWG models

17  were not designed to "indicate the specific impact on the United States."  BLM Br. at 40 (citing

18  AR 8945-8952).  And as discussed by the National Academies of Sciences' report cited by BLM

19  (*see* BLM Br. at 40), it is improper to use the IWG's models in this way.  AR 22770-22772.  In

20  fact, the National Academies specifically cautioned against such an approach both because of the

21  global nature of climate change and because existing methodologies "do not model all relevant

22  interactions among regions."  *See* AR 22728 ("Due to the global nature of the impacts that result

23  from CO2 emissions regardless of where they originate, efforts to estimate the SC-CO2 by both

24  the scientific community and the IWG have focused on total global damages, rather than the

25  damages to an individual country such as the United States"); 22770 ("the IWG has consistently

26  supported a focus on global values"); 22772 (the current models "do not fully account for these

27

28

State Plaintiffs' MSJ Opposition and Reply - Case No. 4:18-cv-05712-YGR

1   types of interactions among the United States and other nations or world regions in a manner that

2   allows for the estimation of comprehensive impacts for the United States").[8]

3       Consequently, BLM's use of this interim, domestic measure and its failure to consider the

4   global impacts of increased methane emissions was arbitrary and capricious.  *See Center for*

5   *Biological Diversity v. NHTSA*, 538 F.3d 1172, 1198-1203 (9th Cir. 2008) (agency "cannot put a

6   thumb on the scale by undervaluing the benefits and overvaluing the costs of more stringent

7   standards" by failing to "monetize or quantify the value of carbon emissions reduction"); *Zero*

8   *Zone Inc. v. Dept. of Energy*, 832 F.3d 654, 677-679 (7th Cir. 2016) (agency reasonably relied on

9   IWG's estimates to calculate global benefits of greenhouse gas reductions from energy efficiency

10  rules); *High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1189-93

11  (D. Colo. 2014) (agency's failure to use social cost of carbon protocol to qualify greenhouse gas

12  emissions from coal lease modifications was arbitrary and capricious).

### 3. BLM's Use of a "Domestic" Social Cost of Methane Metric is Not Owed Substantial Deference (Issue C-1).

13

14

15      BLM argues it is now owed "substantial deference" in its decision to rely on an interim

16  domestic measure.  *See* BLM Br. at 42-43.  As the cases cited by BLM recognize, an agency may

17  "use[] the best scientific data available, even if that science [is] not always perfect."  *San Luis &*

18  *Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 996 (9th Cir. 2014); *see San Luis & Delta-*

19  *Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014); *Lands Council v. McNair*, 537

20  F.3d 981, 993 (9th Cir. 2008) (en banc) (in challenge to reliability of scientific methodology

21  underlying the Forest Service's analysis of a logging project's effect on wildlife, agency is owed

22  deference in an area involving a "high level of technical expertise").  However, this standard still

23  "prohibits [an agency] 'from disregarding available scientific evidence that is in some way better

24  than the evidence [it] relies on.'"  *Jewell*, 747 F.3d at 602 (quoting *Kern Cty. Farm Bureau*, 450

---

25  [8] While BLM claims that Judge Orrick "has already rejected these same Plaintiffs' complaints
26  about BLM's use of the interim domestic [social cost of methane]" for the Suspension, BLM Br.
    at 40, that "ruling was on a motion for preliminary injunction and neither resolved the merits of
    the case nor was based on an administrative record (which had not yet been filed by BLM at that
27  early stage of that case)."  WEA Br. at 12 n.11; *see Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395
    (1981) ("the findings of fact and conclusions of law made by a court granting a preliminary
28  injunction are not binding at trial on the merits").

1   F.3d at 1080) (brackets in original)).  This is exactly what BLM did here in disregarding the best

2   scientific data available and choosing to rely instead on an unsupported, interim measure.  *See*

3   *Western Watersheds Project v. Salazar*, 2011 WL 882641, *4 (D. Mont. Mar. 10, 2011) (agency

4   satisfied best available science standard by choosing not to rely on "eleventh-hour scientific

5   paper" that was "neither peer-reviewed nor published"); *Defenders of Wildlife v. U.S. Fish &*

6   *Wildlife Serv.*, 2016 WL 4382604, *20 (N.D. Cal. Aug. 17, 2016) ("Courts have recognized that

7   the peer review process, while not necessary, clearly is designed to ensure the accuracy and

8   reliability of scientific information relied on by agencies.") (internal quotations and citation

9   omitted).  In this situation, no deference is owed to the agency's decision.  *See Center for*

10  *Biological Diversity v. Zinke*, 900 F.3d 1053, 1067 (9th Cir. 2018) ("[w]e need not defer to the

11  agency when the agency's decision is without substantial basis in fact") (internal quotations and

12  citation omitted); *Center for Biological Diversity v. Lubchenco*, 758 F. Supp. 2d 945, 954 (N.D.

13  Cal. 2010) ("the court need not defer to the agency when the agency's decision is without

14  substantial basis in fact, and there must be a rational connection between the facts found and the

15  determinations made") (internal quotations and citation omitted).

16          Moreover, the Ninth Circuit decisions in *Jewell* and *Locke* involved biological opinions

17  developed pursuant to section 7 of the federal Endangered Species Act, 16 U.S.C. § 1536, by the

18  expert agencies charged with implementing that statute.  *Jewell*, 747 F.3d at 591-92; *Locke*, 776

19  F.3d at 981.  In these circumstances, the Ninth Circuit has noted the high level of deference given

20  in its "review of matters within the expertise of an agency."  *Jewell*, 747 F.3d at 592-93; *Locke*,

21  776 F.3d at 994-96.  Here, nothing in the record shows that the calculation of the social cost of

22  methane is within BLM's expertise.  To the contrary, Defendants repeatedly contend that such

23  matters are beyond the agency's expertise and outside of its statutory authority to consider.  *See*

24  BLM Br. at 38 ("BLM determined that its waste prevention authority under the [Mineral Leasing

25  Act] did not sweep broadly to address societal or environmental impacts"); WY Br. at 20

26  ("Because the Bureau lacks the statutory authority to regulate air emissions and climate change,

27  the agency should not have relied upon *any* 'Social Cost of Methane'") (emphasis in original).

28

Consequently, BLM is not owed "substantial deference" for its use of an unsupported, "interim"

metric, that is outside its area of "specific expertise."  *See Scheduled Airlines Traffic Offices, Inc.*

*v. Dep't of Defense*, 87 F.3d 1356, 1361 (D.C. Cir. 1996) (court does not defer to agency decision

in matter outside of agency's expertise); *Flores v. Meese*, 942 F.2d 1352, 1362 (9th Cir. 1991) (en

banc) (a court need not defer to an agency determination unless the agency has expertise or

special knowledge in the area).

   In sum, BLM's reliance on an interim, domestic social cost of methane metric resulted in its

failure to "examine the relevant data and articulate a satisfactory explanation for its action," in

violation of the APA.  *See State Farm,* 463 U.S. at 43.

### 4.   BLM's Provided No Reasoned Explanation for Its Failure to Consider Other Substantial Benefits of the Waste Prevention Rule (Issue C-2).

   BLM provides almost no response to State Plaintiffs' claim that the regulatory impact

analysis failed to quantify or provide any weight to the other foregone benefits of repealing the

Waste Prevention Rule, including additional emissions of volatile organic compounds ("VOCs")

and hazardous air pollutants, as well as visual and noise impacts.  States' Br. at 28-29.  BLM's

assertion that it is "not legally required by the APA, [Mineral Leasing Act], or any other statute or

regulation to 'monetize' benefits," or even to consider them "relevant," is disingenuous and

incorrect.  *See* BLM Br. at 48.  As with its examination of the social cost of methane, the

requirement to consider such benefits as part of a regulatory impact analysis is mandated by

Executive Order 12866 and OMB Circular A-4.  *See* AR 7586; 58 Fed. Reg. at 51,735 (requiring

agencies to assess "all costs and benefits" of regulatory actions).  Nothing the in Mineral Leasing

Act or BLM's other governing statutes requires a different approach.  In such circumstances,

BLM's failure to consider such benefits violates the APA.  *See California I,* 277 F. Supp. 3d at

1122 ("[w]ithout considering both the costs and the benefits of" a deregulatory action, and agency

"fail[s] to take [an] 'important aspect' of the problem into account"); *Friends of Alaska Nat'l*

*Wildlife Refuges,* 381 F. Supp. 3d at 1139 ("unexplained conflicting findings about the

1  environmental impacts of a proposed agency action violate the APA") (quoting *Organized Vill. of*

2  *Kake*, 795 F.3d at 969).

3      BLM goes on to claim that "it did quantify the foregone emissions reductions and explicitly

4  recognized that [ ] 'VOC and hazardous air pollutants pose negative impacts on climate, health,

5  and human welfare.'"  BLM Br. at 48 (citing AR 82).  Other than this single statement in its

6  regulatory impact analysis, BLM provides no evidence that such benefits were actually

7  considered in determining whether to promulgate the Rescission, which is not surprising given

8  the agency's position that such foregone public health benefits "are not relevant" to BLM's

9  consideration.  *See* BLM Br. at 48; *California III*, 381 F. Supp. 3d at 1170 (finding that agency's

10 citation to record document that summarizes public comments but does not contain any response

11 "hardly constitutes a reasoned explanation" by the agency for repealing a rule that provided

12 "royalty benefits and administrative cost savings").  Moreover, BLM's citation to the inadequate

13 analysis in its Environmental Assessment, or to non-existent analysis that it may conduct in the

14 future for oil and gas development, BLM Br. at 48-49, cannot cure this deficiency.

15          **5.    BLM's New Analysis of Impacts to Marginal Wells is Arbitrary and
16                  Capricious (Issue B-2).**

17     State Plaintiffs hereby incorporate by reference Argument, Section II.B. of the Citizen

18 Groups' Opposition to Cross-Motions for Summary Judgment and Reply in Support of Motion

19 for Summary Judgment.[9]

20      **E.    There is No Basis in the Record to Support BLM's Claim that the Waste
              Prevention Rule is Duplicative of Federal and State Regulations (Issue A-
21            4).**

22     BLM provides no reasoned basis for its assertion that the Rescission was justified because

23 the Waste Prevention Rule is duplicative of other federal and state regulations, a finding that is

24 entirely contrary to its position from 2016.  With regard to EPA's new source performance

25 standards, BLM acknowledges its contrary "not duplicative" position in 2016, but claims that the

26 ─────────────────────
   [9] Given that neither BLM nor Defendant-Intervenors filed timely motions challenging State
   Plaintiffs' standing per this Court's order (ECF No. 95), and that State Plaintiffs have not alleged
27 any violations of the Regulatory Flexibility Act ("RFA"), there is no basis for WEA's statement
   that "Plaintiffs lack standing to challenge BLM's procedural compliance with the RFA."  WEA
28 Br. at 14 (citing States' Br. at 29).

1    overlap with EPA regulations is now "unjustifiable because it exceeded BLM's authority."  BLM

2    Br. at 33-34 (citing AR 5, 8).  There are several problems with this assertion.  First, as discussed

3    *supra* in Part I.A., there is no basis for BLM's newfound doubts about its authority to promulgate

4    the Waste Prevention Rule.  Second, the rationale provided in the Rescission is different – it

5    states that the Waste Prevention Rule created "unnecessary regulatory overlap" with EPA's

6    regulations.  AR 8; *see* States' Br. at 30-31.  BLM's assertion now that this overlap is

7    "unjustifiable" represents a *post-hoc* rationalization that this Court should not consider.  To the

8    extent that this current position is simply another restatement of BLM's statutory authority

9    arguments, the alleged "overlap" with EPA regulations provides no independent basis for the

10   Rescission.  In any event, as BLM is well aware, this alleged "overlap" is greatly exaggerated,

11   given that the EPA standards only apply to new wells, not existing sources, and thus exclude the

12   vast majority of U.S. oil and gas operations.  *See* AR 60-61.  And even with regard to new

13   sources, BLM admits that it was aware of EPA's plans to rescind the new source performance

14   standards, *see* 83 Fed. Reg. at 49,191 (AR 8, n.28), which EPA has now in fact proposed to do.

15   *See* 84 Fed. Reg. 50,244 (Sept. 24, 2019).

16          With regard to state regulations, BLM makes a similar claim that the contradiction of its

17   2016 findings in the Rescission are simply based on its "changed view of 'waste' in the"

18   Rescission.  BLM Br. at 25 (citing AR 19-20, 340-345).  This *post-hoc* rationale was likewise not

19   articulated during the promulgation of the Rescission.  Moreover, having abandoned the rationale

20   in the Rescission—that the 2016 Rule created "unnecessary regulatory overlap and duplication"

21   with state regulations—BLM effectively admits that rationale provides no independent basis for

22   the Rescission.  Moreover, nowhere in the record does BLM make a determination that "the

23   regulations for the ten states that produce 99% of federal oil and gas … prevent 'waste' as BLM

24   now defines it," BLM Br. at 25,[10] nor does BLM even consider whether state regulations should

25   be designed to meet its new statutory interpretation of the Mineral Leasing Act.  And nowhere

26   does BLM explain how the Rescission will fulfill its statutory trust responsibilities with respect to

27   ─────────────────
     [10] BLM cites to an "Information Memorandum" at AR 340-345 for this proposition.  That
     memorandum contains a general description of certain states' regulations, but nowhere analyzes
28   the relationship between the state programs and BLM's new definition of "waste."

                                                    27

1   the development of Indian oil and gas interests, which provided a further basis for the Waste

2   Prevention Rule.  *See* 81 Fed. Reg. at 83,020-21 (AR 921-922).

3        In sum, BLM provides no reasoned explanation in the Rescission for reaching the opposite

4   conclusion it reached in 2016 regarding the need for the Waste Prevention Rule, nor can it rely on

5   the *post-hoc* rationalizations offered for the first time in litigation.  These unexplained

6   inconsistencies warrant reversal.  *See Navarro*, 136 S. Ct. at 2216.

7   **III.   BLM FAILED TO TAKE A "HARD LOOK" AT THE ENVIRONMENTAL IMPACTS OF**
         **THE RESCISSION AS REQUIRED BY NEPA (Issue D).**

8        State Plaintiffs hereby incorporate by reference Argument, Section III of the Citizen

9   Groups' Opposition to Cross-Motions for Summary Judgment and Reply in Support of Motion

10  for Summary Judgment.

11  **IV.   THIS COURT SHOULD APPLY THE STANDARD REMEDY OF VACATUR (Issue E).**

12       There is no merit to BLM's position that vacatur of the Rescission would be "improper"

13  should this Court find that the agency violated the APA.  BLM Br. at 59-60.  Vacatur is the

14  standard remedy under the APA if a court determines that an agency action is unlawful.  5 U.S.C.

15  § 706(2)(A) ("The reviewing court shall ... set aside agency action, findings, and conclusions

16  found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

17  law"); *see All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018)

18  ("vacatur of an unlawful agency action normally accompanies a remand."); *Cal. Wilderness Coal.*

19  *v. U.S. Dep't of Energy*, 631 F.3d 1072, 1095 (9th Cir. 2011) ("When a court determines that an

20  agency's action failed to follow Congress's clear mandate the appropriate remedy is to vacate that

21  action."); *Alsea Valley All. v. Dep't of Commerce*, 358 F.3d 1181, 1185 (9th Cir. 2004)

22  ("Although not without exception, vacatur of an unlawful agency rule normally accompanies a

23  remand.") (citation omitted); *California III*, 381 F. Supp. 3d at 1178 ("Vacatur is the 'standard

24  remedy' when a court concludes that an agency's conduct was illegal under the APA") (citation

25  omitted).

26       In fact, courts decline to vacate an unlawful agency action "only in 'limited

27  circumstances.'"  *Pollinator Stewardship Council v. U.S. E.P.A.*, 806 F.3d 520, 532 (9th Cir.

28

2015) (quoting *Cal. Cmties. Against Toxics v. U.S. E.P.A.*, 688 F.3d 989, 994 (9th Cir. 2012)).

None of these circumstances apply here.  First, when determining whether vacatur is appropriate,

courts "consider whether vacating a faulty rule could result in possible environmental harm, and

[courts] have chosen to leave a rule in place when vacating would risk such harm." *Id.* (citing

*Idaho Farm Bureau Fed'n*, 58 F.3d at 1405); *see also Ctr. for Food Safety v. Vilsack*, 734 F.

Supp. 2d 948, 951 (N.D. Cal. 2010) ("[T]he Ninth Circuit has only found remand without vacatur

warranted by equity concerns in limited circumstances, namely serious irreparable environmental

injury.").  For example, courts have declined to vacate an illegal agency action when vacatur

would increase risks to imperiled species, *Idaho Farm Bureau Fed'n*, 58 F.3d at 1405-06, or

increase harmful pollution, *Cal. Cmties. Against Toxics*, 688 F.3d at 994.

Here, vacating the Rescission would prevent, rather than cause, environmental harm.  As

discussed in State Plaintiffs' brief, the Rescission removes "almost all of the requirements in the

2016 rule that [BLM] previously estimated would … generate benefits of gas savings or

reductions in methane emissions."  83 Fed. Reg. at 49,204 (AR 21).  In particular, BLM admits

that the Rescission will result in increased methane emissions (175,000 tons per year), VOC

emissions (80,000 tons per year), and hazardous air pollutants (1,860 tons per year), and that

"minority and low-income populations living near oil and gas operations would have benefitted

from the reductions in emissions" under the Rule.  Environmental Assessment at 18-19 (AR 315-

316).

Second, courts "weigh the seriousness of the agency's errors against the disruptive

consequences of an interim change that may itself be changed" to determine whether a case

presents the "limited circumstances" warranting remand without vacatur.  *See Pollinator*

*Stewardship Council*, 806 F.3d at 532 (citation and quotation omitted).  With regard to the

seriousness of an agency's errors, "[c]ourts generally only remand without vacatur when the

errors are minor procedural mistakes, such as failing to publish certain documents in the

electronic docket of a notice-and-comment rulemaking." *California I*, 277 F. Supp. 3d at 1125

(finding that BLM's errors in interpreting APA and circumventing notice-and-comment

29

1    requirements were serious).  Here, the seriousness of BLM's legal violations warrants vacatur of

2    the Rescission.  *See California III*, 381 F. Supp. 3d at 1178-79 (finding "serious violations" of the

3    APA where agency "violated clearly established Supreme Court precedent requiring an agency to

4    provide a reasoned explanation for disregarding and contradicting facts and circumstances

5    underlying the adoption of the rules that it now seeks to repeal" and "failed to comport with the

6    APA's notice and comment requirement, thereby denying the public a meaningful opportunity to

7    participate in the regulatory process"); *Friends of Alaska Nat'l Wildlife Refuges,* 381 F. Supp. 3d

8    at 1143 (finding that "the Secretary's failure to acknowledge the change in agency policy and his

9    failure to provide a reasoned explanation for that change in policy are serious errors" warranting

10   vacatur); *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine

11   Fisheries Serv.*, 109 F. Supp. 3d 1238, 1244-45 (N.D. Cal. 2015) (finding that NEPA cumulative

12   impacts analysis is "an integral part of fulfilling NEPA's purpose" and agency's failure to

13   conduct such analysis warranted vacatur); *Pub. Employees for Envtl. Responsibility v. U.S. Fish

14   & Wildlife Serv.*, 189 F. Supp. 3d 1, 2-3 (D.D.C. 2016) (finding that "[a] review of NEPA cases in

15   this district bears out the primacy of vacatur to remedy NEPA violations" and citing cases).

16           Moreover, vacating the Rescission will reinstate the legal regime that was in place during

17   much of 2017 and part of 2018, despite BLM's attempts to illegally delay and then suspend the

18   Waste Prevention Rule.  The fact that vacatur may not lead to "immediate compliance" with the

19   Rule does not warrant a remand only, especially given that operators have had ample time to

20   understand and comply with the Rule's requirements.  *See California III*, 381 F. Supp. 3d at 1179

21   (rejecting federal defendants' position that vacatur would be "unduly disruptive" because lessees

22   and agency would need time to adjust to new rules); *California I*, 277 F. Supp. 3d at 1126

23   (finding that industry's alleged inability to meet Waste Prevention Rule's compliance deadlines

24   "is a problem to some extent of their own making and is not a sufficient reason for the Court to

25   decline vacatur").  Wyoming's claim that it "and others will simply return to the District of

26   Wyoming to obtain a merits ruling against" the Waste Prevention Rule (Wyoming Br. at 25) also

27   provides no basis for a remand without vacatur, especially considering that the Wyoming court

28

1  has already found that these petitioners have failed to demonstrate a likelihood of success on the

2  merits of their claims.  *See Wyoming*, 2017 WL 161428 at *10.[11]

3      The case law cited by BLM does not warrant a different result.  First, several of the cases

4  cited by BLM (*see* BLM Br. at 59-60) discuss the standards for "injunctive relief," which are not

5  relevant to State Plaintiffs' requested relief.  *See* State Plaintiffs Br. at 36 (requesting declaratory

6  relief and vacatur).  The remedy of vacatur is distinct from the remedy of an injunction.  Setting

7  aside an unlawful agency decision through vacatur "prohibits, as a practical matter, the

8  enforcement of" that decision, but is not "the practical equivalent of 'enjoining'" the agency.

9  *Alsea Valley All. v. Dep't of Commerce*, 358 F.3d 1181, 1186 (9th Cir. 2004).  As the Supreme

10 Court has observed, if vacatur of an agency's action is sufficient to redress the plaintiff's injury,

11 "no recourse to the additional and extraordinary relief of an injunction [is] warranted."  *Monsanto*

12 *Co. v. Geertson Seed Farms*, 561 U.S. 139, 166 (2010); *see also Reed v. Salazar*, 744 F. Supp. 2d

13 98, 120 (D.D.C. 2010) (setting aside challenged agency action and declining to issue injunctive

14 relief where it was unnecessary "to redress the NEPA violation found by the Court").  Moreover,

15 even if this Court vacates the Rescission because of the violations alleged by State Plaintiffs,

16 BLM will still have the "first opportunity" to address these violations.  *See* BLM Br. at 60

17 (quoting *Safe Air for Everyone v. U.S. E.P.A.*, 488 F.3d 1088, 1101 (9th Cir. 2007) (vacating EPA

18 order and remanding to agency)).  Finally, while BLM asserts that "each provision of the Rule is

19 severable," BLM Br. at 60, BLM's improper justifications apply to the entirety of the Rescission

20 and thus warrant vacatur.

21     Consequently, this Court should apply the default remedy of vacatur if it finds that BLM

22 violated the APA, NEPA, and the Mineral Leasing Act in promulgating the Rescission.

## CONCLUSION

24     Given BLM's numerous violations of law in promulgating the Rescission, State Plaintiffs

25 respectfully request that this Court grant their motion for summary judgment, deny Defendants'

---

[11] API further cites to the Wyoming court's April 4, 2018 stay order, *see* API Br. at 1, but that decision has been vacated by the Tenth Circuit.  *See Wyoming v. U.S. Dep't of Interior*, 768 Fed. Appx. 790 (10th Cir. Apr. 9, 2019).

1   cross-motions for summary judgment, declare that the Rescission is unlawful, and vacate the

2   Rescission.

3

4   Dated:  October 2, 2019                              Respectfully Submitted,

5                                                        XAVIER BECERRA
                                                         Attorney General of California
6                                                        DAVID A. ZONANA
                                                         Supervising Deputy Attorney General
7

8                                                        /s/ George Torgun
                                                         GEORGE TORGUN
9                                                        SHANNON CLARK
                                                         M. ELAINE MECKENSTOCK
10                                                       Deputy Attorneys General

11                                                       *Attorneys for Plaintiff State of California, by
                                                         and through Xavier Becerra, Attorney
12                                                       General, and the California Air Resources
                                                         Board*

13

14                                                       HECTOR BALDERAS
                                                         Attorney General of New Mexico
15
                                                         /s/ Bill Grantham
16                                                       BILL GRANTHAM
                                                         Assistant Attorney General
17
                                                         *Attorneys for Plaintiff State of New Mexico,
18                                                       by and through Hector Balderas, Attorney
                                                         General*
19

20

21

22

23

24

25

26

27

28

32