Stacey Geis, CA Bar # 181444
Earthjustice
50 California St., Suite 500
San Francisco, CA  94111-4608
Phone: (415) 217-2000
Fax: (415) 217-2040
sgeis@earthjustice.org

*Local Counsel for Plaintiffs in Case No. 4:18-cv-05984, Sierra Club, et al.*
*(Additional Counsel Listed on Signature Page)*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, by and through XAVIER BECERRA, ATTORNEY GENERAL, and the CALIFORNIA AIR RESOURCES BOARD; and STATE OF NEW MEXICO, by and through HECTOR BALDERAS, ATTORNEY GENERAL,<br><br>Plaintiffs,<br><br>v.<br><br>RYAN ZINKE, Secretary of the Interior; JOSEPH R. BALASH, Assistant Secretary for Land and Minerals Management, United States Department of the Interior; UNITED STATES BUREAU OF LAND MANAGEMENT; and UNITED STATES DEPARTMENT OF THE INTERIOR,<br><br>Defendants. | Case No. 4:18-cv-05712-YGR<br>(Consolidated With Case No. 4:18-cv-05984-YGR)<br><br>Judge Assigned: Hon. Yvonne Gonzalez Rodgers<br><br>**CITIZEN GROUPS' OPPOSITION TO CROSS-MOTIONS FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Date:        January 14, 2020<br>Time:        10:00 a.m.<br>Location:  Courtroom 1, Fourth Floor<br>                  1301 Clay Street, Oakland, CA 94612 |

# <u>TABLE OF CONTENTS</u>

Table of Authorities .................................................................................................... iii

ARGUMENT .................................................................................................................. 2

I.     BLM Unlawfully Justifies the Rescission by Arbitrarily Applying a Definition of "Waste" that Violates Congress's Intent (Issue A) ............................................ 2

     A.     BLM's operator profit policy is counter to Congress's clear intent (Issue A-1) ......................................................................................... 4

     B.     BLM's operator profit policy is not a permissible interpretation of BLM's obligation to prevent waste (Issues A-1, A-2) ................................ 7

     C.     BLM's selective application of its operator profit policy is arbitrary and capricious (Issue A-2) ...................................................................... 13

     D.     BLM unlawfully abdicates the agency's duty to prevent waste of public resources based on a deficient analysis (Issue A-3) ............................ 15

     E.     BLM fails to explain its changed position with respect to the need for the Waste Prevention Rule and its definition of waste (Issue A-4) ......... 17

II.    BLM's "Burden" Justification, Including Its Cost-Benefit Analysis, Is Not Supported by the Record and Is Deeply Flawed (Issues B & C) .................... 19

     A.     BLM's "burden" justification is not supported by the record (Issue B-1) ................ 20

     B.     BLM's last-minute, flawed marginal well analysis does not justify the Rescission (Issue B-2) ...................................................................... 22

           1.    *BLM deprived the public of the opportunity to comment on the only evidence allegedly supporting BLM's finding that the Rule unduly burdened marginal wells (Issue B-2a)* ............................ 22

           2.    *BLM's post hoc explanations cannot save its flawed marginal well analysis (Issue B-2b)* ................................................ 24

           3.    *BLM's marginal well analysis does not support its blanket Rescission (Issue B-2c)* ............................................... 27

     C.     BLM cannot save its unsupported "burden" justification by pointing to its flawed cost-benefit analysis (Issue C) ...................................... 27

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with Case No. 4:18-cv-05984-YGR)

i

1. *BLM cannot rely on its "interim" social cost of methane (Issue C-1)* .......... 28

2. *BLM ignores the Rescission's other health and safety costs (Issue C-2)* ...... 31

3. *BLM overstates the foregone compliance costs (Issue C-3)* ........................ 33

III. The Rescission's Environmental Analysis Violates NEPA (Issue D) .................................. 34

A. BLM's analysis of health impacts is not "comprehensive," and ignores impacts on Native Americans altogether (Issues D-1a, D-1b) ................................................. 34

B. BLM fails to take a hard look at climate change impacts (Issue D-1c) .................... 38

C. BLM fails to consider cumulative impacts (Issue D-2) ............................................. 40

D. The Rescission's significant impacts require an EIS (Issue D-3) .............................. 41

VI. The Appropriate Remedy Is To Vacate the Rescission and Reinstate the Waste Prevention Rule (Issue E) ................................................................................. 44

CONCLUSION ................................................................................................. 45

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

ii

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Akhtar v. Burzynski,*
  384 F.3d 1193 (9th Cir. 2004) ...................................................................................7

*Amalgamated Sugar Co. LLC v. Vilsack,*
  563 F.3d 822 (9th Cir. 2009) ....................................................................................4

*Anderson v. Evans,*
  371 F.3d 475 (9th Cir. 2002) ...............................................................................34, 36

*Assiniboine & Sioux Tribes of Ft. Peck Indian Res. v. Bd. of Oil & Gas Conservation
  of Mont.,*
  792 F.2d 782 (9th Cir. 1986) ..................................................................................16

*Barroso v. Gonzales,*
  429 F.3d 1195 (9th Cir. 2005) ..................................................................................9

*Cal. ex rel. Becerra v. U.S. Dep't of the Interior,*
  381 F. Supp. 3d 1153 (N.D. Cal. 2019) .....................................................................18

*Brower v. Evans,*
  257 F.3d 1058 (9th Cir. 2001) ...............................................................................2, 19

*Cal. Cmtys. Against Toxics v. U.S. Envtl. Prot. Agency,*
  688 F.3d 989 (9th Cir. 2012) ..................................................................................45

*Cal. Pub. Utils. Comm'n v. Fed. Energy Regulatory Comm'n,*
  879 F.3d 966 (9th Cir. 2018) (*Cal. PUC*) ............................................................ *passim*

*Cal. Wilderness Coal. v. U.S. Dep't of Energy,*
  631 F.3d 1072 (9th Cir. 2011) .................................................................................42

*California v. Azar,*
  385 F. Supp. 3d 960 (N.D. Cal. 2019) ......................................................................14

*California v. BLM,*
  286 F. Supp. 3d 1054 (N.D. Cal. 2018) .............................................................21, 22, 23

*Calvert Cliffs Coordinating Comm'n v. U.S. Atomic Energy Comm'n,*
  449 F.2d 1109 (D.C. Cir. 1971) ...........................................................................15–16

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary
Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with Case No. 4:18-cv-05984-YGR)

iii

*Cities Serv. Gas Co. v. Peerless Oil & Gas Co.*,
   340 U.S. 179 (1950) ................................................................................12

*Citizens for Better Forestry v. U.S. Dep't of Agric.*,
   632 F. Supp. 2d 968 (N.D. Cal. 2009) ...................................................35

*Clifton v. Koontz*,
   160 Tex. 82 (1959) ................................................................................12

*Coburn v. McHugh*,
   679 F. 3d 924 (D.C. Cir. 2012) .............................................................24

*Ctr. for Biological Diversity v. BLM*,
   --F. Supp. 3d--, 2019 WL 2635587 (N.D. Cal. June 20, 2019) ...............6, 9

*Ctr. for Biological Diversity v. BLM*,
   937 F. Supp. 2d 1140 (N.D. Cal. 2013) (*CBD v. BLM*) ...............42, 43, 43–44

*Ctr. for Biological Diversity v. NHTSA*,
   538 F.3d 1172 (9th Cir. 2008) (*CBD v. NHTSA*) ............................... *passim*

*Ctr. for Biological Diversity v. Zinke*,
   900 F.3d 1053 (9th Cir. 2018) ...........................................................18, 29

*Davis v. EPA*,
   348 F.3d 772 (9th Cir. 2003) ..................................................................7

*Defs. of Wildlife v. Gutierrez*,
   532 F.3d 913 (D.C. Cir. 2008) ..............................................................16

*Earth Island Inst. v. U.S. Forest Serv.*,
   442 F.3d 1147 (9th Cir. 2006) (*Earth Island*) ...................................20, 24

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ........................................................................17, 18, 19

*Food Mktg. Inst. v. Argus Leader Media*,
   139 S. Ct. 2356 (2019) ............................................................................8

*Fuentes v. Lynch*,
   788 F.3d 1177 (9th Cir. 2015) ..............................................................14

*G.H. Daniels III & Assocs., Inc. v. Perez*,
   626 F. App'x 205 (10th Cir. 2015) .......................................................16

*General Chem. Corp. v. United States*,
   817 F.2d 844 (D.C. Cir. 1987) .........................................................23, 31

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary
Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

iv

*Greater Yellowstone Coal., Inc. v. Servheen*,
  665 F.3d 1015 (9th Cir. 2011) .................................................................29, 30

*Hall v. Norton*,
  266 F.3d 969 (9th Cir. 2001) ..........................................................................40

*Henderson Co. v. Thompson*,
  300 U.S. 258 (1937)..................................................................................12, 34

*High Country Conservation Advocates v. U.S. Forest Serv.*,
  52 F. Supp. 3d 1174 (D. Colo. 2014) (*High Country*) ..........................31, 38

*Humane Soc'y of the U.S. v. Locke*,
  626 F.3d 1040 (9th Cir. 2010) ....................................................................24, 45

*Idaho Farm Bureau Fed'n v. Babbitt*,
  58 F.3d 1392 (9th Cir. 1995) ..............................................................22, 23, 45

*Idaho Sporting Cong., Inc. v. Alexander*,
  222 F.3d 562 (9th Cir. 2000) ..........................................................................45

*Judulang v. Holder*,
  565 U.S. 42 (2011)............................................................................................13

*Kern v. BLM*,
  284 F.3d 1062 (9th Cir. 2002) ........................................................................37

*Klamath-Siskiyou Wildlands Ctr. v. BLM*,
  387 F.3d 989 (9th Cir. 2004) ..........................................................................39

*Lands Council v. Martin*,
  529 F.3d 1219 (9th Cir. 2008) ........................................................................29

*Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*,
  459 F. Supp. 2d 874 (N.D. Cal. 2006) (*Lockyer I*) ................................34, 35

*Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*,
  575 F.3d 999 (9th Cir. 2009) (*Lockyer II*) ..................................38, 42, 44

*Michigan v. EPA*,
  135 S. Ct. 2699 (2015)................................................................................ *passim*

*Mont. Envtl. Info. Ctr. v. U.S. Office of Surface Mining*,
  274 F. Supp. 3d 1074 (D. Mont. 2017) (*MEIC*) ..............................38, 39

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Automobile Ins. Co.*,
  463 U.S. 29 (1983) (*State Farm*) .................................................7, 20, 30, 32

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary
Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

v

*N. Plains Res. Council v. Surface Trans. Bd.*,
  668 F.3d 1067 (9th Cir. 2011) ..................................................................41

*Nat. Res. Def. Council v. U.S. Forest Serv.*,
  421 F.3d 797 (9th Cir. 2005) ...................................................................39

*Nat'l Parks Conservation Ass'n v. EPA*,
  788 F.3d 1134 (9th Cir. 2015) .................................................................14

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
  184 F. Supp. 3d 861 (D. Ore. 2016)........................................................31

*Nguyen v. Sessions*,
  901 F.3d 1093 (9th Cir. 2018) ...................................................................5

*NRDC v. EPA*,
  857 F.3d 1030 (9th Cir. 2017) .................................................................16

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
  402 F.3d 846 (9th Cir. 2004) ...................................................................42

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
  795 F.3d 956 (9th Cir. 2015) (*en banc*) (*Kake*) ................................18, 44

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*,
  426 F.3d 1082 ..........................................................................................26

*Paulsen v. Daniels*,
  413 F.3d 999 (9th Cir. 2005) ...................................................................44

*Prometheus Radio Project v. FCC*
  652 F.3d 431, 449 (3d Cir. 2011)............................................................23

*Pub. Citizen v. Dep't of Transp.*,
  316 F.3d 1002, 1027 (9th Cir. 2003) .......................................................43

*Railroad Comm'n of Tex. v. Flour Bluff Oil Corp.*,
  219 S.W.2d 506 (Tex. App. 1949)...........................................................13

*Reed v Salazar*,
  744 F. Supp. 2d 98 (D.D.C. 2010) ..........................................................45

*Rife Oil Properties, Inc.*,
  131 IBLA 357 (1994)...............................................................................11

*S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of the Interior*,
  588 F.3d 718 (9th Cir. 2009) ...................................................................39

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary
Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

vi

*Safe Air For Everyone v. EPA,*
 488 F.3d 1088 (9th Cir. 2007) ..............................................................45

*Sec. & Exch. Comm'n v. Chenery Corp.,*
 318 U.S. 80 (1943) ................................................................................6

*Sierra Club v. Bosworth,*
 510 F.3d 1016 (9th Cir. 2007) .........................................................37, 41

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
 255 F. Supp. 3d 101 (D.D.C. 2017) ....................................................35

*Sugar Cane Growers Co-op. of Fla. v. Veneman,*
 289 F.3d 89 (D.C. Cir. 2002) ..............................................................45

*Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior,*
 608 F.3d 592 (9th Cir. 2010) ..............................................................43

*The Wilderness Soc'y v. U.S. Fish & Wildlife Serv.,*
 353 F.3d 1051 (9th Cir. 2003) (*en banc*) ............................................46

*Tovar v. Sessions,*
 882 F.3d 895 (9th Cir. 2018) ................................................................4

*Tripoli Rocketry Ass'n v. Bureau of Alcohol, Tobacco, Firearms, & Explosives,*
 437 F.3d 75 (D.C. Cir. 2006) ..............................................................24

*U.S. Telecom Ass'n v. FCC,*
 359 F.3d 554 (D.C. Cir. 2004) ............................................................16

*United States v. Afshari,*
 426 F.3d 1150 (9th Cir. 2005) ............................................................45

*W. Watersheds Project v. Kraayenbrink,*
 632 F.3d 472 (9th Cir. 2011) .........................................................36, 37

*WildEarth Guardians v. Zinke,*
 368 F. Supp. 3d 41 (D.D.C. 2019) ...................................................41, 44

*Wyoming v. U.S. Dep't of Agric.,*
 661 F.3d 1209 (10th Cir. 2011) ......................................................37, 38

*Yith v. Nielsen,*
 881 F.3d 1155 (9th Cir. 2018) ..............................................................5

*Zero Zone, Inc. v. U.S. Dep't of Energy,*
 832 F.3d 654 (7th Cir. 2016) ..............................................................31

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

vii

1

**Statutes**

2 30 U.S.C. § 187.................................................................................................................... *passim*

3 30 U.S.C. § 189................................................................................................................................16

4 30 U.S.C. § 225.................................................................................................................... *passim*

5 43 U.S.C. § 1701(a)(8)..............................................................................................................3, 32

6 43 U.S.C. § 1732(b).........................................................................................................................32

7 1919 Tex. Gen. Laws ch. 155..........................................................................................................13

8 Tex. Const. art. XVI, § 59................................................................................................................13

9

10

**Federal Regulations**

11 40 C.F.R. § 1500.1(b).......................................................................................................................39

12 40 C.F.R. § 1502.24..........................................................................................................................39

13 40 C.F.R. § 1508.7............................................................................................................................40

14 40 C.F.R. § 1508.27....................................................................................................................36, 39

15 40 C.F.R. § 1508.27(b).....................................................................................................................42

16 43 C.F.R. § 46.30..............................................................................................................................41

17 43 C.F.R. § 3160.0-5.........................................................................................................................11

18 43 C.F.R. § 3160.05..........................................................................................................................10

19 43 C.F.R. § 3179.3..............................................................................................................................3

20 43 C.F.R. § 3179.101-104.................................................................................................................15

21 43 C.F.R. § 3179.201...................................................................................................................15, 17

22 43 C.F.R. § 3179.201(a)....................................................................................................................16

23 43 C.F.R. § 3179.401(a)(2)(iv).........................................................................................................17

24 83 Fed. Reg. 52,056..........................................................................................................................41

25

26

27

28

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary
Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

viii

1

2

**Other Authorities**

H. Rep. No. 64-17 (Jan. 4, 1916) ..........................................................................9

Howard R. Williams & Charles J. Meyers, *Manual of Oil and Gas Terms* 1046 (14th
ed. 2009) ..............................................................................................................12

*Oil and Gas in a Nutshell*,
214 (6th ed. 2014) ..............................................................................................12

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary
Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

In the face of a growing and well-documented problem of the waste of publicly owned oil and gas resources, dramatic advances in the technology to prevent that waste, and a statutory mandate to require "all reasonable precautions to prevent waste," 30 U.S.C. § 225, the Bureau of Land Management (BLM) decided to rescind all of the Waste Prevention Rule's measures that it had adopted just two years earlier (Rescission). Through the Rescission, BLM has persisted in its quest to ensure that private operators do not need to expend money to conserve publicly owned gas, even after this Court twice struck down previous attempts. BLM's response brief in this case—which is full of post hoc explanations and requests for this Court to defer blindly to the agency—is merely a continuation of the agency's hunt for legal and factual justifications to support its predetermined result. BLM has failed. The Rescission violates the Mineral Leasing Act, Administrative Procedure Act (APA), and National Environmental Policy Act (NEPA).

In an attempt to render irrelevant the public benefits of waste prevention—including increased natural gas production, increased royalty payments, and environmental protections—BLM codifies a new definition of "waste" that focuses entirely the an operator's marginal profits. BLM's new operator profit policy would prohibit BLM from requiring an oil lessee generating millions of dollars from adopting a measure costing a few thousand dollars that would triple gas savings just because that measure costs slightly more to implement than the additional revenue produced by the gas savings. This operator-driven approach is flatly inconsistent with Congress's intent in the Mineral Leasing Act and not entitled to deference because, contrary to BLM counsel's post hoc attempt to argue otherwise, it ignores the public's interest entirely. Compounding this fundamental problem, BLM applies its unlawful waste definition selectively, relying on it to get rid of provisions to which operators objected, dismissing the definition when it would lead to retaining such provisions, and ignoring it altogether when determining which longstanding provisions to leave undisturbed. This outcome-driven charade is plainly arbitrary and capricious and not entitled to deference.

Nor does the factual record support the Rescission. BLM's response does not seriously dispute that the Rescission does not advance (and in some cases impedes) the goals of promoting energy production, investment, and jobs on which BLM claims it is based. Instead, the agency

1  claims that the Rescission, which applies to all wells, is justified by reducing burdens for a subset of

2  the lowest-producing marginal wells. Even there, BLM's brief retreats from the only evidence it had

3  previously identified—a flawed marginal well analysis that it never subjected to public scrutiny in

4  violation of the APA. BLM tries to prop up its burden claim by pointing to its cost-benefit analysis.

5  But this analysis is principally based on an "interim" and unscientific social cost of methane, quickly

6  cobbled together for the sole purpose of supporting deregulation. BLM's main response is that this

7  Court should defer to the agency's use of bad science. However, the "deference accorded an

8  agency's scientific or technical expertise is not unlimited." *Brower v. Evans*, 257 F.3d 1058, 1067

9  (9th Cir. 2001). Here, BLM stretches it far past its breaking point.

10      BLM's defense of its cursory environmental analysis fares no better. BLM's supposed

11  "comprehensive" analysis utterly ignores the Rescission's impacts on "at risk communities" living in

12  areas that already violate federal health standards and Native Americans disproportionately impacted

13  by oil and gas drilling, and falsely claims that there are no metrics for analyzing the Rescission's

14  climate impacts. BLM attempts to hide behind the agency's 2016 environmental analysis for the

15  Waste Prevention Rule, but this cannot substitute for the required "hard look" at the *Rescission's*

16  significant impacts. A more comprehensive environmental impact statement is required.

17      Fundamentally, instead of preventing the waste of publicly owned resources, the Rescission's

18  purpose and effect is to prevent any costs, however minor, to oil and gas companies exploiting those

19  resources—a result at odds with the statutory text and unsupported in the record. As a last-ditch

20  effort, BLM asks this Court not to impose the default remedy of vacatur of the Rescission and

21  reinstatement of the Waste Prevention Rule on the basis of its own prior unlawful attempts to scuttle

22  that Rule. Under controlling Ninth Circuit precedent, this Court should declare the Rescission

23  unlawful, vacate it in its entirety, and reinstate the Waste Prevention Rule.

## ARGUMENT

24

25  **I.   BLM Unlawfully Justifies the Rescission by Arbitrarily Applying a Definition of "Waste" that Violates Congress's Intent (Issue A).**

26

27      Contrary to BLM's assertions, its new definition of waste is not entitled to deference because

28  it ignores the public's interests. In 2016, BLM recognized that the public was suffering the impacts

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary
Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

of industry's wasteful practices—through loss of publicly owned gas and royalty payments and due to air and climate impacts from vented, flared, and leaked gas. *See, e.g.*, AR915. BLM acknowledged that the Mineral Leasing Act "rests on the fundamental principle that the *public* should benefit from mineral production on public lands," and that an "important means of ensuring that the public benefits . . . is minimizing and deterring waste." AR920–21 (emphasis added). Relying on its statutory obligations to require "all reasonable precautions to prevent waste," 30 U.S.C. § 225, for the "safeguarding of the public welfare" and the "protection of the interests of the United States," *id.* § 187, and to "protect the quality of . . . air and atmospheric . . . values," 43 U.S.C. § 1701(a)(8), BLM adopted cost-effective regulations to address the waste problem. AR910, 921. BLM also recognized that simply looking at what is a "rational decision for an individual operator" does not "account for the broader impacts of venting and flaring, including the cost to the public of losing gas that would otherwise be available for productive use, the loss of royalties that would otherwise be paid to States, tribes, and the Federal Government on the lost gas, and the air pollution and other impacts of gas wasted through venting or flaring." AR1014.

In 2018, BLM ignored its obligation to protect the public interest altogether, claiming "its waste prevention authority did not sweep broadly to address societal or environmental impacts." Dfts' Cross Mot. for Summ. J. 38, ECF 123 (Aug. 12, 2019) (BLM Br.). Instead, BLM was laser focused on rescinding requirements to which industry objected and "allow[ing] operators to continue implementing waste reduction strategies and programs that they find successful," AR1—but that are responsible for the growing waste problem. To achieve this goal, BLM redefines "waste" to focus solely on the marginal profitability of the waste prevention measure for the operator:

> *Waste of oil or gas* means any act or failure to act by the operator that is not sanctioned by the authorized officer as necessary for proper development and production, *where compliance costs are not greater than the monetary value of the resources they are expected to conserve*.

43 C.F.R. § 3179.3 (emphasis added). Under this definition, even if a requirement would create substantial benefits to the public to whom the gas belongs at a trivial cost to operators, it does not prevent "waste" unless in implementing it a private operator would profit (or at least break even).

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

3

1   *See* BLM Br. at 48 ("[F]oregone public health benefits . . . are not relevant to BLM's consideration

2   . . . whether compliance costs outweigh the value of the gas to be conserved.").[1]

3   BLM claims that this Court must grant *Chevron* deference to its new definition of waste

4   because the Mineral Leasing Act does not define the term. BLM Br. 12. In doing so, BLM asks this

5   Court to ignore the plain language, context, and purpose of the Act—all of which demonstrate that

6   BLM cannot ignore the public interest in regulating waste. Indeed, BLM's single-minded focus on

7   rescinding public protections to benefit operators' marginal profits—and selective application of the

8   definition to achieve this goal—is not permissible or reasonable under the Mineral Leasing Act.

9   **A.      BLM's operator profit policy is counter to Congress's clear intent (Issue A-1).**

10   BLM's new definition of waste fails at the first step of the *Chevron* analysis. On the question

11   of whether BLM may look exclusively at the marginal profitability of private operators—to the

12   exclusion of the public's interest—when interpreting the statutory term waste, Congress spoke

13   clearly, and said "no." The text, context, and purpose of the Mineral Leasing Act demonstrate that

14   the statute precludes BLM's new operator profit policy. *See The Wilderness Soc'y v. U.S. Fish &*

15   *Wildlife Serv.*, 353 F.3d 1051, 1060–62 (9th Cir. 2003) (en banc) (holding Congress "spoke clearly"

16   to preclude "commercial enterprise[s]" from wilderness areas, an undefined term in the Wilderness

17   Act, given the term's dictionary definition, the Act's broad purposes, and the Act's structure, which

18   repeatedly emphasized wilderness protection); *see also Tovar v. Sessions*, 882 F.3d 895, 900–05 (9th

19   Cir. 2018) (holding Congress clearly intended the term "age" to mean statutory age, rather than

20   biological age, given statute as a whole and the fact that statutory subsections may not be read in

21   isolation); *Amalgamated Sugar Co. LLC v. Vilsack*, 563 F.3d 822, 832–33 (9th Cir. 2009) (holding

22   undefined statutory term was unambiguous based on plain meaning and statutory context).

---

25   [1] BLM attempts to downplay its definition as simply containing an "economic component." BLM

26   Br. 11. In fact, the new definition turns entirely upon an operator's marginal profits, and it is solely this basis that BLM uses as a justification to rescind the Waste Prevention Rule's provisions. *See,*

27   *e.g.*, AR12 ("Because previous § 3179.202 imposed compliance costs greater than the value of the resources it was expected to conserve, the BLM does not consider it to be an appropriate 'waste

28   prevention' requirement, and is rescinding it in its entirety.").

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary
Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

4

In the Mineral Leasing Act, Congress put BLM squarely in charge of leasing publicly owned oil and gas to private operators. *See* Citizen Groups' Mot. for Summ. J. 6–7, ECF 109 (June 7, 2019) (Citizens Br.). To protect the public's interest, Congress directed BLM to require operators to "use *all* reasonable precautions to prevent waste," 30 U.S.C. § 225 (emphasis added), and to ensure leases contained provisions for the "prevention of undue waste," *id.* § 187. The mandate to prevent waste is found alongside other public interest-centered requirements, such as protecting the "interests of the United States" and "safeguarding . . . the public welfare." *Id.* Indeed, *all* of the conditions that Congress mandated BLM to include in leases through the Mineral Leasing Act have the goal of protecting the public from private operators only focused on their profits. For example, in addition to requiring BLM to prevent undue waste and safeguard the public welfare, § 187 requires provisions protecting "the safety and welfare of the miners," "prohibiting the employment of any child," "requiring the payment of wages at least twice a month in lawful money," and "for the prevention of monopoly." *Id.* The Act's text thus demonstrates that Congress's purpose was to impose on the federal government the duty to protect the public interest, including by ensuring that operators prevent waste. By contrast, nothing in the text suggests that BLM may focus exclusively on private operators' profit interests when implementing its statutory waste prevention duties. And BLM identifies no textual language suggesting as much.

BLM points to the statutory language qualifying that it must prevent "[un]reasonable" or "undue" waste. BLM Br. 12. But these qualifiers demonstrate that Congress viewed the term "waste" as an expansive one. Indeed, BLM's restrictive interpretation of waste renders these qualifiers unnecessary and meaningless. If loss of gas is only "waste" when it is cheaper for a particular operator to capture it than to release it into the air, it is difficult to see when waste might not be "undue" or when a precaution would not be "reasonable." *Nguyen v. Sessions*, 901 F.3d 1093, 1098 (9th Cir. 2018) ("Because the BIA's interpretation impermissibly renders a portion of the rule superfluous, there is no ambiguity that would require us to exercise [*Chevron*] deference."); *see also Yith v. Nielsen*, 881 F.3d 1155, 1165–67 (9th Cir. 2018) (noting that courts must employ traditional "tools of statutory interpretation," including the cannon against surplusage, in determining whether

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

5

Congress spoke directly to the question).[2] In contrast, the Waste Prevention Rule appropriately adopted a broad view of waste and then exercised the agency's discretion to determine when that waste was undue (based on lost production royalties and environmental impacts), and when there were reasonable precautions to prevent it (based on technical feasibility and cost). *See* AR910 (concluding that the requirements were "economical, cost-effective, and reasonable measures . . . to minimize gas waste," and to "enhance our nation's natural gas supplies, boost royalty receipts for American taxpayers, tribes, and States, [and] reduce environmental damage").[3]

American Petroleum Institute (API) claims that the Mineral Leasing Act's "public welfare" requirement should not "subsume[] or supersede[]" its requirement to prevent waste. Am. Petrol. Inst. Cross Mot. for Summ. J. 12, ECF 126 (Aug. 26, 2019) (API Br.). The waste requirement, however, "must be read in [its] context with a view to [its] place in the overall statutory scheme." *The Wilderness Soc'y*, 353 F.3d at 1060 (quotation marks omitted). The stated requirement to safeguard public welfare, along with numerous other provisions requiring BLM to protect the public and workers from operators seeking only to maximize profits, demonstrates Congress's intent that BLM regulate private operators to protect the public interest, including by preventing waste. The

---

[2] To the extent BLM's lawyers contend in reply that the Rescission merely determines what waste prevention requirements are "reasonable" rather than redefining "waste," BLM's lawyers are rewriting the regulation and their arguments must be rejected. *See Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 94–95 (1943). If this was true, BLM would not need to adopt the Rescission's new and restrictive definition of "waste," upon which its decisions to rescind the waste-preventing provisions of the Waste Prevention Rule entirely depend. *See supra* p. 4 n.1. Regardless, by completely abdicating its obligations to the public, BLM has not taken "*all* reasonable precautions to prevent waste." 30 U.S.C. § 225.

[3] Intervenors devote large parts of their briefs to arguing that the Waste Prevention Rule itself was unlawful. *See, e.g.*, State of Wyo. Cross Mot. for Summ. J. 16–19, ECF 125 (Aug. 26, 2019) (Wyo. Br.). It was not, but those arguments are not relevant here. The Waste Prevention Rule, and the record upon which it was based, "is not before th[is] Court." *See Ctr. for Biological Diversity v. BLM*, --F. Supp. 3d--, 2019 WL 2635587, at *30–31 (N.D. Cal. June 20, 2019). If the Rescission Rule is unlawful, it must be vacated, and Intervenors are then free to challenge a reinstated Waste Prevention Rule.

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

Rescission's new definition of "waste" contradicts this intent by ignoring the public interest, and neither BLM nor API has any textual response.[4]

**B.     BLM's operator profit policy is not a permissible interpretation of BLM's obligation to prevent waste (Issues A-1, A-2).**

Even if this Court determines that the term "waste" is ambiguous, BLM's new definition is not a "permissible" interpretation and therefore fails under *Chevron* step two. *Davis v. EPA*, 348 F.3d 772, 783–84 (9th Cir. 2003) (rejecting agency interpretation at *Chevron* step 2 where it would "prevent[] consideration of a factor that Congress stated was relevant" and interfere with a goal of the statute); *Akhtar v. Burzynski*, 384 F.3d 1193, 1199–1202 (9th Cir. 2004) (invaliding an agency interpretation at *Chevron* step two after considering the statute's "language, structure, subject matter, context, and history"). As discussed *supra* pp. 4–6, BLM's new definition does not satisfy the Mineral Leasing Act's purpose of protecting the public and is therefore not permissible.

Indeed, BLM's interpretation ignores the problem of excessive waste and the impacts to the public. *Michigan v. EPA*, 135 S. Ct. 2699, 2708 (2015) ("Although this term leaves agencies with flexibility, an agency may not 'entirely fai[l] to consider an important aspect of the problem' when deciding whether regulation is appropriate." (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Automobile Ins. Co*., 463 U.S. 29, 43 (1983) (*State Farm*)); *Davis*, 348 F.3d at 783–84 (rejecting agency interpretation that allowed EPA to ignore harm the Clean Air Act was intended to prevent and thereby "miss[] the forest for the trees"). Here, faced with well-documented evidence of harm to the public from venting, flaring, and leaks on federal and Indian leases, BLM unreasonably chose to define "waste" in a way that will ensure that nothing will be done to address this harm. *See* Citizens Br. 14–15. As BLM acknowledges, the Rescission will *reduce* the amount of gas produced from federal and Indian leases by 299 billion cubic feet, reduce royalties paid to the public by $79.1 million, and increase air pollution and greenhouse gas emissions. AR22, 81. Likewise, BLM

---

[4] Contrary to Intervenors' contentions, API Br. 11, the Citizen Groups have never claimed that the Waste Prevention Rule is "compelled" by the governing statute, or the *only* way that BLM may lawfully carry out its waste prevention duties. The Citizen Groups simply maintain that that Rescission Rule is an unlawful abdication of those duties.

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

1   concedes that its decision to rescind the gas capture requirements and defer to state venting and

2   flaring regulations will not necessarily lead to *any* reduction in the rampant flaring on public lands

3   that has devastating impacts to nearby residents. AR20; *see* Citizens Br. 30 (flaring can be as loud as

4   a jet engine and light up the night sky bright as day). BLM took these steps despite the fact that cost-

5   effective technologies that some states are effectively requiring operators to use are the same or

6   similar to those contained in the Waste Prevention Rule, AR84189–90—a fact that BLM does not

7   dispute. But instead of addressing these public threats with the available tools, BLM redefined

8   "waste" to focus solely on operators' marginal profits. Just as the Supreme Court found EPA's

9   failure to consider cost was impermissible in *Michigan*, 135 S. Ct. at 2711, this Court should find

10  BLM's failure to consider the public interest is impermissible here.

11          Unable to find textual support for its operator profit policy, BLM attempts to rely on cherry-

12  picked statements from early congressional hearings about what eventually became the Mineral

13  Leasing Act in 1920, and BLM's supposed "historic practice"—none of which can overcome

14  Congress's clear intent as expressed in the Act. *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct.

15  2356, 2364 (2019) ("Where . . . [an examination of the ordinary meaning and structure of the law]

16  yields a clear answer, judges must stop. Even those of us who sometimes consult legislative history

17  will never allow it to be used to muddy the meaning of clear statutory language.") (internal

18  quotations and citations omitted). Moreover, viewed as a whole, the legislative history BLM cites

19  only confirms the primary purpose of the Mineral Leasing Act: to constrain unfettered private

20  development by putting the Interior Department in charge of regulating private development on

21  public lands. *See* BLM Br. 12 (resources "'belong' to the public"); *id.* at 13 (Mineral Leasing Act

22  was enacted in response to "rampant fraud and speculation and the monopolizing of public resources

23  by a handful of private companies."); *see also* Citizens Br. 7–8.

24          But even the Mineral Leasing Act "purposes" that BLM selectively gleans from the

25  legislative history—"promot[ing] wise development of [federal] natural resources," "obtain[ing] for

26  the public a reasonable financial return on assets that 'belong' to the public," and "offering

27  prospectors a reasonable rate of return"—fundamentally fail to support the agency's fixation solely

28  on operators' marginal profits. BLM Br. 12–15 (citations omitted). For example, with respect to

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary
Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

promoting wise development and obtaining reasonable financial returns for the public, the record shows that the Rescission will significantly *reduce* natural gas production and royalties paid to public coffers. AR22. As that fact demonstrates, BLM's argument wrongly assumes that any waste prevention requirement that does not pay for itself hinders production, leading to absurd results. BLM's policy would prevent the agency from requiring an oil lessee generating millions of dollars in revenues from adopting a measure costing a few thousand dollars that would double or triple gas savings just because that measure costs slightly more to implement than the additional revenue produced by its gas savings. *See Barroso v. Gonzales*, 429 F.3d 1195, 1207 (9th Cir. 2005) (finding impermissible "an interpretation that would lead to an absurd result." (citation omitted)). Such an approach protects operators' marginal profitability at the expense of the public interest in preventing waste and is a far cry from the "wise" and "orderly" development of publicly owned resources that BLM concedes Congress intended to promote. BLM Br. 12–13.[5]

With respect to BLM's dubious claims that Congress's chief purpose was to "reward[] the prospector,"[6] there is a "logical gap" between this motivation and the Rescission. *Ctr. for Biological Diversity v. BLM*, --F. Supp. 3d---, 2019 WL 2635587, at *23 (C.D. Cal. June 20, 2019). The record reveals that despite rescinding all of the waste-preventing provisions of the Waste Prevention Rule, the Rescission will have little to no effect on operator's economic interests, their incentives to develop resources, or their rates of return. *See infra* pp. 20–21. Indeed, BLM concludes that the Rescission will increase *small* operator profits by only 0.19%. AR23. That is because BLM's new

---

[5] BLM suggests that the Waste Prevention Rule's requirements that operators capture a certain percentage of released gas would lead to underground waste. BLM Br. 13. But it acknowledges that it adopted those requirements in response to waste of public gas from oil wells due to inadequate infrastructure. AR1013–14. *Deferring* production until infrastructure is built is different than *abandoning* resources. *Contra* BLM Br. 14. Rather, it is "wise" and "orderly" development.

[6] Even BLM's cherry-picked citations do not support its operator profit policy. The same House Report that discusses "reward[ing] the prospector," BLM Br. 13–14, states on the next page that the "provisions relative to continued development to prevent waste and speculation are inserted in the bill that will not work too great a hardship on the developer and that will at the same time practice conservation of this resource . . . in which we all feel a keen interest in the prevention of its waste in any form," H. Rep. No. 64-17 (Jan. 4, 1916). In other words, Congress expected operators would have to bear some costs to protect the public interest.

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

1    "waste" definition takes a microscopic focus on the marginal economics of each individual

2    requirement irrespective of how those costs will affect the overall economics of a lease or an

3    operator as a whole. But whether a particular requirement pays for itself or generates a profit on an

4    individual well does not indicate whether operators have sufficient incentives to produce. Indeed,

5    regulatory compliance costs are relatively small relative to both operator revenues and total business

6    costs, which are much more affected by factors like drilling and labor costs, the gas market, and the

7    price of leases. *See* AR96435. That is why API's assertion that no operator would continue to

8    operate under the Waste Prevention Rule is false. API Br. 2. In fact, operators continue to invest

9    heavily in oil and gas resource in states with regulations similar to the Waste Prevention Rule. *See*

10   AR61 (describing Colorado's similar regulations), AR825 (noting that oil production in Colorado

11   increased by 22% after the state adopted its regulations in 2014).

12          BLM also claims that it is returning to its historic interpretation of waste as "accounting for

13   the economics of preventing the loss." BLM Br. 17; *see* API Br. 6–8. In fact, BLM is creating an

14   entirely new standard that looks not at overall lease or operator economics, but instead focuses solely

15   on the marginal profits of operators from executing the specific waste prevention measure. Nothing

16   in BLM's prior regulations—in place for nearly forty years—supports this approach. Citizens Br. 9–

17   10. Indeed, if BLM's operator profitability definition of waste were truly the historic practice, there

18   would be no reason for BLM to *change* its regulatory definition now. *Id.* (discussing 43 C.F.R.

19   § 3160.05 (historic definition of waste)). BLM's response is merely to point out that the preexisting

20   waste definition is in § 3160, which contains general provisions applicable to all onshore oil and gas

21   operations, but that it "modified that definition to fit the waste prevention context." BLM Br. 18.

22   This makes no sense—there is no other context for the waste definition. That BLM adopted new

23

24

25

26

27

28

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary
Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

10

1    waste prevention regulations does not change the fact that it already had an existing definition of

2    waste that contained no reference to an operator's marginal profits. 43 C.F.R. § 3160.0-5.[7]

3          The same is true for BLM's prior regulation governing venting and flaring, NTL-4A.

4    Notably, while explaining that NTL-4A embodied BLM's historic waste prevention authorities,

5    BLM Br. 3, 16–17, BLM does not actually quote the language of that regulation. In fact, NTL-4A

6    did not contain any language that allowed operators to vent or flare so long as the marginal cost of

7    curtailing venting or flaring was more than the value of the gas conserved. To the contrary, NTL-4A

8    provided that BLM could only approve venting or flaring of oil well gas if it was justified by "an

9    evaluation report supported by engineering, geologic, and economic data which demonstrates" *both*:

10          [1] that the expenditures necessary to market or beneficially use such gas are not
            economically justified *and* [2] that conservation of the gas, if required, would lead to

11          the premature abandonment of recoverable oil reserves and ultimately to a greater loss
            of equivalent energy than would be recovered if the venting or flaring were permitted

12          to continue . . .

13

14    AR3013 (emphasis added). NTL-4A further specified that "[w]hen evaluating the feasibility of

15    requiring conservation of the gas," BLM must examine not simply whether the requirement pays for

16    itself, but take into account "the total leasehold production, including both oil and gas, as well as the

17    economics of a fieldwide plan" to determine "whether the *lease* can be operated successfully if it is

18    required that the gas be conserved." AR3014 (emphasis added).

19          Accordingly, to demonstrate that conserving gas was not "economically justified," operators

20    needed to evaluate the marginal cost of curtailing venting or flaring against the "total leasehold

21    production," considering economics broadly, not against the marginal profits from conserving the

22

23    ────────────────
      [7] Nor does BLM adequately respond to the Citizen Groups' argument that its historic practice
      explanation conflates the Mineral Leasing Act's reasonable diligence and waste prevention

24    requirements, Citizens Br. 8. Offering an impermissible and flawed post hoc interpretation of the
      statute, *see Cal. Pub. Utils. Comm'n v. Fed. Energy Regulatory Comm'n*, 879 F.3d 966, 975 (9th

25    Cir. 2018), BLM's lawyers now argue that section 187 of the Act contains an "umbrella provision"
      and, after the first semicolon, "examples of the specific types of provisions within the broad

26    umbrella." BLM Br. 15 n.6. There is no support for this interpretation. Section 187 contains a series
      of directions about which lease provisions BLM must include, all separated by semicolons and

27    beginning with "provisions . . . " or "a provision . . . ." 30 U.S.C. § 187. There is nothing in the text
      or context to suggest that the first is an umbrella provision.

28

      Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary
      Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

gas. *See Rife Oil Properties, Inc.*, 131 IBLA 357, 377 (1994) (considering whether waste-preventing requirement would make "*production* uneconomic") (emphasis added)). And even that was not sufficient: operators also needed to show that it would lead to premature abandonment of recoverable resources. This test is not the same as BLM's operator profit policy; it is more like the Waste Prevention Rule, which contained exemptions from all of its requirements where compliance would lead operators to abandon resources. *See*, *e.g.*, AR913, 956, 957. Accordingly, there is no merit to BLM's claims that its waste definition is a return to its historic practice.

The remainder of BLM's and API's historic practice arguments merit little response. Most of them conflate the fact that the historic practice includes consideration of the economics of the lease *as a whole* with BLM's brand new attempt to look only at the marginal profitability of specific requirements.[8] The Citizen Groups agree with BLM that the historic practice is to take *both* the interests of the lessor and lessee into account. BLM Br. 15. But the Rescission's new operator profit policy *only* counts the interests of the lessee. *See supra* pp. 3–4. The historic practice recognizes that regulators must reconcile the lessee's interests in profiting from its wells with the public's interest in wise management that accounts for the negative externalities created by private operators. Notably, neither BLM nor API have any response to the Supreme Court cases so holding that the Citizen Groups cited in their opening brief. Citizens Br. 9 n.5 (citing *Henderson Co. v. Thompson*, 300 U.S. 258, 264 (1937) and *Cities Serv. Gas Co. v. Peerless Oil & Gas Co.*, 340 U.S. 179, 185–86 (1950)).

Indeed, while API contends that the Mineral Leasing Act was "enacted against [the] background" of a number of sources that *postdate* the Act's passage, API Br. 6–7, sources that predate the Act and thus provide evidence of the "meaning . . . prevailing at that time," permitted

---

[8] For example, the treatise that API cites, API Br. 6, does not support looking at the marginal profitability of a specific waste-preventing requirement, but rather looking at whether the "*lease* is profitable." *Oil and Gas in a Nutshell*, 214 (6th ed. 2014) (emphasis added). That treatise further cites to *Clifton v. Koontz*, 160 Tex. 82, 89 (1959), for the proposition that the inquiry must take into account "all the circumstances." *Contra* API Br. 6–7. Nor is it surprising that a different treatise on which API relies, regarding "an Economic Analysis" of oil and gas conservation, API Br. 7, might support its preferred *economic* definition of waste. But the primary definition of "waste" included in a leading manual of oil and gas terminology is "the ultimate loss of oil or gas." Howard R. Williams & Charles J. Meyers, *Manual of Oil and Gas Terms* 1046 (14th ed. 2009); *see* AR84051.

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

regulators to impose costs on operators that exceeded the value of the gas saved.[9] The Mineral

Leasing Act immediately followed Texas's adoption of a similar law in 1919. *See* 1919 Tex. Gen.

Laws ch. 155; *see also* Tex. Const. art. XVI, § 59 (adopted 1917). Reviewing this history (and as

though speaking directly to this case), a court had no problem concluding:

> If the prevention of waste of natural resources such as gas is to await the time when direct and immediate profits can be realized from the operation, there would have been little need for the people of Texas to have amended their Constitution by declaring that the preservation and conservation of natural resources of the State are public rights and duties and directing that the Legislature pass such laws as may be appropriate thereto (Sec. 59a, Art. 16, Tex. Constitution, Vernon's Ann. St.), for private enterprise would not need the compulsion of law to conserve these resources if the practice were financially profitable.

*Railroad Comm'n of Tex. v. Flour Bluff Oil Corp.*, 219 S.W.2d 506, 508 (Tex. App. 1949). It was

this understanding—that regulators needed to look out for the *public's* interest, not the private

profits—that informed the Mineral Leasing Act's focus on the public interest.

BLM's and API's arguments do not support the proposition that historically a regulator could

never impose a requirement to benefit the public merely because the private operator would not fully

recoup the costs through gas savings, regardless of whether the well as a whole would remain

profitable. BLM's attempt to disregard the public interest is an impermissible construction of the

statute that fails to address the growing waste problem. *See Michigan*, 135 S. Ct. at 2707.

## C.      BLM's selective application of its operator profit policy is arbitrary and capricious (Issue A-2).

In its quest to achieve the predetermined result of rescinding provisions of the Waste

Prevention Rule to which industry objected, BLM not only adopted a waste definition that violates

Congress's intent, but it also failed to apply the definition in a "rational way." *Judulang v. Holder*,

565 U.S. 42, 55 (2011). BLM dismisses its new definition when it does not satisfy the agency's

---

[9] The only source that API cites that predates the Mineral Leasing Act is *Brewster*. API Br. 7. But BLM admits that "courts have not read the language in *Brewster* so broadly as to hold that the prudent operator standard can only be violated where a lessee refuses to engage in activity demanded by the lessor that will be profitable to the lessee." BLM Br. 16. This undermines reliance on *Brewster* and the treatise providing this explanation to support the Rescission, regardless of whether BLM cited this specific part of the treatise in the Rescission. *Contra id.*

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

13

deregulatory goals, and ignores it with respect to the few provisions the Rescission retains. BLM's selective application of its new definition does not constitute reasoned decision making. *Michigan*, 135 S. Ct. at 2708 ("*Chevron* allows agencies to choose among competing reasonable interpretations of a statute; it does not license interpretive gerrymanders under which an agency keeps parts of statutory context it likes while throwing away parts it does not."); *California v. Azar*, 385 F. Supp. 3d 960, 1002 (N.D. Cal. 2019) (holding that a "permissible" interpretation under *Chevron* does not insulate an agency from arbitrary and capricious review and the requirement to provide a "reasoned analysis"). Indeed, such selective application is the "hallmark of arbitrary action." *Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1145 (9th Cir. 2015). And BLM cites to no case to support its claim that deference is warranted where the agency fails to apply its definition uniformly.

BLM's inconsistent application reflects the fact that the waste definition has "no operative effective in the Rule." BLM Br. 18 n.8. BLM concedes that "although [it] defines 'waste of oil or gas' in the Revision Rule as a means of setting forth the agency's policy, it does not actually use that term in the operative provisions of the Rule." BLM Br. 17 (citing AR14). In fact, BLM admits it *could not* apply the policy as written because it does not specify a timeframe over which to make the determination of profitability and different waste prevention measures will capture enough gas to pay for themselves over different time periods. AR192 (BLM noting "it would be absurd to apply the definition without taking into account a time frame").

Fundamentally, BLM *only* applies the new policy when it suits its operator-centered, deregulatory goals. When BLM's new definition gets in the way of these goals, BLM ignores it. Citizens Br. 10–11. Although the Waste Prevention Rule's requirement that operators use low-bleed pneumatic controllers results in compliance costs that are *less* than the monetary value of the resources they are expected to conserve, BLM rescinds them anyway. *Id.* BLM concedes as much by arguing that it eliminated the low-bleed requirement not to prevent waste, but because it expected companies to voluntarily comply. BLM Br. 22. BLM argues that it is entitled to have "different reasons for different aspects of its decision." *Id*. But this reasoning impermissibly renders the Act's waste prevention mandate "superfluous." *Fuentes v. Lynch*, 788 F.3d 1177, 1181 (9th Cir. 2015). That is because, under BLM's reasoning, where a requirement imposes costs that outweigh the gas

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

14

savings it is not "waste," and when the gas savings outweigh the costs it will be "unnecessary in light of the behavior of the regulated community." BLM Br. 22. Under this interpretation of convenience, there is nothing left for BLM to do.[10]

Contrary to BLM's assertions, the agency arbitrarily ignores its new operator profit policy for more than just "one specific provision." BLM Br. 21. For example, BLM's brief highlights that the Rescission kept several Waste Prevention Rule provisions (those that mirrored the earlier regulatory regime in NTL-4A) in place, such as imposing time and volume limits on royalty-free venting and flaring. BLM Br. 20 (citing 43 C.F.R. § 3179.101–104). But BLM never analyzed whether these requirements impose costs that outweigh the gas they save (or, indeed, whether they would save any gas at all or only result in additional royalty payments). In fact, since BLM estimates that the Rescission will reverse all of the gas savings accomplished by the Waste Prevention Rule, AR22, if the agency's supposed "notable improvements" on the NTL-4A entail *any* costs, they would seem to flunk BLM's operator profit test. BLM Br. 22. BLM's arbitrary failure to apply its waste definition uniformly shows that its only purpose is to justify the rescission of provisions to which industry actors objected, and should be rejected.

### D.   BLM unlawfully abdicates the agency's duty to prevent waste of public resources based on a deficient analysis (Issue A-3).

Based on a five-page summary devoid of any analysis, AR340–45, the Rescission cedes the bulk of BLM's authority over venting and flaring to a patchwork of different state regimes, so long as those states have *any* program to limit venting and flaring, regardless of how stringent or effective. *See* 43 C.F.R. § 3179.201. Blindly deferring to state standards without any assurance that they will actually reduce wasteful venting and flaring violates Congress's express mandate that BLM—not the states—prevent waste of federal minerals. 30 U.S.C. § 225; *see Calvert Cliffs*

---

[10] Moreover, BLM does not support its assertion that wells that have not adopted low-bleed pneumatic controllers have a functional need for high-bleed controllers, or are marginal wells where low-bleed controllers might not be cost-effective. *See* AR88–89 (citing no evidence beyond agency's belief to support this conclusion), AR84125–26; *see also* BLM Br. 22. In fact, the record suggests the opposite. It shows that Colorado, Wyoming, Utah, and California all require at least some use of low-bleed controllers, including at marginal wells, without adverse consequences. AR84189–90.

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

15

1   *Coordinating Comm'n v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1122–23 (D.C. Cir. 1971)

2   (striking down agency's "abdication" of its statutory duty because "[t]he only agency in a position to

3   make such a judgment is the agency . . . specifically directed" to consider the issue by Congress).

4       In a non-response, BLM points to two statutory provisions holding that the statute does not

5   interfere with states' rights to manage oil and gas within their borders. BLM Br. 23 (citing 30 U.S.C.

6   §§ 187, 189); *see* API Br. 18. But these provisions say nothing about *BLM's* obligation to prevent

7   waste of *federal* minerals. BLM does not explain how a patchwork of state rules can each constitute

8   "*all* reasonable precautions" to prevent waste of federal minerals. Citizens Br. 12; 30 U.S.C. § 225.

9       BLM also does not identify any "clear proof of legislative intent" to allow delegating its

10   authority to the states. *Assiniboine & Sioux Tribes of Ft. Peck Indian Res. v. Bd. of Oil & Gas*

11   *Conservation of Mont.*, 792 F.2d 782, 795 (9th Cir. 1986); *see also G.H. Daniels III & Assocs., Inc.*

12   *v. Perez*, 626 F. App'x 205, 212 (10th Cir. 2015) ("[D]elegations to outside parties are assumed to be

13   improper absent an affirmative showing of congressional authorization.") (citation omitted). Instead,

14   BLM argues, without citation, that it is properly "deferring" rather than improperly "delegating" to

15   the states. BLM Br. 23; API Br. 16–17. Allowing states to define what constitutes waste of federal

16   minerals without any minimum standards, however, is tantamount to delegating that authority to the

17   states, and carries the same risks, including "blur[red]" accountability," "undermining an important

18   democratic check on government decision-making." *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 564–

19   65 (D.C. Cir. 2004); *see Defs. of Wildlife v. Gutierrez*, 532 F.3d 913, 926 (D.C. Cir. 2008).[11]

20       BLM claims it lawfully deferred to state regulations when it "reconsidered state regulations

21   in light of its new definition of waste and asked whether existing state regulations adequately

22   prevent the loss of gas for which the value of the conserved gas outweighs the cost of capture." BLM

23   Br. 25. There is no record evidence to support this claim. *See NRDC v. EPA*, 857 F.3d 1030, 1040

24   (9th Cir. 2017) (dismissing an argument where agency provided not supporting record evidence).

25

26   _____

    [11] Just as in *Assiniboine*, BLM is providing a rubber stamp in advance for all venting and flaring,

27   regardless of the strength or efficacy of the state regulation, *contra* BLM Br. 23. *See* 43 C.F.R.
    § 3179.201(a). Indeed, BLM has delegated more authority than in *Assiniboine*, where BLM at least

28   *could* review state permitting decisions before rubber-stamping them. 792 F.2d at 793.

    Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary
    Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

1   BLM's five-page analysis does not even mention BLM's waste definition, much less analyze

2   whether the state venting and flaring regulations meet this definition. AR340–45. Accordingly,

3   BLM's post hoc claim in its brief provides no basis to support the Rescission. *See Cal. Pub. Utils.*

4   *Comm'n v. Fed. Energy Regulatory Comm'n*, 879 F.3d 966, 975 (9th Cir. 2018) (*Cal. PUC*). At best,

5   BLM's post hoc rationale amounts to a claim that *any* state regulation, no matter the substance, is

6   presumptively sufficient to meet BLM's definition of waste. This only highlights BLM's complete

7   abdication of its duty to protect the public and take all reasonable precautions to prevent wasteful

8   practices like the rampant flaring of publicly owned gas.

9        BLM claims that the Rescission is similar to the Waste Prevention Rule's variance provision,

10  and simply provides a "blanket variance" instead of case-by-case analysis. BLM Br. 24–25. But this

11  lack of case-by-case analysis also highlights BLM's complete relinquishment of its Mineral Leasing

12  Act waste-prevention duty. The Waste Prevention Rule's variance provision set a federal floor

13  requiring states to show their regulations would "perform at least equally well in terms of reducing

14  waste of oil and gas," and "reducing environmental impacts from venting and or flaring of gas."

15  AR990 (43 C.F.R. § 3179.401(a)(2)(iv) (2016)). Likewise, the NTL-4A only permitted deferral *after*

16  a case-by-case analysis of state standards, *see* AR3010, and, at any rate, neither BLM nor API point

17  to any instance in which BLM did ratify a state standard under the NTL-4A. The Rescission, by

18  contrast, provides a blanket variance to all states based on the mere *existence* of standards no matter

19  their stringency. *See* 43 C.F.R. § 3179.201. BLM claims that this merely "shifts the burden to BLM"

20  to deny insufficient state rules. BLM Br. 25. But there is no mechanism in the Rescission for BLM

21  to do so and therefore BLM would have to undertake a rulemaking to reject a state standard. The

22  Rescission is unlawful because BLM has abdicated its statutory duty to prevent waste to the states.

### E.   BLM fails to explain its changed position with respect to the need for the Waste Prevention Rule and its definition of waste (Issue A-4).

25       BLM did not adequately justify its dramatic change in position under the standards of *FCC v.*

26  *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). While BLM's lawyers now acknowledge

27  the agency's obligation to safeguard the public welfare, BLM Br. 19, there is no mention of this

28  obligation in the Rescission. *See Cal. PUC*, 879 F.3d at 975 (courts do not defer to post hoc

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary
Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

17

1  rationalizations of counsel). As explained *supra* pp. 2–3, BLM defined the waste prevention

2  measures in the Waste Prevention Rule based on the "fundamental principle that the public should

3  benefit from mineral production on public lands," AR920, and expressly relied on the Mineral

4  Leasing Act's mandate to "safeguard[] . . . the public welfare," AR921 (quoting 30 U.S.C. § 187). In

5  the Rescission—perhaps recognizing the impossibility of the task—BLM fails to square its new

6  waste definition with its mandate to protect the public welfare, in violation of the APA. Citizens Br.

7  8; *Fox Television*, 556 U.S. at 515 (requiring agency to demonstrate any change in position is

8  "permissible under the statute"); *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1073 (9th Cir.

9  2018) (recognizing that agency must consider the Endangered Species Act's policy of

10  "institutionalized caution" when changing position). BLM's response fails to address this change in

11  position argument. Indeed, BLM's post hoc claim that the Rescission serves the public interest only

12  serves to highlight that it did not even acknowledge its change in position. BLM Br. 19. BLM's post

13  hoc claim also is flatly wrong. *See supra* pp. 8–10 (explaining the fallacy of BLM's claim that the

14  Rescission safeguards the public welfare by protecting operators' investments, promoting mineral

15  development, and generating a fair return for the public).

16      BLM also fails to address its changed position with respect to whether there was a need to

17  curb venting, flaring and leaks. Citizens Br. 14–15. After a thorough administrative process and

18  based on an extensive record, BLM documented a significant problem of wasted public gas. BLM

19  found that since 1979, oil and gas production had increased dramatically, that between 2009 and

20  2015, total reported flaring from federal and Indian wells increased by over 1,000%, and operators

21  vented or flared enough gas to supply 6.2 million households for a year. AR915–16. The

22  Government Accountability Office (GAO) also raised concerns about excessive venting and flaring.

23  Citizens Br. 14. In rescinding these rules, BLM largely ignored these factual conclusions. *Organized*

24  *Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 968 (9th Cir. 2015) (*en banc*) (requiring

25  "reasoned explanation" for disregarding prior factual findings); *California v. U.S. Dep't of the*

26  *Interior*, 381 F. Supp. 3d 1153, 1166–71 (N.D. Cal. 2019).

27      BLM's principal response is to point to its new (unlawful) waste definition. BLM Br. 31–32.

28  But as discussed *supra* pp. 4–13, this definition is not "permissible under the statute." *Fox*

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary
Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

1   *Television*, 556 U.S. at 515. BLM also disingenuously attempts to claim that it has addressed all of

2   GAO's concerns. BLM Br. 31–32. There is one glaring omission: its failure to do *anything* to curb

3   venting, flaring, or leaks. BLM points to a 2019 GAO Report to support its claim, but fails to

4   acknowledge that the GAO expressly found that the Rescission would "adversely affect . . . efforts to

5   implement [its] recommendations." Ex. A to Dellinger Decl. 104-05, ECF 110-4 (June 20, 2019).

6   BLM's failure to adequately explain its decision to abdicate its responsibility to protect the public

7   from the harms of venting, flaring, and leaks violates the APA.

8   **II.    BLM's "Burden" Justification, Including Its Cost-Benefit Analysis, Is Not Supported
9          by the Record and Is Deeply Flawed (Issues B & C).**

10         BLM does not dispute that it determined that the Waste Prevention Rule posed an "undue

11  burden" on operators well before it proposed the Rescission or performed its new analysis of

12  supposed per-well costs for marginal wells. *See* Citizens Br. 15–16. Nor does BLM dispute that it

13  determined that the Rescission would only affect average profit margins for small companies by

14  0.19% and, like the Waste Prevention Rule, would not have a significant impact on the price or

15  supply of energy or on jobs. *See* BLM Br. 44–45; AR23–24. Yet BLM seeks to justify the

16  Rescission on a claim that the Waste Prevention Rule imposed unnecessary burdens on energy

17  production, including because its costs exceeded its benefits. AR1. In doing so, BLM relies entirely

18  on its last-minute marginal well analysis and "interim" estimate for the social cost of methane. BLM

19  now concedes numerous significant flaws with both analyses, but urges the Court to disregard these

20  errors by asserting repeatedly that the Court should blindly accept its "burden" justification. *E.g.*,

21  BLM Br. 31–32, 38, 42. This stretches the rule of deference far past its breaking point. *See Brower*,

22  257 F.3d at 1067 (deference "not unlimited"). BLM's burden justification is not entitled to deference

23  because it is not supported by the record, is contingent on a procedurally and substantively deficient

24  analysis of marginal well impacts, and relies on an artificial evaluation that over counts the costs and

25  undervalues the benefits of the Waste Prevention Rule.

26

27

28

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary
Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

19

1

**A.      BLM's "burden" justification is not supported by the record (Issue B-1).**

2      BLM's justification that the Rescission is necessary to relieve regulatory burdens that

3   "unnecessarily encumber energy production, constrain economic growth, and prevent job creation"

4   "runs counter" to the conclusions BLM reaches in the Rescission itself, including that the Rescission

5   will decrease natural gas production and will not have a significant impact on small operator profits,

6   energy prices, or jobs. *See Citizens Br. 15–16; State Farm*, 463 U.S. at 43; *Earth Island Inst. v. U.S.*

7   *Forest Serv.*, 442 F.3d 1147, 1160 (9th Cir. 2006) (*Earth Island*) (rejecting agency justification

8   where it was not a "reasoned decision based on [the agency's] evaluation of the evidence").

9      With respect to BLM's conclusion that the Waste Prevention Rule would "unnecessarily

10   encumber energy production," BLM states that the Rescission is expected to "influence" production.

11   BLM Br. 45. But it fails to mention that BLM's own analysis shows that the Rescission—not the

12   Waste Prevention Rule—encumbers natural gas production, reducing it by 299 billion cubic feet.

13   AR22. Likewise, with respect to job creation, BLM admits that the Rescission will not substantially

14   "alter the investment or employment decisions of firms," but that "there *may* be a small positive

15   impact on investment and employment due to the reduction in compliance burdens *if* the output

16   effects dominate." BLM Br. 45 (quoting AR99) (emphases added). This conditional assertion is not

17   only unsupported by the record, but also a far cry from the Rescission's alleged rationale of

18   removing regulations that "constrain economic growth[] and prevent job creation." AR1.[12]

19      BLM concedes that it found these impacts would not be significant, but argues that they are

20   irrelevant because BLM made these findings in support of *other* legal mandates, principally the

21   Regulatory Flexibility Act. BLM Br. 44; W. Energy All. & Indep. Petrol. Ass'n of Am.'s Cross Mot.

22

23

24   —————————————

25   [12] BLM argues that if the Rescission cannot be justified as removing unnecessary regulatory burdens
     because it has "insignificant effects" on energy production, investment, and jobs, the benefits of the

26   Waste Prevention Rule are "equally overblown." BLM Br. 45. But the purpose of the Waste
     Prevention Rule was not to significantly spur production, investment, or jobs—it was to *reduce*

27   *waste* of publicly owned resources, something that it did in spades. Citizens Br. 2. There is nothing
     inconsistent about saying that rescinding a rule that significantly reduced waste at a low cost

28   increases that waste without providing any significant financial benefit.

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary
Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

1   for Summ. J. 12, ECF 127 (Aug. 26, 2019) (WEA Br.).[13] This defies reason. An agency cannot say

2   that "the average reduction in compliance costs associated with [the Rescission] are a small enough

3   percentage of the profit margin for small entities [0.19%] so as not to be considered 'significant,'"

4   AR23–24, while at the same time largely justify rescinding important waste prevention requirements

5   because they allegedly impose an undue economic burden on small entities. This Court rejected that

6   precise argument when BLM advanced it in support of its earlier attempt to suspend the Waste

7   Prevention Rule:

8           BLM does not explain how or why it could conclude that the calculated costs could be
        so insignificant as not to unnecessarily or disproportionately burden small entities
9           within the meaning of the [Regulatory Flexibility Act], and simultaneously conclude
        that there would be a disproportionate effect for other purposes. Nor could it, as these
10          two positions are *entirely inconsistent*.

11

12  *California v. BLM*, 286 F. Supp. 3d 1054, 1066 (N.D. Cal. 2018) (emphasis added). The same

13  analysis applies here. BLM also asserts that $72,000 in cost savings *per operator* per year may

14  provide some "relief to small operators." BLM Br. 45. But this $72,000 estimate corresponds to the

15  change in average profit margins for small companies of 0.19%—the same change that the agency

16  concedes is not significant. BLM did not identify any record evidence to the contrary.[14]

17          Lacking any evidence of significant impacts on operators' bottom lines, the price or supply

18  of energy, or employment, BLM retreats to an argument that the Rescission will have some "positive

19  effect on marginal wells." BLM Br. 45 (quoting AR22, 91). But an impact on marginal wells does

20  not support BLM's claim that the Waste Prevention Rule will burden oil and gas operators writ

21  large. Over time, oil and gas wells experience production declines and become "marginal" and,

22  depending on the price of oil and gas and the costs of operating the well, operators will eventually

23

24  [13] Industry's standing argument is a red herring. WEA Br. 14–16. Plaintiffs allege that the Rescission
25  is arbitrary and capricious under the APA, not that BLM violated the Regulatory Flexibility Act.
    Citizen Groups' Compl. 40–42 (Sept. 28, 2018).

26  [14] In the Rescission's Regulatory Impact Analysis, BLM describes a number of factors that may
27  make this impact slightly higher for certain companies, though ultimately reaffirms its conclusion
    that, even for these companies, impacts on profits are "unlikely to achieve the level of being
28  significant." AR100.

    Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary
    Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

make a decision to "shut in" the wells until market conditions improve. AR953, 84086–87. Large operators who earn tens of millions of dollars in annual revenue own most marginal wells. *See* AR96431 (operators with over 100 BLM-managed wells own 75% (43,788 of the total 58,120) of BLM-managed marginal wells, and they *each* earn on average up to $347 million annually from their BLM-managed wells). BLM did not explain how the modest compliance costs associated with the Waste Prevention Rule would burden any operator, let alone these large operators. Indeed, states with regulations similar to the Rule that apply to marginal wells, like Colorado, have robust oil and gas development. *See supra* p. 10. In the end, BLM cannot justify the Rescission on the basis that it encumbers energy production, constrains economic growth, and prevents job creation.

**B.   BLM's last-minute, flawed marginal well analysis does not justify the Rescission (Issue B-2).**

The centerpiece of BLM's "burdens" justification for the Rescission is that the Waste Prevention Rule imposed undue costs on marginal wells, which is based entirely on a flawed analysis that BLM prepared after-the-fact and was never released for public comment. Citizens Br. 16–21. Because BLM violated the APA by failing to allow for public comment on the analysis, this Court should disregard it. If the Court does consider the analysis, it reject it as fatally flawed.

　　　　1.   *BLM deprived the public of the opportunity to comment on the only evidence allegedly supporting BLM's finding that the Rule unduly burdened marginal wells (Issue B-2a).*

BLM concedes that it developed the marginal well analysis after it had already concluded that the Waste Prevention Rule burdens operators. BLM Br. 37 (noting that it completed the marginal well analysis after the proposed Rescission). As such, BLM did not release its marginal well analysis for public comment, and indeed did not even make it public with the final Rescission, instead only grudgingly releasing it as part of the administrative record negotiation in this litigation. Citizens Br. 17. This violates BLM's obligation to "disclose . . . the data" on which the Rescission is based. *California v. U.S. Dep't of Interior*, 381 F. Supp. 3d at 1173; *see Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1402–04 (9th Cir. 1995) (rejecting agency's failure to provide critical information for public review).

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

22

1   BLM's chief defense is to downplay the importance of the analysis by arguing that it is

2   merely "one specific set of data," providing only an "upper limit" that was not "essential" for the

3   Rescission and therefore did not prejudice Plaintiffs. BLM Br. 28, 36–37. As demonstrated by both

4   the record and BLM's brief, however, the new analysis is a foundational rationale for the Rescission.

5   *See* AR2; BLM Br. 27. BLM "cannot have it both ways"—saying the analysis is unimportant when

6   addressing its blatant notice violation while at the same time relying on it significantly to justify the

7   Rescission. *General Chem. Corp. v. United States*, 817 F.2d 844, 846, 854 (D.C. Cir. 1987).

8   Because the new marginal well analysis is "unique information" that is "central" to BLM's

9   conclusion that the Waste Prevention Rule burdened marginal wells, BLM was required to make it

10   available for public comment. *Idaho Farm Bureau Fed'n*, 58 F.3d at 1402–04. The proposed

11   Rescission provided no data to support BLM's allegations about the Waste Prevention Rule's

12   impacts on marginal wells. AR84085. Indeed, far from simply supporting BLM's "prior

13   calculations," BLM Br. 37, BLM's new analysis is the *only* data BLM cites in support of its

14   conclusion that the Waste Prevention Rule imposed disproportionate burdens on marginal wells.

15   BLM Br. 27; AR4; *see also* WEA Br. 10 (explaining that the "additional information on marginal

16   wells" is one of the "critical aspects of the new administrative record and analysis").

17   Moreover, contrary to BLM's claims, BLM's failure to make this critical analysis public *did*

18   prejudice the Citizen Groups. BLM ignores the Citizen Groups' extensive critique of the analysis

19   provided to this Court. Citizens Br. 18 n.9; Decl. of Rosalie Winn, ECF No. 109.2 ¶¶ 9–10 (June 7,

20   2019). Had the Citizen Groups been able to provide this critique to BLM during the rulemaking,

21   BLM would have been required to respond and consider that information as part of its final decision.

22   *See California v. U.S. Dep't of Interior*, 381 F. Supp. 3d at 1172 ("Among the purposes of the

23   APA's notice and comment requirements [is] . . . to give affected parties an opportunity to develop

24   evidence in the record to support their objections to the rule and thereby enhance the quality of

25   judicial review." (quoting *Prometheus Radio Project v. FCC*, 652 F.3d 431, 449 (3d Cir. 2011)).

26   Industry's argument that the Citizen Groups' critique is "extra-record" only underscores why by

27   BLM's failure to make its analysis available for public comment prejudices the Citizen Groups.

28   WEA Br. 16.

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary
Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

2. *BLM's post hoc explanations cannot save its flawed marginal well analysis (Issue B-2b).*

Had the marginal wells analysis been available for public comment, the Citizen Groups would have demonstrated to BLM that it double counts costs, relies on a misleading timeframe, and is founded on unsupported assertions rather than actual data. Citizens Br. 18–20. BLM's flawed analysis is entitled to no deference. *See Earth Island*, 442 F.3d at 1166 (rejecting agency's "extremely misleading" analysis).

For the first time forced to defend its marginal well analysis from public scrutiny, BLM's response brief adds several post hoc caveats to the analysis, saying that its per-well calculations are only a "potential" revenue reduction and conceding that the data in the Rescission represent the "upper limit of the 2016 Rule's potential impact" on marginal wells. BLM Br. 28. Neither "potential" nor "upper limit" appear in the Rescission itself. AR1 (requirements of the Waste Prevention Rule "*would have* constituted 24 percent of an operator's annual revenues from even the highest-producing marginal oil wells and 86 percent of an operator's annual revenues from the highest-producing marginal gas wells" (emphasis added)); *see also* AR4, 22 (describing marginal well analysis and claiming that it shows "many marginal wells" could be impacted and "many applications for exemptions . . . would have been warranted"). Indeed, in severe tension with BLM's response, the Rescission claimed these estimates were conservative. AR1 (stating numbers were true for "even the highest-producing marginal oil wells"). BLM's post hoc explanations must be rejected. *See Cal. PUC*, 879 F.3d at 975; *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1050 (9th Cir. 2010) ("Defendants' post hoc explanations serve only to underscore the absence of an adequate explanation in the administrative record itself.").

Moreover, even if these post hoc caveats were not enough to make the analysis unlawfully misleading, there are still glaring holes in BLM's marginal well analysis. *Tripoli Rocketry Ass'n v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 437 F.3d 75, 77 (D.C. Cir. 2006); *Coburn v. McHugh*, 679 F. 3d 924, 926, 934 (D.C. Cir. 2012) (where an agency's supposedly scientific "decisions are largely incomprehensible . . . they are unworthy of any deference"). BLM's marginal well analysis consists of one spreadsheet, AR180479, that does not explain key assumptions or the

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

24

1   source of key data, including the "total cost" figures used to support BLM's claim that the Waste

2   Prevention Rule would have "cost marginal oil wells over 24%, and marginal gas wells over 86%, of

3   their annual revenue." BLM Br. 27 (citing AR2, 4).

4          For example, BLM does not dispute that it included the cost of installing plunger lifts (a

5   technique to reduce emissions from liquids unloading) in its assessment of compliance costs for

6   *every* marginal gas well. BLM Br. 28; *see* Citizens Br. 19. But BLM claims it did so to determine the

7   "upper limit" of total costs, despite recognizing that it is possible *no wells at all* would have incurred

8   these costs. BLM Br. 28; AR70. BLM's artificial inflation of plunger lift costs matters because

9   plunger lifts are among the Waste Prevention Rule's most significant expenses for an individual gas

10  well, accounting for 54% of the total annualized per-well costs included in BLM's marginal well

11  analysis. AR180479.[15]

12         Similarly, BLM's marginal well analysis misleadingly compared *total* costs (that are spread

13  over ten years) to one year of revenue. Citizens Br. 19. BLM attempts to paper over this deception

14  by arguing that the Citizen Groups are merely dissatisfied with how BLM "expressed these

15  concepts" and where it included information. BLM Br. 28–29. But how BLM presented this

16  information matters: throughout the Rescission, BLM incorrectly refers to its marginal well cost

17  analysis as being based on "annual compliance costs." *See, e.g.,* AR1, 2, 22. BLM buried the data

18  contradicting that claim in its Regulatory Impact Analysis (RIA). AR103. When BLM assessed

19  impacts of marginal well based on *annualized* compliance costs, they were are an order of magnitude

20

21  [15] WEA's assertion that the plunger lift costs account for a "minor portion" (3%) of the Waste

22  Prevention Rule's compliance costs, WEA Br. 17, perfectly illustrates the illegality of BLM's
    marginal well analysis. WEA's claim is based on BLM's assessment of the Waste Prevention Rule's

23  impacts across the *entire* oil and gas industry, not BLM's data on costs to *individual* marginal wells
    at issue here. *Compare* AR90 (assessing Rule's total compliance costs), *with* AR180479 (assessing

24  costs at individual marginal wells). BLM took costs that it had elsewhere identified as small or non-
    existent (and WEA concedes are "minor") in part because they do not apply to most wells and

25  applied those costs to all natural gas wells in an effort to inflate supposed per-well costs. WEA's
    argument simply underscores the discrepancy between BLM's evaluation of industry-wide costs,

26  which it admits are minimal, and its new assessment of costs at individual marginal wells, and the
    degree to which the latter is divorced from the underlying record. Indeed, BLM's marginal well

27  analysis similarly applies the costs of other requirements to all wells where BLM's analysis
    elsewhere recognizes that they will only apply at a subset of sources. Citizens Br. 18 n.10.

28

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary
Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

1   lower than when BLM compared annual revenues with *total* compliance costs. Citizens Br. 19

2   (citing AR180479). For the first time in its brief, BLM claims that even the annualized figures are

3   "significant" for operators' decisions about whether to shut in marginal wells. BLM Br. 29. But there

4   is no evidence in the record to support this post hoc claim, *see Cal. PUC*, 879 F.3d at 975, and it

5   does not account for the many other serious flaws with BLM's marginal well analysis.

6         Finally, the Rescission relies on BLM's conclusion that marginal wells will "shut in" due to

7   the costs of complying with the Waste Prevention Rule. Citizens Br. 19–20. BLM has recognized

8   that operators frequently shut in wells based on market conditions, in particular the price of oil and

9   gas. AR953, 84086–87. In any event, BLM points to no evidence to support its new finding that the

10  Waste Prevention Rule did not sufficiently address the risk of shut in due to compliance costs.

11  AR105. In fact, the Waste Prevention Rule had exemptions from nearly every provision if they

12  would cause shut ins. *See, e.g.*, AR912–13. Refusing to employ the exemption process and without

13  providing any analysis or evidence, BLM decided that complying with the Waste Prevention Rule

14  "*could*" have led "the *lowest-producing* marginal well operators" to shut in their wells, rather than

15  applying for the exemptions. BLM Br. 29 (citing AR4–5, 105) (emphases added). BLM did not

16  estimate how many operators would make this decision, or how difficult it would be for them to gain

17  exemptions, which BLM itself was in charge of authorizing. *See Pac. Coast Fed'n of Fishermen's*

18  *Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1091–92 (holding that agency's conclusions

19  must be explained and supported; the court cannot just take the agency's word for it).[16] Accordingly,

20  BLM's claim of premature abandonment is overbroad and unsupported.[17]

21

22

---

23  [16] BLM claims that there was no guidance under the Waste Prevention Rule for determining when
    compliance costs would cause the operator to "abandon significant recoverable reserves," the

24  standard the Rule applied to obtain an exemption. BLM Br. 27. As discussed *supra* pp. 11–12,
    however, this is the same standard that BLM had been applying for nearly forty years under NTL-

25  4A. BLM also objects that the Waste Prevention Rule did not allow for a "full exemption" from leak
    detection and repair requirements, *id.*, but the Rule did allow operators to design an alternate

26  schedule if necessary to prevent abandonment of significant underground reserves. AR931.

27  [17] Notably, BLM's first reason for its unlawful cost-benefit analysis, BLM Br. 38, is that its "waste
    definition" means it cannot consider societal benefits, belying its claim that its "waste" and

28  "burdens" definitions "provide two independent grounds" for the Rescission. BLM Br. 44 n.20.

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary
Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

26

3.   *BLM's marginal well analysis does not support its blanket Rescission (Issue B-2c).*

At the same time it focuses on impacts to the "lowest-producing marginal well operators," BLM Br. 29, BLM attempts to defend its decision to exempt *all* operators from *all* of the Waste Prevention Rule's provisions designed to prevent waste of public resources. That decision is overbroad and arbitrary. *California v. BLM*, 286 F. Supp. 3d at 1066–67 (concluding that BLM did not properly tailor its attempt to suspend the Waste Prevention Rule when it relied on burdens to small operators to stay waste-preventing measures at all wells). BLM's claims of "potential" and "upper-limit" harms to marginal wells (and specifically the lowest-producing marginal wells) cannot serve as a basis to rescind the Waste Prevention Rule for all oil and gas wells. BLM Br. 28–29.

BLM's claim that it did "tailor" the Rescission, *id.* at 28, is flatly incorrect: the Rescission applies to all federal and Indian oil and gas wells. BLM responds that the *majority* of wells it manages are allegedly marginal. *Id.* But BLM fails to account for the fact that tens of thousands of wells do not qualify as marginal wells and, even for those that do, many are owned by large, profitable companies and are not the "lowest producing wells." BLM did not tailor the Rescission because it allows all of these wells to continue wasting publicly owned gas, even though BLM does not now (and has never) claimed they are burdened by capturing that gas. Citizens Br. 20–21. BLM's failure to consider a more narrowly tailored rule is simply more evidence of its single-minded focus on rescinding waste prevention provisions to which oil and gas operators objected.

C.   **BLM cannot save its unsupported "burden" justification by pointing to its flawed cost-benefit analysis (Issue C).**

In its brief, BLM tries to save its fundamentally flawed burdens justification by equating its "conclusion that the [Waste Prevention] Rule would unduly burden operators" with its determination that that Rule's "costs outweighed its benefits." BLM Br. 44. But BLM's cost-benefit justification is just as arbitrary as its burdens justification. BLM's cost-benefit analysis relies on a flawed "interim" social cost of methane, refuses to consider the environmental and health costs of the Rescission, and intentionally overstates the Waste Prevention Rule's compliance costs. Citizens Br. 21–26.

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

27

1          1.      *BLM cannot rely on its "interim" social cost of methane (Issue C-1).*

2          To justify the Rescission, BLM cooked the books by creating a new "interim" estimate of the

3   social cost of methane that purportedly considers only select domestic impacts, rejecting actual

4   science-based estimates and reducing the Rescission's acknowledged climate impacts by up to 96%.

5   AR84090. BLM defends its use of the shoddy "interim" estimate with a series of contradictions.

6   BLM argues both that it made a "policy" choice to use the "interim" estimate, BLM Br. 38, and an

7   "expert" determination, *id.* at 42. It also alternates between arguing that this Court must ignore the

8   scientific and technical evidence underpinning the interagency social cost of methane because the

9   technical support documents supporting it were "withdrawn," *id.* at 40, while simultaneously asking

10  the Court to accept those same technical support documents as the basis of its flawed "interim"

11  estimate, *id.* at 43. And while the agency continues to claim that it will update its interim estimate

12  based on 2017 recommendations from the National Academy of Sciences, *id.* at 42, it has no

13  satisfactory answer for why it continues to rely on an estimate that is thoroughly undermined by the

14  National Academy's conclusions. The "interim" social cost is neither interim nor the work of an

15  expert agency trying to do its best in the face of "uncertainty," as BLM claims. *Id.* at 42–44. It is a

16  slapdash estimate put together in a matter of months over two years ago (and not revisited since)

17  solely to justify deregulatory actions. Citizens Br. 21–24.[18]

18         Fundamentally, BLM cannot claim that it is using the "best available" metric to determine

19  the costs of methane pollution. BLM Br. 42. BLM admits that it rejected an estimate that an

20  interagency team of experts developed through years of public comment and peer review for one that

21  was developed in months without *any* public comment or peer review. *Compare* AR21861–81,

22  21882–901, 21902–52, *and* 21953–22003 (thorough explanation of process and basis for interagency

23  estimate), *with* AR128–33 (six pages of explanation for "interim" estimate, leading with a hollow

24  promise to update it later). Contrary to BLM's suggestion, "specialists" are *not* "express[ing]

25

26  ───────────────────
    [18] BLM's failure to identify any evidence of progress in updating the "interim" estimate speaks
27  volumes. *See* BLM Br. 42. Although the interagency effort was a "years-long process," *id.* at 42
    n.16, that process was not secret—indeed, it involved several rounds of public comment and expert
28  peer review. *See id.* (citing the AR). BLM identifies no such processes underway here.

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary
Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

1    conflicting views," and there are *not* multiple "available scientific models." BLM Br. 43. BLM has

2    decided for policy reasons that it prefers a lower estimate and then deployed a completely non-

3    scientific methodology to get there. BLM's reliance—for years, while it promises to do better later—

4    on a methodology that bears none of the indicators of reliability, omits key *domestic* costs, and is

5    undermined by the record before it is not entitled to deference. Citizens Br. 21–24.

6        BLM is incorrect that its "interim" metric is consistent with the recommendations of the

7    National Academies of Science. BLM Br. 41. In fact, the National Academies concluded that "an

8    accurate assessment of domestic-only impacts is *not possible* using the existing integrated

9    assessment model methodologies [i.e., the ones BLM relied on here] because they are designed to

10   produce global estimates and do not model all relevant interactions among regions." Citizens Br. 22

11   (citing AR22770–72). BLM attempts to downplay the conflict between the National Academies'

12   report and its "interim" estimate, arguing that the report stated that domestic estimates were "feasible

13   in principle." BLM Br. 41. But BLM omits the end of that sentence, which says the domestic

14   approach is "limited in practice" by existing methodologies. AR22772. Specifically, the report notes

15   that the interagency group recognized that domestic estimates for the social cost of methane were

16   "approximate, provisional, and highly speculative," and that "[c]orrectly calculating" the domestic

17   social cost requires more than considering direct impacts on American soil, because "[c]limate

18   damages to the United States cannot be accurately characterized without accounting for

19   consequences outside U.S. borders." AR22771–72. But BLM's interim estimate has done precisely

20   what the National Academies warned against—it has created a "speculative" estimate that overlooks

21   the full suite of climate harms that the U.S. will experience due to methane pollution. *See Ctr. for*

22   *Biological Diversity v. Zinke*, 900 F.3d 1053, 1068 (9th Cir. 2018) (although an agency has

23   discretion to rely on expert opinions of its choosing "it cannot ignore available . . . data"); *Greater*

24   *Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1030 (9th Cir. 2011) (agency cannot ignore

25   evidence "pointing in the opposite direction" from its conclusions).

26       The cases BLM cites are not to the contrary. BLM Br. 42–43. For example, *Lands Council v.*

27   *Martin*, 529 F.3d 1219, 1226 (9th Cir. 2008), involved a methodology verified through "field testing

28   and practical experience," rather than verified through peer-review or formal publication. But here,

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary
Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

1    BLM has disregarded an estimate verified through peer-review for a new interim estimate that has

2    *not* been verified by any method—peer-review or otherwise. *Id.*

3        Moreover, although the "interim" estimate purports to "focus on benefits and costs that

4    accrue to citizens and residents of the United States," BLM Br. 40, this ignores that climate change

5    impacts outside the U.S.—including geopolitical security, "economic and political destabilization,"

6    "global migration," effects on multinational companies, and impacts to U.S. citizens living abroad—

7    have real impacts on U.S. interests. Citizens Br. 22; ECF No. 115.1 at 12–17; AR84177–86. BLM's

8    only response is to disparage these impacts as too far afield. BLM Br. 38, 41 n.15. But the

9    interagency estimate took these spillover effects into account, and these impacts *do* affect

10   Americans. Impacts to "U.S. citizens abroad" are effects that "accrue to citizens . . . of the United

11   States." BLM Br. 40. BLM's inconsistent approach is "irrational." *Servheen*, 665 F.3d at 1027.[19]

12       Ultimately, BLM's sole basis for its "policy choice" of the "interim" estimate is that the

13   technical support documents underlying the interagency social cost were withdrawn by Executive

14   Order 13783, which directs BLM to make its cost-benefit analysis consistent with Office of

15   Management and Budget (OMB) Circular A-4. BLM Br. 38, 40.[20] BLM wrongly claims there is "no

16   conflict" between relying on the withdrawn interagency materials for some aspects of its analysis as

17   the "best available Federal agency estimates of social costs" and disregarding the interagency

18   conclusions elsewhere. BLM Br. 43 n.18 (admitting it relied on the interagency inputs and

19   modeling). BLM "cannot have it both ways" by citing evidence as supportive of one conclusion, but

20

21   ───────────────────────

     [19] BLM is wrong to characterize amicus Institute for Policy Integrity's (IPI) brief as principally

22   "press[ing] for a global metric." BLM Br. 40. In fact, IPI's principal argument is that BLM's

23   "interim" metric is faulty because it ignores significant effects that fall to U.S. citizens, is tied
     bizarrely to the relative coastline length of the United States versus the European Union, and is
     inconsistent because BLM counts cost savings that will accrue to foreign entities. Brief of IPI as

24   Amicus Curiae 12–17, ECF 115.1 (June 21, 2019). BLM offers no response to these points.

25   [20] BLM is wrong that another court in this district upheld the interim estimate "on the same
     grounds." BLM Br. 40. The *California v. BLM* court found that Executive Order 13,783 and OMB

26   Circular A-4 provided a basis for BLM's change in position to consider domestic, rather than global,

27   impacts. 286 F. Supp. 3d at 1070. But that court did not consider the issue here: whether BLM's use
     of the interim estimate is arbitrary and capricious because it is not supported by a scientific and

28   economic record. *See State Farm*, 463 U.S. at 43–44.

     Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary
     Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

1   disregarding the same evidence when making another finding. *General Chem. Corp.*, 817 F.2d at

2   854; *see also Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 184 F. Supp. 3d 861, 901 (D. Ore.

3   2016) (similar). Regardless, the policy directives in Executive Order 13,783 and OMB Circular A-4,

4   including the directive to consider domestic costs, cannot override the scientific and economic

5   reality that provided the foundation for the interagency estimate, or absolve BLM of its

6   responsibility under the APA to conduct reasoned decision making. Citizens Br. 23.

7           2.      *BLM ignores the Rescission's other health and safety costs (Issue C-2).*

8           Confirming BLM's focus on operator's bottom lines at the expense of the public, *see supra*

9   pp. 3–4, BLM arbitrarily put its thumb on the scale by giving no weight to the air pollution harms

10  associated with its action. Citizens Br. 24–25. BLM admits that it did not quantify these negative

11  impacts to public health and safety, but it does not argue that such analysis is not possible. BLM Br.

12  48. Instead, BLM argues that it is not "legally required" to do so. *Id.* This claim is contrary to Ninth

13  Circuit law. *See Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1203 (9th Cir. 2008) (*CBD*

14  *v. NHTSA*) (requiring agency to monetize climate pollution harms).[21] Moreover, even if BLM were

15  not required to perform a cost-benefit analysis, it is the very definition of arbitrary for an agency to

16  justify an action by considering only its benefits while ignoring its costs. *See id.* at 1198 (an agency

17  doing a cost-benefit analysis "cannot put a thumb on the scale by undervaluing the benefits and

18  overvaluing the costs of more stringent standards"); *High Country Conservation Advocates v. U.S.*

19  *Forest Serv.*, 52 F. Supp. 3d 1174, 1191 (D. Colo. 2014) (*High Country*) (holding that although

20  "NEPA does not require a cost-benefit analysis, it was nonetheless arbitrary and capricious to

21  quantify the *benefits* of the [coal] lease modifications and then explain that a similar analysis of the

22

23  ───────────────────────

24  [21] *See also Zero Zone, Inc. v. U.S. Dep't of Energy*, 832 F.3d 654, 677 (7th Cir. 2016) (rejecting
    argument that statute did not allow agency "to consider environmental factors" and holding that in

25  determining "whether an energy conservation measure is appropriate under a cost-benefit analysis,
    the expected reduction in environmental costs needs to be taken into account"). Wyoming ignores

26  the binding precedent of *CBD v. NHTSA*, instead offering a red herring that agencies cannot consider
    ancillary benefits. Wyo. Br. 23 (citing *Michigan*, 135 S. Ct. 2699). But Wyoming admits the Court

27  did not "directly answer[] this question." *Id.* Moreover, the *Michigan* Court held that EPA erred by
    *not taking into account* all relevant factors when regulating, including both direct and *indirect* costs.

28  *See* 135 S. Ct. at 2709. Likewise, BLM's cost benefit analysis ignores critical costs.

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary
Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

*costs* was impossible"); *see also* BLM Br. 48 n.23 (acknowledging this holding). BLM cannot ignore health costs when monetizing the Rescission's economic *benefits* to operators, and then justify the Rescission on that cost-benefit assessment.

Moreover, BLM's claim that foregone public health benefits are not even "relevant," BLM Br. 48, is incorrect. *See supra* pp. 4–6. BLM has a statutory obligation under the Mineral Leasing Act to "safeguard[] . . . the public welfare." 30 U.S.C. § 187. Likewise, Federal Land Policy and Management Act mandates that BLM prevent "unnecessary or undue degradation" to public lands, 43 U.S.C. § 1732(b), and "protect . . . air and atmospheric" values of public lands," *id.* § 1701(a)(8). These mandates require BLM to consider public health impacts like air and climate pollution.

BLM further claims that it is not required to monetize the Rescission's public health costs because it did not monetize the Waste Prevention Rule's health benefits. BLM Br. 48. But the Waste Prevention Rule's cost-benefit analysis not before the Court. Moreover, not monetizing additional health benefits did not "put a thumb on the scale" in the Waste Prevention Rule, *CBD v. NHTSA*, 538 F.3d at 1198, because BLM determined that the Rule's other benefits outweighed the costs by a large margin even without those additional benefits. Here, in contrast, BLM's failure to assign any value to these health costs could put a thumb on the scale. Because BLM has relied on its monetized estimates of compliance costs to justify the Rescission, it cannot fail to weigh important foregone health benefits. *See* Citizens Br. 24–25.

In conflict with its claim that such harms are not relevant, BLM acknowledges that volatile organic compounds and air toxics have negative health impacts and asserts, without any supporting analysis, that these impacts would be minimized because they are "dispersed." BLM Br. 48. This is entirely inadequate because the record shows the additional pollution caused by the Rescission has health impacts on people living close to BLM-managed oil and gas development in many parts of the country. *See* Citizens Br. 25. BLM's speculative promise to consider health impacts in distinct and future actions, BLM Br. 48–49, does not absolve it from considering the Rescission's impacts now. *See infra* pp. 36–37. Merely recognizing that volatile organic compounds and air toxics threaten human health, without giving that fact *any weight* in the agency's decision, "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

32

3.      *BLM overstates the foregone compliance costs (Issue C-3).*

BLM also "puts a thumb on" the cost side of the scale by making the unsupported

assumption that *no* operators have taken any steps to comply with the Waste Prevention Rule.

Citizens Br. 25–26. BLM did the same thing in *California v. BLM*, where this court held that:

> [T]he monetary amount that operators have already spent or will need to spend in order
> to come into compliance is a numerical figure capable of being determined….
> Obtaining factual, objective data and values is not subject to 'judgment calls.'
> Judgment calls are for the determination of subjective values, such as what the 'best'
> course of action is or what constitutes reasonable doubt. Contrary to BLM's assertion,
> its baseless calculation of industry cost savings is not a 'judgment call' entitled to
> deference, but rather an estimated figure that lacks a reasonable basis.

286 F. Supp. 3d at 1069, 1076. BLM's brief completely ignores this defect, failing again to support

that same fundamental assumption underlying its cost-benefit analysis.

Instead, BLM now claims it identified several "factors" supporting its "assumption,"

including that some of the Waste Prevention Rule's provisions phased in over time, and BLM's own

unlawful efforts to suspend and revise the Rule. BLM Br. 46–47. But BLM ignores that the Rule was

in effect for much of the time since its promulgation in 2016. *See California v. BLM*, 286 F. Supp.

3d at 1069. BLM now says it would not assume "operators acted unreasonably," by complying with

the rule. BLM Br. 47. But this ignores BLM's own prior statements that operators should comply

with the Rule, as well as statements by operators that they were in fact complying. Citizens Br. 26.

Moreover, BLM's concession that it "overstated" benefits of the Rescission cannot be

overcome by its new unsupported claim that this overstatement "was counterbalanced by the

potential for understatement of costs elsewhere." BLM Br. 47–48; *see California v. BLM*, 286 F.

Supp. 3d at 1069 (requiring "factual, objective data and values" when calculating costs and benefits).

Nor does BLM's claim that it did not monetize unidentified "other aspects of the rule" cure this

defect. BLM Br. 47. This "unfounded assertion" is arbitrary. *CBD v. NHTSA*, 538 F.3d at 1202

(rejecting "unfounded assertion" by agency that accurately accounting for benefits of rule would

have required agency to account for other costs, and "the two would have balanced out"). BLM

arbitrarily fails to support its key assumption underlying its finding of compliance cost savings.

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary
Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

33

1

**III.     The Rescission's Environmental Analysis Violates NEPA (Issue D).**

BLM's focus on operator profits at the expense of the public interest also is evident in its flawed environmental assessment (EA), which ignores the impact of repealing nationwide rules protecting the air, the climate, and Native American communities from harmful pollution emitted by thousands of oil and gas wells. Citizens Br. 27–34. In fact, the Rescission's significant impacts warrant comprehensive analysis in an environmental impact statement (EIS). Citizens Br. 37–40.

**A.     BLM's analysis of health impacts is not "comprehensive," and ignores impacts on Native Americans altogether (Issues D-1a, D-1b).**

The Rescission will exacerbate air quality problems in areas that already violate federal health standards, and will negatively affect the health and daily lives of Native Americans living in the midst of extensive drilling. Citizens Br. 27–32. BLM ignores this Court's conclusion that suspending the Waste Prevention Rule for just one year would cause health risks in "at-risk communities," "leading to and exacerbating impaired lung functioning, serious cardiovascular and pulmonary problems, and cancer and neurological damage." *California v. BLM*, 286 F. Supp. 3d at 1073–74. Indeed, BLM's EA violates the fundamental purpose of NEPA by failing to inform the most impacted communities about the threats to their health that will result from permanently rescinding these same protections. *See Anderson v. Evans*, 371 F.3d 475, 489–92 (9th Cir. 2002) (agency's failure to consider local impacts of management plan deemed a "major analytical lapse"); *Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1012, 1015 (9th Cir. 2009) (*Lockyer II*) (requiring "hard look" before "taking substantive environmental protections off the books").

BLM's primary response is to claim that, in combination, the Rescission EA and Waste Prevention Rule EA (incorporated by reference) include a "comprehensive discussion of health impacts and impacts to low income and minority communities." BLM Br. 50. Not so. The Rescission EA simply contains a recognition that natural gas contains volatile organic compounds and toxic air pollutants that "affect the health and welfare of humans." AR315–16. BLM points to the Rescission EA's quantification of the Waste Prevention Rule's foregone emission reductions. BLM Br. 50. But quantifying emissions does not inform frontline communities about the threats to their health, as NEPA requires. *See CBD v. NHTSA*, 538 F.3d at 1216 (rejecting EA that "quantifies

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

34

the expected amount of $CO_2$ emitted from light trucks," but "does not discuss the *actual* environmental effects resulting from those emissions").

Nor does the Waste Prevention Rule EA's general discussion of the "nature of air quality impacts" related to oil and gas development fill the void. *Cal. ex rel. Lockyer*, 459 F. Supp. 2d 874, 905–08 (N.D. Cal. 2006) (*Lockyer I*) (holding the Forest Service's EA for the Roadless Rule was not a substitute for the repeal's environmental analysis). Although BLM points to the Waste Prevention Rule EA's general discussion of air quality impacts on "humans," it fails to point to any analysis of the impacts to "at risk communities" living in areas that already exceed federal standards or those that suffer disproportionate environmental impacts, like Native Americans. BLM Br. 50 (citing AR1262–65, 1282–86). Under NEPA, BLM must not only disclose to these communities that they are at greater risk, but also fully assess those risks. *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 632 F. Supp. 2d 968, 981 (N.D. Cal. 2009) (rejecting EIS for nationwide rescission because "it does not actually discuss the environmental consequences of eliminating the specific protections that are provided in previous . . . rules"); *CBD v. NHTSA*, 538 F.3d at 1217.[22]

BLM acknowledges that it must consider the environmental justice implications of the Rescission on Native Americans. BLM Br. 51; *see Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 140 (D.D.C. 2017). But BLM offers no support for its claim that it did so. BLM Br. 51. In fact, the pages BLM cites do not include a *single* reference to Native Americans or the Rescission's impacts on their already overburdened communities. *Id.* (citing AR1268, 1293, 1306).

---

[22] Moreover, circumstances have changed since BLM prepared the 2016 Waste Prevention Rule EA, but the Rescission EA fails to address any new information regarding air quality. For example, BLM has rescinded or is in the process of rescinding other air quality protections while at the same time ramping up oil and gas leasing and permit approvals. *See infra* pp. 40–41 (discussing cumulative impacts). EPA also has designated the Uinta Basin in Utah a nonattainment area under the Clean Air Act. AR84146 (comments on proposed rule recognizing that designation was imminent). The Rescission EA fails to consider these and other changes since 2016 that bear on air quality impacts. *Lockyer I*, 459 F. Supp. 2d at 905–08 (rejecting the Forest Service's reliance on the Roadless Rule's "no action" alternative to support its rescission of the Rule because the "no action" alternative considered the status quo when the Roadless Rule was adopted and did not account for changing circumstances in the interim period).

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

1      BLM also disingenuously attempts to discount impacts to Native Americans by pointing to

2   the Waste Prevention Rule's minimal adverse environmental impacts, like increased truck traffic.

3   BLM Br. 51. BLM's EA acknowledges repeatedly that the Waste Prevention Rule's environmental

4   benefits dwarfed its environmental impacts. *See* AR312, 313, 318; AR1297. Indeed, BLM estimates

5   that the Waste Prevention Rule decreased volatile organic compound emissions by five orders of

6   magnitude more than it increased the emissions from truck traffic. *See* AR316; *W. Watersheds*

7   *Project v. Kraayenbrink*, 632 F.3d 472, 491 (9th Cir. 2011) (NEPA analysis "must include a

8   discussion of adverse impacts that does not improperly minimize negative side effects").

9      Developing a theme that the bigger the impact, the less analysis required, BLM relies heavily

10   on the excuse that it can ignore the Rescission's public health and environmental justice impacts

11   because the rule's scope is "national," and the agency can conduct site-specific NEPA analysis at

12   later stages. BLM Br. 51–53; *see also id.* at 53 (attempting to distinguish *Standing Rock* because it

13   involved an action affecting a single tribe and the Rescission would affect many tribes). The

14   fundamental flaw in BLM's argument is that this rulemaking is the *only* stage at which BLM will

15   consider the Rescission's impacts. Any future site-specific analysis will be focused on the impacts of

16   the decision at issue—approving a land use plan, issuing a lease, or approving a drilling permit—

17   leaving the impact of rescinding the Waste Prevention Rule's provisions wholly unstudied and

18   undisclosed to the public and thus unable to inform the rulemaking. National rules are subject to the

19   same standards for NEPA analysis as any other agency action. That such a rule will have localized

20   impacts is not an excuse to fail to consider those impacts. *See Anderson*, 371 F.3d at 489–92

21   (rejecting as a "major analytical lapse" agency's failure to consider local impacts of broad

22   management plan).[23] If anything, the broad scale of impacted lands warrants more NEPA review, not

23

24   [23] BLM attempts to distinguish *Anderson* because the court found this error by reference to the
    § 1508.27 significance factors, rather than the "hard look" requirement. BLM Br. 53 n.25. But the

25   "hard look" and "significance" factors are necessarily interrelated: BLM must take a hard look at all
    impacts in the appropriate scale to determine their significance. *Anderson*, 371 F.3d at 492. BLM

26   implicitly acknowledges this interrelation when it cites the significance regulation to support its
    argument that it took a hard look at public health and environmental justice impacts. BLM Br. 51

27   (citing 40 C.F.R. § 1508.27). As in *Anderson*, BLM's failure to consider local impacts—here ozone

28   pollution and environmental justice—renders the Rescission EA unlawful.

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary
Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

1   less. *See Kraayenbrink*, 632 F.3d at 493 (holding BLM violated NEPA by glossing over

2   environmental impacts of weakening nationwide grazing regulations that would impact 25 million

3   acres); *Sierra Club v. Bosworth*, 510 F.3d 1016, 1027–28 (9th Cir. 2007) (recognizing that

4   nationwide scope of agency action warranted more NEPA analysis).

5        BLM offers little response to the Ninth Circuit's repeated recognition that "NEPA is not

6   designed to postpone analysis of an environmental consequence to the last possible moment. Rather,

7   it is designed to require such analysis as soon as it can reasonably be done." *Kern v. BLM*, 284 F.3d

8   1062, 1072 (9th Cir. 2002); *see* Citizens Br. 29 & n.15 (citing multiple cases). BLM attempts to

9   distinguish *Kern* because there, BLM "failed entirely" to analyze the impact in question. BLM Br.

10  53. The same is true here. BLM has failed entirely to consider the Rescission's impacts in ozone

11  nonattainment areas and on Native Americans, and those impacts are essential to a reasoned and

12  informed national rule. Moreover, even if that distinction were valid, it did not affect the Ninth

13  Circuit's conclusion that agencies must analyze issues in detail whenever there is enough

14  information available to "permit productive analysis." *Kern*, 284 F.3d at 1073; Citizens Br. 28–29.

15       BLM also is wrong that it cannot engage in productive analysis of these issues at the

16  rulemaking stage. BLM Br. 52. The record contains ample evidence about these impacts. For

17  example, the Citizen Groups provided information about existing ozone nonattainment areas and

18  likely impacts in these areas. AR84145–46. Likewise, Native Americans living in areas with

19  substantial BLM-administered oil and gas development provided evidence of the disruption to their

20  daily lives. AR163173 (Fort Berthold resident explaining that "we are surrounded by well pads and

21  flares that have been burning for years," and that "[o]ur air quality has changed . . . there's a constant

22  haze over Fort Berthold from the hundreds of flares surrounding us"); *see also* AR83397–98;

23  AR83403–04 (similar). Furthermore, this Court does not have to resolve the precise level of detail

24  required because BLM has ignored these impacts altogether.

25       The Tenth Circuit's decision in *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209 (10th Cir.

26  2011), is not to the contrary. BLM Br. 51. In *Wyoming*, the Tenth Circuit upheld a Forest Service

27  EIS analyzing the impacts of a nationwide regulation protecting roadless areas, despite its failure to

28  consider site-specific impacts in every roadless area. 661 F.3d at 1255–57. But unlike the Rescission

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary
Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

EA, the *Wyoming* EIS examined both the rule's "general[ized]" impacts at a national scale, and specific examples of "regional distinctions and site-specific aspects" where appropriate. *Id.* at 1256. Here, the Rescission affects a discrete set of ozone nonattainment areas and environmental justice communities. *See* AR84145–46, 161971. But the EA neither discusses these impacts at a nationwide level, nor provides any relevant examples at a local level. *See* AR315–16. Moreover, *Wyoming* involved a challenge to the Roadless Rule, which provided greater environmental protections and therefore had few adverse impacts. 661 F.3d at 1224–25. When the agency *repealed* the Roadless Rule and eliminated those protections, the Ninth Circuit held that more NEPA analysis was necessary. *Lockyer II*, 575 F.3d at 1012–18. The same is true here.

**B.     BLM fails to take a hard look at climate change impacts (Issue D-1c).**

The Rescission EA also violates the "hard look" rule by ignoring readily available science-based metrics for assessing climate impacts. Citizens Br. 32–34. BLM does not dispute that it must consider the "*actual* environmental effects resulting from [greenhouse gas] emissions." *CBD v. NHTSA*, 538 F.3d at 1216. Yet BLM's response does not even attempt to square that requirement with the EA's statement that the Rescission's "actual effects . . . on global climate change cannot be reliably assessed," AR319; *see* BLM Br. 53–55. The EA is wrong because the record shows there are scientifically robust tools available to assess climate impacts, like the global social cost of methane and carbon budgeting. Citizens Br. 32–34. It is arbitrary for an agency to quantify an action's benefits while ignoring its costs, where tools, like the social cost of methane and carbon budgets, exist to calculate those costs. *Mont. Envtl. Info. Ctr. v. U.S. Office of Surface Mining*, 274 F. Supp. 3d 1074, 1096–99 (D. Mont. 2017) (*MEIC*); *High Country*, 52 F. Supp. 3d at 1192–93.[24] That is exactly what BLM did here, relying heavily on the Rescission's reduced compliance costs while claiming (incorrectly) that there are no tools to assess the full climate impacts.

---

[24] BLM attempts to distinguish these cases because they involved "project-level" agency actions. BLM Br. 54 n.26. But neither case holds that the social cost of carbon is only appropriate at the project-level. Indeed, the social cost of carbon was designed "to allow agencies to incorporate the social benefits of reducing carbon dioxide ($CO_2$) emissions into cost-benefit analyses of *regulatory* actions." AR21862 (emphasis added).

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

1    Rather than rely on the EA, BLM points to the "interim" social cost of methane analysis in

2    the RIA. BLM Br. 53–54 (citing AR41, 130).[25] As discussed *supra* pp. 28–31, the "interim" social

3    cost of methane analysis violates NEPA's mandate to use "[a]ccurate scientific analysis" and ensure

4    "scientific integrity." 40 C.F.R. §§ 1500.1(b), 1502.24. Despite previously arguing that the Court

5    should defer to its scientific expertise in this matter, BLM Br. 42–43, BLM now claims that the

6    standard for scientific integrity does not apply because it is a "policy choice," *id.* at 53. BLM cannot

7    have it both ways. BLM's use of the "interim" social cost of methane lacks "scientific integrity"

8    because the National Academies of Science concluded that an accurate assessment of domestic-only

9    impact is not possible using the models that BLM used. *See supra* p. 29.

10    The RIA's "interim" social cost of methane also fails to take a "hard look" at the

11    Rescission's climate impacts because it ignores both important domestic costs, like international

12    trade and migration, and *all* global costs. *See* Citizens Br. 22; *see also* IPI Br. 12–17; AR84154–57,

13    84177–86, 22770–72. Nothing in NEPA allows BLM selectively to ignore certain impacts. *See* 40

14    C.F.R. § 1508.27(a) (requiring the "significance of an action must be analyzed in *several contexts*

15    such as society as a whole (human, national), the affected region, the affected interests, *and* the

16    locality" (emphasis added)); *MEIC*, 274 F. Supp. 3d at 1101–02 (holding that agency violated NEPA

17    when it failed to "address foreseeable impacts beyond the region" caused by climate change);

18    *Anderson*, 371 F.3d at 490 (explaining that NEPA analysis must consider the appropriate context).

19    Finally, BLM argues that courts have not mandated the use of the social cost of carbon or

20    carbon budgeting. BLM Br. 54–55; *see also* API Br. 20. That is beside the point. While NEPA does

21    not mandate any *particular* methodology, BLM must use *a* methodology that is accurate and

22    defensible. *See Nat. Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 813 (9th Cir. 2005)

23    (holding that agency's "misleading" economic methodology violated NEPA's "procedural

24

25

---

26    [25] However, the RIA cannot fulfill NEPA's hard look requirement. *See S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of the Interior*, 588 F.3d 718, 726 (9th Cir. 2009) ("A non-NEPA

27    document . . . cannot satisfy a federal agency's obligations under NEPA."); *Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 998 (9th Cir. 2004) (rejecting agency's reliance on a study

28    that was "not a NEPA document").

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary
Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

1   requirement to present complete and accurate information to decision makers and to the public to

2   allow an informed comparison of the alternatives"). It has not done so here.

### C.    BLM fails to consider cumulative impacts (Issue D-2).

4       BLM's cursory one-page cumulative impacts analysis fails to satisfy NEPA's duty to

5   consider the "incremental impact of the action when added to other past, present, and reasonably

6   foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes

7   such other actions." 40 C.F.R. § 1508.7; Citizens Br. 35–37. Tellingly, BLM's response, like its EA,

8   does not identify a single other "past, present, and reasonably foreseeable future action" that it has

9   considered in combination with the Rescission. *See* BLM Br. 55–56; AR320–21. BLM once again

10  tries to overcome its deficiencies by pointing to the Waste Prevention Rule EA. BLM Br. 55. But the

11  2016 "status quo" analysis does not encompass the cumulative impacts of the Rescission in

12  combination with other reasonably foreseeable actions in 2018.

13      BLM's claim that it analyzed the Rescission's cumulative impacts in combination with

14  BLM's fossil fuel program by simply quantifying the Rescission's methane emissions misses the

15  point. BLM Br. 56. BLM is responsible for managing and permitting all federal and Indian fossil

16  fuel (coal, oil, and gas) production nationwide. Citizens Br. 36–37. The Rescission's methane

17  emissions are only one part of the climate pollution BLM authorizes, which also includes other

18  emissions from both producing and combusting federal fossil fuels. AR21185, 84160, 84164. By

19  failing to consider these cumulative impacts, BLM fails to give the public a sense of how the

20  Rescission contributes to the larger climate picture. *See CBD v. NHTSA*, 538 F.3d at 1216–17

21  (rejecting agency's cumulative impact analysis for emissions from certain model years of light

22  trucks that ignored emissions from other model years of light trucks and passenger vehicles); *Hall v.*

23  *Norton*, 266 F.3d 969, 978–79 (9th Cir. 2001) (rejecting BLM's cumulative impact analysis that

24  ignored emissions from other BLM-managed projects in the region). At a minimum, BLM must

25  consider the cumulative emissions from the federal oil and gas program.

26      Notably, API, not BLM, argues that analyzing the cumulative impacts of BLM's oil and gas

27  leasing program would be "unprecedented" and "[in]feasible." API Br. 20. But the fact that BLM

28  has not analyzed its cumulative fossil fuel emissions says nothing about the legality or feasibility of

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary
Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

1    the analysis in this case. Once BLM undertakes such an analysis, it could tier to it for many site-

2    specific actions. 40 C.F.R. § 150.20. Nor is the analysis impossible. *See WildEarth Guardians v.*

3    *Zinke*, 368 F. Supp. 3d 41, 77 (D.D.C. 2019) (requiring BLM consider cumulative climate impacts

4    for "BLM lease sales in the region and nation"). In fact, the Citizen Groups identified several non-

5    governmental studies that have already analyzed the cumulative climate impacts of the federal fossil

6    fuel program. *See* AR21185, 84159–60.

7         BLM also claims that it did not need to consider the cumulative impacts of EPA also

8    rescinding its methane emissions standards because EPA published its proposed rescission in the

9    Federal Register two weeks after BLM promulgated the Rescission. BLM Br. 55–56. However,

10   BLM fails to address its own NEPA regulations requiring consideration of "[r]easonably foreseeable

11   future actions" including "federal… activities not yet undertaken, but sufficiently likely to occur."

12   43 C.F.R. § 46.30; *see also N. Plains Res. Council v. Surface Trans. Bd.*, 668 F.3d 1067, 1079 (9th

13   Cir. 2011) (concluding that future development of coal bed methane wells was reasonably

14   foreseeable). BLM does not claim that EPA's proposal was not reasonably foreseeable. Indeed, both

15   BLM and EPA were directed to rescind the regulations in the same Executive Order, AR1874, and

16   EPA's proposal was made public *before* the Rescission was finalized. Nor does EPA's proposal have

17   minimal impacts, as BLM suggests. BLM Br. 56. It would increase emissions of methane by

18   380,000 tons annually, 83 Fed. Reg. 52,056, 52,059 (Oct. 15, 2018), causing almost twice the

19   emissions of the Rescission. Regardless, any discussion of the scale of the impacts should be in the

20   environmental analysis, and should not appear for the first time in BLM's brief. *Cal. PUC*, 879 F.3d

21   at 978 n.5 (holding courts "may not accept . . . post hoc rationalizations for agency action").

22        **D.    The Rescission's significant impacts require an EIS (Issue D-3).**

23        BLM admits that it must prepare an EIS if there are "substantial questions" about whether the

24   Rescission will have significant impacts. BLM Br. 56. The Rescission satisfies this low bar: it

25   eliminates national environmental standards that would have prevented hundreds of thousands of

26   tons of pollution from thousands of oil and gas wells each year. Citizens Br. 37–40; *see also*

27   *Bosworth*, 510 F.3d at 1026–30 (finding impacts of relaxing nationally applicable environmental

28   standards to be significant). The Rescission is significant under NEPA's public health, cumulative

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary
Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

41

1   impacts, uncertainty, and controversy factors. *See* 40 C.F.R. 1508.27(b). Satisfying any one of these

2   factors may require an EIS. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th

3   Cir. 2004). BLM's attempt to discount each of these factors falls short.[26]

4          First, the Rescission significantly harms public health. BLM's only response is that the

5   Rescission's public health impacts are insignificant because they will be "'geographically dispersed'

6   and occur in 'sparsely populated areas.'" BLM Br. 57 (quoting AR336). The fact that an area is

7   sparsely populated says nothing about the significance of the impacts to the people that live in areas

8   surrounded by BLM-managed oil and gas wells, and nothing in NEPA allows BLM to ignore these

9   public health impacts. This Court has held that the air pollution from even a small number of oil and

10  gas wells will affect public health and safety and trigger the requirement to prepare an EIS. *Ctr. for*

11  *Biological Diversity v. BLM*, 937 F. Supp. 2d 1140, 1158 (N.D. Cal. 2013) (*CBD v. BLM*). Here,

12  emissions from tens of thousands of wells are at stake. The Rescission will significantly harm the

13  health of Native American communities, including the Navajo Nation and the Fort Berthold

14  Reservation, and communities in Colorado, Utah, and New Mexico with unhealthy ozone levels.

15  AR161895–912, 161941–67, 161969–76.

16         Contrary to BLM's claims, BLM Br. 57, the Citizen Groups have more than met their burden

17  to raise "substantial questions" about whether the Rescission Rule's impacts may be significant. *See*

18  *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1105 (9th Cir. 2011). For example,

19  the Citizen Groups have identified more than 6,000 BLM-managed wells in ozone non-attainment

20  areas where pollution will increase due to the Rescission. *See, e.g.*, AR22632–34 (identifying more

21  than 6,000 BLM-managed wells in ozone non-attainment areas where pollution will increase due to

22  the Rescission). Likewise, the Citizen Groups have shown that, at times, ozone pollution levels in

23

24  ───────────────────────
    [26] API and BLM argue that because the Citizen Groups did not challenge the Waste Prevention Rule
    EA, the Rescission Rule EA is not illegal. API Br. 18–19; BLM Br. 52 n.24. This argument is
25  meritless. The validity of the Waste Prevention Rule's EA is not before this court. In any event, the
    significance of an action to protect communities from the harmful impacts of oil and gas drilling
26  pollution is very different from the significance of an action to expose them to increased levels of
    harmful pollutants. Citizens Br. 40 n.19; *see also Lockyer II*, 575 F.3d at 1018 ("It was unreasonable
27  for the [agency] to characterize the permanent repeal of these substantive protections as 'merely
    procedural'").
28

    Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary
    Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

1   Utah's Uinta Basin have reached more than double the federal health standard, AR20316; *see*

2   *generally* AR23908, 84146, and 23% of Native Americans in the area live within 0.5 miles of an oil

3   and gas well, AR161902–03, 161971–73, 161975. The Rescission's significant public health impacts

4   require further analysis in an EIS.

5          Second, the Rescission will have significant effects when considered cumulatively with other

6   actions, including BLM's fossil fuel program and EPA's proposed methane rule. BLM attempts to

7   downplay the significance of EPA's nationwide rule, BLM Br. 58, without even considering the

8   expected 380,000 tons of increased annual methane emissions. 83 Fed. Reg. at 52,059. The Citizen

9   Groups have shown that the two federal agencies that regulate emissions from oil and gas wells are

10  both rescinding important protections nationwide, which is more than sufficient to show that there

11  are "substantial questions" about the significance of those combined impacts. *Te-Moak Tribe of W.*

12  *Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 605 (9th Cir. 2010) (holding that a

13  plaintiff's burden to show that agency overlooked cumulative in its NEPA analysis "is not an

14  onerous one"); *CBD v. BLM*, 937 F. Supp. 2d at 1157–58. Absent some consideration, BLM cannot

15  dismiss them as insignificant.

16         Third, BLM does not dispute that it must prepare an EIS if the action is "highly

17  controversial," meaning "there is a substantial dispute [about] the size, nature, or effect" of the

18  action. BLM Br. 58 (quoting *Pub. Citizen v. Dep't of Transp.*, 316 F.3d 1002, 1027 (9th Cir. 2003),

19  *rev'd on other grounds*, 541 U.S. 752 (2004))). BLM claims the dispute over its decision to use the

20  "interim" social cost of methane—which reduces the Rescission's projected climate impacts by 96%

21  or 87% (depending on the discount rate used) when compared to the peer-reviewed interagency

22  social cost of methane, AR84090—is not such a dispute. As discussed *supra* pp. 28–31, BLM's

23  "interim" metric is not valid. At a minimum, however, BLM's insistence on its validity in the face of

24  objections from numerous experts amounts to a substantial dispute with respect to whether this

25  "interim" methodology accurately reflects the Rescission's climate impacts. *See* AR206–07, 83411,

26  83414, 83419–31, 83471; *CBD v. BLM*, 937 F. Supp. 2d at 1158 ("[T]he serious concerns raised by

27  federal and state agencies specifically charged with protecting the environment [may] support a

28

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary
Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

43

1  finding that an EIS is necessary." (internal quotation omitted)).[27] Although BLM's "interim" metric

2  should be rejecting outright, at a minimum, it warrants full examination in an EIS.

3      Fourth, BLM fails to explain why the "uncertainties" it identifies in assessing the

4  Rescission's climate impacts does compel a finding of significance. *See* AR308. BLM does not

5  attempt to square the FONSI's statement that "the actual environmental effects attributable to the

6  [Rescission's] impact on climate change, cannot be reliably assessed and thus are sufficiently

7  uncertain," AR336, with its conflicting statement in the same document that "there are no reasonably

8  foreseeable environmental effects that are considered to be highly uncertain," AR337. BLM cannot

9  have it both ways. Additionally, BLM's argument that the climate impacts are not uncertain because

10  it regulated venting and flaring under NTL-4A for decades is a red herring. BLM Br. 59. BLM never

11  analyzed NTL-4A's climate impacts. In the end, BLM has provided no reason that it was not

12  mandated to consider the Rescission's significant impacts in an EIS.

13  **VI.   The Appropriate Remedy Is To Vacate the Rescission and Reinstate the Waste**
14  **Prevention Rule (Issue E).**

15      BLM does not contest—nor could it—that the default APA remedy for an invalid regulation

16  is vacatur of the rule and reinstatement of the rule previously in force. *See Organized Vill. of Kake v.*

17  *U.S. Dep't of Agric.*, 795 F.3d 956, 970 (9th Cir. 2015) (*en banc*); *Lockyer II*, 575 F.3d at 1020–21;

18  *Paulsen v. Daniels,* 413 F.3d 999, 1008 (9th Cir. 2005). There is no reason to depart from that norm.

19      BLM has tried—unsuccessfully—to stay, suspend, and rescind the Waste Prevention Rule

20  for years. Joint Statement Regarding Procedural History 3–7, ECF No. 98 (March 1, 2019). BLM's

21  latest attempt to undermine the Rule is to argue that even if the court finds the Rescission to be

22  unlawful, it should grant remand without vacatur, or "stay" vacatur, to allow BLM to implement an

23  interim remedy. BLM Br. 60. That result would be contrary to Ninth Circuit precedent, and deeply

24  prejudicial to the Citizen Groups. The Ninth Circuit declines to vacate unlawful agency actions only

25

26  [27] To prop up its argument that the Rescission's use of the "interim" methodology is not
controversial, BLM points to a case in which no one objected to the agency's methodology, and less
27  than one ton of carbon dioxide emissions was at stake. BLM Br. 58–59 (citing *WildEarth Guardians*,
368 F. Supp. 3d at 81–82, 83). By contrast here, using the interagency, rather than the "interim"
28  social cost of methane significantly changes the magnitude of the Rescission's impacts. AR84090.

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary
Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

44

1  in "rare" circumstances. *Humane Soc'y of the U.S.*, 626 F.3d at 1053 n.7; *Idaho Sporting Cong., Inc.*

2  *v. Alexander*, 222 F.3d 562, 567 (9th Cir. 2000) ("[W]e have held that agency action taken without

3  observance of the procedure required by law will be set aside." (internal quotation marks omitted));

4  *Reed v. Salazar*, 744 F. Supp. 2d 98, 119 (D.D.C. 2010) (holding vacatur is "default remedy" for

5  NEPA violation). In the past, it has done so where vacatur would defeat a statute's purpose. *See, e.g.*,

6  *Idaho Farm Bureau Fed'n*, 58 F.3d at 1405–06 (declining to vacate because setting aside listing of

7  snail species as endangered would risk potential extinction); *Cal. Cmtys. Against Toxics v. U.S.*

8  *Envtl. Prot. Agency*, 688 F.3d 989, 994 (9th Cir. 2012) (remanding without vacatur because vacating

9  could increase air pollution, undermining the Clean Air Act's goals). Here, vacatur would not

10  undermine the goals of the statutes at issue—as discussed *supra* pp. 4–6, it would advance them.

11       BLM asks this Court to deviate from the default remedy because operators are not poised to

12  comply with the Rule due to BLM's serial unlawful attempt to relieve them of compliance

13  obligations, and reinstatement will likely reactivate litigation over the Waste Prevention Rule. BLM

14  Br. 60. BLM identifies no case law to suggest that these are relevant factors. Indeed, neither of the

15  Ninth Circuit cases BLM cites, BLM Br. 59–60, support remand without vacatur. *See Safe Air For*

16  *Everyone v. EPA*, 488 F.3d 1088, 1091 (9th Cir. 2007) (applying the default remedy of

17  remand *with* vacatur); *United States v. Afshari*, 426 F.3d 1150, 1156 (9th Cir. 2005) (in a criminal

18  case, recognizing in dicta that "[t]hough not entirely uncontroversial," remand without vacatur is not

19  unheard of under the Administrative Procedure Act). And the D.C. Circuit case BLM cites

20  recognized that vacatur is the default remedy, but remanded without vacatur only because "[t]he egg

21  has been scrambled and there is no apparent way to restore the status quo ante." *Sugar Cane*

22  *Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002). No similar circumstance

23  exists here.

### CONCLUSION

25       Because the Rescission violates the Mineral Leasing Act, APA and NEPA, this Court should

26  grant the default remedy of declaring the Rescission unlawful, vacating it in its entirety, and

27  reinstating the Waste Prevention Rule.

28

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

45

Respectfully submitted this 2nd day of October, 2019,

/s/ Stacey Geis
Stacey Geis, CA Bar # 181444
Earthjustice
50 California St., Suite 500,
San Francisco, CA 94111-4608
Phone: (415) 217-2000
Fax: (415) 217-2040
sgeis@earthjustice.org

Robin Cooley, CO Bar # 31168 (*admitted pro hac vice*)
Joel Minor, CO Bar # 47822 (*admitted pro hac vice*)
Earthjustice
633 17th Street, Suite 1600
Denver, CO 80202
Phone: (303) 623-9466
rcooley@earthjustice.org
jminor@earthjustice.org

*Attorneys for Plaintiffs Sierra Club, Fort Berthold Protectors of Water and Earth Rights, The Wilderness Society, and Western Organization of Resource Councils*

Susannah L. Weaver, DC Bar # 1023021 (*admitted pro hac vice*)
Donahue, Goldberg, & Weaver LLP
1008 Pennsylvania Ave., SE
Washington, DC 20003
Phone: (202) 569-3818
susannah@donahuegoldberg.com

Peter Zalzal, CO Bar # 42164 (*admitted pro hac vice*)
Rosalie Winn, CA Bar # 305616
Environmental Defense Fund
2060 Broadway, Suite 300
Boulder, CO 80302
Phone: (303) 447-7214 (Mr. Zalzal)
Phone: (303) 447-7212 (Ms. Winn)
pzalzal@edf.org
rwinn@edf.org

Tomás Carbonell, DC Bar # 989797 (*admitted pro hac vice*)
Environmental Defense Fund
1875 Connecticut Avenue, 6th Floor
Washington, D.C. 20009
Phone: (202) 572-3610
tcarbonell@edf.org

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

46

*Attorneys for Plaintiff Environmental Defense Fund*

Laura King, MT Bar # 13574 (*admitted pro hac vice*)
Western Environmental Law Center
103 Reeder's Alley
Helena, MT 59601
Phone: (406) 204-4852
king@westernlaw.org

Erik Schlenker-Goodrich, NM Bar # 17875 (*admitted pro hac vice*)
Western Environmental Law Center
208 Paseo del Pueblo Sur, #602
Taos, NM 87571
Phone: (575) 613-4197
eriksg@westernlaw.org

*Attorneys for Plaintiffs Los Padres ForestWatch, Center for Biological Diversity, Citizens for a Healthy Community, Diné Citizens Against Ruining Our Environment, Earthworks, Montana Environmental Information Center, National Wildlife Federation, San Juan Citizens Alliance, WildEarth Guardians, Wilderness Workshop, and Wyoming Outdoor Council*

Darin Schroeder, KY Bar # 93828 (*admitted pro hac vice*)
Ann Brewster Weeks, MA Bar # 567998 (*admitted pro hac vice*)
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
Phone: (617) 624-0234
dschroeder@catf.us
aweeks@catf.us

*Attorneys for Plaintiff National Wildlife Federation*

Scott Strand, MN Bar # 0147151 (*admitted pro hac vice*)
Environmental Law & Policy Center
60 S. 6th Street, Suite 2800
Minneapolis, MN 55402
Phone: (312) 673-6500
Sstrand@elpc.org

Rachel Granneman, IL Bar # 6312936 (*admitted pro hac vice*)
Environmental Law & Policy Center
35 E. Wacker Drive, Suite 1600
Chicago, IL 60601
Phone: (312) 673-6500
rgranneman@elpc.org

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

47

*Attorneys for Plaintiff Environmental Law & Policy Center*

David Doniger, DC Bar # 305383 (*admitted pro hac vice*)
Melissa Lynch, MA Bar # 689235 (*admitted pro hac vice*)
Natural Resources Defense Council
1152 15th St. NW, Suite 300
Washington, DC 20005
Phone: (202) 289-6868
ddoniger@nrdc.org
llynch@nrdc.org

*Attorneys for Plaintiff Natural Resources Defense Council*

Citizen Groups' Opposition to Cross-Motions and Reply in Support of Motion for Summary Judgment, Case No. 4:18-cv-05712-YGR (Consolidated with No. 4:18-cv-05984-YGR)

48