Gary J. Smith (SBN 141393)
BEVERIDGE & DIAMOND, P.C.
456 Montgomery Street, Suite 1800
San Francisco, CA 94104-1251
Telephone: (415) 262-4000
Facsimile: (415) 262-4040
gsmith@bdlaw.com

Peter J. Schaumberg, admitted *pro hac vice*
James M. Auslander, admitted *pro hac vice*
John G. Cossa, admitted *pro hac vice*
BEVERIDGE & DIAMOND, P.C.
1350 I St., N.W., Suite 700
Washington, DC 20005
Telephone: (202) 789-6000
pschaumberg@bdlaw.com
jauslander@bdlaw.com
jcossa@bdlaw.com
*Attorneys for Intervenor-Defendant
American Petroleum Institute*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHRN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| STATE OF CALIFORNIA,<br><br>                Plaintiff,<br><br>vs.<br><br>DAVID BERNHARDT, *et al.*,<br><br>                Defendants.<br>_____<br><br>SIERRA CLUB, *et al.*,<br><br>                Plaintiffs,<br><br>vs.<br><br>DAVID BERNHARDT, *et al.*,<br><br>                Defendants. | Civil Case No. 4:18-cv-05712-YGR<br><br>(Consolidated With Case No. 4:18-cv-05984-YGR)<br><br>**AMERICAN PETROLEUM INSTITUTE REPLY IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT**<br><br>Date: January 14, 2020<br>Time: 10:00 am<br>Courtroom: 2, 4th Floor<br>Judge: Hon. Yvonne Gonzalez Rogers |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. ii

INTRODUCTION ............................................................................................. 1

I.   The Revision Rule Properly Reinstates Well-Established Economic
     Concepts of "Waste" Prevention and Operator Diligence Embodied in
     the MLA.  (Issues A-1, A-2) .................................................................... 3

     A.   BLM's Interpretation of "Waste" Properly Reflects Longstanding
          Oil and Gas Industry Principles of Prudent, Economically-Rational
          Lease Operation. ............................................................................. 4

     B.   DOI Historically Implemented its MLA Waste Prevention
          Authority Through the Economic "Avoidable Loss" Standard. ............. 9

     C.   Plaintiffs' "Public Welfare" Waste Prevention Policy Is
          Unprecedented and Precluded Under the MLA. ................................. 11

II.  The Revision Rule Did Not Violate NEPA (Issue D). ................................ 15

CONCLUSION ............................................................................................ 16

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*,
   575 F.3d 999 (9th Cir. 2009) ................................................................. 15

*Cities Serv. Gas Co. v. Peerless Oil and Gas Co.*,
   340 U.S. 179 (1950)................................................................................. 8

*Henderson Co. v. Thompson*,
   300 U.S. 258 (1937)................................................................................. 8

*Humane Soc. of United States v. Locke*,
   626 F.3d 1040 (9th Cir. 2010) ............................................................... 16

*Marathon Oil Co. v. Andrus*,
   452 F. Supp. 548 (D. Wyo. 1978)........................................................... 10

*Railroad Comm'n of Tex. v. Flour Bluff Oil Corp.*,
   219 S.W. 2d 506 (Tex. App. 1949)........................................................... 7

*Rife Oil Properties, Inc.*,
   131 IBLA 357 (1994)........................................................................ 10, 11

**Statutory Authorities**

30 U.S.C. § 187 ............................................................................. 11, 12, 14

30 U.S.C. § 225 .......................................................................... 2, 6, 13, 14

30 U.S.C. § 1756............................................................................... 6, 9

42 U.S.C. §§ 7401 *et seq*............................................................................ 2

43 U.S.C. §§ 1701 *et seq*.......................................................................... 14

43 U.S.C. § 1701(a)(8)............................................................................ 14

**Rules and Regulations**

43 C.F.R. § 3179.4 ............................................................................ 6, 7, 9

43 C.F.R. § 3179.5 ................................................................................. 9

ii

43 C.F.R. § 3179.101 ................................................................................ 7

43 C.F.R. § 3179.102 ................................................................................ 7

43 C.F.R. § 3179.103 ................................................................................ 7

43 C.F.R. § 3179.104 ................................................................................ 7

43 C.F.R. § 3179.201 ................................................................................ 7

43 C.F.R. § 3179.201(c) ............................................................................ 7

43 C.F.R. § 3179.201(d) ....................................................................... 7, 11

**State Authorities**

N.M. Stat. Ann. § 97-802 (1938) ......................................................... 4, 5

58 Pa. Stat. Ann. § 402(12) (1964) .......................................................... 5

1919 Tex. Gen. Laws 285 (ch. 155, Art 1 & 2) ..................................... 4, 7

1935 Tex. Gen. Laws 318 .......................................................................... 8

1935 Tex. Gen. Laws 321-22 ..................................................................... 8

Tex. HB. No. 266, Sec. 1 (Mar. 27, 1935) ................................................ 8

Tex. Rev. Civ. Stat. Ann. Art. 6014 (1936). ............................................. 5

Wyo. Stat. Ann. § 30-5-101 ................................................................... 4, 8

**Other Authorities**

BLM Offer to Lease and Lease for Oil and Gas, Form 3100-11 (Oct. 2008) ... ........................... 6

Interstate Oil Compact Comm'n, A Form for an Oil and Gas Conservation Statute,
   § 1 (1959) ............................................................................................4

Patrick H. Martin and Bruce M. Kramer, *Williams & Meyers, Oil and Gas Law,
   "W Terms"* (LexisNexis Matthew Bender 2019) ................................4, 5, 8

Stephen L. McDonald, *Petroleum Conservation in the United States,
   An Economic Analysis* (1971) ........................................................4, 8

# INTRODUCTION

To prevail in this case Plaintiffs must rebut each of the Bureau of Land Management's ("BLM") multiple justifications for promulgating its 2018 waste prevention regulations ("Revision Rule").  But Plaintiffs fail to overcome even BLM's first rationale for the Revision Rule—that the 2016 Rule replaced by the Revision Rule "exceeded the BLM's statutory authority to regulate for the prevention of 'waste' under the Mineral Leasing Act (MLA)." AR_1-2.  Because the Revision Rule reinstates longstanding waste prevention principles that Congress incorporated into the MLA—the government's foundational mineral leasing statute— and properly excludes from waste gas that prudent lease operators cannot economically recover, BLM had proper justification to adopt the Revision Rule.

Plaintiffs' repeated rhetoric that BLM's return to traditional waste prevention principles founded on economics constitutes adoption of an unprecedented and impermissible "operator profit policy" ignores both history and the statute.  In the government's own words, "as BLM expressly acknowledged in the 2016 Rule, until the 2016 Rule, BLM (and other regulators and courts) had consistently considered the economics of conservation in determining whether a loss was avoidable and therefore 'waste.'"  Gov't Br. at 18 (ECF. No. 123).  Put simply, Congress did not compel commercial lessees under the MLA to operate at a financial loss through capture of gas that is uneconomic to capture and market.

Unable to rebut the Revision Rule's economic-based concepts of waste and avoidably lost gas, Plaintiffs posit that a different MLA term—"public welfare"—instead governs BLM and operators' MLA obligation to avoid "undue waste."  That is, Plaintiffs would have this Court compel BLM to treat as "undue waste" any vented or flared gas that BLM—or in this case Plaintiffs—determine impacts air quality antithetically to their view of the "public welfare."  But whereas BLM's longstanding interpretation of its MLA waste prevention authority as a fundamentally economic test is universally supported by case law, academic literature, historical state practices, and longstanding federal venting and flaring regulation, Plaintiffs fail to identify any legal authority or precedent in the MLA's nearly 100-year history to support their novel

1

1   "public welfare" view of waste prevention.  Only the U.S. Environmental Protection Agency

2   under the Clean Air Act ("CAA"), 42 U.S.C. §§ 7401 *et seq.*, and states such as Plaintiffs

3   California and New Mexico under the CAA and their respective police powers (which BLM does

4   not have), are authorized to restrict flaring to address Plaintiffs' perceived public welfare harms.

5   By contrast, BLM's authority to prevent the physical waste of gas does not allow the agency to

6   restrict flaring for any purpose other than conserving mineral resources.  30 U.S.C. § 225.

7          Plaintiffs further conflate all loss of gas with "waste," and argue that BLM must compel

8   gas capture whatever the cost and regardless of the existence of rational, prudent lease

9   operations.  But even Plaintiffs' cited authority quotes the economic definition of "waste"

10  advanced by API and reflected in the Revision Rule.  Plaintiffs circularly assume the presence of

11  "waste," and then attack the Revision Rule as not sufficiently preventing such "waste."

12         Contrary to Plaintiffs' claims, the waste prevention concepts underpinning the Revision

13  Rule also are consistent with BLM's longstanding practice under former NTL-4A.  Plaintiffs

14  disregard the agency's decades-long "avoidable loss/unavoidable loss" proxy for determining

15  "waste," common to NTL-4A, the 2016 Rule, and the Revision Rule.  Plaintiffs also assert

16  without basis or example that BLM traditionally considered factors *other* than lease economics

17  when determining whether venting or flaring constituted an "avoidable loss."  These claims fly

18  in the face of federal and administrative case law that precipitated and interpreted NTL-4A,

19  longstanding agency guidance implementing NTL-4A, and Plaintiffs' own admissions that

20  "avoidable loss" and "waste" are synonymous.

21         Plaintiffs' recycled attacks on BLM's process under the National Environmental Policy

22  Act ("NEPA") fare no better on reply.  The agency undertook the requisite "hard look," and

23  determined that it did not need to prepare an environmental impact statement ("EIS") for the

24  Revision Rule which replaced the 2016 Rule that itself did not necessitate an EIS.

25         The remainder of Plaintiffs' reply briefs rehash and reallege most of their opening briefs'

26  scattershot attacks on the Revision Rule in the hopes that the Court will seize upon one to

27  invalidate the entire rule.  For example, Plaintiffs re-argue that: (i) the Revision Rule

28
2

impermissibly "delegates" BLM's waste prevention authority to states, despite that states already have the authority to prevent waste without help from BLM and states possess greater authority to limit venting and flaring than BLM has (*see* API Br. at 4, 16-18 (ECF No. 126)); (ii) BLM failed to provide sufficient explanation of its view that the 2016 Rule exceeded its MLA waste prevention authority, despite that the scope of an agency's statutory authority is an issue of law, not of the administrative record (*see* API Br. at 15-16); and (iii) BLM violated the Administrative Procedure Act notice and comment process because it did not supply Plaintiffs with all the case law confirming the true scope of BLM's waste prevention authority (*see* Gov't Reply at 35-36 (ECF No. 145); API Br. at 18-20).  API largely does not repeat its rebuttals to those assertions here, and instead incorporates by reference the arguments on these issues in the government's and API's prior filed briefs.[1]

Accordingly, the Court should grant summary judgment for Defendants.

## ARGUMENT

I.  **The Revision Rule Properly Reinstates Well-Established Economic Concepts of "Waste" Prevention and Operator Diligence Embodied in the MLA.  (Issues A-1, A-2)**

What Plaintiffs mislabel as BLM's "new operator profit policy" (Citizen Groups' Reply at 1 (ECF No. 141)) is instead a fundamental tenet of oil and gas law that is incorporated into the MLA and constrains BLM's regulatory discretion.  The Revision Rule reinstates longstanding waste prevention principles, which the agency has in practice been administering on federal and Indian oil and gas leases for decades except for the blip in the 2016 Rule.  In contrast, Plaintiffs' unprecedented MLA interpretation of "public welfare" to supersede and subsume "waste" not only is inconsistent with longstanding principles of waste prevention as incorporated into the MLA and BLM's historical practices under NTL-4A, but also is unsupported by any waste prevention-related law, policy, or practice.  Accordingly, the Court should decline Plaintiffs'

---

[1] API also generally concurs with and incorporates by reference the other arguments in the reply briefs of Federal Defendants and of Intervenor-Defendants Western Energy Alliance ("the Alliance") and Independent Petroleum Association of America ("IPAA").

API Reply in Support of Cross-Motion for Summary Judgment
Case No. 4:18-cv-05712-YGR (Consolidated)

invitation to impose their novel and vague standard on BLM or the regulated community.

    **A.**    **BLM's Interpretation of "Waste" Properly Reflects Longstanding Oil and Gas Industry Principles of Prudent, Economically-Rational Lease Operation.**

    Plaintiffs insist that traditional, lease-specific economic considerations cannot drive BLM's waste prevention regulations.  They suggest instead that "waste," as used in the MLA and applied to the conservation of natural gas since the inception of the oil and gas industry, has no intrinsic meaning and can be redefined freely by BLM.  But "waste" is a seminal oil and gas industry term-of-art that BLM is not free to disregard.[2]  The Revision Rule is faithful to the proper meaning of waste in the MLA, and properly replaced the 2016 Rule which was not.

    In equating "waste" with all "loss," Plaintiffs rely on an oil and gas treatise that actually debunks this simplistic understanding of "waste," and contains a two-page discussion of that term as applied in various contexts.  Citizen Groups' Reply at 12 n.8; Patrick H. Martin and Bruce M. Kramer, Williams & Meyers, Oil and Gas Law, ("Williams & Meyers"), "W Terms" (LexisNexis Matthew Bender 2019).  Notably, the source cited by Plaintiffs also quotes verbatim the general "waste" definition cited by API and that Plaintiffs decry as an "operator profit policy."  *Id.*; API Br. at 7; Citizen Groups' Reply at 3-4; *Petroleum Conservation in the United States, An Economic Analysis* ("McDonald"), Johns Hopkins Press, 1971 (Reprinted in 2011 by Resources for the Future), at 129 (generally, "[w]aste is a preventable loss the value of which exceeds the cost of avoidance").  Even the pre-MLA Texas waste prevention statute that Plaintiffs claim undermines the Revision Rule's economically-driven definition of "waste" properly defines waste as "the escape of natural gas *in commercial quantities*."  1919 TEX. GEN. LAWS 285 (ch. 155, Arts. 1 & 2) (emphasis added).  Tellingly, the 1919 Texas statute does not

---

[2] The oil and gas industry concept of waste prevention is so prevalent that numeorus state statutes, including New Mexico's first waste prevention statute, define "waste" first and foremost as that term is understood in the oil and gas industry.  *See* N.M. Stat. Ann. § 97-802 (1938) (defining "underground waste" and "surface waste" "as those words are generally understod in the oil business . . .") (originally enacted 1935 N.M. Laws 137); WYO. STAT. ANN. § 30-5-101 (defining "waste as that term is generally understood in the oil and gas industry"); *see also* Interstate Oil Compact Comm'n, A Form for an Oil and Gas Conservation Statute, § 1 (1959).

deem the physical loss of oil well gas—the focus of both the 2016 Rule and the Revision Rule—to be waste at all, likely because the assumption at the time was that gas associated with an oil well was *per se* uneconomic to market.  *Id*. at Art. 1.

Notwithstanding Plaintiffs' assertion that reasonable and prudent lease operations and waste "are two separate statutory requirements" (Plaintiff States' Reply (ECF No. 140) at 5), reasonable and prudent operator principles have always been critical in determining what is—and what is not—waste.  For example, with respect to the physical waste of gas, which is the type of waste addressed in the 2016 Rule and the Revision Rule, the New Mexico definition of "waste" (which is also block-quoted in Plaintiffs' favored "waste" definition) is limited to "the escape, blowing, or releasing, directly or indirectly into the open air, of gas . . . in an *excessive* or *unreasonable* amount from wells . . . and the production of gas in quantities or in such manner as *unreasonably* reduces reservoir pressure or *unreasonably* diminishes the quantity of oil or gas that ultimately may be produced; excepting gas that is *reasonably* necessary in the drilling, completing, testing, and in furnishing power for the production of wells").  William & Meyers, W Terms (emphasis added).  Other state waste prevention statutes, incluing those of Texas and Pennsylvania, contain similar definitions that rely on reasonable and prudent operator conduct. *See* N.M. Stat. Ann. § 97-802 (1938) (defining "waste" to include "inefficient, excessive, or improper[] use of dissipation of reservoir energy," "unnecessary or excessive surface loss," and production "in excess of reasonable market demand"); Tex. Rev. Civ. Stat. Ann. Art. 6014 (West 1936) (defining "waste" to include "unnecessary, inefficient, excessive, or improper use of the reservoir energy," "unnecessary or excessive surface losses," and loss of oil well gas "in excess of the amount which is necessary in the efficient drilling and operation of the well"); 58 Pa. Stat. Ann. § 402(12) (West 1964) ("physical waste" includes "unnecessary or excessive surface loss or destruction of oil or gas," "inefficient or improper use, or unnecessary dissipation or reservoir energy," and "[t]he drilling of more wells than are reasonably required to recover, efficiently and economically, the maximum amount of oil and gas from a pool").

The MLA, which only requires lessees to "use *all reasonable* precautions to prevent

1    waste of oil and gas," is no different.  30 U.S.C. § 225 (emphasis added).  Plaintiffs emphasize

2    the term "all" but not the term "reasonable."  *See, e.g.,* Citizen Groups' Reply at 5.  In this way,

3    Plaintiffs attempt to compel operators to take every conceivable measure to limit surface loss of

4    gas through venting and flaring regardless of whether it would be reasonable and prudent for the

5    operator to do so.  This contorted interpretation of plain statutory language is baseless.  In

6    regulating to prevent "undue waste" BLM may only require a lessee to restrict venting or flaring

7    as a reasonable and prudent operator would; it may not compel federal lessees to operate at an

8    economic loss.  *See* API Br. at 2, 6-7.

9         Plaintiffs' argument that the Federal Oil and Gas Royalty Management Act

10   ("FOGRMA"), 30 U.S.C. § 1756, BLM's Oil and Gas Lease Form 3100-11, and the Revision

11   Rule support the decoupling of waste prevention from prudent lease operations is similarly

12   flawed.  Plaintiff States' Reply at 6, 12.  Only the MLA grants BLM waste prevention authority;

13   FOGRMA directs DOI to collect royalties on minerals determined to be wasted.  *See* API Br. at

14   12-13.  The BLM Lease Form similarly does not affect the scope of BLM's waste prevention

15   authority.  Instead, and consistent with the MLA, the Lease incorporates a provision requiring

16   the lessee to exercise "reasonable diligence" and prevent "unnecessary . . . waste of leased

17   resources."  BLM Lease Form, Sec. 4.  The Revision Rule deems gas "avoidably lost" when the

18   gas "is vented or flared without the authorization or approval of the BLM," or the gas is lost due

19   to "[t]he failure of the operator to comply fully with the applicable lease terms and regulations."

20   43 C.F.R. § 3179.4.  But nothing authorizes BLM to expand its statutory waste prevention

21   authority through administrative orders, lease terms, or regulations as Plaintiffs imply.

22        Plaintiffs additionally misinterpret the scope of the Revision Rule's waste definition to

23   fabricate illusory problems.  For example, Plaintiffs mistakenly presume that under the Revision

24   Rule *operators* determine what constitutes "waste" because the operators determine whether gas

25   capture is profitable.  Citizen Groups' Reply at 1, 5.  But by specifying what constitutes

26

27                                             6

28

1    "avoidably lost" gas, BLM has by rule determined what constitutes waste.  43 C.F.R. § 3179.4.[3]

2    The Revision Rule further reserves to BLM ultimate authority to determine on a case-by-case

3    basis whether an operator imprudently wasted gas.  43 C.F.R. §§ 3179.201(c) & (d) (requiring

4    operator to demonstrate to BLM's satisfaction that flaring was economically justified under the

5    circumstances).  Plaintiffs' "operator profit policy" objections to the Revision rule therefore ring

6    hollow.

7            The authorities Plaintiffs cite purportedly undermining BLM's interpretation of its MLA

8    waste prevention authority are inapposite or actually support *BLM*'s interpretation.  For example,

9    when attempting to demonstrate that the historical concept of waste prevention that prevailed at

10   the time of MLA enactment *did not* account for lease economics, Citizen Groups cite a 1919

11   Texas State law that deems venting and flaring of gas to be "waste" only when the volume lost

12   was otherwise *economically recoverable* (i.e., "commercial quantities").  *See* 919 TEX. GEN.

13   LAWS 285; Citizen Groups' Reply at 13.  But this accounting for lease economics is the very

14   concept BLM reinstated in the Revision Rule.  Citizen Groups further cite a Texas state court

15   case, *Railroad Comm'n of Tex. v. Flour Bluff Oil Corp.*, 219 S.W. 2d 506 (Tex. App. 1949),

16   which is inapposite because it interprets a now-repealed post-MLA state waste prevention statute

17   that was enacted in 1935 under the state's police power, authority that BLM does not have.  *See*

18   1935 Tex. Gen. Laws 318, 321-22; *see also* Tex. HB. No. 266, Sec. 1 (Mar. 27, 1935).[4]

19           Despite that this 1949 case upholding the validity of a 1948 Texas agency order

20   interpreting a 1938 state statute is not relevant to the meaning of "waste" under the 1920 federal

---

[3] Like BLM's previous regulations, including NTL-4A and the 2016 Rule, the Revision Rule
deems certain flaring reasonable, and therefore not an avoidable loss.  Examples include flaring
related to initial production testing (43 C.F.R. § 3179.101, *see* AR_16-17); subsequent well tests
(43 C.F.R. § 3179.102, *see* AR_17); emergencies (43 C.F.R. § 3179.103, *see* AR_17-18); and
downhole well maintenance and liquids unloading (43 C.F.R. § 3179.104, *see* AR_18-19).  In
promulgating the Revision Rule, BLM also determined that applicable state waste prevention
regulations—including those of Plaintiffs California and New Mexico—sufficiently ensure
prudent lease operation and protect against the undue waste of federally-managed mineral
resources.  *See* Gov't Reply at 19.  For flaring not expressly governed by the Revision Rule,
compliance with applicable state requirements also is not avoidable loss.  43 C.F.R. § 3179.201.
[4] *See* https://lrl.texas.gov/LASDOCS/44R/HB266/HB266_44R.pdf#page=1.

API Reply in Support of Cross-Motion for Summary Judgment
Case No. 4:18-cv-05712-YGR (Consolidated)

MLA, its reasoning reinforces the longstanding waste prevention concept that the Revision Rule embraces.  In that case, the state court upheld the Texas agency's finding that an operator violated a Texas waste prevention statute because the operator flared gas without ever determining whether the gas was economic to sell or re-inject for enhanced recovery, and without making any effort to sell its gas to a nearby pipeline that apparently contracted with other operators in the field to take their gas.  *Id*. at 507-508.  Such an operator likely also would fail the reasonable and prudent operator test under traditional waste prevention principles BLM administers under the MLA.  *See also, e.g.,* WYO. STAT. ANN. § 30-5-101 (prohibiting flaring gas from an oil well in circumstances where "with reasonable diligence the gas can be sold or otherwise usefully utilized on terms and conditions that are just and reasonable").

Two other Supreme Court cases Plaintiffs cite also are inapposite and generally reinforce rather than contradict the historical concept of physical waste prevention as based on an economic standard.  *Henderson Co. v. Thompson*, 300 U.S. 258 (1937); *Cities Serv. Gas Co. v. Peerless Oil and Gas Co.*, 340 U.S. 179 (1950).  Neither case deals with flaring or physical waste, but instead involve challenges to state regulations intended to prevent "economic waste," i.e., selling gas for prices below reasonable market price or imprudently using gas for inferior purposes – thus failing to reasonably maximize economic value of the gas.  *See Cities*, 340 U.S. at 182-183; Williams & Meyers, W Terms; McDonald at 127-28.[5]  Apart from recognizing that "a state may adopt reasonable regulations to prevent economic and physical waste of natural gas," and that "[a] state is justifiably concerned with preventing rapid and uneconomic dissipation of one of its chief natural resources"—both propositions that support the Revision Rule's regulatory definition of waste—neither case addresses whether the state regulation at issue was a proper interpretation of the term "waste."  *See Cities,* 340 U.S. at 185, 187.  Instead, the Supreme Court decided the cases on constitutional grounds, which are not at issue here.  *See Henderson*, 300 U.S. at 266-67; *Cities*, 340 U.S. at 179.  Despite 152 pages of merits briefing in

---

[5] Economic waste tends to result in physical waste because it encourages overproduction in excess of true market demand.  *Cities*, 340 U.S. at 186.

API Reply in Support of Cross-Motion for Summary Judgment
Case No. 4:18-cv-05712-YGR (Consolidated)

1    this case, Plaintiffs cite no actual authority for their assertion that waste prevention is not an

2    economically-driven concept.

3        **B.    DOI Historically Implemented its MLA Waste Prevention Authority**
         **Through the Economic "Avoidable Loss" Standard.**
4

5        The operative provisions of BLM's "waste prevention" regulations are the

6    "avoidable/unavoidable loss" requirements (§ 3179.4), which the agency has uniformly used as a

7    proxy for "waste." *See* API Br. at 8-9.  Plaintiffs acknowledge that "waste" and "avoidable loss"

8    are synonymous. *See id.*; Plaintiff States' Reply at 17 ("since the concept of 'avoidable loss' is

9    not limited by an economic test, then neither is the definition of waste"); *see also id.* at 9 (if

10   BLM determines "a loss of oil or gas to be avoidable [it is] thus potentially subject to royalties as

11   waste") (internal quotations from 2016 Rule preamble omitted).  But Plaintiffs inconsistently

12   argue that the case law cited by API and the government in their opening briefs dealing with

13   "avoidable loss" are irrelevant to BLM's authority to prevent "waste." *Id.* at 6, 11.  Plaintiffs

14   cannot have it both ways.

15       Plaintiffs cannot credibly dispute that DOI's historical practice of making

16   "avoidable/unavoidable loss" determinations both prior to and under NTL-4A was the means

17   through which DOI implemented its MLA authority to prevent undue waste and to collect

18   royalties on such waste.  NTL-4A expressly equates "avoidable loss" with waste.  AR_3011

19   ("Where produced gas (both gas well gas and oil well gas) is . . . otherwise *avoidably lost* . . . the

20   compensation due the United States or the Indian lessor will be computed on the basis of the full

21   value of the gas *so wasted* . . . .") (emphasis added);[6] *see* AR_3016, Refund Applications

22   (denying refunds where BLM makes a "determination[] of waste," despite that BLM may only

23   make a determination of "avoidable loss").  Likewise, even Plaintiffs' touted 2016 Rule, like the

24   Revision Rule, hinges on determinations of "avoidable/unavoidable loss" as a proxy for "waste."

25   *See* 43 C.F.R. §§ 3179.4 & 3179.5; former 43 C.F.R. §§ 3179.4 & 3179.5 (2017).  Indeed, there

26   ────────────────

27   [6] Congress' enactment of 30 U.S.C. § 1756 limited the compensation owed to the government
     lessor to the royalty value, rather than the full value, of production deemed wasted.

28                                          9

1  would be no need for Plaintiffs to devote so much briefing to waste-related arguments in the

2  context of the Revision Rule if, as Plaintiffs suggest, "waste" and "avoidable loss" were

3  unrelated.

4        Because "avoidable loss" and "waste" are equivalent, the cases cited by API in its

5  opening brief addressing the economic limitations on BLM's ability to make an "avoidable loss"

6  determination are directly applicable to the scope of BLM's waste prevention authority under the

7  MLA.  The MLA functions as a statutory sideboard constraining the scope of BLM's waste

8  prevention regulations, regardless of the regulatory rubric the agency employs.  *See* API Br. at

9  11.

10        It is likewise indisputable that the criteria BLM has applied to determine whether a loss is

11  avoidable *have always been economic-based*.  API is unaware of any BLM avoidable loss

12  determination based on broad public policy concerns or weighing supposed public interests

13  against operator "profits" as Plaintiffs suggest.  Instead, BLM has consistently administered its

14  waste prevention authority in a way that authorizes the flaring of gas that is uneconomic to

15  capture and market.  That longstanding practice is no accident because it is what Congress

16  required in the MLA.  When BLM's predecessor, the U.S. Geological Survey ("USGS"), briefly

17  attempted to deviate from this practice under NTL-4A's predecessor, NTL-4, the U.S. District

18  Court for the District of Wyoming forced the agency to return to its original "avoidable loss"

19  system.  *Marathon Oil Co. v. Andrus*, 452 F. Supp. 548, 553 (D. Wyo. 1978). The court did so

20  because assessing royalties on flared gas without determining whether it was economic to

21  recover the gas (i.e., without an "avoidable loss" determination) was "manifestly contrary to the

22  Mineral Leasing Act."  *Id.*  Time and again, the Interior Board of Land Appeals has reaffirmed

23  that an "avoidable loss" determination under the agency's MLA authority necessitates a

24  determination of whether the operator would have been able to economically capture and market

25  the lost gas.  *E.g., Rife Oil Properties, Inc.*, 131 IBLA 357, 374 (1994) (whether a loss is

26  "avoidable" turns on "whether it would have been economic to market the gas from the well at

27  issue").  Plaintiffs cite no applicable authority to the contrary.

28

API Reply in Support of Cross-Motion for Summary Judgment
Case No. 4:18-cv-05712-YGR (Consolidated)

In fact, USGS promulgated NTL-4A in part to comply with *Marathon* and other administrative and federal court decisions to ensure that the agency would only require compensation for oil and gas properly deemed "avoidably lost."  *See also* AR_3058, Attachment 2 to NTL-4A (recommending reconsideration of a number of historical royalty cases that lacked record evidence "that BLM ever made a determination of avoidable loss pursuant to [NTL-4A and implementing guidance]")  (emphasis in original).  Although Plaintiffs cherry-pick language from NTL-4A to suggest that the criteria for determining "avoidable loss" at that time went beyond a determination of the economic feasibility of recovering and marketing flared gas, the same language also appears in the Revision Rule.  43 C.F.R. § 3179.201(d).

BLM's implementing guidance for processing operator flaring requests under NTL-4A, *Guidelines for Evaluating Applications for Flaring*, demonstrates BLM's historical practice. The guidance precludes an avoidable loss determination unless the flared gas was itself economically recoverable.  AR_3030-3031 (agency authorized to require gas capture only where (i) capturing and marketing the otherwise flared gas would have achieved profitable "payout" in five years or less, or (ii) reinjecting the gas would have increased oil production value by a margin that exceeds the cost of gas capture within five years); *see Rife*, 131 IBLA at 376.  The Revision Rule reflects well-established BLM practice and prior decisions for prevention of avoidable loss, and thus waste.

### C.   Plaintiffs' "Public Welfare" Waste Prevention Policy Is Unprecedented and Precluded Under the MLA.

Plaintiffs', not the Revision Rule's, interpretation of BLM's waste prevention authority is new and unsupported.  Plaintiffs' novel public welfare-based interpretation of "waste" relies on a tortured interpretation of the MLA that the agency could not adopt.  Specifically, Plaintiffs assert that separate words in Section 187 of the MLA regarding federal lease terms compel BLM to prohibit any venting and flaring that BLM (or Plaintiffs) find not in the interests of the "public welfare."  But their interpretation is unsupportable and cannot displace the Revision Rule.

This provision it is replicated below in full and to demonstrate that Plaintiffs apply portions of the law out of context:

> Each lease shall contain provisions for the purpose of insuring the exercise of reasonable diligence, skill, and care in the operation of said property; *a provision that such rules for the safety and welfare of the miners and <u>for the prevention of undue waste</u> as may be prescribed by said Secretary shall be observed, including a restriction of the workday to not exceeding eight hours in any one day for underground workers except in cases of emergency*; provisions prohibiting the employment of any child under the age of sixteen in any mine below the surface; provisions securing the workmen complete freedom of purchase; provision requiring the payment of wages at least twice a month in lawful money of the United States, and providing proper rules and regulations to insure the fair and just weighing or measurement of the coal mined by each miner, *and such other provisions as he may deem necessary* to insure the sale of the production of such leased lands to the United States and to the public at reasonable prices, for the protection of the interests of the United States, for the prevention of monopoly, and *for the safeguarding of the public welfare*.

30 U.S.C. § 187 (emphasis added).

Plaintiffs strain this provision of the MLA beyond its plain meaning to assert that the Secretary is *compelled* to define "undue waste" however necessary to "safeguard[] the public welfare" from the allegedly deleterious effects of venting and flaring. But Section 187's requirement for federal lease provisions to mandate observance of "rules . . . for the prevention of undue waste" is separate and distinct from compliance with both "rules for the safety and welfare of . . . miners" and "provisions as [the Secretary] may deem necessary . . . for safeguarding the public welfare." While rules for the "prevention of undue waste" may "safeguard the public welfare," DOI does not have carte blanche to define "waste" based on what Plaintiffs believe to be "safeguarding the public welfare."

Plaintiffs' interpretation also reads the term "undue waste" out of the statute because in Plaintiffs' view the agency could limit venting and flaring however it likes in the name of "safeguarding the public welfare." By elevating the section's final clause and rendering the term "undue waste" meaningless within the MLA, the exercise of BLM's MLA waste prevention

authority would be purely outcome determinative—e.g., if the vented or flared gas would have allegedly deleterious health effects, or if it would contribute to pollution, it would be prohibited waste.

Plaintiffs' contention that BLM may exercise its waste prevention authority to regulate venting and flaring any way it wishes in service of an amorphous notion of "public welfare" also is completely unsported by any waste prevention-related law, policy, or practice.  Moreover, Plaintiffs' attempt to define "public welfare" answers the wrong question.  The issue presented is whether the Revision Rule's implementation of the MLA's prohibition on "undue waste" is arbitrary and capricious.  Because Plaintiffs point to no authority allowing—much less compelling—BLM to implement its waste prevention authority for any purpose other than the prevention of *actual waste of oil and gas*, the Court must disregard Plaintiffs' new theory.

Plaintiffs fail to rebut that "waste" is a pre-existing term-of-art with intrinsic meaning specific to the mineral development industry, and not simply a generic term that Congress randomly inserted into the MLA for the Secretary to freely interpret.  Indeed, Congress incorporated into the MLA numerous other prevailing industry norms, including competitive leasing to private entities, standard form oil and gas leases, and a standard 12.5 percent royalty rate.  "Waste" is no different.  Congress intended "waste" in the MLA to have the same meaning as it did in the wider oil and gas industry, which does not include prohibiting reasonable and prudent flaring of uneconomic gas.

Plaintiffs go so far as to claim the MLA "unambiguously" supports their "public welfare" theory, yet they fail to show that there are any administrative or judicial MLA waste prevention decisions even mentioning this theory, much less historical agency actions implementing such a concept.  Citizen Groups' Reply at 4-7; State Plaintiffs' Reply at 2-4.  Instead, relevant cases and practices deal exclusively with economic considerations in light of prudent operator principles. API Br. at 9.

Plaintiffs' "public welfare" interpretation also ignores MLA Section 225 which, unlike

13

Section 187, is specific to oil and gas leases:

> All leases of lands containing oil or gas, made or issued under the provisions of this chapter, *shall be subject to the condition that the lessee will, in conducting his explorations and mining operations, use all reasonable precautions to prevent waste of oil or gas developed in the land*, or the entrance of water through wells drilled by him to the oil sands or oil-bearing strata, to the destruction or injury of the oil deposits. Violations of the provisions of this section shall constitute grounds for the forfeiture of the lease, to be enforced as provided in this chapter.

30 U.S.C. § 225 (emphasis added).  According to Section 225, the "waste" that lessees must take reasonable precautions to avoid is the "waste of oil and gas," and the resource to be conserved through such waste prevention is also oil and gas, not atmospheric or environmental values.

Further distorting the MLA, Citizen Groups graft language from the 1976 Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701 *et seq.*, that is unrelated to waste prevention.  On reply, they blithely present the FLPMA language as though it were an integral part of the MLA's 1920 waste prevention scheme, suggesting that one of the purposes of the MLA's obligation to require "all reasonable precautions to prevent waste" under 30 U.S.C. § 225 was to fulfill one of FLPMA's management goals to "protect the quality of . . . air and atmospheric . . . values" under 43 U.S.C. § 1701(a)(8)).  Citizen Groups' Reply at 3.  However, because the MLA pre-dated FLPMA by over 50 years, and FLPMA does not address waste prevention, this conclusion is plainly unsupportable, and demonstrates just how far Plaintiffs are overreaching to find a plausible basis for their "public welfare" MLA waste prevention theory. API Br. at 11, 13-14.

At bottom, Plaintiffs want BLM to use its MLA waste prevention authority to curtail oil and gas development that Plaintiffs disfavor.  *E.g.,* Citizen Groups' Reply at 7.  But BLM may only use its MLA waste prevention authority *to prevent waste*, not to address environmental harms, perceived or otherwise.  The government has other authority to address Plaintiffs' "public welfare" concerns.  Authority to protect the environment from the allegedly deleterious effects of flaring exists in other federal statutes such as the CAA, which is administered by the U.S.

14

1   Environmental Protection Agency ("EPA"), and resides with states with delegations of CAA

2   authority.  States such as Plaintiffs California and New Mexico and Intervenor-Defendant

3   Wyoming also have inherent police power to protect their citizens.  Contrary to Plaintiffs'

4   assertions, EPA's and the states' exercise of authority to regulate emissions is unrelated to and

5   does not affect BLM's authority to prevent waste of federal minerals.  For example, when EPA

6   declined to impose additional controls on venting and flaring emissions from federal oil and gas

7   lease operations, it did not create an opportunity for BLM to fill any perceived regulatory gap.

8   State Plaintiffs' Reply at 26-26; Citizen Groups' Reply at 41.  Quite the opposite:  EPA's and the

9   states' authority under the CAA preempts any end-run by BLM to regulate venting and flaring to

10  achieve air quality outcomes.  API Br. at 14-15.  Thus, by attempting to re-define waste as any

11  venting or flaring that Plaintiffs perceive as environmentally adverse, Plaintiffs impermissibly

12  ask this Court to anoint BLM as another federal air regulator and force the agency to misuse its

13  limited statutory waste prevention authority to achieve Plaintiffs' environmental policy goals.

14  **II.      The Revision Rule Did Not Violate NEPA (Issue D).**

15          Plaintiffs argue that the Revision Rule should be treated as a "rescission" of BLM's 2016

16  Rule, yet simultaneously insist that the environmental assessment ("EA") prepared for the 2016

17  Rule—which Plaintiffs do not challenge—is irrelevant to any analysis of the effects of the

18  Revision Rule.  Citizen Groups' Reply at 42 n.26.  Plaintiffs ignore that the 2016 Rule EA is

19  incorporated by reference into the Revision Rule EA, and therefore is part of the administrative

20  record before the Court and an integral part of the Revision Rule's NEPA analysis.  AR_306,

21  309; API Br. at 19-20.

22          Plaintiffs also fail to rebut API's explanation that an agency need not prepare an EIS

23  where it repeals regulatory requirements that themselves had no significant *beneficial or* adverse

24  effects.  API Br. at 19.  Plaintiffs' only cited authority says nothing on point.  *Cal. ex rel.*

25  *Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1012, 1015 (9th Cir. 2009) (invalidating use of

26  categorical exclusion to repeal prior rule that underwent an EIS).  To the contrary, the Ninth

27  Circuit has indicated its disagreement with Plaintiffs' argument that only significant "adverse"

28

15

API Reply in Support of Cross-Motion for Summary Judgment
Case No. 4:18-cv-05712-YGR (Consolidated)

effects (in their view) trigger an EIS.  *Humane Soc. of United States v. Locke*, 626 F.3d 1040, 1056 n.9 (9th Cir. 2010) (agreeing with "the weight of circuit authority").  Likewise, Plaintiffs fail to justify their unprecedented request that BLM separately analyze the "cumulative climate impacts of BLM's [entire] fossil fuel program for federal and tribal lands in combination with the [Revision Rule]").  Citizen Groups' Br. at 36 (ECF No. 109).  But BLM is not proposing sweeping changes to major components of its various minerals regulations that would tend to cumulatively influence the impact of the Revision Rule, and the "effects" of such programs are instead properly incorporated into the "affected environment" baseline of the Revision Rule EA. AR_310-11; Gov't Reply at 42-43.  Nothing requires BLM to perform an independent environmental analysis for all the decisions it makes under its various federal mineral programs every time it promulgates a regulation that insignificantly affects one of them.  API Br. at 20. Moreover, and as explained in the government's Reply, BLM employs a tiered decision-making process for mineral development that properly considers the potential for localized effects as such decisions are made (e.g., Resource Management Plan revisions, lease issuance, and approval of applications for permits to drill).  Gov't Reply at 39.

## CONCLUSION

For the reasons above, and in the other Defendants' briefs, the Court should uphold the Revision Rule and dismiss Plaintiffs' claims.

Respectfully submitted this 11th day of December, 2019.

    */s/ Peter J. Schaumberg*
Peter J. Schaumberg, admitted *pro hac vice*
James M. Auslander, admitted *pro hac vice*
John G. Cossa, admitted *pro hac vice*
BEVERIDGE & DIAMOND, P.C.
1350 I St., N.W., Suite 700
Washington, DC 20005
Telephone: (202) 789-6000
pschaumberg@bdlaw.com
jauslander@bdlaw.com
jcossa@bdlaw.com

16

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gary J. Smith (SBN 141393)
BEVERIDGE & DIAMOND, P.C.
456 Montgomery Street, Suite 1800
San Francisco, CA 94104-1251
Telephone: (415) 262-4000
Facsimile: (415) 262-4040
gsmith@bdlaw.com
*Attorneys for Intervenor-Defendant*
*American Petroleum Institute*

17

API Reply in Support of Cross-Motion for Summary Judgment
Case No. 4:18-cv-05712-YGR (Consolidated)